**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| Hardinge Inc., *et al.*,[1] | Case No. 24-11605 (___) |
| Debtors. | (Joint Administration Requested) |

**DEBTORS' MOTION FOR ENTRY OF INTERIM
AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS
TO OBTAIN POSTPETITION FINANCING PURSUANT TO SECTION
364 OF THE BANKRUPTCY CODE, (II) AUTHORIZING THE DEBTORS
TO USE CASH COLLATERAL PURSUANT TO SECTION 363 OF THE
BANKRUPTCY CODE, (III) GRANTING ADEQUATE PROTECTION TO THE
PREPETITION SECURED PARTIES PURSUANT TO SECTIONS 361,
362, 363 AND 364 OF THE BANKRUPTCY CODE, (IV) GRANTING LIENS AND
SUPERPRIORITY CLAIMS, (V) MODIFYING THE AUTOMATIC STAY,
(VI) SCHEDULING A FINAL HEARING, AND (VII) GRANTING RELATED RELIEF**

Hardinge Inc. and its affiliated debtors and debtors in possession (each, a "Debtor" and

collectively, the "Debtors")[2] in the above-captioned chapter 11 cases, by and through their

undersigned proposed counsel, hereby submit this motion (this "Motion") pursuant to sections

105, 361, 362, 363(b), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 364(e), 503, and 507 of title 11

of the United States Code (the "Bankruptcy Code"), Rules 2002, 4001, 6003, and 9014 of the

Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 4001-2 of the Local

Rules of Bankruptcy Practice and Procedure for the District of Delaware (the "Local Rules") for

entry of interim and final orders granting the relief requested below.  In support hereof, the Debtors

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number are:  Hardinge Ventures LLC (0586); Ohio Tool Works, LLC (7569); Kellenberger Swiss Grinding Machines, LLC (N/A); Hardinge Inc. (0200); Hardinge Technology Systems, Inc. (6427); Forkardt Inc. (4671); and Hardinge Grinding Group Inc. (6173).  The Debtors' service address is One Hardinge Drive, Elmira, NY 14902-1507.

[2]   Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them either later in this Motion, in the First Day Declaration, or the Interim Order, or the DIP Documents, as applicable, and each as defined herein.

rely on the (a) *Declaration of Adrian Frankum, Chief Restructuring Officer of the Debtors, in Support of Debtors' Chapter 11 Petitions and First Day Motions* (the "First Day Declaration") and (b) *Declaration of Adam Dunayer in Support of Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Financing Pursuant to Section 364 of the Bankruptcy Code, (II) Authorizing the Debtors to use Cash Collateral Pursuant to Section 363 of the Bankruptcy Code, (III) Granting Adequate Protection to the Prepetition Secured Parties Pursuant to Sections 361, 362, 363 and 364 of the Bankruptcy Code, (IV) Granting Liens and Superpriority Claims, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* (the "Dunayer Declaration"), both filed in connection herewith and incorporated herein for reference, and further represent as follows:

## PRELIMINARY STATEMENT

1.      As set forth in the First Day Declaration, the Debtors filed these chapter 11 cases to effectuate a sale of substantially all of their assets to maximize value for all stakeholders.  The Debtors began marketing the Company's (as defined herein) assets, in the form of a debt sale, prior to the filing of these chapter 11 cases.  The prepetition marketing process generated an actionable offer for the purchase of the Company's assets, subject to a bidding process to ensure that the Debtors receive the highest or otherwise best offer for those assets.  With the assistance of their advisors, the Debtors are actively working to finalize an asset purchase agreement for the proposed transaction in the very near-term.  Consistent with the milestones set forth herein, the Debtors anticipate filing a motion to approve the bidding process contemporaneously with the Motion.

2.      The DIP Facility is a priming, secured superpriority debtor-in-possession credit facility providing for new funds in the amount of $27,350,000 of which up to an aggregate principal amount of $14,000,000 would be made available upon entry of the Interim Order, unless and until the DIP Agent informs the Debtors that the most recent Approved Budget (defined below)

sets forth the use of proceeds of the USACH/Kellenberger Term Loans (as defined in the DIP Agreement) in a satisfactory manner, in which case up to an aggregate principal amount of $24,200,00 would be made available upon entry of the Interim Order (the "Interim Amount"). The Interim Amount is comprised of Initial Term Loans (as defined in the DIP Agreement (as defined herein)) and USACH/Kellenberger Term Loans. The Initial Term Loans will be available immediately upon entry of the Interim Order, subject to the terms of the DIP Agreement. The USACH/Kellenberger Term Loans are subject to satisfaction of certain conditions of the DIP Lenders as set forth in the DIP Documents, and will be disbursed to the Debtors and used to fund the "USACH" and "Kellenberger" business lines operated by Debtor Hardinge Grinding Group Inc. and non-debtor Hardinge Kellenberger AG.[3] Kellenberger is a key part of the Company's global business and provides inventory to the Debtors, which the Debtors distribute in the United States. While the DIP Lenders require additional diligence to approve disbursement of the USACH/Kellenberger Term Loans due to the timeline of these chapter 11 cases, the Debtors view the USACH/Kellenber Term Loans as critical to preserving the value of the Debtors' assets. These businesses have lacked necessary liquidity for several months and approval of the Interim Amount is necessary to prevent immediate and irreparable harm to the Debtors. It is critically important that the Debtors are sufficiently funded during the chapter 11 cases to restore the Debtors ability to obtain materials from suppliers to allow the Debtors to complete inventory and deliver products to customers, which will in turn enhance the value of the Debtors' assets. The DIP Facility, if approved, would allow the Debtors to secure postpetition financing and utilize Cash Collateral in conformance with the Bankruptcy Code, allowing the Debtors to continue operating and ensuring

---

[3]    As of the filing of this Motion, the DIP Lenders and the Debtors are continuing to negotiate the conditions precedent to disbursement of the USACH/Kellenberger Term Loans. The Debtors anticipate providing the Court and other parties in interest a revised version of the DIP Documents prior to the hearing regarding the Interim Order.

payments to employees, third-party vendors, utilities, taxing authorities, and insurance companies, as well as the timely payment of administrative expenses.  Moreover, as evidenced by the marketing process for the DIP Facility, the DIP Facility is the best financing available to the Debtors and no other funding is available on better or comparable terms.

3.    The sale process, the DIP Facility, and the consensual use of Cash Collateral provide the Debtors with a smooth landing into these chapter 11 cases and a viable path forward through the continuation of a sales process that will maximize the value of the Debtors' assets for the benefit of all creditors.  For these reasons, and for the reasons set forth herein, the Debtors respectfully request that the Court (as defined herein) grant the relief requested.

## JURISDICTION AND VENUE

4.    The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction to consider this Motion under 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware dated February 29, 2012.  Pursuant to Local Rule 9013-1(f), of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), the Debtors confirm their consent to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

5.    This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue of these Chapter 11 Cases and this Motion is proper in this district under 28 U.S.C. §§ 1408 and 1409.

6.    The statutory bases for the relief requested herein are sections 105, 361, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 364(e), 503, and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6003 and 9014, and Local Rule 4001-2.

4

## RELIEF REQUESTED

7.      The Debtors respectfully request entry of an interim order substantially in the form attached hereto as **Exhibit A** (the "<u>Interim Order</u>") and a final order (the "<u>Final Order</u>," and together with the Interim Order, the "<u>DIP Orders</u>"):

(a)     Authorizing Hardinge ("<u>Hardinge</u>" or "<u>Borrower</u>") and its affiliated Debtors to obtain secured postpetition financing on a superpriority basis (the "<u>DIP Facility</u>", and the loans provided to Hardinge thereunder, the "<u>DIP Loans</u>") pursuant to the terms and conditions of that certain Superpriority Secured Debtor-in-Possession Credit Agreement filed as **Exhibit B** hereto (as the same may be amended, supplemented, restated or otherwise modified from time to time, the "<u>DIP Agreement</u>"), by and among (i) the Borrower, (ii) the other Debtors, (iii) Centre Lane Solutions Partners, LP, as administrative agent (the "<u>DIP Agent</u>"), and (iv) the lenders from time to time party thereto (each, a "<u>DIP Lender</u>" and, collectively, the "<u>DIP Lenders</u>" and, collectively with the DIP Agent, the "<u>DIP Secured Parties</u>");

(b)     authorizing the Debtors to execute the DIP Agreement and the other documents, agreements and instruments delivered pursuant thereto or executed or filed in connection therewith, all as may be requested by the DIP Secured Parties (as the same may be amended, restated, supplemented or otherwise modified from time to time, and collectively with the DIP Agreement, the "<u>DIP Documents</u>");

(c)     authorizing the Debtors to consummate the transactions contemplated by the DIP Documents;

(d)     granting the DIP Secured Parties the DIP Liens on all of the DIP Collateral to secure the DIP Facility and all obligations owing and outstanding thereunder and under the DIP Documents, as applicable, and the Interim Order and any Final Order, as applicable (collectively, and including all "Obligations" as defined in the DIP Agreement, the "<u>DIP Obligations</u>"), subject only to the Carve-Out;

(e)     granting allowed superpriority administrative expense claims to the DIP Secured Parties in connection with the DIP Facility;

(f)     authorizing the Debtors to use Prepetition Collateral and Cash Collateral (together with the DIP Facility, the "<u>Postpetition Financing Arrangement</u>");

(g)     authorizing the Debtors to grant adequate protection to the Prepetition Lenders;

(h)     scheduling a hearing (the "<u>Final Hearing</u>"), pursuant to Bankruptcy Rule 4001(c)(2), to consider entry of the Final Order; and

(i)     granting such other and further relief as this Court deems necessary and just.

## BACKGROUND

### I.    CHAPTER 11 CASES

8.    On the date hereof (the "Petition Date"), each Debtor filed a voluntary petition for relief pursuant to chapter 11 of the Bankruptcy Code.  The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  Concurrently with the filing of this Motion, the Debtors have filed a motion requesting procedural consolidation and joint administration of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b).  No request for the appointment of a trustee or examiner has been made in these chapter 11 cases, and no official committee of unsecured creditors has been appointed.

9.    Hardinge Inc., together with the other Debtors and its non-debtor direct and indirect subsidiaries (the "Company"), is a global leader in the design, manufacture and distribution of precise, advanced metal-cutting machine tool solutions.  With locations spanning the globe, including the United States, England, France, Germany, Switzerland, China, and India, the Company is able to service customers worldwide.  Through the twelve brands operated under the Company's umbrella, including Kellenberger®, Hardinge®, Buck Chuck®, Forkardt® and Ohio Tool Works®, the Company engineers and supplies computer controlled metalcutting turning machines, grinding machines, machining centers, collets, chucks, index fixtures, repair parts for machines, and other industrial products.  The Company also provides post-sale support services and maintenance training, in-field maintenance, and in-field repair.

10.    Additional factual background regarding the Debtors, including their business operations, their corporate and capital structure, and the events leading to the filing of these chapter 11 cases, is set forth in detail in the First Day Declaration, filed concurrently herewith and incorporated herein by reference.

## II.    PREPETITION INDEBTEDNESS

11.    As of the Petition Date, the Debtors have approximately $106,660,241.92 of funded principal debt obligations, consisting of obligations under the Prepetition Credit Agreement (as defined below).

12.    On September 27, 2022, Debtor Hardinge Inc. (the "Borrower") entered into that certain Loan and Secured Agreement (as amended, restated, supplemented, amended and restated or otherwise modified from time to time prior to the Petition Date, the "Prepetition Credit Agreement," and together all other agreements, documents, notes, guarantees, subordination agreements, instruments, amendments, and any other agreements delivered pursuant thereto or in connection therewith, each as amended, restated, supplemented or otherwise modified from time to time, the "Prepetition Loan Documents"), among the Borrower, the other Debtors and other guarantors party thereto, and certain financial institutions parties as lenders (the "Prepetition Financial Institutional Lenders") and BMO Harris Bank N.A., as administrative agent  (in such capacities, the "Prepetition Agent").  On July 22, 2024, all of the Loans and Commitments (each as defined in the Prepetition Credit Agreement) of the Prepetition Financial Institutional Lenders were assigned to Centre Lane Partners V, L.P. (together with the Prepetition Financial Institution Lenders, the "Prepetition Lenders" and together with the Prepetition Agent, the "Prepetition Secured Parties").

13.    Each of the Borrower, Hardinge Holdings, LLC, Hardinge Grinding Group Inc., Hardinge Technology Systems, Inc., Hardinge Ventures LLC, Forkardt Inc., and Ohio Tool Works, LLC (collectively, the "Prepetition Obligors") and the Prepetition Agent are party to the Security Agreement, dated October 27, 2015 (as amended, restated, supplemented, amended and restated or otherwise modified from time to time prior to the Petition Date, the "Prepetition Security Agreement").  Pursuant to the Prepetition Security Agreement and the other Prepetition

7

Loan Documents, to secure the "Obligations" (as defined in the Prepetition Credit Agreement, the "Prepetition Obligations"), the Prepetition Obligors granted to the Prepetition Agent, for the benefit of the Prepetition Lenders, first priority liens upon and security interests in (the "Prepetition Liens") substantially all of the Prepetition Obligors' property and assets, and, in all instances, the proceeds and products thereof (as set forth more fully in the Prepetition Loan Documents, collectively, the "Prepetition Collateral"), each of the Debtors Prepetition U.S. Loan Parties has granted and pledged to the Prepetition Agent for the benefit of each Prepetition Secured Party, a security interest in substantially all of the assets of each of the Prepetition U.S. Loan Parties to secure the obligations under the Prepetition Credit Agreement.

14.     Following the July 22, 2024 sale by Prepetition Financial Institutional Lenders to Centre Lane Partners V, LP, referenced above, the Borrower entered into a second amendment to the Prepetition Credit Agreement, which provides for a new term loan to the Borrower in the aggregate principal amount of $2,930,515 and that all borrowings under the Prepetition Credit Agreement mature on July 31, 2024.

15.     As of the Petition Date, approximately $106,660,241.92 in aggregate principal amount and accrued but unpaid interest remains outstanding on the Prepetition Credit Agreement.

## RELIEF REQUESTED

## I.     THE DEBTORS' URGENT AND IMMEDIATE LIQUIDITY NEEDS

34.     The Debtors require immediate access to liquidity to ensure that they are able to continue operating during these chapter 11 cases and preserve the value of their estates for the benefit of all stakeholders.  *See* First Day Decl. ¶ 33.  Without prompt access to postpetition financing and to Cash Collateral, the Debtors will be unable to continue to pay vendors and administer these chapter 11 cases, causing immediate and irreparable harm to the value of the Debtors' estates, and any sale value, to the detriment of all stakeholders.  *See id.* ¶ 34.

35.    The Debtors, in consultation with Ankura Consulting Group, LLC ("Ankura"), to provide the Debtors with a Chief Restructuring Officer and additional necessary support personnel, reviewed and analyzed the Approved Budget outlining the Debtors' postpetition cash needs in the initial weeks of these cases.  The Debtors believe that the Approved Budget and their projections provide an accurate reflection of their funding requirements over the identified period, will allow them to meet their obligations—including the administrative expenses of the chapter 11 cases— and are reasonable and appropriate under the circumstances.  *See id.* ¶¶ 35, 37.

36.    The Debtors relied on these forecasts to determine the amount of postpetition financing required to administer these chapter 11 cases.  The DIP Facility is critical to the Debtors' ability to smoothly operate postpetition, including by providing sufficient liquidity to fund the administrative cost of these chapter 11 cases.   Thus, the Debtors believe that the DIP Facility and use of Cash Collateral will enable them to fund these payments and continue the sale process postpetition.  *See id.* ¶¶ 34, 37.

37.    With insufficient cash on hand, the Debtors require interim approval of the DIP Facility to obtain access to mission-critical financing.   Absent the immediate relief requested by this Motion, the Debtors face a material risk of substantial, irreparable, and ongoing harm.  *See id.* ¶ 34.

## II.    ALTERNATIVE SOURCES OF FINANCING ARE NOT AVAILABLE ON BETTER TERMS

### A.    THE MARKETING PROCESS

38.    The Debtors do not have alternative sources of financing on better or comparable terms readily available.  *See* Dunayer Decl. ¶ 10.  The Prepetition Secured Parties assert that they have liens on substantially all of the Prepetition Loan Parties' assets, which, along with the Debtors' precarious liquidity position, restricts the availability of, and options for, postpetition

financing.

39.     On May 24, 2024, the Debtors engaged Houlihan Lokey Capital, Inc. ("Houlihan") to assist them in evaluating strategic and financial alternatives to improve liquidity.  In addition to approaching the Prepetition Secured Parties, the Debtors, with the assistance of Houlihan, solicited indications of interest from third-party sources of asset-based financing (including specialty lenders and those that routinely provide debtor-in-possession financing), to gauge their interest in providing debtor-in-possession financing to the Debtors.  *See* Dunayer Decl. ¶ 12, 15.    None of the parties contacted indicated a willingness to provide DIP financing on an unsecured, junior-lien, or *pari passu* basis.  *See id.* ¶ 12–15.

40.     As part of the DIP Lenders' proposal, they agreed to provide the Debtors with sufficient postpetition liquidity if they were provided liens senior to the Prepetition Secured Parties.   The Prepetition Financial Institutional Lenders and the other alternative financing sources contacted were unwilling to provide financing on the same or better terms.    Accordingly, the Debtors determined that the DIP Facility was the best option, and the Debtors therefore focused their efforts on negotiating the terms of postpetition financing with the DIP Lenders.

41.     The terms of the DIP Facility and the DIP Orders provide the Debtors with access to the necessary liquidity to fund operations through these chapter 11 cases.  Based on the terms of the DIP Facility and the DIP Orders, the Debtors determined that entry into the DIP Loan Documents and agreement to the terms of the DIP Orders is reasonable, fair, and in the best interests of the Debtors and their estates.

## B.     THE DIP FACILITY HAS BEEN HEAVILY NEGOTIATED

42.     The Debtors' management team and legal and financial advisors were actively involved throughout the negotiations with the DIP Lenders for debtor in possession financing, which were conducted at arm's length and in good faith.  Dunayer Decl. ¶ 16.   The Debtors and

their advisors worked to negotiate the most favorable terms of the DIP Facility available to the Debtors given the Debtors' lack of alternative third-party financing and pressing liquidity needs. *Id*. Ultimately, the DIP Lenders were unwilling to lend on terms other than those specifically set forth in the DIP Documents. *Id*.

### A.    THE RATES AND FEES OF THE DIP FACILITY ARE REASONABLE

43.    Pursuant to the DIP Documents, the Debtors have agreed, subject to Court approval, to pay certain interest and fees to the DIP Agent and the DIP Lenders. Dunayer Decl. ¶ 23. Specifically, the Debtors have agreed to an interest rate of: (a) for the DIP Loans that are SOFR Loans, 5.50% per annum *plus* Adjusted Term SOFR applicable to such Interest Period, and (ii) Base Rate Loans, 5.50% per annum *plus* the applicable Base Rate from time to time in effect (together, the "Applicable Rate"). *Id*. Upon the occurrence and during the continuation of a DIP Facility Event of Default, interest would accrue at (i) in the case of principal on any loan, 2.00% plus the Applicable Rate; and (ii) in the case of any other amount, 2.00% plus the Applicable Rate for Base Rate Loans. *Id*. In addition, the Debtors have agreed to pay to the DIP Agent, for the benefit of the DIP Lenders, the: (i) DIP Origination Payment, equal to 3.00% of the aggregate amount of the Initial Term Loan Commitments and the Delayed Draw Term Loan Commitments, and (ii) DIP Origination Premium, to 3.00% of the aggregate amount of the Initial Term Loan Commitments and the Delayed Draw Term Loan Commitments (collectively, the "DIP Fees"). The DIP Fees are both fully earned and due upon the date on which the Interim Order is entered and are to be paid in kind.

44.    The Applicable Rate and the DIP Fees provided for in the DIP Facility are reasonable under the circumstances as compared to similar debtor in possession financings in the market as well as the attendant interest rates and fees in comparable debtor in possession financing facilities. *Id.* at ¶ 24. The Applicable Rate and DIP Fees are customary, usual, and in line with

11

debtor in possession financings of this kind.  *Id.*  The Debtors and their advisors considered the

Applicable Rate and the DIP Fees when determining whether the DIP Facility constituted the

best alternative reasonably available to the Debtors.  *Id.*  As a result, the Debtors' payment of the

Applicable Rate and DIP Fees in order to obtain the DIP Facility is in the best interests of the

estates.

45.     The Debtors and the DIP Lenders agree that the terms, covenants, interest rates,

and fees were subject to negotiation and are an integral component of the overall terms of the DIP

Facility.  *Id.* at ¶ 25.  Under the Debtors' circumstances, the interest rates and fees reflected in the

DIP Agreement are reasonable and constitute the best terms on which the Debtors could obtain the

financing necessary to maintain their ongoing business operations and fund their chapter 11 cases,

and are an integral component of the overall terms of the DIP Facility.  *Id.*

### B.    THE MILESTONES THAT THE DEBTORS MUST MEET UNDER THE TERMS OF THE DIP FACILITY ARE REASONABLE

46.     The DIP Facility contemplates, as a product of negotiation with and as required by

the DIP Lenders as a condition to providing the DIP Facility, certain milestones that the Debtors

must meet throughout their chapter 11 cases (the "Milestones"), the failure of which would

constitute a Termination Event.  These Milestones were heavily negotiated and required by the

DIP Lenders as conditions to providing the DIP Facility.  Dunayer Decl. ¶ 26.

47.     The DIP Facility serves as an important component of these chapter 11 cases

because it provides the Debtors with the stability and certainty that they need to smoothly land into

chapter 11 and continue to operate in the ordinary course of business, all while facilitating and

hopefully consummating a sale of their business as a going concern.  *Id.*  The continued and viable

operation of the Debtors' businesses would not be possible absent access to the DIP Facility.  *Id.*

The DIP Facility, and the Debtors' ability to achieve the Milestones contemplated therein, if

approved, would prevent interruptions to the Debtors' operations, preserve the Debtors' ability to maintain ordinary course relationships with, among other parties in interest, employees, customers, and vendors, satisfy working capital needs in the ordinary course, of the Debtors' businesses, and enable the Debtors to facilitate the sale process and consummate a sale transaction. *Id.*

## III.   MATERIAL TERMS OF THE DIP FACILITY[4]

48.   The following chart contains a summary of: (i) the material terms of the DIP Facility; and (ii) use of the Prepetition Secured Parties' Cash Collateral, each with references to the applicable sections of the relevant source documents, as required by Bankruptcy Rules 4001(b)(1)(B) and 4001(c)(1)(B), and Local Rule 4001-2.

| SUMMARY OF MATERIAL TERMS OF THE DIP CREDIT FACILITY | | |
|---|---|---|
| **Borrower** <br> Bankruptcy Rule 4001(c)(1)(B) | Hardinge Inc. | DIP Agmt. Preamble |
| **Guarantors** <br> Bankruptcy Rule 4001(c)(1)(B) | Each of the Debtors (other than the Borrower) and any non-Debtor affiliate that the DIP Agent shall request become a guarantor | Interim Order § D(ii)(a) |
| **Administrative Agent** <br> Bankruptcy Rule 4001(c)(1)(B) | Centre Lane Solutions Partners, LP | DIP Agmt. Preamble |
| **Lenders** <br> Bankruptcy Rule 4001(c)(1)(B) | Centre Lane Solutions Partners, LP | DIP Agmt. Preamble |
| **Commitment** <br> Bankruptcy Rule 4001(c)(1)(B) <br> Local Rule 4001-2(a)(ii) | (a) Each Lender with an Initial Term Loan Commitment (defined below) severally agrees to lend to the Borrower on the Closing Date, upon satisfaction of the conditions set forth in the DIP Agreement, a term loan in a principal amount not to exceed its pro rata share of $14,000,000 unless and until the DIP Lenders agree on a modified Approved Budget which includes funding the USACH/Kellenberger Term Loan Commitment, in which case the debtor-in-possession credit facility will | DIP Agmt. § 2.1, Sch. 1 |

---

[4]   The following summary of the DIP Facility is qualified in its entirety by reference to the applicable provisions of the relevant DIP Documents or the Interim Order, as applicable.  To the extent there are any inconsistencies between this summary and the provisions of the DIP Documents or the Interim Order, the provisions of the Interim Order or the DIP Documents, as applicable, shall control.  Any capitalized terms used but not otherwise defined in this summary shall have the respective meanings ascribed to such terms in the DIP Documents or the Interim Order, as applicable.  The Debtors reserve the right to supplement the statements made pursuant to Bankruptcy Rule 4001 and Local Rule 4001-2 herein.

| | | |
|---|---|---|
| | be in the amount of $24,200,000 (the commitment to make the Initial Term Loan hereunder, such Lender's "Initial Term Loan Commitment" (which, as of the Closing Date, shall be in the amount set forth adjacent such Lender's name under a heading of the same title on Schedule 1)). Amounts borrowed under subsection 2.1(a) are also referred to as the "Initial Term Loans." Amounts borrowed as Initial Term Loans Loan which are repaid or prepaid may not be reborrowed.<br><br>(b) Each Lender with a Delayed Draw Term Loan Commitment (defined below) severally agrees to lend to the Borrower, upon satisfaction of the conditions set forth in the DIP Agreement, a term loan in a principal amount equal to its share of such Lender's Delayed Draw Term Loan Commitment (the Commitment to make the Delayed Draw Term Loans hereunder, such Lender's "Delayed Draw Term Loan Commitment"; the Delayed Draw Term Loan Commitments, together with the Initial Term Loan Commitments, the "Commitments") (The Delayed Draw Term Loan Commitments, which as of the Closing Date, shall be in the amount set forth adjacent such Lender's name under a heading of the same title on Schedule 1)). Amounts borrowed under subsection 2.1(b) are also referred to as the "Delayed Draw Term Loans." Amounts borrowed as Delayed Draw Term Loans which are repaid or prepaid may not be reborrowed. | |
| **Maturity Date**<br>Bankruptcy Rule 4001(c)(1)(B)<br>Local Rule 4001-2(a)(i)(M) | All DIP Obligations will be due and payable in full in cash unless otherwise agreed to by the DIP Lenders on the earliest of (a) the Interim Facility Maturity Date (30 days from the Petition Date), (b) the Outside Date (90 days after the Petition Date), (c) the filing of a motion by the Loan Parties seeking dismissal of any of the Cases (without the prior consent of the Required DIP Lenders), the dismissal of any of the Cases, or the filing of a motion by the Loan Parties seeking to convert any of the Cases to a case under Chapter 7, (d) the substantial consummation (as defined in Section 1101 of the Bankruptcy Code, and which shall be no later than the "effective date") of a chapter 11 plan of any Loan Party, which has been confirmed by an order entered by the Bankruptcy Court in any of the Cases, (e) the acceleration of the Obligations and the termination of all Commitments hereunder upon the occurrence of an Event of Default in accordance with the Loan Documents and the DIP Orders, (f) the termination of the Stalking Horse APA for any reason without the prior written consent of the Required DIP Lenders other than a termination of the Stalking Horse APA as a result of a default by the Stalking Horse Purchaser or a termination for the Debtors to pursue approval of an Alternative Transaction that results in the payment in full of the Obligations at or prior to the maturity thereof as of the closing of such Alternative Transaction, (g) the entry of an order by the Court approving (A) a motion seeking | DIP Agmt. § 2.8; Interim Order § 8 |

| | | |
|---|---|---|
| | conversion or dismissal of any or all of the Cases or (B) a motion seeking the appointment or election of a trustee, a responsible officer or examiner with enlarged powers related to the operation of the Debtors' business, (viii) the date the Court orders the conversion of the bankruptcy case of any of the Debtors to a chapter 7 liquidation, and (ix) the dismissal of the bankruptcy case of any Debtor. | |
| **Use of Proceeds**<br>Bankruptcy Rule 4001(c)(1)(B)<br>Local Rule 4001-2(a)(i)(L) | The proceeds of the DIP Facility shall be used solely for the following purposes, subject in all cases to the Approved Budget:<br><br>(i)    pay certain costs, fees and expenses related to the DIP Credit Agreement and the Cases;<br><br>(ii)    fund the Carve-out;<br><br>(iii)    for working capital and general corporate purposes of the Borrower and its Subsidiaries, in each case in accordance with the Approved Budget, or in a manner constituting Permitted Variance.<br><br>Without limiting the foregoing, (x) no proceeds of any Loan shall be used to fund the Wind-Down Reserve and (y) the proceeds of the USACH/Kellenberger Term Loans shall be used solely to fund the USACH and Kellenberger Businesses in accordance with the Approved Budget.<br><br>No proceeds of the DIP Loans and none of the Obligations, the Cash Collateral, the Collateral or the Carve-Out will be used in connection with: (i) preventing, hindering, or delaying the DIP Secured Parties' enforcement or realization upon any of the Collateral; (ii) using or seeking to use cash collateral or selling or otherwise disposing of Collateral outside the ordinary course of business; (iii) outside the ordinary course of business, using or seeking to use any insurance proceeds constituting Collateral; (iv) incurring any indebtedness; (v) seeking to amend or modify any of the rights granted to the DIP Secured Parties under the Interim DIP Order or the Loan Documents; (vi) objecting to or challenging in any way the Liens, the Obligations, the Collateral (including Cash Collateral) or any other claims or liens, held by or on behalf of any of the DIP Secured Parties; (vii) asserting, commencing, or prosecuting any claims or causes of action whatsoever, including, without limitation, any actions under Chapter 5 of the Bankruptcy Code, applicable state law equivalents, any so-called "lender liability" claims and causes of action or other actions to recover or disgorge payments against the DIP Secured Parties, or any of their affiliates, successors and assigns and the partners, shareholders, controlling persons, directors, officers, employees, agents, attorneys, advisors, and professionals; (viii) litigating, objecting to, challenging, | DIP Agmt. § 5.4(b) |

| | | |
|---|---|---|
| | contesting in any manner, or raising any defenses to, the validity, extent, amount, perfection, priority, or enforceability of any of the Obligations, the Liens, or any other rights or interests of the DIP Secured Parties; or (ix) seeking to subordinate, recharacterize, disallow, or avoid the Obligations. | |
| **Interest Rate** Bankruptcy Rule 4001(c)(1)(B) Local Rule 4001-2(a)(i)(B) | **Interest Rate**: (i) for the DIP Loans that are SOFR Loans, 5.50% per annum *plus* Adjusted Term SOFR applicable to such Interest Period and (ii) Base Rate Loans, 5.50% per annum plus the applicable Base Rate from time to time in effect. **Default Interest Rate**: (i) in the case of principal on any loan, 2.00% plus the Applicable Rate; and (ii) in the case of any other amount, 2.00% plus the Applicable Rate for ABR loans plus the Applicable Rate for Base Rate Loans. | DIP Agmt. §§ 2.4, 2.10 |
| **Fees** Bankruptcy Rule 4001(c)(1)(B) Local Rule 4001-2(a)(i)(B) | **DIP Origination Payment** 3.00% of the Commitments **DIP Transaction Premium**: 3.00% of the Commitments | DIP Agmt. § 2.12 |
| **Priority, Collateral Under the DIP Facility** Bankruptcy Rule 4001(c)(1)(B)(i), 4001(c)(1)(B)(ii) | To secure the DIP Obligations, the DIP Secured Parties are hereby granted pursuant to and in accordance with Sections 364(c)(2), 364(c)(3), and 364(d) of the Bankruptcy Code, valid, enforceable and fully perfected liens (collectively, the "<u>DIP Liens</u>") on the DIP Collateral. "DIP Collateral" means, all of the property, assets or interests in property or assets of each Debtor, and all "property of the estate" (within the meaning of the Bankruptcy Code) of each Debtor, of any kind or nature whatsoever, real or personal, tangible or intangible or mixed, now existing or hereafter acquired or created, including, without limitation, all of each Debtor's now owned or hereafter acquired right, title, and interest in and to all cash, accounts, accounts receivable, goods, inventory, property, plant and equipment, commercial tort claims, intellectual property, contract rights, tax refunds, prepaid expenses, deposits, general intangibles, real estate, leaseholds, all proceeds or property recovered in connection with actions under chapter 5 of the Bankruptcy Code ("<u>Avoidance Actions</u>") (provided that the lien on Avoidance Actions and proceeds of Avoidance Actions shall be limited to the proceeds and property recovered in connection therewith and shall only attach hereunder to the extent approved in the Final Order), all intercompany claims, all claims, and causes of action of each Debtor or its respective estate (including, without limitation, all commercial tort claims of every kind and description, whether described in specificity in the DIP Documents or not) and any and all proceeds and property recovered therefrom, any and | DIP Agmt. § 2.15; Interim Order ¶ 12 |

| | | |
|---|---|---|
| | all proceeds arising from insurance policies, all intellectual property, and the equity interests of each direct subsidiary of each Debtor, which for the avoidance of doubt, shall include, without limiting the generality of the foregoing, all assets of each Debtor that constitute Prepetition Collateral, and all other property and assets including, without limitation, Cash Collateral, and all cash and non-cash proceeds, rents, products, substitutions, accessions, offspring and profits of any of the collateral described above. | |
| **Carve-Out** Bankruptcy Rule 4001(b)(1)(B)(iii) Local Rule 4001-2(a)(i)(F) | The Interim Order provides a "Carve-Out" of certain statutory fees, allowed professional fees of the Debtors, and any official committee of unsecured creditors appointed under section 1102 of the Bankruptcy Code, appointed in these Chapter 11 Cases pursuant to section 328 or 1103 of the Bankruptcy Code, including a Professional Fee Carve-Out and a Post-Trigger Carve-Out, all as defined and detailed in the Interim Order. | Interim Order § 17 |
| **Adequate Protection** Bankruptcy Rules 4001(b)(l)(B)(iv), 4001(c)(1)(B)(ii) | **Adequate Protection Liens**: To secure the Adequate Protection Superiority Claim, the Prepetition Agent, for itself and for the benefit of the Prepetition Lenders, is hereby granted (effective and perfected by operation of law immediately upon entry of this Interim Order and without the necessity of execution by the Debtors of mortgages, security agreements, pledge agreements, financing statements, account control agreements and other agreements, filings or instruments) valid, perfected, postpetition security interests and liens (the "Adequate Protection Liens") in and on all of the DIP Collateral, with a priority subject and subordinate only to (i) the DIP Liens, the DIP Superpriority Claim, (ii) the Senior Third-Party Liens, and (iii) the Carve-Out. The Adequate Protection Liens shall be pari passu with the Prepetition Liens.<br><br>**Adequate Protection Superpriority Claim**: As further adequate protection, the Prepetition Agent, for itself and for the benefit of the Prepetition Lenders, is hereby granted a superpriority claim to the extent of any Diminution, which claim shall, to the extent provided by the Bankruptcy Code, have priority over all other administrative expense claims and unsecured claims against the Debtors or their estates, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kind specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 503(a), 503(b), 506(c) (subject to entry of the Final Order), 507(a), 507(b), 546(c), 546(d), 552, 726, 1113, and 1114 and any other provision of the Bankruptcy Code (the "Adequate Protection Superpriority Claim"), provided however, such Adequate Protection Superpriority Claim shall (i) be subordinate and subject only to the DIP Superpriority Claim and the Carve-Out, and (ii) shall be entitled to all protections and benefits of Section 507(b) of the Bankruptcy Code. For the avoidance of doubt, the | Interim Order § 15 |

Adequate Protection Superpriority Claim shall not be payable from, pending entry of the Final Order, any proceeds or property recovered in connection with the pursuit of Avoidance Actions.

**Prepetition Lenders' Fees and Expenses**:

The Debtors shall pay the reasonable fees, charges, expenses (including attorneys' fees and other professional expenses) of the Prepetition Agent in connection with the Chapter 11 Cases and any Successor Case(s), including, without limitation, in connection with (i) the preparation and negotiation of the DIP Facility, DIP Loan Documents, this Interim Order and any Final Order, (ii) any amendment or waiver of any provision of this Interim Order and any Final Order, (iii) the administration of the Chapter 11 Cases and any Successor Case(s), and (iv) the enforcement or protection of the Prepetition Lenders' rights and remedies under the Prepetition Credit Agreement, this Interim Order, and any Final Order. The Debtors' obligations to make such payments shall include, in each instance, any of such fees, charges, expenses and other amounts which were incurred or accrued but unpaid as of the date hereof, including amounts incurred prior to the Petition Date, all of which shall be paid by the Debtors promptly upon entry of this Interim Order as adequate protection and as a condition to the effectiveness of the DIP Facility (the "Initial Reimbursement"). All such fees, costs and expenses shall be paid by the Debtors within ten (10) days after delivery of an invoice (redacted for privilege) to the Debtors and without the need for further application to or order of the Court. None of such fees, costs, and expenses shall be required to be recorded or maintained in any particular format and no recipient of any such payment shall be required to file any interim or final fee application with the Court. A copy of such invoice shall be provided by the Prepetition Lender to the U.S. Trustee, counsel for the DIP Agent and counsel for any Creditors' Committee at the same time as delivery to the Debtors. Notwithstanding the foregoing, if (x) the Debtors, the U.S. Trustee or any Creditors' Committee object to an invoice submitted by the Prepetition Lenders and (y) the parties cannot resolve such objection, in each case within the ten (10) day period following the Debtors' receipt of such invoice, the Debtors, the U.S. Trustee or such Creditors' Committee, as the case may be, shall file with the Court and serve on the Prepetition Lenders a fee objection (a "Prepetition Lenders Fee Objection"). The Debtors shall promptly pay or the DIP Lenders are hereby authorized to make an advance under the DIP Agreement to timely pay, any submitted invoice after the expiration of the ten (10) day period if no Prepetition Lenders Fee Objection has been filed with the Court and served on the DIP Agent in such ten (10) day period. If a Prepetition Lenders Fee Objection is

| | | |
|---|---|---|
| | timely filed and served, the Debtors shall promptly pay or the DIP Secured Parties are hereby authorized to make an advance under the DIP Agreement to timely pay, the undisputed amount of the invoice, and the Court shall have jurisdiction to determine the disputed portion of such invoice if the parties are unable to resolve the Prepetition Lenders Fee Objection.  In all events, the payments pursuant to this subsection (c) shall be subject to the rights reserved to third parties under paragraph 19. | |
| **Milestones**<br>Bankruptcy Rule 4001(c)(1)(B)(vi)<br>Local Rule 4001-2(a)(i)(H) | The Loan Parties shall, and shall cause their Subsidiaries to, achieve each of the following milestones (the "Milestones"):<br><br>(a)  On or before one (1) calendar day after the Petition Date, file the sale motion and bidding procedures for sale of all of the assets of the Debtors.<br><br>(b)  On or before the twenty-eighth (28th) calendar day after the Petition Date, the Bankruptcy Court shall have approved the Bidding Procedures Order and the Final DIP Order.<br><br>(c)  On or before the forty-second (42nd) calendar day after the Petition Date, the bid deadline under the bidding procedures established pursuant to the Bidding Procedures Order shall have occurred.<br><br>(d)  On or before the forty-third (43rd) calendar day after the Petition Date, the Auction shall have been held to the extent required under the Bidding Procedures Order.<br><br>(e)  On or before the forty-fifth (45th) calendar day after the Petition Date, the Bankruptcy Court shall have held the hearing to consider entry of the Sale Order.<br><br>(f)  On or before the forty-sixth (46th) calendar day after the Petition Date, the Bankruptcy Court shall have entered the Sale Order.<br><br>(g)  On or before the fiftieth (50th) calendar day after the Petition Date, the Debtors shall have consummated the 363 sale transaction. | DIP Agmt. § 6.16; Interim Order § 33 |
| **Loan Covenants**<br>Bankruptcy Rule 4001(c)(1)(B)<br>Local Rule 4001-2(a)(i)(B) | The DIP Documents contain affirmative covenants that are customary and appropriate for debtor in possession financings of this type, including, but not limited to: (i) maintenance of business; (ii) maintenance of properties; (iii) taxes and assessments; (iv) insurance; (v) financial and other reports; (vi) inspection; (vii) ERISA; (viii) compliance laws; (ix) compliance with anti-corruption laws, anti-money laundering laws and sanctions; (x) formation of subsidiaries; (xi) use of proceeds; (xii) guarantees and collateral; (xiii) certain post-closing matters;  (xiv)  people  with  significant | DIP Agmt. §§ 6, 7 |

| | | |
|---|---|---|
| | control regime; (xv) lenders meetings and conference calls; (xvi) milestones; and (xvii) bankruptcy matters.<br><br>The DIP Documents also contain negative covenants that are customary and appropriate for debtor in possession financings of this type, including, but not limited to: (i) borrowings and guaranties; (ii) liens; (iii) investments, acquisitions, loans and advances; (iv) mergers, consolidations and sales; (v) maintenance of subsidiaries; (vi) dividends and certain other restricted payments; (vii) burdensome contracts with affiliates; (viii) no changes in fiscal year; (ix) change in the nature of business; (x) no restrictions; (xi) subordinated debt; (xii) use of proceeds; (xiii) modifications to organizational documents; (xiv) no flowbacks in Switzerland; (xv) disbursements and DIP Budget variance; and (xvi) case matters. | |
| **Events of Default**<br>Bankruptcy Rule 4001(c)(1)(B)<br>Local Rule 4001-2(a)(i)(M) | Events of Default include:<br><br>(a) (i) Borrower shall fail to pay any principal of any Loan when and as the same shall become due and payable, whether at the due date thereof or at a date fixed for prepayment thereof or otherwise and (ii) Borrower shall fail to pay any interest on any Loan, or any fee or any other amount (other than an amount referred to in clause (i) of this Section 8.1(a)) payable under this Agreement or under any other Loan Document, when and as the same shall become due and payable, and such failure shall continue unremedied for a period of three or more Business Days; (b)  default in the observance or performance of any covenant, condition or agreement set forth in (i) <u>Section 6.5(a)</u> and <u>(b)</u>, or <u>Section 6.1</u>, <u>Section 6.4</u>, <u>Section 6.5</u>, <u>Section 6.6</u>, <u>Section 6.12</u>, <u>Section 6.13</u>, <u>Section 6.15</u>, <u>Section 6.16</u>, <u>Section 6.17</u>, or <u>Section 7</u>;<br><br>(c) default in the observance or performance of any other provision hereof or of any other Loan Document which is not remedied within 30 days after the earlier of (i) the date on which such failure shall first become known to any officer of Borrower or (ii) written notice thereof is given to Borrower by Administrative Agent;<br><br>(d) any representation or warranty made herein or in any other Loan Document or in any certificate furnished to Administrative Agent or the Lenders pursuant hereto or thereto or in connection with any transaction contemplated hereby or thereby proves untrue in any respect (or in any material respect if such representation, warranty, certification or statement is not by its terms already qualified as to materiality) as of the date of the issuance or making or deemed making thereof;<br><br>(e) (i) any event occurs or condition exists (other than those described in subsections (a) through (d) | DIP Agmt. § 8 |

above) which is specified as an event of default under this Agreement or any of the other Loan Documents and such event of default shall continue unremedied for a period of thirty (30) days after notice thereof from Administrative Agent to Borrower, (ii) any of the Collateral Documents shall for any reason fail to create a valid and perfected first priority Lien in favor of Administrative Agent in any material portion of the Collateral purported to be covered thereby except as expressly permitted by the terms thereof or (i) any Loan Party takes any action for the purpose of terminating, repudiating or rescinding any Loan Document executed by it or any of its obligations thereunder (other than in accordance with the terms of such Loan Document);

(f)     other than with respect to the Prepetition Obligations and Prepetition Loan Documents or any defaults caused by the filing of the Cases, any default shall occur under any Indebtedness for Borrowed Money issued, assumed or guaranteed by Borrower, any Subsidiary or any Guarantor aggregating in excess of $1,000,000, or under any indenture, agreement or other instrument under which the same may be issued, and in each case such default shall continue for a period of time sufficient to permit the acceleration of the maturity of any such Indebtedness for Borrowed Money (whether or not such maturity is in fact accelerated), or any such Indebtedness for Borrowed Money shall not be paid when due (whether by demand, lapse of time, acceleration or otherwise);

(g)     any final judgment or judgments for the payment of money, writ or writs or warrant or warrants of attachment, or any similar process or processes, shall be entered or filed against Borrower, any Subsidiary or any Guarantor, or against any of its Property, in an aggregate amount in excess of $2,000,000 (except to the extent fully covered by insurance pursuant to which the insurer has accepted liability therefor in writing), and which remains undischarged, unvacated, unbonded or unstayed for a period of 30 days;

(h)     (i) Borrower or any Subsidiary, or any member of its Controlled Group, shall fail to pay when due an amount or amounts aggregating in excess of $1,000,000 which it shall have become liable to pay to the PBGC or to a Plan under Title IV of ERISA; (ii) notice of intent to terminate a Plan or Plans having aggregate Unfunded Vested Liabilities in excess of $2,000,000 (collectively, a "Material Plan") shall be filed under Title IV of ERISA by Borrower or any Subsidiary, or any

other member of its Controlled Group, any plan administrator or any combination of the foregoing; (iii) the PBGC shall institute proceedings under Title IV of ERISA to terminate or to cause a trustee to be appointed to administer any Material Plan or a proceeding shall be instituted by a fiduciary of any Material Plan against Borrower or any Subsidiary, or any member of its Controlled Group, to enforce Section 515 or 4219(c)(5) of ERISA and such proceeding shall not have been dismissed within 30 days thereafter; or (iv) any failure, notice, event or condition similar to those set forth in the foregoing clauses (i) through (iii) above shall have occurred with respect to Foreign Plans which may, in each case, result in any material obligations in relation to a Foreign Plan; or

(i)    Any Change of Control shall occur; or

(j)    Any of the following shall have occurred in the Cases:

(i)    the bringing of a motion or application by any Debtor in the Cases, or the entry of any order by the Bankruptcy Court in the Cases: (A) to obtain additional post-petition financing under section 364(c) or (d) of the Bankruptcy Code that does not provide for the payment of all Obligations in full immediately upon the consummation of such financing; (B) to grant any Lien, other than Liens expressly permitted under this Agreement or the DIP Orders upon or affecting any Collateral; or (C) except as provided in this Agreement or the DIP Orders, to use cash collateral of Administrative Agent and the Lenders under section 363(c) of the Bankruptcy Code; or (ii)        filing of a plan of reorganization or liquidation by the Debtors that does not propose to indefeasibly repay the Obligations in full in cash, unless otherwise consented to by the Administrative Agent and the Required Lenders;

(ii)    the filing of any plan of reorganization or disclosure statement attendant thereto, or any amendment, modification or supplement to such plan or disclosure statement, by any Debtor, unless such plan or disclosure statement contains provision for the payment in full of the Obligations prior to the Maturity Date (an "Approved Plan"); or

(iii)    the termination or modification of any Debtor's exclusive right to file and solicit acceptances of a plan of reorganization; or

(iv)    the entry of an order in any of the Cases approving a disclosure statement in respect of a plan other than an Approved Plan, or the entry of an order

22

confirming a Reorganization Plan other than an Approved Plan; or

(v) entry of an order terminating exclusivity having been entered (or requested, unless actively contested by the Loan Parties); or

(vi) for such time as the Stalking Horse Purchaser remains the stalking horse purchaser in the 363 Sale Transaction process or either the winning or backup bidder following any Auction, any default or termination event under the Stalking Horse APA; or

(vii) the entry of an order in the Cases amending, supplementing, staying, vacating or otherwise modifying any Loan Document in a manner adverse to the interests of the Lenders; or

(viii) the payment of, or application by any Debtor for authority to pay, any prepetition claim other than amounts set forth in the Approved Budget; or

(ix) the entry of an order by the Bankruptcy Court appointing, or the filing of a motion or application by any Debtor for an order seeking the appointment of an interim or permanent trustee in the Cases or the appointment of a receiver or an examiner under section 1104 of the Bankruptcy Code in the Cases, with expanded powers (beyond those set forth in sections 1106(a)(3) and 1106(a)(4) of the Bankruptcy Code) to operate or manage the financial affairs, the business, or reorganization of the Borrower or with the power to conduct an investigation of (or compel discovery); or

(x) the sale of any of the Debtors' assets (other than pursuant to the Stalking Horse APA) either through a sale under section 363 of the Bankruptcy Code, through a Reorganization Plan confirmed by the Bankruptcy Court in the Cases, or otherwise, except to the extent that such sale results in the payment in full of the Obligations prior to the Maturity Date; or

(xi) the revocation, reversal, stay, vacation, supplementation or other modification to the Bidding Procedures Order, or any Debtor files a motion or application seeking the same, in each case without the prior written consent of the Required Lenders; or

(xii) the dismissal of any of the Cases, or if any Debtor files a motion or other pleading seeking the dismissal of the Cases; or

(xiii) the conversion of any of the Cases from one under Chapter 11 of the Bankruptcy Code to one under Chapter 7 of the Bankruptcy Code, or if any Debtor files a motion or other pleading seeking the

conversion of any of the Cases under section 1112 of the Bankruptcy Code or otherwise; or

(xiv) any Debtor files a motion or application seeking, or the entry of an order by the Bankruptcy Court, as applicable, granting relief from or modifying the automatic stay of section 362 of the Bankruptcy Code (x) to allow any creditor to execute upon or enforce a Lien on any Collateral not in accordance with the terms hereof with respect to Collateral having an aggregate value in excess of $100,000, or (y) with respect to any Lien of or the granting of any Lien on any Collateral to any state or local environmental or regulatory agency or authority having priority over the Liens in favor of Administrative Agent; or

(xv) any Debtor files a motion or application seeking to challenge, subordinate, disgorge, avoid or require repayment of, or the entry of an order in the Cases challenging, subordinating, disgorging, avoiding or requiring repayment of any portion of the payments made on account of the Obligations owing under this Agreement or the other Loan Documents; or

(xvi) the failure of any Debtor to perform any of its obligations under the DIP Orders or any violation of any of the terms of the DIP Orders, subject to any applicable grace or cure periods set forth therein; or

(xvii) the DIP Orders shall cease to create a valid and perfected Lien on the Collateral or to be in full force and effect; or

(xviii) any Debtor shall be enjoined from conducting any material portion of its business, any disruption of the material business operations of the Debtors shall occur, or any material damage to or loss of material assets of any Debtor shall occur; or

(xix) the challenge by any Debtor to the validity, extent, perfection or priority of any liens granted under or obligations arising under the Loan Documents; or

(xx) the remittance, use or application of proceeds of the DIP Loans, cash collateral or other cash or funds of any Debtor other than in accordance with this Agreement and the DIP Orders; or

(xxi) an order of the Bankruptcy Court shall be entered denying or terminating use of cash collateral by the Loan Parties; or

(xxii) any Debtor files a motion or application seeking, or the entry of an order in any of the Cases granting any other superpriority administrative claim or Lien equal or superior to that granted to

4893-5575-0612, v. 2

Administrative Agent, on behalf of itself and the Lenders, without the prior written consent of the Required Lenders (other than any such superpriority administrative claim or lien that is expressly permitted to have such priority hereunder); or

(xxiii) the filing of a motion or application by any Debtor requesting, or the entry of any order granting, any super-priority claim which is senior or pari passu with Administrative Agent's or the Lenders' claims under the Loan Documents not in accordance with the terms hereof; or

(xxiv) any (a) Debtor files a motion or application seeking, or the entry of an order precluding Administrative Agent (or its designee) from having the right to or being permitted to "credit bid" any amount of the Obligations with respect to the assets of the Debtors or (b) the Bankruptcy Court enters an order prohibiting, restricting, precluding, or otherwise impairing the unqualified right of Administrative Agent (or its designee) from having the right to or being permitted to "credit bit" any amount of the Obligations, with respect to the assets of the Debtors; or

(xxv) any attempt by any Debtor to reduce (other than a reduction in accordance with the terms of this Agreement), avoid, set off or subordinate the Obligations or the Liens securing the Obligations to any other debt, including, without limitation, the Prepetition Obligations; or

(xxvi) the revocation, reversal, stay, vacation, supplementation or other modification of the DIP Orders or any provision thereof; or

(xxvii) the payment of or granting adequate protection (except for the Adequate Protection Superpriority Claims) with respect to any Prepetition Obligations (other than with respect to payment permitted under the DIP Orders); or

(xxviii) the payment of any administrative expense claim of $50,000 or more, unless such claim is expressly set forth in the Approved Budget; or

(xxix) (A) any Debtor, holder of an equity interest in any Debtor or any Affiliate of any Debtor commences, or any Debtor supports any Person, in any proceeding challenging or seeking to challenge the validity and priority of the DIP Liens against Administrative Agent or the Lender or the Loan Documents, or the disallowance of the Obligations (or any of them), or (B) any material provision of the DIP Orders governing the use of Cash Collateral (as defined in the applicable DIP

| | | |
|---|---|---|
| | Order) shall, in each case, cease to be valid and binding unless, in any case under this clause (xxix), the Lenders shall have consented to the same; or | |
| | (xxx) if the confirmation order with respect to any Reorganization Plan is entered in form and substance which is not acceptable to the Required Lenders in respect of the treatment of the claims of Administrative Agent and the Lenders; or | |
| | (xxxi) any Debtor shall make any payment or grant any form of adequate protection with respect to Indebtedness existing prior to the Petition Date (other than, in each case, as permitted under this Agreement, the DIP Orders or an Approved Plan or relief sought in any "first day" motions filed on the Petition Date); or | |
| | (xxxii) an application or motion for any of the orders described in this Section 8.1(j) shall be made by a Person other than Administrative Agent or the Required Lenders and such application is not, to the extent requested by Administrative Agent or the Required Lenders, contested by the Borrower in good faith and the relief requested is granted in an order that is not stayed pending appeal; or | |
| | (xxxiii) the cessation of Liens or superpriority claims granted with respect to this Agreement to be valid, perfected and enforceable in all respects; or the Bankruptcy Court shall cease to have exclusive jurisdiction with respect to all matters relating to the exercise of rights and remedies under the Loan Documents, the DIP Orders, the Liens granted under the Collateral Documents and the Collateral; or | |
| | (xxxiv) the entry by the Bankruptcy Court of an interim DIP order other than the Interim DIP Order, or a Final DIP Order that is not acceptable to the Lenders in their sole discretion. | |
| **Conditions of Borrowing** Bankruptcy Rule 4001(c)(1)(B) Local Rule 4001-2(a)(i)(E) | The effectiveness of the DIP Facility shall be subject to certain customary closing conditions, including, without limitation, the satisfaction of the following conditions precedent (the "Conditions Precedent"): (a)  Loan Documents. Receipt by Administrative Agent of executed counterparts of this Agreement and the other Loan Documents, each properly executed by a Responsible Officer of the signing Loan Party and, in the case of this Agreement, by each Lender. (b)  Organizational Documents, Resolutions, Etc. Receipt by Administrative Agent of the following, in form and substance reasonably satisfactory to Administrative Agent and its legal | DIP Agmt. § 4.1 |

4893-5575-0612, v. 2

counsel:

(i)    copies of each Loan Party's articles of incorporation and bylaws (or comparable organizational documents) and any amendments thereto, and incumbency certificates of the duly authorized officers of such Loan Party, certified in each instance by its Secretary or Assistant Secretary or other duly authorized signatory or authority;

(ii)    such certificates of resolutions or other action, incumbency certificates and/or other certificates of Responsible Officers of each Loan Party as Administrative Agent may require evidencing the identity, authority and capacity of each Responsible Officer thereof authorized to act as a Responsible Officer in connection with this Agreement and the other Loan Documents to which such Loan Party is a party; and

(iii)    such documents and certifications as Administrative Agent may require to evidence that each Loan Party is duly organized or formed, and is validly existing, in good standing and qualified to engage in business in its state of organization or formation.

(c)    <u>Perfection and Priority of Liens</u>. Receipt by Administrative Agent of the following:

(i)    UCC financing statements for each appropriate jurisdiction as is necessary, in Administrative Agent's sole discretion, to perfect Administrative Agent's security interest in the Collateral;

(ii)    all certificates evidencing any certificated equity Interests pledged to Administrative Agent pursuant to the Collateral Documents, together with duly executed in blank and undated stock powers attached thereto; and

(iii)    duly executed notices of grant of security interest in the form required by the Collateral Documents as are necessary, in Administrative Agent's sole discretion, to perfect Administrative Agent's security interest in the intellectual property of the Loan Parties.

(d)    <u>Closing Certificate</u>. Receipt by Administrative Agent of a certificate signed by a Responsible Officer of the Borrower certifying that the conditions specified in <u>Sections 4.2(a)</u> and <u>(b)</u> have been satisfied.

(e)     <u>Attorney Costs</u>.  Borrower shall have paid all fees, charges and disbursements of counsel to Administrative Agent to the extent invoiced on or prior to the Closing Date, plus such additional amounts of such fees, charges and disbursements as shall constitute its reasonable estimate of such fees, charges and disbursements incurred or to be incurred by it through the closing proceedings (provided that such estimate shall not thereafter preclude a final settling of accounts between Borrower and Administrative Agent).  Such fees, charges and disbursements may be paid directly by Administrative Agent from the proceeds of the Initial Term Loans.

(f)     <u>Request for Credit Extension</u>.  Receipt by Administrative Agent of a Notice of Borrowing in accordance with the requirements hereof with respect to the Initial Term Loans.

(g)     <u>Due Diligence; PATRIOT ACT</u>.  Administrative Agent and the Lenders shall have received all documentation and other information required under applicable "know your customer" and anti-money laundering rules and regulations, including the PATRIOT Act, at least three Business Days prior to the requested Borrowing.

(h)     <u>Collateral Requirement</u>.  On or prior to the Closing Date, the U.S. Security Agreement and the Interim DIP Order (upon its entry in the Chapter 11 Case), shall be effective to create in favor of Administrative Agent, for the benefit of the holders of the Obligations, a legal, valid and enforceable: (i) first priority perfected security interests in and Liens on the Collateral, subject to the Carve-Out.

(i)     <u>Interim DIP Order</u>. Prior to the Closing Date, the Bankruptcy Court shall have entered the Interim DIP Order, which Interim DIP Order shall be in full force and effect and shall not have been reversed, vacated or stayed, and shall not have been amended, supplemented or otherwise modified without the prior consent of each Lender in its sole discretion.  If the Interim DIP Order is the subject of a pending appeal in any respect, neither the Interim DIP Order nor the making of the DIP Loans or the performance by any Loan Party of any of its obligations under any of the Loan Documents shall be the subject of a presently effective stay pending appeal.

(j)     <u>Budget</u>.  The Lenders shall have received and be reasonably satisfied with a detailed 13-week consolidated weekly budget (as updated with the

28

|  |  |  |
|---|---|---|
|  | approval of Administrative Agent from time to time pursuant to Section 6.5(d), the "Approved Budget") of projected receipts and expenditures of the Loan Parties for the period specified therein, delivered to Administrative Agent on or prior to the Closing Date, which shall set forth forecasted (A) cash receipts, (B) cash operating disbursements, (C) cash bankruptcy disbursements and (D) net cash flow. |  |
|  | (k) Chapter 11 Cases. Borrower and each of the other Debtors shall have commenced the Cases in the Bankruptcy Court. |  |
|  | (l) Outside Date. The Closing Date shall have occurred within one (1) Business Day after the Interim Order Entry Date. |  |
|  | (m) 363 Sale Transaction Motion. On or prior to the date that is one (1) Business Day after the Petition Date, Debtors shall have filed a motion, in form and substance satisfactory to the Administrative Agent in its sole discretion, seeking (a) the entry of the Bidding Procedures Order and (b) the entry of an order of the Bankruptcy Court, in form and substance satisfactory to the Administrative Agent in its sole discretion, expressly authorizing and approving the 363 Sale Transaction. |  |
|  | (n) Consent. The Lenders under (and as defined in) the Prepetition Loan Agreement shall have consented to the DIP Facility on the terms set forth herein and the Stalking Horse APA on the terms set forth herein, in a manner reasonably satisfactory to the Lenders. |  |
| **Costs and Expenses; Indemnification** Bankruptcy Rule 4001(c)(1)(B)(ix) | (a) In accordance with the applicable DIP Order, each Loan Party agrees to pay all reasonable and documented costs and expenses (including, without limitation, reasonable due diligence expenses, syndication expenses and travel expenses, reasonable and documented costs and expenses incurred in connection with the establishment and maintenance of an internet site to be used in the syndication of the DIP Loans, and fees, charges and disbursements of counsel subject to the limitations set forth in this sentence below) of Administrative Agent in connection with the preparation, negotiation, syndication, and administration of the Loan Documents, including the reasonable and documented fees and disbursements of counsel to Administrative Agent, in connection with the preparation and execution of the Loan Documents and in connection with the transactions contemplated hereby or thereby, and any amendment, waiver or consent related thereto, whether or not the transactions contemplated herein are consummated, together with | DIP Agmt. § 11.13 |

any reasonable and documented fees and charges suffered or incurred by Administrative Agent in connection with periodic environmental audits, fixed asset appraisals, title insurance policies, collateral filing fees and lien searches. Each Loan Party agrees, subject to the applicable DIP Orders, to pay to Administrative Agent and each Lender, and any other holder of any Obligations outstanding hereunder, all costs and expenses reasonably incurred or paid by Administrative Agent, such Lender, or any such holder, including reasonable and documented attorneys' fees and reasonable and documented disbursements and court costs, in connection with any Default or Event of Default hereunder or in connection with the enforcement of any of the Loan Documents (including all such costs and expenses incurred in connection with any proceeding under the United States Bankruptcy Code involving Borrower, any other Loan Party or any Guarantor as a debtor thereunder). Each Loan Party further agrees to indemnify Administrative Agent, each Lender, and any security trustee therefor, and their respective directors, officers, employees, agents, financial advisors, and consultants (each such Person being called an "Indemnitee") against all losses, claims, damages, penalties, judgments, liabilities and reasonable and documented expenses (including all reasonable and documented fees and disbursements of counsel for any such Indemnitee and all reasonable expenses of litigation or preparation therefor, whether or not the Indemnitee is a party thereto, or any settlement arrangement arising from or relating to any such litigation) which any of them may pay or incur arising out of or relating to any Loan Document or any of the transactions contemplated thereby or the direct or indirect application or proposed application of the proceeds of any Loan, other than those which directly result from (i) the gross negligence or willful misconduct of such Indemnitee or any of such Indemnitee's controlled or controlling affiliates, any of its or their respective officers, directors, employees, controlling persons, or members, or the respective representatives and agents of such Indemnitee (collectively, such Indemnitee's "Related Persons") (as determined by a court of competent jurisdiction by final and non-appealable judgment), (ii) a material breach by such Indemnitee or any of its Related Persons of its obligations under this Agreement (as determined by a court of competent jurisdiction by final and non-appealable judgment) or (iii) any dispute solely among Indemnitees (not arising as a result of any act or omission by you or any of your affiliates) other than claims against an Indemnitee in its capacity or as a result of fulfilling its role as an agent, bookrunner, arranger or any other similar role under this Agreement or the Obligations evidenced hereby. Each Loan Party, upon demand by Administrative Agent or a Lender at any

time, shall reimburse Administrative Agent or such Lender for any reasonable and documented legal or other expenses (including all reasonable and documented fees and disbursements of counsel for any such Person) incurred in connection with investigating or defending against any of the foregoing (including any settlement costs relating to the foregoing) except if the same is directly due to (i) the gross negligence or willful misconduct of such Person or any of such Person's Related Persons (as determined by a court of competent jurisdiction by final and non-appealable judgment), (ii) a material breach by such Person or any of its Related Persons of its obligations under this Agreement (as determined by a court of competent jurisdiction by final and non-appealable judgment) or (iii) any dispute solely among such Persons (not arising as a result of any act or omission by you or any of your affiliates) other than claims against such Person in its capacity or as a result of fulfilling its role as an agent, bookrunner, arranger or any other similar role under this Agreement or the Obligations evidenced hereby.  To the extent permitted by applicable Law, no Person party to this Agreement shall assert, and each such Person hereby waives, any claim against any Indemnitee, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement or the other Loan Documents or any agreement or instrument contemplated hereby or thereby, the transactions contemplated hereby or thereby, any Loan or the use of the proceeds thereof.  No party hereto shall be liable for any damages arising from the use by unintended recipients of any information or other materials distributed by it through telecommunications, electronic or other information transmission systems in connection with this Agreement or the other Loan Documents or the transactions contemplated hereby or thereby except to the extent resulting from the gross negligence or willful misconduct of such Person or any of its Related Persons or the material breach by such Person or any of its Related Persons of its obligations under this Agreement.

(b)  Each Loan Party unconditionally agrees to indemnify, defend and hold harmless, each Indemnitee for any damages, loss or reasonable and documented costs or expense, including response, remedial or removal costs and all fees and disbursements of counsel for any such Indemnitee, arising out of any of the following:  (i) any presence, release, threatened release or disposal of any hazardous or toxic substance or petroleum by any Loan Party or any Subsidiary or otherwise occurring on or with respect to its Property (whether owned or leased), (ii) the operation or violation of any Environmental Law, whether federal, state, or local, and any regulations promulgated thereunder, by

|  | any Loan Party or any Subsidiary or otherwise occurring on or with respect to its Property (whether owned or leased), (iii) any claim for personal injury or property damage in connection with any Loan Party or any Subsidiary or otherwise occurring on or with respect to its Property (whether owned or leased), and (iv) the inaccuracy or breach of any environmental representation, warranty or covenant by any Loan Party or any Subsidiary made herein or in any other Loan Document evidencing or securing any Obligations or setting forth terms and conditions applicable thereto or otherwise relating thereto, except for damages arising from the (i) the gross negligence or willful misconduct of such Person or any of such Person's Related Persons (as determined by a court of competent jurisdiction by final and non-appealable judgment), (ii) a material breach by such Person or any of its Related Persons of its obligations under this Agreement (as determined by a court of competent jurisdiction by final and non-appealable judgment) or (iii) any dispute solely among such Persons (not arising as a result of any act or omission by you or any of your affiliates) other than claims against such Person in its capacity or as a result of fulfilling its role as an agent, bookrunner, arranger or any other similar role under this Agreement or the Obligations evidenced hereby. |  |
|---|---|---|
| **Approved Budget**<br><br>Bankruptcy Rule 4001(c)(1)(B)<br>Local Rule 4001-2(a)(iii) | "Approved Budget" means a 13-week consolidated weekly budget (as updated with the approval of Administrative Agent from time to time pursuant to Section 6.5(d)) of projected receipts and expenditures of the Loan Parties for a period specified therein, delivered to Administrative Agent on or prior to the Closing Date, which shall set forth forecasted (A) cash receipts, (B) cash operating disbursements, (C) cash bankruptcy disbursements and (D) net cash flow. | DIP Agmt. § 4.1(j);<br>Interim Order ¶ 4 |
| **Variance Covenant**<br>Bankruptcy Rule 4001(c)(1)(B)<br>Local Rule 4001-2(a)(i) | Commencing after the first full calendar week following the Petition Date and for each calendar week thereafter, by no later than 12:00 p.m. New York City time on the Wednesday of such calendar week (each such Tuesday, a "Variance Report Date"), a variance report substantially in the form of Exhibit F (each, a "Variance Report") for the applicable Testing Period setting forth, in reasonable detail, any differences between (i) the aggregate cumulative actual cash receipts for such Testing Period on a line by line basis compared to the projected aggregate cumulative cash receipts on a line by line basis set forth in the Approved Budget for such Testing Period (any such difference, a "Receipts Variance") and (ii) the aggregate cumulative actual cash disbursements on a cumulative basis (including, for the avoidance of doubt, Professional Fees) for such Testing Period on a line by line basis compared to the projected aggregate cash disbursements on a line by line basis (including, for the avoidance of doubt, Professional Fees) set forth in the Approved Budget for such Testing Period (any such difference, a "Disbursements | DIP Agmt. § 6.5(a);<br>Interim Order ¶ 4(d) |

| | | |
|---|---|---|
| | Variance"), together with a statement from the Borrower's chief financial officer certifying the information contained in such Variance Report and compliance with Section 7.16 hereof. The Variance Report shall also provide a reasonably detailed explanation for any variance that exceed the Permitted Variances. The term "Testing Period" means, with respect to each Variance Report required to be delivered hereunder, the period from the Saturday immediately prior to the Petition Date and ending on the Friday prior to the applicable Variance Report Date. "Permitted Variance" means (a) a negative variance of up to 5% for aggregate cumulative actual cash receipts for such Testing Period compared to the projected cumulative cash receipts for the Debtors for such Testing Period as set forth in the Approved Budget and (b) a positive variance of up to 5% for aggregate cumulative actual cash disbursements on a line by line basis (including professional fees) of the Debtors for such Testing Period compared to the projected aggregate cash disbursements on a line by line basis (including professional fees) for such Testing Period as set forth in the Approved Budget. | |
| **Use of Cash Collateral; Entities with Interest in Cash Collateral** Bankruptcy Rule 4001(b)(l)(B)(i) | The Debtors are authorized to use Cash Collateral subject to and in accordance with the terms, conditions, and limitations set forth in the Interim Order, the Approved Budget and the DIP Documents, without further approval by the Court. | Interim Order ¶ 3 |
| **Liens on Avoidance Actions** Bankruptcy Rule 4001(c)(1)(b) Local Rule 4001(a)(i)(U) | Upon entry of the Final Order, the DIP Collateral shall include Avoidance Actions and proceeds of Avoidance Actions | Interim Order ¶ 12(a) |
| **Challenge Period** Bankruptcy Rule 4001(c)(1)(B), 4001(c)(1)(B)(viii) Local Rule 4001(a)(i)(Q) | The Debtors' stipulations made in the Interim Order are subject to the rights of parties to assert standing to bring a Challenge (as defined in the Interim Order) within seventy-five (75) days following the entry of the Interim Order. Failure of the creditors' committee or any other party in interest to file such a pleading with the Court shall forever bar such party from making such a Challenge. | Interim Order ¶ 19 |
| **Waivers/Modification of Automatic Stay** Bankruptcy Rule 4001(c)(1)(B)(iv) Local Rule 4001-2(a)(i)(S) | The automatic stay provisions of section 362 of the Bankruptcy Code are vacated and modified without the need for further Court order to permit the DIP Secured Parties, upon the occurrence and during the continuance of an Event of Default under the DIP Agreement or the Debtors' violation of any provision of this Interim Order, and without any interference from the Debtors or any other party in interest, to (i) (A) cease making DIP DIP Loans or suspend or terminate the commitments under the DIP Documents, and (B) declare all DIP Obligations immediately due and payable, and (ii) subject to five (5) business days' prior written notice (which may be delivered by electronic mail) (the "Remedies Notice Period") to the Debtors, their counsel, | DIP Agmt. § 8.2; Interim Order ¶ 21(b) |

| | counsel to any Creditors' Committee and the U.S. Trustee, to exercise all rights and remedies provided for in the DIP Documents, this Interim Order or under other applicable bankruptcy and non-bankruptcy law including, without limitation, the right to (A) take any actions reasonably calculated to preserve or safeguard the DIP Collateral or to prepare the DIP Collateral for sale; (B) foreclose or otherwise enforce the DIP Liens on any or all of the DIP Collateral; (C) set off any amounts held as Cash Collateral (including, without limitation, in any Cash Collateral account held for the benefit of the DIP Secured Parties); or (D) exercise any other default-related rights and remedies under the DIP Documents or this Interim Order or applicable law. The Remedies Notice Period shall run concurrently with any notice period provided for under the DIP Documents. | |
|---|---|---|
| **Section 506(c), 552(b) "Equities of the Case," and Marshalling Waivers** Bankruptcy Rule 4001(c)(1)(B)(x); Local Rule 4001-2(a)(i)(V)-(X) | The Interim Order provides, with respect to the Prepetition Secured Parties, the Final Order shall provide, for: (i) a waiver of the "equities of the case" exception to section 552(b) of the Bankruptcy Code, and (ii) a waiver of the ability to surcharge under section 506(c) of the Bankruptcy Code. With respect to the DIP Secured Parties, and after payment in full of the DIP Obligations, the Prepetition Secured Parties, the Final Order shall provide for a waiver of the equitable doctrine of "marshaling." | Interim Order ¶¶ 22, 23 |

52.     Each of the foregoing terms is justified because the Debtors need immediate access to financing and the use of Cash Collateral to continue in these chapter 11 cases and facilitate the sale process. The DIP Facility, which was negotiated in good faith and at arm's length, is the only viable proposal to provide critical liquidity.

## BASIS FOR RELIEF REQUESTED

## I.   ENTRY INTO THE DIP DOCUMENTS IS AN EXERCISE OF THE DEBTORS' SOUND BUSINESS JUDGEMENT

53.     The Court should authorize the Debtors, as an exercise of their sound business judgment, to enter into the DIP Documents, obtain access to the proceeds of the DIP Loans, and continue using the Cash Collateral. Section 364 of the Bankruptcy Code authorizes a debtor to obtain secured or superpriority financing under certain circumstances discussed in detail below. Courts grant debtors considerable deference in acting in accordance with their business judgment in obtaining postpetition secured credit, so long as the agreement to obtain such credit does not run

afoul of the provisions of, and policies underlying, the Bankruptcy Code.  *See, e.g.*, *In re Trans World Airlines, Inc.*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving a postpetition loan and receivables facility because such facility "reflect[ed] sound and prudent business judgment"); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[C]ases consistently reflect that the court's discretion under section 364 [of the Bankruptcy Code] is to be utilized on grounds that permit [a debtor's] reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest.").

54.    To determine whether the business judgment test is met, the Court need only "examine whether a reasonable business person would make a similar decision under similar circumstances."  *In re Dura Auto. Sys. Inc.*, No. 06-11202 (KJC), 2007 WL 7728109, at \*97 (Bankr. D. Del. Aug. 15, 2007) (citation omitted).  Bankruptcy courts generally will not second-guess a debtor's business decisions when those decisions involve "a business judgment made in good faith, upon a reasonable basis, and within the scope of [its] authority under the [Bankruptcy] Code."  *In re Curlew Valley Assoc.'s*, 14 B.R. 506, 513–14 (Bankr. D. Utah. Oct 8, 1981) (noting that courts should not second guess a debtor's business decision when that decision involves "a business judgment made in good faith, upon a reasonable basis, and within the scope of [the debtor's] authority under the [Bankruptcy] Code").

55.    In determining whether the Debtors have exercised sound business judgment in entering into the DIP Documents, the Court should consider the economic terms of the DIP Facility under the totality of circumstances.  *See* Hr'g Tr. at 734–35:24, *In re Lyondell Chem. Co.*, No. 09-10023 (Bankr. S.D.N.Y. Feb. 27, 2009) (recognizing that "the terms that are now available for DIP financing in the current economic environment aren't as desirable" as they once were previously,

referring to the period following the 2008 financial markets collapse); *In re Farmland Indus., Inc.*, 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003) (while many of the terms favored the DIP lenders, "taken in context, and considering the relative circumstances of the parties," the court found them to be reasonable).  Moreover, the Court may appropriately take into consideration non-economic benefits to the Debtors offered under the DIP Facility.  *See In re ION Media Networks, Inc.*, No. 09-13125 (JMP), 2009 WL 2902568, at *4 (Bankr. S.D.N.Y. July 6, 2009) (holding that "a business decision to obtain credit from a particular lender is almost never based purely on economic terms . . .  Relevant features of the financing must be evaluated, including non-economic elements such as the timing and certainty of closing, the impact on creditor constituencies and the likelihood of a successful reorganization . . . .").

56.     The Debtors' decision to enter into the DIP Facility is an exercise of their sound business judgment.  As further discussed in the Dunayer Declaration, the DIP Facility was a product of an arms'-length negotiation and a careful evaluation of alternatives.  Dunayer Decl. ¶ 16.  The Debtors ultimately decided that moving forward with the proposed DIP Facility was an appropriate step given that the DIP Facility:  (a) allows the Debtors to avoid a value-destructive priming fight; (b) provides a path forward in chapter 11 by allowing the Debtors to facilitate the sale process with a stalking horse bidder, subject to higher and better bids; and (c) allows the Debtors to operate in the ordinary course of business postpetition and fund the administration of the chapter 11 cases for the benefit of the estates and all of the Debtors' stakeholders.  First Day Decl. ¶¶ 34, 37; Dunayer Decl. ¶¶ 16–17.  The DIP Facility allows the Debtors to obtain necessary liquidity on market terms, without the risk of a priming fight, and fund the sale process with the benefit of a Stalking Horse Bid. Dunayer Decl. ¶ 27.  The Debtors and their advisors therefore determined that entry into the DIP Facility was the best path available and

they have obtained the best terms currently achievable under the circumstances.  Dunayer Decl.

¶ 25.

## II.  THE DEBTORS SHOULD BE AUTHORIZED TO GRANT LIENS AND SUPERPRIORITY CLAIMS

57.     The Debtors propose to obtain the DIP Facility by providing security interests and

liens as set forth in the DIP Documents and described above.   The Debtors satisfy the requirements

for relief under section 364 of the Bankruptcy Code, which authorizes a debtor to incur secured or

superpriority debt under certain circumstances.     Specifically, section 364(c) of the Bankruptcy

Code provides that:

> If the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt:
>
> (1)     with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title;
>
> (2)     secured by a lien on property of the estate that is not otherwise subject to a lien; or
>
> (3)     secured by a junior lien on property of the estate that is subject to a lien[.]

11 U.S.C. § 364(c).

58.     To satisfy the requirements of section 364(c) of the Bankruptcy Code, a debtor need

only demonstrate "by a good faith effort that credit was not available" to the debtor on an

unsecured or administrative expense basis.  *See In re Crouse Grp., Inc.*, 71 B.R. 544, 549 (Bankr.

E.D. Pa. 1987) (secured credit under section 364(c) of the Bankruptcy Code is authorized, after

notice and hearing, upon showing that unsecured credit cannot be obtained). "[Section 364(c)]

imposes no duty to seek credit from every possible lender before concluding that such credit is

unavailable."  *Bray v. Shenandoah Fed. Savs. & Loan Ass'n* (*In re Snowshoe Co.*), 789 F.2d 1085,

1088 (4th Cir. 1986); *see also Pearl-Phil GMT (Far East) Ltd. v. Caldor Corp.*, 266 B.R. 575, 584

(S.D.N.Y. 2001) (superpriority administrative expenses authorized where debtor could not obtain

credit as an administrative expense).

59.    When few (or no) lenders are likely to be able or willing to extend the necessary

credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such

an exhaustive search for financing." *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga.

1988), *aff'd sub nom.*, *Anchor Savs. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n. 4 (N.D. Ga.

1989); *see also In re Snowshoe Co.*, 789 F.2d 1085, 1088 (4th Cir. 1986) (demonstrating that credit

was unavailable absent the senior lien by establishment of unsuccessful contact with other financial

institutions in the geographic area); *In re Stanley Hotel, Inc.*, 15 B.R. 660, 663 (D. Colo. 1981)

(bankruptcy court's finding that two national banks refused to grant unsecured loans was sufficient

to support conclusion that section 364 requirement was met); *In re Ames Dep't Stores*, 115 B.R. at

40 (approving financing facility and holding that debtor made reasonable efforts to satisfy

standards of section 364(c) where it approached four lending institutions, was rejected by two, and

selected most favorable of two offers it received).

60.    Courts have articulated a three-part test to determine whether a debtor is entitled to

financing under section 364(c) of the Bankruptcy Code.  Specifically, courts look to whether:

    a.    the debtor is unable to obtain unsecured credit under section
              364(b) of the Bankruptcy Code, *i.e.*, by allowing a lender only
              an administrative claim;

    b.    the credit transaction is necessary to preserve the assets of the
              estate; and

    c.    the terms of the transaction are fair, reasonable, and adequate,
              given the circumstances of the debtor-borrower and proposed
              lenders.

*In re L.A. Dodgers LLC*, 457 B.R. at 312; *In re Aqua Assocs.*, 123 B.R. 192, 195–96 (Bankr. E.D.

Pa. 1991); *In re St. Mary Hosp.*, 86 B.R. 393,  401–02 (Bankr. E.D. Pa. 1988).  Furthermore, in

the event that a debtor is unable to obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code, section 364(c) of the Bankruptcy Code provides that a court "may authorize the obtaining of credit or the incurring of debt (1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of [the Bankruptcy Code]; (2) secured by a lien on property of the estate that is not otherwise subject to a lien; or (3) secured by a junior lien on property of the estate that is subject to a lien." 11 U.S.C. § 364(c).

61.    As described above, the Debtors are in need of an immediate infusion of liquidity to ensure sufficient working capital to operate their businesses and administer their estates. *See* Dunayer Decl. ¶ 19.  From the outset, several factors made clear that the required new money infusion in the form of debtor in possession financing would be highly likely to originate from a member of the Debtors' capital structure.  First, substantially all of the Debtors' assets were encumbered under the Prepetition Secured Documents, which restricted the availability of, and the Debtors' options for, securing additional financing absent lender consent or a bankruptcy.  Second, third-party unsecured financing was not a viable option due to the amount of existing secured debt relative to the Debtors' financial position.  Third, the Prepetition Financial Institutional Lenders would not consent to "priming" debtor in possession financing, either provided by a third-party or from an existing member of the Debtors' capital structure, and the absence of a sufficient equity cushion made it unlikely that priming debtor in possession financing could be obtained over the objection of the Prepetition Financial Institutional Lenders and the Debtors precarious liquidity position made the prospect of a priming fight risky at best.  Dunayer Decl. at ¶11.  Accordingly, the only available avenue for obtaining workable financing was with the Prepetition Lenders. *Id*. at ¶13.

4893-5575-0612, v. 2

62.     As discussed above and as set forth in the Dunayer Declaration, Houlihan solicited potential alternative debtor in possession financing from a handful of well-known third-party DIP financing parties to develop viable alternatives to the financing proposed by the DIP Lenders. Dunayer Decl. ¶ 13–15.  However, those efforts resulted in the Debtors receiving no viable or actionable financing alternative, and as a result, no better financing is available.  *Id*.

63.     Further, section 364(d) of the Bankruptcy Code provides that a debtor may obtain credit secured by a senior or equal lien on property of the estate already subject to a lien, after notice and a hearing, when the debtor is "unable to obtain such credit otherwise" and "there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted." 11 U.S.C. § 364(d)(1).  Consent by the secured creditors to liens priming their interests in collateral obviates the need to show adequate protection. *See Anchor Savs. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 122 (N.D. Ga. 1989) ("[B]y tacitly consenting to the superpriority lien, those [undersecured] creditors relieved the debtor of having to demonstrate that they were adequately protected.").  Accordingly, the Debtors may incur "priming" liens under the DIP Agreement if either (a) the Prepetition Secured Parties support the priming or (b) the Prepetition Secured Parties' interests in collateral are adequately protected.

64.     Here, the Prepetition Secured Parties support priming their own prepetition liens in connection with the DIP Facility.  Further, the Debtors do not believe any alternative financing is available on equal or better terms from the DIP Lenders.  Dunayer Decl. at ¶ 19.  Therefore, the Debtors submit that the requirement of section 364 of the Bankruptcy Code that alternative credit on more favorable terms be unavailable to the Debtors is satisfied.

65.     Finally, as evidenced by the First Day Declaration, the incremental liquidity provided under the DIP Agreement is needed to ensure adequate working capital and funding for

other administrative expenses associated with these chapter 11 cases.  First Day Decl. ¶ 34.  The

Debtors, with the assistance of Ankura, Houlihan, and their other professionals, engaged in

extensive, good-faith and arm's-length negotiation with the DIP Lenders over the terms of the DIP

Agreement.  Those negotiations resulted in fair and reasonable terms that are consistent with or

better than terms generally available in the market for debtor in possession financing.

## III.    THE DEBTORS SHOULD BE AUTHORIZED TO USE CASH COLLATERAL

66.    Section 363(c) of the Bankruptcy Code governs a debtor's use of a secured

creditor's cash collateral.  Section 363(c) provides, in pertinent part, that:

> The trustee may not use, sell, or lease cash collateral . . . unless—
>
> (A) each entity that has an interest in such cash collateral consents; or
>
> (B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section [363].

11 U.S.C. § 363(c)(2).

67.    Here, the use of Cash Collateral is consensual.  The Prepetition Secured Parties are

deemed to consent to the Debtors' use of the Cash Collateral by virtue of the Prepetition Lenders

expressly consenting to the use of Cash Collateral.

68.    Parties with an interest in cash collateral are entitled to adequate protection under

section 363(e) of the Bankruptcy Code.  11 U.S.C. § 363(e).  Further, section 362(d)(1) of the

Bankruptcy Code provides for adequate protection of interests in property due to the imposition

of the automatic stay.  *In re Cont'l Airlines*, 91 F.3d 553, 556 (3d Cir. 1996) (en banc).  While

section 361 of the Bankruptcy Code provides examples of forms of adequate protection, such as

granting replacement liens and administrative claims, courts decide what constitutes sufficient

adequate protection on a case-by-case basis.  *In re Swedeland Dev. Grp., Inc.*, 16 F.3d 552, 564

(3d Cir. 1994); *In re Satcon Tech. Corp.*, No. 12-12869 (KG), 2012 WL 6091160, at *6 (Bankr.

D. Del. Dec. 7, 2012); *In re Columbia Gas Sys., Inc.*, Nos. 91-803, 91-804, 1992 WL 79323, at *2

(Bankr. D. Del. Feb. 18, 1992); *see also In re Dynaco Corp.*, 162 B.R. 389, 394 (Bankr. D.N.H.

1993) (citing 2 Collier on Bankruptcy ¶ 361.01[1] at 361–66 (15th ed. 1993) (explaining that

adequate protection can take many forms and "must be determined based upon equitable

considerations arising from the particular facts of each proceeding")).

69.     As noted above, the Prepetition Secured Parties have or are deemed to have

consented to the use of Cash Collateral, and the Debtors propose providing the Prepetition Secured

Parties with adequate protection that is fair and reasonable and adequately protects against the

diminution in value of their interest in the Prepetition Collateral.  Specifically, the Prepetition

Secured Parties are entitled to, among other things, (i) adequate protection liens (subject to the

Carve-Out and the priorities set out in the Interim Order); (ii) allowed adequate protection

superpriority claims under sections 507(b) of the Bankruptcy Code (subject to the Carve-Out and

the priorities set out in the Interim Order); and (iii) adequate protection payments of the reasonable

and documented fees, costs, and expenses of counsel and financial advisors for the Prepetition

Agent (the "Prepetition Adequate Protection").

70.     The adequate protection obligations above are sufficient to protect the Prepetition

Secured Parties from any potential diminution in value of their Prepetition Collateral, including

the Cash Collateral.  In light of the foregoing, the Debtors submit, and the Prepetition Secured

Parties agree, that the proposed adequate protection to be provided is appropriate.

## IV.    THE DEBTORS SHOULD BE AUTHORIZED TO PAY THE FEES DUE UNDER THE DIP DOCUMENTS

71.     The Debtors have agreed, subject to Court approval, to pay certain fees [(including

the DIP Origination Payment and the DIP Origination Premium) to the DIP Agent for the benefit

of the DIP Lenders for providing the DIP Facility.  As set forth in the Dunayer Declaration, the

terms of the DIP Documents, including the fees imposed thereunder, constitute the best terms on which the Debtors could obtain the financing necessary to maintain their ongoing business operations and fund their chapter 11 cases and are an integral component of the overall terms of the DIP Facility.  Dunayer Decl. ¶¶ 25.  Moreover, the fees are customary and usual and in line with debtor in possession financings of this kind.  *Id.* at ¶ 24.  The Debtors considered the fees when determining in their sound business judgment whether the DIP Facility constituted the best alternative reasonably available to the Debtors.  The Debtors believe paying these fees in order to obtain the DIP Facility is in the best interests of the Debtors' estates.  *Id*.  Accordingly, the Court should authorize the Debtors to pay the fees.

## V.    THE DIP LENDERS SHOULD BE DEEMED GOOD FAITH LENDERS

72.    Section 364(e) of the Bankruptcy Code protects a good faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal. Section 364(e) of the Bankruptcy Code provides that:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

11 U.S.C. § 364(e).

73.    Here, the Debtors believe the DIP Facility embodies the most favorable terms on which the Debtors could obtain postpetition financing.  As further described in the Dunayer Declaration, negotiations of the terms of the DIP Agreement with the DIP Lenders were conducted in good faith and at arms' length.    Dunayer Decl. ¶ 16.  The terms and conditions of the DIP Documents are fair and reasonable, and the proceeds of the DIP Facility will be used only for

4893-5575-0612, v. 2

purposes that are permissible under the Bankruptcy Code, and in accordance with the DIP Orders and the DIP Documents, including, for the avoidance of doubt, the Approved Budget (subject to any Permitted Variances). Further, no consideration is being provided to any party to the DIP Documents other than as described herein and in the Dunayer Declaration. Accordingly, the Court should find that the DIP Lenders are "good faith" lenders within the meaning of section 364(e) of the Bankruptcy Code, and are entitled to all of the protections afforded by that section.

## VI.    MODIFICATION OF THE AUTOMATIC STAY IS WARRANTED

74.    The relief requested herein contemplates a modification of the automatic stay to permit the Debtors and the DIP Secured Parties, as applicable, to, among other things: (i) grant the security interests, liens, and superpriority claims described above and to perform such acts as may be requested to assure the perfection and priority of such security interests and liens; (ii) upon the occurrence of a DIP Event of Default, subject to any applicable notice periods set forth in the DIP Orders, exercise any remedies available to them; and (iii) implement the terms of the proposed DIP Orders, including payment of all amounts referred to in the DIP Documents.

75.    Stay modifications of this kind are ordinary and standard features of debtor in possession financing arrangements and, in the Debtors' business judgment, are reasonable and fair under the circumstances of the Chapter 11 Cases. *See, e.g.*, *In re Never Slip Holdings, Inc.*, No. 24-10663 (LSS) (Bankr. D. Del. Apr. 26, 2024); *In re iMedia Brands, Inc.*, No. 23-10852 (KBO) (Bankr. D. Del. July 6, 2023); *In re OSG Group Holdings, Inc.*, No. 22-10718 (JTD) (Bankr. D. Del. Aug. 9, 2022); *In re RentPath Holdings, Inc.,* No. 20-10312 (BLS) (Bankr. D. Del. Mar. 10, 2020); *In re Blackhawk Mining LLC,* No. 19-11595 (LSS); (Bankr. D. Del. Aug. 13, 2019); *In re Z Gallerie, LLC*, No. 19-10488 (LSS) (Bankr. D. Del. Apr. 9, 2019); *In re Checkout Holding Corp.*, No. 18-12794 (KG) (Bankr. D. Del. January 17, 2019).

## REQUEST FOR A FINAL HEARING

76.    Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors request the

Court set a date for the final hearing that is as soon as practicable, and in no event more than 28

days after the Petition Date in accordance with the Milestones, and fix the time and date prior to

the final hearing for parties to file objections to this Motion.

## IMMEDIATE AND UNSTAYED RELIEF IS NECESSARY

77.    The Court may grant the relief requested in this Motion immediately if the "relief

is necessary to avoid immediate and irreparable harm."  Bankruptcy Rule 6003; *In re First NLC*

*Fin. Servs., LLC*, 382 B.R. 547, 549 (Bankr. S.D. Fla. 2008).  The Third Circuit Court of Appeals

has interpreted the language "immediate and irreparable harm" in the context of preliminary

injunctions.  In that context, the Third Circuit has instructed that irreparable harm is that which

"cannot be redressed by a legal or an equitable remedy following a trial."  *Instant Air Freight Co.*

*v. C.F. Air Freight, Inc.*, 882 F.2d 797, 801 (3d Cir. 1989).  As explained above and in the Dunayer

Declaration, access to the DIP Facility and the use of Cash Collateral, in the interim amounts

proposed, are essential and the relief requested is narrowly tailored to only the relief that is

necessary to prevent immediate and irreparable damage to the Debtors' operations, and therefore,

Bankruptcy Rule 6003 is satisfied.

## BANRUPTCY RULE 6004(a) AND (h) WAIVERS ARE APPROPRIATE

78.    To implement the foregoing successfully, the Debtors request that the Court find that

notice of the Motion is adequate under Bankruptcy Rule 6004(a) under the circumstances, and

waive the fourteen (14)-day stay of an order authorizing the use, sale, or lease of property under

Bankruptcy Rule 6004(h).  As explained above and in the Dunayer Declaration, the relief requested

herein is necessary to avoid immediate and irreparable harm to the Debtors.  Accordingly, ample

cause exists to justify finding that the notice requirements under Bankruptcy Rule 6004(a) have

been satisfied and to grant a waiver of the fourteen (14) day stay imposed by Bankruptcy Rule 6004(h), to the extent such notice requirements and such stay apply.

## RESERVATION OF RIGHTS

79.     Except as otherwise provided in the DIP Orders, nothing contained herein is intended or shall be construed as:  (i) an admission as to the validity of any claim against the Debtors; (ii) a waiver of the Debtors' or any appropriate party in interest's rights to dispute the amount of, basis for, or validity of any claim against the Debtors; (iii) a waiver of any claims or causes of action that may exist against any creditor or interest holder; or (iv) an approval, assumption, adoption, or rejection of any agreement, contract, lease, program, or policy between the Debtors and any third-party under section 365 of the Bankruptcy Code.

## NOTICE

80.     The Debtors will provide notice of this Motion to:  (a) the United States Trustee for the District of Delaware, 844 N. King Street, Room 2207, Wilmington, Delaware, 19801 (Attn: Linda Casey (Linda.Casey@usdoj.com); (b) the United States Attorney's Office for the District of Delaware; (c) the state attorneys general for all states in which the Debtors conduct business; (d) the Internal Revenue Service; (e) the United States Securities and Exchange Commission; (f) the holders of the thirty (30) largest unsecured claims against the Debtors on a consolidated basis; (g) counsel to BMO Harris Bank N.A., as administrative agent, under the Debtors' Prepetition Credit Agreement, Chapman and Cutler LLP, 320 S. Canal Street, Chicago, IL 60606 (Attn: David T. Audley, email: audley@chapman.com); (h) counsel to DIP Agent, DIP Lenders and Prepetition Lenders, (i) Jones Day, 250 Vesey Street, New York, NY 10281 (Attn: Thomas M. Wearsch and Genna Ghaul; emails: twearsch@jonesday.com and gghaul@jonesday.com), Jones Day, 100 High Street, Boston, MA 02110 (Attn: John D. Casais; email: jcasais@jonesday.com), and (ii) Delaware counsel to the DIP Agent, DIP Lenders and

Prepetition Lenders, Richards, Layton & Finger, P.A., 920 N. King Street, Wilmington, DE 19801 (Attn: Mark D. Collins and Zachary I. Shapiro; emails: collins@rlf.com and shapiro@rlf.com); (i) the banks and financial institutions where the Debtors maintain accounts; (j) any and all known parties that may be asserting a lien against the DIP Collateral; and (j) any party that has requested notice pursuant to Local Rule 9013-1(m).  The Debtors respectfully submit that, in light of the nature of the relief requested, no further notice is necessary.

[*Remainder of Page Intentionally Left Blank*]

# CONCLUSION

WHEREFORE, the Debtors respectfully request that the Court enter the Interim Order, substantially in the form annexed hereto as **Exhibit A**, and the Final Order, granting the relief requested herein and such other and further relief as the Court deems appropriate under the circumstances.

Dated:  July 29, 2024
       Wilmington, Delaware

**CHIPMAN BROWN CICERO & COLE, LLP**

*/s/ Mark L. Desgrosseilliers*
Robert A. Weber (I.D. No. 4013)
Mark L. Desgrosseilliers (No. 4083)
Hercules Plaza
1313 North Market Street, Suite 5400
Wilmington, Delaware 19801
Telephone: (302) 295-0192
E-mail: weber@chipmanbrown.com
       desgross@chipmanbrown.com

-and-

**ROPES & GRAY LLP**
Gregg M. Galardi (No. 2991)
Lindsay C. Barca (*pro hac vice* pending)
1211 Avenue of the Americas
New York, New York 10036
Telephone: (212) 596-9000
Facsimile: (212) 596-9090
E-mail: gregg.galardi@ropesgray.com
       lindsay.barca@ropesgray.com

*Proposed Counsel to the Debtors and Debtors in Possession*

**<u>EXHIBIT A</u>**

**Interim Order**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| | ) |
| In re: | ) Chapter 11 |
| | ) |
| Hardinge Inc., *et al.*,[1] | ) Case No. 24-24-11605 (___) |
| | ) |
| Debtors. | ) (Joint Administration Requested) |
| | ) |
| | ) |

**INTERIM ORDER *(*I) AUTHORIZING THE DEBTORS TO OBTAIN POSTPETITION
FINANCING PURSUANT TO SECTION 364 OF THE BANKRUPTCY CODE,
(II) AUTHORIZING THE DEBTORS TO USE CASH COLLATERAL PURSUANT TO
SECTION 363 OF THE BANKRUPTCY CODE, (III) GRANTING ADEQUATE
PROTECTION TO THE PREPETITION SECURED PARTIES PURSUANT TO
SECTIONS 361, 362, 363 AND 364 OF THE BANKRUPTCY CODE, (IV) GRANTING
LIENS AND SUPERPRIORITY CLAIMS, (V) MODIFYING THE AUTOMATIC STAY,
(VI) SCHEDULING A FINAL HEARING, AND (VII) GRANTING RELATED RELIEF**

This matter coming before the Court on the *Debtors' Motion for Entry of Interim
and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Financing Pursuant to Section
364 of the Bankruptcy Code, (II) Authorizing the Debtors to Use Cash Collateral Pursuant to
Section 363 of the Bankruptcy Code, (III) Granting Adequate Protection to the Prepetition Secured
Parties Pursuant to Sections 361, 362, 363 and 364 of the Bankruptcy Code, (IV) Granting Liens
and Superpriority Claims, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing,
and (VII) Granting Related Relief* [Docket No. [___]] (the "Motion"),[2] filed by the above-captioned
debtors and debtors in possession (collectively, the "Debtors"), seeking entry of (i) an interim order
(this "Interim Order") and (ii) a final order (the "Final Order") approving the Motion; and the

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification
number are:  Hardinge Inc. (0200); Ohio Tool Works, LLC (7569); Hardinge Technology Systems, Inc. (6427);
Hardinge Grinding Group Inc. (6173); Forkardt Inc. (4671); Hardinge Ventures LLC (0586); and Kellenberger Swiss
Grinding Machines, LLC (N/A).  The Debtors' service address is One Hardinge Drive, Elmira, NY 14902-1507.

[2]  Unless otherwise defined, capitalized terms used herein shall have the meanings ascribed to them in the Motion or
the DIP Documents (defined below), as applicable.

Debtors having requested on the record at the interim hearing on the Motion (the "Interim Hearing") that the Court enter this Interim Order, *inter alia*:

(a)     authorizing Hardinge Inc. ("Hardinge" or "Borrower") and its affiliated Debtors to obtain secured postpetition financing on a superpriority basis (the "DIP Facility", and the loans provided to Hardinge thereunder, the "DIP Loans") pursuant to the terms and conditions of that certain Superpriority Secured Debtor-in-Possession Credit Agreement filed as Exhibit B to the Motion (as the same may be amended, supplemented, restated or otherwise modified from time to time, the "DIP Agreement"), by and among (i) the Borrower, (ii) the other Debtors, (iii) Centre Lane Solutions Partners, LP, as administrative agent (the "DIP Agent"), and (iv) the lenders from time to time party thereto (each, a "DIP Lender" and, collectively, the "DIP Lenders") and, collectively with the DIP Agent, the "DIP Secured Parties");

(b)     authorizing the Debtors to execute the DIP Agreement and the other documents, agreements and instruments delivered pursuant thereto or executed or filed in connection therewith, all as may be reasonably requested by the DIP Secured Parties (as the same may be amended, restated, supplemented or otherwise modified from time to time, and collectively with the DIP Agreement, the "DIP Documents");

(c)     authorizing the Debtors to consummate the transactions contemplated by the DIP Documents;

(d)     granting to the DIP Secured Parties the DIP Liens (as defined below) on all of the DIP Collateral (as defined below) to secure the DIP Facility and all obligations owing and outstanding thereunder and under the DIP Documents, as applicable, and this Interim Order and any Final Order, as applicable (collectively, and including all "Obligations" as defined in the DIP

Agreement, the "DIP Obligations"), subject only to the Carve-Out (as defined in paragraph 17 below);

(e)      granting allowed superpriority administrative expense claims to the DIP Secured Parties in connection with the DIP Facility;

(f)      authorizing the Debtors to use Prepetition Collateral and Cash Collateral (each as defined below) (together with the DIP Facility, the "Postpetition Financing Arrangement");

(g)      authorizing the Debtors to grant adequate protection to the Prepetition Lenders (as defined below);

(h)      scheduling a hearing (the "Final Hearing"), pursuant to Rule 4001(c)(2) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), to consider entry of the Final Order; and

(i)      granting such other and further relief as this Court deems necessary and just ((a) through (i) collectively, the "Requested Relief"); and the Interim Hearing having been held on July [•], 2024; and upon all of the pleadings filed with the Court, the First Day Declaration,[3] the Dunayer Declaration,[4] and the evidence proffered or adduced and representations of counsel at the Interim Hearing; and the Court having heard and resolved or overruled any and all objections to the Requested Relief; and it appearing that the Requested Relief is in the best interests of the Debtors, their estates, and creditors; and upon the record herein; and after due deliberation thereon, and good and sufficient cause appearing therefor:

---

[3]    *Declaration of Adrian Frankum, Chief Restructuring Officer of the Debtors, in Support of Debtors' Chapter 11 Petitions and First Day Motions* [Docket No. [___]].

[4]    *Declaration of Adam Dunayer in Support Debtors' Motion to Obtain Postpetition Debtor in Possession Financing and the Debtors' Bidding Procedures Motion* [Docket No. [___]].

**IT IS HEREBY FOUND AND DETERMINED THAT**:[5]

A.      <u>Petition Date</u>.  On July 29, 2024 (the "<u>Petition Date</u>"), the Debtors commenced their chapter 11 cases (these "<u>Chapter 11 Cases</u>") by filing voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>") in the United States Bankruptcy Court for the District of Delaware (the "<u>Court</u>").  The Debtors are operating their businesses and managing their affairs as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  As of the date hereof, no trustee, examiner, or official committee of creditors holding unsecured claims (a "<u>Creditors' Committee</u>") has been appointed in any of these Chapter 11 Cases.

B.      <u>Jurisdiction; Venue</u>.  The Court has jurisdiction over these Chapter 11 Cases, the parties, and the Debtors' property pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(D).  The Court is a proper venue of these Chapter 11 Cases and the Motion under 28 U.S.C. §§ 1408 and 1409.

C.      <u>Notice</u>.  Notice of the Motion, the relief requested therein and the Interim Hearing (the "<u>Notice</u>") has been served by the Debtors pursuant to Bankruptcy Rules 2002 and 4001 and in accordance with the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "<u>Local Rules</u>") on (i) the Debtors' thirty (30) largest unsecured creditors on a consolidated basis, (ii) counsel to the DIP Agent, DIP Lenders and Prepetition Lenders, (iii) counsel to the Prepetition Agent, (iv) all known holders of liens upon the Debtors' assets, (v) the Internal Revenue Service, (vi) the United States Trustee for the District of

---

[5] Findings of fact shall be construed as conclusions of law, and conclusions of law shall be construed as findings of fact, as applicable, pursuant to Bankruptcy Rule 7052.

Delaware (the "U.S. Trustee"), and (vii) any parties entitled to notice pursuant to Local Rule 9013-1(m).

        D.    <u>Debtors' Acknowledgements and Stipulations</u>.

        (i)    In requesting the Postpetition Financing Arrangement, and in exchange for and as a material inducement to the DIP Lenders to agree to provide the Postpetition Financing Arrangement, the Debtors acknowledge, represent, stipulate and agree, for themselves and their estates:

        (a)    the DIP Lenders are not control persons or insiders (as defined in section 101(31) of the Bankruptcy Code) of any Debtor;

        (b)    until such time as all DIP Obligations are indefeasibly paid in full in cash, the Debtors shall not in any way prime or seek to prime (or otherwise cause to be subordinated in any way) the liens provided to the DIP Secured Parties by offering subsequent lenders or any party-in-interest a superior or *pari passu* lien or claim with respect to the DIP Collateral (as defined below) pursuant to section 364(d) of the Bankruptcy Code or otherwise, except with respect to the Carve-Out (as defined below); and

        (c)    until such time as all DIP Obligations are indefeasibly paid in full in cash, the Debtors shall not in any way or at any time seek allowance of any administrative expense claim against the Debtors of any kind or nature whatsoever, including, without limitation, claims for any administrative expenses of the kind specified in, or arising or ordered under sections 105, 326, 328, 330, 331, 503(a), 503(b), 506(c) (subject to entry of the Final Order), 507(a), 507(b), 546(c), 546(d), 552(b), 726, 1113 and 1114 of the Bankruptcy Code that is superior

to or *pari passu* with the DIP Superpriority Claim (as defined below) provided herein, except with respect to the Carve-Out.

(ii)     In requesting the Postpetition Financing Arrangement, the Debtors acknowledge, represent, stipulate and agree, for themselves and their estates, subject to the challenge rights set forth in paragraph 19 herein, as follows:

(a)     the Borrower and the other Debtors as guarantors (in such capacity, the "Debtor Guarantors" and collectively with the Borrower, the "Prepetition Obligors") are parties to the Loan and Security Agreement, dated as of September 27, 2022 (as the same has been amended, restated, supplemented or modified from time to time, including pursuant to the Second Amendment (as defined below) the "Prepetition Credit Agreement") with BMO Harris Bank N.A., as administrative agent (the "Prepetition Agent") and certain financial institutions parties as lenders (the "Prepetition Financial Institutional Lenders").[6] On July 22, 2024 all of the Loans and Commitments (each as defined in the Prepetition Credit Agreement) of the Prepetition Financial Institutional Lenders were assigned to Centre Lane Partners V, L.P. (together with the Prepetition Financial Institution Lenders, the "Prepetition Lenders" and together with the Prepetition Agent, the "Prepetition Secured Parties").  In connection with this transfer an amendment to the Prepetition Credit Agreement was executed on July 23, 2024 (the "Second Amendment") that provided incremental liquidity to the Debtors;

---

[6]     Other than with respect to paragraph **D(ii)** of this Interim Order, references to the Prepetition Lenders or the Prepetition Secured Parties in this Interim DIP Order exclude the Prepetition Financial Institution Lenders.

(b)      to secure the "Obligations" (as defined in the Prepetition Credit Agreement, the "Prepetition Obligations"), the Prepetition Obligors granted to the Prepetition Agent, for the benefit of the Prepetition Lenders, first priority liens upon and security interests in (the "Prepetition Liens") substantially all of the Prepetition Obligors' property and assets, pursuant to all security agreements (including all documents and instruments used to perfect the Prepetition Liens), collateral agreements, pledge agreements, control agreements, guarantees, instruments and other documents (together with the Prepetition Credit Agreement, and all other agreements, documents, notes, guarantees, subordination agreements, instruments, amendments, and any other agreements delivered pursuant thereto or in connection therewith, each as amended, restated, supplemented or otherwise modified from time to time, the "Prepetition Loan Documents"), and, in all instances, the proceeds and products thereof (as set forth more fully in the Prepetition Loan Documents, collectively, the "Prepetition Collateral");

(c)      the Prepetition Secured Parties duly perfected the Prepetition Liens securing the Prepetition Obligations by, among other things, filing financing statements and, where necessary, by possession of relevant instruments, certificates, cash or other property, and all such instruments and actions were validly executed or performed, as the case may be, by, or with the consent of, the Debtors;

(d)      as of the Petition Date:  (A) the current outstanding principal balance of the Prepetition Obligations (exclusive of interest, fees, reimbursable expenses and other charges) is not less than $106,660,241.92; (B) the Prepetition

Loan Documents are valid and enforceable by the Prepetition Secured Parties (excluding, for the avoidance of doubt, the Prepetition Financial Institution Lenders) against the Borrower and the Debtor Guarantors; (C) all of the Prepetition Obligations are absolutely and unconditionally owed by the Prepetition Obligors to the Prepetition Lenders (excluding, for the avoidance of doubt, the Prepetition Financial Institution Lenders); (D) the Prepetition Obligations constitute legal, valid and binding obligations of the Prepetition Obligors, enforceable in accordance with their terms (other than in respect of the stay of enforcement arising from section 362 of the Bankruptcy Code to the extent applicable); (E) no recoupments, offsets, challenges, objections, defenses, reductions, impairments, claims, counterclaims, or cross claims of any kind or nature to any of the Prepetition Secured Parties, Prepetition Liens, Prepetition Collateral, or Prepetition Secured Obligations by any person or entity exist; and (F) no portion of the Prepetition Obligations or any payments or other transfers made to the Prepetition Agent or any other Prepetition Lender or applied to the Prepetition Obligations prior to the Petition Date is subject to avoidance, disallowance, disgorgement, subordination (whether equitable, contractual, or otherwise), recharacterization, recovery, attack, recoupment, offset, counterclaim, defense or Claim (as defined in the Bankruptcy Code), or other challenge of any kind pursuant to the Bankruptcy Code or applicable non-bankruptcy law or regulation;

(e)    the Prepetition Liens constitute valid, binding, continuing, enforceable (other than in respect of the stay of enforcement arising from section 362 of the Bankruptcy Code) and perfected first priority liens with priority over any

and all other liens on and security interests in the Prepetition Collateral (except as otherwise provided in the Prepetition Loan Documents) and are not subject to any challenge or defense, including without limitation, respectively, avoidance, disallowance, disgorgement, subordination (whether equitable, contractual, or otherwise), recharacterization, recovery, reduction, set-off, offset, attack, counterclaim, cross-claim, or Claim (as defined in the Bankruptcy Code), or other challenge of any kind pursuant to the Bankruptcy Code or applicable non-bankruptcy law;

(f)    the Debtors and their estates have no valid claims, objections, challenges, causes of actions, including without limitation, claims or causes of action pursuant to sections 501(d), 544, 545, 547, 548, 549, 550, 551, 553(b) or 724(a) of the Bankruptcy Code or applicable non-bankruptcy law against the Prepetition Secured Parties or against any of their respective affiliates, agents, attorneys, advisors, professionals, officers, managers, members, directors or employees arising out of, based upon or related to the Prepetition Liens, Prepetition Collateral, Prepetition Secured Obligations or Prepetition Loan Documents and the Debtors irrevocably waive, discharge and release all rights to challenge or contest the Prepetition Liens of the Prepetition Secured Parties on the Prepetition Collateral or the validity or amount of the Prepetition Liens, Prepetition Collateral, Prepetition Secured Obligations, or the Prepetition Loan Documents;

(g)    any payments made on account of the Prepetition Obligations before the Petition Date were (A) made pursuant to the provisions of the Prepetition Loan Documents, (B) payments out of the Prepetition Collateral or

(C) made in the ordinary course of business and in exchange for reasonably equivalent value and did not diminish any property otherwise available for distribution to unsecured creditors;

(h)     all of the Debtors' cash, including the cash in their deposit accounts and other accounts, wherever located, whether as original collateral or proceeds of other Prepetition Collateral, constitutes Cash Collateral (as defined below);

(i)     none of the Prepetition Lenders is a control person or insider (as defined in section 101(31) of the Bankruptcy Code) of any Debtor; and

(j)     the Prepetition Lenders (excluding the Prepetition Financial Institution Lenders) are entitled to, pursuant to sections 361, 363(e) and 364(d)(1) of the Bankruptcy Code, adequate protection of their respective interests in the Prepetition Collateral, including the Cash Collateral, to the extent of any diminution in the value of the Prepetition Collateral occurring from and after the Petition Date (the "Diminution"), caused by or arising as a result of (A) the incurrence and payment of the DIP Obligations, (B) the use of Prepetition Collateral (including Cash Collateral), (C) the granting of the DIP Liens and the DIP Superpriority Claim, (D) the subordination of the Prepetition Obligations to the DIP Obligations and the Carve-Out, and (E) imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code.

E.     Cash Collateral.  For purposes of this Interim Order, the term "Cash Collateral" shall mean and include all "cash collateral," as defined in section 363 of the Bankruptcy Code, in or on which the DIP Secured Parties or the Prepetition Lenders have a lien, security interest or any

other interest (including, without limitation, any adequate protection liens or security interests), whether existing on the Petition Date, arising pursuant to this Interim Order, or otherwise, and shall include, without limitation:

(i)      all cash proceeds arising from the collection, sale, lease or other disposition, use or conversion of any real or personal property, in or on which the DIP Secured Parties or the Prepetition Lenders have a lien or a replacement lien, whether as part of the DIP Collateral or the Prepetition Collateral, or pursuant to an order of the Court or applicable law or otherwise, and whether such property has been converted to cash, existed as of the commencement of these Chapter 11 Cases, or arose or was generated thereafter;

(ii)      all of the respective deposits, refund claims and rights in retainers of the Debtors on which the DIP Secured Parties or the Prepetition Lenders hold a lien or replacement lien, whether as part of the DIP Collateral or Prepetition Collateral or pursuant to an order of the Court or applicable law or otherwise; and

(iii)      the proceeds of any sale, transfer or other disposition of DIP Collateral or Prepetition Collateral.

F.      <u>Adequate Protection</u>.  The Prepetition Lenders are entitled, pursuant to sections 361, 363(e) and 364(c)(2), (c)(3) and (d) of the Bankruptcy Code, to adequate protection of their interests in the Prepetition Collateral, including the Cash Collateral, to the extent of any Diminution resulting from (i) the incurrence of the DIP Obligations, (ii) the use of Prepetition Collateral (including Cash Collateral), (iii) the granting of the DIP Liens and the DIP Superpriority Claim, (iv) the subordination of the Prepetition Obligations to the DIP Obligations and the Carve-Out, and (v) imposition of the automatic stay pursuant to section 362 of the Bankruptcy

Code.  For the avoidance of doubt, any adequate protection provided in this Interim Order to the Prepetition Lenders excludes the Prepetition Financial Institution Lenders.

G.    <u>Purpose and Necessity of Financing</u>.    The Debtors require the Postpetition Financing Arrangement to (i) permit the continuation of their businesses and maximize and preserve their going concern value, (ii) satisfy payroll obligations and other working capital and general corporate purposes of the Debtors consistent with the terms set forth in the DIP Documents and the Approved Budget (as defined below), (iii) provide adequate protection to the Prepetition Lenders, (iv) pay fees and expenses related to the DIP Documents and these Chapter 11 Cases, and (v) for such other purpose as set forth in, or otherwise permitted by, the DIP Documents (including the Approved Budget).  If the Debtors do not obtain authorization to use the Prepetition Collateral (including Cash Collateral) and borrow under the DIP Agreement, they will suffer immediate and irreparable harm.  The Debtors are unable to obtain adequate unsecured credit allowable only as an administrative expense under section 503 of the Bankruptcy Code, or other sufficient financing under sections 364(c) or (d) of the Bankruptcy Code, on more favorable terms than those set forth in the DIP Documents.  A loan facility in the amount provided by the DIP Documents is not available to the Debtors without granting the superpriority claims, liens, and security interests, pursuant to sections 364(c)(1), 364(c)(2), 364(c)(3), and 364(d) of the Bankruptcy Code, as provided in this Interim Order and the DIP Documents.  After considering all alternatives, the Debtors have concluded, in the exercise of their sound business judgment, that the Postpetition Financing Arrangement, including without limitation, the DIP Facility, is the best financing available to them at this time.

H.    <u>Good and Sufficient Cause Shown</u>.  Good and sufficient cause has been shown for entry of this Interim Order.  The ability of the Debtors to obtain sufficient working capital and

liquidity under the DIP Documents and use of the Prepetition Collateral (including the Cash Collateral) is vital to the Debtors' estates and creditors. The liquidity to be provided under the DIP Documents and this Interim Order will enable the Debtors to continue to operate their businesses in the ordinary course and preserve the value of the Debtors' businesses pending the sale of substantially all of their assets. Among other things, entry of this Interim Order is necessary to maximize the value of the Debtors' assets and to avoid immediate and irreparable harm to the Debtors and their estates.

I.    Sections 506(c) and 552(b) Waivers. In light of (i) the DIP Secured Parties' agreement to subordinate their liens and superpriority claims to the Carve-Out, and in exchange for and as a material inducement to the DIP Lenders to agree to provide the DIP Facility and (ii) the Prepetition Lenders' agreement to subordinate their liens and superpriority claims to the DIP Obligations, the Carve-Out and the DIP Liens, and to permit the use of the Prepetition Collateral (including Cash Collateral), subject to entry of the Final Order, each of the DIP Secured Parties and the Prepetition Lenders are entitled to a waiver of the provisions of section 506(c), and the Prepetition Lenders are entitled to a waiver of the exceptions provided in sections 552(b)(1) and (2) of the Bankruptcy Code.

J.    Good Faith. The terms of the DIP Documents and the use of the Prepetition Collateral (including the Cash Collateral) pursuant to this Interim Order, including, without limitation, the interest rates and fees applicable are more favorable to the Debtors than those available from alternative sources, if any. Based upon the record before the Court, the DIP Documents and the use of the Prepetition Collateral (including the Cash Collateral) pursuant to this Interim Order have been negotiated in good faith and at arm's-length among the Debtors, the DIP Secured Parties and the Prepetition Lenders. Any DIP Loans and other financial

accommodations made to the Debtors by the DIP Secured Parties pursuant to the DIP Documents and this Interim Order shall be deemed to have been extended by the DIP Secured Parties in good faith, as that term is used in section 364(e) of the Bankruptcy Code, and each of the DIP Secured Parties shall be entitled to all protections and benefits afforded thereby.

K.      <u>Fair Consideration and Reasonably Equivalent Value</u>.  All of the Debtors have received and will receive fair and reasonable consideration by virtue of their obtaining access to the DIP Loans, the use of the Prepetition Collateral (including the Cash Collateral) pursuant to this Interim Order and all other financial accommodations provided under the DIP Documents and this Interim Order.  The terms of the DIP Documents and this Interim Order are fair and reasonable, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties and are supported by reasonably equivalent value and fair consideration.

L.      <u>Immediate Entry of Interim Order</u>.  The Debtors have requested immediate entry of this Interim Order pursuant to Bankruptcy Rule 4001(c)(2) and Local Rule 4001-2(b).  The permission granted herein to enter into the DIP Documents, to obtain funds thereunder and to use the Prepetition Collateral (including the Cash Collateral) pursuant to this Interim Order is necessary to avoid immediate and irreparable harm to the Debtors.  Based on the Dunayer Declaration, this Court concludes that entry of this Interim Order is in the best interests of the Debtors' respective estates and creditors as its implementation will, among other things, allow for access to the financing necessary for the continued flow of supplies and services to the Debtors and payment of employees necessary to sustain the operation of the Debtors' existing businesses and further enhance the Debtors' prospects for a successful sale of substantially all of their assets. Based upon the foregoing findings, acknowledgements, and conclusions, and upon the record made before this Court at the Interim Hearing, and good and sufficient cause appearing therefor;

**IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:**

1.      <u>Disposition</u>.  The relief requested by the Debtors in the Motion and otherwise on the record at the Interim Hearing is granted on the terms solely as set forth in this Interim Order.  Any objection to the interim relief sought by the Debtors that has not previously been withdrawn or resolved is hereby overruled on its merits.

2.      <u>Authorization For DIP Financing</u>.  The Debtors are hereby authorized, on an interim basis, to incur DIP Obligations immediately during the period prior to entry of the Final Order, subject to the terms of this Interim Order, the Approved Budget and the DIP Documents, in an aggregate principal amount not to exceed $14,000,000 (the "<u>Interim Amount</u>") unless and until the DIP Secured Parties agree on further funding for the USACH/Kellenberger Term Loan Commitment (as defined in the DIP Documents), in which case the aggregate principal amount is not to exceed $24,200,00 ("<u>Interim Borrowings</u>"), with the maximum principal amount that may be borrowed following entry of the Final Order not to exceed $27,350,000[7] (the "<u>Maximum Commitment</u>").  Available financing and advances under the DIP Agreement shall, on an interim basis, be made to fund, in accordance with the DIP Documents and the Approved Budget, working capital and general corporate requirements of the Debtors, adequate protection to the Prepetition Lenders, bankruptcy-related costs and expenses (including interest, fees, and expenses in accordance with this Interim Order and the DIP Documents), and any other amounts required or allowed to be paid in accordance with this Interim Order, but only as and to the extent authorized by the Approved Budget and the DIP Documents.

---

[7]   Which amount does not include any amounts on account of the DIP Fees which are to be paid in kind upon funding of the Interim Amount.  Inclusive of the amounts paid in kind on account of the DIP Fees, the Maximum Commitment is $29,486,764.

3.      <u>Authorization for Use of Cash Collateral</u>.  The Debtors are authorized to use Cash Collateral subject to and in accordance with the terms, conditions, and limitations set forth in this Interim Order, the Approved Budget and the DIP Documents, without further approval by the Court.

4.      <u>Approved Budget</u>.

(a)      The Debtors have delivered to the DIP Agent a detailed budget that sets forth projected cash receipts and cash disbursements on a weekly basis for the time period from and including the Petition Date through September 15, 2024 that has been approved by the Required DIP Lenders (defined below), and a copy of which is attached hereto as <u>Exhibit A</u> (as updated, amended, supplemented or otherwise modified in accordance herewith, the "<u>Approved Budget</u>").  The Debtors shall provide to the DIP Secured Parties financial reporting in accordance with the terms of the DIP Documents.  Funds borrowed under the DIP Agreement and Cash Collateral used under this Interim Order shall be used by the Debtors in accordance with the DIP Documents, including the Approved Budget, and this Interim Order.  Except to the extent provided in paragraph 17 of this Interim Order to fund the Carve-Out, the consent of the Required DIP Lenders to the Approved Budget shall not be construed as a commitment of the DIP Lenders to provide DIP Loans or of the DIP Secured Parties or Prepetition Lenders to permit the use of Cash Collateral (subject to the Carve-Out) after the occurrence of a Termination Event (as defined below) under this Interim Order, regardless of whether the aggregate funds shown on the Approved Budget have been expended.

(b)      The Approved Budget and Approved Variance Report (as defined below) shall, including any and all updates, amendments, supplements and modifications, at all times be in form and substance reasonably acceptable to the Required DIP Lenders and approved in writing

by the DIP Agent (email being sufficient) prior to the implementation thereof.  Notwithstanding anything herein to the contrary, any such updates, amendments, supplements or modifications to the Approved Budget must be consented to in writing (email being sufficient) by the DIP Lenders holding more than fifty percent (50%) of the DIP Loan Commitments (the "Required DIP Lenders") prior to the implementation thereof, and, subject to paragraph 11, shall not require further notice, hearing, or Court order.  Any updates, amendments, supplements or modifications to the Approved Budget that are approved by the Required DIP Lenders shall be provided to the U.S. Trustee and counsel for any Creditors' Committee.

       (c)      The DIP Secured Parties (i) may assume the Debtors will comply with the Approved Budget, (ii) shall have no duty to monitor such compliance, and (iii) shall not be obligated to pay (directly or indirectly from the DIP Collateral) any unpaid expenses incurred or authorized to be incurred pursuant to any Approved Budget other than to permit the Debtors' use of Cash Collateral as expressly provided herein prior to the occurrence of a Termination Event (and subsequent to a Termination Event to the extent provided in paragraph 17 of this Interim Order to fund the Carve-Out).  All advances and extensions of credit shall be based upon the terms and conditions of the DIP Documents, as the same may be amended from time to time with the consent of the DIP Lenders or Required DIP Lenders (as applicable in accordance with the DIP Documents).  Subject to the terms and conditions of this Interim Order, the DIP Lenders shall have the right, but not the obligation, to extend credit independent of any Approved Budget line item restrictions on loan availability set forth in the DIP Documents, and all DIP Loans shall be entitled to the benefits and protections of this Interim Order.  For the avoidance of doubt, no DIP Lender shall be obligated to extend credit outside the terms of the DIP Documents.

(d)     As more fully described in the DIP Credit Agreement, on or before 12:00 p.m. Eastern time each Wednesday (each, a "Testing Date"), commencing after the first full calendar week following the Petition Date and each calendar week thereafter, the Debtors shall deliver to the DIP Agent a variance report in form and substance reasonably acceptable to the Required DIP Lenders (an "Approved Variance Report") that shows (A) comparisons of actual results for each line item against such line item in the Approved Budget for the prior periods ended and (B) indicates whether there are any adverse variances that exceed the Permitted Variance.  The term "Testing Period" means, with respect to each Variance Report required to be delivered under the DIP Credit Agreement, the period from the Saturday immediately prior to the Petition Date and ending on the Friday prior to the applicable Testing Date.  As used herein, "Permitted Variance" means (a) a negative variance of up to 5% for aggregate cumulative actual cash receipts for such Testing Period compared to the projected aggregate cumulative cash receipts for the Debtors for such Testing Period as set forth in the Approved Budget and (b) a positive variance of up to 5% for aggregate cumulative actual cash disbursements on a line by line basis (including professional fees) of the Debtors for such Testing Period compared to the projected aggregate cash disbursements on a line by line basis (including professional fees) for such Testing Period as set forth in the Approved Budget.  The Approved Variance Report shall also provide a reasonable detailed narrative explanation for any variance that exceeds the Permitted Variances.  The DIP Agent shall promptly deliver to the DIP Lenders a copy of each Approved Variance Report upon such agent's receipt.

5.     Authority to Execute and Deliver Necessary Documents.  Subject to paragraph 11, each of the Debtors is authorized to negotiate, prepare, enter into, and deliver the DIP Documents, in each case including any amendments, supplements and modifications thereto

in accordance with the terms thereof and this Interim Order. Each of the Debtors is further authorized to negotiate, prepare, enter into and deliver any other UCC financing statements, pledge and security agreements, mortgages or deeds of trust, or similar documents, instruments, or agreements encumbering all of the DIP Collateral and securing all of the Debtors' obligations under the DIP Documents, each as may be reasonably requested by the DIP Agent.

6. <u>Authority to Perform Obligations and Acts</u>. Each of the Debtors is further authorized to (i) perform all of its obligations and acts contemplated by the DIP Documents and such other agreements as may be required by the DIP Documents to give effect to the terms of the financing provided for therein and in this Interim Order, including pursuant to the terms of the DIP Documents to cause non-Debtor subsidiaries to become Guarantors of the DIP Obligations, and (ii) perform all acts required under the DIP Documents and this Interim Order.

7. <u>Valid and Binding Obligations</u>. All obligations under the DIP Documents and this Interim Order shall constitute valid and binding obligations of each of the Debtors, enforceable against each of them and each of their successors and assigns, in accordance with their terms and the terms of this Interim Order, and no obligation, payment, transfer, or grant of a lien or security interest under the DIP Documents or this Interim Order shall be stayed, restrained, voidable, or recoverable under the Bankruptcy Code or under any applicable law (including, without limitation, under section 502(d) of the Bankruptcy Code) or subject to any avoidance, reduction, set-off, offset, recharacterization, subordination (whether equitable, contractual, or otherwise), counterclaim, cross-claim, defense, or any other challenge under the Bankruptcy Code or any applicable law or regulation by any person or entity.

8. <u>Termination of DIP Documents</u>. Notwithstanding anything in this Interim Order to the contrary, the DIP Lenders' commitments under the DIP Documents will terminate

and the DIP Obligations will become due and payable, and the Debtors' authority to use Cash Collateral in accordance with this Interim Order will terminate, on the date that is the earliest to occur of (in each case, the "Maturity Date"):  (i) the date that is ninety (90) days following the Petition Date; (ii) the date that is thirty (30) days following the entry of this Interim Order if the Court has not entered the Final Order on or prior to such date; (iii) termination of the Stalking Horse APA for any reason without the prior written consent of the Required DIP Lenders other than a termination of the Stalking Horse APA as a result of a default by the Stalking Horse Purchaser or a termination for the Debtors to pursue approval of an Alternative Transaction that results in the payment in full of the DIP Obligations at or prior to the maturity thereof as of the closing of such Alternative Transaction; (iv) the substantial consummation (as defined in section 1101 of the Bankruptcy Code and which for purposes hereof shall be no later than the "effective date" thereof) of a plan of reorganization or liquidation filed in the Chapter 11 Cases that is confirmed pursuant to an order entered by the Court; (v) date of acceleration of the DIP Obligations and the termination of the DIP Commitments upon the occurrence of an Event of Default (as defined in the DIP Credit Agreement); (vi) the filing of a motion by the Loan Parties seeking dismissal of any of the Chapter 11 Cases (without the prior consent of the Required DIP Lenders), the dismissal of any of the Chapter 11 Cases, or the filing of a motion by the Loan Parties seeking to convert any of the Chapter 11 Cases to a case under Chapter 7 of the Bankruptcy Code; (vii) entry of an order by the Court approving (A) a motion seeking conversion or dismissal of any or all of the Chapter 11 Cases or (B) a motion seeking the appointment or election of a trustee, a responsible officer or examiner with enlarged powers relating to the operation of the Debtors' business; (viii) the date the Court orders the conversion of the bankruptcy case of any of the Debtors to a chapter 7 liquidation; and (ix) the dismissal of the bankruptcy case of any Debtor.

9.      <u>Termination of Authority to Use Cash Collateral</u>.  Subject to paragraph 21(f), the Debtors' ability to use Cash Collateral prior to the Maturity Date will immediately terminate (except to the extent provided in paragraph 17 of this Interim Order to fund the Carve-Out) following the occurrence of any event described below (each a "<u>Termination Event</u>"):

(a)      any Debtor fails to comply in any material respect with any of the terms or conditions of this Interim Order, and such failure is not cured during any applicable Remedies Notice Period;

(b)      any Debtor seeks any modification or extension of this Interim Order, without consent of the Required DIP Lenders;

(c)      an application (other than the application for financing provided by a third party which seeks authority to pay all of the DIP Obligations and the Prepetition Obligations in full upon entry of the order approving such financing) is filed by any Debtor for the approval of (or an order is entered by the Court approving) any claim arising under section 507(b) of the Bankruptcy Code or otherwise, or any lien in any of the Chapter 11 Cases, which is *pari passu* with or senior to the DIP Obligations or DIP Liens, excluding liens expressly permitted to be senior to the DIP Liens under this Interim Order or pursuant to any other financing agreement made with the prior written consent of the Required DIP Lenders;

(d)      the commencement or support of any action by any Debtor or any party exercising the authority of any Debtor against any of the DIP Lenders, or its agents and employees, to subordinate or avoid any liens made in connection with the DIP Documents or to avoid any obligations incurred in connection with the DIP Documents;

(e)       any Order shall be entered granting relief from the stay arising under section 362 of the Bankruptcy Code to the holder or holders of any security interest, lien or right of setoff to permit foreclosure (or the granting of a deed in lieu of foreclosure or similar instrument), possession, set-off or any similar remedy with respect to any assets of the Debtors with an aggregate value of more than $150,000;

(f)       (i) any Debtor shall assert in any pleading filed in any court that any material provision of this Interim Order is not valid and binding for any reason, or (ii) any material provision of this Interim Order shall for any reason, or any other order of this Court approving the Debtors' use of Cash Collateral, without the prior written consent of the Required DIP Lenders, cease to be valid and binding;

(g)       any Debtor withdraws or modifies the motion to approve the sale of all or substantially all of the Debtors' assets without the consent of the Required DIP Lenders;

(h)       the Debtors fail to meet any Milestone (as defined below), unless extended or waived by Required DIP Lenders; or

(i)       the occurrence of the Maturity Date.

10.       <u>Authorization and Direction for Payment of DIP Financing Fees and Expenses</u>.  Subject to the provisions of this paragraph 10, all fees paid or payable, and all reasonable costs and expenses reimbursed or reimbursable (including, without limitation, all fees, costs and expenses referred to in the DIP Documents and the DIP Agent's and DIP Lenders' reasonable attorneys' fees ("<u>Professionals</u>")), by the Debtors to the DIP Secured Parties are hereby approved, to the extent provided in the DIP Agreement.  The Debtors are hereby authorized and directed to pay all such fees, costs, and expenses in accordance with the terms of the DIP

Documents and this Interim Order, without any requirement that the Debtors, the DIP Agent, the DIP Lenders or their respective attorneys file any further application or other pleading, notice, or document with the Court for approval or payment of such fees, costs or expenses. To the extent provided in the DIP Agreement, the Debtors shall pay all reasonable prepetition and postpetition out of pocket costs and expenses of the DIP Secured Parties (including all reasonable fees, expenses and disbursements of outside counsel, including local counsel, and Professionals) in connection with the Chapter 11 Cases and any Successor Case(s) (as defined below), including, without limitation, in connection with (a) the preparation, negotiation, execution and delivery of the DIP Documents, this Interim Order, and any Final Order, and the funding of all DIP Loans under the DIP Facility, (b) the administration of the DIP Facility and any amendment or waiver of any provision of the DIP Documents, this Interim Order, and any Final Order, (c) the administration of the Chapter 11 Cases and any Successor Case(s), and (d) the enforcement or protection of the DIP Secured Parties' rights and remedies under the DIP Documents, this Interim Order, and any Final Order. Notwithstanding anything to the contrary herein, the payment of all such fees, costs and expenses of the DIP Secured Parties, whether incurred before or after the Petition Date, including, without limitation, all fees referred to in the DIP Documents and all reasonable attorneys' fees and expenses, shall (i) be deemed non-refundable and irrevocable, and (ii) the Debtors shall not be deemed to have breached the terms of the Approved Budget to the extent the actual amount of such fees, costs and expenses exceed the applicable budgeted amounts as set forth in the Approved Budget. None of the DIP Secured Parties' attorneys' fees or disbursements shall be subject to the prior approval of this Court or the guidelines of the Office of the U.S. Trustee, and no recipient of any such payment shall be required to file with respect thereto any interim or final fee application with this Court. Any such fees, costs and expenses shall be

paid by the Debtors within ten (10) days after delivery of an invoice (redacted for privilege) to the Debtors and without the need for application to or order of the Court.  A copy of such invoice shall be provided by the DIP Agent to the U.S. Trustee, counsel for the Prepetition Agent and counsel for any Creditors' Committee on the same business day as the Debtors' receipt of such invoice. Notwithstanding the foregoing, if (x) the Debtors, U.S. Trustee or any Creditors' Committee object to an invoice submitted by the DIP Secured Parties and (y) the parties cannot resolve such objection, in each case within the ten (10) day period following receipt of such invoice, the Debtors, the U.S. Trustee or such Creditors' Committee, as the case may be, shall file with the Court and serve on the DIP Agent and DIP Secured Parties submitting the fee request a fee objection (a "DIP Secured Party Fee Objection").  The Debtors shall promptly pay or the DIP Lenders are hereby authorized to make an advance under the DIP Agreement to timely pay, any submitted invoice after the expiration of the ten (10) day period if no DIP Secured Party Fee Objection is filed with the Court and served on the DIP Agent and the DIP Lenders in such ten (10) day period.  If a DIP Secured Party Fee Objection is timely filed and served, the Debtors shall promptly pay or the DIP Secured Parties are hereby authorized to make an advance under the DIP Agreement to timely pay, the undisputed amount of the invoices, and the Court shall have jurisdiction to determine the disputed portion of such invoice if the parties are unable to resolve the DIP Secured Party Fee Objection.

> 11.    Amendments, Consents, Waivers, and Modifications.  The Debtors, with the express written consent of the Required DIP Lenders in accordance with the terms and conditions of the DIP Documents, may enter into any amendments, consents, waivers, or modifications to the DIP Documents without the need for further notice and hearing or any order of this Court, so long as such amendments, consents, waivers, or modifications are non-material

or not adverse to the Debtors' estates or their creditors (other than the Required DIP Lenders).  A copy of any such amendment, consent, waiver or modification shall be provided by the Debtors to the DIP Lenders, U.S. Trustee and counsel for any Creditors' Committee.  Any material or adverse changes to the DIP Documents, as well as any increases in the amount of the DIP Loans (except as provided in paragraphs 2 and 4(c) of this Interim Order), will require the consents of the Required DIP Lenders in addition to any express written consents required by the DIP Documents and Court approval and increases in the amount of the DIP Loans shall require the consent of all DIP Lenders whose commitments are being increased.

12.     <u>DIP Secured Parties' Lien Priority</u>.

(a)     To secure the DIP Obligations, the DIP Secured Parties are hereby granted pursuant to and in accordance with Sections 364(c)(2), 364(c)(3), and 364(d) of the Bankruptcy Code, valid, enforceable and fully perfected liens (the "<u>DIP Liens</u>") in and on all of the property, assets or interests in property or assets of each Debtor, and all "property of the estate" (within the meaning of the Bankruptcy Code) of each Debtor, of any kind or nature whatsoever, real or personal, tangible or intangible or mixed, now existing or hereafter acquired or created, including, without limitation, all of each Debtor's now owned or hereafter acquired right, title, and interest in and to all cash, accounts, accounts receivable, goods, inventory, property, plant and equipment, commercial tort claims, intellectual property, contract rights, tax refunds, prepaid expenses, deposits, general intangibles, real estate, leaseholds, all proceeds or property recovered in connection with actions under chapter 5 of the Bankruptcy Code ("<u>Avoidance Actions</u>") (provided that the lien on Avoidance Actions and proceeds of Avoidance Actions shall be limited to the proceeds and property recovered in connection therewith and shall only attach hereunder to the extent approved in the Final Order), all intercompany claims, all claims, and causes of action of

each Debtor or its respective estate (including, without limitation, all commercial tort claims of every kind and description, whether described in specificity in the DIP Documents or not) and any and all proceeds and property recovered therefrom, any and all proceeds arising from insurance policies, all intellectual property, and the equity interests of each direct subsidiary of each Debtor, which for the avoidance of doubt, shall include, without limiting the generality of the foregoing, all assets of each Debtor that constitute Prepetition Collateral, and all other property and assets including, without limitation, Cash Collateral, and all cash and non-cash proceeds, rents, products, substitutions, accessions, offspring and profits of any of the collateral described above (collectively, the "DIP Collateral").

(b)    The DIP Liens shall be effective immediately upon the entry of this Interim Order and shall not at any time be made subject or subordinated to, or made *pari passu* with, any other lien, security interest or claim existing as of the Petition Date or created thereafter, including under Sections 363 or 364(d) of the Bankruptcy Code or otherwise, other than the Carve-Out.

(c)    The DIP Liens shall be and hereby are deemed fully perfected liens and security interests, effective and perfected upon the date of this Interim Order, without the necessity of execution by the Debtors of mortgages, security agreements, pledge agreements, financing agreements, financing statements, account control agreements or any other agreements, filings or instruments, such that no additional actions need be taken by the DIP Agent, the DIP Lenders or any other party (including, without limitation, any depository bank or securities intermediary) to perfect such interests.

(d)    At all times prior to indefeasible payment in cash in full of the DIP Obligations, the priority of the DIP Liens will:

(i)    Pursuant to Section 364(c)(2) of the Bankruptcy Code, be perfected first priority liens on all DIP Collateral which, as of the Petition Date, was unencumbered or subject to invalid, unperfected or avoidable liens;

(ii)    Pursuant to Section 364(c)(3) of the Bankruptcy Code, be perfected junior liens on all DIP Collateral that was, as of the Petition Date, subject to valid, perfected (before the Petition Date or in accordance with Section 546(b) of the Bankruptcy Code), unavoidable liens in existence at the time of the commencement of the Chapter 11 Cases (other than the liens securing the Prepetition Obligations, which liens are "primed" by the DIP Liens pursuant to the liens described in subsection (iii) below) with a priority immediately junior to any such liens ("Senior Third-Party Liens");[8]

(iii)    Pursuant to Section 364(d)(1) of the Bankruptcy Code, be perfected first priority, senior priming liens on all DIP Collateral that is subject to (a) the existing liens that secure the obligations of the applicable Debtors under or in connection with the Prepetition Credit Agreement and (b) subject to entry of the Final Order, existing liens junior in priority to the liens granted in favor of the Prepetition Lenders (collectively, the "Junior Lienholders" and collectively with the Prepetition Lenders, the "Primed Parties"), all of which existing liens (the "Primed Liens") shall be primed by and made subject and subordinate to the perfected first-priority senior liens granted to the DIP Secured Parties

---

[8] For the avoidance of doubt, nothing herein shall constitute a finding or ruling by this Court that any asserted Senior Third-Party Liens are valid, senior, enforceable, prior, perfected or non-avoidable. Moreover, nothing shall prejudice the rights of any party-in-interest, including, but not limited to, the Debtors, the Prepetition Lenders, the DIP Secured Parties or any Creditors' Committee, to challenge the validity, priority, enforceability, seniority, non-avoidability, perfection or extent of any alleged Senior Third-Party Liens.

hereunder, which senior priming liens in favor of the DIP Secured Parties shall also prime any liens granted after the commencement of the Chapter 11 Cases to provide adequate protection in respect of any of the Primed Liens; and

(iv)    Pursuant to the terms of this Interim Order, be subject to the Carve-Out.

13.    DIP Secured Parties' Superpriority Claim.  The DIP Secured Parties are hereby granted an allowed superpriority administrative expense claim (the "DIP Superpriority Claim") pursuant to section 364(c)(1) of the Bankruptcy Code in each of the Chapter 11 Cases and in any successor case(s) under the Bankruptcy Code (including any case or cases under chapter 7 of the Bankruptcy Code, the "Successor Case(s)") for all DIP Obligations, having priority over any and all other claims against the Debtors, now existing or hereafter arising, of any kind whatsoever, including, without limitation but to the extent provided in the Bankruptcy Code, all administrative expenses of the kinds specified in or arising or ordered under sections 105(a), 326, 328, 330, 331, 503(a), 503(b), 506(c) (subject to entry of the Final Order), 507(a), 507(b), 546(c), 546(d), 726, 1113, and 1114 and any other provision of the Bankruptcy Code or otherwise, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, which allowed DIP Superpriority Claim shall be payable from and have recourse to all pre- and postpetition property of the Debtors and all proceeds thereof including, without limitation, (upon the entry of the Final Order) any proceeds or property recovered in connection with the pursuit of Avoidance Actions.  The DIP Superpriority Claim shall be subject and subordinate in priority of payment only to the Carve-Out.

14.    Survival of DIP Liens, DIP Superpriority Claim, Adequate Protection Liens, and Adequate Protection Superpriority Claim.  The DIP Liens, DIP Superpriority Claim,

Adequate Protection Liens, and Adequate Protection Superpriority Claim and other rights and remedies granted under this Interim Order to the DIP Agent, the DIP Lenders, the Prepetition Agent, and the Prepetition Lenders shall continue in these Chapter 11 Cases and any Successor Case(s), and shall be valid and enforceable against any trustee appointed in any or all of the Debtors' Chapter 11 Cases and upon the dismissal of any or all of the Debtors' Chapter 11 Cases, or in any Successor Case(s), and such liens and security interests shall maintain their first priority as provided in this Interim Order until all the DIP Obligations and the Prepetition Obligations have been indefeasibly paid in full in cash and the DIP Lenders' commitments have been terminated in accordance with the DIP Documents and this Interim Order.

15.    <u>Adequate Protection for Prepetition Lenders</u>.    As adequate protection in respect of, and as consideration for any Diminution resulting from any of the incurrence and payment of the DIP Obligations, the use of Cash Collateral, the use of other Prepetition Collateral, the granting of the DIP Liens and the DIP Superpriority Claim, the subordination of the Prepetition Obligations to the DIP Obligations and the Carve-Out and the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code, the Prepetition Lenders are hereby granted (in each case subject only to the DIP Liens, the DIP Superpriority Claim, and the Carve-Out) the following adequate protection:

(a)    <u>Adequate Protection Liens</u>.    To secure the Adequate Protection Superpriority Claim (as defined below), the Prepetition Agent, for itself and for the benefit of the Prepetition Lenders, is hereby granted (effective and perfected by operation of law immediately upon entry of this Interim Order and without the necessity of execution by the Debtors of mortgages, security agreements, pledge agreements, financing statements, account control agreements and other agreements, filings or instruments) valid, perfected,

postpetition security interests and liens (the "Adequate Protection Liens") in and on all of the DIP Collateral, with a priority subject and subordinate only to (i) the DIP Liens, the DIP Superpriority Claim, (ii) the Senior Third-Party Liens, and (iii) the Carve-Out. The Adequate Protection Liens shall be *pari passu* with the Prepetition Liens.

(b)     Adequate Protection Superpriority Claim.  As further adequate protection, the Prepetition Agent, for itself and for the benefit of the Prepetition Lenders, is hereby granted a superpriority claim to the extent of any Diminution, which claim shall, to the extent provided by the Bankruptcy Code, have priority over all other administrative expense claims and unsecured claims against the Debtors or their estates, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kind specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 503(a), 503(b), 506(c) (subject to entry of the Final Order), 507(a), 507(b), 546(c), 546(d), 552, 726, 1113, and 1114 and any other provision of the Bankruptcy Code (the "Adequate Protection Superpriority Claim"), provided however, such Adequate Protection Superpriority Claim shall (i) be subordinate and subject only to the DIP Superpriority Claim and the Carve-Out, and (ii) shall be entitled to all protections and benefits of Section 507(b) of the Bankruptcy Code.  For the avoidance of doubt, the Adequate Protection Superpriority Claim shall not be payable from, pending entry of the Final Order, any proceeds or property recovered in connection with the pursuit of Avoidance Actions.

(c)     Prepetition Lenders' Fees and Expenses.  The Debtors shall pay the reasonable fees, charges, expenses (including attorneys' fees and other professional expenses) of the Prepetition Agent in connection with the Chapter 11 Cases and any

Successor Case(s), including, without limitation, in connection with (i) the preparation and negotiation of the DIP Facility, DIP Loan Documents, this Interim Order and any Final Order, (ii) any amendment or waiver of any provision of this Interim Order and any Final Order, (iii) the administration of the Chapter 11 Cases and any Successor Case(s), and (iv) the enforcement or protection of the Prepetition Lenders' rights and remedies under the Prepetition Credit Agreement, this Interim Order, and any Final Order.  The Debtors' obligations to make such payments shall include, in each instance, any of such fees, charges, expenses and other amounts which were incurred or accrued but unpaid as of the date hereof, including amounts incurred prior to the Petition Date, all of which shall be paid by the Debtors promptly upon entry of this Interim Order as adequate protection and as a condition to the effectiveness of the DIP Facility (the "Initial Reimbursement").  All such fees, costs and expenses shall be paid by the Debtors within ten (10) days after delivery of an invoice (redacted for privilege) to the Debtors and without the need for further application to or order of the Court.  None of such fees, costs, and expenses shall be required to be recorded or maintained in any particular format and no recipient of any such payment shall be required to file any interim or final fee application with the Court. A copy of such invoice shall be provided by the Prepetition Lender to the U.S. Trustee, counsel for the DIP Agent and counsel for any Creditors' Committee at the same time as delivery to the Debtors.  Notwithstanding the foregoing, if (x) the Debtors, the U.S. Trustee or any Creditors' Committee object to an invoice submitted by the Prepetition Lenders and (y) the parties cannot resolve such objection, in each case within the ten (10) day period following the Debtors' receipt of such invoice, the Debtors, the U.S. Trustee or such Creditors' Committee, as the case may be, shall file with the Court and serve on the

Prepetition Lenders a fee objection (a "Prepetition Lenders Fee Objection").  The Debtors shall promptly pay or the DIP Lenders are hereby authorized to make an advance under the DIP Agreement to timely pay, any submitted invoice after the expiration of the ten (10) day period if no Prepetition Lenders Fee Objection has been filed with the Court and served on the DIP Agent in such ten (10) day period.  If a Prepetition Lenders Fee Objection is timely filed and served, the Debtors shall promptly pay or the DIP Secured Parties are hereby authorized to make an advance under the DIP Agreement to timely pay, the undisputed amount of the invoice, and the Court shall have jurisdiction to determine the disputed portion of such invoice if the parties are unable to resolve the Prepetition Lenders Fee Objection.  In all events, the payments pursuant to this subsection (c) shall be subject to the rights reserved to third parties under paragraph 19.

(d)    506(c) and 552(b) Waivers.  Subject to the entry of the Final Order, the Prepetition Lenders' consent to use of Cash Collateral and Prepetition Collateral under this Interim Order and the Debtors' right to use Cash Collateral and Prepetition Collateral: (i) is in lieu of any section 506(c) claim, payment or priority for the costs or expenses of the administration of any of these Chapter 11 Cases; and (ii) is granted as consideration for (among other things) the waiver of the exceptions provided in sections 552(b)(1) and (2) of the Bankruptcy Code, which exceptions are hereby waived.

16.    Access; Reporting; Credit Bid Rights.

(a)    Access to Debtor's Chief Restructuring Officer and Investment Banker.  The Debtors shall cause their chief restructuring officer (the "CRO") and investment bankers (the "Investment Bankers") to meet with the DIP Agent and the DIP Lenders and their representatives as reasonably requested and to cause the Investment

Bankers and the CRO to be available to meet with the DIP Agent and the DIP Lenders by phone every two-weeks during the Chapter 11 Cases.

(b)    <u>Reporting</u>.  As and when required under the terms of the DIP Agreement, the Debtors shall provide to the DIP Secured Parties all of the financial information, operational information and related reports, documents and analysis required under the terms of the DIP Agreement.

(c)    <u>Credit Bidding Rights</u>.  Subject to paragraph 19 of this Order with respect to any credit bid of the Prepetition Obligations, the Debtors and the DIP Lenders and the Prepetition Lenders, as applicable, agree that in any sale of the DIP Collateral or Prepetition Collateral, the DIP Lenders or the Prepetition Lenders, respectively, shall have the right to credit bid the Prepetition Obligations and the DIP Obligations, subject to Section 363(k) of the Bankruptcy Code.  The Debtors agree that any motion filed by the Debtors seeking approval of bid procedures will contain a request for approval of the right of the DIP Lenders or the Prepetition Lenders to credit bid the DIP Obligations or the Prepetition Obligations, as applicable.  The foregoing agreement shall operate as a finding that the DIP Lenders (or the DIP Agent, on the DIP Lenders' behalf) and, subject to paragraph 19 of this Order, the Prepetition Lenders (or the Prepetition Agent, on the Prepetition Lenders' behalf) shall have the right to credit bid the full amount of the DIP Obligations or the Prepetition Obligations, as applicable, then outstanding subject to Section 363(k) of the Bankruptcy Code (as set forth above) and the right of the DIP Lenders or the Prepetition Lenders to credit bid in accordance with this subsection (c) shall not be modified or altered by any event, without the prior written consent of each affected DIP Lender or Prepetition Lender.  Each DIP Lender or Prepetition Lender is also authorized

to assign its right to credit bid in whole or in part to affiliates of such DIP Lender or Prepetition Lender, to be exercised by such affiliate(s) at any auction in connection with the sale of any of the Debtors' assets.

17.    Carve-Out.

(a)    The DIP Liens, the DIP Superpriority Claim, the Adequate Protection Liens, the Adequate Protection Superpriority Claim, and the Prepetition Liens shall be subject and subordinate to the following: (i) all fees required to be paid to (A) the clerk of the Bankruptcy Court and (B) the Office of the United States Trustee under section 1930(a) of Title 28 of the United States Code, plus interest required to be paid on any past due amount at the statutory rate (collectively, the "UST Carve-Out"); (ii) all reasonable fees and expenses, up to $50,000, incurred by a trustee under section 726(b) of the Bankruptcy Code (the "Chapter 7 Trustee Carve-Out"); (iii) to the extent allowed at any time, all unpaid fees and expenses (the "Allowed Professional Fees") of persons or firms retained by the Debtors pursuant to sections 327, 328, or 363 of the Bankruptcy Code (the "Debtor Professionals") or by any Creditors' Committee pursuant to sections 328 or 1103 of the Bankruptcy Code (the "Committee Professionals" and, together with the Debtor Professionals, the "Professional Persons") that are incurred or earned at any time before or on the first Business Day following delivery by the DIP Agent of a Carve-Out Trigger Notice (as defined below), whether allowed prior to or after delivery of a Carve-Out Trigger Notice (the "Professional Fee Carve-Out") but, in each case, to the extent set forth in the Approved Budget; and (iv) Allowed Professional Fees in an aggregate amount not to exceed $250,000, incurred after the first Business Day following delivery by the DIP Agent of the Carve-Out Trigger Notice, to the extent allowed at any time (the "Post-Trigger Carve-Out" and with the UST Carve-Out, the Chapter 7 Carve-Out and the Professional Fee Carve-Out, the "Carve-Out")). "Carve-Out Trigger

Notice" shall mean a written notice delivered by the DIP Agent to lead restructuring counsel to the Debtors, the U.S. Trustee, and counsel to any Creditors' Committee, stating that (a) the Post-Trigger Carve-Out has been invoked, which notice may be delivered following the occurrence and during the continuation of an Event of Default under the DIP Agreement; (b) the DIP Loans have been accelerated and (c) the DIP Lenders do not intend to fund further advances under the DIP Loans, or consent to further use of Cash Collateral.  For the avoidance of doubt, the Carve-Out shall not include fees of any investment banker earned in conjunction with consummation of a sale transaction or transactions as set forth in their respective engagement letters with the applicable Debtors, unless such amounts are included in the Approved Budget.  Further, to the extent fees of any investment banker earned in conjunction consummation of a transaction or transactions as set forth in their respective engagement letters with the applicable Debtors are included in the Approved Budget, such amounts may be paid out of the collateral of the Prepetition Lenders and the DIP Lenders only to the extent such fees were (a) actually earned pursuant to the terms of the respective engagement letters with the Debtors in effect as of the date of the DIP Loan Documents (or as amended with the consent of the Required DIP Lenders), (b) approved by the Bankruptcy Court, and (c) earned in connection with transactions consented to by the Required DIP Lenders.

(b)     Professional Fee Escrow.

(i)     Prior to delivery of a Carve-Out Trigger Notice by the DIP Agent, the Debtors shall be authorized and directed to establish and maintain an escrow, to be held solely for the benefit of the Professional Persons, and, fund such escrow on a weekly basis in the amounts set forth in the Approved Budget for fees and expenses of the Professional Persons (the "Professional Fee Escrow").  If any excess amounts remain in the Professional Fee Escrow after payment of Allowed Professional Fees in accordance with the Carve-Out (but subject to the

Approved Budget), such amounts shall be returned to the DIP Lender; *provided* that to the extent that the DIP Obligations have been indefeasibly paid in full at the time such amounts are to be returned, such amounts shall be paid to the Prepetition Agent in satisfaction of the Prepetition Obligations.

(ii)     Following the delivery of the Carve-Out Trigger Notice, the Debtors are hereby authorized to use Cash Collateral on hand as of such date in accordance with the Approved Budget, and any available Cash Collateral thereafter held by any Debtor, to fund the Carve-Out.

(iii)    Following delivery of a Carve-Out Trigger Notice, the DIP Secured Parties shall not sweep or foreclose on cash (including cash received as a result of the sale or other disposition of any assets) of the Debtors until the Carve-Out has been fully funded.

(iv)    The Carve-Out shall be effective upon entry of this Interim Order and shall not be rendered ineffective as a result of the occurrence, or non-occurrence, of any event or circumstance thereafter.  In no event shall any Approved Budget or the Carve-Out be construed as a cap or limitation on the amount of the Allowed Professional Fees due and payable by the Debtors.

(v)     Nothing herein, including the inclusion of line items in the Approved Budget, shall be construed as consent to the allowance of any particular professional fees or expense of the Debtors, of any Creditors' Committee, or of any other person or shall affect the right of the DIP Agent, the DIP Lenders or the Prepetition Secured Parties to object to the allowance and payment of such fees and expenses.  The DIP Agent, the DIP Lenders and the Prepetition Secured Parties shall not be responsible for the direct payment or reimbursement of any fees or disbursements of any Professional Persons incurred in connection with the Chapter 11

Cases or any Successor Cases under any chapter of the Bankruptcy Code. Nothing in this Interim Order or otherwise shall be construed to obligate the DIP Agent, the DIP Lenders or the Prepetition Secured Parties in any way to pay compensation to or to reimburse expenses of any Professional Person, or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement.

18.    _Release_.  The stipulations set forth in Paragraph D of this Interim Order shall be deemed effective upon entry of the Interim Order, subject only to the rights expressly set forth in paragraph 19 below.

(a)    The Debtors forever and irrevocably release, discharge, and acquit each of the DIP Secured Parties, their affiliates and predecessors in interest, and their respective former, current or future officers, employees, directors, agents, representatives, owners, members, partners, advisors, legal advisors, shareholders, managers, consultants, accountants, and attorneys (in each case, solely in their capacities as such) (collectively, the "DIP Lender Releasees"), of and from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness, and obligations, of every type at any time arising prior to the Petition Date, and all claims and causes of action under chapter 5 of the Bankruptcy Code, _provided_ that nothing in this Interim Order shall constitute or permit a release of any claims or causes of action arising from an act or omission that is determine to have constituted willful misconduct, gross negligence, or actual fraud.

(b)    Subject to entry of the Final Order and the rights expressly set forth in paragraph 19 below, the Debtors forever and irrevocably release, discharge, and acquit each of the Prepetition Lenders and their respective affiliates and predecessors in interest, and their respective former, current or future officers, employees, directors, agents, representatives, owners, members,

partners, advisors, legal advisors, shareholders, managers, consultants, accountants, and attorneys (in each case, solely in their capacities as such) (collectively, the "Prepetition Lender Releasees" and collectively with the DIP Lender Releasees, the "Releasees"), of and from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness, and obligations, of every type at any time arising prior to the Petition Date, and all claims and causes of action under chapter 5 of the Bankruptcy Code, *provided* that nothing in this Interim Order shall constitute or permit a release of any claims or causes of action arising from an act or omission that is determined to have constituted willful misconduct, gross negligence, or actual fraud.

19.    Reservation of Certain Third Party Rights and Bar of Challenges and Claims. The stipulations in respect of the Prepetition Lenders set forth in Paragraph (D)(ii) of this Interim Order shall be binding upon the Debtors upon entry of this Interim Order and the releases of the Prepetition Lenders and related parties set forth in Paragraph 18(b) shall be binding upon the Debtors upon entry of the Final Order. In addition, such releases and stipulations shall be binding upon each other party in interest, including the Creditors' Committee, if any, unless a party in interest, including any Creditors' Committee, having standing, *first*, by the earlier of (i) seventy-five (75) calendar days following the date of entry of this Interim Order and (ii) subject to entry of the Final Order, the date of the hearing to consider entry of the Sale Order (such time period shall be referred to as the "Challenge Period," and the date that is the next calendar day after the termination of the Challenge Period in the event that either (i) no Challenge (as defined below) is properly raised during the Challenge Period or (ii) with respect only to those parties who properly and timely file a Challenge and only for the matters specifically set forth in such Challenge, such Challenge is fully and finally adjudicated, shall be referred to as the "Challenge Period Termination Date"), (A) a contested matter, adversary proceeding, or other action or claim (as

defined in the Bankruptcy Code) challenging or otherwise objecting to the releases of the Prepetition Lenders and related parties set forth in Paragraph 18(b) above and the stipulations in respect of the Prepetition Lenders set forth in Paragraph (D)(ii) of this Interim Order or (B) a contested matter, adversary proceeding, or other action or claim (as defined in the Bankruptcy Code) against any Releasee relating to any pre-Petition Date act, omission or aspect of the relationship between such Releasee and the Debtors ((A) and (B) being, collectively, the "Challenges" and, each individually, a "Challenge"), and, *second*, obtains a final, non-appealable order in favor of such party in interest sustaining any such Challenge in any such timely-filed contested matter, adversary proceeding, or other action.  Upon the Challenge Period Termination Date and for all purposes in these Chapter 11 Cases and any Successor Case(s), (i) any and all such Challenges by any party in interest shall be deemed to be forever released, waived, and barred, (ii) the releases of the Prepetition Lenders and related parties set forth in Paragraph 18(b) above and the stipulations in respect of the Prepetition Lenders set forth in Paragraph (D)(ii) of this Interim Order shall be binding on all parties in interest (other than the Debtors, to which they are already binding), including any Creditors' Committee, (iii) the claims of the Prepetition Secured Parties shall constitute allowed claims for all purposes in the Chapter 11 Cases and any Successor Case(s), (iv) the Prepetition Liens shall be deemed legal, valid, binding, perfected and otherwise unavoidable, (v) the Prepetition Liens and Prepetition Obligations shall not be subject to subordination, counterclaims, set-off, defense, avoidance or any other or further challenge by any party in interest seeking to exercise the rights of the Debtors' estates, including, without limitation, any successor thereto, and (vi) as a result of the foregoing, the repayment of any Prepetition Obligations in accordance with the terms of this Interim Order and the Prepetition Loan Documents shall constitute an indefeasible payment and shall be final and binding for all purposes.

If any such Challenge is timely commenced within the Challenge Period, the agreements, stipulations and findings contained in Paragraph (D)(ii) shall nonetheless remain binding and preclusive on the Debtors and their estates and respective creditors, the Creditors' Committee (if any) and all other parties in interest in these Chapter 11 Cases, except to the extent that such findings or admissions were expressly and successfully disputed in such Challenge. Nothing in this Interim Order confers on any Person, including, but not limited to any Creditors' Committee, standing or authority to pursue any cause of action belonging to the Debtors or their estates, including without limitation, claims and defenses with respect to the Prepetition Obligations. Notwithstanding the foregoing, the timely filing of a motion seeking standing to file a Challenge consistent with applicable law and rules of procedure before the expiration of the Challenge Period, which attaches a draft complaint setting forth the legal and factual basis of the proposed Challenge, shall toll the Challenge Period only as to the party that timely filed such standing motion, and solely with respect to the Challenge(s) asserted in the draft complaint, until entry of an order granting the motion for standing to prosecute such claim described in the draft complaint and permitted by the Court; *provided that*, if standing is denied by the Court, the Challenge Period Termination Date shall be deemed to have occurred with respect to such Challenge(s). Notwithstanding the foregoing, if a trustee is appointed or elected in these Chapter 11 Cases or any Successor Case(s) prior to the expiration of the Challenge Deadline, such trustee shall have the longer of the remaining Challenge Period or 10 days from the date of appointment to assert a Challenge.  The Prepetition Secured Parties stipulate and agree that each of the Prepetition Secured Parties will not raise as a defense in connection with any Challenge the ability of creditors to file derivative suits on behalf of limited liability companies.  For the avoidance of doubt, any trustee appointed or elected in these Chapter 11 Cases or any Successor Case(s), until the expiration of

the period provided herein for asserting a Challenge, and thereafter for the duration of any adversary proceeding or contested matter commenced pursuant to this paragraph (whether commenced by such trustee or commenced by any other party in interest on behalf of the Debtors' estates), be deemed to be a party other than the Debtors and shall not, for purposes of such adversary proceeding or contested matter, be bound by the acknowledgments, admissions, confirmations and stipulations of the Debtors in this Interim Order.  The Court may fashion an appropriate remedy in the event of a successful Challenge.

20.    <u>Restrictions on Use of Funds</u>. Notwithstanding anything in this Interim Order or the DIP Documents to the contrary, without the express written consent of the DIP Agent and the Prepetition Agent, no proceeds of the DIP Facility, any DIP Collateral or Prepetition Collateral (including, without limitation, Cash Collateral) or any portion of the Carve-Out may be used to pay any claims for services rendered by any professionals retained by the Debtors, any creditor or party in interest, any Creditors' Committee, any trustee appointed under these Chapter 11 Cases or any Successor Case(s), or any other party to (a) request authorization to obtain postpetition loans or other financial accommodations pursuant to section 364 of the Bankruptcy Code or otherwise, other than from the DIP Secured Parties, unless the proceeds of such loans or accommodations are or will be sufficient, and will be used, to indefeasibly pay in full in cash all DIP Obligations, or (b) investigate (except as set forth in this paragraph below), assert, join, commence, support or prosecute any Challenge or other action or claim, counter-claim, proceeding, application, motion, objection, defense, or other adversary proceeding or contested matter seeking any order, judgment, determination or similar relief against, or adverse to the interests of the DIP Secured Parties or any other Releasee with respect to any transaction, occurrence, omission, or action including, without limitation, (i) any actions under chapter 5 of the

Bankruptcy Code, (ii) any action relating to any act, omission or aspect of the relationship between or among any of the Releasees, on the one hand, and any of the Debtors, on the other, (iii) any action with respect to the validity and extent of the DIP Obligations, the Prepetition Obligations, or the validity, extent, and priority of the DIP Liens, the Prepetition Liens, or the Adequate Protection Liens, (iv) any action seeking to invalidate, set aside, avoid or subordinate, in whole or in part, the DIP Obligations, the DIP Liens, the Prepetition Obligations, the Prepetition Liens, the Adequate Protection Superpriority Claim, or the Adequate Protection Liens, or (v) any action that has the effect of preventing, hindering or delaying (whether directly or indirectly) any DIP Secured Party in respect of the enforcement of the DIP Liens, (c) subject to authority provided to the Debtors pursuant to the DIP Documents, pay any claim (as defined in the Bankruptcy Code) of a prepetition creditor (as defined in the Bankruptcy Code) if the Debtors have received a written objection to such payment from the DIP Agent, or (d) use or seek to use Cash Collateral or sell or otherwise dispose of DIP Collateral, unless otherwise permitted hereby or by the DIP Documents, without the express written consent of the applicable DIP Secured Parties.  Notwithstanding the foregoing, up to $25,000 in the aggregate of the DIP Facility, DIP Collateral, Cash Collateral and Carve-Out may be used by a Creditors' Committee during the Challenge Period to investigate, but not pursue, the validity and enforceability of Liens and obligations, under the Prepetition Loan Documents.

21.     <u>Remedies and Stay Modification.</u>  The provisions of this paragraph 21 are each subject to the Carve-Out.

(a)     The automatic stay provisions of section 362 of the Bankruptcy Code are, to the extent applicable, vacated and modified without further application or motion to, or order from, the Court, to the extent necessary so as to permit the following, and neither section 105 of

the Bankruptcy Code nor any other provision of the Bankruptcy Code or applicable law shall be utilized to prohibit the exercise, enjoyment and enforcement of any of such rights, benefits, privileges and remedies regardless of any change in circumstances (whether or not foreseeable), whether or not an Event of Default (as defined in the DIP Agreement) under the DIP Documents or a default by any of the Debtors of any of their obligations under this Interim Order has occurred: (i) the right to require all cash, checks or other collections or proceeds from DIP Collateral received by any of the Debtors to be deposited in accordance with the requirements of the DIP Documents or written instructions of the DIP Agent, and to apply any amounts so deposited and other amounts paid to or received by the DIP Secured Parties under the DIP Documents in accordance with any requirements of the DIP Documents; (ii) the right to file or record any financing statements, mortgages or other instruments or other documents to evidence the security interests in and liens upon the DIP Collateral; (iii) the right to charge and collect any interest, fees, costs and other expenses accruing at any time under the DIP Documents as provided therein; and (iv) the right to give the Debtors any notice provided for in any of the DIP Documents or this Interim Order.

(b)     Subject to Paragraph 21(d) below, the automatic stay provisions of section 362 of the Bankruptcy Code are vacated and modified without the need for further Court order to permit the DIP Secured Parties, upon the occurrence and during the continuance of an Event of Default under the DIP Agreement or the Debtors' violation of any provision of this Interim Order, and without any interference from the Debtors or any other party in interest, to (i) (A) cease making DIP Loans or suspend or terminate the commitments under the DIP Documents, and (B) declare all DIP Obligations immediately due and payable, and (ii) subject to five (5) business days' prior written notice (which may be delivered by electronic mail) (the "Remedies Notice Period") to the Debtors, their counsel, counsel to any Creditors' Committee and the U.S. Trustee, to exercise all

rights and remedies provided for in the DIP Documents, this Interim Order or under other applicable bankruptcy and non-bankruptcy law including, without limitation, the right to (A) take any actions reasonably calculated to preserve or safeguard the DIP Collateral or to prepare the DIP Collateral for sale; (B) foreclose or otherwise enforce the DIP Liens on any or all of the DIP Collateral; (C) set off any amounts held as Cash Collateral (including, without limitation, in any Cash Collateral account held for the benefit of the DIP Secured Parties); or (D) exercise any other default-related rights and remedies under the DIP Documents or this Interim Order or applicable law.  The Remedies Notice Period shall run concurrently with any notice period provided for under the DIP Documents.

(c)     Notwithstanding anything herein to the contrary, immediately upon the occurrence of a Termination Event or a default by any of the Debtors of any of their obligations under this Interim Order, the DIP Lenders may charge interest at the default rate set forth in the DIP Documents, regardless of any notice thereof and without being subject to the Remedies Notice Period.

(d)     The automatic stay of section 362(a) of the Bankruptcy Code, to the extent applicable, shall be deemed terminated without the necessity of any further action by the Court in the event that the Debtors, the Creditors' Committee, if any, or the U.S. Trustee have not obtained an order from this Court prior to the expiration of the Remedies Notice Period providing that no Event of Default under the DIP Agreement and no violation of this Interim Order has occurred. The sole issue at any hearing to re-impose the automatic stay or to obtain any other injunctive or other relief with respect to any exercise of rights or remedies by the DIP Secured Parties that may be raised by the Debtors shall be limited to whether or not an Event of Default has occurred and is

continuing under the DIP Documents and whether a violation of the Final Order (or, if applicable, any continuing provisions of this Interim Order) has occurred.

(e)     If the DIP Secured Parties are entitled, and have elected in accordance with the provisions hereof, to enforce their liens or security interests or exercise any other default-related remedies following expiration of the Remedies Notice Period, the Debtors shall cooperate with the DIP Secured Parties in connection with such enforcement by, among other things, (A) providing at all reasonable times access to the DIP Collateral and the Debtors' premises to representatives or agents of the DIP Secured Parties (including any collateral liquidator or consultant), (B) providing the DIP Secured Parties and their representatives or agents, at all reasonable times, access to the Debtors' books and records and any information or documents requested by the DIP Secured Parties or their representatives or agents, (C) performing all other obligations set forth in the DIP Documents, and (D) taking reasonable steps to safeguard and protect the DIP Collateral, and the Debtors shall not otherwise interfere with or actively encourage others to interfere with the DIP Secured Parties' enforcement of rights.

(f)     Upon the occurrence and during the continuance of an Event of Default under the DIP Documents, a violation of the terms of this Interim Order, or any other Termination Event, and including during the pendency of any applicable Remedies Notice Period, the DIP Secured Parties shall have no further obligation to provide financing under the DIP Documents. Upon (i) initiation of a Remedies Notice Period or (ii) the occurrence of a Maturity Date, the DIP Secured Parties and the Prepetition Lenders shall have no further obligation to permit the continued use of Cash Collateral (except to the extent provided in paragraph 17 of this Interim Order to fund the Carve-Out). Once the Debtors' right to use Cash Collateral is no longer permitted by this Interim Order, the Debtors shall be prohibited from using any Cash Collateral under this Interim

Order (except to the extent provided in paragraph 17 of this Interim Order to fund the Carve-Out), until such time (if any) as the Prepetition Lenders and the DIP Secured Parties have consented to further use of Cash Collateral.

(g)    Upon the occurrence and during the continuance of an Event of Default under the DIP Documents, a violation of the terms of this Interim Order, or any other Termination Event, the DIP Secured Parties may at all times continue to collect and sweep cash as provided herein or as provided in the DIP Documents, provided that sufficient funds are (or have been) set aside to fund the Carve-Out and payment of all accrued but unpaid expenses set forth in the Approved Budget through the date of the commencement of the Remedies Notice Period.

(h)    This Court shall retain jurisdiction to hear and resolve any disputes and enter any orders pursuant to the provisions of this Interim Order and relating to the application, re-imposition or continuance of the automatic stay of section 362(a) of the Bankruptcy Code or other injunctive relief requested.

22.    Limitation on Surcharge.  Subject to the entry of the Final Order, no costs or expenses of administration which have been or may be incurred in the Chapter 11 Cases or any Successor Case(s) at any time shall be surcharged against, and no person may seek to surcharge any costs or expenses of administration against the DIP Secured Parties, the Prepetition Secured Parties, the DIP Collateral, or the Prepetition Collateral, pursuant to sections 105 or 506(c) of the Bankruptcy Code or otherwise, without the prior written consent of the DIP Agent and the Prepetition Agent.  No action, inaction or acquiescence by the DIP Secured Parties or the Prepetition Secured Parties shall be deemed to be or shall be considered evidence of any alleged consent to a surcharge against the DIP Secured Parties, the DIP Collateral, the Prepetition Secured Parties or the Prepetition Collateral.

23.    <u>No Marshaling</u>.  Subject to entry of the Final Order, the DIP Secured Parties (and after payment in full of the DIP Obligations, the Prepetition Secured Parties) shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral or the Prepetition Collateral.  Without limiting the generality of the immediately preceding sentence, from and after the entry of the Final Order, no party (other than the DIP Secured Parties and after payment in full of the DIP Obligations, the Prepetition Lenders) shall be entitled, directly or indirectly, to direct the exercise of remedies or seek (whether by order of this Court or otherwise) to marshal or otherwise control the disposition of the DIP Collateral or the Prepetition Collateral (as applicable) after an Event of Default under the DIP Documents.

24.    <u>Additional Perfection Measures</u>.

(a)    If the DIP Agent, in its sole discretion, requests that the Debtors execute additional DIP Loan documentation or chooses to take any action to obtain consents from any landlord, licensor or other party in interest, to file mortgages, financing statements, notices of lien or similar instruments, or to otherwise record or perfect such security interests and liens, the DIP Agent is hereby authorized, but not directed to, take such action or to request that Debtors take such action on its behalf (and Debtors are hereby authorized to take such action) and:

(i)    any such documents or instruments shall be deemed to have been recorded and filed as of the time and on the date of entry of this Interim Order; and

(ii)    no defect in any such act shall affect or impair the validity, perfection and enforceability of the liens granted hereunder.

(b)    In lieu of obtaining such consents or filing any mortgages, financing statements, notices of lien or similar instruments, each of the DIP Agent and the Prepetition Agent may, in its respective sole discretion, choose to file a true and complete copy of this Interim Order

in any place at which any such instruments would or could be filed, together with a description of the DIP Collateral, and such filing by the DIP Agent or Prepetition Agent shall have the same effect as if such mortgages, deeds of trust, financing statements, notices of lien or similar instruments had been filed or recorded at the time and on the date of entry of this Interim Order.

25.    <u>Application of Collateral Proceeds</u>.  To the extent required by this Interim Order and the DIP Documents, after (a) an Event of Default and (b) the receipt by the Debtors of written notice that the DIP Lenders will no longer fund the Debtors through the proceeds of the DIP Loans or by consenting to the Debtors' use of Cash Collateral, the Debtors are hereby authorized to remit to the DIP Agent, subject to the payment of the Carve-Out, one hundred percent (100%) of all collections on, and proceeds of, the DIP Collateral until the DIP Obligations are paid in full, and the automatic stay provisions of section 362 of the Bankruptcy Code are hereby modified to permit the DIP Lenders to retain and apply all collections, remittances, and proceeds of the DIP Collateral in accordance with the DIP Documents.  In furtherance of the foregoing, (a) all cash, securities, investment property and other items of any Debtor deposited with any bank or other financial institution shall be subject to a perfected, first priority security interest in favor of the DIP Secured Parties, (b) upon the occurrence and during the continuance of a Termination Event and the expiration of the Remedies Notice Period, each bank or other financial institution with an account of any Debtor is hereby authorized to (i) comply at all times with any instructions originated by the DIP Agent (or its nominee) to such bank or financial institution directing the disposition of cash, securities, investment property and other items from time to time credited to such account, without further consent of any Debtor, including, without limitation, any instruction to send to the DIP Agent (or its nominee) by wire transfer (to such account as the DIP Agent (or its nominee) shall specify, or in such other manner as the DIP Agent (or its nominee) shall direct)

all such cash, securities, investment property and other items held by it, and (ii) waive any right of set off, banker's lien or other similar lien, security interest or encumbrance that is or may be invoked against the DIP Agent (or its nominee) and (c) any deposit account or securities account control agreement executed and delivered by any bank or other financial institution or any Debtor and the Prepetition Agent prior to the Petition Date in connection with the Prepetition Loan Documents shall establish co-control in favor of the DIP Agent of any and all accounts subject thereto and any and all cash, securities, investment property and other items of any Debtor deposited therein to secure the DIP Obligations (provided that primary control rights shall vest in the DIP Agent), and all rights thereunder in favor of the Prepetition Agent shall inure also to the benefit of, and shall be exercisable exclusively by, the DIP Agent, until all of the DIP Obligations have been paid in full in cash, at which time all rights shall automatically revert to the Prepetition Agent, solely to the extent such deposit account or securities account control agreement relates to Cash Collateral.

26.     <u>Access to DIP Collateral</u>.     Subject to entry of the Final Order, notwithstanding anything contained herein to the contrary, and without limiting any other rights or remedies of the DIP Secured Parties contained in this Interim Order or the DIP Documents, or otherwise available at law or in equity, and subject the terms of the DIP Documents, upon reasonable advance written notice to the landlord, lienholder, licensor or other third party owner of any leased or licensed premises or intellectual property of any Debtor that an Event of Default under the DIP Documents, a violation by any of the Debtors of any provision of this Interim Order, or any other Termination Event has occurred and is continuing, the DIP Agent (or its nominee) (a) may, unless otherwise provided in any separate agreement by and between the applicable landlord, lienholder or licensor and the DIP Agent (or its nominee) (the terms of which shall be reasonably

acceptable to the parties thereto), enter upon any leased or licensed premises of any of the Debtors for the purpose of exercising any remedy with respect to DIP Collateral located thereon and (b) shall be entitled to exercise all of the Debtors' rights and privileges as lessee or licensee under the applicable lease or license and to use any and all trademarks, trade names, copyrights, licenses, patents or any other similar assets of the Debtors, which are owned by or subject to a lien of any third party and which are used by the Debtors in their businesses, in either the case of subparagraph (a) or (b) of this paragraph, without interference from such lienholders, landlords, licensors or third parties thereunder, subject to such lienholders, landlords or licensors rights under applicable law; *provided, however*, that, with respect to any leased premises, the DIP Agent (or its nominee) shall pay only base rent payable during the period of such occupancy or use by the DIP Agent (or its nominee), as the case may be, calculated on *a per diem* basis, during the five (5) business day period the applicable landlord, lienholder, licensor or other third party may seek expedited relief from the rights set forth in this paragraph and the burden is on such party to obtain relief within such period. Nothing herein shall require the Debtors or the DIP Agent to assume any lease or license under section 365(a) of the Bankruptcy Code as a precondition to the rights afforded to the DIP Agent in this paragraph.

27.     <u>Lenders Not Responsible Persons</u>.  In (a) making the decision to make the DIP Loans and consent to the use of Cash Collateral, (b) administering the DIP Facility and the DIP Loans, (c) extending other financial accommodations to the Debtors under the DIP Documents, and (d) making the decision to collect the indebtedness and obligations of the Debtors, neither the DIP Agent, nor the DIP Secured Parties nor any Prepetition Secured Party shall, solely by reason thereof, be considered to (x) owe any fiduciary obligation to the Debtors or any other party with respect to their exercise of any consent or other rights afforded them under the DIP

Documents or this Interim Order or (y) be exercising control over any operations of the Debtors or acting in any way as a responsible person, or as an owner or operator under any applicable law, including without limitation, any environmental law (including but not limited to the *United States Comprehensive Environmental Response, Compensation and Liability Act*, 42 U.S.C. 9601, *et seq.*, and the *Resource Conservation and Recovery Act*, 42 U.S.C. 6901, *et seq.*, as either may be amended from time to time, or any similar federal or state statute).

28.    <u>Successors and Assigns</u>.  The DIP Documents and the provisions of this Interim Order shall be binding upon the Debtors and the DIP Agent, the DIP Lenders, the Prepetition Agent, the Prepetition Lenders and each of their respective successors and assigns, and shall inure to the benefit of the Debtors, the DIP Agent, the DIP other Secured Parties, the Prepetition Agent, and the Prepetition Lenders and each of their respective successors and assigns including, without limitation, any trustee, examiner with expanded powers, responsible officer, estate administrator or representative, or similar person appointed or elected in a case for any Debtor under any chapter of the Bankruptcy Code, including any Successor Case.  The terms and provisions of this Interim Order shall also be binding on all of the Debtors' creditors, equity holders, and all other parties in interest, including, but not limited to a trustee appointed or elected under chapter 7 or chapter 11 of the Bankruptcy Code.

29.    <u>Binding Nature of Agreement</u>.  Each of the DIP Documents to which any of the Debtors are or will become a party shall constitute legal, valid, and binding obligations of the Debtors party thereto, enforceable in accordance with their terms.  Unless otherwise consented to in writing by the Required DIP Lenders and the Required Prepetition Lenders (as applicable), the rights, remedies, powers, privileges, liens, and priorities of the DIP Agent, the other DIP Secured Parties, the Prepetition Agent, and the Prepetition Lenders provided for in this Interim

Order, the DIP Documents, or otherwise, shall not be modified, altered or impaired in any manner

by any subsequent order (including a confirmation or sale order), by any plan of reorganization or

liquidation in these Chapter 11 Cases, by the dismissal or conversion of these Chapter 11 Cases or

in any Successor Case under the Bankruptcy Code unless and until the DIP Obligations have first

been indefeasibly paid in full in cash and completely satisfied, the commitments thereunder are

terminated in accordance with the DIP Documents and the Prepetition Obligations are indefeasibly

paid in full in cash and completely satisfied.

30.    <u>Subsequent Reversal or Modification</u>.  If any or all of the provisions of this

Interim Order are hereafter reversed, modified, vacated or stayed, the DIP Secured Parties and the

Prepetition Secured Parties are entitled to all of the protections and benefits afforded by section

364(e) of the Bankruptcy Code.

31.    <u>Collateral Rights</u>.  Subject to any order of the Bankruptcy Court entered

without the objection of the DIP Agent authorizing the Debtors to make payments to prepetition

creditors, and subject to entry of a Final Order if any party who holds a lien or security interest in

DIP Collateral or Prepetition Collateral that is junior or otherwise subordinate to the DIP Liens,

the Adequate Protection Liens, or the Prepetition Liens in such DIP Collateral receives or is paid

the proceeds of such DIP Collateral or Prepetition Collateral, or receives any other payment with

respect thereto from any other source prior to the indefeasible payment in full in cash and the

complete satisfaction of (a) all DIP Obligations under the DIP Documents and termination of the

commitments thereunder in accordance with the DIP Documents and, as applicable (b) the

Prepetition Obligations under the Prepetition Loan Documents, such junior or subordinate

lienholder shall be deemed to have received, and shall hold, the proceeds of any such DIP

Collateral or Prepetition Collateral, as applicable, in trust for the DIP Secured Parties or Prepetition

Lenders, as applicable, and shall immediately turn over such proceeds to the DIP Agent or Prepetition Agent, as applicable, for application to repay the DIP Obligations and, as applicable, the Prepetition Obligations, in accordance with the DIP Documents, the Prepetition Loan Documents and this Interim Order until the DIP Obligations and the Prepetition Obligations, as applicable, are indefeasibly paid in full in cash.

32.    No Waiver.  This Interim Order shall not be construed in any way as a waiver or relinquishment of any rights that the DIP Secured Parties may have to bring or be heard on any matter brought before this Court.

33.    Sales.  The Debtors agree not to seek or support entry of any order that provides for either the sale of the stock of the Debtors or the sale of all or substantially all of the assets of the Debtors under section 363 of the Bankruptcy Code to any party unless (a) the Required DIP Lenders and the Required Prepetition Lenders consent and (b) the order approving such sale provides that the sale proceeds shall be distributed in accordance with the DIP Documents, the Prepetition Loan Documents and this Interim Order at the closing of such sale.  The Debtors agree to adhere to the following milestones with respect to the sale of all or substantially all of their assets (collectively, the "Milestones"):

| Timeline | Action/Deadline |
|---|---|
| One (1) business day following Petition Date | File sale motion and bidding procedures for sale of all of the assets of the Debtors |
| Twenty-eight (28) days following Petition Date | Deadline to obtain entry of order approving bidding procedures. |

| Timeline | Action/Deadline |
|---|---|
| Forty-two (42) days following Petition Date | Deadline for interested parties to submit qualified bids for purchase of assets of the Debtors. |
| Forty-three (43) following Petition Date | Deadline for holding auction for purchase of assets of the Debtors (if there is more than one qualified bid). |
| Forty-five (45) days following the Petition Date | Deadline for hearing to approve the sale. |
| Forty-six (46) days following Petition Date | Deadline for Court approval of the sale. |
| Fifty (50) following Petition Date | Deadline to consummate sale(s) of substantially all of the Debtors' assets |

For the avoidance of doubt, failure to comply with the Milestones or the other provisions of this paragraph 34 shall be a Termination Event for purposes of this Interim Order.

34.    <u>Dismissal and Conversion</u>.  If an order dismissing or converting any of these Chapter 11 Cases under sections 305 or 1112 of the Bankruptcy Code or otherwise, or appointing a chapter 11 trustee or a responsible officer or examiner with expanded powers, is at any time entered, (a) the DIP Liens, the DIP Superpriority Claim, the Adequate Protection Liens and the Adequate Protection Superpriority Claim granted hereunder and in the DIP Documents shall continue in full force and effect, remain binding on all parties-in-interest, and maintain their priorities as provided in this Interim Order and the DIP Documents and (b) to the fullest extent permitted by law, this Court shall retain jurisdiction, notwithstanding such dismissal, for purposes of enforcing the DIP Liens, the DIP Superpriority Claim, the Adequate Protection Liens and the Adequate Protection Superpriority Claim.

35.    <u>Limits on Lenders' Liability</u>.  Nothing in this Interim Order or in any of the DIP Documents or any other documents related to this transaction shall in any way be construed

or interpreted to impose or allow the imposition upon any of the DIP Secured Parties or the Prepetition Secured Parties of any liability for any claims arising from any and all activities by the Debtors or any of their subsidiaries or affiliates in the operation of their businesses or in connection with their restructuring efforts.

36.    <u>Priority of Terms</u>.  To the extent of any conflict between or among (a) the express terms or provisions of any of the DIP Documents, the Motion, the Requested Relief, any other order of this Court, or any other agreements, on the one hand, and (b) the terms and provisions of this Interim Order, on the other hand, unless such term or provision herein is phrased in terms of "as defined in" "as set forth in" or "as more fully described in" the DIP Documents (or words of similar import), the terms and provisions of this Interim Order shall govern.

37.    <u>No Third-Party Beneficiary</u>.  Except as explicitly set forth herein, no rights are created hereunder for the benefit of any third party, any creditor or any direct, indirect or incidental beneficiary.

38.    <u>Survival</u>.  Except as otherwise provided herein, (a) the protections afforded under this Interim Order, and any actions taken pursuant thereto, shall survive the entry of an order (i) dismissing any of these Chapter 11 Cases or (ii) converting any of these Chapter 11 Cases to a case pursuant to chapter 7 of the Bankruptcy Code, and (b) the DIP Liens, the Adequate Protection Liens, the DIP Superpriority Claim and the Adequate Protection Superpriority Claim shall continue in these Chapter 11 Cases, any such Successor Case(s) or after any such dismissal.  Except as otherwise provided herein, the DIP Liens, the Adequate Protection Liens, the DIP Superpriority Claim, and the Adequate Protection Superpriority Claim shall maintain their priorities as provided in this Interim Order, the Final Order, and the DIP Documents, and not be modified, altered or impaired in any way by any other financing, extension of credit, incurrence of indebtedness (except

with respect to any additional financing to be provided by the DIP Secured Parties in accordance with the DIP Agreement and any Final Order), or any conversion of any of these Chapter 11 Cases into a case pursuant to chapter 7 of the Bankruptcy Code or dismissal of any of these Chapter 11 Cases, or by any other act or omission until: (i) all DIP Obligations are indefeasibly paid in full in cash and completely satisfied, and the commitments under the DIP Documents are terminated in accordance therewith, and (ii) the Prepetition Obligations have been or are deemed to have been satisfied in accordance with the Bankruptcy Code.

39.    <u>Scheduling of Final Hearing</u>.  The notice given by the Debtors of the Interim Hearing was given in accordance with Bankruptcy Rules 2002 and 4001 and the Local Rules of this Court.  The Debtors shall promptly mail copies of this Interim Order and notice of the Final Hearing to any known party affected by the terms of this Interim Order or Final Order and any other party requesting notice after the entry of this Interim Order.  Any objection to the relief sought at the Final Hearing shall be made in writing setting forth with particularity the grounds thereof, and filed with the Court and served by _____ _.m. (Eastern) on the following parties: (a) proposed co-counsel to the Debtors, Ropes & Gray LLP, 1211 Avenue of the Americas, New York, NY 10036 (Attn: Gregg M. Galardi and Lindsay C. Barca, email: gregg.galardi@ropesgray.com and lindsay.barca@ropesgray.com); and Chipman Brown Cicero & Cole LLP, 1313 N. Market Street, Suite 5400, Wilmington, DE 19801 (Attn: Robert A. Weber and Mark L. Desgrosseilliers; email: weber@chipmanbrown.com and desgross@chipmanbrown.com); (b) counsel to the DIP Agent, DIP Lenders and Prepetition Lenders, (i) Jones Day, 250 Vesey Street, New York, New York 10281 , Attn: Thomas M. Wearsch and Genna Ghaul or by email at twearsch@jonesday.com and gghaul@jonesday.com and (ii) Jones Day, 100 High Street, Boston, MA 02110, Attn: John D. Casais or by email at

jcasais@jonesday.com; (c) Delaware counsel to the DIP Agent, DIP Lenders and Prepetition Lenders, Richards, Layton & Finger, P.A., 920 N. King Street, Wilmington, DE 19801, Attn: Mark D. Collins and Zachary I. Shapiro or by email at collins@rlf.com and shapiro@rlf.com; (d) counsel to the Prepetition Agent, Chapman and Cutler LLP, 320 S. Canal Street, Chicago, IL 60606 (Attn: David T. Audley, email: audley@chapman.com); and (e) the Office of the U.S. Trustee for the District of Delaware, 844 King Street, Suite 2207, Wilmington, Delaware 19801 (Attn: Linda J. Casey or by email at linda.casey@usdoj.gov. The Court shall conduct a Final Hearing on the Requested Relief commencing on [_____], 2024 at _____ (Eastern).

40.    <u>Immediate Binding Effect; Entry of Interim Order</u>. This Interim Order shall not be stayed and shall be valid and fully effective immediately upon entry, notwithstanding the possible application of Bankruptcy Rules 6004(h), 7062, and 9014, or otherwise, and the Clerk of the Court is hereby directed to enter this Interim Order on the Court's docket in these Chapter 11 Cases.

41.    <u>Proofs of Claim</u>. Neither the DIP Secured Parties nor the Prepetition Secured Parties shall be required to file proofs of claim in any of these Chapter 11 Cases or Successor Cases on account of the DIP Obligations, the Prepetition Obligations or any other claim provided for in this Interim Order. Notwithstanding any order entered by the Court in relation to the establishment of a bar date in any of these Chapter 11 Cases or Successor Cases to the contrary, the Prepetition Agent is hereby authorized and entitled, in its sole discretion, but not required, to file (and amend and/or supplement as it sees fit) a proof of claim and/or aggregate proofs of claim in each of these Chapter 11 Cases or Successor Cases on account of the DIP Obligations, the Prepetition Obligations or any other claim provided for in this Interim Order.

42.    <u>Headings</u>.  The headings of the various paragraphs in this Interim Order are for convenience of reference only and shall not define or limit any of the terms or provisions hereof.

43.    <u>Retention of Jurisdiction</u>.    This Court shall retain jurisdiction over all matters pertaining to the implementation, interpretation, and enforcement of this Interim Order.

**Exhibit A**

**Approved Budget**

**Hardinge, Inc.**
**DIP Budget**

| ($ in '000s) | wk 1 Forecast 8/2/24 | wk 2 Forecast 8/9/24 | wk 3 Forecast 8/16/24 | wk 4 Forecast 8/23/24 | wk 5 Forecast 8/30/24 | wk 6 Forecast 9/6/24 | wk 7 Forecast 9/13/24 | 7-wk Forecast Total |
|---|---|---|---|---|---|---|---|---|
| **1** **Operating Receipts** | | | | | | | | |
| 2  Workholding Receipts | $ 765 | $ 711 | $ 711 | $ 767 | $ 767 | $ 830 | $ 830 | $ 5,382 |
| 3  OTW Abrasives Receipts | 83 | 42 | 42 | 52 | 26 | 26 | 26 | 297 |
| 4  U.S. Machines / Parts & Services Receipts | 218 | 218 | 218 | 218 | 218 | 218 | 218 | 1,526 |
| 5  Foreign Repatriated Funds | - | - | 312 | - | - | - | - | 312 |
| **6  Subtotal - Operating Receipts** | **$ 1,066** | **$ 971** | **$ 1,283** | **$ 1,037** | **$ 1,011** | **$ 1,074** | **$ 1,074** | **$ 7,517** |
| **7** **Operating Disbursements** | | | | | | | | |
| 8  Supplier Disbursements | (327) | (347) | (347) | (329) | (329) | (192) | (192) | (2,065) |
| 9  Payroll / Benefits / Pension | (696) | (1,323) | (691) | (813) | (531) | (785) | (503) | (5,342) |
| 10  T&E Reimbursement | (19) | (19) | (9) | (9) | (9) | (12) | (12) | (88) |
| 11  Rent / Utilities / Insurance | (296) | (23) | (23) | (23) | (49) | (256) | (29) | (698) |
| 12  Information Technology | (33) | (7) | (27) | (93) | (37) | (80) | (113) | (390) |
| 13  Freight - Outbound | (25) | (25) | (25) | (18) | (18) | (18) | (18) | (145) |
| 14  Other | (127) | (106) | (6) | (106) | (16) | (227) | (6) | (593) |
| **15  Subtotal - Operating Disbursements** | **$ (1,522)** | **$ (1,850)** | **$ (1,128)** | **$ (1,391)** | **$ (990)** | **$ (1,569)** | **$ (872)** | **$ (9,321)** |
| **16  Net Operating Cash Flow** | **$ (456)** | **$ (878)** | **$ 155** | **$ (354)** | **$ 21** | **$ (495)** | **$ 202** | **$ (1,804)** |
| **17** **Restructuring Costs** | | | | | | | | |
| 18  Capex | - | - | - | (250) | - | - | - | (250) |
| 19  Critical & Foreign Vendors / 503(b)(9) | (833) | (833) | (833) | - | (414) | - | - | (2,914) |
| 20  Utilities Adequate Assurance | - | (70) | - | - | - | - | - | (70) |
| 21  Taxes | (250) | - | - | - | (200) | - | - | (450) |
| 22  Shippers / Warehousing | (100) | - | - | - | (50) | - | - | (150) |
| 23  US Trustee Fees | - | - | - | - | - | - | (183) | (183) |
| 24  Professional Fees | (1,015) | (620) | (605) | (1,050) | (700) | (880) | (580) | (5,450) |
| **25  Subtotal - Restructuring Costs** | **$ (2,198)** | **$ (1,523)** | **$ (1,438)** | **$ (1,300)** | **$ (1,364)** | **$ (880)** | **$ (763)** | **$ (9,467)** |
| 26  International - Kellenberger Funding | (4,300) | - | - | - | - | - | - | (4,300) |
| **27  Total Disbursements** | **$ (8,021)** | **$ (3,373)** | **$ (2,566)** | **$ (2,691)** | **$ (2,354)** | **$ (2,449)** | **$ (1,635)** | **$ (23,088)** |
| **28  Net Cash Flow** | **$ (6,955)** | **$ (2,402)** | **$ (1,283)** | **$ (1,654)** | **$ (1,343)** | **$ (1,375)** | **$ (561)** | **$ (15,571)** |
| **29  Beginning U.S. Cash Balance** | $ 460 | $ 7,505 | $ 5,104 | $ 3,821 | $ 2,167 | $ 3,974 | $ 2,600 | $ 460 |
| 30  Net Cash Flow | (6,955) | (2,402) | (1,283) | (1,654) | (1,343) | (1,375) | (561) | (15,571) |
| 31  Net Borrowing | 14,000 | - | - | - | 3,150 | - | - | 17,150 |
| **32  Ending U.S. Cash Balance** | **$ 7,505** | **$ 5,104** | **$ 3,821** | **$ 2,167** | **$ 3,974** | **$ 2,600** | **$ 2,039** | **$ 2,039** |
| **33  Beginning DIP Balance** | $ - | $ 15,770 | $ 15,770 | $ 15,770 | $ 15,770 | $ 19,062 | $ 19,062 | $ - |
| 34  Borrowings | 14,000 | - | - | - | 3,150 | - | - | 17,150 |
| 35  PIK Interest & Fees | 1,770 | - | - | - | 142 | - | 86 | 1,999 |
| **36  Ending DIP Balance** | **$ 15,770** | **$ 15,770** | **$ 15,770** | **$ 15,770** | **$ 19,062** | **$ 19,062** | **$ 19,149** | **$ 19,149** |
| **37  Beginning DIP Balance (incl. contingent funding)** | $ - | $ 15,770 | $ 25,970 | $ 25,970 | $ 25,970 | $ 29,355 | $ 29,355 | $ - |
| 38  Contingent Kellenberger Funding | - | 7,700 | - | - | - | - | - | 7,700 |
| 39  Contingent USACH Funding | - | 2,500 | - | - | - | - | - | 2,500 |
| 40  PIK Interest on contingent funding | - | - | - | - | 92 | - | 46 | 138 |
| **41  Ending DIP Balance (incl. contingent funding)** | **$ 15,770** | **$ 25,970** | **$ 25,970** | **$ 25,970** | **$ 29,355** | **$ 29,355** | **$ 29,487** | **$ 29,487** |

**<u>EXHIBIT B</u>**
**DIP Agreement**

**Draft: 7/28/2024**

Secured Superpriority Debtor-in-Possession Credit Agreement

Dated as of July [__], 2024

among

HARDINGE INC.,

the Guarantors from time to time parties hereto,

the Lenders from time to time parties hereto,

and

[Centre Lane Solutions Partners, LP],
as Administrative Agent

## TABLE OF CONTENTS

Page

*Section 1. Definitions; Interpretation.* .................................................................................................. *1*

    *Section 1.1*    *Definitions* ........................................................................................ *1*
    *Section 1.2*    *Interpretation* ................................................................................. 27
    *Section 1.3*    *[Reserved]* ....................................................................................... 27
    *Section 1.4*    *[Reserved]* ....................................................................................... 27
    *Section 1.5*    *Interest Rates* ................................................................................ 27
    *Section 1.6*    *Divisions* ......................................................................................... 28
    *Section 1.7*    *German Terms.* ............................................................................... 28
    *Section 1.8*    *Dutch terms.* ................................................................................... 29
    *Section 1.9*    *Swiss terms* ..................................................................................... 30

*Section 2. The Credit Facilities.* ..................................................................................................... 30

    *Section 2.1*    *Initial Term Loan and Delayed Draw Term Loan Commitments* ...................... 30
    *Section 2.2*    *[Reserved]* ....................................................................................... 31
    *Section 2.3*    *[Reserved]* ....................................................................................... 31
    *Section 2.4*    *Applicable Interest Rates.* ............................................................ 31
    *Section 2.5*    *Minimum Borrowing Amounts* ..................................................... 32
    *Section 2.6*    *Manner of Borrowing Loans and Designating Applicable Interest Rates.* .......... 32
    *Section 2.7*    *[Reserved]* ....................................................................................... 33
    *Section 2.8*    *Maturity of Loans.* ........................................................................ 33
    *Section 2.9*    *Prepayments.* .................................................................................. 33
    *Section 2.10*    *Default Rate* ................................................................................... 34
    *Section 2.11*    *Evidence of Indebtedness* ............................................................. 34
    *Section 2.12*    *Origination Payment; Transaction Premium* ................................ 35
    *Section 2.13*    *Place and Application of Payments.* ............................................. 35
    *Section 2.14*    *[Reserved]* ....................................................................................... 36
    *Section 2.15*    *Priority and Liens.* ....................................................................... 36
    *Section 2.16*    *No Discharge; Survival of Claims* ............................................... 37
    *Section 2.17*    *Defaulting Lenders.* ...................................................................... 38

*Section 3. Taxes; Change In Circumstances.* ................................................................................. 39

    *Section 3.1*    *Withholding Taxes.* ....................................................................... 39
    *Section 3.2*    *Documentary Taxes* ...................................................................... 40
    *Section 3.3*    *Intended Tax Treatment* ................................................................ 40
    *Section 3.4*    *Funding Indemnity* ........................................................................ 41
    *Section 3.5*    *Change in Law* ............................................................................... 41
    *Section 3.6*    *Inability to Determine Rates* ........................................................ 41
    *Section 3.7*    *Increased Cost and Reduced Return* ............................................ 42
    *Section 3.8*    *Lending Offices* .............................................................................. 43
    *Section 3.9*    *[Reserved]* ....................................................................................... 43
    *Section 3.10*    *Effect of Benchmark Transition Event* ........................................ 43

*Section 4. Conditions Precedent.* .................................................................................................... 44

    *Section 4.1*    *Conditions Precedent to the Occurrence of the Closing Date and to the Making of the Initial Term Loans* ................................................. 44
    *Section 4.2*    *Conditions Precedent to All Loans* .............................................. 46

*Section 5. Representations and Warranties.* ................................................................................... 47

146392832_4

# TABLE OF CONTENTS
(continued)

Page

| | | |
|---|---|---|
| Section 5.1 | Organization and Qualification | 47 |
| Section 5.2 | Subsidiaries | 47 |
| Section 5.3 | Authority and Validity of Obligations | 48 |
| Section 5.4 | Use of Proceeds; Margin Stock | 48 |
| Section 5.5 | Financial Reports | 49 |
| Section 5.6 | No Material Adverse Change | 49 |
| Section 5.7 | Full Disclosure | 49 |
| Section 5.8 | Intellectual Property | 50 |
| Section 5.9 | Governmental Authority and Licensing | 50 |
| Section 5.10 | Good Title | 50 |
| Section 5.11 | Litigation and Other Controversies | 50 |
| Section 5.12 | Taxes | 50 |
| Section 5.13 | Approvals | 50 |
| Section 5.14 | Affiliate Transactions | 51 |
| Section 5.15 | Investment Company | 51 |
| Section 5.16 | ERISA; Foreign Plans; Plan Assets; Prohibited Transactions. | 51 |
| Section 5.17 | Compliance with Laws | 51 |
| Section 5.18 | Sanctions; Anti-Money Laundering Laws and Anti-Corruption Laws. | 52 |
| Section 5.19 | Other Agreements | 53 |
| Section 5.20 | [Reserved] | 53 |
| Section 5.21 | No Default | 53 |
| Section 5.22 | No works council | 53 |
| Section 5.23 | No Broker Fees | 53 |
| Section 5.24 | EEA Financial Institution | 53 |
| Section 5.25 | Bankruptcy Matters | 53 |
| Section 6. Affirmative Covenants. | | 54 |
| Section 6.1 | Maintenance of Business | 54 |
| Section 6.2 | Maintenance of Properties | 54 |
| Section 6.3 | Taxes and Assessments | 54 |
| Section 6.4 | Insurance | 54 |
| Section 6.5 | Financial and Other Reports | 55 |
| Section 6.6 | Inspection | 57 |
| Section 6.7 | ERISA | 57 |
| Section 6.8 | Compliance with Laws. | 57 |
| Section 6.9 | Compliance with Anti-Corruption Laws, Anti-Money Laundering Laws and Sanctions. | 58 |
| Section 6.10 | Formation of Subsidiaries | 58 |
| Section 6.11 | Use of Proceeds | 59 |
| Section 6.12 | Guaranties and Collateral. | 59 |
| Section 6.13 | Certain Post-Closing Matters | 60 |
| Section 6.14 | People with significant control regime | 60 |
| Section 6.15 | Lenders Meetings and Conference Calls. | 60 |
| Section 6.16 | Milestones | 60 |
| Section 6.17 | Bankruptcy Matters | 61 |
| Section 7. Negative Covenants. | | 62 |
| Section 7.1 | Borrowings and Guaranties | 62 |

146392832_4

# TABLE OF CONTENTS
(continued)

| | | Page |
|---|---|---|
| Section 7.2 | Liens | 63 |
| Section 7.3 | Investments, Acquisitions, Loans and Advances | 65 |
| Section 7.4 | Mergers, Consolidations and Sales | 66 |
| Section 7.5 | Maintenance of Subsidiaries | 67 |
| Section 7.6 | Dividends and Certain Other Restricted Payments | 67 |
| Section 7.7 | Burdensome Contracts With Affiliates | 67 |
| Section 7.8 | No Changes in Fiscal Year | 68 |
| Section 7.9 | Change in the Nature of Business | 68 |
| Section 7.10 | No Restrictions | 68 |
| Section 7.11 | Subordinated Debt | 68 |
| Section 7.12 | Use of Proceeds | 69 |
| Section 7.13 | Modifications to Organizational Documents | 69 |
| Section 7.14 | [Reserved] | 69 |
| Section 7.15 | No flowback in Switzerland | 69 |
| Section 7.16 | Disbursements; DIP Budget Variance | 69 |
| Section 7.17 | Case Matters | 70 |
| Section 8. Events of Default and Remedies | | 71 |
| Section 8.1 | Events of Default | 71 |
| Section 8.2 | Remedies Upon an Event of Default | 75 |
| Section 8.3 | [Reserved] | 76 |
| Section 8.4 | [Reserved] | 76 |
| Section 8.5 | Notice of Default | 76 |
| Section 9. Administrative Agent | | 76 |
| Section 9.1 | Appointment and Authorization of Administrative Agent | 76 |
| Section 9.2 | Special Appointment of Administrative Agent for Swiss Security Documents | 77 |
| Section 9.3 | Rights as a Lender | 78 |
| Section 9.4 | Action by Administrative Agent | 78 |
| Section 9.5 | Consultation with Experts | 78 |
| Section 9.6 | Liability of Administrative Agent; Credit Decision. | 78 |
| Section 9.7 | Indemnity | 79 |
| Section 9.8 | Resignation of Administrative Agent and Successor Administrative Agent | 80 |
| Section 9.9 | Credit Bidding | 80 |
| Section 9.10 | [Reserved] | 82 |
| Section 9.11 | Designation of Additional Agents | 82 |
| Section 9.12 | Authorization to Release or Subordinate or Limit Liens | 82 |
| Section 9.13 | Authorization to Enter into, and Enforcement of, the Collateral Documents. | 83 |
| Section 9.14 | Delegation of Duties. | 83 |
| Section 9.15 | [Reserved] | 84 |
| Section 9.16 | Certain ERISA Matters | 84 |
| Section 9.17 | Recovery of Erroneous Payments. | 85 |
| Section 9.18 | Parallel Debt | 85 |
| Section 10. The Guarantees. | | 86 |
| Section 10.1 | The Guarantees | 86 |
| Section 10.2 | Guarantee Unconditional | 86 |

# TABLE OF CONTENTS

(continued)

Page

*Section 10.3*    *Discharge Only upon Payment in Full; Reinstatement in Certain Circumstances*................................................87
*Section 10.4*    *Subrogation*..................................................87
*Section 10.5*    *Waivers*........................................................87
*Section 10.6*    *Limit on Recovery*.......................................87
*Section 10.7*    *Contribution*................................................88
*Section 10.8*    *Stay of Acceleration*..................................89
*Section 10.9*    *Benefit to Guarantors*................................89
*Section 10.10*   *Guarantor Covenants*................................89
*Section 10.11*   *Swiss Guarantee Limitations*....................89
*Section 10.12*   *German Guarantee Limitations*..................90

*Section 11. Miscellaneous*..................................................................93

*Section 11.1*    *No Waiver, Cumulative Remedies*..............93
*Section 11.2*    *Non-Business Days*.....................................93
*Section 11.3*    *Survival of Representations*.......................93
*Section 11.4*    *Survival of Indemnity and Certain Other Provisions*....93
*Section 11.5*    *Sharing of Set Off*.....................................93
*Section 11.6*    *Notices*........................................................94
*Section 11.7*    *Electronic Execution; Electronic Records; Counterparts*....95
*Section 11.8*    *Successors and Assigns*..............................96
*Section 11.9*    *Participants*................................................96
*Section 11.10*   *Assignments.*...............................................97
*Section 11.11*   *Amendments*................................................99
*Section 11.12*   *Headings*.....................................................100
*Section 11.13*   *Costs and Expenses; Indemnification*........100
*Section 11.14*   *Set off*.........................................................102
*Section 11.15*   *Entire Agreement*.......................................102
*Section 11.16*   *Governing Law*...........................................102
*Section 11.17*   *Severability of Provisions*.........................102
*Section 11.18*   *Excess Interest*..........................................103
*Section 11.19*   *Construction*...............................................103
*Section 11.20*   *Lender's Obligations Several*....................103
*Section 11.21*   *Submission to Jurisdiction; Waiver of Venue; Service of Process.*....104
*Section 11.22*   *Waiver of Jury Trial*..................................104
*Section 11.23*   *USA Patriot Act*.........................................104
*Section 11.24*   *Time is of the Essence*...............................105
*Section 11.25*   *Confidentiality*..........................................105
*Section 11.26*   *Customary Advertising Material*...............105
*Section 11.27*   *Acknowledgement and Consent to Bail-In of Affected Financial Institutions*....105
*Section 11.28*   *Acknowledgement Regarding any Supported QFCs*....106

146392832_4

Exhibits

| Exhibit A | Form of Assignment and Acceptance |
| Exhibit B | Form of Interim DIP Order |
| Exhibit C | Form of Notice of Borrowing |
| Exhibit D | [Reserved] |
| Exhibit E | Form of Note |
| Exhibit F | Form of Variance Report |
| Exhibit G | Additional Guarantor Supplement |
| Exhibit H | [Reserved] |
| Exhibit I | Form of United States Tax Compliance Certificates |

Schedules

| Schedule 1 | Commitments |
| Schedule 5.2 | Subsidiaries |
| Schedule 5.8 | Intellectual Property |
| Schedule 5.14 | Intercompany Notes |
| Schedule 5.16(a) | ERISA Matters |
| Schedule 5.23 | Broker Fees |
| Schedule 6.13 | Post-Closing Matters |
| Schedule 7.1 | Indebtedness for Borrowed Money |
| Schedule 7.2 | Liens |

## SECURED SUPERPRIORITY DEBTOR-IN-POSSESSION CREDIT AGREEMENT

This Secured Superpriority Debtor-in-Possession Credit Agreement is entered into as of [July __], 2024 by and among Hardinge Inc., a New York corporation and a Debtor and Debtor-in-Possession under Chapter 11 of the Bankruptcy Code ("*Borrower*"), the direct and indirect Subsidiaries of Borrower from time to time party to this Agreement, as Guarantors, the several financial institutions from time to time party to this Agreement, as Lenders, and [Centre Lane Solutions Partners, LP], as Administrative Agent as provided herein.  All capitalized terms used herein without definition shall have the same meanings ascribed thereto in Section 1.1.

## PRELIMINARY STATEMENT

On July [__], 2024 (the "*Petition Date*"), Borrower and certain of the Loan Parties (in their capacity as debtors under the Cases (as defined below), each a "*Debtor*" and collectively, the "*Debtors*") commenced Chapter 11 case numbers [_____] through [_____], as jointly administered for procedural purposes at Chapter 11 case number [_____], (each a "*Case*" and collectively, the "*Cases*") by filing with the United States Bankruptcy Court for the District of Delaware (the "*Bankruptcy Court*") voluntary petitions for relief under Chapter 11 of the Bankruptcy Code and the Debtors have continued to operate their business as debtor-in-possession pursuant to Sections 1107 and 1108 thereof.

Prior to the Petition Date, the Prepetition Lenders (as hereinafter defined) provided financing to Borrower, guaranteed by each of the other Debtors, pursuant to that certain Credit Agreement, dated as of September 27, 2022 (as amended, restated, amended and restated, supplemented or otherwise modified prior to the date hereof, the "*Prepetition Loan Agreement*"), by and among Borrower, each of the other Debtors and certain other subsidiaries of Borrower, as guarantors, BMO Harris Bank N.A., a national banking association, as collateral agent (in such capacity, the "*Prepetition Agent*"), and the lenders from time to time party thereto (the "*Prepetition Lenders*" and, together with the Prepetition Agent, the "*Prepetition Secured Parties*"); and

Borrower has requested and the Lenders have agreed to provide Borrower with a priming, secured superpriority debtor-in-possession credit facility in an aggregate principal amount not to exceed $27,350,000 subject to the terms and conditions set forth in this Agreement and the DIP Orders, as applicable.

NOW, THEREFORE, in consideration of the mutual agreements contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

*Section 1.  Definitions; Interpretation.*

*Section 1.1     Definitions*.  The following terms when used herein shall have the following meanings:

"*363 Sale Transaction*" means the sale of all or substantially all of the Debtors' assets (the "Acquired Assets") consummated under Section 363 of the Bankruptcy Code to: (a) the Stalking Horse Purchaser on the terms set forth in the Stalking Horse APA or (b) another Qualified Bidder pursuant to the terms of an Alternative Transaction.

"*Acquisition*" means any transaction or series of related transactions for the purpose of or resulting, directly or indirectly, in (a) the acquisition of all or substantially all of the assets of a Person, or of any business or division of a Person, (b) the acquisition of in excess of 50% of the equity interests of any Person

(other than a Person that is a Subsidiary), or otherwise causing any Person to become a Subsidiary, or (c) a merger or consolidation or any other combination with another Person (other than a Person that is a Subsidiary); provided that in any transaction involving a merger, consolidation or any other combination with Borrower, Borrower is the surviving entity, and in any other merger, consolidation or any other combination, a Person that is a Subsidiary of Borrower immediately after giving effect to such transaction is the surviving entity.

"***Adequate Protection Obligations***" means the Loan Parties' obligations to provide adequate protection to the Prepetition Secured Parties.

"***Adequate Protection Superpriority Claims***" has the meaning specified in the DIP Orders.

"***Adjusted Term SOFR***" means the per annum rate equal to the sum of (i) Term SOFR *plus* (ii) of 0.10000% (10.000 basis points) for a one month tenor; <u>provided</u>, if Adjusted Term SOFR determined as provided above shall ever be less than the Floor, then Adjusted Term SOFR shall be deemed to be the Floor.

"***Administrative Agent***" means [Centre Lane Solutions Partners, LP], in its capacity as Administrative Agent hereunder, and any successor in such capacity pursuant to <u>Section 9.8</u>.

"***Administrative Questionnaire***" means an Administrative Questionnaire in a form supplied by Administrative Agent.

"***Affected Financial Institution***" means (a) with respect to any EEA Member Country, any EEA Financial Institution or (b) with respect to the United Kingdom, any party to which the UK Bail-In Legislation applies.

"***Affiliate***" means any Person directly or indirectly controlling or controlled by, or under direct or indirect common control with, another Person. A Person shall be deemed to control another Person for purposes of this definition if such Person possesses, directly or indirectly, the power to direct, or cause the direction of, the management and policies of the other Person, whether through the ownership of voting securities, common directors, trustees or officers, by contract or otherwise; provided that, in any event for purposes of this definition, any Person that owns, directly or indirectly, 10% or more of the securities having the ordinary voting power for the election of directors or governing body of a corporation or 10% or more of the partnership or other ownership interest of any other Person (other than as a limited partner of such other Person) will be deemed to control such corporation or other Person.

"***AFOS***" means AFOS, LLC, a Delaware limited liability company.

"***Agreement***" means this Secured Superpriority Debtor-in-Possession Term Loan Agreement, as the same may be amended, restated, supplemented, or otherwise modified from time to time pursuant to the terms hereof.

"***Alternative Transaction***" means a sale of all or substantially all of the Debtors' assets to a Qualified Bidder that submits the winning bid for such assets (other than CLP as the "Stalking Horse" under the Stalking Horse APA) for cash consideration greater than the Release Price.

"***Anti-Corruption Laws***" means all Laws of any jurisdiction applicable to a Loan Party or any of their Subsidiaries from time to time concerning or relating to bribery or corruption.

146392832_4

"***Anti-Money Laundering Laws***" means any and all Laws applicable to a Loan Party or its Subsidiaries related to terrorism financing or money laundering, including any applicable provision of the Patriot Act.

"***Applicable Margin***" means 5.50% per annum.

"***Approved Budget***" has the meaning specified in Section 4.1(k).

"***Approved Fund***" means any Fund that is administered or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) an entity or an Affiliate of an entity that administers or manages a Lender.

"***Approved Plan***" has the meaning specified in Section 8.01(j)(ii).

"***Asset Sale***" means a sale, lease or sub lease (as lessor or sublessor), sale and leaseback, assignment, conveyance, transfer, license or sublicense or other disposition to (other than to a Loan Party), or any exchange of property with, any Person, in one transaction or a series of transactions, of all or any part of any Loan Party's or Subsidiary's businesses, assets or properties of any kind, whether real, personal, or mixed and whether tangible or intangible, whether now owned or hereafter acquired, including, without limitation, the equity interests of any Loan Party or Subsidiary thereof.  For purposes of clarification, "Asset Sale" shall include (a) the sale or other disposition for value of any contracts, (b) any disposition of property through a "plan of division" under the Delaware Limited Liability Company Act or any comparable transaction under any similar law, (c) the early termination or modification of any contract resulting in the receipt by any Loan Party of a cash payment or other consideration in exchange for such event and (d) any sale of accounts (or any rights thereto) by any Loan Party or Subsidiary of the Borrower.

Notwithstanding the foregoing, none of the following items will be deemed to be an Asset Sale:

(i)      an issuance of equity interests by a Subsidiary of the Borrower to the Borrower or to another Loan Party;

(ii)      use or transfer of cash or cash equivalents in a manner that is not prohibited by the terms of this Agreement or the other Loan Documents;

(iii)      the licensing or sublicensing of patents, trademarks, know-how or other intellectual property or general intangibles related thereto in the ordinary course of business which do not materially interfere with the ordinary conduct of the business of Borrower or any of its Subsidiaries (provided that any exclusive license that effectively constitutes a transfer of the related property shall be deemed to be an Asset Sale); and

(iv)      the lease, assignment or sublease of any real or personal property in the ordinary course of business which do not materially interfere with the ordinary conduct of the business of the Borrower or any of its Subsidiaries.

"***Assignment and Acceptance***" means an assignment and acceptance entered into by a Lender and an Eligible Assignee (with the consent of any party whose consent is required by Section 11.10), and accepted by Administrative Agent, in substantially the form of Exhibit A or any other form approved by Administrative Agent.

"***Auction***" shall have the meaning provided in the definition of Bidding Procedures Order.

"***Authorized Representative***" means those persons shown on the list of officers provided by Borrower pursuant to Section 4.1 or on any update of any such list provided by Borrower to Administrative

146392832_4

Agent, or any further or different officers of Borrower so named by any Authorized Representative of Borrower in a written notice to Administrative Agent.

"***Automatic Stay***" means the automatic stay imposed under Section 362 of the Bankruptcy Code.

"***Available Tenor***" means, as of any date of determination and with respect to the then-current Benchmark, as applicable, (x) if such Benchmark is a term rate, any tenor for such Benchmark (or component thereof) that is or may be used for determining the length of an interest period pursuant to this Agreement or (y) otherwise, any payment period for interest calculated with reference to such Benchmark (or component thereof) that is or may be used for determining any frequency of making payments of interest calculated with reference to such Benchmark, in each case, as of such date and not including, for the avoidance of doubt, any tenor for such Benchmark that is then-removed from the definition of "Interest Period" pursuant to Section 3.10(d).

"***Avoidance Action***" means any action under chapter 5 of the Bankruptcy Code.

"***Bail-In Action***" means the exercise of any Write-Down and Conversion Powers by the applicable Resolution Authority in respect of any liability of an Affected Financial Institution.

"***Bail-In Legislation***" means (a) with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law, regulation, rule or requirement for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule and (b) with respect to the United Kingdom, the UK Bail-In Legislation.

"***Bankruptcy Code***" means Title 11 of the United States Code entitled "Bankruptcy," as now and hereafter in effect, or any successor statute.

"***Bankruptcy Court***" has the meaning specified in the Preliminary Statement hereto.

"***Bankruptcy Laws***" means, collectively: (a) Debtor Relief Laws; and (b) all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor-relief Laws of any other applicable jurisdictions from time to time in effect and affecting the rights of creditors generally, including without limitation the United Kingdom's Insolvency Act 1986.

"***Base Rate***" means, for any day, the rate per annum equal to the greatest of: (a) the rate of interest announced or otherwise established by Administrative Agent from time to time as its prime commercial rate as in effect on such day, with any change in the Base Rate resulting from a change in said prime commercial rate to be effective as of the date of the relevant change in said prime commercial rate (it being acknowledged and agreed that such rate may not be Administrative Agent's best or lowest rate) (such rate, the "***Prime Rate***"), and (b) the sum of (i) the Federal Funds Rate, plus (ii) 1/2 of 1%. Any change in the Base Rate due to a change in the prime rate or the Federal Funds Rate, as applicable, shall be effective from and including the effective date of the change in such rate.  If Base Rate as determined above shall ever be less than the Floor *plus* 1.00%, then Base Rate shall be deemed to be the Floor *plus* 1.00%.

"***Base Rate Loan***" means a Loan bearing interest at a rate specified in Section 2.4(a).

"***Benchmark***" means, initially, the Term SOFR Reference Rate; provided that if a Benchmark Transition Event has occurred with respect to the Term SOFR Reference Rate or the then-current

146392832_4

Benchmark, then "Benchmark" means the applicable Benchmark Replacement to the extent that such Benchmark Replacement has replaced such prior benchmark rate pursuant to Section 3.10.

"***Benchmark Replacement***" means the first alternative set forth in the order below that can be determined by the Administrative Agent for the applicable Benchmark Replacement Date,

(a)    the sum of (i) Daily Simple SOFR plus (ii) 0.10000% (10.000 basis points); or

(b)    the sum of: (i) the alternate benchmark rate that has been selected by the Administrative Agent and Borrower giving due consideration to (A) any selection or recommendation of a replacement benchmark rate or the mechanism for determining such a rate by the Relevant Governmental Body or (B) any evolving or then-prevailing market convention for determining a benchmark rate as a replacement to the then-current Benchmark for Dollar-denominated syndicated credit facilities and (ii) the related Benchmark Replacement Adjustment.

If the Benchmark Replacement as determined pursuant to clause (a) or (b) above would be less than the Floor, the Benchmark Replacement will be deemed to be the Floor for the purposes of this Agreement and the other Loan Documents.

"***Benchmark Replacement Adjustment***" means, with respect to any replacement of the then-current Benchmark with an Unadjusted Benchmark Replacement, the spread adjustment, or method for calculating or determining such spread adjustment, (which may be a positive or negative value or zero) that has been selected by the Administrative Agent and Borrower giving due consideration to (a) any selection or recommendation of a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of such Benchmark with the applicable Unadjusted Benchmark Replacement by the Relevant Governmental Body or (b) any evolving or then-prevailing market convention for determining a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of such Benchmark with the applicable Unadjusted Benchmark Replacement for Dollar-denominated syndicated credit facilities.

"***Benchmark Replacement Date***" means the earliest to occur of the following events with respect to the then-current Benchmark:

(a)    in the case of clause (a) or (b) of the definition of "Benchmark Transition Event", the later of (i) the date of the public statement or publication of information referenced therein and (ii) the date on which the administrator of such Benchmark (or the published component used in the calculation thereof) permanently or indefinitely ceases to provide all Available Tenors of such Benchmark (or such component thereof); or

(b)    in the case of clause (c) of the definition of "Benchmark Transition Event", the first date on which such Benchmark (or the published component used in the calculation thereof) has been determined and announced by or on behalf of the administrator of such Benchmark (or such component thereof) or the regulatory supervisor for the administrator of such Benchmark (or such component thereof) to be no longer representative; provided that such non-representativeness or non-compliance will be determined by reference to the most recent statement or publication referenced in such clause (c) and even if any Available Tenor of such Benchmark (or such component thereof) continues to be provided on such date.

For the avoidance of doubt, the "Benchmark Replacement Date" will be deemed to have occurred in the case of clause (a) or (b) with respect to any Benchmark upon the occurrence of the applicable event or events set forth therein with respect to all then-current Available Tenors of such Benchmark (or the published component used in the calculation thereof).

"*Benchmark Transition Event*" means the occurrence of one or more of the following events with respect to the then-current Benchmark:

(a)     a public statement or publication of information by or on behalf of the administrator of such Benchmark (or the published component used in the calculation thereof) announcing that such administrator has ceased or will cease to provide all Available Tenors of such Benchmark (or such component thereof), permanently or indefinitely, provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide any Available Tenor of such Benchmark (or such component thereof);

(b)     a public statement or publication of information by the regulatory supervisor for the administrator of such Benchmark (or the published component used in the calculation thereof), the Federal Reserve Board, the Federal Reserve Bank of New York, an insolvency official with jurisdiction over the administrator for such Benchmark (or such component), a resolution authority with jurisdiction over the administrator for such Benchmark (or such component) or a court or an entity with similar insolvency or resolution authority over the administrator for such Benchmark (or such component), which states that the administrator of such Benchmark (or such component) has ceased or will cease to provide all Available Tenors of such Benchmark (or such component thereof) permanently or indefinitely, provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide any Available Tenor of such Benchmark (or such component thereof); or

(c)     a public statement or publication of information by or on behalf of the administrator of such Benchmark (or the published component used in the calculation thereof) or the regulatory supervisor for the administrator of such Benchmark (or such component thereof) announcing that all Available Tenors of such Benchmark (or such component thereof) are no longer, or as of a specified future date will no longer be, representative.

For the avoidance of doubt, a "Benchmark Transition Event" will be deemed to have occurred with respect to any Benchmark if a public statement or publication of information set forth above has occurred with respect to each then-current Available Tenor of such Benchmark (or the published component used in the calculation thereof).

"*Benchmark Unavailability Period*" means the period (if any) (a) beginning at the time that a Benchmark Replacement Date has occurred if, at such time, no Benchmark Replacement has replaced the then-current Benchmark for all purposes hereunder and under any Loan Document in accordance with Section 3.10 and (b) ending at the time that a Benchmark Replacement has replaced the then-current Benchmark for all purposes hereunder and under any Loan Document in accordance with Section 3.10.

"*Beneficial Ownership Certification*" means a certification regarding beneficial ownership of Borrower as required by 31 C.F.R. § 1010.230 (as amended, modified or supplemented from time to time), in form and substance satisfactory to the Administrative Agent.

"*Bidding Procedures Order*" means an order entered by the Bankruptcy Court, in form and substance reasonably acceptable to the Required Lenders, approving the bidding and auction (the "Auction") procedures with respect to the sale by the Debtors of all or substantially all of the Debtors' assets including designating CLP as the "Stalking Horse" on the terms set forth in the Stalking Horse APA.

"*BMO*" means BMO Harris Bank N.A.

"*Board of Directors*" means, as to any person, the board of directors, the board of managers, the sole manager or other governing body of such person.

146392832_4

"***Borrower***" is defined in the introductory paragraph of this Agreement.

"***Borrowing***" means a borrowing consisting of simultaneous Loans made by each of the Lenders pursuant to Section 2.1.

"***Business***" means the business of the Loan Parties as conducted on the date hereof.

"***Business Day***" means any day (other than a Saturday or Sunday) on which banks are not authorized or required to close in New York City, New York.

"***Capital Lease***" means any lease of Property which in accordance with GAAP is required to be capitalized on the balance sheet of the lessee. Notwithstanding anything to the contrary in this Agreement, only those leases that would constitute capital leases or financing leases in conformity with GAAP prior to December 31, 2018 shall be considered Capital Leases, and all calculations and deliverables under this Agreement or any other Loan Document shall be made or delivered, as applicable, in accordance therewith.

"***Capitalized Lease Obligation***" means, for any Person, the amount of the liability shown on the balance sheet of such Person in respect of a Capital Lease determined in accordance with GAAP.

"***Carve-Out***" has the meaning specified in the DIP Orders.

"***Case***" or "***Cases***" has the meaning specified in the Preliminary Statement to this Agreement.

"***CERCLA***" means the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended by the Superfund Amendments and Reauthorization Act of 1986, 42 U.S.C. §§9601 et seq., and any future amendments.

"***Change in Law***" means the occurrence, after the date of this Agreement, of any of the following: (a) the adoption or taking effect of any Law, (b) any change in any Law or in the administration, interpretation or application thereof by any Governmental Authority or (c) the making or issuance of any request, rule, guideline, interpretation or directive (whether or not having the force of law) by any Governmental Authority; provided that notwithstanding anything herein to the contrary, (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (y) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "Change in Law", regardless of the date enacted, adopted or issued.

"***Change of Control***" means any of (a) Permitted Holders cease to own (within the meaning of Rule 13d-5 under the Exchange Act as in effect on the date hereof) at least 67% of the Voting Stock of the Parent, (b) the Parent ceases to own, legally and beneficially, 100% of the equity interests of Borrower, or (c) Permitted Holders fail to have the right to appoint a majority of the Board of Directors of the Parent and Borrower, or (d) any "Change of Control" (or words of like import), as defined in any agreement or indenture relating to any issue of Indebtedness for Borrowed Money of Borrower or any Subsidiary in an aggregate principal amount in excess of $150,000 outstanding, shall occur.

"***Chinese Security Documents***" means, collectively, any equity pledge contract, or similar document, executed after the Closing Date pursuant to the terms hereof or otherwise in connection with the transaction contemplated hereby and any other Collateral Document governed by the Laws of the People's Republic of China to secure the Obligations or any part thereof.

146392832_4

"***Closing Date***" means the date of this Agreement or such later Business Day upon which each condition described in Section 4.1 shall be satisfied or waived in a manner acceptable to Administrative Agent in its discretion.

"***CLP***" means Centre Lane Partners, LLC or its designees.

"***Code***" means the Internal Revenue Code of 1986, as amended from time to time and any successor statute thereto.

"***Collateral***" means all properties, rights, interests, and privileges from time to time subject to the Liens granted to Administrative Agent, or any security trustee therefor, by the Collateral Documents and the DIP Orders.

"***Collateral Documents***" means (a) the U.S. Security Documents, (b) subject to Section 6.13, the French Security Documents, the Swiss Security Documents, the Dutch Security Documents, the Chinese Security Documents, the Hong Kong Security Documents and the UK Security Documents; (c) any other intellectual property security agreements; and (d) other foreign security documents and guarantees necessary to grant the security interests required to be granted pursuant to the terms of the Loan Documents, in each case, including to the extent required for perfection of assets required to be pledged pursuant to the terms of the Loan Documents, any notices sent thereunder.

"***Commitments***" means the Initial Term Loan Commitments, the Delayed Draw Term Loan Commitments and the USACH/Kellenberger Term Loan Commitments.  The amount of each Lender's Commitment as of the Closing Date is set forth on Schedule 1 and the aggregate amount of the Commitments as of the Closing Date is $27,350,000 (in each case, before giving effect to the making of any Loans.

"***Committee***" means an official committee of unsecured creditors holding unsecured claims, if any, appointed in the Cases pursuant to Section 1102(a) of the Bankruptcy Code.

"***Commodity Exchange Act***" means the Commodity Exchange Act (7 U.S.C. § 1 et seq.).

"***Communication***" means this Agreement, any Loan Document and any document, amendment, waiver, forbearance, approval, consent, information, notice, certificate, request, statement, disclosure or authorization related to any Loan Document (including any Assignment and Acceptance).

"***Conforming Changes***" means with respect to either the use of administration of Term SOFR or the use, administration, adoption or implementation of any Benchmark Replacement, any technical, administrative or operational changes (including changes to the definition of "Base Rate," the definition of "Business Day," the definition of "Interest Period," the definition of "U.S. Government Securities Business Day", the timing and frequency of determining rates and making payments of interest, the timing of borrowing requests or prepayment, conversion or continuation notices, the applicability and length of lookback periods, the applicability of breakage provisions, and other technical, administrative or operational matters) that the Administrative Agent decides may be appropriate to reflect the adoption and implementation of any such rate or to permit the use and administration thereof by the Administrative Agent in a manner substantially consistent with market practice (or, if the Administrative Agent decides that adoption of any portion of such market practice is not administratively feasible or if the Administrative Agent determines that no market practice for the administration of any such rate exists, in such other manner of administration as the Administrative Agent decides is reasonably necessary in connection with the administration of this Agreement and the other Loan Documents).

"***Connection Income Taxes***" means Other Connection Taxes which are imposed on or measured by net income (however denominated) or which are franchise Taxes or branch profits Taxes.

"***Contractual Obligation***" means, as to any Person, any provision of any security issued by such Person, or of any agreement, loan agreement, indenture, mortgage, deed of trust, lease, instrument or other undertaking to which such Person is a party or by which it or any of its property is bound.

"***Controlled Group***" means all members of a controlled group of corporations and all trades or businesses (whether or not incorporated) under common control which, together with Borrower, are treated as a single employer under Section 414 of the Code.

"***Controlled Investment Affiliate***" means, with respect to a Permitted Holder of the type referred to in clause (a) of the definition thereof, any other investment fund or similar Person that (a) is organized primarily for the purpose of making equity investments in one or more companies and (b) is directly or indirectly controlled by, or is under common control with, such Permitted Holder.  For purposes of this definition "control" means the power to direct or cause the direction of management and policies of a Person, whether by contract or otherwise.

"***Correspondence***" is defined in Section 11.6(e).

"***Credit Event***" means the advancing of any Loan.

"***Daily Simple SOFR***" means, for any day, SOFR, with the conventions for this rate (which will include a lookback) being established by the Administrative Agent in accordance with the conventions for this rate selected or recommended by the Relevant Governmental Body for determining "Daily Simple SOFR" for syndicated business loans; provided that if the Administrative Agent decides that any such convention is not administratively feasible for the Administrative Agent, then the Administrative Agent may establish another convention in its reasonable discretion.

"***Debtor Relief Laws***" means the Bankruptcy Code of the United States of America, the Dutch Bankruptcy Code (*Faillissementswet*) and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief Laws of the United States or other applicable jurisdictions from time to time in effect.

"***Debtors***" has the meaning specified in the Preliminary Statement hereto.

"***Default***" means any event or condition the occurrence of which would, with the passage of time or the giving of notice, or both, constitute an Event of Default.

"***Default Rate***" means when used with respect to (a) the principal amount of the Loans, an interest rate equal to the interest rate (including the Applicable Margin) otherwise applicable to such Loan pursuant to Section 2.4 plus 2.00% per annum and (b) other Obligations, an interest rate equal to the interest rate (including the Applicable Margin) applicable to Base Rate Loans plus 2.00% per annum.

"***Defaulting Lender***" means, subject to Section 2.17(b), any Lender that (a) has failed to (i) fund all or any portion of its Loans within two Business Days of the date such Loans were required to be funded hereunder unless such Lender notifies the Administrative Agent and the Borrower in writing that such failure is the result of such Lender's determination that one or more conditions precedent to funding (each of which conditions precedent, together with any applicable default, shall be specifically identified in such writing) has not been satisfied, or (ii) pay to the Administrative Agent or any Lender any other amount required to be paid by it hereunder within two Business Days of the date when due, (b) has notified

146392832_4

Borrower or the Administrative Agent in writing that it does not intend to comply with its funding obligations hereunder, or has made a public statement to that effect (unless such writing or public statement relates to such Lender's obligation to fund a Loan hereunder and states that such position is based on such Lender's determination that a condition precedent to funding (which condition precedent, together with any applicable default, shall be specifically identified in such writing or public statement) cannot be satisfied), (c) has failed, within three (3) Business Days after written request by the Administrative Agent or Borrower, to confirm in writing to the Administrative Agent and Borrower that it will comply with its prospective funding obligations hereunder (provided that such Lender shall cease to be a Defaulting Lender pursuant to this clause (c) upon receipt of such written confirmation by the Administrative Agent and Borrower), or (d) has, or has a direct or indirect parent company that has, (i) become the subject of a proceeding under any Bankruptcy Law, (ii) had appointed for it a receiver, custodian, conservator, trustee, administrator, assignee for the benefit of creditors or similar Person charged with reorganization or liquidation of its business or assets, including the Federal Deposit Insurance Corporation or any other state or federal regulatory authority acting in such a capacity or (iii) become the subject of a Bail-in Action; provided that a Lender shall not be a Defaulting Lender solely by virtue of the ownership or acquisition of any equity interest in that Lender or any direct or indirect parent company thereof by a Governmental Authority so long as such ownership interest does not result in or provide such Lender with immunity from the jurisdiction of courts within the United States or from the enforcement of judgments or writs of attachment on its assets or permit such Lender (or such Governmental Authority) to reject, repudiate, disavow or disaffirm any contracts or agreements made with such Lender. Any determination by the Administrative Agent that a Lender is a Defaulting Lender under any one or more of clauses (a) through (d) above shall be conclusive and binding absent manifest error, and such Lender shall be deemed to be a Defaulting Lender (subject to Section 2.17(b)) upon delivery of written notice of such determination to Borrower and each Lender.

"**_Delayed Draw Term Funding Date_**" has the meaning specified in Section 2.1(b).

"**_Delayed Draw Term Loan_**" has the meaning specified in Section 2.1(b).

"**_Delayed Draw Term Loan Commitment_**" means the commitment of a Lender to make or otherwise fund any Delayed Draw Term Loan pursuant to Section 2.1(b), and "Delayed Draw Term Loan Commitments" means such commitments of all Lenders in the aggregate. The amount of each Lender's Delayed Draw Term Loan Commitment is set forth opposite such Lender's name on Schedule 1, or, if such Lender's Delayed Draw Term Loan Commitment has been assigned, in the applicable Assignment and Acceptance, subject to any adjustment pursuant to the terms and conditions hereof. The aggregate amount of the Delayed Draw Term Loan Commitments as of the Closing Date is $3,150,000 (before giving effect to the making of any Delayed Draw Term Loans).

"**_Delayed Draw Term Loan Percentage_**" means, for each Lender, the percentage of the Delayed Draw Term Loan Commitments represented by such Lender's Delayed Draw Term Loan Commitment or, if the Delayed Draw Term Loan Commitments have been terminated or have expired, the percentage held by such Lender of the aggregate principal amount of all Delayed Draw Term Loans then outstanding.

"**_Designated Disbursement Account_**" means an account of Borrower designated in writing to Administrative Agent as Borrower's Designated Disbursement Account (or such other account as Borrower and Administrative Agent may otherwise agree).

"**_Designated Jurisdiction_**" means, at any time, any country, region or territory which is itself the subject or target of any Sanctions.

"**_DIP Facility_**" means the credit facility contemplated by this Agreement.

146392832_4

"***DIP Lien***" has the meaning specified in the DIP Orders.

"***DIP Orders***" means the Interim DIP Order and/or the Final DIP Order, as applicable, as each may be amended, restated, amended and restated, supplemented or otherwise modified with the prior written consent of Administrative Agent.

"***DIP Origination Payment***" has the meaning specified in <u>Section 2.12</u>.

"***DIP Origination Premium***" has the meaning specified in <u>Section 2.12</u>.

"***Disbursements Variance***" has the meaning specified in <u>Section 6.5(a)</u>.

"***Disposition***" means the sale, lease, conveyance or other disposition (in one transaction or in a series of transactions and whether effected pursuant to a Division or otherwise) of Property, other than sales or other dispositions expressly permitted under <u>Section 7.4</u>.

"***Disqualified Stock***" means any capital stock or other equity interests which, by its terms (or by the terms of any security or other capital stock or equity interests into which it is convertible or for which it is exchangeable), or upon the happening of any event or condition, (a) matures or is mandatorily redeemable, pursuant to a sinking fund obligation or otherwise, or is redeemable at the option of the holder thereof, in whole or in part, on or prior to the date that is ninety-one (91) days following the final maturity date of the Loans, (b) is convertible into or exchangeable for (i) debt securities or (ii) any capital stock or other equity interests referred to in (a) above, in each case, at any time on or prior to the date that is ninety-one (91) days following the final maturity date of the Loans except as a result of a change of control or asset sale so long as the rights of the holders thereof upon the occurrence of a change of control or asset sale event shall be subject to the prior Payment in Full, or (c) is entitled to receive scheduled dividends or distributions in cash prior to the Payment in Full.

"***Dividing Person***" has the meaning assigned to it in the definition of "Division."

"***Division***" means the division of the assets, liabilities and/or obligations of a Person (the "***Dividing Person***") among two or more Persons (whether pursuant to a "plan of division" or similar arrangement), which may or may not include the Dividing Person and pursuant to which the Dividing Person may or may not survive.

"***Division Successor***" means any Person that, upon the consummation of a Division of a Dividing Person, holds all or any portion of the assets, liabilities and/or obligations previously held by such Dividing Person immediately prior to the consummation of such Division. A Dividing Person which retains any of its assets, liabilities and/or obligations after a Division shall be deemed a Division Successor upon the occurrence of such Division.

"***Domestic Subsidiary***" means a Subsidiary that is not a Foreign Subsidiary.

"***Dutch Loan Party***" means a Loan Party incorporated in the Netherlands.

"***Dutch Security Documents***" means, if and to the extent that Administrative Agent by notice to Borrower directs Borrower to cause the applicable Person to enter into the same, (a) a Dutch law deed of pledge of shares of all issued and outstanding shares in the capital of Hardinge Machine Tools B.V., between Hardinge Holdings B.V., as pledgor, Administrative Agent, as pledgee, and Hardinge Machine Tools B.V., as the company, executed after the Closing Date pursuant to the terms of <u>Schedule 6.13</u> and (b) a Dutch law deed of pledge of shares of all issued and outstanding shares in the capital of Hardinge Holdings

-11-

B.V., between Hardinge Holdings GmbH as pledgor, Administrative Agent, as pledgee, and Hardinge Holdings B.V., as the company, executed after the Closing Date pursuant to the terms of Schedule 6.13 and any other Collateral Document governed by the Laws of the Netherlands to secure the Obligations or any part thereof.

"*EEA Financial Institution*" means (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established in an EEA Member Country which is a subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent.

"*EEA Member Country*" means any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"*EEA Resolution Authority*" means any public administrative authority or any person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any credit institution or investment firm established in any EEA Member Country.

"*Electronic Record*" means a record created, generated, sent, communicated, received, or stored by electronic means.

"*Electronic Signature*" means an electronic sound, symbol, or process attached to or logically associated with an electronic record and executed or adopted by a person with the intent to sign the Electronic Record.

"*Eligible Assignee*" means (a) a Lender, (b) an Affiliate of a Lender, (c) an Approved Fund, and (d) any other Person (other than a natural person) approved by Administrative Agent (such approval not to be unreasonably withheld or delayed); provided that notwithstanding the foregoing, "*Eligible Assignee*" shall not include Borrower or any Guarantor or any of Borrower's or such Guarantor's Affiliates or Subsidiaries or any Defaulting Lender.

"*Environmental Claim*" means any investigation, notice, violation, demand, action, suit, injunction, judgment, order, consent decree, penalty, fine, lien, proceeding or claim (whether administrative, judicial or private in nature) arising (a) pursuant to, or in connection with an actual or alleged violation of, any Environmental Law, (b) in connection with any Hazardous Material, (c) from any abatement, removal, remedial, corrective or response action in connection with a Hazardous Material, Environmental Law or order of a Governmental Authority under Environmental Law or (d) from any actual or alleged damage, injury, threat or harm to health, safety, natural resources or the environment.

"*Environmental Law*" means any current or future Legal Requirement pertaining to (a) the protection of health, safety and the indoor or outdoor environment, (b) the conservation, management or use of natural resources and wildlife, (c) the protection or use of surface water or groundwater, (d) the management, manufacture, possession, presence, use, generation, transportation, treatment, storage, disposal, Release, threatened Release, abatement, removal, remediation or handling of, or exposure to, any Hazardous Material or (e) pollution (including any Release to air, land, surface water or groundwater), and any amendment, rule, regulation, order or directive issued thereunder.

"*ERISA*" means the Employee Retirement Income Security Act of 1974, as amended, or any successor statute thereto.

-12-

"***EU Bail-In Legislation Schedule***" means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor person), as in effect from time to time.

"***Event of Default***" means any event or condition identified as such in <u>Section 8.1</u>.

"***Event of Loss***" means, with respect to any Property, any of the following: (a) any loss, destruction or damage of such Property or (b) any condemnation, seizure, or taking, by exercise of the power of eminent domain or otherwise, of such Property, or confiscation of such Property or the requisition of the use of such Property.

"***Excluded Subsidiary***" means (a) each Foreign Subsidiary of Borrower existing on the Petition Date that is not a guarantor under the Prepetition Loan Documents, and (b) each  Foreign Subsidiary of Borrower that is a guarantor under the Prepetition Loan Documents unless, in the case of this clause (b), Administrative Agent shall request that such Subsidiary become a Guarantor, at which time such Subsidiary shall cease to be an Excluded Subsidiary.

"***Excluded Swap Obligation***" means any Swap Obligation of a Loan Party (other than the direct counterparty of such Swap Obligation) if, and to the extent that, all or a portion of the Guaranty of such Loan Party of, or the grant by such Loan Party of a security interest to secure, such Swap Obligation (or any Guaranty thereof) is or becomes illegal under the Commodity Exchange Act or any rule, regulation or order of the Commodity Futures Trading Commission (or the application or official interpretation of any thereof) by virtue of such Loan Party's failure for any reason to constitute an "eligible contract participant" as defined in the Commodity Exchange Act at the time the Guaranty of such Loan Party or the grant of such security interest becomes effective with respect to such Swap Obligation.  If a Swap Obligation arises under a master agreement governing more than one swap, such exclusion shall apply only to the portion of such Swap Obligation that is attributable to swaps for which such Guaranty or security interest is or becomes illegal.

"***Excluded Taxes***" means any of the following Taxes imposed on or with respect to the Administrative Agent or any Lender or any other recipient of any payment to be made by or on account of any obligation of any Loan Party hereunder or required to be withheld or deducted from such payment, (a) Taxes imposed on or measured by net income, franchise Taxes, and branch profits Taxes, in each case, (i) imposed as a result of such recipient being organized or incorporated under the laws of, or having its principal office or, in the case of any Lender, its applicable lending office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (ii) that are Other Connection Taxes, (b) in the case of a Lender, U.S. federal withholding Taxes imposed on amounts payable to or for the account of such recipient with respect to an applicable interest in a Loan or commitment pursuant to a law in effect on the date on which (i) such recipient acquires such interest in the Loan or commitment (other than pursuant to an assignment requested by Borrower under <u>Section 2.16</u>) or (ii) such recipient changes its lending office, except in each case to the extent that, pursuant to Section 3.1, amounts with respect to such Taxes were payable either to such recipient's assignor immediately before such recipient acquired the applicable interest in the Loan or commitment or to such recipient immediately before it changed its lending office, (c) Taxes attributable to such recipient's failure to comply with <u>Section 3.1(b)</u> or <u>(d)</u> and (d) any Taxes imposed under FATCA.

"***Extraordinary Receipt***" means any cash received by or paid to or for the account of any Person not in the ordinary course of business, including (a) tax refunds, pension plan reversions, proceeds of insurance, indemnity payments (other than to the extent such payments are payable to a Person that is not an Affiliate of any Loan Party or any of its respective Subsidiaries) and any purchase price adjustment, (b) Net Cash Proceeds of any Event of Loss and, (c) after approval of the application thereof to the Obligations pursuant to the Final DIP Order, all proceeds of Avoidance Actions.

"*FATCA*" means (a) Sections 1471 through 1474 of the Code, as of the date hereof (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof and any agreements entered into pursuant to Section 1471(b)(1) of the Code, (b) any treaty, law, regulation, practice, or other official guidance adopted or enacted in any other jurisdiction, or relating to any intergovernmental agreement, in each case, entered into in connection with the implementation of such clause (a) above, and (c) any agreement entered into with any Governmental Authority in connection with the implementation of clauses (a) or (b) above.

"*Federal Funds Rate*" means the fluctuating interest rate per annum equal to the rate determined by Administrative Agent to be the average (rounded upward, if necessary, to the next higher 1/100 of 1%) of the rates per annum quoted to Administrative Agent at approximately 10:00 a.m. (or as soon thereafter as is practicable) on such day (or, if such day is not a Business Day, on the immediately preceding Business Day) by two or more Federal funds brokers selected by Administrative Agent for sale to Administrative Agent at face value of Federal funds in the secondary market in an amount equal or comparable to the principal amount for which such rate is being determined.

"*Final DIP Order*" means an order of the Bankruptcy Court approving the Loans, this Agreement and the other Loan Documents on a final basis, which order shall be (a) in form and substance acceptable to each Lender in its sole discretion, and (b) in full force and effect and shall not have been reversed, vacated or stayed.

"*Final Order Entry Date*" means the date on which the Final DIP Order is entered by the Bankruptcy Court.

"*Floor*" means the rate per annum of interest equal to 0.00%.

"*Foreign Plan*" means any employee defined benefit pension plan, program, policy arrangement or agreement maintained or contributed to by any Loan Party with respect to employees employed outside the United States, other than any such plan, program, policy arrangement or agreement sponsored by a Governmental Authority.

"*Foreign Subsidiary*" means each Subsidiary which is organized under the laws of a jurisdiction other than the United States of America or any state thereof or the District of Columbia.

"*FRB*" means the Board of Governors of the Federal Reserve System of the United States.

"*French Security Documents*" means any French law governed guaranty or security agreement or other document executed after the Closing Date pursuant to the terms hereof or otherwise in connection with the transactions contemplated hereby and any other Collateral Document governed by the Laws of France to secure the Obligations.

"*Fund*" means any Person (other than a natural person) that is (or will be) engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of its business.

"*GAAP*" means generally accepted accounting principles set forth from time to time in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board (or agencies with similar functions of comparable stature and authority within the U.S. accounting profession), which are applicable to the circumstances as of the date of determination.

"***German Subsidiary***" means a Subsidiary of the Borrower which is incorporated or established in Germany as a limited liability company (*Gesellschaft mit beschränkter Haftung*) or limited partnership with a limited liability company as general partner (*GmbH & Co. KG*).

"***German Security Documents***", means, if and to the extent that Administrative Agent by notice to Borrower directs Borrower to cause the applicable Person to enter into the same, each German law governed (a) account pledge agreement (*Verpfändung von Kontoguthaben*), (b) each share/interest pledge agreement (*Verpfändung von Geschäftsanteilen oder Gesellschaftsanteilen*), (c) each security assignment agreement (*Sicherungsabtretung von Forderungen*), (d) each IP assignment agreement (*Sicherungsabtretung von Schutzrechten*), (e) each security transfer agreement (*Sicherungsübereignung*), (f) any guarantee or surety (*Garantie/Bürgschaft*), (g) any security trust agreement (*Sicherheitentreuhandvertrag*) (h) any security pool agreement (*Sicherheitenpoolvertrag*) and (i) any guaranty, guaranty and security agreement or other document similar to the documents referred to in clauses (a) through (h) of this definition executed after the Closing Date pursuant to the terms hereof or otherwise in connection with the transactions contemplated hereby and any other Collateral Document governed by the Laws of Germany to secure the Obligations or any part thereof.

"***Germany***" means the Federal Republic of Germany.

"***Governmental Authority***" means the government of the United States or any other nation, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national bodies such as the European Union or the European Central Bank).

"***Guarantor***" *and* "***Guarantors***" each is defined in Section 6.12(a).

"***Guaranty***" *and* "***Guaranties***" each is defined in Section 6.12(a).

"***Hazardous Material***" means any substance, chemical, compound, product, solid, gas, liquid, waste, byproduct, pollutant, contaminant or material which is hazardous or toxic, and includes (a) asbestos, polychlorinated biphenyls and petroleum (including crude oil or any fraction thereof) and (b) any material classified or regulated as "hazardous" or "toxic" or words of like import pursuant to an Environmental Law.

"***Hazardous Material Activity***" means any activity, event or occurrence involving a Hazardous Material, including the manufacture, possession, presence, use, generation, transportation, treatment, storage, disposal, Release, threatened Release, abatement, removal, remediation, handling of or corrective or response action to any Hazardous Material.

"***Hong Kong Security Documents***" means, if and to the extent that Administrative Agent by notice to Borrower directs Borrower to cause the applicable Person to enter into the same, a share charge of shares in the capital of Hardinge Asia Limited between Hardinge Holdings GmbH as pledgor, the Administrative Agent (or CLP, as the case may be), as pledgee to be entered into in accordance with the requirements set forth on Schedule 6.13 and any other Collateral Document governed by the Laws of Hong Kong to secure the Obligations or any part thereof.

"***Indebtedness for Borrowed Money***" means for any Person (without duplication) (a) all indebtedness created, assumed or incurred in any manner by such Person representing money borrowed (including by the issuance of debt securities), (b) all indebtedness for the deferred purchase price of property or services (other than trade accounts payable arising in the ordinary course of business which are not more than ninety (90) days past due), (c) all indebtedness secured by any Lien upon Property of such Person,

-15-

whether or not such Person has assumed or become liable for the payment of such indebtedness, (d) all Capitalized Lease Obligations of such Person, (e) all obligations of such Person on or with respect to amounts drawn under letters of credit, bankers' acceptances and other similar types of extensions of credit whether or not representing obligations for borrowed money, (f) all obligations of such Person, whether or not contingent, in respect of Disqualified Stock, valued at, in the case of redeemable preferred capital stock or other equity interests, the greater of the voluntary liquidation preference and the involuntary liquidation preference of such capital stock or other equity interests plus accrued and unpaid dividends, and (g) swap or termination value of all Swap Obligations of such Person.

"***Indemnified Tax(es)***" means (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of any Loan Party under any Loan Document and (b) to the extent not otherwise described in (a), Other Taxes.

"***Initial Term Loan Commitment***" means, as to each Lender, its commitment to make an Initial Term Loan to Borrower on the Closing Date (before giving effect to the Initial Term Loans made on the Closing Date) pursuant to Section 2.1(a), and "***Initial Term Loan Commitments***" means such commitments of all Lenders in the aggregate.  The amount of each Lender's Initial Term Loan Commitment as of the Closing Date is as set forth opposite such Lender's name on Schedule 1 or in the Assignment and Acceptance pursuant to which such Lender becomes a party hereto, as applicable, as such amount may be adjusted from time to time in accordance with this Agreement; provided, that the Initial Term Loan Commitments to make Initial Term Loans on the Closing Date shall not exceed $14,000,000 (in each case, before giving effect to the Initial Term Loans made on the Closing Date).

"***Initial Term Loan Percentage***" means, for each Lender, the percentage of the Initial Term Loan Commitments represented by such Lender's Initial Term Loan Commitment or, if the Initial Term Loan Commitments have been terminated or have expired, the percentage held by such Lender of the aggregate principal amount of all Initial Term Loans then outstanding.

"***Initial Term Loans***" has the meaning specified in Section 2.1(a).

"***Interim DIP Order***" means an interim order of the Bankruptcy Court approving the Loans, this Agreement  and the other Loan Documents on an interim basis, which order shall be substantially in the form attached hereto as Exhibit B (or in form and substance acceptable to each Lender in its sole discretion).

"***Interim Facility Maturity Date***" means the date that is thirty (30) days after the Petition Date, if the Final DIP Order has not been entered on or prior to such date.

"***Interim Order Entry Date***" means the date on which the Interim DIP Order is entered by the Bankruptcy Court.

"***Interest Payment Date***" means, (a) with respect to any Base Rate Loan, the last day of every calendar month and on the maturity date, (b) as to any Loan, the last day of each Interest Period therefor; provided that, as to any such Loan, (i) if any such date would be a day other than a Business Day, such date shall be extended to the next succeeding Business Day unless such next succeeding Business Day would fall in the next calendar month, in which case such date shall be the next preceding Business Day and (ii) the Interest Payment Date with respect to any Borrowing that occurs on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in any applicable calendar month) shall be the last Business Day of any such succeeding applicable calendar month.

146392832_4

"*Interest Period*" means the period commencing on the date a Borrowing of Loans is advanced or continued, and ending on the numerically corresponding day in the calendar month that is one month thereafter, *provided,* that:

> (i)      no Interest Period shall extend beyond the final maturity date of the relevant Loans;

> (ii)      whenever the last day of any Interest Period would otherwise be a day that is not a Business Day, the last day of such Interest Period shall be extended to the next succeeding Business Day, provided that, if such extension would cause the last day of an Interest Period for a Borrowing of SOFR Loans to occur in the following calendar month, the last day of such Interest Period shall be the immediately preceding Business Day; and

> (iii)      for purposes of determining an Interest Period for a Borrowing of SOFR Loans, a month means a period starting on one day in a calendar month and ending on the numerically corresponding day in the next calendar month; provided that if there is no numerically corresponding day in the month in which such an Interest Period is to end or if such an Interest Period begins on the last Business Day of a calendar month, then such Interest Period shall end on the last Business Day of the calendar month in which such Interest Period is to end.

"*Kellenberger*" means L. Kellenberger & Co. AG, a Swiss stock corporation.

"*Laws*" means, collectively, all international, foreign, Federal, state and local statutes, treaties, rules, regulations, ordinances, codes, obligatory government orders, decrees and administrative or judicial precedents or authorities, including the interpretation or administration thereof by any Governmental Authority charged with the enforcement, interpretation or administration thereof, and all applicable administrative orders, directed duties, requests, licenses, authorizations and permits of, and agreements with, any Governmental Authority, in each case whether or not having the force of law.

"*Legal Requirement*" means any treaty, convention, statute, law, regulation, ordinance, license, permit, governmental approval, injunction, judgment, order, consent decree or other requirement of any Governmental Authority, whether federal, state, or local.

"*Lenders*" means and includes CLP and the other financial institutions from time to time party to this Agreement, including each assignee Lender pursuant to Section 11.10.

"*Lending Office*" is defined in Section 3.8.

"*Lien*" means any mortgage, lien, security interest, pledge, charge, assignment, security transfer of assets, land charge or encumbrance of any kind in respect of any Property, including the interests of a vendor or lessor under any conditional sale, Capital Lease or other title retention arrangement.

"*Loan Documents*" means this Agreement, the Notes (if any), the Collateral Documents, the Guaranties, the DIP Orders, and each other instrument or document to be delivered hereunder or thereunder or otherwise in connection herewith or therewith.

"*Loan Parties*"  means Borrower and each Guarantor, collectively.

"*Loans*" means the Initial Term Loans, the Delayed Draw Term Loans and the USACH/Kellenberger Term Loans.

"***Management Agreement***" means that certain Second Amended and Restated Management Services Agreement dated as of September 22, 2022 among Privet Fund Management LLC, a Delaware limited liability company, Parent and Borrower in consideration for, directly or indirectly, management, consulting or similar services, as amended on the Closing Date.

"***Material Adverse Effect***" means any (a) event or circumstance that has had or is reasonably likely to result in a material adverse change in, or have a material adverse effect on, the operations, business, Property, financial condition or prospects of the Borrower and its Subsidiaries (taken as a whole) since the Petition Date, but excluding any matters publicly disclosed prior to the filing of the Cases and excluding the effect of the filing of the Cases or the circumstances and events leading up thereto, (b) material adverse effect upon the ability of Borrower and its Subsidiaries, taken as a whole, to perform their obligations under the Loan Documents or (c) a material adverse effect upon (i) the legality, validity, binding effect or enforceability against Borrower or any other Loan Party of the Loan Documents, taken as a whole, or the rights and remedies, taken as a whole, of Administrative Agent and the Lenders thereunder or (ii) perfection of any Lien granted under any Collateral Document.

"***Maturity Date***" means the earliest of (a) the Interim Facility Maturity Date, (b) the Outside Date, (c) the filing of a motion by the Loan Parties seeking dismissal of any of the Cases  (absent the prior consent of the Required Lenders), the dismissal of any of the Cases  (absent the prior consent of the Required Lenders), or the filing of a motion by the Loan Parties seeking to convert any of the Cases to a case under Chapter 7 of the Bankruptcy Code, (d) the substantial consummation (as defined in Section 1101 of the Bankruptcy Code, and which for the purposes of this clause (d) shall be no later than the "effective date") of a chapter 11 plan of any Loan Party, which has been confirmed by an order entered by the Bankruptcy Court in any of the Cases, (e) the acceleration of the Obligations  and the termination of all Commitments hereunder upon the occurrence of an Event of Default in accordance with the Loan Documents and the DIP Orders, and (f) the termination of the Stalking Horse APA for any reason without the prior written consent of the Required Lenders other than a termination of the Stalking Horse APA as a result of a default by the Stalking Horse Purchaser or a termination for the Debtors to pursue approval of an Alternative Transaction that results in the payment in full of the Obligations at or prior to the maturity thereof (including as described in this definition) as of the closing of such Alternative Transaction.

"***Milestones***" has the meaning specified in Section 6.16.

"***Moody's***" means Moody's Investors Service, Inc.

"***Net Cash Proceeds***" means, as applicable, (a) with respect to any Disposition by a Person or any Extraordinary Receipt (other than any Extraordinary Receipt in respect of an Event of Loss), cash and cash equivalent proceeds received by or for such Person's account, net of (i) reasonable out of pocket attorneys' fees, accountants' fees, amounts required to be applied to the repayment of indebtedness secured by a Lien expressly permitted hereunder on any asset that is the subject of such Disposition and other customary and reasonable costs, fees and expenses relating to such Disposition and in each case which are not paid to Affiliates of such Person and (ii) taxes paid or payable by such Person as a direct result of such Disposition and (b) with respect to any Event of Loss of a Person, cash and cash equivalent proceeds received by or for such Person's account (whether as a result of payments made under any applicable insurance policy therefor or in connection with condemnation proceedings or otherwise), net of attorneys' fees, and other customary and reasonable costs, fees and expenses incurred in connection with the collection of such proceeds, awards or other payments.

"***Non-Defaulting Lender***" means, at any time, each Lender that is not a Defaulting Lender at such time.

146392832_4

"***Note***" and "***Notes***" each is defined in <u>Section 2.11</u>.

"***Obligations***" means (a) all obligations of Borrower to pay principal and interest on the Loans, all fees and charges payable hereunder and all other payment obligations of Borrower or any of its Subsidiaries arising under or in relation to any Loan Document, together with all renewals, extensions, modifications or refinancings of any of the foregoing, in each case whether now existing or hereafter arising, due or to become due, direct or indirect, absolute or contingent, and howsoever evidenced, held or acquired; <u>provided</u> that Obligations shall not include Excluded Swap Obligations.

"***OFAC***" means the United States Department of Treasury Office of Foreign Assets Control.

"***OFAC SDN List***" means the list of the Specially Designated Nationals and Blocked Persons maintained by OFAC.

"***Other Connection Taxes***" means, with respect to any recipient, Taxes imposed as a result of a present or former connection between such recipient and the jurisdiction imposing such Tax (other than connections arising from such recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in any Loan or Loan Document).

"***Other Taxes***" means all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes (excluding, for the avoidance of doubt, value added taxes based upon EU VAT Directive 2006/112/EC or otherwise), that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, this Agreement or any Loan Document, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment (other than an assignment made pursuant to <u>Section 2.16</u>).

"***Outside Date***" means the date that is ninety (90) calendar days after the Petition Date.

"***Parent***" means Hardinge Holdings, LLC, a Delaware limited liability company.

"***Patriot Act***" means the USA Patriot Act (Title III of Pub. L. 107 56 (signed into law October 26, 2001)).

"***Payment in Full***" means as of any date of determination, (i) the indefeasible payment in full in cash of all Loans, together with accrued and unpaid interest thereon; (ii) the Commitments to lend under this Agreement are terminated; and (iii) the indefeasible payment in full in cash of all fees, reimbursable expenses and other Obligations (other than contingent indemnification obligations in respect of which no claim for payment has yet been asserted by the Person entitled thereto).

"***PBGC***" means the Pension Benefit Guaranty Corporation or any Person succeeding to any or all of its functions under ERISA.

"***Percentage***" means for any Lender, the percentage (carried out to the ninth decimal place) of the Commitments (or, where such term is used with respect to the Initial Term Loans, the Delayed Draw Term Loans or the USACH/Kellenberger Term Loans only, of the Initial Term Loans, Delayed Draw Term Loans or the USACH/Kellenberger Term Loans, respectively) represented by the outstanding principal balance of such Lender's Loan at such time to the Total Outstandings at such time. The Percentage of each Lender is

-19-

set forth opposite the name of such Lender on Schedule 1 or in the Assignment and Acceptance pursuant to which such Lender becomes a party hereto, as applicable.

"***Permitted German Sale***" means any sale or other disposition of the equity interests of Weisser GmbH and J.G. Weisser Söhne GmbH & Co. KG. so long as (a) neither Borrower nor any of its Subsidiaries (i) makes any payment or incurs any other obligation in connection therewith, (ii) has any liability to the purchaser or purchasers thereof, or (iii) is or remains liable for any obligation of any Person or assets so disposed of (other than, in the case of the foregoing clauses (i) and (ii), customary indemnification obligations or purchase price adjustments) and (b) the assets of the Persons so disposed of do not include, and the purchasers of such equity interests and their Affiliates do not receive, (i) any assets other than those used in the ordinary course of business of such Persons or (ii) assets or property contributed or otherwise transferred to such Persons after the Petition Date other than cash or Cash Equivalents contributed to such Persons in accordance with the Approved Budget for ordinary course working capital purposes.

"***Permitted Holders***" means (a) Privet Fund LP, a Delaware limited partnership, and Privet Capital Investments II, LP, a Delaware limited partnership, (b) any Controlled Investment Affiliates, and (c) Affiliates of the foregoing (but excluding any operating portfolio companies of the foregoing); and "***Permitted Holder***" means any of them.

"***Permitted Variances***" has the meaning specified <u>Section 7.16(b)</u>.

"***Person***" means an individual, partnership, corporation, limited liability company, association, trust, unincorporated organization or any other entity or organization, including a government or agency or political subdivision thereof.

"***Petition Date***" has the meaning specified in the Preliminary Statement hereto.

"***Petitions***" means the voluntary petitions for relief under Chapter 11 of the Bankruptcy Code filed by the Loan Parties with the Bankruptcy Court.

"***Plan***" means any employee pension benefit plan covered by Title IV of ERISA or subject to the minimum funding standards under Section 412 of the Code that either (a) is maintained by a member of the Controlled Group for employees of a member of the Controlled Group or (b) is maintained pursuant to a collective bargaining agreement or any other arrangement under which more than one employer makes contributions and to which a member of the Controlled Group is then making or accruing an obligation to make contributions or has within the preceding five plan years made contributions.

"***Platform***" means Debt Domain, Intralinks, Syndtrak, DebtX or a substantially similar electronic transmission system.

"***Premises***" means the real property owned or leased by Borrower or any Subsidiary, including the real property and improvements thereon owned by Borrower or any Subsidiary subject to the Liens of the Collateral Documents or otherwise securing the Obligations.

"***Prepayment Event***" has the meaning set forth in <u>Section 2.9(b)(i)</u>.

"***Prepetition Agent***" means BMO, in its capacity as collateral agent for the Prepetition Secured Parties under the Prepetition Loan Agreement.

"***Prepetition Collateral***" means any and all "Collateral" (as defined under the Prepetition Loan Agreement) that any Loan Party (as defined in the Prepetition Loan Agreement) has pledged to secure the Prepetition Obligations as of the Petition Date.

"***Prepetition Lenders***" means the "Lenders" under and as defined in the Prepetition Loan Agreement.

"***Prepetition Lien***" has the meaning specified in the DIP Orders.

"***Prepetition Loan Agreement***" has the meaning specified in the Preliminary Statement hereto.

"***Prepetition Loan Documents***" means the Prepetition Loan Agreement and the "Loan Documents" under and as defined in the Prepetition Loan Agreement as such Prepetition Loan Documents have been amended, restated, amended and restated, supplemented or otherwise modified prior to the Petition Date.

"***Prepetition Obligations***" means the "Obligations" (as defined in the Prepetition Loan Agreement).

"***Prepetition Secured Parties***" has the meaning specified in the Preliminary Statement hereto.

"***Professional Fees***" means the reasonable and documented out-of-pocket fees and expense reimbursements of Professional Persons.

"***Professional Person***" means a Person who is an attorney, accountant, appraiser, auctioneer or financial advisor or other professional person who is retained with approval of the Bankruptcy Court by any Debtor or Committee pursuant to Section 327, 328 or 363 of the Bankruptcy Code.

"***Property***" means, as to any Person, all types of real, personal, tangible, intangible or mixed property owned by such Person whether or not included in the most recent balance sheet of such Person and its subsidiaries under GAAP.

"***PTE***" means a prohibited transaction class exemption issued by the U.S. Department of Labor, as any such exemption may be amended from time to time.

"***Qualified Bidder***" means a bidder who submits an unconditional bid for all or substantially all of the Debtors' assets for a cash purchase price greater than the Release Price and otherwise complies with the Bidding Procedures Order.

"***Qualified ECP Guarantor***" means, in respect of any Swap Obligation, each Loan Party that has total assets exceeding $10,000,000 at the time the relevant Guaranty or grant of the relevant security interest becomes effective with respect to such Swap Obligation or such other person as constitutes an "eligible contract participant" under the Commodity Exchange Act and can cause another person to qualify as an "eligible contract participant" at such time by entering into a keepwell under Section 1a(18)(A)(v)(II) of the Commodity Exchange Act.

"***RCRA***" means the Solid Waste Disposal Act, as amended by the Resource Conservation and Recovery Act of 1976 and Hazardous and Solid Waste Amendments of 1984, 42 U.S.C. §§ 6901 et seq., and any future amendments.

"***Related Parties***" means, with respect to any Person, such Person's Affiliates and the partners, directors, officers, employees, agents, trustees, administrators, managers, advisors and representatives of such Person and of such Person's Affiliates.

"**_Release_**" means any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, migration, dumping, or disposing into the indoor or outdoor environment, including the abandonment or discarding of barrels, drums, containers, tanks or other receptacles containing or previously containing any Hazardous Material.

"**_Release Price_**" means the amount of all outstanding Obligations.

"**_Relevant Governmental Body_**" means the FRB and/or the Federal Reserve Bank of New York, or a committee officially endorsed or convened by the FRB and/or the Federal Reserve Bank of New York, or any successor thereto.

"**_Reorganization Plan_**" means a liquidation plan or plan of reorganization in any or all of the Cases.

"**_Required Lenders_**" means, as of the date of determination thereof, Lenders whose outstanding Loans constitute more than 50% of the sum of (a) the Total Outstandings, and (b) the unused Commitments; provided that to the extent that any Lender is a Defaulting Lender, such Defaulting Lender and all of its Loans and Commitments shall be excluded for purposes of determining Required Lenders.

"**_Rescindable Amount_**" is defined in Section 2.13(b).

"**_Resolution Authority_**" means an EEA Resolution Authority or, with respect to the United Kingdom, any body which has authority to exercise any Write-down and Conversion Powers in respect of the UK Bail-In Legislation.

"**_Responsible Officer_**" means, with respect to any Loan Party or any of their respective Subsidiaries, the chief executive officer, chief operating officer, president, chief financial officer, treasurer or controller of such Person or of the managing member or manager of such Person; provided, however, that with respect to delivery of financial information, "Responsible Officer" means the chief financial officer, treasurer or controller of such Person, or any other officer having substantially the same authority and responsibility.

"**_Restricted Payments_**" means (a) any dividends on or make any other distributions in respect of any class or series of its capital stock or other equity interests, (b) any direct or indirect purchase, redemption, or other acquisition or retirement any of its capital stock or other equity interests or any warrants, options, or similar instruments to acquire the same, or (c) any direct or indirect payment of fees, charges and other amounts (including salaries and any other compensation such as bonuses, pensions and profit sharing payments) in consideration for, directly or indirectly, management, consulting or similar services, including, for the avoidance of doubt, directors fees.

"**_S&P_**" means Standard & Poor's Ratings Services Group, a division of The McGraw Hill Companies, Inc.

"**_Sale Order_**" shall mean an order approving the Stalking Horse APA (or such other agreement effecting a 363 Sale Transaction that is in form and substance acceptable to Administrative Agent and, if the Stalking Horse Purchaser is the ultimate purchaser, the Stalking Horse Purchaser), authorizing the Borrower to consummate such 363 Sale Transaction and containing any other provisions as may be required to be contained therein by the Stalking Horse APA or other such agreement effecting a 363 Sale Transaction.

"**_Sanctioned Person_**" means, at any time, (a) any Person listed in any Sanctions-related list of designated Persons maintained by OFAC (including the OFAC SDN List), the United States Department

of State, the United Nations Security Council, the European Union, any European Union member state, His Majesty's Treasury of the United Kingdom, Global Affairs Canada or any other relevant sanctions authority, (b) any Person located, organized or resident in a Designated Jurisdiction or (c) any Person owned or controlled by any such Person or Persons described in clauses (a) or (b) above.

"***Sanctions***" means all economic or financial sanctions, sectoral sanctions, secondary sanctions or trade embargoes imposed, administered or enforced from time to time by (a) the United States government (including those administered by OFAC or the United States Department of State) and the government of Canada, or (b) the United Nations Security Council, the European Union, any European Union member state, His Majesty's Treasury of the United Kingdom, Global Affairs Canada or any other relevant sanctions authority with jurisdiction over any Loan Party or any of their respective Subsidiaries.

"***Secured Parties***" means (a) Administrative Agent, (b) each Lender, and (c) each other Person entitled to indemnification under Section 11.13.

"***Security Agreement***" means that certain Security Agreement dated the date of this Agreement among Borrower and the U.S. Grantors party thereto from time to time and Administrative Agent, as the same may be amended, modified, supplemented or restated from time to time.

"***SOFR***" means a rate equal to the secured overnight financing rate as administered by the SOFR Administrator (or a successor administrator of the secured overnight financing rate).

"***SOFR Administrator***" means the Federal Reserve Bank of New York (or a successor administrator of the secured overnight financing rate).

"***SOFR Loan***" means a Loan bearing interest based on Adjusted Term SOFR.

"***Stalking Horse APA***" means that certain Asset Purchase Agreement, to be dated on or after the Closing Date, by and among the Debtors, as the sellers thereunder, and the Stalking Horse Purchaser, as the purchaser thereunder, as may be amended, restated, amended and restated, supplemented or otherwise modified from time to time with the prior written consent of the Administrative Agent.

"***Stalking Horse Purchaser***" shall mean the purchaser or purchasers under the Stalking Horse APA which purchaser(s) shall be a newly-formed Affiliate(s) of CLP.

"***Subordinated Debt***" means (a) the Prepetition Obligations and (b) any other Indebtedness for Borrowed Money which is subordinated in right of payment to the prior payment of the Obligations pursuant to subordination provisions approved in writing by Administrative Agent and is otherwise pursuant to documentation that is, which is in an amount that is, and which contains interest rates, payment terms, maturities, amortization schedules, covenants, defaults, remedies and other material terms that are, in each case, in form and substance reasonably satisfactory to Administrative Agent.

"***Subsidiary***" means, as to any particular parent corporation or organization, any other corporation or organization more than 50% of the outstanding Voting Stock of which is at the time directly or indirectly owned by such parent corporation or organization or by any one or more other entities which are themselves subsidiaries of such parent corporation or organization. Unless otherwise expressly noted herein, the term "Subsidiary" means a Subsidiary of Borrower or of any of its direct or indirect Subsidiaries. For Dutch Loan Parties, the term "Subsidiary" includes a '*dochtermaatschappij*' within the meaning of article 2:24a of the Dutch Civil Code (Burgerlijk Wetboek).

146392832_4

"***Superpriority Claims***" means all of the allowed superpriority administrative expense claims of the Administrative Agent and the other Secured Parties on account of the Obligations, which claims shall be entitled to the benefits of section 364(c)(1) and 364(e) of the Bankruptcy Code, having priority over any and all administrative expenses of the kind that are specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 364(c)(1), 365, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 1113, 1114 or any other provisions of the Bankruptcy Code and any other claims against the Loan Parties. Superpriority Claims shall, at all times be (a) junior only to the Carve-Out and (b) senior to any and all other administrative expense claims or other claims against the Loan Parties or their estates, in the Cases and any successor cases.

"***Swap Obligation***" means, with respect to any Loan Party, any obligation to pay or perform under any agreement, contract or transaction that constitutes a "swap" within the meaning of Section 1a(47) of the Commodity Exchange Act.

"***Swiss Code of Obligations***" means the Swiss code of obligations of 30 March 1911 (*Schweizerisches Obligationenrecht, OR*), as amended from time to time (SR 220).

"***Swiss Federal Tax Administration***" means the Swiss federal tax administration (*Eidgenössische Steuerverwaltung*) referred to in article 34 of the Swiss Withholding Tax Act.

"***Swiss Loan Party***" means a Loan Party which is incorporated or established under the laws of Switzerland or, if different, is considered to be tax resident in Switzerland for Swiss Withholding Tax purposes.

"***Swiss Security Documents***" means, if and to the extent that Administrative Agent by notice to Borrower directs Borrower to cause the applicable Person to enter into the same, (a) a Swiss law pledge by Borrower over the quotas of Hardinge Holdings GmbH, (b) a Swiss law pledge by Hardinge Holdings GmbH over the shares of Kellenberger, (c) a Swiss law pledge over the bank accounts of Hardinge Holdings GmbH, (d) a Swiss law pledge over the bank accounts of Kellenberger, (e) a Swiss law security assignment of trade and intra-group and insurance receivables by Hardinge Holdings GmbH and (f) a Swiss law security assignment of trade and intra-group and insurance receivables by Kellenberger, each to be entered into in accordance with the requirements set forth on Schedule 6.13 and any other Collateral Document governed by the Laws of Switzerland to secure the Obligations or any part thereof.

"***Swiss Withholding Tax***" means any taxes imposed under the Swiss Withholding Tax Act.

"***Swiss Withholding Tax Act***" means the Swiss Federal Act on Withholding Tax of 13 October 1965 (*Bundesgesetz über die Verrechnungssteuer*), as amended from time to time (SR 642.21), together with the related ordinances, regulations and guidelines, all as amended and applicable from time to time.]

"***Taxes***" means all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholdings), assessments, fees, or other similar charges imposed by any Governmental Authority, including any interest, additions to tax, or penalties applicable thereto.

"***Term SOFR***" means,

(a)        for any calculation with respect to a SOFR Loan, the Term SOFR Reference Rate for a tenor comparable to the applicable Interest Period on the day (such day, the "*Periodic Term SOFR Determination Day*") that is two (2) U.S. Government Securities Business Days prior to the first day of such Interest Period, as such rate is published by the Term SOFR Administrator; provided, however, that if as of 5:00 p.m. (New York City time) on any Periodic Term SOFR Determination Day the Term SOFR

Reference Rate for the applicable tenor has not been published by the Term SOFR Administrator and a Benchmark Replacement Date with respect to the Term SOFR Reference Rate has not occurred, then Term SOFR will be the Term SOFR Reference Rate for such tenor as published by the Term SOFR Administrator on the first preceding U.S. Government Securities Business Day for which such Term SOFR Reference Rate for such tenor was published by the Term SOFR Administrator so long as such first preceding U.S. Government Securities Business Day is not more than three (3) U.S. Government Securities Business Days prior to such Periodic Term SOFR Determination Day, and

(b) for any calculation with respect to a Base Rate Loan on any day, the Term SOFR Reference Rate for a tenor of one month on the day (such day, the "*Base Rate Term SOFR Determination Day*") that is two (2) U.S. Government Securities Business Days prior to such day, as such rate is published by the Term SOFR Administrator; provided, however, that if as of 5:00 p.m. (New York City time) on any Base Rate Term SOFR Determination Day the Term SOFR Reference Rate for the applicable tenor has not been published by the Term SOFR Administrator and a Benchmark Replacement Date with respect to the Term SOFR Reference Rate has not occurred, then Term SOFR will be the Term SOFR Reference Rate for such tenor as published by the Term SOFR Administrator on the first preceding U.S. Government Securities Business Day for which such Term SOFR Reference Rate for such tenor was published by the Term SOFR Administrator so long as such first preceding U.S. Government Securities Business Day is not more than three (3) U.S. Government Securities Business Days prior to such Base Rate Term SOFR Determination Day.

"*Term SOFR Administrator*" means CME Group Benchmark Administration Limited (CBA) (or a successor administrator of the Term SOFR Reference Rate selected by the Administrative Agent in its reasonable discretion).

"*Term SOFR Reference Rate*" means the forward-looking term rate based on SOFR.

"*Total Outstandings*" means the aggregate outstanding principal amount of all Loans.

"*UK Bail-In Legislation*" means Part I of the United Kingdom Banking Act 2009 and any other law or regulation applicable in the United Kingdom relating to the resolution of unsound or failing banks, investment firms or other financial institutions or their affiliates (otherwise than through liquidation, administration or other insolvency proceedings).

"*UK Loan Party*" means a Loan Party incorporated under the laws of England and Wales.

"*UK Security Documents*" means, if and to the extent that Administrative Agent by notice to Borrower directs Borrower to cause the applicable Person to enter into the same, any guaranty or security agreement or other document governed by the laws of England and Wales executed on or after the Closing Date pursuant to the terms hereof or otherwise in connection with the transactions contemplated hereby and any other Collateral Document governed by the Laws of England and Wales to secure the Obligations.

"*Unadjusted Benchmark Replacement*" means the applicable Benchmark Replacement excluding the related Benchmark Replacement Adjustment.

"*Unfunded Vested Liabilities*" means, for any Plan at any time, the amount (if any) by which the present value of all vested nonforfeitable accrued benefits under such Plan exceeds the fair market value of all Plan assets allocable to such benefits, all determined as of the then most recent valuation date for such Plan, but only to the extent that such excess represents a potential liability of a member of the Controlled Group to the PBGC or the Plan under Title IV of ERISA.

146392832_4

"***USACH and Kellenberger Businesses***" means the "USACH" business line operated by Hardinge Grinding Group Inc. and the "Kellenberger" business line operated by Hardinge Kellenberger AG.

"***USACH/Kellenberger Term Loan***" has the meaning specified in <u>Section 2.1(e)</u>.

"***USACH/Kellenberger Term Loan Commitment***" means the commitment of a Lender to make or otherwise fund any USACH/Kellenberger Term Loan pursuant to <u>Section 2.1(e)</u>, and "USACH/Kellenberger Term Loan Commitments" means such commitments of all Lenders in the aggregate. The amount of each Lender's USACH/Kellenberger Term Loan Commitment is set forth opposite such Lender's name on <u>Schedule 1</u>, or, if such Lender's USACH/Kellenberger Term Loan Commitment has been assigned, in the applicable Assignment and Acceptance, subject to any adjustment pursuant to the terms and conditions hereof. The aggregate amount of the USACH/Kellenberger Term Loan Commitments as of the Closing Date is $10,200,000 (before giving effect to the funding of any USACH/Kellenberger Term Loans).

"***USACH/Kellenberger Term Loan Percentage***" means, for each Lender, the percentage of the USACH/Kellenberger Term Loan Commitments represented by such Lender's USACH/Kellenberger Term Loan Commitment or, if the USACH/Kellenberger Term Loan Commitments have been terminated or have expired, the percentage held by such Lender of the aggregate principal amount of all USACH/Kellenberger Term Loans then outstanding.

"***U.S. Dollars***" and "***$***" each means the lawful currency of the United States of America.

"***U.S. Government Securities Business Day***" means any day except for (i) a Saturday, (ii) a Sunday or (iii) a day on which the Securities Industry and Financial Markets Association recommends that the fixed income departments of its members be closed for the entire day for purposes of trading in United States government securities.

"***U.S. Grantor***" means Borrower and any Domestic Subsidiary of Borrower that executes and delivers the Security Agreement (or any joinder thereto).

"***U.S. Security Documents***" means the Security Agreement, and all other mortgages, deeds of trust, security agreements, pledge agreements, assignments, financing statements and other documents as shall from time to time secure or relate to the Obligations or any part thereof, in each case governed by the Laws of the United States to secure the Obligations or any part thereof.

"***Variance Report***" has the meaning specified in <u>Section 6.5(a)</u>.

"***Variance Report Date***" has the meaning specified in <u>Section 6.5(a)</u>.

"***Voting Stock***" of any Person means capital stock or other equity interests of any class or classes (however designated) having ordinary power for the election of directors or other similar governing body of such Person, other than stock or other equity interests having such power only by reason of the happening of a contingency.

"***Welfare Plan***" means a "welfare plan" as defined in Section 3(1) of ERISA.

"***Wholly owned Subsidiary***" means a Subsidiary of which all of the issued and outstanding shares of capital stock (other than directors' qualifying shares as required by law) or other equity interests are owned by Borrower and/or one or more Wholly owned Subsidiaries within the meaning of this definition.

-26-

"***Wind Down Budget***" means the budget for the post-sale wind down of the Loan Parties, as expressly incorporated in, and made a part of, the Approved Budget.

"***Wind Down Reserve***" means a separate reserve to be created by the Loan Parties, which may be within an existing deposit account maintained by the Debtors, to hold sufficient funds to satisfy obligations under the Wind Down Budget, which reserve shall be funded up to the amount and at the times set forth in the Wind Down Budget.

"***Write-Down and Conversion Powers***" means, (a) with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule, and (b) in relation to the UK Bail-In Legislation, any powers under that UK Bail-In Legislation to cancel, transfer or dilute shares issued by a person that is a bank or investment firm or other financial institution or affiliate of a bank, investment firm or other financial institution, to cancel, reduce, modify or change the form of a liability of such a person or any contract or instrument under which that liability arises, to convert all or part of that liability into shares, securities or obligations of that person or any other person, to provide that any such contract or instrument is to have effect as if a right had been exercised under it or to suspend any obligation in respect of that liability or any of the powers under that UK Bail-In Legislation that are related to or ancillary to any of those powers.

Section 1.2    *Interpretation*.    The foregoing definitions are equally applicable to both the singular and plural forms of the terms defined.  The words "hereof", "herein", and "hereunder" and words of like import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement.  The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation." All references to time of day herein are references to Chicago, Illinois, time unless otherwise specifically provided. Where the character or amount of any asset or liability or item of income or expense is required to be determined or any consolidation or other accounting computation is required to be made for the purposes of this Agreement, it shall be done in accordance with GAAP except where such principles are inconsistent with the specific provisions of this Agreement.  The term "shall" shall have the same meaning as the term "will".  All incorporation by reference of covenants, terms, definitions or other provisions from other agreements are incorporated into this Agreement as if such provisions were fully set forth herein, and such incorporation shall include all necessary definitions and related provisions from such other agreements but including only amendments thereto agreed to by the Lenders, and shall survive any termination of such other agreements until Payment in Full.  Any reference to any Law shall include all statutory and regulatory provisions consolidating, amending, replacing or interpreting such Law and any reference to any Law or regulation shall, unless otherwise specified, refer to such Law or regulation as amended, modified or supplemented from time to time and any successor law or regulation.  References to any document, instrument or agreement (a) shall include all exhibits, schedules and other attachments thereto, (b) shall include all documents, instruments or agreements issued or executed in replacement thereof, to the extent permitted hereby and (c) shall mean such document, instrument or agreement, or replacement or predecessor thereto, as amended, supplemented, restated or otherwise modified from time to time to the extent not otherwise stated herein or prohibited hereby and in effect at any given time.

Section 1.3    [Reserved].

Section 1.4    [Reserved].

Section 1.5    *Interest Rates*.  The Administrative Agent does not warrant or accept responsibility for, and shall not have any liability with respect to (a) the continuation of, administration of, submission of, calculation of or any other matter related to the Benchmark, any component definition thereof or rates referred to in the definition thereof, or any alternative, successor or replacement rate thereto (including any

-27-

Benchmark Replacement), including whether the composition or characteristics of any such alternative, successor or replacement rate (including any Benchmark Replacement) will be similar to, or produce the same value or economic equivalence of, or have the same volume or liquidity as, the Benchmark or any other Benchmark prior to its discontinuance or unavailability, or (b) the effect, implementation or composition of any Conforming Changes. The Administrative Agent and its affiliates or other related entities may engage in transactions that affect the calculation of the Benchmark, any alternative, successor or replacement rate (including any Benchmark Replacement) and/or any relevant adjustments thereto, in each case, in a manner adverse to Borrower. The Administrative Agent may select information sources or services in its reasonable discretion to ascertain the Benchmark or any other Benchmark, in each case pursuant to the terms of this Agreement, and shall have no liability to Borrower, any Lender or any other person or entity for damages of any kind, including direct or indirect, special, punitive, incidental or consequential damages, costs, losses or expenses (whether in tort, contract or otherwise and whether at law or in equity), for any error or calculation of any such rate (or component thereof) provided by any such information source or service.

Section 1.6    *Divisions*. For all purposes under the Loan Documents, in connection with any division or plan of division under Delaware law (or any comparable event under a different jurisdiction's laws): (a) if any asset, right, obligation or liability of any Person becomes the asset, right, obligation or liability of a different Person, then it shall be deemed to have been transferred from the original Person to the subsequent Person, and (b) if any new Person comes into existence, such new Person shall be deemed to have been organized on the first date of its existence by the holders of its equity interests at such time.

Section 1.7    *German Terms*. All references herein in the context of German law or a German Loan Party to:

(a)    a person being "**unable to pay its debts**" includes that person being in a state of *Zahlungsunfähigkeit* under Section 17 of the German Insolvency Act (*Insolvenzordnung*) or being over-indebted (*überschuldet*) under Section 19 of the German Insolvency Act (*Insolvenzordnung*);

(b)    a "**liquidator**", "**receiver**", "**administrative receiver**", "**administrator**", "**compulsory manager**" includes an insolvency administrator (*Insolvenzverwalter*), interim insolvency administrator (*vorläufiger Insolvenzverwalter*) or custodian (*Sachwalter*) or interim custodian (*vorläufiger Sachwalter*);

(c)    a "**corporate action, formal legal proceedings or other formal procedure or formal step taken for the winding up, administration or dissolution**" includes liquidation (*Liquidation*) and any action taken by the competent court as set out in Section 21 of the German Insolvency Act (*Insolvenzordnung*);

(d)    a "**moratorium**" includes, without limitation, protective shield proceedings (*Schutzschirmverfahren*) and insolvency plan proceedings (*Insolvenzplanverfahren*);

(e)    a "**director**" or "**manager**" of a company includes any statutory legal representative(s) (including any German law (*organschaftlicher Vertreter*)) of a person pursuant to the laws of its jurisdiction of incorporation, including with respect to a person incorporated or established in Germany, any managing director (*Geschäftsführer*) or member of the board (*Vorstand*) or a proxy (*Prokurist*);

(f)    a "**guarantee**" includes any guarantee (*Garantie*), any indemnity, any joint and several (*gesamtschuldnersich*) or independent obligation (*unabhängiges Schuldversprechen*) within the meaning of German law;

(g)    "**gross negligence**" includes *grobe Fahrlässigkeit*;

-28-

(h)     "**wilful misconduct**" includes *Vorsatz*;

(i)     "**Subsidiary**" includes a subsidiary (*Tocherunternehmen*) within the meaning of section 290 German Commercial Code (*Handelsgesetzbuch*);

(j)     a "**security interest**" includes any mortgage (*Hypothek*), land charge (*Grundschuld*) pledge (*Pfandrecht*), retention of title arrangement (*Eigentumsvorbehalt*), security assignment (*Sicherungsabtretung*) and security transfer (*Sicherungsübereignung*);

(k)     a "**disposal**" includes: (i) a *Verfügung*, (ii) the entry into an agreement on a priority notice (*Auflassungsvormerkung*), and (iii) an agreement on the transfer of title to a property (*Auflassung*) in whole or part; and

(l)     the partition of ownership in a property (*Grundstücksteilung*);

(m)     the constitutional, incorporation and registry documents and/or excerpts include the relevant entity's articles of association (*Satzung*) (as filed with the competent commercial register) or partnership agreement (*Gesellschaftsvertrag*), an online excerpt from the competent commercial register (*elektronischer Abdruck aus dem Handelsregister*) obtained on the same date when such excerpt has to be delivered and, as applicable, a copy of its list of shareholders (*Gesellschafterliste*) (as filed with the competent commercial register) and, as applicable, any by-laws (*Geschäftsordnungen*); and

(n)     where a German translation of an English word or phrase appears in the text of this Agreement, the German translation of such word or phrase shall be decisive for the construction of the English term it relates to, throughout.

*Section 1.8     Dutch terms.* In this Agreement, where it relates to a Dutch Loan Party, a reference to:

(a)     "**works council**" means each works council (*ondernemingsraad*) or central or group works council (*centrale of groeps ondernemingsraad*) within the meaning of the Works Councils Act of the Netherlands (*Wet op de ondernemingsraden*) having jurisdiction over a Dutch Loan Party;

(b)     "**full right and authority**" includes any action required to comply with the Works Councils Act of the Netherlands (*Wet op de ondernemingsraden*);

(c)     "**security**" or "**security interest**" includes, in respect of a Dutch Loan Party or in connection with any security in the Netherlands, a retention of title arrangement (*eigendomsvoorbehoud*), privilege (*voorrecht*), a right of retention (*recht van retentie*), a right to reclaim goods (*recht van reclame*) and in general any right in rem (*beperkt recht*) created for the purpose of granting security (*goederenrechtelijke zekerheid*);

(d)     "**admit in writing its inability to pay its debts generally as they become due**" includes a Dutch Loan Party having filed a notice under Section 36 of the Tax Collection Act of the Netherlands (*Invorderingswet 1990*) or Section 60 of the Social Insurance Financing Act of the Netherlands (*Wet Financiering Sociale Verzekeringen*) in conjunction with Section 36 of the Tax Collection Act of the Netherlands (*Invorderingswet 1990*);

(e)     a "**winding up**", "**liquidation**" or "**dissolution**" includes a Dutch entity being declared bankrupt (*failliet verklaard*) or dissolved (*ontbonden*)

(f)    a "**moratorium**" includes *surseance van betaling* and any stay under section 376 of the Dutch Bankruptcy Code (*Faillissementswet*) and granted a moratorium includes *surseance verleend*;

(g)    a "**receiver**", "**examiner**", "**trustee**", "**custodian**", "**liquidator**" or similar official includes a *curator, bewindvoerder*, a *stille bewindvoerder*, an *observator* and a *herstructureringsdeskundige*;

(h)    a "**reorganization arrangement**" or "**composition**" includes an *akkoordprocedure*; and

(i)    an "**attachment**" includes an *executoriaal beslag* and a *conservatoir beslag*.

*Section 1.9    Swiss terms*.  In this Agreement, where it relates to a Swiss Loan Party, a reference to insolvency, bankruptcy, winding-up, liquidation, dissolution, administration, reorganization or moratorium shall include any analogous steps, actions, events or proceedings under Swiss law and shall include, without limitation, that such Swiss Loan Party is unable to or admits inability to pay its debts as they fall due (*zahlungsunfähig*), or is declared to be unable to pay its debts, suspends making payments on any of its debts, or (a) has initiated against it; (b) is legally obliged to initiate; or (c) initiates:(i) bankruptcy proceedings (*Konkurs*); (ii) proceedings leading to a provisional or a definitive composition moratorium (*provisorische oder definitive Nachlassstundung*); (iii) proceedings leading to an emergency moratorium (*Notstundung*); (iv) proceedings for a postponement of bankruptcy pursuant to article 725a of the Swiss Code of Obligations (*Konkursaufschub*); or (v) any proceedings pursuant to article 731b or article 736 of the Swiss Code of Obligations which lead to its dissolution or liquidation, or any proceeding having similar effects in force at that time.

Section 2.  The Credit Facilities.

*Section 2.1    Initial Term Loan and Delayed Draw Term Loan Commitments*.

(a)    *Initial Term Loans*.  Subject to the terms and conditions hereof, each Lender having an Initial Term Loan Commitment, by its acceptance hereof, severally agrees to make a loan (individually an "*Initial Term Loan*" and collectively for all the Lenders the "*Initial Term Loans*") in U.S. Dollars to Borrower in the amount of such Lender's Initial Term Loan Commitment.  The Initial Term Loans shall be advanced in a single Borrowing on the Closing Date and shall be made ratably by the Lenders in proportion to their respective Initial Term Loan Percentages, at which time the Initial Term Loan Commitments shall expire.  No amount repaid or prepaid on any Initial Term Loan may be borrowed again.

(b)    *Delayed Draw Term Loans*.  Subject to the terms and conditions hereof, each Lender having a Delayed Draw Term Loan Commitment, by its acceptance hereof, severally agrees to make a loan (individually a "Delayed Draw Term Loan" and collectively for all the Lenders the "Delayed Draw Term Loans") in U.S. Dollars to Borrower in the amount of such Lender's Delayed Draw Term Loan Commitment.  Subject to the terms and conditions hereof, in accordance with the procedures in Section 2.6, upon written request by Borrower after the entry of the Final DIP Order, the Delayed Draw Term Loans shall be advanced in a single Borrowing on a date which may be no later than two (2) Business Days following the Final Order Entry Date (the "*Delayed Draw Term Funding Date*") and shall be made ratably by the Lenders in proportion to their respective Delayed Draw Term Loan Percentages, at which time the Delayed Draw Term Loan Commitments shall expire.  No amount repaid or prepaid on any Delayed Draw Term Loan may be borrowed again.

(c)    The Commitments shall terminate on the date that is five (5) Business Days after the date hereof if the Closing Date has not occurred by such date.

146392832_4

(d) During the period after the Closing Date but (in the case of the Delayed Draw Term Loan Commitments) prior to the Delayed Draw Term Funding Date, Borrower may, upon notice to the Administrative Agent, from time to time terminate (in whole or in part) the unused portion of the aggregate Delayed Draw Term Loan Commitments or the USACH/Kellenberger Term Loan Commitments; provided that (i) any such notice shall be received by the Administrative Agent not later than 11:00 a.m. five (5) Business Days prior to the date of termination or reduction, (ii) any such partial reduction shall be in a minimum amount of $500,000 or any whole multiple of $100,000 in excess thereof.

(e) *USACH/Kellenberger Term Loans*. Subject to the terms and conditions hereof, each Lender having a USACH/Kellenberger Term Loan Commitment, by its acceptance hereof, severally agrees to make loans (individually a "USACH/Kellenberger Term Loan" and collectively for all the Lenders the "USACH/Kellenberger Term Loans") in U.S. Dollars to Borrower not later than [_____], 2024 (but following the notice contemplated by Section 4.2(g)(i)) in an aggregate amount not to exceed such Lender's USACH/Kellenberger Term Loan Commitment. Subject to the terms and conditions hereof, in accordance with the procedures in Section 2.6, upon written request by Borrower after the entry of the Initial DIP Order, the USACH/Kellenberger Term Loans shall be advanced in a not more than two Borrowings, with each such Borrowing to be made ratably by the Lenders in proportion to their respective USACH/Kellenberger Term Loan Percentages, at which time the USACH/Kellenberger Term Loan Commitments shall expire. The aggregate original principal amount of USACH/Kellenberger Term Loans made by any Lender shall not exceed such Lemder's USACH/Kellenberger Term Loan Commitment. No amount repaid or prepaid on any USACH/Kellenberger Term Loan may be borrowed again. Upon the second Borrowing of USACH/Kellenberger Term Loans, the unused portion of the USACH/Kellenberger Term Loan Commitments shall automatically terminate.

(f) Borrower may, upon notice to the Administrative Agent, from time to time terminate (in whole or in part) the unused portion of the aggregate USACH/Kellenberger Term Loan Commitments; provided that (i) any such notice shall be received by the Administrative Agent not later than 11:00 a.m. five (5) Business Days prior to the date of termination or reduction, (ii) any such partial reduction shall be in a minimum amount of $500,000 or any whole multiple of $100,000 in excess thereof.

Section 2.2    *[Reserved]*.

Section 2.3    *[Reserved]*.

Section 2.4    *Applicable Interest Rates.*

(a) *Base Rate Loans*. Each Base Rate Loan made or maintained by a Lender shall bear interest (computed on the basis of a year of 365 or 366 days, as the case may be, if such rate is based on the Prime Rate, or otherwise on the basis of a 360-day year, and the actual days elapsed) on the unpaid principal amount thereof from the date such Loan is advanced, or created by conversion from a SOFR Loan, until maturity (whether by acceleration or otherwise) at a rate per annum equal to the sum of the Applicable Margin plus the Base Rate from time to time in effect, payable by Borrower on each Interest Payment Date and at maturity (whether by acceleration or otherwise).

(b) *SOFR Loans*. Each SOFR Loan made or maintained by a Lender shall bear interest during each Interest Period it is outstanding (computed on the basis of a year of 360 days and actual days elapsed) on the unpaid principal amount thereof from the date such Loan is advanced or continued, until maturity (whether by acceleration or otherwise) at a rate per annum equal to the sum of the Applicable Margin plus Adjusted Term SOFR applicable to such Interest Period, payable by Borrower on each Interest Payment Date and at maturity (whether by acceleration or otherwise).

-31-

(c)     *PIK Interest*.  Interest payable hereunder shall automatically be paid in kind on each Interest Payment Date by adding the accrued amount thereof to the outstanding principal amount of the Loans, and the amounts so added to principal shall thereafter bear interest in accordance with this <u>Section 2.4</u>.

(d)     *Rate Determinations*.  Administrative Agent shall determine each interest rate applicable to the Loans hereunder, and its determination thereof shall be conclusive and binding except in the case of manifest error.  In connection with the use or administration of Term SOFR, the Administrative Agent will have the right to make Conforming Changes from time to time and, notwithstanding anything to the contrary herein or in any other Loan Document, any amendments implementing such Conforming Changes will become effective without any further action or consent of any other party to this Agreement or any other Loan Document.  The Administrative Agent will promptly notify Borrower and the Lenders of the effectiveness of any Conforming Changes in connection with the use or administration of Term SOFR.

(e)     Notwithstanding anything in this Agreement to the contrary, Loans shall be Base Rate Loans solely in the event that the Base Rate is being used as an alternative rate of interest pursuant to <u>Sections 3.5</u> or <u>3.9</u>.

Section 2.5     *Minimum Borrowing Amounts*.  Each Borrowing of Loans advanced or continued under this Agreement shall be in an amount equal to $1,000,000 or such greater amount which is an integral multiple of $500,000.

Section 2.6     *Manner of Borrowing Loans and Designating Applicable Interest Rates*.

(a)     *Notice to Administrative Agent*.  Borrower shall give notice to Administrative Agent by no later than 10:00 a.m.: (i) at least three (3) Business Days (or, in the case of the initial borrowing hereunder, one (1) Business Day) (or, in each case any such shorter period as Administrative Agent may agree) before the date on which Borrower requests the Lenders to advance the Initial Term Loans or the Delayed Draw Term Loans, or to advance a Borrowing of USACH/Kellenberger Term Loans.  Borrower shall give all such notices requesting an advance or continuation of a Borrowing to Administrative Agent by telephone, telecopy, or other telecommunication device reasonably acceptable to Administrative Agent (which notice shall be irrevocable once given and, if by telephone, shall be promptly confirmed in writing), substantially in the form attached hereto as Exhibit C (Notice of Borrowing), or in such other customary form reasonably acceptable to Administrative Agent.  All such notices concerning the advance or continuation of a Borrowing shall specify the date of the requested advance or continuation of a Borrowing (which shall be a Business Day) and the amount of the requested Borrowing to be advanced or continued.  No Borrowing shall be advanced if any Event of Default then exists.  Borrower agrees that Administrative Agent may rely on any such telephonic, telecopy or other telecommunication notice given by any person Administrative Agent in good faith believes is an Authorized Representative without the necessity of independent investigation, and in the event any such notice by telephone conflicts with any written confirmation such telephonic notice shall govern if Administrative Agent has acted in reliance thereon.

(b)     *Notice to the Lenders*.  Administrative Agent shall give prompt telephonic, telecopy or other telecommunication notice to each Lender of any notice from Borrower received pursuant to <u>Section 2.6(a)</u> above and the amount of such Lender's Loan to be made as part of the requested Borrowing.

(c)     *[Reserved]*.

(d)     *Disbursement of Loans*.  Not later than 1:00 p.m. on the date of any requested advance of a new Borrowing, subject to <u>Section 4</u>, each Lender shall make available its Loan comprising part of such Borrowing in funds immediately available at the principal office of Administrative Agent in New York,

146392832_4

NY (or at such other location as Administrative Agent shall designate). Administrative Agent shall make all such funds so received available to Borrower at Administrative Agent's principal office in New York, NY (or at such other location as Administrative Agent shall designate), by depositing or wire transferring such proceeds to the credit of Borrower's Designated Disbursement Account or as Borrower and Administrative Agent may otherwise agree.

(e)  *Administrative Agent Reliance on Lender Funding.* Unless Administrative Agent shall have been notified by a Lender prior to the date on which such Lender is scheduled to make payment to Administrative Agent of the proceeds of a Loan (which notice shall be effective upon receipt) that such Lender does not intend to make such payment, Administrative Agent may assume that such Lender has made such payment when due and Administrative Agent may (but shall not be required to) in reliance upon such assumption make available to Borrower the proceeds of the Loan to be made by such Lender and, if any Lender has not in fact made such payment to Administrative Agent, such Lender shall, on demand, pay to Administrative Agent the amount made available to Borrower attributable to such Lender together with interest thereon in respect of each day during the period commencing on the date such amount was made available to Borrower and ending on (but excluding) the date such Lender pays such amount to Administrative Agent at a rate per annum equal to:  (i) from the date the related advance was made by Administrative Agent to the date two (2) Business Days after payment by such Lender is due hereunder, the Federal Funds Rate for each such day and (ii) from the date two (2) Business Days after the date such payment is due from such Lender to the date such payment is made by such Lender, the Base Rate in effect for each such day.  If such amount is not received from such Lender by Administrative Agent immediately upon demand, Borrower will, on demand, repay to Administrative Agent the proceeds of the Loan attributable to such Lender with interest thereon at a rate per annum equal to the interest rate applicable to the relevant Loan, but without such payment being considered a payment or prepayment of a Loan under Section 3.4 so that Borrower will have no liability under such Section with respect to such payment.

Section 2.7    [*Reserved*].

Section 2.8    *Maturity of Loans*.  The Borrower shall repay to Administrative Agent, for the account of each Lender, the aggregate outstanding principal amount of all Loans (including any interest or fees added to principal in accordance with the terms hereof) on the Maturity Date.

Section 2.9    *Prepayments*.

(a)  *Optional Prepayments*.  Borrower may prepay in whole or in part (but, if in part, then:  (i) in an amount not less than $100,000, and (ii) in an amount such that the minimum amount required for a Borrowing pursuant to Section 2.5 remains outstanding) any Borrowing of Loans at any time upon three (3) U.S. Government Securities Business Days (or such shorter period of time agreed to by Administrative Agent) prior written notice by Borrower to Administrative Agent, each such prepayment, to be made by the payment of the principal amount to be prepaid and , accrued interest thereon to the date fixed for prepayment plus any amounts due the Lenders under Section 3.4.

(b)  *Mandatory Prepayments*.

(i)  Subject in all respects to the DIP Orders, the outstanding Loans shall be prepaid as follows upon any of the following events (each of the following being a "*Prepayment Event*"):

(ii)  Asset Sales.

(A)  On the date of receipt by any Loan Party or any Subsidiary thereof of any Net Cash Proceeds from one or more Asset Sales (other than a sale to the Lenders or their

designee), Borrower shall prepay the Loans as set forth in subsection (vi) below in an aggregate amount equal to such Net Cash Proceeds.

(B)    Nothing contained in this Section 2.9(b) shall permit Borrower or any of its Subsidiaries to sell or otherwise dispose of any assets other than in accordance with Section 7.4.

(iii)    [Reserved].

(iv)    Extraordinary Receipts.  On the date of receipt by Borrower or any of its Subsidiaries of any Extraordinary Receipts, the Borrower shall prepay the Loans as set forth in subsection (vi) below in the amount of such Extraordinary Receipts.

(v)    Prepayment Certificate.  Concurrently with any prepayment of the Loans pursuant to Section 2.9(b)(i) through Section 2.9(b)(iv), Borrower shall deliver to Administrative Agent a certificate of a Responsible Officer demonstrating the calculation of the amount of the applicable net proceeds.  In the event that Borrower shall subsequently determine that the actual amount received exceeded the amount set forth in such certificate, Borrower shall promptly make an additional prepayment of the Loans, and Borrower shall concurrently therewith deliver to Administrative Agent a certificate of a Responsible Officer demonstrating the derivation of such excess.

(vi)    All mandatory prepayments in respect of the Loans shall be applied pro rata to the Loans.

Section 2.10    Default Rate.  Notwithstanding anything to the contrary contained herein, during the occurrence and continuance of an Event of Default, the Administrative Agent or the Required Lenders may, at their option, by notice to Borrower (which notice may be revoked at the option of the Required Lenders notwithstanding any provision of Section 11.11 requiring the consent of "each Lender affected thereby" for reductions in interest rates), declare that (a) all Loans accrue interest at a rate per annum equal to the applicable Default Rate and (b) to the fullest extent permitted by law, the outstanding amount of all interest, fees and other Obligations accrue interest at a rate per annum equal to the applicable Default Rate.

Section 2.11    Evidence of Indebtedness.

(a)    Each Lender shall maintain in accordance with its usual practice an account or accounts evidencing the indebtedness of Borrower to such Lender resulting from each Loan made by such Lender from time to time, including the amounts of principal and interest payable and paid to such Lender from time to time hereunder.

(b)    Administrative Agent shall also maintain accounts in which it will record (i) the amount of each Loan made hereunder, the type thereof and the Interest Period with respect thereto, (ii) the amount of any principal or interest due and payable or to become due and payable from Borrower to each Lender hereunder and (iii) the amount of any sum received by Administrative Agent hereunder from Borrower and each Lender's share thereof.

(c)    The entries maintained in the accounts maintained pursuant to paragraphs (a) and (b) above shall be prima facie evidence of the existence and amounts of the Obligations therein recorded; provided that the failure of Administrative Agent or any Lender to maintain such accounts or any error therein shall not in any manner affect the obligation of Borrower to repay the Obligations in accordance with their terms. In the event of any conflict between the records maintained by any Lender and the records maintained by

the Administrative Agent in such matters, the records of the Administrative Agent shall control in the absence of manifest error.

(d)      Any Lender may request that its Loans be evidenced by a promissory note in the form of Exhibit E (referred to herein collectively as the "*Notes*" or individually as a "*Note*"). In such event, Borrower shall prepare, execute and deliver to such Lender a Note payable to such Lender or its registered assigns in the amount of the relevant Loan or Commitment, as applicable. Thereafter, the Loans evidenced by such Note or Notes and interest thereon shall at all times (including after any assignment pursuant to Section 11.10) be represented by one or more Notes payable to the payee named therein or any assignee pursuant to Section 11.10, except to the extent that any such Lender or assignee subsequently returns any such Note for cancellation and requests that such Loans once again be evidenced as described in subsections (a) and (b) above.

Section 2.12      *Origination Payment; Transaction Premium.*

(a)      Origination Payment. Borrower agrees to pay to Administrative Agent, for the ratable benefit of the Lenders in accordance with their Commitments, a non-refundable origination payment equal to 3.00% of the aggregate original amount of the Initial Term Loan Commitments, the Delayed Draw Term Loan Commitments and the USACH/Kellenberger Term Loan Commitments (the "*DIP Origination Payment*"), which is fully earned on the date hereof and due and payable upon the funding of the Initial Term Loans. Such DIP Origination Payment shall be paid in kind by being added to the principal balance of the Loans on such date.

(b)      Transaction Premium. Borrower agrees to pay to Administrative Agent, for the ratable benefit of the Lenders in accordance with their Commitments, a non-refundable transaction premium equal to 3.00% of the aggregate original amount of the Initial Term Loan Commitments, the Delayed Draw Term Loan Commitments and the USACH/Kellenberger Term Loan Commitments (the "*DIP Transaction Premium*"), which is fully earned on the date hereof and due and payable upon the funding of the Initial Term Loans. Such DIP Transaction Premium shall be paid in kind by being added to the principal balance of the Loans on such date.

Section 2.13      *Place and Application of Payments.*

(a)      Except as otherwise expressly provided herein with respect to the payment of interest and fees in kind, rather than in cash, all payments payable by Borrower under this Agreement and the other Loan Documents shall be made by Borrower to Administrative Agent by no later than 12:00 Noon on the due date thereof at the office of Administrative Agent in New York, NY (or such other location as Administrative Agent may designate to Borrower), for the benefit of the Lender(s) entitled thereto. Any payments received after such time shall be deemed to have been received by Administrative Agent on the next Business Day. All such payments shall be made in U.S. Dollars, in immediately available funds at the place of payment, in each case without set off or counterclaim. Administrative Agent will promptly thereafter cause to be distributed like funds relating to the payment of principal or interest on Loans ratably to the Lenders, and like funds relating to the payment of any other amount payable to any Lender to such Lender, in each case to be applied in accordance with the terms of this Agreement.

(b)      Unless Administrative Agent shall have received notice from Borrower prior to the date on which any payment is due to Administrative Agent for the account of the Lenders hereunder that Borrower will not make such payment, Administrative Agent may assume that Borrower has made such payment on such date in accordance herewith and may (but shall not be required to) in reliance upon such assumption, distribute to the applicable Lenders the amount due. With respect to any payment that Administrative Agent makes to any Lender or other Secured Party as to which Administrative Agent determines (which

-35-

determination shall be conclusive and binding absent manifest error) that any of the following applies (such payment referred to as the "Rescindable Amount"): (1) Borrower has not in fact made the corresponding payment to Administrative Agent; (2) Administrative Agent has made a payment in excess of the amount(s) received by it from Borrower either individually or in the aggregate (whether or not then owed); or (3) Administrative Agent has for any reason otherwise erroneously made such payment; then each of the Secured Parties severally agrees to repay to Administrative Agent forthwith on demand the Rescindable Amount so distributed to such Secured Party, in immediately available funds with interest thereon, for each day from and including the date such amount is distributed to it to but excluding the date of payment to Administrative Agent, at the greater of the Federal Funds Rate and a rate determined by Administrative Agent in accordance with banking industry rules on interbank compensation.

(c)    Anything contained herein to the contrary notwithstanding (including Section 2.9(b)), all payments and collections received in respect of the Obligations and all proceeds of the Collateral received, in each instance, by Administrative Agent or any of the Lenders after acceleration or the final maturity of the Obligations or termination of the Commitments as a result of an Event of Default shall be remitted to Administrative Agent and distributed as follows:

(i)    first, to payment of that portion of the Obligations constituting fees, indemnities, expenses and other amounts (including fees and disbursements and other charges of counsel payable under Section 11.13) payable to the Administrative Agent in its capacity as such;

(ii)    second, to payment of that portion of the Obligations constituting fees, indemnities and other amounts (other than principal and interest) payable to the Lenders (including fees and disbursements and other charges of counsel payable under Section 11.13) arising under the Loan Documents, ratably among them in proportion to the respective amounts described in this clause (ii) payable to them;

(iii)    third, to payment of that portion of the Obligations constituting accrued and unpaid interest on the Loans ratably among the Lenders in proportion to the respective amounts described in this clause (iii) payable to them;

(iv)    fourth, (A) to payment of that portion of the Obligations constituting unpaid principal of the Loans;

(v)    fifth, to the payment in full of all other Obligations, in each case ratably among the Administrative Agent and the Lenders based upon the respective aggregate amounts of all such Obligations owing to them in accordance with the respective amounts thereof then due and payable; and

(vi)    finally, the balance, if any, after all Obligations have been indefeasibly paid in full, to Borrower or as otherwise required by Law.

(d)    The provisions of this Section 2.13 shall be subject in all respects to the DIP Orders.

Section 2.14    [Reserved].

Section 2.15    Priority and Liens.

(a)    Priority.  The Obligations, and the Liens of the Collateral Documents, shall have the priority specified in the applicable DIP Order.

146392832_4

(b)  <u>Collateral; Grant of Lien and Security Interest</u>.

(i)  Upon entry of the Interim DIP Order or Final DIP Order, as the case may be, the Liens and security interests in favor of Administrative Agent under the Collateral Documents shall be valid and perfected Liens on, and security interests in, the Collateral, prior to all other Liens on, and security interests in, the Collateral, other than the Carve-Out. Such Liens and security interests and their priority shall remain in effect until the Commitments shall have been terminated and all Obligations shall have been repaid in cash.

(ii)  Notwithstanding anything herein to the contrary (i) all proceeds received by Administrative Agent and the Lenders from the Collateral subject to the Liens granted under the Collateral Documents and by the DIP Orders shall be subject to the Carve-Out and (ii) no Person entitled to the Carve-Out shall be entitled to sell or otherwise dispose, or seek or object to the sale or other disposition, of any Collateral.

(c)  <u>Grants; Rights and Remedies</u>. The Liens and security interests granted under the Collateral Documents may be independently granted by the Loan Documents and by other Loan Documents hereafter entered into. This Agreement, the DIP Orders and such other Loan Documents supplement each other, and the grants, priorities, rights and remedies of Administrative Agent and the Lenders hereunder and thereunder are cumulative.

(d)  <u>No Filings Required</u>. The Liens and security interests referred to herein shall be deemed valid and perfected by entry of the Interim DIP Order or the Final DIP Order, as the case may be. Administrative Agent shall not be required to file any financing statements, mortgages, certificates of title, notices of Lien or similar instruments in any jurisdiction or filing office or to take any other action in order to validate or perfect the Lien and security interest granted by or pursuant to this Agreement, the Interim DIP Order or the Final DIP Order, as the case may be, or any other Loan Document; <u>provided</u>, that Administrative Agent shall be permitted to file any financing statements, mortgages, certificates of title, notices of Lien or similar instruments in any jurisdiction or filing office or to take any other action with respect to the Lien and security interest granted by or pursuant to this Agreement.

(e)  <u>Further Assurances</u>. The Loan Parties shall take any other actions reasonably requested by Administrative Agent or any Lender from time to time to cause the attachment, perfection and first priority of, and the ability of Administrative Agent and the Lenders to enforce, the security interest of Administrative Agent and the Lenders in any and all of the Collateral, including, without limitation, (a) executing and delivering any requested security agreement, pledge agreement or mortgage, (b) executing, delivering and, where appropriate, filing financing statements and amendments relating thereto under the Uniform Commercial Code or other applicable law, to the extent, if any, that any Loan Party's signature thereon is required therefor, (c) causing Administrative Agent's name to be noted as secured party on any certificate of title for a titled good if such notation is a condition to attachment, perfection or priority of, or ability of Administrative Agent to enforce, the security interest of Administrative Agent in such Collateral, (d) complying with any provision of any statute, regulation or treaty of the United States as to any Collateral if compliance with such provision is a condition to attachment, perfection or priority of, or ability of Administrative Agent to enforce, the security interest of Administrative Agent in such Collateral, and (e) obtaining the consents and approvals of any Governmental Authority or third party and taking all actions required by the Uniform Commercial Code or by other law, as applicable in any relevant jurisdiction.

*Section 2.16     No Discharge; Survival of Claims*. Borrower agrees that to the extent that the Obligations have not been paid in full, (i) its obligations under the Loan Documents shall not be discharged by the entry of an order confirming a Reorganization Plan (and Borrower, pursuant to Section 1141(d)(4) of the Bankruptcy Code, hereby waives any such discharge) and (ii) the Superpriority Claim granted to

-37-

Administrative Agent and the Lenders pursuant to the DIP Orders and the Liens granted to Administrative Agent and the Lenders pursuant to the DIP Orders shall not be affected in any manner by the entry of an order confirming a Reorganization Plan.

Section 2.17    *Defaulting Lenders.*

(a)    *Defaulting Lender Adjustments*.  Notwithstanding anything to the contrary contained in this Agreement, if any Lender becomes a Defaulting Lender, then, until such time as such Lender is no longer a Defaulting Lender, to the extent permitted by applicable Law:

(i)    Waivers and Amendments.  Such Defaulting Lender's right to approve or disapprove any amendment, waiver or consent with respect to this Agreement shall be restricted as set forth in the definition of Required Lenders and Section 11.11.

(ii)    Defaulting Lender Waterfall.  Any payment of principal, interest, fees or other amounts received by the Administrative Agent for the account of such Defaulting Lender (whether voluntary or mandatory, at maturity, pursuant to Section 8 or otherwise) or received by the Administrative Agent from a Defaulting Lender pursuant to Section 11.14 shall be applied at such time or times as may be determined by the Administrative Agent as follows:  *first*, to the payment of any amounts owing by such Defaulting Lender to the Administrative Agent hereunder; *second*, (A) as Borrower may request (so long as no Default or Event of Default exists), to the funding of any Loan in respect of which such Defaulting Lender has failed to fund its portion thereof as required by this Agreement, as determined by the Administrative Agent; *third*, if so determined by the Administrative Agent (acting reasonably) and Borrower, to be held in a deposit account and released pro rata in order to satisfy such Defaulting Lender's potential future funding obligations with respect to Loans under this Agreement; *fourth*, to the payment of any amounts owing to the Lenders as a result of any judgment of a court of competent jurisdiction obtained by any Lender against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement; *fifth*, so long as no Default or Event of Default exists, to the payment of any amounts owing to Borrower as a result of any judgment of a court of competent jurisdiction obtained by Borrower against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement; and *sixth*, to such Defaulting Lender or as otherwise may be required under the Loan Documents in connection with anu Lien conferred thereunder or directed by a court of competent jurisdiction; provided that if (x) such payment is a payment of the principal amount of any Loans in respect of which such Defaulting Lender has not fully funded its appropriate share, and (y) such Loans were made at a time when the conditions set forth in Section 4.2 were satisfied or waived, such payment shall be applied solely to pay the Loans of all Non-Defaulting Lenders on a pro rata basis prior to being applied to the payment of any Loans of such Defaulting Lender until such time as all Loans are held by the Lenders pro rata in accordance with the Commitments hereunder.  Any payments, prepayments or other amounts paid or payable to a Defaulting Lender that are applied (or held) to pay amounts owed by a Defaulting Lender shall be deemed paid to and redirected by such Defaulting Lender, and each Lender irrevocably consents hereto.

(b)    *Defaulting Lender Cure*.  If Borrower and Administrative Agent agree in writing that a Lender is no longer a Defaulting Lender, the Administrative Agent will so notify the parties hereto, whereupon as of the effective date specified in such notice and subject to any conditions set forth therein, that Lender will, to the extent applicable, purchase at par that portion of outstanding Loans of the other Lenders or take such other actions as the Administrative Agent may determine to be necessary to cause the Loans to be held on a pro rata basis by the Lenders in accordance with the Commitments their applicable Percentages, whereupon, such Lender will cease to be a Defaulting Lender; provided that no adjustments

-38-

will be made retroactively with respect to fees accrued or payments made by or on behalf of Borrower while that Lender was a Defaulting Lender; and provided, further, that except to the extent otherwise expressly agreed by the affected parties, no change hereunder from Defaulting Lender to Lender will constitute a waiver or release of any claim of any party hereunder arising from that Lender's having been a Defaulting Lender.

*Section 3.  Taxes; Change In Circumstances.*

    *Section 3.1    Withholding Taxes*.

    (a)    *Payments Free of Withholding.*  Except as otherwise required by law and subject to this Section 3.1(a) and Section 10.11, each payment by Borrower and the Guarantors under this Agreement or the other Loan Documents shall be made without deduction or withholding for or on account of any Taxes. If any such deduction or withholding is so required, Borrower or such Guarantor shall be entitled to make such deduction or withholding, shall pay the amount deducted or withheld to the appropriate Governmental Authority before penalties attach thereto or interest accrues thereon, and, to the extent such deduction or withholding is of an Indemnified Tax, then the applicable Loan Party shall forthwith pay such additional amount as may be necessary to ensure that the net amount actually received by the applicable Lender (or, in the case of a payment received by Administrative Agent for its own account, Administrative Agent) after all such withholding has been made (including such deductions and withholdings applicable to additional sums payable under this Section 3.1) is equal to the amount which that Lender or Administrative Agent (as the case may be) would have received had such withholding not been made.  If Administrative Agent or any Lender pays any amount in respect of any such Indemnified Taxes, or any penalties or interest arising therefrom or with respect thereto, Borrower or such Guarantor shall reimburse Administrative Agent or such Lender for the full amount of such Indemnified Taxes within thirty days after written demand therefor. If Borrower or such Guarantor pays any such Taxes, penalties or interest, it shall deliver official Tax receipts evidencing that payment, or certified copies thereof, to the Administrative Agent on or before the thirtieth day after such payment is made, and the Administrative Agent shall deliver a copy of such official Tax receipts to Lender.  If any party determines, in its reasonable and good faith discretion, that it has received a refund in respect of any Indemnified Taxes as to which it has been reimbursed by Borrower or any Guarantor pursuant to this Section 3.1 (including by the payment of additional amounts by Borrower or any Guarantor pursuant to this Section 3.1), it shall within thirty days after receipt thereof remit an amount equal to such refund (net of any Taxes paid or payable by the recipient on such refund) to Borrower or such Guarantor.

    (b)    *U.S. Withholding Tax Exemptions.*  Each Lender (or, if such Lender is disregarded as an entity separate from its owner for U.S. federal income tax purposes, each such owner) that is not a "United States person" (as such term is defined in Section 7701(a)(30) of the Code) shall submit to Borrower and Administrative Agent on or before the date the initial Credit Event is made hereunder or, if later, the date such financial institution becomes a Lender hereunder, two duly completed and signed copies of whichever of the following is applicable (i) Internal Revenue Service Form W-8BEN or Form W-8BEN-E, as applicable (relating to such Lender or (or such owner) and entitling it to claim eligibility for benefits of an income tax treaty to which the United States is a party with respect to amounts to be received by such Lender, including fees, pursuant to the Loan Documents and the Obligations), (ii) Internal Revenue Service Form W-8ECI (relating to all amounts to be received by such Lender, including fees, pursuant to the Loan Documents and the Obligations), (iii) solely if such Lender (or such owner) is claiming exemption from United States withholding Tax under Section 881(c) of the Code with respect to payments of "portfolio interest", an Internal Revenue Service Form W-8BEN or Form W-8BEN-E, as applicable, or any successor form prescribed by the Internal Revenue Service, and a certificate substantially in the form of Exhibit I hereto (any such certificate a "***United States Tax Compliance Certificate***"), or any other form approved by Administrative Agent in its reasonable discretion, representing that such Lender (or such owner) is not a

-39-

"bank" for purposes of Section 881(c)(3)(A) of the Code, is not a "10 percent shareholder" (within the meaning of Section 871(h)(3)(B) of the Code) and is not a "controlled foreign corporation" (within the meaning of Section 881(c)(3)(C) and Section 864(d)(4) of the Code) and that no interest payments under any Loan Document are effectively connected with such Lender's (or such owner's) conduct of a U.S. trade or business, or (iv) to the extent a Lender (or such owner) is not the beneficial owner, Internal Revenue Service Form W-8IMY of the Lender (or such owner), accompanied by an Internal Revenue Service Form W-8ECI, W-8BEN, W-8BEN-E, a United States Tax Compliance Certificate, Internal Revenue Service Form W-9, Form W-8IMY or any other required information from each beneficial owner, as applicable (provided that, if the Lender (or such owner) is a partnership and one or more direct or indirect partners are claiming the portfolio interest exemption, the United States Tax Compliance Certificate may be provided by such Lender (or such owner) on behalf of such direct or indirect partner(s)). Thereafter and from time to time, each Lender shall submit to Borrower and Administrative Agent such additional duly completed and signed copies of one or the other of such Forms (or such successor forms as shall be adopted from time to time by the relevant United States taxing authorities) and such other documentation or certificates as may be (i) requested by Borrower in a written notice, directly or through Administrative Agent, to such Lender and (ii) prescribed by applicable law or regulations to avoid or reduce withholding Taxes on payments in respect of amounts to be received by such Lender, including fees, pursuant to the Loan Documents or the Obligations.  Each Lender (or, if such Lender is disregarded as an entity separate from its owner for U.S. federal income tax purposes, each such owner) that is a "United States person" (as such term is defined in Section 7701(a)(30) of the Code) shall submit to Borrower and Administrative Agent on or before the date the initial Credit Event is made hereunder or, if later, the date such financial institution becomes a Lender hereunder, two duly completed and signed copies of Internal Revenue Service Form W-9 certifying that such Lender (or such owner) is a United States person that is exempt from U.S. federal backup withholding.

(c)      *FATCA*.  If a payment made to a Lender under any Loan Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Sections 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to Borrower and Administrative Agent at the time or times prescribed by applicable laws and at such time or times reasonably requested by Borrower or Administrative Agent such documentation prescribed by applicable laws (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by Borrower or Administrative Agent as may be necessary for Borrower and Administrative Agent to comply with its FATCA obligations, to determine whether such Lender has or has not complied with such Lender's FATCA obligations and to determine the amount, if any, to deduct and withhold from such payment.  Solely for purposes of this Section 3.1(c), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

(d)      *Inability of Lender to Submit Forms*.  If any Lender determines that it is unable to submit to Borrower or Administrative Agent any form or certificate that such Lender is obligated to submit pursuant to subsection (b) or subsection (c) of this Section 3.1 or that such Lender is required to withdraw or cancel any such form or certificate previously submitted or any such form or certificate otherwise becomes ineffective or inaccurate, such Lender shall promptly notify Borrower and Administrative Agent of such fact and the Lender shall to that extent not be obligated to provide any such form or certificate and will be entitled to withdraw or cancel any affected form or certificate, as applicable.

Section 3.2      *Documentary Taxes*.  Borrower and/or Guarantors agree to timely pay to the relevant Governmental Authority in accordance with applicable law, or, at the option of Administrative Agent, timely reimburse Administrative Agent for the payment of, any Other Taxes required to be paid.

Section 3.3      *Intended Tax Treatment.* Each of the parties hereto (i) intends that the Loans be treated as short-term debt instruments for U.S. federal, state, and local income Tax purposes and (ii) agrees

146392832_4

not to file any Tax return, report or declaration inconsistent with sub-clause (A) of the foregoing clause (i) except, in each case, as otherwise required pursuant to a final "determination" within the meaning of Section 1313(a) of the Code. The inclusion of this <u>Section 3.3</u> is not an admission by any Lender that it is subject to United States taxation.

*Section 3.4    Funding Indemnity.*  If any Lender shall incur any loss, cost or expense (including any loss, cost or expense incurred by reason of the liquidation or re-employment of deposits or other funds acquired by such Lender to fund or maintain any SOFR Loan or the relending or reinvesting of such deposits or amounts paid or prepaid to such Lender) as a result of:

(a)    any payment or prepayment of a SOFR Loan on a date other than the last day of its Interest Period,

(b)    any failure (because of a failure to meet the conditions of <u>Section 4</u> or otherwise) by Borrower to borrow or continue a SOFR Loan on the date specified in a notice given pursuant to <u>Section 2.6(a)</u>,

(c)    any failure by Borrower to make any payment of principal on any SOFR Loan when due (whether by acceleration or otherwise), or

(d)    any acceleration of the maturity of a SOFR Loan as a result of the occurrence of any Event of Default hereunder,

then, upon the demand of such Lender, Borrower shall pay to such Lender such amount as will reimburse such Lender for such loss, cost or expense.  If any Lender makes such a claim for compensation, it shall provide to Borrower, with a copy to Administrative Agent, a certificate setting forth the amount of such loss, cost or expense in reasonable detail (including an explanation of the basis for and the computation of such loss, cost or expense) and the amounts shown on such certificate shall be conclusive and binding on Borrower absent manifest error.

*Section 3.5    Change in Law.*  Notwithstanding any other provisions of this Agreement or any other Loan Document, if at any time any Change in Law or regulation or in the interpretation thereof makes it unlawful for any Lender to make or continue to maintain any SOFR Loans, such Lender shall promptly give notice thereof to Borrower and such Lender's obligations to make or maintain SOFR Loans under this Agreement shall be suspended until it is no longer unlawful for such Lender to make or maintain SOFR Loans.  Borrower shall prepay on demand the outstanding principal amount of any such affected SOFR Loans, together with all interest accrued thereon and all other amounts then due and payable to such Lender under this Agreement.  Upon any such repayment, Borrower shall also be required to pay any additional amounts required pursuant to <u>Section 3.4</u>.

*Section 3.6    Inability to Determine Rates.*  Subject to <u>Section 3.10</u>, if, on or prior to the first day of any Interest Period for any SOFR Loan:

(a)    the Administrative Agent determines (which determination shall be conclusive and binding absent manifest error) that "Term SOFR" cannot be determined pursuant to the definition thereof, or

(b)    the Required Lenders determine in good faith that for any reason in connection with any request for a SOFR Loan or a conversion thereto or a continuation thereof that Term SOFR for any requested Interest Period with respect to a proposed SOFR Loan does not adequately and fairly reflect the cost to such Lenders of funding such Loan, and the Required Lenders have provided notice of such determination to the Administrative Agent,

146392832_4

then the Administrative Agent will promptly so notify Borrower and each Lender. Upon notice thereof by the Administrative Agent to Borrower, any obligation of the Lenders to make or continue SOFR Loans shall be suspended (to the extent of the affected SOFR Loans and, in the case of a SOFR Loan, the affected Interest Periods) until the Administrative Agent revokes such notice. Upon receipt of such notice, (i) Borrower may revoke any pending request for a borrowing or continuation of SOFR Loans (to the extent of the affected SOFR Loans and, in the case of a SOFR Loan, the affected Interest Periods) or, failing that, Borrower will be deemed to have converted any such request into a request for a Borrowing of or conversion to Base Rate Loans in the amount specified therein and (ii) any outstanding affected SOFR Loans will be deemed to have been converted into Base Rate Loans immediately or, in the case of a SOFR Loan, at the end of the applicable Interest Period. Upon any such conversion, Borrower shall also pay any additional amounts required pursuant to <u>Section 3.4</u>.

Section 3.7    *Increased Cost and Reduced Return*.

(a)    If any Change in Law:

(i)    shall subject any Lender (or its Lending Office) to any Tax (other than (A) Indemnified Taxes (B) Taxes described in clauses (b) through (d) of the definition of Excluded Taxes and (C) Connection Income Taxes) with respect to its SOFR Loans, its Notes, or its participation in any thereof, or its obligation to make SOFR Loans or to participate therein; or

(ii)    shall impose, modify or deem applicable any reserve, special deposit or similar requirement (including any such requirement imposed by the FRB) or shall impose on any Lender (or its Lending Office) or on the interbank market any other condition affecting its SOFR Loans, its Notes, or its participation in any thereof, or its obligation to make SOFR Loans or to participate therein;

and the result of any of the foregoing is to increase the cost to such Lender (or its Lending Office) of making or maintaining any SOFR Loan or participating therein, or to reduce the amount of any sum received or receivable by such Lender (or its Lending Office) under this Agreement or under any other Loan Document with respect thereto, by an amount reasonably deemed by such Lender to be material, then, within 15 days after demand by such Lender (with a copy to Administrative Agent), Borrower shall be obligated to pay to such Lender such additional amount or amounts as will compensate such Lender for such increased cost or reduction.

(b)    If any Lender determines that any Change in Law affecting such Lender or any lending office of such Lender or such Lender's holding company, if any, regarding capital or liquidity requirements, has or would have the effect of reducing the rate of return on such Lender's capital or on the capital of such Lender's holding company, if any, as a consequence of this Agreement, the Commitments of such Lender or the Loans made by such Lender to a level below that which such Lender or such Lender's holding company could have achieved but for such Change in Law (taking into consideration such Lender's policies and the policies of such Lender's holding company with respect to capital adequacy), then from time to time Borrower will pay to such Lender, as the case may be, such additional amount or amounts as will compensate such Lender or such Lender's holding company for any such reduction suffered; <u>provided</u> that Borrower shall not be required to compensate any Lender pursuant to this <u>Section 3.7(b)</u> for any amounts incurred more than 180 days prior to the date that such Lender notifies Borrower, in writing of the amounts and of such Lender's intention to claim compensation thereof; <u>provided</u>, <u>further</u>, that if the event giving rise to such increase is retroactive, then the 180-day period referred to above shall be extended to include the period of retroactive effect thereof.

(c)      A certificate of a Lender setting forth the amount or amounts necessary to compensate such Lender or its holding company, as the case may be, as specified in paragraph (a) or (b) of this Section and delivered to Borrower, shall be conclusive and binding absent manifest error.  Borrower shall pay such Lender the amount shown as due on any such certificate within 10 days after receipt thereof.

Section 3.8      *Lending Offices*.  Each Lender may, at its option, elect to make its Loans hereunder at the branch, office or affiliate specified on the appropriate signature page hereof (each a "*Lending Office*") for each Loan available hereunder or at such other of its branches, offices or affiliates as it may from time to time elect and designate in a written notice to Borrower and Administrative Agent.

Section 3.9      [Reserved].

Section 3.10      *Effect of Benchmark Transition Event*.  Notwithstanding anything to the contrary herein or in any other Loan Document (and any interest rate swap agreement shall be deemed not to be a "Loan Document" for the purposes of this Section 3.10):

(a)      *Benchmark Replacement*.  Notwithstanding anything to the contrary herein or in any other Loan Document, if a Benchmark Transition Event and its related Benchmark Replacement Date have occurred prior any setting of the then-current Benchmark, then (x) if a Benchmark Replacement is determined in accordance with clause (a) of the definition of "Benchmark Replacement" for such Benchmark Replacement Date, such Benchmark Replacement will replace such Benchmark for all purposes hereunder and under any Loan Document in respect of such Benchmark setting and subsequent Benchmark settings without any amendment to, or further action or consent of any other party to, this Agreement or any other Loan Document and (y) if a Benchmark Replacement is determined in accordance with clause (b) of the definition of "Benchmark Replacement" for such Benchmark Replacement Date, such Benchmark Replacement will replace such Benchmark for all purposes hereunder and under any Loan Document in respect of any Benchmark setting at or after 5:00 p.m. (New York City time) on the fifth (5th) Business Day after the date notice of such Benchmark Replacement is provided to the Lenders without any amendment to, or further action or consent of any other party to, this Agreement or any other Loan Document so long as the Administrative Agent has not received, by such time, written notice of objection to such Benchmark Replacement from Lenders comprising the Required Lenders.  If the Benchmark Replacement is Daily Simple SOFR, all interest payments will be payable on a monthly basis.

(b)      *Benchmark Replacement Conforming Changes*.  In connection with the use, administration, adoption or implementation of a Benchmark Replacement, the Administrative Agent will have the right to make Conforming Changes from time to time and, notwithstanding anything to the contrary herein or in any other Loan Document, any amendments implementing such Conforming Changes will become effective without any further action or consent of any other party to this Agreement or any other Loan Document.

(c)      *Notice; Standards for Decisions and Determinations*.  The Administrative Agent will promptly notify Borrower and the Lenders of (i) the implementation of any Benchmark Replacement and (ii) the effectiveness of any Conforming Changes in connection with the use, administration, adoption or implementation of a Benchmark Replacement.  The Administrative Agent will promptly notify Borrower of the removal or reinstatement of any tenor of a Benchmark pursuant to Section 3.10.  Any determination, decision or election that may be made by the Administrative Agent or, if applicable, any Lender (or group of Lenders) pursuant to this Section 3.10, including any determination with respect to a tenor, rate or adjustment or of the occurrence or non-occurrence of an event, circumstance or date and any decision to take or refrain from taking any action or any selection, will be conclusive and binding absent manifest error and may be made in its or their sole discretion and without consent from any other party to this Agreement or any other Loan Document, except, in each case, as expressly required pursuant to this Section 3.10.

-43-

(d)    *Unavailability of Tenor of Benchmark.*  Notwithstanding anything to the contrary herein or in any other Loan Document, at any time (including in connection with the implementation of a Benchmark Replacement), (i) if the then-current Benchmark is a term rate (including the Term SOFR Reference Rate) and either (A) any tenor for such Benchmark is not displayed on a screen or other information service that publishes such rate from time to time as selected by the Administrative Agent in its reasonable discretion or (B) the administration of such Benchmark or the regulatory supervisor for the administrator of such Benchmark has provided a public statement or publication of information announcing that any tenor for such Benchmark is not or will not be representative, then the Administrative Agent may modify the definition of "Interest Period" (or any similar or analogous definition) for any Benchmark settings at or after such time to remove such unavailable, non-representative, non-compliant or non-aligned tenor and (ii) if a tenor that was removed pursuant to clause (i) above either (A) is subsequently displayed on a screen or information service for a Benchmark (including a Benchmark Replacement) or (B) is not or will not be representative for a Benchmark (including a Benchmark Replacement), then the Administrative Agent may modify the definition of "Interest Period" (or any similar or analogous definition) for all Benchmark settings at or after such time to reinstate such previously removed tenor.

(e)    *Benchmark Unavailability Period.*  Upon Borrower's receipt of notice of the commencement of a Benchmark Unavailability Period, Borrower may revoke any pending request for a SOFR Borrowing of, conversion to or continuation of SOFR Loans to be made, converted or continued during any Benchmark Unavailability Period and, failing that, Borrower will be deemed to have converted any such request into a request for a Borrowing of or conversion to Base Rate Loans.

*Section 4.  Conditions Precedent.*

*Section 4.1    Conditions Precedent to the Occurrence of the Closing Date and to the Making of the Initial Term Loans.*  The occurrence of the Closing Date, and the obligation of each Lender to make Initial Term Loans on the Closing Date is subject to the fulfillment or waiver by the applicable party, to the satisfaction of Administrative Agent and each Lender, of each of the following conditions precedent (but in each case, any item required to be delivered after the Closing Date pursuant to Section 6.13 shall be deemed to have been delivered on the Closing Date for the purposes of determining compliance with this Section 4.1):

(a)    Loan Documents.  Receipt by Administrative Agent of executed counterparts of this Agreement and the other Loan Documents, each properly executed by a Responsible Officer of the signing Loan Party and, in the case of this Agreement, by each Lender.

(b)    Organization Documents, Resolutions, Etc.  Receipt by Administrative Agent of the following, in form and substance reasonably satisfactory to Administrative Agent and its legal counsel:

(i)    copies of each Loan Party's articles of incorporation and bylaws (or comparable organizational documents) and any amendments thereto, and incumbency certificates of the duly authorized officers of such Loan Party, certified in each instance by its Secretary or Assistant Secretary or other duly authorized signatory or authority;

(ii)    such certificates of resolutions or other action, incumbency certificates and/or other certificates of Responsible Officers of each Loan Party as Administrative Agent may require evidencing the identity, authority and capacity of each Responsible Officer thereof authorized to act as a Responsible Officer in connection with this Agreement and the other Loan Documents to which such Loan Party is a party; and

(iii)    such documents and certifications as Administrative Agent may require to evidence that each Loan Party is duly organized or formed, and is validly existing, in good standing and qualified to engage in business in its state of organization or formation.

(c)    <u>Perfection and Priority of Liens</u>.  Receipt by Administrative Agent of the following:

(i)    UCC financing statements for each appropriate jurisdiction as is necessary, in Administrative Agent's sole discretion, to perfect Administrative Agent's security interest in the Collateral;

(ii)    all certificates evidencing any certificated equity Interests pledged to Administrative Agent pursuant to the Collateral Documents, together with duly executed in blank and undated stock powers attached thereto; and

(iii)    duly executed notices of grant of security interest in the form required by the Collateral Documents as are necessary, in Administrative Agent's sole discretion, to perfect Administrative Agent's security interest in the intellectual property of the Loan Parties.

(d)    <u>Closing Certificate</u>.  Receipt by Administrative Agent of a certificate signed by a Responsible Officer of the Borrower certifying that the conditions specified in <u>Sections 4.2(a)</u> and <u>(b)</u> have been satisfied.

(e)    <u>Attorney Costs</u>.  Borrower shall have paid all fees, charges and disbursements of counsel to Administrative Agent to the extent invoiced on or prior to the Closing Date, <u>plus</u> such additional amounts of such fees, charges and disbursements as shall constitute its reasonable estimate of such fees, charges and disbursements incurred or to be incurred by it through the closing proceedings (provided that such estimate shall not thereafter preclude a final settling of accounts between Borrower and Administrative Agent).  Such fees, charges and disbursements may be paid directly by Administrative Agent from the proceeds of the Initial Term Loans.

(f)    <u>Request for Credit Extension</u>.  Receipt by Administrative Agent of a Notice of Borrowing in accordance with the requirements hereof with respect to the Initial Term Loans.

(g)    <u>Due Diligence; PATRIOT ACT</u>.  Administrative Agent and the Lenders shall have received all documentation and other information required under applicable "know your customer" and anti-money laundering rules and regulations, including the PATRIOT Act, at least three (3) Business Days prior to the requested Borrowing.

(h)    <u>Collateral Requirement</u>.  On or prior to the Closing Date, the U.S. Security Agreement and the Interim DIP Order (upon its entry in the Chapter 11 Case), shall be effective to create in favor of Administrative Agent, for the benefit of the holders of the Obligations, a legal, valid and enforceable: (i) first priority perfected security interests in and Liens on the Collateral, subject to the Carve-Out.

(i)    <u>Interim DIP Order</u>. Prior to the Closing Date, the Bankruptcy Court shall have entered the Interim DIP Order, which Interim DIP Order shall be in full force and effect and shall not have been reversed, vacated or stayed, and shall not have been amended, supplemented or otherwise modified without the prior consent of each Lender in its sole discretion.  If the Interim DIP Order is the subject of a pending appeal in any respect, neither the Interim DIP Order nor the making of the Loans or the performance by any Loan Party of any of its obligations under any of the Loan Documents shall be the subject of a presently effective stay pending appeal.

-45-

(j)    Budget.  The Lenders shall have received and be reasonably satisfied with a detailed 13-week consolidated weekly budget (as updated with the approval of Administrative Agent from time to time pursuant to Section 6.5(d), the "*Approved Budget*") of projected receipts and expenditures of the Loan Parties for the period specified therein, delivered to Administrative Agent on or prior to the Closing Date, which shall set forth forecasted (A) cash receipts, (B) cash operating disbursements, (C) cash bankruptcy disbursements and (D) net cash flow.

(k)    Chapter 11 Cases.  Borrower and each of the other Debtors shall have commenced the Cases in the Bankruptcy Court.

(l)    Outside Date.  The Closing Date shall have occurred within one (1) Business Day after the Interim Order Entry Date.

(m)    [Reserved].

(n)    363 Sale Transaction Motion.  On or prior to the date that is one (1) Business Day after the Petition Date, Debtors shall have filed a motion, in form and substance satisfactory to the Administrative Agent in its sole discretion, seeking (a) the entry of the Bidding Procedures Order and (b) the entry of an order of the Bankruptcy Court, in form and substance satisfactory to the Administrative Agent in its sole discretion, expressly authorizing and approving the 363 Sale Transaction.

(o)    Consent.  The Lenders under (and as defined in) the Prepetition Loan Agreement shall have consented to the DIP Facility on the terms set forth herein and the Stalking Horse APA on the terms set forth therein, in each case, in a manner reasonably satisfactory to the Lenders.

Without limiting the generality of the provisions of Section 9.6(b), for purposes of determining compliance with the conditions specified in this Section 4.1, each Lender that has signed this Agreement shall be deemed to have consented to, approved or accepted or to be satisfied with, each document or other matter required thereunder to be consented to or approved by or acceptable or satisfactory to a Lender unless Administrative Agent shall have received notice from such Lender prior to the proposed Closing Date specifying its objection thereto.

Section 4.2    Conditions Precedent to All Loans.  The obligation of each Lender to participate in any Credit Event (including any initial Credit Event) hereunder is subject to the following conditions precedent:

(a)    each of the representations and warranties set forth herein and in the other Loan Documents shall be and remain true and correct in all material respects as of said time (other than (i) such representations as are made as of a specific earlier date, in which case such representations and warranties shall be true and correct in all material respects as of such earlier date, and (ii) such representations that are qualified by materiality or as to material adverse effect in the text thereof, in which case such representations and warranties shall be true and correct in all respects);

(b)    no Default or Event of Default shall have occurred and be continuing or would occur as a result of such Credit Event;

(c)    Administrative Agent shall have received the notice required by Section 2.6;

(d)    in the case of any Delayed Draw Term Loan, the Bankruptcy Court shall have entered the Final DIP Order which shall be in form and substance acceptable to each Lender in its sole discretion, shall be in full force and effect and shall not have been reversed, vacated, stayed, amended, supplemented or otherwise modified without the prior consent of each Lender in its sole discretion.  If the Final DIP Order

-46-

is the subject of a pending appeal in any respect, none of such DIP Order, the making of the Delayed Draw Term Loans or the performance by any Loan Party of any of its obligations under any of the Loan Documents shall be the subject of a presently effective stay pending appeal;

(e)    (i) all orders (if any) providing for payment of prepetition indebtedness of the Loan Parties or affecting in any way the Obligations or Collateral submitted for entry in the Cases (in each case, other than the DIP Orders) shall be reasonably satisfactory in form and substance to Administrative Agent, as entered, and shall not deviate from the form thereof approved by Administrative Agent in any material respect which is adverse to the interests of Administrative Agent or the Lenders and (ii) all motions and other documents to be filed by the Debtors with the Bankruptcy Court in connection with the DIP Facility or that could reasonably be expected to affect the DIP Facility, the Collateral or the rights or remedies of Administrative Agent shall be in form and substance reasonably satisfactory to the Lenders;

(f)    Subject to the entry of the DIP Orders and subject to the terms thereof, the Loan Parties, Administrative Agent and the Lenders shall be permitted and required to perform their respective obligations in compliance with this Agreement and the other Loan Documents, and the making of such loan shall not violate any requirement of Law and shall not have been enjoined, whether temporarily, preliminarily or permanently.

(g)    in the case of any USACH/Kellenberger Term Loan, (i) Administrative Agent shall have determined in its sole discretion, and shall have notified Borrower, that the most recent Approved Budget sets forth the use of proceeds of the USACH/Kellenberger Term Loans in a satisfactory manner and (ii) if any DIP Order previously entered is the subject of a pending appeal in any respect, none of such DIP Order, the making of the applicable USACH/Kellenberger Term Loans or the performance by any Loan Party of any of its obligations under any of the Loan Documents shall be the subject of a presently effective stay pending appeal;

Each request for a Borrowing hereunder shall be deemed to be a representation and warranty by Borrower on the date of such Credit Event as to (1) the facts specified in subsections (a) through (c), (e) and (f) above, and, (2) in addition, (x) in the case of a Credit Event constituting a Borrowing of Delayed Draw Term Loans, the facts specified in subsection (d) above, and (y) in the case of a Credit Event constituting a Borrowing of USACH/Kellenberger Term Loans, the facts specified in subsection (g) above, each inclusive, of this Section.

*Section 5.    Representations and Warranties.*

On the date of each Credit Event, Borrower and each other Loan Party represents and warrants to Administrative Agent and the Lenders as follows:

*Section 5.1    Organization and Qualification.*  Borrower is (a) duly organized, validly existing, and in good standing as a corporation, limited liability company, or partnership under the laws of the jurisdiction of its incorporation, organization or formation, as applicable, (b) has full and adequate power to own its Property and conduct its business as now conducted, and (c) is duly licensed or qualified and in good standing in each jurisdiction in which the nature of the business conducted by it or the nature of the Property owned or leased by it requires such licensing or qualifying, except, with respect to this clause (c), where the failure to do so, individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect.

*Section 5.2    Subsidiaries.*  Each other Loan Party (a) is duly organized, validly existing, and (where applicable) in good standing under the laws of the jurisdiction in which it is organized, (b) subject to the entry of the DIP Orders and subject to the terms thereof, has full and adequate power to own its

-47-

Property and conduct its business as now conducted, and (c) is duly licensed or qualified and in good standing in each jurisdiction in which the nature of the business conducted by it or the nature of the Property owned or leased by it requires such licensing or qualifying, except, with respect to clauses (a) through (c), where the failure to be, have or do so, individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect. Schedule 5.2 hereto identifies each Subsidiary, the jurisdiction of its organization, the percentage of issued and outstanding shares of each class of its capital stock or other equity interests owned by Borrower and the other Subsidiaries and, if such percentage is not 100% (excluding directors' qualifying shares as required by law), a description of each class of its authorized capital stock and other equity interests and the number of shares of each class issued and outstanding. All of the outstanding shares of capital stock and other equity interests of each Subsidiary are validly issued and outstanding and fully paid and non-assessable and all such shares and other equity interests indicated on Schedule 5.2 as owned by Borrower or another Subsidiary are owned, beneficially and of record, by Borrower or such Subsidiary free and clear of all Liens other than the Liens granted in favor of Administrative Agent pursuant to the Collateral Documents and other Lien permitted by this Agreement to be incurred. As of the Closing Date, there are no outstanding commitments or other obligations of any Subsidiary to issue, and no options, warrants or other rights of any Person to acquire, any shares of any class of capital stock or other equity interests of any Subsidiary.

Section 5.3    *Authority and Validity of Obligations*. Subject to the entry of the DIP Orders and subject to the terms thereof, Borrower has full right and authority to enter into this Agreement and the other Loan Documents executed by it, to make the borrowings herein provided for, to grant to Administrative Agent the Liens described in the Collateral Documents executed by Borrower, and to perform all of its obligations hereunder and under the other Loan Documents executed by it. Subject to the entry of the DIP Orders and subject to the terms thereof, each other Loan Party has full right and authority to enter into the Loan Documents executed by it, to guarantee the Obligations, as applicable, to grant to Administrative Agent the Liens described in the Collateral Documents executed by such Person, and to perform all of its obligations under the Loan Documents executed by it. Subject to the entry of the DIP Orders and subject to the terms thereof, the Loan Documents delivered by Borrower and the other Loan Parties have been duly authorized, executed, and delivered by such Persons and constitute valid and binding obligations of Borrower and such Loan Parties enforceable against them in accordance with their terms, except as enforceability may be limited by bankruptcy, insolvency, fraudulent conveyance or similar laws affecting creditors' rights generally and general principles of equity (regardless of whether the application of such principles is considered in a proceeding in equity or at law); and .subject to the entry of the DIP Orders and subject to the terms thereof, this Agreement and the other Loan Documents do not, nor does the performance or observance by Borrower or any other Loan Party of any of the matters and things herein or therein provided for, (a) contravene or constitute a default under (i) any provision of law or any judgment, injunction, order or decree binding upon Borrower or any other Loan Party or (ii) any provision of the organizational documents (e.g., charter, certificate or articles of incorporation and bylaws, certificate or articles of association and operating agreement, partnership agreement, or other similar organizational documents) of Borrower or any other Loan Party, (b) conflict with, contravene or constitute a default under any indenture or agreement of or affecting Borrower or any other Loan Party or any of their Property, where any such conflict or default referred to in clause (a)(i) or this clause (b), would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, or (c) result in the creation or imposition of any Lien on any Property of Borrower or any other Loan Party other than the Liens granted in favor of Administrative Agent pursuant to the Collateral Documents.

Section 5.4    *Use of Proceeds; Margin Stock*.

(a)    Borrower shall use the proceeds of the Loans (i) to pay certain costs, fees and expenses related to this Agreement and the Cases, (ii) to fund the Carve-Out as more fully described in the DIP Orders and (iii) for working capital and general corporate purposes of the Borrower and its Subsidiaries, in

each case in accordance with the Approved Budget, or in a manner constituting a Permitted Variance. Without limiting the foregoing, (x) no proceeds of any Loan shall be used to fund the Wind-Down Reserve and (y) the proceeds of the USACH/Kellenberger Term Loans shall be used solely to fund the USACH and Kellenberger Businesses in accordance with the Approved Budget.

(b)    Notwithstanding anything to the contrary contained in any Loan Document, none of the proceeds of the Loans and none of the Obligations, the cash collateral, the Collateral or the Carve-Out will be used in connection with: (i) preventing, hindering, or delaying the Secured Parties' enforcement or realization upon any of the Collateral; (ii) using or seeking to use cash collateral or selling or otherwise disposing of Collateral outside the ordinary course of business; (iii) outside the ordinary course of business, using or seeking to use any insurance proceeds constituting Collateral; (iv) incurring any indebtedness; (v) seeking to amend or modify any of the rights granted to the Secured Parties under the Interim DIP Order or the Loan Documents; (vi) objecting to or challenging in any way the Liens, the Obligations, the Collateral (including cash collateral) or any other claims or liens, held by or on behalf of any of the Secured Parties; (vii) asserting, commencing, or prosecuting any claims or causes of action whatsoever, including, without limitation, any actions under Chapter 5 of the Bankruptcy Code, applicable state law equivalents, any so-called "lender liability" claims and causes of action or other actions to recover or disgorge payments against the Secured Parties, or any of their affiliates, successors and assigns and the partners, shareholders, controlling persons, directors, officers, employees, agents, attorneys, advisors, and professionals); (viii) litigating, objecting to, challenging, contesting in any manner, or raising any defenses to, the validity, extent, amount, perfection, priority, or enforceability of any of the Obligations, the Liens, or any other rights or interests of the Secured Parties; or (ix) seeking to subordinate, recharacterize, disallow, or avoid the Obligations.

(c)    No portion of the proceeds of any Loan shall be used in any manner that causes or might cause such Loan or the application of such proceeds to violate Regulation T, Regulation U or Regulation X of the FRB or any other regulation thereof.

Section 5.5    *Financial Reports*.   The consolidated balance sheet of Borrower and its Subsidiaries as at December 31, 2023, and the related consolidated statements of income, retained earnings and cash flows of Borrower and its Subsidiaries for the fiscal year then ended, and accompanying notes thereto, which financial statements are accompanied by the audit report of BDO USA, LLP, independent public accountants, and the unaudited interim consolidated balance sheet of Borrower and its Subsidiaries as at March 31, 2024, and the related consolidated statements of income, retained earnings and cash flows of Borrower and its Subsidiaries for the 3 months then ended, heretofore furnished to the Prepetition Lenders under the Prepetition Loan Agreement, fairly present in all material respects the consolidated financial condition of Borrower and its Subsidiaries as at said dates and the consolidated results of their operations and cash flows for the periods then ended in conformity with GAAP applied on a consistent basis.

Section 5.6    *No Material Adverse Change*.  Since the Petition Date, other than in connection with the Cases, there has been no event or circumstance that, individually or in the aggregate with other events or circumstances, has had or would reasonably be expected to have a Material Adverse Effect.

Section 5.7    *Full Disclosure*.  The written statements and written information (excluding projections, forward-looking statements and information of a general economic or industry nature) furnished by (on behalf of) any Loan Party to Administrative Agent and the Lenders in connection with the negotiation of this Agreement and the other Loan Documents and the arrangement of the commitments by the Lenders to provide all or part of the financing contemplated hereby do not, when taken as a whole, contain any untrue statements of a material fact or omit a material fact necessary to make the material statements contained herein or therein not materially misleading in light of the circumstances under which

such statements were made (giving effect to all supplements and updates provided thereto), as of the date such information was furnished to Administrative Agent and the Lenders. Administrative Agent and the Lenders acknowledge that as to any projections furnished to Administrative Agent and the Lenders in connection with the negotiation of this Agreement and the other Loan Documents and the arrangement of commitments by the Lenders to provide all or part of the financing contemplated hereby, Borrower only represents that the same were prepared on the basis of information and estimates Borrower believed to be reasonable at the time made. The information included in the Beneficial Ownership Certification, as updated in accordance with Section 6.9(b), is true and correct in all respects.

Section 5.8    *Intellectual Property*. Except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, Borrower and its Subsidiaries own, possess, or have the right to use all necessary patents, trademarks, copyrights, trade secrets and other intellectual property rights to conduct their businesses as now conducted, without known violation of any patent, trademark, copyright or other intellectual property right of any other Person. Schedule 5.8 sets forth all issued, registered or applied-for patents, trademarks, and copyrights owned by Borrower and its Subsidiaries as of the Closing Date.

Section 5.9    *Governmental Authority and Licensing*. Subject to the entry of the DIP Orders, Borrower and its Subsidiaries have received all licenses, permits, and approvals of all Governmental Authorities, if any, necessary to conduct their businesses, in each case, except where the failure to obtain or maintain the same would not reasonably be expected to have a Material Adverse Effect. No investigation or (other than the Cases) proceeding is pending or, to the knowledge of Borrower, threatened, before or by any Governmental Authority that would reasonably be expected to have a Material Adverse Effect.

Section 5.10    *Good Title*. Except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, Borrower and its Subsidiaries have good and defensible title (or valid leasehold interests) to their assets necessary to conduct the business of Borrower and its Subsidiaries in the ordinary course, subject to no Liens other than such thereof as are permitted by Section 7.2.

Section 5.11    *Litigation and Other Controversies*. There is no litigation or governmental or arbitration proceeding or labor controversy pending, nor to the knowledge of Borrower threatened in writing, against Borrower or any Subsidiary or any of their Property which, individually or in the aggregate, would reasonably be expected to have a Material Adverse Effect.

Section 5.12    *Taxes*. All Tax returns required to be filed by Borrower or any Subsidiary in any jurisdiction have, in fact, been filed, and all Taxes levied or imposed upon Borrower or any Subsidiary or upon any of its Property, income or franchises, which are shown to be due and payable in such returns, have been paid, except (a) such Taxes, if any, as are being contested in good faith and by appropriate proceedings and as to which adequate reserves established in accordance with GAAP have been provided or (b) to the extent prohibited by the Automatic Stay or otherwise by the Bankruptcy Code or the Bankruptcy Court including the DIP Orders. To the knowledge of Borrower, no additional Tax assessment against it or its Subsidiaries has been proposed in writing or otherwise by a Tax authority in respect of any taxable year of Borrower or the applicable Subsidiary not closed by applicable statutes, for which adequate provisions in accordance with GAAP have not been made on their accounts, except as would not reasonably be expected, individually or in the aggregate, to have a Material Adverse Effect.

Section 5.13    *Approvals*. No authorization, consent, license or exemption from, or filing or registration with, any Governmental Authority, nor any approval or consent of any other Person, is or will be necessary to the valid execution, delivery or performance by Borrower or any Subsidiary of any Loan Document, except for (a) such approvals which have been obtained prior to the date of this Agreement and

-50-

remain in full force and effect, (b) the filing of Uniform Commercial Code financing statements, (c) filings with the United States Patent and Trademark Office and the United States Copyright Office, (d) such actions, consents and approvals the failure of which to be obtained or made would not reasonably be expected, individually or in the aggregate, (i) in the case of the Loan Parties and each Subsidiary which is incorporated or established under the laws of Switzerland, to affect any such Person in any material and adverse respect or (ii) in the case of other Subsidiaries of Borrower, to have a Material Adverse Effect, (e) any other filings or registrations required to perfect Liens created by the Collateral Documents and (f) the entry of the Interim Order and the Final Order, as applicable.

Section 5.14    *Affiliate Transactions.*    As of the Closing Date, neither Borrower nor any Subsidiary is a party to any contracts or agreements with any of its Affiliates (other than any such contracts or agreements set forth on Schedule 5.14) on terms and conditions which are less favorable to Borrower or such Subsidiary than would be usual and customary in similar contracts or agreements between Persons not affiliated with each other.

Section 5.15    *Investment Company.*    None of Borrower or any of the other Loan Parties is required to be registered as an "investment company" within the meaning of the Investment Company Act of 1940, as amended.

Section 5.16    *ERISA; Foreign Plans; Plan Assets; Prohibited Transactions.*

(a)    Except as, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect and except as set forth in Schedule 5.16(a), (i) Borrower and each other member of its Controlled Group has fulfilled its obligations under the minimum funding standards of and is in compliance in all material respects with ERISA and the Code to the extent applicable to it and has not incurred any liability to the PBGC or a Plan under Title IV of ERISA other than a liability to the PBGC for premiums under Section 4007 of ERISA, and (ii) neither Borrower nor any Subsidiary has any contingent liabilities with respect to any post-retirement benefits under a Welfare Plan, other than liability for continuation coverage described in article 6 of Title I of ERISA.

(b)    No Loan Party is an entity deemed to be "plan assets" within the meaning of 29 C.F.R. § 2510.3-101, as modified by Section 3(42) of ERISA, of an employee benefit plan (as defined in Section 3(3) of ERISA) which is subject to Title I of ERISA or any plan (within the meaning of Section 4975 of the Code) which is subject to Section 4975 of the Code. Assuming that the Lenders' source of funds for the Loans hereunder do not constitute "plan assets" within the meaning of 29 C.F.R. § 2510.3-101, as modified by Section 3(42) of ERISA, neither the execution of this Agreement nor the making of Loans as contemplated hereunder will give rise to a prohibited transaction within the meaning of Section 406(a) of ERISA or Section 4975(c)(1)(A)-(D) of the Code. No Loan Party is deemed to be plan assets of any non-U.S. plan subject to any law, rule or regulation which is substantially similar to the prohibited transaction provisions of Section 406 of ERISA or Section 4975 of the Code.

(c)    Except as, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect, (i) to the extent applicable, each Foreign Plan has been maintained in compliance with its terms and with the requirements of any and all applicable Laws and all pension schemes operated by or maintained for the benefit of it and/or any of their respective employees are funded to the extent required by applicable Laws and (ii) no Loan Party has incurred any obligation in connection with the termination of or withdrawal from any Foreign Plan.

Section 5.17    *Compliance with Laws.*

146392832_4

(a)      Borrower and its Subsidiaries are in compliance with the requirements of all federal, state and local laws, rules and regulations applicable to or pertaining to their Property or business operations (including the Occupational Safety and Health Act of 1970, the Americans with Disabilities Act of 1990, and laws and regulations establishing quality criteria and standards for air, water, land and toxic or hazardous wastes and substances), where any such noncompliance, individually or in the aggregate, would reasonably be expected to have a Material Adverse Effect.

(b)      Without limiting the representations and warranties set forth in Section 6.8(a) below, except for such matters, individually or in the aggregate, which would not reasonably be expected to result in a Material Adverse Effect, Borrower represents and warrants that:  (i) Borrower and its Subsidiaries, and each of the Premises, comply in all material respects with all applicable Environmental Laws; (ii) Borrower and its Subsidiaries have obtained all governmental approvals required for their operations and each of the Premises by any applicable Environmental Law; (iii) Borrower and its Subsidiaries have not, and Borrower has no knowledge of any other Person who has, caused any Release, threatened Release or disposal of any Hazardous Material at, on, about, or off any of the Premises in any material quantity and, to the knowledge of Borrower, none of the Premises are adversely affected by any Release, threatened Release or disposal of a Hazardous Material originating or emanating from any other property; (iv) none of the Premises contain and have contained any:  (1) underground storage tank, (2) material amounts of asbestos containing building material, (3) landfills or dumps, (4) hazardous waste management facility as defined pursuant to RCRA or any comparable state law, or (5) site on or nominated for the National Priority List promulgated pursuant to CERCLA or any state remedial priority list promulgated or published pursuant to any comparable state law; (v) except in the ordinary course of business and in material compliance with Environmental Law, Borrower and its Subsidiaries have not used a material quantity of any Hazardous Material and have conducted no Hazardous Material Activity at any of the Premises; (vi) Borrower and its Subsidiaries have no material liability for response or corrective action, natural resource damage or other harm pursuant to CERCLA, RCRA or any comparable state law; (vii) Borrower and its Subsidiaries are not subject to, have no notice or knowledge of and are not required to give any notice of any Environmental Claim involving Borrower or any Subsidiary or any of the Premises, and there are no conditions or occurrences at any of the Premises which could reasonably be anticipated to form the basis for an Environmental Claim against Borrower or any Subsidiary or such Premises; (viii) none of the Premises are subject to any, and Borrower has no knowledge of any imminent restriction on the ownership, occupancy, use or transferability of the Premises in connection with any (1) Environmental Law or (2) Release, threatened Release or disposal of a Hazardous Material; and (ix) there are no conditions or circumstances at any of the Premises which pose an unreasonable risk to the environment or the health or safety of Persons.

Section 5.18      *Sanctions; Anti-Money Laundering Laws and Anti-Corruption Laws.*

(a)      None of the Loan Parties, any of their Subsidiaries, any director, officer or, to the knowledge of Borrower, employee or agent of any Loan Party or any of their Subsidiaries is a Sanctioned Person or currently the subject or target of any Sanctions.

(b)      The Loan Parties, each of their Subsidiaries is in compliance with all applicable Anti-Corruption Laws, Anti-Money Laundering Laws and Sanctions.

(c)      The Loan Parties and their Subsidiaries have instituted and maintain in effect policies and procedures reasonably designed to ensure compliance by the Loan Parties and their Subsidiaries with all applicable Anti-Corruption Laws, Anti-Money Laundering Laws and Sanctions.

(d)      No provision of this Section 5.18, Section 6.9 *(Compliance with Anti-Corruption Laws, Anti-Money Laundering Laws and Sanctions)* and Section 7.12 *(Use of Proceeds)* shall be interpreted or applied in relation to it, any Loan Party, any Lender, or the Administrative Agent to the extent that the

-52-

representations made pursuant to this Section 5.18 or compliance with the covenants in Sections 6.9 or 7.12 violate or expose such entity or any director, officer or employee thereof to any liability under any applicable anti-boycott or blocking law, regulation or statute that is in force from time to time in the European Union (and/or any of its member states) or the United Kingdom that are applicable to such entity (including, but not limited to, EU Regulation (EC) 2271/96 of 22 November 1996 (or any law or regulation implementing such Regulation in any member state of the European Union), any provision of Council Regulation (EC) No 2271/1996 of 22 November 1996, as it forms part of domestic law of the United Kingdom by virtue of the European Union (Withdrawal) Act 2018 and section 7 of the German Foreign Trade Regulation (*Außenwirtschaftsverordnung - AWV*) in connection with the German Foreign Trade Law (*Außenwirtschaftsgesetz*) and any similar applicable anti-boycott law or regulation).

Section 5.19     *Other Agreements*.  Other than continuing events of default under the Prepetition Loan Agreement, neither Borrower nor any Subsidiary is in default under the terms of any covenant, indenture or agreement of or affecting such Person or any of its Property, which default would reasonably be expected to have a Material Adverse Effect.

Section 5.20     *[Reserved].*

Section 5.21     *No Default*.  No Default or Event of Default has occurred and is continuing.

Section 5.22     *No works council*.  No works council has been established by any Dutch Loan Party which has the right to advise in relation to its entry into and performance of the Loan Documents and no Dutch Loan Party is in the process of establishing a works council.

Section 5.23     *No Broker Fees*.  No broker's or finder's fee or commission will be payable with respect hereto or any of the transactions contemplated hereby; and Borrower hereby agrees to indemnify Administrative Agent and the Lenders against, and agrees that it will hold Administrative Agent and the Lenders harmless from, any claim, demand, or liability for any such broker's or finder's fees alleged to have been incurred in connection herewith or therewith and any expenses (including reasonable attorneys' fees) arising in connection with any such claim, demand, or liability, except as set forth on Schedule 5.23.

Section 5.24     *EEA Financial Institution*.  No Loan Party, nor any of their respective Subsidiaries, is an EEA Financial Institution.

Section 5.25     *Bankruptcy Matters*.

(a)     The Interim DIP Order and, at all times after its entry by the Bankruptcy Court, the Final DIP Order, is in full force and effect, and has not been reversed, modified, amended, stayed or vacated absent the written consent of the Lenders.

(b)     Upon the maturity (whether by acceleration or otherwise) of any of the Obligations, the Lenders shall, subject to the provisions of the Interim DIP Order or Final DIP Order, be entitled to immediate payment of such Obligations, and to enforce the remedies provided for hereunder in accordance with the terms hereof, without further application to or order by the Bankruptcy Court.

(c)     If either the Interim DIP Order or the Final DIP Order is the subject of a pending appeal in any respect, none of such DIP Order, the making of the Loans or the performance by the Loan Parties of any of their obligations under any of the Loan Documents is or shall be the subject of a presently effective stay pending appeal. The Loan Parties, Administrative Agent and the Lenders shall be entitled to rely in good faith upon the DIP Orders, notwithstanding objection thereto or appeal therefrom by any interested party. The Loan Parties, Administrative Agent and the Lenders shall be permitted and required to perform

their respective obligations in compliance with this Agreement notwithstanding any such objection or appeal unless the relevant DIP Order has been stayed by a court of competent jurisdiction.

(d)  The Loan Parties are in compliance with all material agreements entered into and all orders entered by the Bankruptcy Court from and after the Petition Date.

(e)  Pursuant to the terms of the DIP Orders, the joint and several Obligations of the Loan Parties under this Agreement constitute Superpriority Claims and shall be allowed superpriority administrative expense claims in the Cases under section 364(c) of the Bankruptcy Code, having priority over all administrative expense claims and unsecured claims against such Loan Parties now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expense claims of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code and all super-priority administrative expense claims granted to any other Person, subject only to the terms of the DIP Orders and the Carve-Out.

## Section 6.  *Affirmative Covenants.*

Until such time as Payment in Full has occurred or the Administrative Agent and Required Lenders otherwise consent in writing, Borrower and each Loan Party covenants and agrees that:

*Section 6.1      Maintenance of Business*.  Borrower shall, and shall cause each Subsidiary to, preserve and maintain its existence, except as otherwise provided in Section 7.4(c) or, in the case of a Subsidiary of Borrower other than a Loan Party, where the failure to do so would not reasonably be expected to have a Material Adverse Effect.  Borrower shall, and shall cause each Subsidiary to, preserve and keep in force and effect all licenses, permits, franchises, approvals, patents, trademarks, trade names, trade styles, copyrights, and other proprietary rights necessary to the proper conduct of its business where the failure to do so would reasonably be expected to have a Material Adverse Effect.

*Section 6.2      Maintenance of Properties*.  Borrower shall, and shall cause each Subsidiary to, maintain, preserve, and keep its property, plant, and equipment in good repair, working order and condition (ordinary wear and tear excepted), and shall from time to time make all needful and proper repairs, renewals, replacements, additions, and betterments thereto so that at all times the efficiency thereof shall be fully preserved and maintained, except to the extent that, in the reasonable business judgment of such Person, (a) any such Property is no longer necessary for the proper conduct of the business of such Person or (b) the failure to do so would not reasonably be expected to have a Material Adverse Effect.

*Section 6.3      Taxes and Assessments*.  Borrower shall duly pay and discharge, and shall cause each Subsidiary to duly pay and discharge, all Taxes upon or against it or its Property, in each case before the same become delinquent and before penalties accrue thereon, unless and to the extent that (a) the same are being contested in good faith and by appropriate proceedings and adequate reserves are provided therefor or (b) such payment and discharge is prohibited by the Automatic Stay or otherwise by the Bankruptcy Code or the Bankruptcy Court including the DIP Orders.

*Section 6.4      Insurance*.  Borrower shall insure and keep insured, and shall cause each Subsidiary to insure and keep insured, with financially sound and reputable insurance companies which are not Affiliates of Borrower, all insurable Property owned by it which is of a character usually insured by Persons similarly situated and operating like Properties against loss or damage from such hazards and risks, and in such amounts, as are insured by Persons similarly situated and operating like Properties; and Borrower shall insure, and shall cause each Subsidiary to insure, such other hazards and risks (including business interruption, employers' and public liability risks) with financially sound and reputable insurance companies which are not Affiliates of Borrower as and to the extent usually insured by Persons similarly

-54-

146392832_4

situated and conducting similar businesses.  [Borrower shall name Administrative Agent as additional insured on all liability policies of Borrower and its Subsidiaries and shall use commercially reasonable efforts to name Administrative Agent as lender loss payee (pursuant to a lender loss payee endorsement reasonably approved by Administrative Agent) on all casualty and property insurance policies of Borrower and its Subsidiaries and in any event maintain, and cause each Subsidiary to maintain, insurance on the Collateral to the extent required by the Collateral Documents.  Borrower shall use commercially reasonable efforts to, as promptly as reasonably practicable upon the request of Administrative Agent (not made more than once per calendar year), furnish to Administrative Agent and the Lenders a certificate setting forth in summary form the nature and extent of the insurance maintained pursuant to this Section.]

*Section 6.5      Financial and Other Reports*.  Borrower shall, and shall cause each Subsidiary to, furnish to Administrative Agent, each Lender and each of their duly authorized representatives such information respecting the business and financial condition of Borrower and each Subsidiary as Administrative Agent or such Lender may reasonably request; and without any request, shall furnish to Administrative Agent and the Lenders (each of which shall be in form and scope reasonably acceptable to the Administrative Agent):

(a)      Budget and Variance Reports; Other Reports; Updates to Approved Budget.  Commencing after the first full calendar week following the Petition Date and for each calendar week thereafter, by no later than noon New York City time on the Wednesday of such calendar week (each such Wednesday, a "***Variance Report Date***"), a variance report substantially in the form of Exhibit F (each, a "***Variance Report***") for the applicable Testing Period setting forth, in reasonable detail, any differences between (i) the aggregate cumulative actual cash receipts for such Testing Period on a line by line basis compared to the projected aggregate cumulative cash receipts on a line by line basis set forth in the Approved Budget for such Testing Period (any such difference, a "***Receipts Variance***") and (ii) the aggregate cumulative actual cash disbursements on a cumulative basis (including, for the avoidance of doubt, Professional Fees) for such Testing Period on a line by line basis compared to the projected aggregate cash disbursements on a line by line basis (including, for the avoidance of doubt, Professional Fees) set forth in the Approved Budget for such Testing Period (any such difference, a "***Disbursements Variance***"), together with a statement from the Borrower's chief financial officer certifying the information contained in such Variance Report and compliance with Section 7.16 hereof.  The Variance Report shall also provide a reasonably detailed explanation for any variance that exceed the Permitted Variances.  The term "***Testing Period***" means, with respect to each Variance Report required to be delivered hereunder, the period from the Saturday immediately prior to the Petition Date and ending on the Friday prior to the applicable Variance Report Date.

(b)      Cash Balance Report.  On or before noon New York City time on the Wednesday of each calendar week following the Petition Date, the Loan Parties' cash balances as of the immediately preceding Monday.

(c)      Certificates; other Information.

(i)      general weekly updates to Administrative Agent as to the process for the 363 Sale Transaction, in form and detail reasonably satisfactory to Administrative Agent;

(ii)      promptly after the sending or filing thereof, copies of each financial statement, report, notice or proxy statement sent by Borrower or any Subsidiary to its stockholders or other equity holders, and copies of each regular, periodic or special report, registration statement or prospectus (including all Form 10 K, Form 10 Q and Form 8 K reports) filed by Borrower or any Subsidiary with any securities exchange or the Securities and Exchange Commission or any successor agency;

146392832_4

(iii)    promptly after receipt thereof, a copy of each audit made by any regulatory agency of the books and records of Borrower or any Subsidiary or of notice of any material noncompliance with any applicable Law, regulation or guideline relating to Borrower or any Subsidiary, or its business;

(iv)    [reserved];

(v)    promptly, and in any event within two (2) Business Days after receipt thereof by the Borrower or any Subsidiary, copies of all material written reports and presentations delivered by or on behalf of any Loan Party to the Committee or any other party in interest in the Cases that have not been filed publicly on the Bankruptcy Court's docket within such period; and

(vi)    promptly (after a director or officer of any Loan Party obtains knowledge, or has notice, thereof), notice of any party seeking relief from the Automatic Stay other than as expressly authorized under the DIP Orders.

(vii)    promptly after knowledge thereof shall have come to the attention of any Responsible Officer of Borrower, written notice of (i) any threatened (in writing) or pending litigation or governmental or arbitration proceeding or labor controversy against Borrower or any Subsidiary or any of their Property which would reasonably be expected to have a Material Adverse Effect, (ii) the occurrence of any Default or Event of Default hereunder, (iii) the occurrence of any Change of Control, (iv) any event, circumstance or fact that would reasonably be expected to have a Material Adverse Effect, or (v) material change in financial reporting practices;

(viii)    promptly, such additional business, financial, corporate affairs, perfection certificates and other information as the Administrative Agent or any Lender (through the Administrative Agent) may from time to time reasonably request (including such other information and documentation reasonably requested by the Administrative Agent or any Lender for purposes of compliance with the Beneficial Ownership Regulation).

(d)    Updates to Approved Budget.  Commencing on the second Wednesday after the Petition Date and no later than noon New York City time on Wednesday of each succeeding calendar week, Borrower shall deliver to Administrative Agent a proposed update to the Approved Budget setting forth on a weekly basis for the next thirteen weeks (commencing with the immediately succeeding calendar week) an updated budget for such period having the same level of detail as the Approved Budget being updated, and upon the approval thereof by Administrative Agent such proposed update shall become the "Approved Budget" hereunder (but until such approval, the Approved Budget, without giving effect to such proposed update shall continue to constitute the "Approved Budget" until otherwise agreed by Borrower and Administrative Agent).

(e)    Monthly Financial Statements.  By the 15th day of each calendar month, a consolidated balance sheet of the Borrower and its Subsidiaries as at the end of the most recently ended calendar month (commencing with the calendar month ending on July 31, 2024) and the related (x) consolidated statements of income or operations for such calendar month and for the portion of the fiscal year then ended and (y) consolidated statements of cash flows for such calendar month and the portion of the fiscal year then ended, setting forth, in each case, in comparative form the figures for the corresponding calendar month of the previous fiscal year and the corresponding portion of the previous fiscal year, all in reasonable detail and certified by a Responsible Officer of the Borrower as fairly presenting in all material respects the financial condition, results of operations and cash flows of the Borrower and its Subsidiaries in accordance with GAAP (except as noted therein), subject only to normal year-end audit adjustments and the absence of footnotes; *provided*, that any change in GAAP (or relevant pronouncements) or in the application thereof

-56-

(including through conforming changes made consistent with IFRS) shall not be required to be reflected in the financial statements delivered pursuant to this Section 6.05(e) until after such changes are reflected in the most recent audited financial statements of the Borrower and its Subsidiaries.

Section 6.6    *Inspection*.    Borrower shall, and shall cause each Subsidiary to, permit Administrative Agent, each Lender and each of their duly authorized representatives and agents to visit and inspect any of its Property, corporate books, and financial records, to examine and make copies of its books of accounts and other financial records, and to discuss its affairs, finances, and accounts with, and to be advised as to the same by, its officers, employees and independent public accountants (and by this provision Borrower hereby authorizes such accountants to discuss with Administrative Agent and such Lenders the finances and affairs of Borrower and its Subsidiaries) at such reasonable times and intervals as Administrative Agent or any such Lender may designate and, so long as no Default or Event of Default exists, with reasonable prior notice to Borrower, in each case, subject to reasonable requirements of confidentiality, including requirements imposed by law or by contract as reasonably determined by Borrower in consultation with Administrative Agent; provided that in the absence of a Default or Event of Default, Borrower shall not be required to reimburse the Administrative Agent or such Lender for more than one (1) such visit and inspection per fiscal year.

Section 6.7    *ERISA*.    Borrower shall, and shall cause each Subsidiary to, promptly pay and discharge all obligations and liabilities arising under ERISA or any Foreign Plan of a character which if unpaid or unperformed would reasonably be expected to result in the imposition of a Lien against any of its Property.  Borrower shall, and shall cause each Subsidiary to, promptly notify Administrative Agent and each Lender of:  (a) the occurrence of any reportable event (as defined in Section 4043(c) of ERISA) for which the 30-day notice period has not been waived with respect to a Plan or a similar event with respect to any Foreign Plan, (b) receipt of any notice from the PBGC of its intention to seek termination of any Plan or appointment of a trustee therefor (or an equivalent notice with respect to any Foreign Plan), or (c) its intention to terminate or withdraw from any Plan or Foreign Plan.

Section 6.8    *Compliance with Laws*.

(a)    Borrower shall, and shall cause each Subsidiary to, comply in all respects with the requirements of all federal, state, and local laws, rules, regulations, ordinances and orders applicable to or pertaining to its Property or business operations, where any such non-compliance, individually or in the aggregate, would reasonably be expected to have a Material Adverse Effect or result in a Lien upon any of its Property; provided that this Section 6.8(a) shall not apply to laws related to Taxes, which are the subject of Section 6.3.

(b)    Without limiting the agreements set forth in Section 6.8(a) above, Borrower shall, and shall cause each Subsidiary to, at all times, do the following to the extent the failure to do so, individually or in the aggregate, would reasonably be expected to have a Material Adverse Effect:  (i) comply in all material respects with, and maintain each of the Premises in compliance in all material respects with, all applicable Environmental Laws; (ii) require that each tenant and subtenant, if any, of any of the Premises or any part thereof comply in all material respects with all applicable Environmental Laws; (iii) obtain and maintain in full force and effect all material governmental approvals required by any applicable Environmental Law for operations at each of the Premises; (iv) cure any material violation by it or at any of the Premises of applicable Environmental Laws; (v) not allow the presence or operation at any of the Premises of any (1) landfill or dump or (2) hazardous waste management facility or solid waste disposal facility as defined pursuant to RCRA or any comparable state law; (vi) not manufacture, use, generate, transport, treat, store, release, dispose or handle any Hazardous Material at any of the Premises except in the ordinary course of its business and in de minimis amounts; (vii) within ten (10) Business Days notify Administrative Agent in writing of and provide any reasonably requested documents upon learning of any of the following in

-57-

146392832_4

connection with Borrower or any Subsidiary or any of the Premises: (1) any material liability for response or corrective action, natural resource damage or other harm pursuant to CERCLA, RCRA or any comparable state law; (2) any material Environmental Claim; (3) any material violation of an Environmental Law or material Release, threatened Release or disposal of a Hazardous Material; (4) any restriction on the ownership, occupancy, use or transferability arising pursuant to any (x) Release, threatened Release or disposal of a Hazardous Material or (y) Environmental Law; or (5) any environmental, natural resource, health or safety condition, which would reasonably be expected to have a Material Adverse Effect; (viii) conduct at its expense any investigation, study, sampling, testing, abatement, cleanup, removal, remediation or other response action necessary to remove, remediate, clean up or abate any material Release, threatened Release or disposal of a Hazardous Material as required by any applicable Environmental Law, (ix) abide by and observe any restrictions on the use of the Premises imposed by any Governmental Authority as set forth in a deed or other instrument affecting Borrower's or any Subsidiary's interest therein; (x) promptly provide or otherwise make available to Administrative Agent any reasonably requested environmental record concerning the Premises which Borrower or any Subsidiary possesses or can reasonably obtain; and (xi) perform, satisfy, and implement any operation or maintenance actions required by any Governmental Authority or Environmental Law, or included in any no further action letter or covenant not to sue issued by any Governmental Authority under any Environmental Law.

Section 6.9    *Compliance with Anti-Corruption Laws, Anti-Money Laundering Laws and Sanctions*.

(a)    Borrower shall at all times comply in all material respects with the requirements of all Anti-Corruption Laws, Anti-Money Laundering Laws and Sanctions applicable to Borrower and shall cause each other Loan Party and each of its and their respective Subsidiaries to comply with the requirements of all Anti-Corruption Laws, Anti-Money Laundering Laws and Sanctions applicable to such Persons.

(b)    Borrower shall provide Administrative Agent and the Lenders, upon reasonable request in writing, any information regarding Borrower, each other Loan Party, and each of their respective owners, Affiliates, and Subsidiaries necessary for Administrative Agent and the Lenders to comply with all applicable Anti-Corruption Laws, Anti-Money Laundering Laws and Sanctions; subject however, in the case of Affiliates, to Borrower's ability to provide information applicable to them.

(c)    Borrower will maintain in effect and enforce policies and procedures reasonably designed to ensure compliance by the Loan Parties, their Subsidiaries' respective directors, officers, employees and agents, and the Loan Parties' and their Subsidiaries' with applicable Anti-Corruption Laws, Anti Money-Laundering Laws and Sanctions.

(d)    This Section 6.9 shall not be interpreted or applied in relation to, any Loan Party, any Lender or the Administrative Agent to the extent that the covenants under this Section 6.9 violate or expose such entity or any director, officer or employee thereof to any liability under any applicable anti-boycott or blocking law, regulation or statute that is in force from time to time in the European Union (and/or any of its member states) or the United Kingdom that are applicable to such entity (including EU Regulation (EC) 2271/96) and section 7 of the German Foreign Trade Regulation (*Außenwirtschaftsverordnung – AWV*) in connection with the German Foreign Trade Law (*Außenwirtschaftsgesetz*).

Section 6.10    *Formation of Subsidiaries*.  Promptly upon the formation or acquisition of any Subsidiary, and in any event, within 10 days (or such longer period of time agreed to by Administrative Agent) after such formation or acquisition, Borrower shall provide Administrative Agent and the Lenders notice thereof and comply with the requirements of Section 6.12 (at which time Schedule 5.2 shall be deemed amended to include reference to such Subsidiary).  Without limiting the restriction on Divisions in Section 7.4, if any Loan Party consummates a Division (with or without the prior consent of Administrative

-58-

Agent), Borrower shall provide Administrative Agent and the Lenders notice thereof and with respect to each Division Successor shall be required to timely, but in no event less than 10 days (or such longer period of time agreed to by Administrative Agent) after such Division, comply with the requirements of <u>Section 6.12</u> (at which time <u>Schedule 5.2</u> shall be deemed amended to include reference to such Division Successor).

Section 6.11    *Use of Proceeds*.  Borrower shall use the credit extended under this Agreement solely for the purposes set forth in, or otherwise permitted by, <u>Section 5.4</u>.

Section 6.12    *Guaranties and Collateral*.

(a)    *Guaranties*.  Subject to Section 6.13, Borrower agrees to cause the payment and performance of the Obligations at all times be guaranteed by each direct and indirect Subsidiary of Borrower pursuant to <u>Section 10</u> (other than any Excluded Subsidiary) or pursuant to one or more guaranty agreements in form and substance reasonably acceptable to Administrative Agent, as the same may be amended, modified or supplemented from time to time (individually a "*Guaranty*" and collectively the "*Guaranties*" and Borrower and each other Person executing and delivering this Agreement (including any Person hereafter executing and delivering an Additional Guarantor Supplement in the form called for by <u>Section 10</u>) or a separate Guaranty being referred to herein as a "*Guarantor*" and collectively the "*Guarantors*").  Notwithstanding anything to the contrary provided herein or in any other Loan Document, in connection with the required joinder of any Person as a Guarantor that is not organized under the laws of the United States, Germany, France, Switzerland, the Netherlands, Hong Kong or the People's Republic of China, the Administrative Agent and the Borrower shall negotiate in good faith to amend the provisions of the Loan Documents relevant to the terms of such guarantee to the extent necessary, appropriate or customary to reflect the Laws, practices and customs with respect to such guarantee in such jurisdiction, and no consent of any other Person shall be required to effect such amendments.

(b)    *Collateral.*  Borrower agrees to cause the Obligations to be secured by valid, perfected, and enforceable Liens on all right, title, and interest of Borrower and each Guarantor in all of their accounts, chattel paper, instruments, documents, general intangibles, intellectual property, letter of credit rights, supporting obligations, deposit accounts, investment property, inventory, equipment, fixtures, commercial tort claims, real estate and certain other Property, whether now owned or hereafter acquired or arising, and all proceeds thereof; <u>provided</u> that: at no point shall Excluded Assets (as defined in the Security Agreement) constitute Collateral or be subject to this <u>Section 6.12</u>.  Borrower acknowledges and agrees that the Liens on the Collateral shall be granted to Administrative Agent for the benefit of the holders of the Obligations and shall be valid and perfected first priority Liens, in each case pursuant to one or more Collateral Documents from such Persons, each in form and substance reasonably satisfactory to Administrative Agent. Notwithstanding anything to the contrary, if at any time, any Change in Law or regulation would in the reasonable judgement of Administrative Agent result in a material adverse tax consequence to Borrower and its Subsidiaries, taken as a whole, arising as a result of any security interest granted in or any pledge of any asset (including any capital stock or other equity interest of any Foreign Subsidiary) pursuant to the terms of this Agreement, then, to the extent necessary to ameliorate such adverse tax consequence, neither Borrower nor any Guarantor shall be required to grant such security interest or provide such pledge of such asset (including any such capital stock or equity interest).

(c)    *Liens on Real Property*.  In the event that Borrower or any Guarantor owns or hereafter acquires any real property, at the request of Administrative Agent, Borrower shall, or shall cause such Guarantor to, execute and deliver to Administrative Agent a mortgage or deed of trust reasonably acceptable in form and substance to Administrative Agent for the purpose of granting to Administrative Agent (or a security trustee therefor) a Lien on such real property to secure the Obligations shall pay all reasonable and documented taxes, costs, and expenses incurred by Administrative Agent in recording such mortgage or

146392832_4

deed of trust, and shall supply to Administrative Agent at Borrower's cost and expense a survey, environmental report, hazard insurance policy, appraisal report, and a mortgagee's policy of title insurance from a title insurer reasonably acceptable to Administrative Agent insuring the validity of such mortgage or deed of trust and its status as a first Lien (subject to Liens permitted by this Agreement) on the real property encumbered thereby and such other customary instrument, documents, certificates, and opinions reasonably required by Administrative Agent in connection therewith.

(d)        *Further Assurances*.  Borrower agrees that it shall, and shall cause each Person that is, or is required to be, a Guarantor hereunder to, from time to time at the reasonable request of Administrative Agent or the Required Lenders, execute and deliver such documents and do such acts and things as Administrative Agent or the Required Lenders may reasonably request in order to provide for or perfect or protect such Liens on the Collateral.  In the event Borrower or any Guarantor forms or acquires any other Subsidiary after the date hereof, except as otherwise provided in Sections 6.12(a) and 6.12(b) above, Borrower shall promptly upon such formation or acquisition but in no event more than 10 days (or such shorter period of time agreed to by Administrative Agent) after such formation or acquisition, cause such newly formed or acquired Subsidiary to execute a Guaranty and such Collateral Documents as Administrative Agent may reasonably then require, and Borrower shall also deliver to Administrative Agent, or cause such Subsidiary to deliver to Administrative Agent, at Borrower's cost and expense, such other customary instruments, documents, certificates, and opinions reasonably required by Administrative Agent in connection therewith.

Section 6.13        *Certain Post-Closing Matters*.  As promptly as practicable, and in any event within the time periods after the Closing Date specified in Schedule 6.13 or such later date as the Administrative Agent agrees to in writing, the Loan Parties shall deliver the documents or take the actions specified on Schedule 6.13, in each case, in form and substance reasonably satisfactory to the Administrative Agent.

Section 6.14        *People with significant control regime*.  Each Loan Party shall (and Borrower shall ensure that each Subsidiary will): (a) within the relevant timeframe, comply with any notice it receives pursuant to Part 21A of the United Kingdom Companies Act 2006 from any UK Loan Party whose shares are the subject of security under the UK Security Documents, and (b) promptly provide the Administrative Agent with a copy of that notice.

Section 6.15        *Lenders Meetings and Conference Calls.*.  Each Loan Party shall cause the chief financial officer and any other Authorized Representative or other advisors of the Loan Parties requested by Administrative Agent to participate in meetings with Administrative Agent and Lenders and their representatives as reasonably requested, and, to the extent requested by the Administrative Agent, shall cause each such person to be available to meet with the Administrative Agent and Lenders by phone each week.

Section 6.16        Milestones.  The Loan Parties shall, and shall cause their Subsidiaries to, achieve each of the following milestones (as the same may be extended from time to time with the consent of Administrative Agent; the "*Milestones*"):

(a)        On or before the twenty-eighth (28th) calendar day after the Petition Date, the Bankruptcy Court shall have approved the Bidding Procedures Order.

(b)        On or before the twenty-eighth (28th) calendar day after the Petition Date, the Bankruptcy Court shall have entered the Final DIP Order.

(c)        On or before the forty-second (42nd) calendar day after the Petition Date, the bid deadline under the bidding procedures established pursuant to the Bidding Procedures Order shall have occurred;

(d)      On or before the forty-third (43rd) calendar day after the Petition Date, the Auction (as defined in the applicable DIP Order) shall have been held to the extent required under the Bidding Procedures Order;

(e)      On or before the forty-fifth (45th) calendar day after the Petition Date, the Bankruptcy Court shall have held the hearing to consider entry of the Sale Order;

(f)      On or before the forty-sixth (46th) calendar day after the Petition Date, the Bankruptcy Court shall have entered the Sale Order; and

(g)      On or before the fiftieth (50th) calendar day after the Petition Date, the Debtors shall have consummated the 363 Sale Transaction.

Each of the foregoing motions and orders shall be in form and substance acceptable to Administrative Agent and the Lenders (unless a different standard is specified above).

Section 6.17      *Bankruptcy Matters*.  Each Loan Party shall, and shall cause its Subsidiaries to:

(a)      Comply in all material respects with all of the requirements and obligations set forth in the DIP Orders and in all material respects with any other orders entered in the Cases to the extent relevant to the interests of the Lenders, in each case after the entry thereof.

(b)      Deliver (or, if the same do not relate to the DIP Facility, the DIP Liens, the Collateral or the 363 Sale Transaction process, use reasonable efforts to deliver) to Administrative Agent and the Lenders (and each of their respective advisors) as soon as reasonably practicable, but in no event less than three (3) days (or such shorter period as may be agreed by the Administrative Agent) prior to any filing, copies of all material proposed pleadings, motions, applications, orders, financial information and other documents to be filed by or on behalf of the Loan Parties with the Bankruptcy Court in the Cases that affect or may affect Administrative Agent or the Lenders, or distributed by or on behalf of the Loan Parties to any official or unofficial committee appointed or appearing in the Cases or any other party in interest, including, without limitation, the DIP Orders, any Reorganization Plan and any disclosure statements related to such plan, in the Cases (each of which must (i) in the case of any of the foregoing relating to the DIP facility, the DIP Liens, the Collateral or the 363 Sale Transaction process, be in form and substance reasonably acceptable to Administrative Agent and Lenders in their sole discretion, or (ii) otherwise be in form and substance reasonably acceptable to Administrative Agent and the Lenders).

(c)      If not otherwise provided through the Bankruptcy Court's electronic docketing system, as soon as available, promptly deliver to Administrative Agent and the Lenders (and their counsel), copies of all final pleadings, motions, applications, orders, financial information and other documents distributed by or on behalf of the Loan Parties to any official or unofficial committee appointed or appearing in the Cases.

(d)      Except as otherwise is permitted by the DIP Orders, provide prior written notice as soon as reasonably practicable to Administrative Agent and the Lenders (and their counsel) prior to any assumption or rejection of any Loan Party's or any Subsidiary's material contracts or material non-residential real property leases pursuant to Section 365 of the Bankruptcy Code, and no such contract or lease shall be assumed or rejected if such assumption or rejection adversely impacts the Collateral, any Liens thereon or any Superpriority Claims payable therefrom (including, without limitation, any sale or other disposition of Collateral or the priority of any such Liens or Superpriority Claims), if Administrative Agent informs the Borrower in writing within three (3) Business Days of receipt of the notice from the Borrower referenced above that it objects to such assumption or rejection, as applicable.

*Section 7.  Negative Covenants.*

Until such time as Payment in Full has occurred or the Administrative Agent and the Required Lenders otherwise consent in writing, Borrower and each Loan Party covenants and agrees that:

*Section 7.1        Borrowings and Guaranties.*  Borrower shall not, nor shall it permit any Subsidiary to, issue, incur, assume, create or have outstanding any Indebtedness for Borrowed Money, or incur liabilities for interest rate, currency, or commodity cap, collar, swap, or similar hedging arrangements, or be or become liable as endorser, guarantor, surety or otherwise for any Indebtedness for Borrowed Money of any other Person, or apply for or become liable to the issuer of a letter of credit which supports an obligation of another; <u>provided</u> that the foregoing shall not restrict nor operate to prevent:

(a)        the Obligations of Borrower and its Subsidiaries, including any extensions, refinancings, modifications, amendments and restatements thereof;

(b)        Indebtedness for Borrower Money evidenced by the Prepetition Loan Documents in an amount not to exceed the aggregate principal amount outstanding on the Closing Date plus accrued but unpaid interest and fees thereon and in respect thereof, as incurred under the terms of the Prepetition Loan Documents as in effect on the date hereof, including any capitalized interest pursuant to the Prepetition Loan Documents as in effect on the date hereof;

(c)        obligations of Borrower or any Subsidiary arising out of interest rate, foreign currency, and commodity hedging agreements entered into with financial institutions in connection with bona fide hedging activities in the ordinary course of business and not for speculative purposes;

(d)        endorsement of items for deposit or collection of commercial paper received in the ordinary course of business;

(e)        intercompany advances from time to time owing by any Subsidiary to Borrower or another Subsidiary or by Borrower to a Subsidiary and which, if evidenced by a note, comply with the requirements set forth in <u>Section 7.3(g)</u>, so long as such intercompany advances are set forth in the Approved Budget and (i) to the extent constituting Indebtedness, such intercompany advances are in the form of payments and other accounts payable made by customers to and held by Borrower or its Domestic Subsidiaries on behalf of any Foreign Subsidiary of Borrower in the ordinary course of business, or (ii) to the extent such intercompany advances are by Loan Parties to Subsidiaries which are not Loan Parties, such intercompany advances, together with the investments, loans and advances permitted pursuant to <u>Section 7.3(l)</u>, shall not exceed $150,000 in the aggregate at any one time outstanding;

(f)        obligations (including any guarantee given by Borrower or its Subsidiaries pursuant to section 8a of the German Old Age Employees Part Time Act (*Altersteilzeitgesetz*) or section 7e of the Fourth Book of the German Social Code (*Sozialgesetzbuch IV*)) in respect of: (i) workers' compensation claims, social security obligations or obligations in respect of health, disability, old age benefits or other employee benefits; (ii) property, casualty or liability insurance or self-insurance; (iii) completion, bid, performance, appeal or surety bonds issued for the account of Borrower or any Subsidiary thereof; or (iv) Taxes not yet delinquent or which are being contested in compliance with <u>Section 6.3</u>, in each case to the extent incurred in the ordinary course of business;

(g)        Indebtedness for Borrowed Money of Borrower and its Subsidiaries outstanding or committed on the Closing Date and set forth on <u>Schedule 7.1</u>, including, for the avoidance of doubt, Indebtedness of Foreign Subsidiaries in respect of letters of credit and/or bank guarantees issued from time

146392832_4

to time in an aggregate amount that shall not at any time exceed the total amount available under such letters of credit and/or bank guarantees on the Closing Date (including any undrawn amounts with respect thereto);

(h)        unsecured indebtedness of Borrower and its Subsidiaries not otherwise permitted by this Section in an amount not to exceed $150,000 in the aggregate at any one time outstanding;

(i)        indebtedness arising from the honoring by a bank or other financial institution of a check, draft or similar instrument inadvertently (except in the case of daylight overdrafts) drawn against insufficient funds in the ordinary course of business; *provided*, that such indebtedness is promptly extinguished;

(j)        indebtedness arising in connection with endorsement of instruments for deposit in the ordinary course of business;

(k)        indebtedness of Borrower or any of its Subsidiaries arising from customary cash management services, foreign exchange guidance lines and services, or in connection with any automated clearinghouse transfer of funds in the ordinary course of business; and

(l)        to the extent constituting indebtedness, unsecured deferred compensation or any bonus or profit sharing plan, in each case existing on the Petition Date, of any Loan Party or any Subsidiary thereof;

(m)        Any liability for obligations of Loan Parties incorporated under the laws of the Netherlands (within the meaning of article 2:24b of the Dutch Civil Code), under a statement as referred to in article 2:403 (1)(f) of the Dutch Civil Code or any fiscal unity between Loan Parties incorporated under the laws of the Netherlands.

Notwithstanding the foregoing, and except for the Carve-Out to the extent provided in the DIP Orders, no Indebtedness for Borrowed Money shall be permitted to the extent it has an administrative expense claim status under the Bankruptcy Code senior to or pari passu with (x) the Superpriority Claims and (y) the superpriority administrative expense claims of the Prepetition Agent and the other Prepetition Secured Parties, in each case, as set forth herein and in the DIP Orders.

Section 7.2    *Liens*.  Borrower shall not, nor shall it permit any Subsidiary to, create, incur or permit to exist any Lien on any Property owned by any such Person; <u>provided</u> that the foregoing shall not apply to nor operate to prevent:

(a)        Liens arising by statute in connection with worker's compensation, unemployment insurance, old age benefits, social security obligations, Taxes, assessments, statutory obligations or other similar charges (other than Liens arising under ERISA or any Foreign Plan), but including Liens under of section 8a of the German Old Age Employees Part Time Act (*Altersteilzeitgesetz*) or section 7e of the Fourth Book of the German Social Code (*Sozialgesetzbuch IV*)**,** good faith cash deposits in connection with tenders, contracts or leases to which Borrower or any Subsidiary is a party or other cash deposits required to be made in the ordinary course of business, provided in each case that the obligation is not for borrowed money and that the obligation secured is not overdue or, if overdue, is being contested in good faith by appropriate proceedings which prevent enforcement of the matter under contest and adequate reserves have been established therefor;

(b)        mechanics', workmen's, materialmen's, landlords', carriers' or other similar Liens arising in the ordinary course of business with respect to obligations which are not overdue for a period of more than 30 days or which are being contested in good faith by appropriate proceedings which prevent enforcement of the matter under contest;

146392832_4

(c)     judgment liens and judicial attachment liens of Borrower and its Subsidiaries not constituting an Event of Default and the pledge of assets for the purpose of securing an appeal, stay or discharge in the course of any legal proceeding;

(d)     Liens on equipment of Borrower or any Subsidiary created solely for the purpose of securing indebtedness permitted by Section 7.1(b), representing or incurred to finance the purchase price of such Property; provided that no such Lien shall extend to or cover other Property of Borrower or such Subsidiary other than the respective Property so acquired, and the principal amount of indebtedness secured by any such Lien shall at no time exceed the purchase price of such Property, as reduced by repayments of principal thereon;

(e)     any interest or title of a lessor under any operating lease nor any grant of license under license agreements;

(f)     easements, rights of way, restrictions, and other similar encumbrances against real property incurred in the ordinary course of business which, in the aggregate, are not substantial in amount and which do not materially detract from the value of the Property subject thereto or materially interfere with the ordinary conduct of the business of Borrower or any Subsidiary;

(g)     Liens granted in favor of Administrative Agent pursuant to the Collateral Documents;

(h)     any Lien of a collecting bank arising in the ordinary course of business under Section 4-208 of the Uniform Commercial Code(or the applicable corresponding section) in effect in the relevant jurisdiction covering only the items being collected upon and any Lien arising under the general terms and conditions of banks or savings banks (*Allgemeine Geschäftsbedingungen der Banken oder Sparkassen*) or under any other applicable Laws;

(i)     Liens required by law to be granted in favor of creditors in relation to a merger, demerger or other corporate reconstruction of German Subsidiaries, provided such merger, demerger, or other corporate reconstruction is permitted under this Agreement;

(j)     any security or similar arrangement arising under any retention of title (including extended and prolonged retention of title arrangements (*erweiterter oder verlängerter Eigentumsvorbehalt*)), hire purchase or conditional sale arrangement or arrangements having similar effect in respect of goods supplied to a member of the Group in the ordinary course of business and on the supplier's standard or usual terms and not arising as a result of any default or omission by any Loan Party or any Subsidiary;

(k)     rights of third parties with respect to inventory, molds, tooling, and other equipment in the possession of any Loan Party or any Subsidiary thereof for the production of goods for such third party;

(l)     any Lien on an asset of a Subsidiary that is not a Loan Party granted in favor of any Loan Party or granted to secure any obligation of any such Subsidiary that is permitted under this Agreement;

(m)     any security or right to set-off provided by Loan Parties incorporated under the laws of the Netherlands arising under articles 24 or 25 respectively of the general terms and conditions (*algemene voorwaarden*) of any member of the Dutch Bankers' Association (*Nederlandse Vereniging van Banken*) or any foreign equivalent thereof;

(n)     any Lien over cash to cash collateralize letters of credit and/or bank guarantees permitted pursuant to Section 7.1(g);

-64-

(o)      any Lien for Taxes to the extent permitted by Section 6.3;

(p)      any deposit to secure the performance of bids, trade contracts or leases (other than Indebtedness for Borrowed Money), statutory obligations, surety bonds (other than bonds related to judgments or litigation), performance bonds and other obligations of a like nature, in each case incurred in the ordinary course of business, including, without limitation, security given in the ordinary course of business to a public utility or any Governmental Authority where required by such utility or Governmental Authority in connection with the operations of Borrower or any Subsidiary;

(q)      Liens securing obligations other than Indebtedness for Borrowed Money in an aggregate principal amount outstanding not to exceed $150,000; and

(r)      any Lien existing on the Closing Date and listed on Schedule 7.2 (excluding, for the avoidance of doubt, any Liens granted pursuant to Section 7.2(n)) and any renewals or extensions thereof; provided that (i) the property encumbered thereby is not changed; (ii) the amount secured or benefited thereby is not increased; and (iii) the direct or any contingent obligor with respect thereto is not changed.

Section 7.3      Investments, Acquisitions, Loans and Advances.  Borrower shall not, nor shall it permit any Subsidiary to, directly or indirectly, make or have outstanding any investments (whether through purchase of equity interests or obligations or otherwise) in, or loans or advances to (other than for travel advances and other cash advances made to employees in the ordinary course of business), any other Person, or acquire all or any substantial part of the assets or business of any other Person or division thereof; provided that the foregoing shall not apply to nor operate to prevent:

(a)      investments in direct obligations of the United States of America or of any agency or instrumentality thereof whose obligations constitute full faith and credit obligations of the United States of America, provided that any such obligations shall mature within one year of the date of issuance thereof;

(b)      investments in commercial paper rated at least P 1 by Moody's and at least A 1 by S&P maturing within one year of the date of issuance thereof;

(c)      investments in certificates of deposit issued by any Lender or by any United States commercial bank having capital and surplus of not less than $100,000,000 which have a maturity of one year or less;

(d)      investments in repurchase obligations with a term of not more than 7 days for underlying securities of the types described in subsection (a) above entered into with any bank meeting the qualifications specified in subsection (c) above, provided all such agreements require physical delivery of the securities securing such repurchase agreement, except those delivered through the Federal Reserve Book Entry System;

(e)      investments in money market funds that invest solely, and which are restricted by their respective charters to invest solely, in investments of the type described in the immediately preceding subsections (a), (b), (c), and (d) above;

(f)      (i) Borrower's investment existing on the date of this Agreement in its Subsidiaries, (ii) Borrower's investments from time to time in its Subsidiaries which are Guarantors, and (iii) investments made from time to time by a Subsidiary which is a Guarantor in one or more Subsidiaries which are Guarantors;

(g)    the intercompany notes of Borrower and its Subsidiaries outstanding on the Closing Date and set forth on <u>Schedule 5.14</u>, which subject to the time periods set forth on <u>Schedule 6.13</u>, notes shall be subject to a subordination agreement in form and substance satisfactory to Administrative Agent;

(h)    other investments, loans, and advances in addition to those otherwise permitted by this Section in an amount not to exceed $250,000 in the aggregate at any one time outstanding;

(i)    investments arising from transactions by Borrower or any Subsidiary thereof with customers or suppliers in the ordinary course of business, including investments (including debt obligations) received in connection with the bankruptcy or reorganization of customers and suppliers and in settlement of delinquent obligations of, and other disputes with, customers or suppliers arising in the ordinary course of business;

(j)    guarantees (or counter-indemnities in respect of guarantees) given in order to enable German Subsidiaries to comply with section 8a of the German Partial Retirement Act (*Altersteilzeitgesetz*) or section 7e of the German Social Security Code (*Viertes Buch Sozialgesetzbuch*) or any works council or similar agreement or arrangement in relation to part-time work or working-time accounts or other flexible work arrangements;

(k)    guarantees (or counter-indemnities in respect of guarantees) required by law to be granted in favor of creditors in relation to a merger, demerger or other corporate reconstruction of German Subsidiaries, provided such merger, demerger, or other corporate reconstruction is permitted under this Agreement; and

(l)    (i) investments, loans and advances between and among Borrower and its Subsidiaries, so long as (A) such investments, loans and advances are set forth in the Approved Budget or (B) otherwise, in the case of all such investments, loans and advances by Loan Parties to Subsidiaries which are not Loan Parties, such investments, loans and advances, together with the intercompany advances permitted pursuant to <u>Section 7.1(e)</u>, shall not exceed $150,000 in the aggregate at any one time outstanding and (ii) to the extent constituting an investment, investments by a Foreign Subsidiary of a Loan Party in a Loan Party in respect of payments and other accounts payable made by customers to and held by Borrower or any other Loan Party on behalf of, and pending payment thereof to, any Foreign Subsidiary of Borrower in the ordinary course of business.

In determining the amount of investments, acquisitions, loans, and advances permitted under this Section, investments and acquisitions shall always be taken at the original cost thereof (regardless of any subsequent appreciation or depreciation therein), and loans and advances shall be taken at the principal amount thereof then remaining unpaid.

*Section 7.4    Mergers, Consolidations and Sales*.  Borrower shall not, nor shall it permit any Subsidiary to, be a party to any merger or consolidation, consummate a Division, or sell, transfer, lease or otherwise dispose of (or, without the consent of the Administrative Agent and the Required Lenders, execute any agreement to commit to sell, transfer, lease or dispose of) all or any part of its Property, including any disposition of Property as part of a sale and leaseback transaction, or in any event sell or discount (with or without recourse) any of its notes or accounts receivable; <u>provided</u> that the foregoing shall not apply to nor operate to prevent:

(a)    the sale or lease of inventory in the ordinary course of business;

(b)    the sale, transfer, lease or other disposition of Property of a Loan Party to another Loan Party in the ordinary course of its business;

-66-

(c)        [reserved];

(d)        the sale, transfer, abandonment, forfeiture, non-renewal or other disposition of any tangible personal property or intellectual property that, in the reasonable business judgment of Borrower or its Subsidiary, has become obsolete or worn out, or in the case of intellectual property is otherwise commercially reasonable to not protect or maintain or is not material to the business of Borrower or its Subsidiaries, or that is disposed of in the ordinary course of business;

(e)        [reserved];

(f)        Restricted Payments expressly permitted pursuant to <u>Section 7.6</u> and investments expressly permitted pursuant to <u>Section 7.3</u>;

(g)        [reserved];

(h)        dispositions of cash and cash equivalents in the ordinary course of business;

(i)        dispositions of accounts receivable in connection with the compromise, settlement or collection thereof in the ordinary course of business; and

(j)        the Permitted German Sale.

Section 7.5        *Maintenance of Subsidiaries*.  Borrower shall not assign, sell or transfer, nor shall it permit any Subsidiary to issue, assign, sell or transfer, any shares of capital stock or other equity interests of a Subsidiary; <u>provided</u> that the foregoing shall not operate to prevent (a) Liens on the capital stock or other equity interests of Subsidiaries granted to Administrative Agent pursuant to the Collateral Documents or other Liens permitted to <u>Section 7.2</u>, (b) the issuance, sale, and transfer to any person of any shares of capital stock of a Subsidiary solely for the purpose of qualifying, and to the extent legally necessary to qualify, such person as a director of such Subsidiary, (c) any transaction permitted by <u>Section 7.3</u> or <u>7.4</u> above, and (d) the issuance of capital stock or other equity interest that is not Disqualified Stock by a Subsidiary to its parent.

Section 7.6        *Dividends and Certain Other Restricted Payments*.  Borrower shall not, nor shall it permit any Subsidiary to, declare, pay or make any Restricted Payments; <u>provided</u> that, (a) so long as no Default or Event of Default shall have occurred and be continuing or would result therefrom, the Loan Parties and their Subsidiaries may make any Restricted Payments set forth in the Approved Budget necessary to enable such Loan Party any other applicable Subsidiary to make any required catch up contributions to any Plan or Foreign Plan and (b) the Loan Parties and their Subsidiaries may make other Restricted Payments set forth in the Approved Budget.

Section 7.7        *Burdensome Contracts With Affiliates*.  Borrower shall not, nor shall it permit any Subsidiary to, enter into any contract, agreement or business arrangement with any of its Affiliates (other than with Wholly owned Subsidiaries) on terms and conditions which are less favorable to Borrower or such Subsidiary than would be usual and customary in similar contracts, agreements or business arrangements between Persons not affiliated with each other; <u>provided</u> that the foregoing shall not prohibit:

(a)        transactions among Loan Parties;

(b)        (A) the payment of reasonable fees, reasonable out-of-pocket costs and customary indemnities to directors, officers, consultants and employees of Borrower and the Subsidiaries in the ordinary course of business (including pursuant to employment agreements entered into by Borrower or

any of the Subsidiaries in the ordinary course of business), (B) any subscription agreement or similar agreement pertaining to the repurchase of equity interests pursuant to put/call rights or similar rights with employees, officers or directors, and (C) any employee compensation, benefit plan or arrangement, any health, disability or similar insurance plan which covers employees, and any reasonable employment contract and transactions pursuant thereto; and

(c)  Restricted Payments expressly permitted under Section 7.6 and investments expressly permitted under Section 7.3.

Section 7.8  *No Changes in Fiscal Year*.  The fiscal year of Borrower and its Subsidiaries ends on December 31 of each year; and Borrower shall not, nor shall it permit any Subsidiary to, change its fiscal year from its present basis.

Section 7.9  *Change in the Nature of Business*.  Borrower shall not, nor shall it permit any Subsidiary to, engage in any business or activity if as a result the general nature of the business of Borrower or any Subsidiary would be changed in any material respect from the general nature of the business engaged in by it as of the Closing Date.

Section 7.10  *No Restrictions*.  Except as provided herein, Borrower shall not, nor shall it permit any Subsidiary to, directly create or otherwise cause or suffer to exist or become effective any consensual encumbrance on the ability of Borrower or any Subsidiary to:  (A) pay dividends or make any other distribution on any Subsidiary's capital stock or other equity interests owned by Borrower or any other Subsidiary, (B) pay any indebtedness owed to Borrower or any other Subsidiary, (C) make loans or advances to Borrower or any other Subsidiary, (D) transfer any of its Property to Borrower or any other Subsidiary, or (E) guarantee the Obligations and/or grant Liens on its assets to Administrative Agent as required by the Loan Documents; provided that the foregoing shall not prohibit:

(a)  restrictions imposed by applicable law with respect to Foreign Subsidiaries;

(b)  contractual encumbrances or restrictions of the type referred to in clauses (A) through (D) above in effect on the Closing Date under the Prepetition Loan Documents or any Indebtedness for Borrowed Money existing on the Closing Date and permitted pursuant to Section 7.1;

(c)  customary provisions contained in leases or licenses of intellectual property and other similar agreements entered into in the ordinary course of business with respect to the transfer of such leases or licenses;

(d)  customary provisions restricting subletting or assignment of any lease governing a leasehold interest; and

(e)  restrictions on cash or other deposits imposed by customers under contracts entered into in the ordinary course of business.

Section 7.11  *Subordinated Debt*.  Borrower shall not, nor shall it permit any Subsidiary to, (a) amend or modify any of the terms or conditions relating to the subordination of any Subordinated Debt, (b) make any voluntary prepayment of Subordinated Debt or effect any voluntary redemption thereof, or (c) make any payment on account of Subordinated Debt which is prohibited under the terms of any instrument or agreement subordinating the same to the Obligations.  Notwithstanding the foregoing, Borrower may agree to a decrease in the interest rate applicable thereto or to a deferral of repayment of any of the principal of or interest on the Subordinated Debt beyond the current due dates therefor.

146392832_4

Section 7.12    *Use of Proceeds*.

(a)    Neither Borrower nor any Subsidiary will engage, principally or as one of its important activities, in the business of purchasing or carrying margin stock or in the business of extending credit for the purpose of purchasing or carrying margin stock (within the meaning of Regulation U of the FRB), and no part of the proceeds of any Loan or any other extension of credit made hereunder will be used to purchase or carry any such margin stock or to extend credit to others for the purpose of purchasing or carrying any such margin stock.

(b)    Borrower will not request any Loan, and Borrower shall not use, and shall ensure that its Subsidiaries and Affiliates, and its or their respective directors, officers, employees and agents not use, the proceeds of any Loan, directly or indirectly, (i) in furtherance of an offer, payment, promise to pay, or authorization of the payment or giving of money, or anything else of value, to any Person in violation of any Anti-Corruption Laws, (ii) to fund, finance or facilitate any activities, business or transaction of or with any Sanctioned Person or in any Designated Jurisdiction, or (iii) in any other manner that would result in the violation of any Sanctions applicable to any party hereto.

Section 7.13    *Modifications to Organizational Documents*.  No Loan Party shall, nor shall they permit any Subsidiary of any Loan Party to modify, amend or otherwise alter the articles of incorporation or formation or the bylaws or operating agreements (or, in each case, any comparable organizational documents) of the Borrower or any Subsidiary except as required by the Bankruptcy Code.

Section 7.14    *[Reserved]*.

Section 7.15    *No flowback in Switzerland*.

None of the amounts borrowed under this Agreement shall be used in a manner which would constitute a "use of proceeds in Switzerland" (*Mittelverwendung in der Schweiz*), as interpreted by the Swiss Federal Tax Administration for purposes of Swiss Withholding Tax, unless (i) a written confirmation is obtained from the Swiss Federal Tax Administration confirming that such use of proceeds in Switzerland does not trigger Swiss Withholding Tax consequences or (ii) such use of proceeds in Switzerland is possible under then applicable Swiss taxation laws without triggering Swiss Withholding Tax consequences.

Section 7.16    *Disbursements; DIP Budget Variance*.  No Loan Party shall, nor shall permit any of its Subsidiaries to, directly or indirectly:

(a)    Make any disbursements other than (i) those set forth in the Approved Budget (or as otherwise permitted in accordance with the terms of the DIP Orders) or (ii) in respect of Professional Fees otherwise approved by the Administrative Agent.

(b)    Commencing after the second full calendar week following the Petition Date, permit as of any Variance Report Date (i) a negative Receipts Variance for the most recent Testing Period in the Approved Budget in excess of 5.0% (with a negative variance meaning, for the avoidance of doubt, that actual receipts are less than projected receipts) or (ii) a positive Disbursements Variance for such Testing Period for any line item in the Approved Budget in excess of 5.0% (with positive variance meaning, for the avoidance of doubt, that actual disbursements are greater than the projected disbursements) (any negative or positive variances not exceeding the limitations set forth in this clause (b) are referred to in this Agreement as "***Permitted Variances***").

146392832_4

*Section 7.17    Case Matters.*  No Loan Party shall, nor shall permit any of its Subsidiaries to, directly or indirectly:

(a)    Assert, file or seek, or consent to the filing or the assertion of or joinder in, or use any portion of the proceeds of the Loans, Obligations, the Collateral, the Carve-Out or cash collateral to compensate services rendered or expenses incurred in connection with, any claim, counterclaim, action, proceeding, order, application, pleading, motion, objection, any other papers or documents, defense (including offsets and counterclaims of any nature or kind), or other contested matter (including any of the foregoing the purpose of which is to seek or the result of which would be to obtain any order, judgment, determination, declaration, or similar relief):

(i)    avoiding, re-characterizing, recovering, reducing, subordinating (except pursuant to the DIP Orders), disallowing, or otherwise challenging (under Sections 105, 506(c), 542, 543, 544, 545, 547, 548, 549, 550, 551, 552(b), or 553 of the Bankruptcy Code or applicable non-bankruptcy law), in each case, in whole or in part, the Obligations or the DIP Liens; or reversing, modifying, amending, staying or vacating the DIP Orders, without the prior written consent of Administrative Agent;

(ii)    granting priority for any administrative expense, secured claim or unsecured claim against the Borrower or any of the Guarantors (now existing or hereafter arising of any kind or nature whatsoever, including, without limitation, any administrative expenses of the kind specified in, or arising or ordered under, Sections 105, 326, 327, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546, 726, 1113 and 1114 of the Bankruptcy Code) equal or superior to the priority of Administrative Agent and the Lenders in respect of the Obligations, except as provided under the Carve-Out or to the extent expressly permitted under the DIP Orders;

(iii)    granting or imposing, under Section 364(c) or 364(d) of the Bankruptcy Code or otherwise, any additional financing under such sections or any Lien equal or superior to the priority of the DIP Lien except to the extent expressly permitted under the DIP Orders;

(iv)    permitting the use of cash collateral as defined in Section 363 of the Bankruptcy Code, except as expressly permitted by the DIP Orders and this Agreement;

(v)    modifying, altering, or impairing in any manner the DIP Liens or the Prepetition Liens, or any of Administrative Agent's, the Lenders' or the Prepetition Secured Parties' rights or remedies under the DIP Orders, this Agreement, any of the other Loan Documents, any of the Prepetition Loan Documents or any documents related thereto (including the right to demand payment of all Obligations and Adequate Protection Obligations, as applicable, and to enforce its Liens and security interests in the Collateral and the Prepetition Collateral, as applicable), whether by Reorganization Plan, order of confirmation, or any financings of, extensions of credit to, or incurring of debt by any Loan Party or otherwise, whether pursuant to Section 364 of the Bankruptcy Code or otherwise;

(b)    Seek or consent to any order (i) dismissing any of the Cases under Sections 105, 305 or 1112 of the Bankruptcy Code or otherwise; (ii) converting any of the Cases to cases under Chapter 7 of the Bankruptcy Code; (iii) appointing a Chapter 11 trustee in any of the Cases; (iv) appointing an examiner with enlarged powers beyond those set forth in sections 1104(d) and 1106(a)(3) and (4) of the Bankruptcy Code in any of the Cases; or (v) granting a change of venue with respect to any Case or any related adversary proceeding.

(c)       Make any payments or transfer any property on account of claims asserted by any vendors of any Loan Party for reclamation in accordance with Section 2-702 of any applicable UCC and Section 546(c) of the Bankruptcy Code, unless otherwise ordered by the Bankruptcy Court upon prior notice to Administrative Agent or unless otherwise consented to by the Required Lenders.

(d)       Return any inventory or other property to any vendor pursuant to Section 546(g) of the Bankruptcy Code, unless otherwise ordered by the Bankruptcy Court in accordance with Section 546(g) of the Bankruptcy Code upon prior notice to Administrative Agent or unless otherwise consented to by the Required Lenders.

(e)       Propose to the Bankruptcy Court, or otherwise, a sale of all or substantially all of the Collateral, without the prior written consent of the Required Lenders.

(f)       (i) Make payments under any management incentive plan or on account of claims or expenses arising under Section 503(c) of the Bankruptcy Code, except, in each case, in amounts and on terms and conditions that (1) are approved by order of the Bankruptcy Court after notice and hearing, (2) are expressly permitted by the terms of the Loan Documents and within the limits, including any allowed variance, of the Approved Budget, and (3) as approved by Administrative Agent, or (ii)(A) enter into or make or implement any amendment, waiver, supplement, or other modification to any employment agreement or employee compensation plan or (B) pay or cause to be paid any amount contemplated by such agreements or plans before the date on which such amount becomes due and payable pursuant to the terms of such agreements or plans, as applicable, in each case, unless in the ordinary course of business.

## Section 8.  Events of Default and Remedies.

Section 8.1       Events of Default.  Any one or more of the following shall constitute an "Event of Default" hereunder:

(a)       (i) Borrower shall fail to pay any principal of any Loan when and as the same shall become due and payable, whether at the due date thereof or at a date fixed for prepayment thereof or otherwise and (ii) Borrower shall fail to pay any interest on any Loan, or any fee or any other amount (other than an amount referred to in clause (i) of this Section 8.1(a)) payable under this Agreement or under any other Loan Document, when and as the same shall become due and payable, and such failure shall continue unremedied for a period of three or more Business Days;

(b)       default in the observance or performance of any covenant, condition or agreement set forth in (i) Section 6.5(a) and (b), or Section 6.1, Section 6.4, Section 6.5 , Section 6.6, Section 6.12, Section 6.13, Section 6.15, Section 6.16, Section 6.17, or Section 7;

(c)       default in the observance or performance of any other provision hereof or of any other Loan Document which is not remedied within 30 days after the earlier of (i) the date on which such failure shall first become known to any officer of Borrower or (ii) written notice thereof is given to Borrower by Administrative Agent;

(d)       any representation or warranty made herein or in any other Loan Document or in any certificate furnished to Administrative Agent or the Lenders pursuant hereto or thereto or in connection with any transaction contemplated hereby or thereby proves untrue in any respect (or in any material respect if such representation, warranty, certification or statement is not by its terms already qualified as to materiality) as of the date of the issuance or making or deemed making thereof;

-71-

(e)      (i) any event occurs or condition exists (other than those described in subsections (a) through (d) above) which is specified as an event of default under this Agreement or any of the other Loan Documents and such event of default shall continue unremedied for a period of thirty (30) days after notice thereof from Administrative Agent to Borrower, (ii) any of the Collateral Documents shall for any reason fail to create a valid and perfected first priority Lien in favor of Administrative Agent in any material portion of the Collateral purported to be covered thereby except as expressly permitted by the terms thereof or (i) any Loan Party takes any action for the purpose of terminating, repudiating or rescinding any Loan Document executed by it or any of its obligations thereunder (other than in accordance with the terms of such Loan Document);

(f)      other than with respect to the Prepetition Obligations and Prepetition Loan Documents or any defaults caused by the filing of the Cases, any default shall occur under any Indebtedness for Borrowed Money issued, assumed or guaranteed by Borrower, any Subsidiary or any Guarantor aggregating in excess of $1,000,000, or under any indenture, agreement or other instrument under which the same may be issued, and in each case such default shall continue for a period of time sufficient to permit the acceleration of the maturity of any such Indebtedness for Borrowed Money (whether or not such maturity is in fact accelerated), or any such Indebtedness for Borrowed Money shall not be paid when due (whether by demand, lapse of time, acceleration or otherwise);

(g)      any final judgment or judgments for the payment of money, writ or writs or warrant or warrants of attachment, or any similar process or processes, shall be entered or filed against Borrower, any Subsidiary or any Guarantor, or against any of its Property, in an aggregate amount in excess of $2,000,000 (except to the extent fully covered by insurance pursuant to which the insurer has accepted liability therefor in writing), and which remains undischarged, unvacated, unbonded or unstayed for a period of 30 days;

(h)      (i) Borrower or any Subsidiary, or any member of its Controlled Group, shall fail to pay when due an amount or amounts aggregating in excess of $1,000,000 which it shall have become liable to pay to the PBGC or to a Plan under Title IV of ERISA; (ii) notice of intent to terminate a Plan or Plans having aggregate Unfunded Vested Liabilities in excess of $2,000,000 (collectively, a "*Material Plan*") shall be filed under Title IV of ERISA by Borrower or any Subsidiary, or any other member of its Controlled Group, any plan administrator or any combination of the foregoing; (iii) the PBGC shall institute proceedings under Title IV of ERISA to terminate or to cause a trustee to be appointed to administer any Material Plan or a proceeding shall be instituted by a fiduciary of any Material Plan against Borrower or any Subsidiary, or any member of its Controlled Group, to enforce Section 515 or 4219(c)(5) of ERISA and such proceeding shall not have been dismissed within 30 days thereafter; or (iv) any failure, notice, event or condition similar to those set forth in the foregoing clauses (i) through (iii) above shall have occurred with respect to Foreign Plans which may, in each case, result in any material obligations in relation to a Foreign Plan;

(i)      Any Change of Control shall occur; or

(j)      Any of the following shall have occurred in the Cases:

(i)      the bringing of a motion or application by any Debtor in the Cases, or the entry of any order by the Bankruptcy Court in the Cases: (A) to obtain additional post-petition financing under section 364(c) or (d) of the Bankruptcy Code that does not provide for the payment of all Obligations in full immediately upon the consummation of such financing; (B) to grant any Lien, other than Liens expressly permitted under this Agreement or the DIP Orders upon or affecting any Collateral; or (C) except as provided in this Agreement or the DIP Orders, to use cash collateral of Administrative Agent and the Lenders under section 363(c) of the Bankruptcy Code; or

(ii)     the filing of any plan of reorganization or disclosure statement attendant thereto, or any amendment, modification or supplement to such plan or disclosure statement, by any Debtor, unless such plan or disclosure statement contains provision for the payment in full of the Obligations prior to the Maturity Date (an "*Approved Plan*"); or

(iii)     the termination or modification of any Debtor's exclusive right to file and solicit acceptances of a plan of reorganization; or

(iv)     the entry of an order in any of the Cases approving a disclosure statement in respect of a plan other than an Approved Plan, or the entry of an order confirming a Reorganization Plan other than an Approved Plan; or

(v)     entry of an order terminating exclusivity having been entered (or requested, unless actively contested by the Loan Parties); or

(vi)     for such time as the Stalking Horse Purchaser remains the stalking horse purchaser in the 363 Sale Transaction process or either the winning or backup bidder following any Auction, any default or termination event under the Stalking Horse APA.

(vii)     the entry of an order in the Cases amending, supplementing, staying, vacating or otherwise modifying any Loan Document in a manner adverse to the interests of the Lenders; or

(viii)     the payment of, or application by any Debtor for authority to pay, any prepetition claim other than amounts set forth in the Approved Budget; or

(ix)     the entry of an order by the Bankruptcy Court appointing, or the filing of a motion or application by any Debtor for an order seeking the appointment of an interim or permanent trustee in the Cases or the appointment of a receiver or an examiner under section 1104 of the Bankruptcy Code in the Cases, with expanded powers (beyond those set forth in sections 1106(a)(3) and 1106(a)(4) of the Bankruptcy Code) to operate or manage the financial affairs, the business, or reorganization of the Borrower or with the power to conduct an investigation of (or compel discovery); or

(x)     the sale of any of the Debtors' assets (other than pursuant to the Stalking Horse APA) either through a sale under section 363 of the Bankruptcy Code, through a Reorganization Plan confirmed by the Bankruptcy Court in the Cases, or otherwise, except to the extent that such sale results in the payment in full of the Obligations prior to the Maturity Date; or

(xi)     the revocation, reversal, stay, vacation, supplementation or other modification to the Bidding Procedures Order, or any Debtor files a motion or application seeking the same, in each case without the prior written consent of the Required Lenders; or

(xii)     the dismissal of any of the Cases, or if any Debtor files a motion or other pleading seeking the dismissal of the Cases; or

(xiii)     the conversion of any of the Cases from one under Chapter 11 of the Bankruptcy Code to one under Chapter 7 of the Bankruptcy Code, or if any Debtor files a motion or other pleading seeking the conversion of any of the Cases under section 1112 of the Bankruptcy Code or otherwise; or

146392832_4

(xiv)   any Debtor files a motion or application seeking, or the entry of an order by the Bankruptcy Court, as applicable, granting relief from or modifying the automatic stay of section 362 of the Bankruptcy Code (x) to allow any creditor to execute upon or enforce a Lien on any Collateral not in accordance with the terms hereof with respect to Collateral having an aggregate value in excess of $100,000, or (y) with respect to any Lien of or the granting of any Lien on any Collateral to any state or local environmental or regulatory agency or authority having priority over the Liens in favor of Administrative Agent; or

(xv)   any Debtor files a motion or application seeking to challenge, subordinate, disgorge, avoid or require repayment of, or the entry of an order in the Cases challenging, subordinating, disgorging, avoiding or requiring repayment of any portion of the payments made on account of the Obligations owing under this Agreement or the other Loan Documents; or

(xvi)   the failure of any Debtor to perform any of its obligations under the DIP Orders or any violation of any of the terms of the DIP Orders, subject to any applicable grace or cure periods set forth therein; or

(xvii)   the DIP Orders shall cease to create a valid and perfected Lien on the Collateral or to be in full force and effect; or

(xviii)   any Debtor shall be enjoined from conducting any material portion of its business, any disruption of the material business operations of the Debtors shall occur, or any material damage to or loss of material assets of any Debtor shall occur; or

(xix)   the challenge by any Debtor to the validity, extent, perfection or priority of any liens granted under or obligations arising under the Loan Documents; or

(xx)   the remittance, use or application of proceeds of the Loans, cash collateral or other cash or funds of any Debtor other than in accordance with this Agreement and the DIP Orders; or

(xxi)   an order of the Bankruptcy Court shall be entered denying or terminating use of cash collateral by the Loan Parties; or

(xxii)   any Debtor files a motion or application seeking, or the entry of an order in any of the Cases granting any other superpriority administrative claim or Lien equal or superior to that granted to Administrative Agent, on behalf of itself and the Lenders, without the prior written consent of the Required Lenders (other than any such superpriority administrative claim or lien that is expressly permitted to have such priority hereunder); or

(xxiii)   the filing of a motion or application by any Debtor requesting, or the entry of any order granting, any super-priority claim which is senior or pari passu with Administrative Agent's or the Lenders' claims under the Loan Documents not in accordance with the terms hereof; or

(xxiv)   any (a) Debtor files a motion or application seeking, or the entry of an order precluding Administrative Agent (or its designee) from having the right to or being permitted to "credit bid" any amount of the Obligations with respect to the assets of the Debtors or (b) the Bankruptcy Court enters an order prohibiting, restricting, precluding, or otherwise impairing the unqualified right of Administrative Agent (or its designee) from having the right to or being permitted to "credit bit" any amount of the Obligations, with respect to the assets of the Debtors; or

-74-

(xxv)    any attempt by any Debtor to reduce (other than a reduction in accordance with the terms of this Agreement), avoid, set off or subordinate the Obligations or the Liens securing the Obligations to any other debt, including, without limitation, the Prepetition Obligations; or

(xxvi)    the revocation, reversal, stay, vacation, supplementation or other modification of the DIP Orders or any provision thereof; or

(xxvii)    the payment of or granting adequate protection (except for the Adequate Protection Superpriority Claims) with respect to any Prepetition Obligations (other than with respect to payment permitted under the DIP Orders); or

(xxviii)    the payment of any administrative expense claim of $50,000 or more, unless such claim is expressly set forth in the Approved Budget; or

(xxix)    (A) any Debtor, holder of an equity interest in any Debtor or any Affiliate of any Debtor commences, or any Debtor supports any Person, in any proceeding challenging or seeking to challenge the validity and priority of the DIP Liens against Administrative Agent or the Lender or the Loan Documents, or the disallowance of the Obligations (or any of them), or (B) any material provision of the DIP Orders governing the use of Cash Collateral (as defined in the applicable DIP Order) shall, in each case, cease to be valid and binding unless, in any case under this clause (xxix), the Lenders shall have consented to the same; or

(xxx)    if the confirmation order with respect to any Reorganization Plan is entered in form and substance which is not acceptable to the Required Lenders in respect of the treatment of the claims of Administrative Agent and the Lenders; or

(xxxi)    any Debtor shall make any payment or grant any form of adequate protection with respect to Indebtedness existing prior to the Petition Date (other than, in each case, as permitted under this Agreement, the DIP Orders or an Approved Plan or relief sought in any "first day" motions filed on the Petition Date); or

(xxxii)    an application or motion for any of the orders described in this Section 8.1(j) shall be made by a Person other than Administrative Agent or the Required Lenders and such application is not, to the extent requested by Administrative Agent or the Required Lenders, contested by the Borrower in good faith and the relief requested is granted in an order that is not stayed pending appeal; or

(xxxiii)    the cessation of Liens or superpriority claims granted with respect to this Agreement to be valid, perfected and enforceable in all respects; or the Bankruptcy Court shall cease to have exclusive jurisdiction with respect to all matters relating to the exercise of rights and remedies under the Loan Documents, the DIP Orders, the Liens granted under the Collateral Documents and the Collateral; or

(xxxiv)    the entry by the Bankruptcy Court of an interim DIP order other than the Interim DIP Order, or a Final DIP Order that is not acceptable to the Lenders in their sole discretion.

*Section 8.2    Remedies Upon an Event of Default.*  Upon the occurrence and during the continuance of any Event of Default, Administrative Agent shall at the request of the Required Lenders, deliver a written notice to Borrower (a "*Termination Declaration*"), that, pursuant to and subject to the DIP Orders, the automatic stay provision of Section 362 of the Bankruptcy Code shall be deemed vacated and modified to the extent necessary to permit Administrative Agent and the Lenders to: (a) terminate the

146392832_4

remaining Commitments and all other obligations of the Lenders hereunder on the date stated in such notice (which may be the date thereof); and (b) declare the principal of and the accrued interest on all outstanding Loans to be forthwith due and payable and thereupon all outstanding Loans, including both principal and interest thereon, shall be and become immediately due and payable together with all other amounts payable under the Loan Documents without further demand, presentment, protest or notice of any kind, and (c) to the extent not prohibited by the DIP Orders, proceed to protect, enforce and exercise all rights and remedies of the Secured Parties under this Agreement, any of the other Loan Documents or applicable Law, including, but not limited to, by suit in equity, action at law or other appropriate proceeding, whether for the specific performance of any covenant or agreement contained in this Agreement and the other Loan Documents or any instrument pursuant to which the Obligations are evidenced, and, if such amount shall have become due, by declaration or otherwise, proceed to enforce the payment thereof or any other legal or equitable right of the Secured Parties.  Administrative Agent, after giving notice to Borrower pursuant to Section 8.1(c) or this Section 8.2, shall also promptly send a copy of such notice to the other Lenders, but the failure to do so shall not impair or annul the effect of such notice.

No remedy herein is intended to be exclusive of any other remedy and each and every remedy shall be cumulative and shall be in addition to every other remedy given hereunder or now or hereafter existing at law or in equity or by statute or any other provision of Law.

Each of the Lenders agrees that it shall not, unless specifically requested to do so in writing by Administrative Agent, take or cause to be taken any action, including, the commencement of any legal or equitable proceedings to enforce any Loan Document against any Loan Party or to foreclose any Lien on, or otherwise enforce any security interest in, or other rights to, any of the Collateral.

The Loan Parties may seek an emergency hearing during the five (5) calendar days following the date a Termination Declaration is delivered (such five (5) calendar day period, the "*Remedies Notice Period*"), at which the sole issue that may be raised by the Loan Parties shall be whether an Event of Default has in fact occurred or is continuing, and the Loan Parties  hereby waive their right to and shall not be entitled to seek relief, including, without limitation, under Section 105 of the Bankruptcy Code, to the extent that such relief would in any way impair or restrict the rights and remedies of the Secured Parties.

Section 8.3       *[Reserved]*.

Section 8.4       *[Reserved]*.

Section 8.5       *Notice of Default*.  Administrative Agent shall give notice to Borrower under Section 8.1(c) promptly upon being requested to do so by any Lender and shall thereupon notify all the Lenders thereof.

Section 9.  *Administrative Agent.*

Section 9.1       *Appointment and Authorization of Administrative Agent*.  Each Lender hereby appoints CLP as Administrative Agent under the Loan Documents and hereby authorizes Administrative Agent to take such action as Administrative Agent on its behalf and to exercise such powers under the Loan Documents as are delegated to Administrative Agent by the terms thereof, together with such powers as are reasonably incidental thereto.  It is understood and agreed that the use of the term "agent" herein or in any other Loan Documents (or any other similar term) with reference to the Administrative Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable Law. Instead such term is used as a matter of market custom, and is intended to create or reflect only an administrative relationship between contracting parties.  Therefore, the Lenders expressly

-76-

agree that Administrative Agent is not acting as a fiduciary of the Lenders in respect of the Loan Documents, Borrower or otherwise, and nothing herein or in any of the other Loan Documents shall result in any duties or obligations on Administrative Agent or any of the Lenders except as expressly set forth herein.  Except as provided in <u>Section 9.8</u>, the provisions of this Section are solely for the benefit of the Administrative Agent and the Lenders, and Borrower shall not have rights as a third-party beneficiary of any of such provisions.

The Administrative Agent shall also act as the "collateral agent" under the Loan Documents, and each of the Lenders irrevocably appoints and authorizes the Administrative Agent to act as the agent of such Lender for purposes of acquiring, holding and enforcing any and all Liens on Collateral granted by any of the Loan Parties to secure any of the Obligations, together with such powers and discretion as are reasonably incidental thereto (including, without limitation, to enter into additional Loan Documents or supplements to existing Loan Documents on behalf of the Secured Parties).  In this connection, the Administrative Agent, as "collateral agent" and any co-agents, sub-agents and attorneys-in-fact appointed by the Administrative Agent pursuant to this <u>Section 9</u> for purposes of holding or enforcing any Lien on the Collateral (or any portion thereof) granted under the Loan Documents, or for exercising any rights and remedies thereunder at the direction of the Administrative Agent, shall be entitled to the benefits of all provisions of <u>Sections 9</u> and <u>11</u> (including <u>Section 11.13</u>, as though such co-agents, sub-agents and attorneys-in-fact were the "collateral agent" under the Loan Documents) as if set forth in full herein with respect thereto.

Section 9.2    *Special Appointment of Administrative Agent for Swiss Security Documents.* Without limiting any other rights of the Administrative Agent under any Loan Document, in relation to the Swiss Security Documents, the following shall apply: (i) in relation to the Swiss Security Documents, the Administrative Agent shall hold, administer and (subject to the same having become enforceable) realize any such Swiss Security Document which is pledged (*Pfandrecht*) or otherwise granted under an accessory security right (*akzessorische Sicherheit*) as a direct representative (*direkter Stellvertreter*) acting for itself and in the name and for the account of all Secured Parties which have the benefit of such security in accordance with this Agreement and the respective Swiss Security Document; (ii) each Secured Party which becomes a party to this Agreement ratifies and approves all acts, statements and declarations previously done by the Administrative Agent on such Secured Party's behalf in relation to the creation of any pledge or other accessory security right (*akzessorische Sicherheit*) in the name and for the account of any Secured Party in respect of the Swiss Security Documents; and (iii) each Secured Party (other than the Administrative Agent) hereby authorizes the Administrative Agent to: (A) (1) accept, hold, administer and (subject to the same having become enforceable) realize as its direct representative (*direkter Stellvertreter*) any pledge or other accessory security right (*akzessorische Sicherheit*) made to such Secured Party under or pursuant to a Swiss Security Document; (2) act and prepare, execute and deliver as its direct representative (*direkter Stellvertreter*), subject to the terms of this Agreement and the respective Swiss Security Document, any necessary confirmations, amendments, alterations or releases of, or accessions to, the respective Swiss Security Document; and (3) carry out similar dealings with regard to any Swiss Security Document which creates a pledge or any other accessory security right (*akzessorische Sicherheit*); (B) act on its behalf in connection with the preparation, execution and delivery of the Swiss Security Documents and the perfection and monitoring of the Swiss Security Documents; and (C) prepare, execute and deliver on its behalf where relevant, without the need for any further referral to, or authority from, any other person, any necessary confirmations, amendments, alterations or releases of, or accessions to, the Swiss Security Document.  Further, without limiting any other rights of the Administrative Agent under any Loan Document, in relation to the Swiss Security Documents which provide for a non-accessory security interest (*nicht-akzessorische Sicherheiten*), the Administrative Agent shall hold, administer and (subject to the same having become enforceable) realize any such Swiss Security Document on a fiduciary basis for itself (including as joint and several creditor) and for the benefit of the other Secured Parties.

Section 9.3     *Rights as a Lender*.  The Person serving as the Administrative Agent hereunder shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not the Administrative Agent, and the term "Lender" or "Lenders" shall, unless otherwise expressly indicated or unless the context otherwise requires, include the Person serving as the Administrative Agent hereunder in its individual capacity.  Such Person and its Affiliates may accept deposits from, lend money to, own securities of, act as the financial advisor or in any other advisory capacity for, and generally engage in any kind of business with, Borrower or any Subsidiary or other Affiliate thereof as if such Person were not the Administrative Agent hereunder and without any duty to account therefor to the Lenders.

Section 9.4     *Action by Administrative Agent*.  The Administrative Agent shall not have any duties or obligations except those expressly set forth herein and in the other Loan Documents, and its duties hereunder shall be administrative in nature.  Without limiting the generality of the foregoing, the Administrative Agent (a) shall not be subject to any fiduciary or other implied duties, regardless of whether a Default has occurred and is continuing, (b) shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the other Loan Documents that the Administrative Agent is required to exercise as directed in writing by the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Loan Documents); provided that the Administrative Agent shall not be required to take any action that, in its opinion or the opinion of its counsel, may expose the Administrative Agent to liability or that is contrary to any Loan Document or applicable Law, including for the avoidance of doubt any action that may be in violation of the automatic stay under any Bankruptcy Law or that may effect a forfeiture, modification or termination of property of a Defaulting Lender in violation of any Bankruptcy Law and (c) shall not, except as expressly set forth herein and in the other Loan Documents, have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to Borrower or any of its Affiliates that is communicated to or obtained by the Person serving as the Administrative Agent or any of its Affiliates in any capacity.  Administrative Agent shall in all cases be fully justified in failing or refusing to act hereunder or under any other Loan Document unless it first receives such advice or concurrence of the Required Lenders (or, if so specified by this Agreement, all or other Lenders) as it deems appropriate and any further assurances of its indemnification from the Lenders that it may require, including prepayment of any related expenses and any other protection it requires against any and all costs, expense, and liability which may be incurred by it by reason of taking or continuing to take any such action.  The Administrative Agent shall in all cases be fully protected in acting, or in refraining from acting, under this Agreement and the other Loan Documents in accordance with a request of the Required Lenders (or, if so specified by this Agreement, all or other Lenders), and such request and any action taken or failure to act pursuant thereto shall be binding upon all the Lenders and all future holders of the Loans.

Section 9.5     *Consultation with Experts*.  Administrative Agent may consult with legal counsel, independent public accountants, and other experts selected by it and shall not be liable for any action taken or omitted to be taken by it in good faith in accordance with the advice of such counsel, accountants or experts.

Section 9.6     *Liability of Administrative Agent; Credit Decision*.

(a)     Neither Administrative Agent nor any of its directors, officers, agents or employees shall be liable for any action taken or not taken by it in connection with the Loan Documents:  (i) with the consent or at the request of the Required Lenders or (ii) in the absence of its own gross negligence or willful misconduct as determined by a court of competent jurisdiction by final and non-appealable judgment.  The Administrative Agent shall be deemed not to have knowledge of any Default unless and until notice describing such Default is given to the Administrative Agent in writing by Borrower or a Lender.  Neither Administrative Agent nor any of its directors, officers, agents or employees shall be responsible for or have

-78-

any duty to ascertain, inquire into or verify:  (i) any statement, warranty or representation made in connection with this Agreement, any other Loan Document or any Credit Event; (ii) the contents of any certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith, (iii) the performance or observance of any of the covenants or agreements of Borrower or any Subsidiary contained herein or in any other Loan Document; (iv) the satisfaction of any condition specified in Section 4, other than to confirm receipt of items expressly required to be delivered to the Administrative Agent; or (v) the validity, effectiveness, genuineness, enforceability, perfection, value, worth or collectability hereof or of any other Loan Document or of any other documents or writing furnished in connection with any Loan Document or of any Collateral (including, for the avoidance of doubt, in connection with the Administrative Agent's reliance on any Electronic Signature transmitted by telecopy, emailed .pdf or any other electronic means); and Administrative Agent makes no representation of any kind or character with respect to any such matter mentioned in this sentence.

(b)    The Administrative Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing (including any electronic message, Internet or intranet website posting or other distribution) believed by it to be genuine and to have been signed, sent or otherwise authenticated by the proper Person.  The Administrative Agent also may rely upon any statement made to it orally or by telephone and believed by it to have been made by the proper Person, and shall not incur any liability for relying thereon.  In determining compliance with any condition hereunder to the making of a Loan that by its terms must be fulfilled to the satisfaction of a Lender, the Administrative Agent may presume that such condition is satisfactory to such Lender unless the Administrative Agent shall have received notice to the contrary from such Lender prior to the making of such Loan.  In particular and without limiting any of the foregoing, Administrative Agent shall have no responsibility for confirming the accuracy of any Variance Report or other document or instrument received by it under the Loan Documents.  Administrative Agent may treat the payee of any Obligation as the holder thereof until written notice of transfer shall have been filed with Administrative Agent signed by such payee in form satisfactory to Administrative Agent.  Each Lender acknowledges that it has independently and without reliance on Administrative Agent or any other Lender (or any of their Related Parties), and based upon such information, investigations and inquiries as it deems appropriate, made its own credit analysis and decision to extend credit to Borrower in the manner set forth in the Loan Documents.  It shall be the responsibility of each Lender to keep itself informed as to the creditworthiness of Borrower and its Subsidiaries, and Administrative Agent shall have no liability to any Lender with respect thereto.

Section 9.7    Indemnity.  To the extent that Borrower for any reason fails to indefeasibly pay any amount required under Section 11.13 to be paid by it to the Administrative Agent (or any sub-agent thereof) or any Related Party of any of the foregoing, each Lender severally agrees to pay to the Administrative Agent (or any such sub-agent) or such Related Party, as the case may be, such Lender's pro rata share (determined as of the time that the applicable unreimbursed expense or indemnity payment is sought based on each Lender's applicable Percentage at such time) of such unpaid amount (including any such unpaid amount in respect of a claim asserted by such Lender); provided that the unreimbursed expense or indemnified loss, claim, damage, liability or related expense, as the case may be, was incurred by or asserted against the Administrative Agent (or any such sub-agent, or against any Related Party of any of the foregoing acting for the Administrative Agent (or any such sub-agent)) in connection with such capacity.  The obligations of the Lenders under this Section shall survive termination of this Agreement.  Administrative Agent shall be entitled to offset amounts received for the account of a Lender under this Agreement against unpaid amounts due from such Lender to Administrative Agent (whether as fundings of participations, indemnities or otherwise, and with any amounts offset for the benefit of Administrative Agent to be held by it for its own account), but shall not be entitled to offset against amounts owed to Administrative Agent by any Lender arising outside of this Agreement and the other Loan Documents.

Section 9.8    *Resignation of Administrative Agent and Successor Administrative Agent*. Administrative Agent may resign at any time by giving written notice thereof to the Lenders and Borrower. Upon any such resignation of Administrative Agent, the Required Lenders shall have the right, in consultation with Borrower, to appoint a successor Administrative Agent.  If no successor Administrative Agent shall have been so appointed by the Required Lenders, and shall have accepted such appointment within 30 days after the retiring Administrative Agent's giving of notice of resignation (or such earlier day as shall be agreed by the Required Lenders) (the "*Resignation Effective Date*") then the retiring Administrative Agent may (but shall not be obligated to), on behalf of the Lenders, appoint a successor Administrative Agent, which may be any Lender hereunder or any commercial bank, or an Affiliate of a commercial bank, having an office in the United States of America and having a combined capital and surplus of at least $200,000,000; <u>provided</u> that in no event shall any such successor Administrative Agent be a Defaulting Lender.  With effect from the Resignation Effective Date (i) the retiring Administrative Agent shall be discharged from its duties and obligations hereunder and under the other Loan Documents (except that in the case of any collateral security held by the Administrative Agent on behalf of the Lenders under any of the Loan Documents, the retiring or removed Administrative Agent shall continue to hold such collateral security until such time as a successor Administrative Agent is appointed) and (ii) except for any indemnity payments owed to the retiring Administrative Agent, all payments, communications and determinations provided to be made by, to or through the Administrative Agent shall instead be made by or to each Lender directly, until such time, if any, as the Required Lenders appoint a successor Administrative Agent as provided for above.  Upon the acceptance of its appointment as Administrative Agent hereunder, such successor Administrative Agent shall thereupon succeed to and become vested with all the rights and duties of the retiring Administrative Agent under the Loan Documents.  The fees payable by Borrower to a successor Administrative Agent shall be the same as those payable to its predecessor unless otherwise agreed between Borrower and such successor.  After any retiring Administrative Agent's resignation hereunder as Administrative Agent, the provisions of this <u>Section 9</u> and all protective provisions of the other Loan Documents shall continue in effect for the benefit of such retiring or removed Administrative Agent, its sub-agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while the retiring or removed Administrative Agent was acting as Administrative Agent.

Section 9.9    *Credit Bidding*.  Each of the Lenders hereby irrevocably authorizes Administrative Agent, on behalf of itself and all Lenders, to, and Administrative Agent shall, take any of the following actions upon the instruction of the Required Lenders:

(a)    consent to the Disposition of all or any portion of the Collateral free and clear of the Liens securing the Obligations in connection with any Disposition pursuant to the applicable provisions of the Bankruptcy Code, including Section 363 thereof (or other applicable Debtor Relief Laws);

(b)    credit bid all or any portion of the Obligations, or facilitate the purchase of all or any portion of the Collateral (in each case, either directly or through one or more acquisition vehicles or on behalf of any Lender or designee thereof) by the Lenders or their designee, in connection with any Disposition of all or any portion of the Collateral pursuant to the applicable provisions of the Bankruptcy Code, including under Section 363 of the Bankruptcy Code (or other applicable Debtor Relief Laws);

(c)    credit bid all or any portion of the Obligations, or facilitate the purchase of all or any portion of the Collateral by the Lenders or their designee (in each case, either directly or through one or more acquisition vehicles or on behalf of any Lender or designee thereof), in connection with any Disposition of all or any portion of the Collateral pursuant to the applicable provisions of the UCC, including pursuant to Sections 9-610 or 9-620 of the UCC;

146392832_4

(d)    credit bid all or any portion of the Obligations, or facilitate the purchase of all or any portion of the Collateral by the Lenders or their designee (in each case, either directly or through one or more acquisition vehicles or on behalf of any Lender or designee thereof), in connection with any foreclosure or other Disposition conducted in accordance with applicable law following the occurrence of an Event of Default, including by power of sale, judicial action or otherwise; and/or

(e)    estimate the amount of any contingent or unliquidated Obligations of such Lender in such amounts as directed by the Required Lenders;

it being understood that (x) any portion of the Obligations owing on behalf of any Lender may be bid on behalf of such Lender, and (y) neither any Lender nor the Administrative Agent shall be required to fund any amount in connection with any purchase of all or any portion of the Collateral pursuant to the foregoing clause (b), (c) or (d) without its prior written consent.

Each Lender agrees that Administrative Agent is under no obligation to credit bid any part of the Obligations or to purchase or retain or facilitate the acquisition of any portion of the Collateral by the Lenders or their designee unless it is so directed in writing by the Required Lenders (and the Administrative Agent shall comply with any such direction by the Required Lenders).  In connection with any credit bid or purchase described under clause (b), (c) or (d) of the preceding paragraph, the Obligations owed to all of the Lenders (other than with respect to contingent or unliquidated liabilities as set forth in the next succeeding paragraph) may be credit bid by Administrative Agent on a ratable basis or on such other basis as Administrative Agent may determine with the consent (or at the direction) of the Required Lenders.

With respect to any contingent or unliquidated claim that is an Obligation, Administrative Agent is hereby authorized, but is not required (unless it is so directed in writing by the Required Lenders (and the Administrative Agent shall comply with any such direction by the Required Lenders)), to estimate the amount thereof for purposes of any credit bid or purchase described in the second preceding paragraph so long as the estimation of the amount or liquidation of such claim would not unduly delay the ability of Administrative Agent to credit bid the Obligations or purchase the Collateral in the relevant Disposition. In the event that Administrative Agent, with the consent of the Required Lenders, elects not to estimate any such contingent or unliquidated claim or any such claim cannot be estimated without unduly delaying the ability of Administrative Agent to consummate any credit bid or purchase in accordance with the second preceding paragraph, then any contingent or unliquidated claims not so estimated shall be disregarded, shall not be credit bid, and shall not be entitled to any interest in the portion or the entirety of the Collateral purchased by means of such credit bid.

Each of Borrower and each other Loan Party hereby consents to the provisions of this Section 9.9 and hereby gives Administrative Agent the power and right, without assent by any Loan Party, to credit bid the Obligations in connection with the sale or disposition of any asset of any Loan Party (in whole or in part), including without limitation, sales or dispositions occurring pursuant to section 363 of the Bankruptcy Code or included as part of any restructuring plan subject to confirmation under section 1129(b)(2)(A)(ii)-(iii) of the Bankruptcy Code. Any motion filed by the Debtors seeking approval of bid procedures shall contain a request for approval of the right of Administrative Agent to credit bid the Obligations and shall be in form and substance acceptable to the Required Lenders.

Administrative Agent shall, at the direction of the Required Lenders, assign its rights to credit bid under this Section 9.9.  The provisions of this Section 9.9 shall supersede any provision of Section 9.8, Section 11.8 or Section 11.10 to the contrary.

Administrative Agent may exercise its rights under this Section 9.9 whether or not a Default or Event of Default shall have occurred or be continuing.

-81-

Section 9.10      *[Reserved]*.

Section 9.11      *Designation of Additional Agents*.  Administrative Agent shall have the continuing right, for purposes hereof, at any time and from time to time to designate one or more of the Lenders (and/or its or their Affiliates) as "syndication agents," "documentation agents," "book runners," "lead arrangers," "arrangers," or other designations for purposes hereto, but such designation shall have no substantive effect, and such Lenders and their Affiliates shall have no additional powers, duties or responsibilities as a result thereof.

Section 9.12      *Authorization to Release or Subordinate or Limit Liens*.  Each of the Lenders and Administrative Agent hereby irrevocably agree, subject to the DIP Orders:

(a)      that any Lien on any property granted to or held by Administrative Agent under any Loan Document shall be automatically released (and following such automatic release Administrative Agent shall execute any appropriate release documentation to document or evidence such release at Borrower's reasonable request and sole expense):

(i)      upon Payment in Full,

(ii)      if the property subject to such Lien is sold, disposed of or distributed as part of or in connection with any transaction or series of related transactions permitted hereunder or under any other Loan Document, in each case to a Person that is not a Loan Party,

(iii)      subject to Section 11.11, if such release is approved, authorized or ratified in writing by the Administrative Agent and the Required Lenders,

(iv)      if the property subject to such Lien constitutes or becomes Excluded Property (as defined in the Security Agreement) as a result of an occurrence permitted hereunder, or

(v)      if the property subject to such Lien is owned by a Guarantor, upon release of such Guarantor from its obligations under its Guaranty, any Collateral Document or hereunder, as applicable, pursuant to clause (b) below; and

(b)      that any Guarantor shall be automatically released from its obligations under the applicable Guaranty, Collateral Document or hereunder, as applicable (and following such automatic release Administrative Agent shall execute any appropriate documentation to document or evidence such release and/or subordination at Borrower's reasonable request and sole expense):

(i)      if in the case of any Subsidiary, such Person ceases to be a Subsidiary or otherwise becomes an Excluded Subsidiary as a result of a transaction or designation permitted hereunder; or

(ii)      upon Payment in Full.

In each case as specified in this Section 9.12, the Administrative Agent will (and each Lender irrevocably authorizes the Administrative Agent to), at Borrower's expense, execute and deliver to the applicable Loan Party such documents as such Loan Party may reasonably request to evidence the release or subordination of such item of Collateral from the assignment and security interest granted under the Collateral Documents, or to evidence the release of such Guarantor from its obligations under the Guaranty or Collateral Documents, in each case in accordance with the terms of the Loan Documents and this Section 9.12.

146392832_4

Additionally, subject to the DIP Orders, upon reasonable request of Borrower, Administrative Agent will return possessory Collateral held by it that is released from the security interests created by the Collateral Documents pursuant to this Section 9.12; *provided* that in each case of this Section 9.12, prior to Administrative Agent's execution of any release or intercreditor documentation (but without effecting the automatic nature of the releases described in this Section 9.12), upon Administrative Agent's reasonable request, Borrower shall deliver to Administrative Agent a certificate of a Responsible Officer of Borrower certifying that any such transaction has been consummated in compliance with this Agreement and the other Loan Documents and that such release is not prohibited hereby. In the event that Administrative Agent loses or misplaces any possessory collateral delivered to it by Borrower, upon reasonable request of Borrower, Administrative Agent shall provide a loss affidavit to Borrower, in the form customarily provided by Administrative Agent in such circumstances.

Section 9.13    *Authorization to Enter into, and Enforcement of, the Collateral Documents*.

(a)    Administrative Agent is hereby irrevocably authorized by each of the Lenders to execute and deliver the Collateral Documents on behalf of each of the Lenders and their Affiliates and, subject to Section 11.11, to take such action and exercise such powers under the Collateral Documents as Administrative Agent considers appropriate. Each Lender acknowledges and agrees that it will be bound by the terms and conditions of the Collateral Documents upon the execution and delivery thereof by Administrative Agent.

(b)    Notwithstanding anything to the contrary contained herein or in any other Loan Document, but subject to the DIP Orders, the authority to enforce rights and remedies hereunder and under the other Loan Documents against the Loan Parties or any of them shall be vested exclusively in, and all actions and proceedings at law in connection with such enforcement shall be instituted and maintained exclusively by, the Administrative Agent in accordance with Sections 8.2, 8.3 and 8.4 for the benefit of all the Lenders; provided that the foregoing shall not prohibit (i) the Administrative Agent from exercising on its own behalf the rights and remedies that inure to its benefit (solely in its capacity as Administrative Agent) hereunder and under the other Loan Documents, (ii) any Lender from exercising setoff rights in accordance with Section 11.14 (subject to the terms of Section 11.5), or (iii) any Lender from filing proofs of claim or appearing and filing pleadings on its own behalf during the pendency of a proceeding relative to any Loan Party under any Bankruptcy Law; and provided, further, that if at any time there is no Person acting as Administrative Agent hereunder and under the other Loan Documents, then (a) the Required Lenders shall have the rights otherwise ascribed to the Administrative Agent pursuant to Sections 8.2, 8.3 and 8.4 and (b) in addition to the matters set forth in clauses (ii) and (iii) of the preceding proviso and subject to Section 11.5, any Lender may, with the consent of the Required Lenders, enforce any rights and remedies available to it and as authorized by the Required Lenders.

Section 9.14    *Delegation of Duties*.

The Administrative Agent may perform any and all of its duties and exercise its rights and powers hereunder or under any other Loan Document by or through any one or more sub-agents appointed by the Administrative Agent. The Administrative Agent and any such sub-agent may perform any and all of its duties and exercise its rights and powers by or through their respective Related Parties. The exculpatory provisions of this Section shall apply to any such sub-agent and to the Related Parties of the Administrative Agent and any such sub-agent, and shall apply to their respective activities in connection with the syndication of the Loans as well as activities as Administrative Agent. The Administrative Agent shall not be responsible for the negligence or misconduct of any sub-agents except to the extent that a court of competent jurisdiction determines in a final and nonappealable judgment that the Administrative Agent acted with gross negligence or willful misconduct in the selection of such sub-agents.

Section 9.15      *[Reserved]*.

Section 9.16      *Certain ERISA Matters*

(a)      Each Lender (x) represents and warrants, as of the date such Person became a Lender party hereto, to, and (y) covenants, from the date such Person became a Lender party hereto to the date such Person ceases being a Lender party hereto, for the benefit of, the Administrative Agent and its Affiliates, and not, for the avoidance of doubt, to or for the benefit of Borrower or any other Loan Party, that at least one of the following is and will be true:

(i)      such Lender is not using "plan assets" (within the meaning of 29 CFR § 2510.3-101, as modified by Section 3(42) of ERISA) of one or more Plans in connection with the Loans, the Commitments or this Agreement;

(ii)      the transaction exemption set forth in one or more PTEs, such as PTE 84-14 (a class exemption for certain transactions determined by independent qualified professional asset managers), PTE 95-60 (a class exemption for certain transactions involving insurance company general accounts), PTE 90-1 (a class exemption for certain transactions involving insurance company pooled separate accounts), PTE 91-38 (a class exemption for certain transactions involving bank collective investment funds) or PTE 96-23 (a class exemption for certain transactions determined by in-house asset managers), is applicable with respect to such Lender's entrance into, participation in, administration of and performance of the Loans, the Commitments and this Agreement;

(iii)      (A) such Lender is an investment fund managed by a "Qualified Professional Asset Manager" (within the meaning of Part VI of PTE 84-14), (B) such Qualified Professional Asset Manager made the investment decision on behalf of such Lender to enter into, participate in, administer and perform the Loans, the Commitments and this Agreement, (C) the entrance into, participation in, administration of and performance of the Loans, the Commitments and this Agreement satisfies the requirements of sub-sections (b) through (g) of Part I of PTE 84-14 and (D) to the best knowledge of such Lender, the requirements of subsection (a) of Part I of PTE 84-14 are satisfied with respect to such Lender's entrance into, participation in, administration of and performance of the Loans, the Commitments and this Agreement; or

(iv)      such other representation, warranty and covenant as may be agreed in writing between the Administrative Agent, in its sole discretion, and such Lender.

(b)      In addition, unless sub-clause (i) in the immediately preceding clause (a) is true with respect to a Lender or such Lender has not provided another representation, warranty and covenant as provided in sub-clause (iv) in the immediately preceding clause (a), such Lender further (x) represents and warrants, as of the date such Person became a Lender party hereto, to, and (y) covenants, from the date such Person became a Lender party hereto to the date such Person ceases being a Lender party hereto, for the benefit of, the Administrative Agent and its Affiliates, and not, for the avoidance of doubt, to or for the benefit of Borrower or any other Loan Party, that the Administrative Agent is not a fiduciary with respect to the assets of such Lender involved in such Lender's entrance into, participation in, administration of and performance of the Loans, the Commitments and this Agreement (including in connection with the reservation or exercise of any rights by the Administrative Agent under this Agreement, any Loan Document or any documents related hereto or thereto).

146392832_4

Section 9.17    *Recovery of Erroneous Payments*.

Notwithstanding anything to the contrary in this Agreement, if at any time Administrative Agent determines (which determination shall be conclusive and binding absent manifest error) that it has made a payment hereunder in error to any Lender or other Secured Party, whether or not in respect of an Obligation due and owing by Borrower at such time, where such payment is a Rescindable Amount, then in any such event, each such Person receiving a Rescindable Amount severally agrees to repay to Administrative Agent forthwith on demand the Rescindable Amount received by such Person in immediately available funds in the currency so received, with interest thereon, for each day from and including the date such Rescindable Amount is received by it to but excluding the date of payment to Administrative Agent, at the greater of the Federal Funds Rate and a rate determined by Administrative Agent in accordance with banking industry rules on interbank compensation. Each Lender and each other Secured Party irrevocably waives any and all defenses, including any "discharge for value" (under which a creditor might otherwise claim a right to retain funds mistakenly paid by a third party in respect of a debt owed by another), "good consideration", "change of position" or similar defenses (whether at law or in equity) to its obligation to return any Rescindable Amount. Administrative Agent shall inform each Lender or other Secured Party that received a Rescindable Amount promptly upon determining that any payment made to such Person comprised, in whole or in part, a Rescindable Amount. Each Person's obligations, agreements and waivers under this Section 9.17 shall survive the resignation or replacement of the Administrative Agent, any transfer of rights or obligations by, or the replacement of, a Lender, the termination of the Commitments and/or the repayment, satisfaction or discharge of all Obligations (or any portion thereof) under any Loan Document.

Section 9.18    *Parallel Debt*

(a)    For the purpose of taking and ensuring the continuing validity and enforceability of certain of the security under the Collateral Documents, subject to any applicable guarantee imitation, each of the Loan Parties party hereto, on behalf of themselves and their subsidiaries that are Loan Parties hereby agrees and covenants with the Administrative Agent that each of them shall pay to the Administrative Agent an amount equal to, and in the currency of, any sums owing by it to a Secured Party under any document creating an Obligation (the "*Principal Obligations*") as and when the same fall due for payment under the relevant Loan Document (the "*Parallel Obligations*").

(b)    Each Parallel Obligation will become due and payable as and when one or more of the Principal Obligations of the relevant Loan Party becomes due and payable.

Notwithstanding anything to the contrary in any document creating an Obligation (the "*Relevant Document*"), the Administrative Agent shall have its own independent right to demand payment of the Parallel Obligations by the Secured Parties and the Administrative Agent acts in its own name and not as a trustee, and its claims in respect of the Parallel Obligations shall not be held on trust. The rights of the Secured Parties to receive payment of the Principal Obligations are several from the rights of the Administrative Agent to receive payment of the Parallel Obligations; provided that the payment by a Loan Party of its Parallel Obligations to the Administrative Agent in accordance with this paragraph and the immediately preceding paragraph shall be a good discharge of the corresponding Principal Obligations and the payment by a Loan Party of its corresponding Principal Obligations in accordance with the Relevant Documents shall be a good discharge of the relevant Parallel Obligations. In the event of a good discharge of the Principal Obligations, the Administrative Agent and the Secured Parties shall not be entitled any more to demand payment of the corresponding Parallel Obligations and such Parallel Obligations shall cease to exist. The amount of the Parallel Obligations of a Loan Party shall at all times be equal to the amount of its Principal Obligations. This shall apply accordingly in the event of a good discharge of the Parallel Obligations to the corresponding Principal Obligations. Despite the foregoing, any payment under

-85-

the Relevant Documents shall be made to the Administrative Agent, unless expressly stated otherwise in the Relevant Documents (save for this paragraph and the immediately two preceding paragraphs).

Section 10.  The Guarantees.

Section 10.1    The Guarantees.  To induce the Lenders to provide the credits described herein and in consideration of benefits expected to accrue to Borrower and the other Loan Parties by reason of the Commitments and for other good and valuable consideration, receipt of which is hereby acknowledged, each Loan Party (including any Loan Party executing an Additional Guarantor Supplement in the form attached hereto as Exhibit G or such other form acceptable to Administrative Agent) hereby unconditionally and irrevocably guarantees jointly and severally to Administrative Agent, the Lenders and their Affiliates, the due and punctual payment of all present and future Obligations, including, but not limited to, the due and punctual payment of principal of and interest on the Loans, and the due and punctual payment and performance of all other Obligations now or hereafter owed by the Loan Parties under the Loan Documents, in each case as and when the same shall become due and payable, whether at stated maturity, by acceleration, or otherwise, according to the terms hereof and thereof (including all interest, costs, fees, and charges after the entry of an order for relief against any Loan Party or such other obligor in a case under the United States Bankruptcy Code or any similar proceeding, whether or not such interest, costs, fees and charges would be an allowed claim against such Loan Party or any such obligor in any such proceeding) (collectively, the "*Guaranteed Obligations*").

Section 10.2    Guarantee Unconditional.  The obligations of each Guarantor under this <u>Section 10</u> shall be unconditional and absolute and, without limiting the generality of the foregoing, shall not be released, discharged, or otherwise affected by:

(a)    any extension, renewal, settlement, compromise, waiver, or release in respect of any obligation of any Loan Party or other obligor or of any other guarantor under this Agreement or any other Loan Document or by operation of law or otherwise;

(b)    any modification or amendment of or supplement to this Agreement or any other Loan Document or any agreement relating to any Guaranteed Obligations;

(c)    any change in the corporate existence, structure, or ownership of, or any insolvency, bankruptcy, reorganization, or other similar proceeding affecting, any Loan Party or other obligor, any other guarantor, or any of their respective assets, or any resulting release or discharge of any obligation of any Loan Party or other obligor or of any other guarantor contained in any Loan Document;

(d)    the existence of any claim, set off, or other rights which any Loan Party or other obligor or any other guarantor may have at any time against Administrative Agent, any Lender or any other Person, whether or not arising in connection herewith;

(e)    any failure to assert, or any assertion of, any claim or demand or any exercise of, or failure to exercise, any rights or remedies against any Loan Party or other obligor, any other guarantor, or any other Person or Property;

(f)    any application of any sums by whomsoever paid or howsoever realized to any obligation of any Loan Party or other obligor, regardless of what obligations of Borrower or other obligor remain unpaid;

(g)    any invalidity or unenforceability relating to or against any Loan Party or other obligor or any other guarantor for any reason of this Agreement or of any other Loan Document or any agreement

relating to any Guaranteed Obligations or any provision of applicable Law or regulation purporting to prohibit the payment by any Loan Party or other obligor or any other guarantor of the principal of or interest on any Loan or any other amount payable under the Loan Documents or any agreement relating to any Guaranteed Obligations; or

(h)      any other act or omission to act or delay of any kind by Administrative Agent, any Lender, or any other Person or any other circumstance whatsoever that might, but for the provisions of this paragraph, constitute a legal or equitable discharge of the obligations of any Guarantor under this <u>Section 10</u>.

*Section 10.3      Discharge Only upon Payment in Full; Reinstatement in Certain Circumstances*. Until such time as Payment in Full occurs, each Guarantor's obligations under this <u>Section 10</u> shall remain in full force and effect.  If at any time any payment of any Guaranteed Obligations is rescinded or must be otherwise restored or returned upon the insolvency, bankruptcy, or reorganization of Borrower or other obligor or of any guarantor, or otherwise, each Guarantor's obligations under this <u>Section 10</u> with respect to such payment shall be reinstated at such time as though such payment had become due but had not been made at such time.

*Section 10.4      Subrogation*.  Until such time as Payment in Full occurs, each Guarantor agrees it will not exercise any rights which it may acquire by way of subrogation by any payment made hereunder, or otherwise.  If any amount shall be paid to a Guarantor on account of such subrogation rights at any time prior to Payment in Full occurring, such amount shall be held in trust for the benefit of Administrative Agent and the Lenders (and their Affiliates) and shall forthwith be paid to Administrative Agent for the benefit of the Lenders (and their Affiliates) or be credited and applied to the Guaranteed Obligations, whether matured or unmatured, in accordance with the terms of this Agreement.

*Section 10.5      Waivers*.  Each Guarantor irrevocably waives acceptance hereof, presentment, demand, protest, and any notice not provided for herein, as well as any requirement that at any time any action be taken by Administrative Agent, any Lender or any other Person against any Loan Party or other obligor, another guarantor, or any other Person.

*Section 10.6      Limit on Recovery*.

(I) Notwithstanding any other provision of this <u>Section 10</u>, the amount guaranteed by each Guarantor hereunder shall be limited to the extent, if any, required so that its obligations hereunder shall not be subject to avoidance under Section 548 of the Bankruptcy Code or under any applicable state Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, Uniform Voidable Transactions Act or similar statute or common law.  In determining the limitations, if any, on the amount of any Guarantor's obligations hereunder pursuant to the preceding sentence, it is the intention of the parties hereto that any rights of subrogation, indemnification or contribution which such Guarantor may have under this <u>Section 10</u>, any other agreement or applicable law shall be taken into account.

(II) (a)      As regards any Guarantor incorporated in France (a "French Guarantor"), the obligations of such French Guarantor under the Guaranty shall apply only insofar as required to:

(i)      guarantee the payment obligations of any other French Guarantor under the Loan Documents if such other French Guarantor is also its direct or indirect Subsidiary (a "French Subsidiary"); and

(ii)      guarantee the payment obligations of any Loan Party which is not a French Subsidiary of such French Guarantor, provided that in such case such guarantee shall be limited:

-87-

(A) to the payment obligations of such Loan Party under the Loan Documents but (B) not exceeding the total outstanding principal amount of any intercompany loan(s) advanced to such French Guarantor and/or to any of its direct or indirect Subsidiaries by such Loan Party out of the proceeds utilized under this Agreement (such amount being the "Maximum Guaranteed Amount").

(b)    Any payment made by a French Guarantor in respect of the payment obligations of a Loan Party referred to in paragraph (a)(ii) above shall reduce the relevant Maximum Guaranteed Amount.

(c)    Any payment made by a French Guarantor in respect of the obligations of any Loan Party referred to in paragraph (a)(ii) above shall reduce pro tanto and on a pro rata basis the total outstanding amount of the intra-group loan(s) referred to in that paragraph, due by such French Guarantor and/or its direct or indirect Subsidiaries to that Loan Party.

(d)    Notwithstanding the provisions of paragraphs (a) to (c) above no French Guarantor shall secure liabilities under the Loan Documents which would result in such French Guarantor not complying with French financial assistance rules as set out in article L. 225-216 of the French Code de commerce and/or would constitute a misuse of corporate assets within the meaning of article L. 241-3 or L. 242-6 of the French Code de commerce or any other laws or regulations having the same effect, as interpreted by French courts.

(e)    It is acknowledged that each French Guarantor is not acting jointly and severally with the other Guarantors and shall not be considered as "co-débiteur solidaire" as to their obligations pursuant to the Guarantee.

(f)    For the purpose of paragraphs (a) to (e) above, "Subsidiary" means, in relation to any company, another company which is controlled by it within the meaning of article L. 233-3 I 1 and 2 of the French Code de commerce.

*Section 10.7    Contribution.*

(a)    To the extent that any Guarantor shall make a payment under this Section 10 (a "*Guarantor Payment*") which, taking into account all other Guarantor Payments then previously or concurrently made by any other Guarantor, exceeds the amount which otherwise would have been paid by or attributable to such Guarantor if each Guarantor had paid the aggregate Guaranteed Obligations satisfied by such Guarantor Payment in the same proportion as such Guarantor's "Allocable Amount" (as defined below) (as determined immediately prior to such Guarantor Payment) bore to the aggregate Allocable Amounts of each of the Guarantors as determined immediately prior to the making of such Guarantor Payment, then, following indefeasible payment in full in cash of the Guarantor Payment and the occurrence of Payment in Full, such Guarantor shall be entitled to receive contribution and indemnification payments from, and be reimbursed by, each other Guarantor for the amount of such excess, pro rata based upon their respective Allocable Amounts in effect immediately prior to such Guarantor Payment.

(b)    As of any date of determination, the "Allocable Amount" of any Guarantor shall be equal to the excess of the fair saleable value of the property of such Guarantor over the total liabilities of such Guarantor (including the maximum amount reasonably expected to become due in respect of contingent liabilities, calculated, without duplication, assuming each other Guarantor that is also liable for such contingent liability pays its ratable share thereof), giving effect to all payments made by other Guarantors as of such date in a manner to maximize the amount of such contributions.

(c)    This Section 10.7 is intended only to define the relative rights of the Guarantors, and nothing set forth in this Section 10.7 is intended to or shall impair the obligations of the Guarantors, jointly

-88-

and severally, to pay any amounts as and when the same shall become due and payable in accordance with the terms of this <u>Section 10</u>.

(d)    The parties hereto acknowledge that the rights of contribution and indemnification hereunder shall constitute assets of the Guarantor or Guarantors to which such contribution and indemnification is owing.

(e)    The rights of the indemnifying Guarantors against other Guarantors under this <u>Section 10.7</u> shall only be exercisable upon the occurrence of Payment in Full.

*Section 10.8    Stay of Acceleration*.  Subject to the DIP Orders, if acceleration of the time for payment of any amount payable by any Loan Party or other obligor under this Agreement or any other Loan Document, or under any agreement relating to the Guaranteed Obligations, is stayed upon the insolvency, bankruptcy or reorganization of such Loan Party or such obligor, all such amounts otherwise subject to acceleration under the terms of this Agreement or the other Loan Documents, or under any agreement relating to the Guaranteed Obligations, shall nonetheless be payable by the Guarantors hereunder forthwith on demand by Administrative Agent made at the request of the Required Lenders.

*Section 10.9    Benefit to Guarantors*.  The Guarantors are engaged in related businesses and integrated to such an extent that the financial strength and flexibility of each Guarantor has a direct impact on the success of each other Guarantor.  Each Guarantor will derive substantial direct and indirect benefit from the extensions of credit hereunder.

*Section 10.10    Guarantor Covenants*.  Each Guarantor shall take such action as Borrower is required by this Agreement to cause such Guarantor to take, and shall refrain from taking such action as Borrower is required by this Agreement to prohibit such Guarantor from taking.

*Section 10.11*    Swiss Guarantee Limitations.

(a)    If and to the extent that a Guarantor incorporated in Switzerland (a "**Swiss Guarantor**") becomes liable under this Agreement or any other Loan Document for obligations of any other Loan Party (other than wholly-owned direct or indirect Subsidiaries of the Swiss Guarantor) and if complying with such obligations would be restricted under then applicable Swiss corporate law (the "**Restricted Obligations**"), the aggregate liability of the Swiss Guarantor hereunder or under such other Loan Document for Restricted Obligations shall be limited to the amount of unrestricted equity capital surplus available for distribution as dividends to the shareholders of the Swiss Guarantor (the "**Maximum Amount**") provided that this is a requirement under then applicable Swiss law and understood that such limitation shall not free the Swiss Guarantor from its obligations in excess of the Maximum Amount, but that it shall merely postpone the performance date of those obligations until such time or times as performance is again permitted.

(b)    Promptly after having been requested to perform the Restricted Obligations under this Agreement or under any other Loan Document, the Swiss Guarantor shall (i) perform any obligations which are not affected by the above limitations, and (ii) in respect of any balance, if and to the extent requested by the Administrative Agent or required under then applicable Swiss law, provide the Administrative Agent with an interim balance sheet audited by the statutory auditors of the Swiss Guarantor setting out the Maximum Amount, take any further corporate and other action as may be reasonably required by the Administrative Agent (such as board and shareholders' approvals and the receipt of any confirmations from the Swiss Guarantor's statutory auditors) and other measures required to allow the Swiss Guarantor to make the payments agreed hereunder or under any other Loan Document with a minimum of limitations and, immediately thereafter, pay up to the Maximum Amount to the Administrative Agent.

-89-

(c)      In relation to payments made hereunder in satisfaction of Restricted Obligations, the Swiss Guarantor shall:

(i)      if and to the extent required by applicable law and subject to any applicable double tax treaties in force at the relevant time:

(A)      deduct Swiss withholding tax at the rate of 35 per cent. (or such other rate as is in force at that time) from any such payment; and

(B)      pay any such deduction to the Swiss federal tax administration; and

(C)      notify and provide evidence to the Administrative Agent that such Swiss withholding tax has been paid to the Swiss federal tax administration;

(ii)      as soon as possible after a deduction for Swiss withholding tax is made as required by applicable law:

(A)      ensure that any person who is entitled to a full or partial refund of the Swiss withholding tax is in a position to be so refunded; and

(B)      in case it has received any refund of the Swiss withholding tax, pay such refund to the Administrative Agent promptly upon receipt thereof.

(d)      If the enforcement of Restricted Obligations would be limited due to the effects referred to in this Section 10.11, then the Swiss Guarantor shall to the extent permitted by applicable law, revalue or realise any of its assets that are shown on its balance sheet with a book value that is significantly lower than the market value of such assets, in case of realisation, however, only if such assets are not necessary for the Swiss Guarantor's business.

Section 10.12    German Guarantee Limitations.

(a)      In this Section 10.12:

"**Finance Parties**" means the Lenders and the Administrative Agent;

"**German Guarantor**" means a German Loan Party;

"**GmbHG**" means the German Limited Liability Companies Act (*Gesetz betreffend die Gesellschaften mit beschränkter Haftung*);

"**Guarantee**" means the guarantee and indemnity granted pursuant to this Section 10.12;

"**HGB**" means the German Commercial Code (*Handelsgesetzbuch*);

"**Net Assets**" means the aggregate of the German Guarantor's (or, in the case of a GmbH & Co. KG, its general partner's) assets (consisting of all assets which correspond to the items set forth in section 266 para 2 A, B, C, D and E HGB), less the aggregate amount of such German Guarantor's (or, in the case of a GmbH & Co. KG, its general partner's) liabilities (consisting of all liabilities and liability reserves which correspond to the items set forth in section 266 para 3 B, C, D and E HGB); provided that any obligations (*Verbindlichkeiten*) of the German Guarantor (or any accruals (*Rückstellungen*) therefor) (i) for an enforcement of the Guarantee (ii) which are subordinated by law or by contract to any indebtedness outstanding under the Loan Documents (including, for the avoidance of doubt, obligations that would in an

insolvency be subordinated pursuant to section 39 para 1 no 5 or section 39 para 2 of the German Insolvency Code (*Insolvenzordnung*)) and including obligations under guarantees for obligations which are so subordinated; or (iii) incurred in violation of any of the provisions of a Loan Document, shall be disregarded.

The Net Assets shall be determined in accordance with the generally accepted accounting principles applicable from time to time in Germany (*Grundsätze ordnungsmäßiger Buchführung*) and be based on the same principles that were applied by the German Guarantor (or, in the case of a GmbH & Co. KG, its general partner) in the preparation of its most recent annual balance sheet (*Jahresbilanz*);

"**Protected Capital**" means, in relation to a German Guarantor, the aggregate amount of: (i) its (or, where the German Guarantor is a GmbH & Co. KG, its general partner's) share capital (*Stammkapital*) as registered in the commercial register (*Handelsregister*), provided that any increase registered after the date of this Agreement shall (i) not be taken into account unless such increase has been effected with the prior written consent of the Administrative Agent (even if such increase is permitted under any Loan Document) and (ii) otherwise be taken into account only to the extent it is fully paid up; and (ii) its (or when applicable where the German Guarantor is a GmbH & Co. KG, its general partner's) amount of profits (*Gewinne*) or reserves (*Rücklagen*) which are not available for distribution to its shareholder(s) (e.g. in accordance with section 268 para 8 HGB); and

"**Up-stream and/or Cross-stream Guarantee**" means any Guarantee if and to the extent such Guarantee secures the obligations of an obligor which is a shareholder of the German Guarantor (and/or, in the case of a GmbH & Co. KG, of its general partner) or an affiliated company (*verbundenes Unternehmen*) of such shareholder within the meaning of section 16, 17 or 18 of the German Stock Corporation Act (*Aktiengesetz*) (other than the German Guarantor and its Subsidiaries and, in the case of a GmbH & Co. KG, the general partner and its Subsidiaries), provided that it shall not constitute an Up-stream or Cross-stream Guarantee if and to the extent the Guarantee guarantees amounts outstanding under any Loan Document in relation to any funds or financial accommodation made available under such Loan Document to or at the request of any Borrower and on-lent or otherwise passed on to, or issued for the benefit of, the relevant German Guarantor or any of its Subsidiaries (and, where the German Guarantor is a GmbH & Co. KG, to, or for the benefit of, its general partner or any of its Subsidiaries) and outstanding from time to time.

(b)      Each Finance Party agrees that the enforcement of the Guarantee given by a German Guarantor shall be limited if and to the extent that the German Guarantor can show that:

(i)      the Guarantee constitutes an Up-stream and/or Cross-stream Guarantee; and

(ii)      payment under the Guarantee would otherwise:

(A)      have the effect of reducing the German Guarantor's (or, where the German Guarantor is a GmbH & Co. KG, its general partner's) Net Assets to an amount that is lower than the amount of its (or, in the case of a GmbH & Co. KG, its general partner's) Protected Capital or, if the amount of the Net Assets is already lower than the amount of its (or, in the case of a GmbH & Co. KG, its general partner's) Protected Capital, cause the Net Assets to be further reduced; and

(B)      thereby give rise to a violation of the capital maintenance requirement as set out in section 30 para 1 GmbHG.

(a "**Limitation Event**"),

provided that relevant German Guarantor has complied with its obligations under paragraphs (c) and/or (d) below.

(c)     Within fifteen (15) Business Days after a Finance Party has made a demand under the Guarantee, the German Guarantor shall provide a certificate signed by its directors confirming in writing (i) if and to what extent the Guarantee is an Up-stream and/or Cross-stream Guarantee and (ii) whether an enforcement of the Guarantee would lead to an Limitation Event (the "***Management Determination***"). Such confirmation shall comprise an up-to-date balance sheet of the German Guarantor (and, in the case of a GmbH & Co. KG, its general partner) and a detailed calculation (based on the provisions of this Agreement) of the amount of the relevant Net Assets and Protected Capital.  The relevant German Guarantor shall fulfil its obligations under the Guarantee within five (5) Business Days of providing the Management Determination (and each Finance Party shall be entitled to enforce the Guarantee) in an amount which, pursuant to the Management Determination, would not cause a Limitation Event (irrespective of whether or not the Administrative Agent agrees with the Management Determination).

(d)     If the Administrative Agent (acting on the instructions of the Required Lenders) disagrees with the Management Determination, it may within (twenty) 20 Business Days of its receipt request the German Guarantor to deliver (at the German Guarantor's own cost and expense), within thirty (30) Business Days of such request an up-to-date balance sheet of the German Guarantor (and, in the case of a GmbH & Co. KG, of its general partner), drawn-up by a firm of auditors appointed by the German Guarantor in consultation with the Administrative Agent, together with (i) a detailed calculation, based on the provisions of this Agreement, of the amount of the relevant Net Assets and Protected Capital (the "***Auditor's Determination***") and (ii) a confirmation if and to what extent the Guarantee is an Up-stream and/or Cross-stream Guarantee and (iii) whether an enforcement of the Guarantee would result in a Limitation Event.  The German Guarantor shall fulfil its obligations under the Guarantee within five (5) Business Days of providing the Auditor's Determination (and each Finance Party shall be entitled to enforce the Guarantee) in an amount which, pursuant to the Auditor's Determination, would not cause a Limitation Event.  In case the amount enforceable pursuant to the Auditor's Determination is lower than the amount enforceable pursuant to the Management Determination and if and to the extent that the Guarantee has been enforced up to the higher amount, each Finance Party (other than the Administrative Agent in respect of the amounts already distributed to the other Finance Parties) shall upon written demand by the German Guarantor to the Administrative Agent (which must be made within 20 Business Days of the delivery of the Auditor's Determination) repay any proceeds from the enforcement of such Guarantee received by such Finance Party in an amount equal to the difference.

(e)     In case it claims a Limitation Event has occurred, the German Guarantor shall do everything legally permitted and commercially justifiable to minimise the limitation of the enforcement of the Guarantee under this Section 10.12 and, in particular, the German Guarantor shall, to the extent legally permitted, promptly, but in any event within three (3) months, realise, at least at market value, assets that are shown in its balance sheet with a book value (*Buchwert*) which is, in the Administrative Agent's reasonable determination, significantly lower than their market value and that are not necessary for the German Guarantor's business (*nicht betriebsnotwendig*).  Following the disposal, the German Guarantor shall promptly provide an updated, detailed calculation of the Net Assets (taking into account the disposal proceeds) to the Administrative Agent.  Such calculation shall, upon the Administrative Agent's reasonable request, be confirmed by the German Guarantor's auditors within 30 Business Days.

(f)     No reduction of the amount enforceable pursuant to this Section 10.12 will prejudice the right of the Finance Parties to continue to enforce the Guarantee (subject always to the operation of the limitations set out above at the time of such enforcement) until full satisfaction of the claims guaranteed.

-92-

(g)       The limitations set out in this <u>Section 10.12</u> shall not apply:

(i)       to the extent the relevant German Guarantor is a party to a domination and/or profit and loss pooling agreement (*Beherrschungs- und/oder Gewinnabführungs-vertrag*, "DPLPA") and the existence of such DPLPA would lead to the inapplicability of section 30 paragraph 1 sentence 1 of the German Limited Liability Companies Act (*Gesetz betreffend die Gesellschaften mit beschränkter Haftung - GmbHG*); and

(ii)       to the extent the relevant German Guarantor will acquire a valuable consideration or recourse claim (*vollwertiger Gegenleistungs- oder Rückgewähranspruch*) against any of its direct or indirect shareholders at the time of the enforcement of the Guarantee.

*Section 11.  Miscellaneous.*

*Section 11.1       No Waiver, Cumulative Remedies*.   No delay or failure on the part of Administrative Agent or any Lender, or on the part of the holder or holders of any of the Obligations, in the exercise of any power or right under any Loan Document shall operate as a waiver thereof or as an acquiescence in any default, nor shall any single or partial exercise of any power or right preclude any other or further exercise thereof or the exercise of any other power or right.  The rights and remedies hereunder of Administrative Agent, the Lenders, and of the holder or holders of any of the Obligations are cumulative to, and not exclusive of, any rights or remedies which any of them would otherwise have.

*Section 11.2       Non-Business Days*.  If any payment hereunder becomes due and payable on a day which is not a Business Day, the due date of such payment shall be extended to the next succeeding Business Day on which date such payment shall be due and payable.  In the case of any payment of principal falling due on a day which is not a Business Day, interest on such principal amount shall continue to accrue during such extension at the rate per annum then in effect, which accrued amount shall be due and payable on the next scheduled date for the payment of interest.

*Section 11.3       Survival of Representations*.  All representations and warranties made herein or in any other Loan Document or in certificates given pursuant hereto or thereto shall survive the execution and delivery of this Agreement and the other Loan Documents, and shall continue in full force and effect with respect to the date as of which they were made as long as any credit is in use or available hereunder.

*Section 11.4       Survival of Indemnity and Certain Other Provisions*.  All indemnity provisions and other provisions relative to reimbursement to the Lenders of amounts sufficient to protect the yield of the Lenders with respect to the Loans, including, but not limited to, <u>Sections 3.3</u>, <u>3.6</u>, and <u>11.13</u>, shall survive Payment in Full, and shall remain in force beyond the expiration of any applicable statute of limitations and payment or satisfaction in full of any single claim thereunder.  All such indemnity and other provisions shall be binding upon the successors and assigns of each Loan Party and shall inure to the benefit of each applicable Indemnitee and its successors and assigns.

*Section 11.5       Sharing of Set Off*.  Each Lender agrees with each other Lender a party hereto that if such Lender shall receive and retain any payment, whether by set off or application of deposit balances or otherwise, on any of the Loans in excess of its ratable share of payments on all such Obligations then outstanding to the Lenders, then such Lender shall purchase for cash at face value, but without recourse, ratably from each of the other Lenders such amount of the Loans, or participations therein, held by each such other Lenders (or interest therein) as shall be necessary to cause such Lender to share such excess payment ratably with all the other Lenders; <u>provided</u> that if any such purchase is made by any Lender, and if such excess payment or part thereof is thereafter recovered from such purchasing Lender, the related

146392832_4

purchases from the other Lenders shall be rescinded ratably and the purchase price restored as to the portion of such excess payment so recovered, but without interest.

     *Section 11.6    Notices*

     (a)    Except as otherwise specified herein, all notices hereunder and under the other Loan Documents shall be in writing (including notice by telecopy) and shall be given to the relevant party at its address or telecopier number set forth below, or such other address or telecopier number as such party may hereafter specify by notice to Administrative Agent and Borrower given by courier, by United States certified or registered mail, by telecopy or by other telecommunication device capable of creating a written record of such notice and its receipt.  Notices under the Loan Documents to any Lender shall be addressed to its address or telecopier number set forth on its Administrative Questionnaire; and notices under the Loan Documents to Borrower, any other Loan Party or Administrative Agent shall be addressed to its respective address or telecopier number set forth below:

| to any Loan Party: | to Administrative Agent: |
|---|---|
| Hardinge Inc. | Centre Lane Solutions Partners, LP |
| One Hardinge Drive | 60 East 42nd Street, Suite 2220, |
| Elmira, New York 14903 | New York, NY 10165 |
| Attention: Matthew Weeks | Attention: Quinn Morgan |
| Telephone: (630) 880-7871 | Telephone: (646) 843-0711 |
| Email: matt.wees@hardinge.com | Email: qmorgan@centrelanepartners.com |

Each such notice, request or other communication shall be effective (i) if given by telecopier, when such telecopy is transmitted to the telecopier number specified in this Section or in the relevant Administrative Questionnaire and a confirmation of such telecopy has been received by the sender, (ii) if given by mail, five (5) days after such communication is deposited in the mail, certified or registered with return receipt requested, addressed as aforesaid or (iii) if given by any other means, when delivered at the addresses specified in this Section or in the relevant Administrative Questionnaire; provided that any notice given pursuant to Section 2 shall be effective only upon receipt.

     (b)    Notices and other communications to the Lenders hereunder may be delivered or furnished by electronic communication (including e-mail, FpML, and Internet or intranet websites) pursuant to procedures approved by the Administrative Agent, provided that the foregoing shall not apply to notices to any Lender pursuant to Section 2 if such Lender has notified the Administrative Agent that it is incapable of receiving notices under such Section by electronic communication.  The Administrative Agent or Borrower may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it; provided that approval of such procedures may be limited to particular notices or communications.

     Unless the Administrative Agent otherwise prescribes, (i) notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement), and (ii) notices or communications posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient, at its e-mail address as described in the foregoing clause (i), of notification that such notice or communication is available and identifying the website address therefor; provided that, for both clauses (i) and (ii) above, if such notice, email or other communication is not sent during the normal business hours of the recipient, such notice or

146392832_4

communication shall be deemed to have been sent at the opening of business on the next business day for the recipient.

(c)     Any party hereto may change its address or facsimile number for notices and other communications hereunder by notice to the other parties hereto.

(d)     Borrower agrees that the Administrative Agent may, but shall not be obligated to, make the Correspondence (as defined below) available to the other Lenders by posting the Correspondence on the Platform.

(e)     The Platform is provided "as is" and "as available."  The Agent Parties (as defined below) do not warrant the adequacy of the Platform and expressly disclaim liability for errors or omissions in the Correspondence.  No warranty of any kind, express, implied or statutory, including any warranty of merchantability, fitness for a particular purpose, non-infringement of third-party rights or freedom from viruses or other code defects, is made by any Agent Party in connection with the Correspondence or the Platform.  In no event shall the Administrative Agent or any of its Related Parties (collectively, the "*Agent Parties*") have any liability to Borrower, any Lender or any other Person or entity for damages of any kind, including direct or indirect, special, incidental or consequential damages, losses or expenses (whether in tort, contract or otherwise) arising out of Borrower's or the Administrative Agent's transmission of communications through the Platform.  "*Correspondence*" means, collectively, any notice, demand, communication, information, document or other material provided by or on behalf of Borrower pursuant to any Loan Document or the transactions contemplated therein that is distributed to the Administrative Agent or any Lender by means of electronic communications pursuant to this Section, including through the Platform.

Section 11.7     *Electronic Execution; Electronic Records; Counterparts*.  This Agreement, any Loan Document, any Assignment and Acceptance and any other Communication, including Communications required to be in writing, may be in the form of an Electronic Record and may be executed using Electronic Signatures.  Each of the Loan Parties, the Administrative Agent and each Lender agrees that any Electronic Signature of such Person on or associated with any Communication shall be valid and binding on such Person to the same extent as a manual, original signature, and that any Communication entered into by Electronic Signature, will constitute the legal, valid and binding obligation of such Person enforceable against such Person in accordance with the terms thereof to the same extent as if a manually executed original signature was delivered.  Any Communication may be executed in as many counterparts as necessary or convenient, including both paper and electronic counterparts, but all such counterparts are one and the same Communication.  For the avoidance of doubt, the authorization under this paragraph may include, without limitation, use or acceptance of a manually signed paper Communication which has been converted into electronic form (such as scanned into PDF format), or an electronically signed Communication converted into another format, for transmission, delivery and/or retention.  The Administrative Agent and each Lender may, at its option, create one or more copies of any Communication in the form of an imaged Electronic Record ("*Electronic Copy*"), which shall be deemed created in the ordinary course of such Person's business, and destroy the original paper document.  All Communications in the form of an Electronic Record, including an Electronic Copy, shall be considered an original for all purposes, and shall have the same legal effect, validity and enforceability as a paper record.  Notwithstanding anything contained herein to the contrary, neither the Administrative Agent nor any Lender is under any obligation to accept an Electronic Signature in any form or in any format unless expressly agreed to by such Person pursuant to procedures approved by it; provided, further, without limiting the foregoing, (a) to the extent the Administrative Agent or any Lender has agreed to accept such Electronic Signature, the Administrative Agent and each of the Lenders shall be entitled to rely on any such Electronic Signature purportedly given by or on behalf of any Loan Party and/or any Lender without further

146392832_4

verification and (b) upon the request of the Administrative Agent or any Lender, any Electronic Signature shall be promptly followed by such manually executed counterpart.

Each of the Loan Parties and each Lender hereby waives (i) any argument, defense or right to contest the legal effect, validity or enforceability of this Agreement, any other Loan Document or any Communication based solely on the lack of paper original copies of this Agreement, such other Loan Document or such Communication, and (ii) waives any claim against the Administrative Agent, each Lender and each of their Related Parties for any liabilities arising solely from the Administrative Agent's and/or any Lender's reliance on or use of Electronic Signatures, including any liabilities arising as a result of the failure of the Loan Parties to use any available security measures in connection with the execution, delivery or transmission of any Electronic Signature.

Section 11.8    *Successors and Assigns*.  This Agreement shall be binding upon Borrower, the Guarantors and the other Loan Parties and their successors and assigns, and shall inure to the benefit of Administrative Agent and each of the Lenders, and their respective successors and assigns, including any subsequent holder of any of the Obligations.  Borrower, Guarantors and the other Loan Parties may not assign any of their rights or obligations under any Loan Document without the written consent of all of the Lenders.

Section 11.9    *Participants*.  Any Lender may at any time, without the consent of, or notice to, Borrower or the Administrative Agent, sell participations to any Person (other than a natural Person, or a holding company, investment vehicle or trust for, or owned and operated for the primary benefit of, a natural Person, or Borrower or any of Borrower's Affiliates or Subsidiaries) (each, a "*Participant*") in all or a portion of such Lender's rights and/or obligations under this Agreement (including all or a portion of its Commitment and/or the Loans owing to it); *provided* that (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations, and (iii) Borrower, the Administrative Agent, and the Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement.  For the avoidance of doubt, each Lender shall be responsible for the indemnity under <u>Section 9.7</u> with respect to any payments made by such Lender to its Participant(s).  Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any provision of this Agreement; *provided* that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, modification or waiver described in the proviso of <u>Section 11.11</u> that affects such Participant.  Borrower agrees that each Participant shall be entitled to the benefits of <u>Sections 3.1</u> through <u>3.4</u> and <u>3.6</u> (subject to the requirements and limitations therein) to the same extent as if it were a Lender and had acquired its interest by assignment pursuant <u>Section 11.10</u> (including, for the avoidance of doubt, that each Participant shall be bound by the provisions of <u>Section 3.1(b)</u> and <u>(c)</u> as if it were an assignee of the Lender); *provided* that such Participant (A) agrees to be subject to the provisions of <u>Section 2.16</u> as if it were an assignee under paragraph (b) of this Section; and (B) shall not be entitled to receive any greater payment under <u>Sections 3.1</u>, <u>3.2</u> or <u>3.6</u>, with respect to any participation, than its participating Lender would have been entitled to receive, except to the extent such entitlement to receive a greater payment results from a Change in Law that occurs after the Participant acquired the applicable participation.  Each Lender that sells a participation agrees, at Borrower's request and expense, to use reasonable efforts to cooperate with Borrower to effectuate the provisions of <u>Section 2.16</u> with respect to any Participant.  To the extent permitted by law, each Participant also shall be entitled to the benefits of <u>Section 11.14</u> as though it were a Lender; *provided* that such Participant agrees to be subject to <u>Section 11.5</u> as though it were a Lender.  Each Lender that sells a participation shall, acting solely for this purpose as a non-fiduciary agent of Borrower, maintain a register on which it enters the name and address of each Participant and the principal amounts (and stated interest) of each Participant's interest in the Loans or other obligations under the Loan Documents (the "*Participant*

*Register*"); <u>provided</u> that no Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any Participant or any information relating to a Participant's interest in any commitments, loans, letters of credit or its other obligations under any Loan Document) to any Person except to the extent that such disclosure is necessary to establish that such commitment, loan, or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations. The entries in the Participant Register shall be conclusive and binding absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary. For the avoidance of doubt, the Administrative Agent (in its capacity as Administrative Agent) shall have no responsibility for maintaining a Participant Register.

    *Section 11.10    Assignments*.

    (a)    Any Lender may at any time assign to one or more Eligible Assignees all or a portion of such Lender's rights and obligations under this Agreement (including all or a portion of its Commitment and the Loans at the time owing to it); <u>provided</u> that any such assignment shall be subject to the following conditions:

    (i)    *Minimum Amounts.*  (A) In the case of an assignment of the entire remaining amount of the assigning Lender's Commitment and the Loans at the time owing to it or in the case of an assignment to a Lender, an Affiliate of a Lender or an Approved Fund, no minimum amount need be assigned; and (B) in any case not described in <u>subsection (a)(i)(A)</u> of this Section, the aggregate amount of the Commitment, or, if the applicable Commitment is not then in effect, the principal outstanding balance of the Loans of the assigning Lender subject to each such assignment (determined as of the date the Assignment and Acceptance with respect to such assignment is delivered to Administrative Agent or, if "Effective Date" is specified in the Assignment and Acceptance, as of the Effective Date) shall not be less than $500,000 unless each of Administrative Agent and, so long as no Event of Default has occurred and is continuing, Borrower otherwise consents (each such consent not to be unreasonably withheld or delayed);

    (ii)    *Proportionate Amounts.*  Each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement with respect to the Loan or the Commitment assigned, except that this clause (ii) shall not prohibit any Lender from assigning all or a portion of its rights and obligations among the Initial Term Loans, the Delayed Draw Term Loans and the USACH/Kellenberger Term Loans, or any class of Commitments, on a non-pro rata basis.

    (iii)    *Required Consents.*  No consent shall be required for any assignment except to the extent required by <u>Section 11.10(a)(i)(B)</u> and, in addition:

    (b)    [reserved];

    (c)    the consent of Administrative Agent (such consent not to be unreasonably withheld or delayed) (but not any consent by Borrower or any Loan Party) shall be required for assignments in respect of the Initial Term Loans, Delayed Draw Term Loans and the USACH/Kellenberger Term Loans, or any class of Commitments, to a Person who is not a Lender, an Affiliate of a Lender or an Approved Fund;

    (i)    *Assignment and Acceptance.*    The parties to each assignment shall execute and deliver to Administrative Agent an Assignment and Acceptance, together with a processing and recordation fee of $3,500 (provided that such fee shall be waived for any assignment by a Lender to an Approved Fund and the Administrative Agent may, in its sole discretion, elect to waive such

146392832_4

processing and recordation fee in the case of any other assignment) and the assignee, if it is not a Lender, shall deliver to Administrative Agent an Administrative Questionnaire.

(ii)     *No Assignment to Certain Persons.*  No such assignment shall be made to (A) Borrower or any of Borrower's Affiliates or Subsidiaries or (B) to any Defaulting Lender or any of its Subsidiaries, or any Person who, upon becoming a Lender hereunder, would constitute a Defaulting Lender or a Subsidiary thereof.

(iii)     *No Assignment to Natural Persons.*     No such assignment shall be made to a natural person (or a holding company, investment vehicle or trust for, or owned and operated for the primary benefit of, a natural Person).

(iv)     *Certain Additional Payments*.  In connection with any assignment of rights and obligations of any Defaulting Lender hereunder, no such assignment shall be effective unless and until, in addition to the other conditions thereto set forth herein, the parties to the assignment shall make such additional payments to the Administrative Agent in an aggregate amount sufficient, upon distribution thereof as appropriate (which may be outright payment, purchases by the assignee of participations or subparticipations, or other compensating actions, including funding, with the consent of Borrower and the Administrative Agent, the applicable pro rata share of Loans previously requested but not funded by the Defaulting Lender, to each of which the applicable assignee and assignor hereby irrevocably consent), to pay and satisfy in full all payment liabilities then owed by such Defaulting Lender to the Administrative Agent and each other Lender hereunder (and interest accrued thereon).  Notwithstanding the foregoing, in the event that any assignment of rights and obligations of any Defaulting Lender hereunder shall become effective under applicable Law without compliance with the provisions of this paragraph, then the assignee of such interest shall be deemed to be a Defaulting Lender for all purposes of this Agreement until such compliance occurs.

Subject to acceptance and recording thereof by Administrative Agent pursuant to Section 11.10(d), from and after the effective date specified in each Assignment and Acceptance, the assignee thereunder shall be a party to this Agreement and, to the extent of the interest assigned by such Assignment and Acceptance, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Acceptance, be released from its obligations under this Agreement (and, in the case of an Assignment and Acceptance covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto) but shall continue to be entitled to the benefits of Sections 11.4 and 11.13 with respect to facts and circumstances occurring prior to the effective date of such assignment.  Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this Section shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with Section 11.9.

(d)     *Register.*  Administrative Agent, acting solely for this purpose as an agent of Borrower, shall maintain at one of its offices in New York City, New York, a copy of each Assignment and Acceptance delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Commitments of, and principal amounts of (and stated interest on) the Loans owing to, each Lender pursuant to the terms hereof from time to time (the "Register").  The entries in the Register shall be conclusive, and Borrower, Administrative Agent, and the Lenders may treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary.  The Register shall be available for inspection by Borrower and any Lender, at any reasonable time and from time to time upon reasonable prior notice.

146392832_4

(e)    Any Lender may at any time pledge or grant a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including any such pledge or grant to a FRB, and this Section shall not apply to any such pledge or grant of a security interest; provided that no such pledge or grant of a security interest shall release a Lender from any of its obligations hereunder or substitute any such pledgee or secured party for such Lender as a party hereto; provided, however, the right of any such pledgee or grantee (other than any FRB) to further transfer all or any portion of the rights pledged or granted to it, whether by means of foreclosure or otherwise, shall be at all times subject to the terms of this Agreement.

Section 11.11    Amendments.  Subject to Section 3.10, Section 6.10, or any other provision to the contrary in any Loan Document, any provision of this Agreement or the other Loan Documents may be amended or waived if, but only if, such amendment or waiver is in writing and is signed by (a) Borrower, (b) the Required Lenders, and (c) the Administrative Agent (or by Borrower and the Administrative Agent with the consent of the Required Lenders), and each such amendment or waiver shall be effective only in the specific instance and for the specific purpose for which given; provided that no such amendment or waiver shall:

(i)    extend or increase any Commitment of any Lender without the written consent of such Lender (it being understood that a waiver of any condition precedent set forth in Section 4 or the waiver of any Default shall not constitute an extension or increase of any Commitment of any Lender);

(ii)    reduce the principal of, or rate of interest specified herein on, any Loan, or any fees or other amounts payable hereunder or under any other Loan Document, without the written consent of each Lender directly and adversely affected thereby (provided that only the consent of the Required Lenders shall be necessary to amend the definition of "Default Rate" or to waive the obligation of Borrower to pay interest at the Default Rate, even if the effect of such amendment would be to reduce the rate of interest on any Loan or other Obligation or to reduce any fee payable hereunder);

(iii)    postpone any date scheduled for any payment of principal of, or interest on, any Loan, or any fees or other amounts payable hereunder or under any other Loan Document, or reduce the amount of, waive or excuse any such payment, without the written consent of each Lender directly and adversely affected thereby;

(iv)    change Section 2.13(c) or Section 11.5 in a manner that would alter the pro rata sharing of payments required thereby without the written consent of each Lender directly and adversely affected thereby;

(v)    waive any condition set forth in Section 4.1 without the written consent of each Lender;

(vi)    [reserved];

(vii)    change any provision of this Section or the percentage in the definition of "Required Lenders" or any other provision hereof specifying the number or percentage of Lenders required to amend, waive or otherwise modify any rights hereunder or make any determination or grant any consent hereunder, without the written consent of each Lender;

146392832_4

(viii)    release all or substantially all of the Collateral, or subordinate the lien of the Administrative Agent therein, without the written consent of each Lender (other than, in each case, in connection with a transaction expressly permitted under this Agreement);

(ix)    release all or substantially all of the value of the Guaranties, without the written consent of each Lender (other than in connection with a transaction expressly permitted under this Agreement); or

(x)    directly or indirectly, subordinate all or a portion of the Obligations, without the written consent of each Lender (other than, in each case, in connection with a transaction expressly permitted under this Agreement).

provided, further, that no such amendment or waiver shall amend, modify or otherwise affect the rights or duties hereunder or under any other Loan Document of the Administrative Agent, unless in writing executed by the Administrative Agent, in addition to Borrower and the Lenders required above.

Notwithstanding anything herein to the contrary, no Defaulting Lender shall have any right to approve or disapprove any amendment, waiver or consent hereunder and any amendment, waiver or consent that by its terms requires the consent of all the Lenders or each affected Lender may be effected with the consent of the applicable Lenders other than Defaulting Lenders, except that (x) the Commitment of any Defaulting Lender may not be increased or extended, or the maturity of any of its Loan may not be extended, the rate of interest on any of its Loans may not be reduced and the principal amount of any of its Loans may not be forgiven, in each case without the consent of such Defaulting Lender and (y) any amendment, waiver or consent requiring the consent of all the Lenders or each affected Lender that by its terms affects any Defaulting Lender more adversely than the other affected Lenders shall require the consent of such Defaulting Lender.

In addition, notwithstanding anything in this Section to the contrary, if the Administrative Agent and Borrower shall have jointly identified an obvious error or any error or omission of a technical nature, in each case, in any provision of the Loan Documents, then the Administrative Agent and Borrower shall be permitted to amend such provision, and, in each case, such amendment shall become effective without any further action or consent of any other party to any Loan Document if the same is not objected to in writing by the Required Lenders to the Administrative Agent within ten Business Days following receipt of notice thereof.

Section 11.12    Headings.  Section headings used in this Agreement are for reference only and shall not affect the construction of this Agreement.

Section 11.13    Costs and Expenses; Indemnification.

(a)    In accordance with the applicable DIP Order, each Loan Party agrees to pay all reasonable and documented costs and expenses (including, without limitation, reasonable due diligence expenses, syndication expenses and travel expenses, reasonable and documented costs and expenses incurred in connection with the establishment and maintenance of an internet site to be used in the syndication of the Loans, and fees, charges and disbursements of counsel subject to the limitations set forth in this sentence below) of Administrative Agent in connection with the preparation, negotiation, syndication, and administration of the Loan Documents, including the reasonable and documented fees and disbursements of counsel to Administrative Agent, in connection with the preparation and execution of the Loan Documents and in connection with the transactions contemplated hereby or thereby, and any amendment, waiver or consent related thereto, whether or not the transactions contemplated herein are consummated, together with any reasonable and documented fees and charges suffered or incurred by Administrative

Agent in connection with periodic environmental audits, fixed asset appraisals, title insurance policies, collateral filing fees and lien searches. Each Loan Party agrees, subject to the applicable DIP Orders, to pay to Administrative Agent and each Lender, and any other holder of any Obligations outstanding hereunder, all costs and expenses reasonably incurred or paid by Administrative Agent, such Lender, or any such holder, including reasonable and documented attorneys' fees and reasonable and documented disbursements and court costs, in connection with any Default or Event of Default hereunder or in connection with the enforcement of any of the Loan Documents (including all such costs and expenses incurred in connection with any proceeding under the United States Bankruptcy Code involving Borrower, any other Loan Party or any Guarantor as a debtor thereunder). Each Loan Party further agrees to indemnify Administrative Agent, each Lender, and any security trustee therefor, and their respective directors, officers, employees, agents, financial advisors, and consultants (each such Person being called an "*Indemnitee*") against all losses, claims, damages, penalties, judgments, liabilities and reasonable and documented expenses (including all reasonable and documented fees and disbursements of counsel for any such Indemnitee and all reasonable expenses of litigation or preparation therefor, whether or not the Indemnitee is a party thereto, or any settlement arrangement arising from or relating to any such litigation) which any of them may pay or incur arising out of or relating to any Loan Document or any of the transactions contemplated thereby or the direct or indirect application or proposed application of the proceeds of any Loan, other than those which directly result from (i) the gross negligence or willful misconduct of such Indemnitee or any of such Indemnitee's controlled or controlling affiliates, any of its or their respective officers, directors, employees, controlling persons, or members, or the respective representatives and agents of such Indemnitee (collectively, such Indemnitee's "*Related Persons*") (as determined by a court of competent jurisdiction by final and non-appealable judgment), (ii) a material breach by such Indemnitee or any of its Related Persons of its obligations under this Agreement (as determined by a court of competent jurisdiction by final and non-appealable judgment) or (iii) any dispute solely among Indemnitees (not arising as a result of any act or omission by you or any of your affiliates) other than claims against an Indemnitee in its capacity or as a result of fulfilling its role as an agent, bookrunner, arranger or any other similar role under this Agreement or the Obligations evidenced hereby. Each Loan Party, upon demand by Administrative Agent or a Lender at any time, shall reimburse Administrative Agent or such Lender for any reasonable and documented legal or other expenses (including all reasonable and documented fees and disbursements of counsel for any such Person) incurred in connection with investigating or defending against any of the foregoing (including any settlement costs relating to the foregoing) except if the same is directly due to (i) the gross negligence or willful misconduct of such Person or any of such Person's Related Persons (as determined by a court of competent jurisdiction by final and non-appealable judgment), (ii) a material breach by such Person or any of its Related Persons of its obligations under this Agreement (as determined by a court of competent jurisdiction by final and non-appealable judgment) or (iii) any dispute solely among such Persons (not arising as a result of any act or omission by you or any of your affiliates) other than claims against such Person in its capacity or as a result of fulfilling its role as an agent, bookrunner, arranger or any other similar role under this Agreement or the Obligations evidenced hereby. To the extent permitted by applicable Law, no Person party to this Agreement shall assert, and each such Person hereby waives, any claim against any Indemnitee, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement or the other Loan Documents or any agreement or instrument contemplated hereby or thereby, the transactions contemplated hereby or thereby, any Loan or the use of the proceeds thereof. No party hereto shall be liable for any damages arising from the use by unintended recipients of any information or other materials distributed by it through telecommunications, electronic or other information transmission systems in connection with this Agreement or the other Loan Documents or the transactions contemplated hereby or thereby except to the extent resulting from the gross negligence or willful misconduct of such Person or any of its Related Persons or the material breach by such Person or any of its Related Persons of its obligations under this Agreement.

(b)       Each Loan Party unconditionally agrees to indemnify, defend and hold harmless, each Indemnitee for any damages, loss or reasonable and documented costs or expense, including response, remedial or removal costs and all fees and disbursements of counsel for any such Indemnitee, arising out of any of the following:  (i) any presence, release, threatened release or disposal of any hazardous or toxic substance or petroleum by any Loan Party or any Subsidiary or otherwise occurring on or with respect to its Property (whether owned or leased), (ii) the operation or violation of any Environmental Law, whether federal, state, or local, and any regulations promulgated thereunder, by any Loan Party or any Subsidiary or otherwise occurring on or with respect to its Property (whether owned or leased), (iii) any claim for personal injury or property damage in connection with any Loan Party or any Subsidiary or otherwise occurring on or with respect to its Property (whether owned or leased), and (iv) the inaccuracy or breach of any environmental representation, warranty or covenant by any Loan Party or any Subsidiary made herein or in any other Loan Document evidencing or securing any Obligations or setting forth terms and conditions applicable thereto or otherwise relating thereto, except for damages arising from the (i) the gross negligence or willful misconduct of such Person or any of such Person's Related Persons (as determined by a court of competent jurisdiction by final and non-appealable judgment), (ii) a material breach by such Person or any of its Related Persons of its obligations under this Agreement (as determined by a court of competent jurisdiction by final and non-appealable judgment) or (iii) any dispute solely among such Persons (not arising as a result of any act or omission by you or any of your affiliates) other than claims against such Person in its capacity or as a result of fulfilling its role as an agent, bookrunner, arranger or any other similar role under this Agreement or the Obligations evidenced hereby.

Section 11.14    Set off.   Subject to the DIP Orders, in addition to any rights now or hereafter granted under the Loan Documents or applicable Law and not by way of limitation of any such rights, upon the occurrence of any Event of Default, with the prior written consent of Administrative Agent, each Lender, each subsequent holder of any Obligation, and each of their respective affiliates, is hereby authorized by Borrower, each Loan Party and each Guarantor at any time or from time to time, without notice to Borrower, any other Loan Party or any Guarantor or to any other Person, any such notice being hereby expressly waived, to set off and to appropriate and to apply any and all deposits (general or special, including, but not limited to, indebtedness evidenced by certificates of deposit, whether matured or unmatured, and in whatever currency denominated, but not including trust accounts) and any other indebtedness at any time held or owing by that Lender, , subsequent holder, or affiliate, to or for the credit or the account of Borrower, any such Loan Party or any such Guarantor, whether or not matured, against and on account of the Obligations of Borrower, any such Loan Party or any such Guarantor to that Lender, or subsequent holder under the Loan Documents, including, but not limited to, all claims of any nature or description arising out of or connected with the Loan Documents, irrespective of whether or not (a) that Lender, or subsequent holder shall have made any demand hereunder or (b) the principal of or the interest on the Loans and other amounts due hereunder shall have become due and payable pursuant to Section 8 and although said obligations and liabilities, or any of them, may be contingent or unmatured.

Section 11.15    Entire Agreement.  The Loan Documents constitute the entire understanding of the parties thereto with respect to the subject matter thereof and any prior agreements, whether written or oral, with respect thereto are superseded hereby.

Section 11.16    Governing Law.   This Agreement and the other Loan Documents (except as otherwise specified therein), and any claim, controversy, dispute or cause of action (whether in contract, tort or otherwise) based upon, arising out of or relating to this Agreement or any Loan Document, and the rights and duties of the parties hereto, shall be governed by and construed and determined in accordance with the internal laws of the State of New York.

Section 11.17    Severability of Provisions.   Any provision of any Loan Document which is unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such

unenforceability without invalidating the remaining provisions hereof or affecting the enforceability of such provision in any other jurisdiction. The parties shall endeavor in good faith negotiations to replace the illegal, invalid or unenforceable provision with valid provisions the economic effect of which comes as close as possible to that of the illegal, invalid or unenforceable provisions. All rights, remedies and powers provided in this Agreement and other Loan Documents may be exercised only to the extent that the exercise thereof does not violate any applicable mandatory provisions of law, and all the provisions of this Agreement and other Loan Documents are intended to be subject to all applicable mandatory provisions of law which may be controlling and to be limited to the extent necessary so that they will not render this Agreement or the other Loan Documents invalid or unenforceable.

Section 11.18    *Excess Interest*.  Notwithstanding any provision to the contrary contained herein or in any other Loan Document, and subject to the DIP Orders, no such provision shall require the payment or permit the collection of any amount of interest in excess of the maximum amount of interest permitted by applicable Law to be charged for the use or detention, or the forbearance in the collection, of all or any portion of the Loans or other obligations outstanding under this Agreement or any other Loan Document ("*Excess Interest*").  If any Excess Interest is provided for, or is adjudicated to be provided for, herein or in any other Loan Document, then in such event (a) the provisions of this Section shall govern and control, (b) neither Borrower, nor any other Loan Party,  nor any Guarantor or endorser shall be obligated to pay any Excess Interest, (c) any Excess Interest that Administrative Agent or any Lender may have received hereunder shall, at the option of Administrative Agent, be (i) applied as a credit against the then outstanding principal amount of Obligations hereunder and accrued and unpaid interest thereon (not to exceed the maximum amount permitted by applicable Law), (ii) refunded to Borrower, or (iii) any combination of the foregoing, (d) the interest rate payable hereunder or under any other Loan Document shall be automatically subject to reduction to the maximum lawful contract rate allowed under applicable usury laws (the "*Maximum Rate*"), and this Agreement and the other Loan Documents shall be deemed to have been, and shall be, reformed and modified to reflect such reduction in the relevant interest rate, and (e) neither Borrower, nor any Loan Party, nor any Guarantor or endorser shall have any action against Administrative Agent or any Lender for any damages whatsoever arising out of the payment or collection of any Excess Interest.  Notwithstanding the foregoing, if for any period of time interest on any of the Obligations is calculated at the Maximum Rate rather than the applicable rate under this Agreement, and thereafter such applicable rate becomes less than the Maximum Rate, the rate of interest payable on such Obligations shall remain at the Maximum Rate until the Lenders have received the amount of interest which such Lenders would have received during such period on such Obligations had the rate of interest not been limited to the Maximum Rate during such period.

Section 11.19    *Construction.*  The parties acknowledge and agree that the Loan Documents shall not be construed more favorably in favor of any party hereto based upon which party drafted the same, it being acknowledged that all parties hereto contributed substantially to the negotiation of the Loan Documents.  The provisions of this Agreement relating to Subsidiaries shall only apply during such times as Borrower has one or more Subsidiaries.  Nothing contained herein shall be deemed or construed to permit any act or omission which is prohibited by the terms of any Collateral Document, the covenants and agreements contained herein being in addition to and not in substitution for the covenants and agreements contained in the Collateral Documents.

Section 11.20    *Lender's Obligations Several*.  The obligations of the Lenders hereunder are several and not joint.  Nothing contained in this Agreement and no action taken by the Lenders pursuant hereto shall be deemed to constitute the Lenders a partnership, association, joint venture or other entity.

146392832_4

Section 11.21    *Submission to Jurisdiction; Waiver of Venue; Service of Process*.

(a)    BORROWER, EACH OTHER LOAN PARTY AND GUARANTORS IRREVOCABLY AND UNCONDITIONALLY SUBMIT, FOR THEMSELVES AND THEIR PROPERTY, TO THE EXCLUSIVE JURISDICTION OF THE COURTS OF THE STATE AND FEDERAL COURTS IN THE STATE OF NEW YORK, AND ANY APPELLATE COURT FROM ANY THEREOF, IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT, OR FOR RECOGNITION OR ENFORCEMENT OF ANY JUDGMENT, AND EACH OF THE PARTIES HERETO IRREVOCABLY AND UNCONDITIONALLY AGREES THAT ALL CLAIMS IN RESPECT OF ANY SUCH ACTION OR PROCEEDING MAY BE HEARD AND DETERMINED IN SUCH STATE COURT OR, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, IN SUCH FEDERAL COURT.  EACH OF THE PARTIES HERETO AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW.  NOTHING IN THIS AGREEMENT OR IN ANY OTHER LOAN DOCUMENT SHALL AFFECT ANY RIGHT THAT ADMINISTRATIVE AGENT AND LENDERS MAY OTHERWISE HAVE TO BRING ANY ACTION OR PROCEEDING RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT AGAINST BORROWER, LOAN PARTIES AND GUARANTORS OR THEIR PROPERTY IN THE COURTS OF ANY OTHER JURISDICTION.

(b)    BORROWER, EACH OTHER LOAN PARTY AND GUARANTORS IRREVOCABLY AND UNCONDITIONALLY WAIVE, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY OBJECTION THAT THEY MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT IN ANY COURT REFERRED TO IN PARAGRAPH (a) OF THIS SECTION.  EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, THE DEFENSE OF AN INCONVENIENT FORUM TO THE MAINTENANCE OF SUCH ACTION OR PROCEEDING IN ANY SUCH COURT.

(c)    EACH PARTY HERETO IRREVOCABLY CONSENTS TO SERVICE OF PROCESS IN THE MANNER PROVIDED FOR NOTICES IN SECTION 11.6(a).  NOTHING IN THIS AGREEMENT WILL AFFECT THE RIGHT OF ANY PARTY HERETO TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY APPLICABLE LAW.

Section 11.22    *Waiver of Jury Trial*.  EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY).  EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

Section 11.23    *USA Patriot Act*.  Each Lender that is subject to the requirements of the USA Patriot Act (Title III of Pub. L. 107 56 (signed into law October 26, 2001)) (the "*Act*") hereby notifies each

-104-

Loan Party and Guarantor that pursuant to the requirements of the Act, it is required to obtain, verify, and record information that identifies each such Loan Party and Guarantor, which information includes the name and address of such Loan Party and Guarantor and other information that will allow such Lender to identify such Loan Party and Guarantor in accordance with the Act.

Section 11.24    *Time is of the Essence*.  Time is of the essence of this Agreement and each of the other Loan Documents.

Section 11.25    *Confidentiality*.  Each of Administrative Agent and the Lenders severally agrees to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (a) to its and its Affiliates' and its Related Parties, including accountants, legal counsel and other advisors to the extent any such Person has a need to know such Information (it being understood that the Persons to whom such disclosure is made will first be informed of the confidential nature of such Information and instructed to keep such Information confidential), (b) to the extent required or requested by any regulatory authority (including any self-regulatory authority, such as the National Association of Insurance Commissioners), (c) to the extent required by applicable Laws or regulations or by any subpoena or similar legal process, (d) to any other party hereto, (e) in connection with the exercise of any remedies hereunder or under any other Loan Document or any suit, action or proceeding relating to this Agreement or any other Loan Document or the enforcement of rights hereunder or thereunder, (f) subject to an agreement containing provisions substantially the same as those of this Section, to (A) any assignee of or participant in, or any prospective assignee of or participant in, any of its rights or obligations under this Agreement or (B) any actual or prospective counterparty (or its advisors) to any swap or derivative transaction relating to Borrower, any other Loan Party or any Subsidiary and its obligations, (g) on a confidential basis to any rating agency in connection with rating Borrower or its Subsidiaries or any Loans; (h) with the prior written consent of the applicable Loan Party, (i) to the extent such Information (A) becomes publicly available other than as a result of a breach of this Section or (B) becomes available to Administrative Agent or any Lender on a non-confidential basis from a source other than Borrower, a Loan Party or any Subsidiary or any of their directors, officers, employees or agents, including accountants, legal counsel and other advisors, or (j) to entities which compile and publish information about the syndicated loan market, provided that only basic information about the pricing and structure of the transaction evidenced hereby may be disclosed pursuant to this subsection (j).    For purposes of this Section, "Information" means all information received from Borrower, any Loan Party or any of the Subsidiaries or from any other Person on behalf of Borrower, any Loan Party or any Subsidiary relating to Borrower, any Loan Party or any Subsidiary or any of their respective businesses, other than any such information that is available to Administrative Agent or any Lender on a non-confidential basis prior to disclosure by Borrower, any Loan Party or any of their Subsidiaries or from any other Person on behalf of Borrower, any Loan Party or any of their Subsidiaries**; *provided* that, in the case of information received from Borrower, any Loan Party or any Subsidiary, or on behalf of Borrower, any Loan Party or any Subsidiary, after the date hereof, such information is clearly identified at the time of delivery as confidential**.  **Any Person required to maintain the confidentiality of Information as provided in this Section shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information**.

Section 11.26    *Customary Advertising Material*.  Notwithstanding anything to the contrary in Section 11.25, the Loan Parties consent to the publication by the Administrative Agent or any Lender of customary advertising material (including customary "tombstone" disclosure) relating to the transactions contemplated hereby using the name, product photographs, logo or trademark of the Loan Parties.

Section 11.27    *Acknowledgement and Consent to Bail-In of Affected Financial Institutions*.  Notwithstanding anything to the contrary in any Loan Document or in any other agreement, arrangement

-105-

or understanding among any such parties, each party hereto acknowledges that any liability of any Affected Financial Institution arising under any Loan Document, may be subject to Bail-In Action by the relevant Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a)    the application of any Write-Down and Conversion Powers by the applicable Resolution Authority to any such liabilities arising hereunder which may be payable to it by any party hereto that is an Affected Financial Institution; and

(b)    the effects of any Bail-In Action on any such liability, including, if applicable:

(i)    a reduction in full or in part, in the principal amount, or outstanding amount due (including any accrued but unpaid interest) in respect of any such liability;

(ii)    a cancellation of any such liability;

(iii)    a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such Affected Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Loan Document; or

(iv)    the variation of the terms of any Loan Document to the extent necessary to give effect to any Bail-In Action in relation to any such liability.

Section 11.28    *Acknowledgement Regarding any Supported QFCs*.  To the extent that the Loan Documents provide support, through a guarantee or otherwise, for hedging liability or any other agreement or instrument that is a QFC (such support, "*QFC Credit Support*" and each such QFC a "*Supported QFC*"), the parties acknowledge and agree as follows with respect to the resolution power of the Federal Deposit Insurance Corporation under the Federal Deposit Insurance Act and Title II of the Dodd-Frank Wall Street Reform and Consumer Protection Act (together with the regulations promulgated thereunder, the "*U.S. Special Resolution Regimes*") in respect of such Supported QFC and QFC Credit Support (with the provisions below applicable notwithstanding that the Loan Documents and any Supported QFC may in fact be stated to be governed by the laws of the State of New York and/or of the United States or any other state of the United States):

(a)    In the event a Covered Entity that is party to a Supported QFC (each, a "*Covered Party*") becomes subject to a proceeding under a U.S. Special Resolution Regime, the transfer of such Supported QFC and the benefit of such QFC Credit Support (and any interest and obligation in or under such Supported QFC and such QFC Credit Support, and any rights in property securing such Supported QFC or such QFC Credit Support) from such Covered Party will be effective to the same extent as the transfer would be effective under the U.S. Special Resolution Regime if the Supported QFC and such QFC Credit Support (and any such interest, obligation and rights in property) were governed by the laws of the United States or a state of the United States.  In the event a Covered Party or a BHC Act Affiliate of a Covered Party becomes subject to a proceeding under a U.S. Special Resolution Regime, Default Rights under the Loan Documents that might otherwise apply to such Supported QFC or any QFC Credit Support that may be exercised against such Covered Party are permitted to be exercised to no greater extent than such Default Rights could be exercised under the U.S. Special Resolution Regime if the Supported QFC and the Loan Documents were governed by the laws of the United States or a state of the United States.  Without limitation of the foregoing, it is understood and agreed that rights and remedies of the parties with respect to a Defaulting Lender shall in no event affect the rights of any Covered Party with respect to a Supported QFC or any QFC Credit Support.

-106-

(b)       As used in this <u>Section 11.28</u>, the following terms have the following meanings:

"*BHC Act Affiliate*" of a party means an "affiliate" (as such term is defined under, and interpreted in accordance with, 12 U.S.C. 1841(k)) of such party.

"*Covered Entity*" means any of the following: (i) a "covered entity" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 252.82(b); (ii) a "covered bank" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 47.3(b); or (iii) a "covered FSI" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 382.2(b).

"*Default Right*" has the meaning assigned to that term in, and shall be interpreted in accordance with, 12 C.F.R. §§ 252.81, 47.2 or 382.1, as applicable.

"*QFC*" has the meaning assigned to the term "qualified financial contract" in, and shall be interpreted in accordance with, 12 U.S.C. 5390(c)(8)(D).

[Signature Pages to Follow]

-107-

This Agreement is entered into between us for the uses and purposes hereinabove set forth as of the date first above written.

"*Borrower*"

**HARDINGE INC.**, a New York corporation

By:_____
Name:  Ryan J. Levenson
Title:    Chief Executive Officer

"*Guarantors*"

**GUARANTORS:**

**HARDINGE GRINDING GROUP INC.**, an Illinois corporation

By:_____
Name:
Title:

**HARDINGE TECHNOLOGY SYSTEMS, INC.**, a New York corporation

By:_____
Name:
Title:

**HARDINGE VENTURES LLC**, a Delaware limited liability company

By:_____
Name:
Title:

**FORKARDT INC.**, a New York corporation

By:_____
Name:
Title:

**GUARANTORS CONTINUED:**

**OHIO TOOL WORKS, LLC**, a Delaware limited
liability company

By: _____

Name:

Title:

**KELLENBERGER SWISS GRINDING
MACHINES, LLC**, a Delaware limited liability
company

By: _____

Name:

Title:

146392832_4

"*Administrative Agent*"

**CENTRE LANE SOLUTIONS PARTNERS, LP,** as
Administrative Agent


By:_____
Name:
Title:

"*Lenders*"

**CENTRE LANE SOLUTIONS PARTNERS, LP**


By: _____
Name:
Title:

"*Lenders*"

[_____]

By:_____
Name:
Title: