**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| Hardinge Inc., *et al.*,[1] | Case No. 24-11605 (___) |
| Debtors. | (Joint Administration Requested) |

**DECLARATION OF ADAM DUNAYER**
**IN SUPPORT DEBTORS' MOTION TO OBTAIN POSTPETITION DEBTOR IN**
**POSSESSION FINANCING AND THE DEBTORS' BIDDING PROCEDURES MOTION**

I, Adam Dunayer, pursuant to 28 U.S.C. § 1764, hereby declare and state:

1. I am a Managing Director at Houlihan Lokey Capital, Inc. ("Houlihan") and am duly authorized to execute this declaration (the "Declaration") on behalf of Houlihan. I am familiar with the matters set forth herein and, if called as a witness, I could and would testify thereto.

2. I submit this Declaration in support of the DIP Motion,[2] including the financing package proposed therein (the "DIP Facility"), and the Debtors' Bidding Procedures Motion.[3]

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number are: Hardinge Ventures LLC (0586); Ohio Tool Works, LLC (7569); Kellenberger Swiss Grinding Machines, LLC (N/A); Hardinge Inc. (0200); Hardinge Technology Systems, Inc. (6427); Forkardt Inc. (4671); and Hardinge Grinding Group Inc. (6173). The Debtors' service address is One Hardinge Drive, Elmira, NY 14902-1507.

[2] "DIP Motion" mean the *Debtors' Motion For Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Financing Pursuant to Section 364 of the Bankruptcy Code, (II) Authorizing the Debtors to use Cash Collateral Pursuant to Section 363 of the Bankruptcy Code, (III) Granting Adequate Protection to the Prepetition Secured Parties Pursuant to Sections 361, 362, 363 and 364 of the Bankruptcy Code, (IV) Granting Liens and Superpriority Claims, (V) Modifying the Automatic Stay, (VI) Scheduling a Final hearing, and (VII) Granting Related Relief*. Capitalized terms used but not otherwise defined herein have the meaning given them in the DIP Motion.

[3] "Bidding Procedures Motion" means the *Debtors Motion Pursuant to Sections 105, 363, and 365 of the Bankruptcy Code for Entry of an Order (I) Approving the Bidding Procedures, Including the Debtors' Entry into the Stalking Horse APA, the Sale Timeline, and the Form and Manner of Notice Thereof; (II) Approving the Debtors' (A) Sale of All or Substantially All of the Debtors' Assets Free and Clear of All Liens Other Than Assumed Liabilities and (B) Assumption and Assignment of Certain Executory Contracts and Unexpired Leases to the Successful Bidder; and Granting Related Relief*.

3.      Except as otherwise indicated, I base all facts set forth in this Declaration on my personal knowledge, my review of business records, or my opinion based on my experience, knowledge, and information concerning the Debtors' operational and financial condition. If called as a witness, I would testify competently to the facts set forth in this Declaration, which I am authorized to submit on behalf of the Debtors.

## Houlihan's Qualifications and Services

4.      Houlihan is an internationally recognized investment banking and financial advisory firm, with offices worldwide and more than 2,000 global employees. Houlihan is a leader in providing such services to debtors, unsecured and secured creditors, acquirers, and other parties in interest involved with financially troubled companies, both in and outside of bankruptcy. Houlihan has been, and is, involved in some of the largest restructurings in the United States, both out of court and in chapter 11 cases. Houlihan has been retained to provide investment banking and financial advisory services in, among other cases: *In re Corsicana Bedding, LLC*, No. 22-90016 (Bankr. N.D. Tex. Aug. 9, 2022); *In re GVS Texas Holdings I, LLC*, No. 21-31121 (Bankr. N.D. Tex. Oct. 31, 2021); *In re Utex Indus., Inc.*, No. 20-34932 (Bankr. S.D. Tex. Dec. 3, 2020); *In re PHI, Inc.*, No. 19-30923 (Bankr. N.D. Tex. May 13, 2019); *In re Walter Inv. Mgmt. Corp.*, No. 17-13446 (Bankr. S.D.N.Y. Nov. 30, 2017); *In re Seadrill Ltd.*, No. 17-60079 (Bankr. S.D. Tex. Sep. 12, 2017); *In re Westinghouse Elec. Co. LLC*, No. 17-10751 (Bankr. S.D.N.Y. Mar. 29, 2017).

5.      I am a member of Houlihan's Financial Restructuring Group. I have over 30 years of experience consummating transactions and providing strategic advice to companies and creditors in connection with in- and out-of-court special situations, mergers, acquisitions, and dispositions. I also have extensive experience raising debt and equity capital in public and private

markets. My experience spans industries, including energy and oilfield services, consumer products, food, healthcare, building products, general industrial, telecom, and technology. I speak frequently on trends and issues in special situations and other topics. I have also testified as an expert witness on a variety of bankruptcy and special situations issues.

6. Before joining Houlihan, I was a Managing Director with Bear, Stearns & Co. In addition, I was an Executive Vice President and Chief Financial Officer with Miller Industries, where I also served as President of the company's largest subsidiary.

7. Houlihan has agreed to provide investment banking and financial advisory services to the Debtors pursuant to the terms and conditions of an engagement agreement between the Debtors and Houlihan, dated as of May 24, 2024 (the "Restructuring Engagement").

8. Prior to entering into the Restructuring Engagement, Houlihan Lokey Corporate Finance was engaged by the Company in connection with its efforts to sell certain of its businesses in China.

9. Since entering into the Restructuring Engagement, Houlihan has provided financial advice and investment banking services to the Debtors, including assisting management in evaluating strategic alternatives, exploring the Debtors' financing options, conducting extensive meetings and negotiations with the various parties in interest regarding transaction and financing alternatives, assisting the Debtors in evaluating indications of interest and proposals regarding potential transactions and financing, facilitating extensive diligence for the various parties in interest, and assisting in preparation of the filing of the Debtors' chapter 11 cases.

## DIP MOTION

10. I am familiar with the DIP Motion and the proposed debtor in possession financing for which the debtors seek Court approval. Absent the relief requested in this DIP Motion, I

believe the Debtors would suffer immediate and irreparable harm that would jeopardize their ability to continue their business operations and consummate a value-maximizing going concern sale transaction. I further believe that the relief sought in the DIP Motion is critical to the Debtors' efforts to orderly transition into chapter 11 efficiently and minimize disruptions to their business operations, thereby permitting the Debtors to preserve and maximize enterprise value while pursuing a section 363 sale. Finally, I believe the financing being sought to be approved in the DIP Motion reflects the best, and currently the only, financing alternative available to the Debtors.

**I.     PREPETITION RESTRUCTURING EFFORTS**

11.     Upon entering into the Restructuring Engagement, Houlihan immediately began conducting due diligence with respect to the Debtors' assets, operations, and financing needs. Subsequent to this initial assessment of alternatives and of a marketing process, the Company, together with its advisors, including Houlihan, determined the Company lacked the liquidity needed to conduct a value maximizing out of court sale process. Instead, the Company needed an immediate liquidity infusion. Accordingly, to that end, the Company approached the existing lenders under the Prepetition Credit Agreement (the "<u>Prepetition Financial Institutional Lenders</u>") to request incremental liquidity to allow time to develop the best plan to maximize the value of the Company's assets for all the Company's stakeholders. While the Prepetition Financial Institutional Lenders initially stated they would provide some bridge financing, the Prepetition Financial Institutional Lenders never provided any funding; neither the funding necessary to remain a going concern nor to fully explore a going concern sale process. Houlihan then, on behalf of the Company, approached the Prepetition Financial Institutional Lenders to engage on potential terms under which the Prepetition Financial Institutional Lenders would agree to subordinate their debt to allow the Company to bring in third-party financing, either in court or out of court. While the Prepetition Financial Institutional Lenders indicated they would engage in these discussions,

they never provided metrics for potential priming lenders to meet. While Houlihan presented several such offers on behalf of the Company, the Prepetition Financial Institutional Lenders refused to consent to being primed.

12. Simultaneously with these negotiations with the Prepetition Financial Institutional Lenders, Houlihan launched a process to identify a solution to the Company's urgent liquidity crisis, seeking to either (a) find a purchaser for the secured debt held by the Prepetition Financial Institutional Lenders; (b) find a third-party willing to provide debt junior to the secured debt held by the Prepetition Financial Institutional Lenders; (c) find a third-party willing to provide a consensual or non-consensual priming facility; or (d) find a purchaser for substantially all assets of the Company. Houlihan approached this process similar to a straight-forward sale of substantially all assets of the Company. For a buyer to purchase the Company's secured debt, the buyer would need to be comfortable with the value of the collateral securing the debt, *i.e.*, the Company's assets. Houlihan encouraged interested parties to submit any bid those parties were comfortable with, be it to purchase the Prepetition Financial Institutional Lenders' debt, to purchase substantially all of the Company's assets, to provide additional financing whether in court or out of court, or to purchase a subset of assets.

13. Given the urgency of the Company's liquidity concerns, on June 4, 2024, Houlihan began contacting potential bidders for the sale of the Company, providing a teaser to 81 potential strategic and financial sponsor parties and holding introductory calls with 70 parties. Of those parties, 47 potential bidders executed non-disclosure agreements, after which Houlihan held numerous follow-up diligence calls for these parties' benefit and these parties received access to a virtual data room, management presentations, and other, more comprehensive diligence information. Houlihan requested that the potential bidders submit initial bids by June 19, 2024.

The Company received five (5) proposals, which Houlihan presented to the Prepetition Financial Institutional Lenders. However, the Prepetition Financial Institutional Lenders were not willing to consent to any proposals, rendering then unactionable.

14. At the time Houlihan requested bids by June 19, 2024, the only options available to the Company were to commence a chapter 7 process to liquidate the Company's assets, to attempt to find a lender to provide postpetition financing on a non-consensual, priming basis to commence a chapter 11 proceeding with very limited liquidity to make it through a priming fight, or find a more supportive lender to buy the secured debt held by the Prepetition Financial Institutional Lenders. Fortunately, due to the dedicated work of the Company's management team, the Company was able to extend the process to July 12, 2024, to allow additional time for parties to conduct diligence and submit bids. In the additional time between June 19, 2024, and July 12, 2024, Houlihan continued to approach additional parties, increasing the total parties contacted to 94, engage in conversations with an additional fourteen (14) (bringing the total to 84), and bring an additional nine (9) parties under NDA (bringing the total to 56).

15. By July 12, 2024, the Company had received eight (8) proposals, including, among others, proposals that provided for consensual or non-consensual priming loans and a proposal for Centre Lane Partners V, LP (the "<u>Prepetition Lenders</u>") to (a) purchase the secured debt held by the Prepetition Financial Institutional Lenders, (b) provide an incremental bridge facility immediately after the closing of the debt purchase, (c) provide a debtor in possession financing facility in chapter 11, and (d) serve as the stalking horse purchaser for the Debtor's assets. On July 22, 2024, the sale of the Prepetition Financial Institutional Lenders' secured debt to the Prepetition Lenders closed. On July 23, 2024, the Prepetition Lenders funded a bridge loan in the amount of $2.9 million pursuant to an amendment to the Prepetition Credit Agreement.

16. The Debtors and their advisors, on the one hand, and the Prepetition Lenders, on the other, then commenced negotiations with respect to the debtor in possession financing. In my view, these negotiations were conducted in good faith and at arms' length. Those arms'-length negotiations led to improvements in terms for the Debtors. As a result of these arms'-length negotiations, the parties agreed upon the DIP Facility for which the Debtors seek Court approval. This DIP Facility contemplates an initial draw in the aggregate principal amount of up to $14,000,000 of new money upon entry of the Interim Order unless and until the DIP Lenders agree on further funding for the USACH/Kellenberger Term Loan Commitment (as defined in the DIP Documents), in which case the aggregate principal amount is not to exceed $24,200,00 (the "<u>Initial DIP Loans</u>"), and a second draw upon entry of the Final Order in an aggregate principal amount that will not, when combined with the Initial DIP Loans advanced prior to the second draw, exceed $27,350,000.

17. Having carefully reviewed and considered the DIP Facility, I believe the terms and conditions are appropriate under the circumstances, and that the Debtors' will benefit materially from approval of the DIP Facility and the liquidity provided thereunder. Not only will the DIP Facility signal to the Debtors' customers, employees, and vendors that it is "business as usual," but also will allow the Debtors to sell their business as a going-concern, for the benefit of all stakeholders. These chapter 11 cases were precipitated by, among other things, the Company's severe liquidity concerns and the Debtors' inability to obtain additional liquidity from the Prepetition Financial Institution Lenders. Accordingly, in my view, to preserve going concern value, the Court should approve the proposed the immediate cash infusion provided under the DIP Facility, so that the Debtors may conduct a sale process and consummate a going concern sale

transaction for the benefit of the Debtors' stakeholders, including the majority of its employees who will continue to be employed after consummation of the sale.

## II. THE DEBTORS' NEED FOR LIQUIDITY

18. I am familiar with the DIP Facility and the terms thereof, in addition to the Debtors' immediate liquidity needs. Based on my experience in the restructuring industry generally and my experience with the Debtors in particular, I believe that approval of the proposed DIP Facility, and the use of Cash Collateral during the interim period, is appropriate and necessary in these chapter 11 cases.

19. Based upon my understanding of the Debtors' liquidity needs, the current state of debt markets, and our recent inquiries to potential postpetition financing sources, I do not believe alternative sources of financing are readily available to the Debtors (whether unsecured or secured) on better or comparable terms than the DIP Facility. The proposed DIP Facility will provide the Debtors with immediate access to liquidity that is necessary to ensure that the Debtors' business is stabilized, chapter 11 administrative costs are paid in full and an adequate 363 sale process is run, and value is preserved during the course of the Debtors' reorganization. Additionally, I do not believe it would be possible to administer the Debtors' chapter 11 estates on a "cash collateral" basis. The Debtors have been operating with extremely limited liquidity for several weeks now and have only narrowly avoided the need to file for chapter 7 by reaching an agreement with the DIP Lenders in the week prior to the filing of these chapter 11 cases. Without access to the DIP Facility, the Debtors would have extremely limited cash on hand, and I do not expect the Debtors to be able to generate sufficient levels of operating cash flow in the ordinary course of business to cover their working capital needs, which would result in immediate and irreparable harm to the value of the Debtors' assets. Certainly, without the benefit of debtor in possession financing, the Debtors would very quickly have to commence a fire-sale liquidation of all of their assets, as

opposed to the sale process currently contemplated in these chapter 11 cases. Accordingly, the Debtors' access to the proposed DIP Facility will enable the Debtors to stabilize their cash flows, continue operating in the ordinary course, and complete a value maximizing sale transaction.

### III. ADEQUACY OF DIP

20. In connection with the search for postpetition financing, Houlihan assisted the Debtors, their management, and their other advisors, including Ankura Consulting Group, LLC ("Ankura"), in reviewing and refining projected cash forecasts for the Debtors' business during these chapter 11 cases. These forecasts take into account anticipated cash receipts and disbursements during the projected period and consider a number of factors, including, but not limited to, the effect of the chapter 11 filing on the operations of the business, fees and interest expenses associated with postpetition financing, professional fees, and customer and vendor obligations, as well as the operational performance of the business.

21. As of the Petition Date, substantially all of the Debtors' cash is encumbered, which means that the Debtors require immediate access to Cash Collateral to operate their business and continue paying their debts as they come due. Prior to the Petition Date, the Debtors, in consultation with Houlihan and Ankura, reviewed and analyzed their projected cash needs and prepared a cash budget outlining the Debtors' postpetition needs (as may be amended, modified, or supplemented from time to time, the "DIP Budget"), including detailed line items for categories of cash flows anticipated to be received or disbursed during the period covered by the DIP Budget, and determined the amount of postpetition financing required to administer these chapter 11 cases.

22. I believe that the DIP Budget and projections provide an accurate reflection of the Debtors' likely funding requirements over the identified period, respectively, and are fair, reasonable, and appropriate under the circumstances. Based on my knowledge, extensive discussions with the Debtors' management team and advisors, and the DIP Budget, I believe that

the proposed DIP Facility provides the Debtors sufficient liquidity to stabilize their operations and fund the sale process as contemplated and these chapter 11 cases. Finally, based on extensive discussions with the Debtors' other advisors, I believe that the proposed DIP Facility is on the most favorable terms available under the circumstances of these chapter 11 cases. Accordingly, in my professional opinion, the relief requested in the DIP Motion is necessary and appropriate to avoid immediate and irreparable harm to the Debtors' estates and should be approved by this Court.

## IV. THE RATES, FEES AND OTHER TERMS OF THE DIP FACILITY ARE FAIR REASONABLE

23. Based on my review of the terms of the DIP Facility and the attendant DIP Documents, I understand that the Debtors have agreed, subject to Court approval, to pay certain interest and fees to the DIP Agent and the DIP Lenders. Specifically, with respect to interest rates, I understand that the Debtors have agreed to an interest rate of: (i) for SOFR Loans (as defined in the DIP Agreement), 5.50% per annum *plus* Adjusted Term SOFR (as defined in the DIP Agreement) applicable to such Interest Period (as defined in the DIP Agreement); and (ii) Base Rate Loans (as defined in the DIP Agreement), 5.50% per annum *plus* the applicable Base Rate (as defined in the DIP Agreement) from time to time in effect (together, the "Applicable Rate"). Upon the occurrence and during the continuation of a DIP Event of Default, I understand that interest will accrue at SOFR plus the Applicable Rate plus a rate equal to 2.00% per annum, payable in cash upon demand. In addition, I understand that the Debtors have agreed to pay to the DIP Lenders the DIP Fees.

24. Based on my experience and knowledge of similar debtor in possession financings in the market and my analysis of interest rates and fees in comparable debtor in possession financing facilities, I believe that the Applicable Rate and the DIP Fees provided for in the DIP Facility are fair and reasonable under the circumstances. I believe that the Applicable Rate and

DIP Fees are customary, usual, and in line with debtor in possession financings of this kind. The Debtors and their advisors (including Houlihan) considered the Applicable Rate and the DIP Fees when determining whether the DIP Facility constituted the best alternative reasonably available to the Debtors. As a result, I believe that paying the Applicable Rate and DIP Fees in order to obtain the DIP Facility is in the best interests of the estates.

25. Based on my discussions with the Debtors and their Advisors, I also understand that the Debtors and the DIP Lenders agree that the Applicable Rate and DIP Fees were subject to negotiation and are an integral component of the overall terms of the DIP Facility, which, in turn, is integral to the success of the Debtors' broader efforts to effectuate a value maximizing sale. I believe that the Applicable Rate and the DIP Fees pursuant to the DIP Documents are fair and reasonable because such economics constitute the best terms on which the Debtors could obtain the financing necessary to maintain their ongoing business operations and fund their chapter 11 cases and are an integral component of the overall terms of the DIP Facility.

26. Further, I understand that the DIP Facility requires the Debtors to comply with certain Milestones in connection with the postpetition sale process. I understand these Milestones were heavily negotiated and required by the DIP Lenders as conditions to providing the DIP Facility. The continued and viable operation of the Debtors' businesses would not be possible absent access to the DIP Facility. The DIP Facility, and the Debtors' ability to achieve the Milestones contemplated therein, if approved, would prevent interruptions to the Debtors' operations, preserve the Debtors' ability to maintain ordinary course relationships with, among other parties in interest, employees, customers, and vendors, satisfy working capital needs in the ordinary course, of the Debtors' businesses, and enable the Debtors to facilitate the sale process and consummate a sale transaction.

27. In sum, based on my discussions with the Debtors' management team and their advisors, my involvement in the marketing process, and my review of the terms of the DIP Facility, I believe that the DIP Facility provides the Debtors with the best path forward in these chapter 11 cases as the Debtors work to continue the sale process and ultimately consummate a sale to the benefit of the estates and all stakeholders. The DIP Facility allows the Debtors to obtain necessary liquidity on market terms, without the risk of a priming fight, and fund the sale process with the benefit of a Stalking Horse Bid.

## BIDDING PROCEDURES MOTION

28. As discussed above, and as set forth in greater detail in the First Day Declaration, prior to the commencement of these chapter 11 cases, the Debtors retained Houlihan to act as the Debtors' exclusive investment banker in connection with, among other things, the Sale Process, and Houlihan canvassed the market for interested buyers. In connection with the Debtors' prepetition restructuring efforts, including the marketing and sale processes and the negotiation of the stalking horse asset purchase agreement (the "Stalking Horse APA") by and among Hardinge Inc., the other direct and indirect wholly-owned subsidiaries of Hardinge Inc. that are signatories thereto, and an affiliate of the DIP Agent (the "Stalking Horse Purchaser"), I, along with the rest of the Houlihan team, participated directly in discussions, due diligence, and negotiations alongside the Debtors' senior management, outside counsel, and other advisors.

I. **SALE TIMELINE**

29. As detailed above, as of the Petition Date, Houlihan has been actively marketing the Company for nearly two months, nearly 100 potentially interested purchasers were contacted and over 50 parties executed NDAs. While multiple options were presented to interested parties, Houlihan made clear that the Company was open to any viable transaction, including a sale of substantially all assets. After the Petition Date and during the pendency of these chapter 11 cases,

Houlihan plans to continue the Debtors' marketing process. Given the substantial head start provided by the prepetition marketing process, including outreach to interested parties, management calls, entering into NDAs, and gathering substantial diligence to create a robust data room, I believe that the Sale Process, on the timeframe contemplated by the Bidding Procedures, should allow for sufficient postpetition marketing of the Debtors' business and is fair, reasonable, and appropriate to enable the Debtors to seek the highest value for their Assets under the circumstances.

30. As discussed in the First Day Declaration, the Debtors have limited liquidity and have only narrowly avoided a chapter 7 liquidation. Indeed, I believe the Debtors cannot afford a longer Sale Process because the DIP Facility is contingent on closing a sale within the timeline provided in the Bidding Procedures. Further, the Assets have been marketed since early June with nearly 100 parties having been contacted and the Debtors' proposed auction date is not until September 10, 2024, and, therefore, I believe that is ample time for the Debtors to conduct a robust sale marketing process. Accordingly, I believe that the Debtors' and the Debtors' Sale Process should be best served by approval of the Bidding Procedures Order.

## II. THE BIDDING PROCEDURES

31. In connection with the Sale Process, the Debtors are filing the Bidding Procedures Motion, pursuant to which the Debtors seek entry of two orders: (i) an order (the "Bidding Procedures Order") approving the proposed bidding procedures (the "Bidding Procedures"), approving certain bidding procedures, authorizing and approving the Debtors' entry into the Stalking Horse APA, and granting related relief; and (ii) an order approving the sale of the Assets, which will be filed at a later date. Additionally, as noted in the Bidding Procedures Motion, the Debtors also seek authority to enter into the Stalking Horse APA with an affiliate of the DIP Agent

as the Stalking Horse Bidder.  In connection therewith, the Debtors are seeking approval of the Stalking Horse Bidder's expense reimbursement (the "Expense Reimbursement").

32.     With respect to the Expense Reimbursement, in my experience, stalking horse bidders typically require bid protections such as the Expense Reimbursement and I believe that such terms are customary and usual under the circumstances.

33.     Further, the Bidding Procedures should provide a transparent, fair, and comprehensive avenue through which the Debtors will further solicit competing bids for the Assets.  I understand that the timeline provided for in the Bidding Procedures is consistent with the Milestones required by the DIP Facility, and as noted above, the Debtors likely cannot afford a longer Sale Process.  Additionally, I believe that the Bidding Procedures reflect the Debtors' objective of conducting the Sale Process in an orderly and open manner, while ensuring that the highest or otherwise best bid is generated for the Assets.  I also understand that the Bidding Procedures, through approval of the Debtors' entry into the Stalking Horse APA, set a floor for the auction with respect to a Sale of their Assets (the "Auction").  Accordingly, I do not believe that the Bidding Procedures will chill or otherwise hamper potential bidders' bidding.  Further, I believe that the Stalking Horse APA was negotiated in good faith and at arm's-length and should serve as the baseline for all prospective bidders to negotiate from and will be subject to higher or otherwise better bids for the Assets pursuant to the Bidding Procedures.  Given the exigencies of the Debtors' financial condition, I believe that the timely Sale of the Assets, in accordance with the Sale Timeline and the timeline contemplated by the Stalking Horse APA, is the best way to avoid a fire-sale liquidation of the Assets and yield the highest or best value for the Assets.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated: July 29, 2024

*/s/ Adam Dunayer*
Adam Dunayer
Managing Director
Houlihan Lokey Capital, Inc.