UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| Hardinge Inc., *et al.*,[1] | Case No. 24-11605 (____) |
| Debtors. | (Joint Administration Requested) |

**DECLARATION OF ADRIAN FRANKUM,
CHIEF RESTRUCTURING OFFICER OF THE DEBTORS, IN
SUPPORT OF DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

I, Adrian Frankum, hereby declare under penalty of perjury to the best of my knowledge, information, and belief:

1.      I am the Chief Restructuring Officer of Hardinge Inc., a corporation organized under the laws of New York and one of the above-captioned debtors and debtors in possession (collectively, the "Debtors"), and each of its Debtor subsidiaries.  On July 29, 2024 (the "Petition Date"), each of the Debtors filed a voluntary petition in the United States Bankruptcy Court for the District of Delaware (the "Court") for relief under chapter 11 of title 11 of the United States Code, as amended (the "Bankruptcy Code").

2.      I have served as the Debtors' Chief Restructuring Officer since May 2024. I have more than 25 years of experience in the restructuring industry. I am also a Senior Managing Director at Ankura Consulting Group, LLC ("Ankura").  I hold an MBA from NYU Stern School

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number are:  Hardinge Inc. (0200); Ohio Tool Works, LLC (7569); Hardinge Technology Systems, Inc. (6427); Hardinge Grinding Group Inc. (6173); Forkardt Inc. (4671); Hardinge Ventures LLC (0586); and Kellenberger Swiss Grinding Machines, LLC (N/A).  The Debtors' service address is One Hardinge Drive, Elmira, NY 14902-1507.

of Business and a BBA from the University of Georgia.  I am also a certified public accountant (inactive).

3.      In my capacity as Chief Restructuring Officer of the Debtors, I am generally familiar with the Debtors' day-to-day operations, business and financial affairs, and books and records.  I submit this declaration (this "<u>Declaration</u>") to assist the Court and parties in interest in understanding the Debtors' corporate history, business operations, prepetition corporate and capital structure, the circumstances compelling the commencement of these chapter 11 cases (the "<u>Chapter 11 Cases</u>"), and in support of the Debtors' chapter 11 petitions and first day motions filed contemporaneously herewith, which seek relief intended to avoid immediate and irreparable harm to the Debtors' estates and to preserve their value.  The first day motions also seek certain procedural relief that will facilitate the Debtors' orderly transition into chapter 11.

4.      Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my discussions with other members of the Debtors' management team and the Debtors' advisors, my review of relevant documents and information concerning the Debtors' operations, financial affairs, and restructuring initiatives, or my opinions based upon my experience and knowledge and information I have reviewed or obtained from the Debtors.  The statements in this Declaration are accurate and correct to the best of my knowledge, information, and belief.  If called upon as a witness, I could and would testify competently to the facts set forth in this Declaration on that basis.

## PRELIMINARY STATEMENT

5.      Hardinge Inc., together with the other Debtors and its non-debtor direct and indirect subsidiaries (the "<u>Company</u>"), is a global leader in the design, manufacture and distribution of precise, advanced metal-cutting machine tool solutions.  With locations spanning the globe,

including the United States, England, France, Germany, Switzerland, China, and India, the Company is able to service customers worldwide. Through the twelve brands operated under the Company's umbrella, including Kellenberger®, Hardinge®, Buck Chuck®, Forkardt® and Ohio Tool Works®, the Company engineers and supplies computer controlled metalcutting turning machines, grinding machines, machining centers, collets, chucks, index fixtures, repair parts for machines, and other industrial products. The Company also provides post-sale support services and maintenance training, in-field maintenance, and in-field repair.

6.      Founded in the 1890's by Henry and Franklin Hardinge, the Company has over 130 years of experience providing high-precision machine tools with leading brand names. Today, the Company has approximately 1,700 employees across the globe, working hard to serve the Company's customer base of over 15,000 customers. The Company generates approximately $330 million of revenue annually across its seven business segments. In addition, the Company operates across the globe, with key operations in the United States, Germany, China and India, including 10 manufacturing sites globally.

7.      In recent years, the Company has been working to proactively transform its business. In mid-2023, the Company began to focus on streamlining its business by divesting non-core business lines to allow the Company to gain capital from asset sales, reduce long-term costs, and focus on the Company's core business lines. Unfortunately, these plans have not been successful.

8.      Recognizing the need for a long-term solution, in May 2024, the Debtors retained Ankura to provide me to serve in the role of Chief Restructuring Officer of the Debtors, along with additional necessary support personnel, Ropes & Gray LLP ("Ropes") as restructuring legal counsel, and Houlihan Lokey Capital, Inc. as investment banker ("Houlihan", and together with

Ankura and Ropes, the "Advisors") to explore strategic alternatives, including a sale of some or all of the Company's assets and businesses to a third-party buyer.  Shortly after hiring the Advisors, the Hardinge Inc. board of directors (the "Hardinge Board") determined it was advisable to appoint an independent director to the Hardinge Board and, following such appointment, to form a restructuring committee of the Hardinge Board, responsible for all of the Debtors' restructuring matters (the "Restructuring Committee").  In addition, in the months leading up to these chapter 11 cases, the Debtors proactively engaged with their secured lenders with the goal of developing and ultimately implementing a strategic transaction or transactions that would provide incremental liquidity to fund the Debtors' operations and allow the Debtors the time needed to conduct a value-maximizing sale of their assets and business segments.

9.     At the time the Debtors engaged the Advisors, the Company was in default under its Prepetition Credit Agreement (as defined below) and required a significant infusion of additional cash to stabilize the business and provide the runway necessary for the Company to explore value maximizing transactions.  Accordingly, with the Advisors' assistance, the Company approached the existing lenders under the Prepetition Credit Agreement (the "Prepetition Financial Institution Lenders") requesting that the Prepetition Financial Institution Lenders provide additional capital and the Company began its search for third-party financing.  Unfortunately, however, the Prepetition Financial Institution Lenders did not agree to provide incremental funding or consent to new financing on a consensual "priming" basis.  Accordingly, in an effort to preserve the substantial value associated with the Company operating as a going concern, avoid an imminent chapter 7 bankruptcy filing, and preserve jobs, at the direction of the Restructuring Committee, the Debtors simultaneously looked for alternative solutions, including, among other things, soliciting bids for the potential sale and assignment by the Prepetition Financial Institution

Lenders of the existing obligations under the Prepetition Credit Agreement to a third party.  As a result of this process, on July 22, 2024, the Prepetition Financial Institution Lenders consummated a sale and assignment of the Prepetition Credit Agreement to Centre Lane Partners V, L.P. (the "Replacement Lender").  On the next day, certain of the Company parties to the Prepetition Credit Agreement (the "Loan Parties") and the Replacement Lender entered into an amendment of the Prepetition Credit Agreement, pursuant to which the Company received a bridge loan of approximately $2.9 million.  This necessary incremental liquidity allowed the Debtors to continue to fund certain operations, prepare for the orderly commencement of these chapter 11 cases, and negotiate the terms of a stalking horse asset purchase agreement with an affiliate of the Replacement Lender (the "Stalking Horse Bidder"), which will be subject to a bidding and sale process for higher or better offers, that will ensure that all or substantial portions of the Company's business operations will remain a going concern.

## BACKGROUND

10.    To assist the Court and parties in interest in understanding the Company's business generally, and the Debtors in particular, and the relief the Debtors are seeking in the first day motions, this Declaration is organized as follows:

- *Part I* provides a general overview of the Company's corporate history and business operations;

- *Part II* provides an overview of the Company's prepetition corporate and capital structure;

- *Part III* describes the circumstances leading to the filing of these chapter 11 cases; and

- *Part IV* discusses the first day motions.

## I.    CORPORATE HISTORY AND BUSINESS OPERATIONS

### A.    The Company's Corporate History

11.    Originally founded as Hardinge Brothers in 1890 by Henry and Franklin Hardinge, the Company began by making watchmakers' tools in the back of a Chicago boardinghouse. After its formation in Chicago, Hardinge moved to its current corporate headquarters in Elmira, New York in the 1920s. During the mid-1900s, Hardinge began to expand internationally, including selling its first machines in China in the 1960s, a market which would become key to the Company's success. After a number of expansions, acquisitions and ownership changes, the Company is now a global leader in the design, manufacture and distribution of turning, milling, grinding, rotary and workholding solutions. Through innovation and acquisition, the Company has built a diverse portfolio of brands and products to meet the needs of its customers. Today, the Company has seven (7) business segments, ten (10) manufacturing sites across the globe, including in New York, Illinois, Michigan, Ohio, Germany, China, Switzerland, and India, and approximately 1,700 employees.

12.    In May 1993, Hardinge Inc. completed an initial public offering and remained publicly traded on the NASDAQ exchange until 2018. Beginning in 2014, affiliates of Privet Fund Management ("Privet") began acquiring shares of Hardinge Inc., accumulating a significant stake such that by mid-2017, Privet was Hardinge Inc.'s largest shareholders. Then, on May 25, 2018, the Company was acquired by Privet for a total transaction value of $245 million, which amounted to $18.50 per outstanding share.

### B.    The Company's Operations

13.    The Company generates approximately $330 million of aggregate revenue annually and, due to liquidity constraints, currently has over $220 million in order backlogs. The Company is active in many industries, and its key end markets include industrial, semiconductors,

automobiles and transportation, and aerospace and defense. The Company's seven business lines fall into three product segments – (1) grinding, (2) turning and milling, and (3) workholding.

14.    The Company's seven business lines are USACH ("USACH"), Kellenberger ("Kellenberger"), Weisser ("Weisser"), Hardinge China ("Hardinge China"), Hardinge Super Precision ("Hardinge Super Precision"), Ohio Tool Works ("Ohio Tool Works"), and Workholding ("Workholding"). The Company's USACH and Kellenberger business lines are in the grinding product segment, with USACH also operating as the United States distributer for the Swiss-based Kellenberger brand products. The Company's Weisser business line operates across all three segments but almost exclusively serves customers in the automotive industry. The Company's Hardinge China business line also operates in all three product segments and acts as the Chinese distributor for certain of the Company's other product lines, namely Weisser and Kellenberger. Hardinge Super Precision and Ohio Tools Works are in the turning and honing, and consumables (abrasives and tooling) segment. Finally, the Company's Workholding business line is exclusively in the workholding segment and operates in the United States, Germany, France and India. Through Workholding, the Company provides a comprehensive portfolio of standard and customized engineered workholding solutions and serves tens of thousands of existing installed machines. The Workholding business serves a highly-diversified blue chip customer base, in industries ranging from technology to power generation to health care.

15.    The Debtors conduct operations in the United States in facilities located in: Elmira, New York; Elgin, Illinois; Berwyn, Pennsylvania; Ashland, Ohio; and Traverse City, Michigan. The Debtors own their facility located in Traverse City, Michigan, while its four remaining facilities are leased. The Debtors lease the location in Elmira, New York pursuant to that certain Lease Agreement among One Hardinge Drive LLC as Landlord and Hardinge Technology

Systems, Inc. as Tenant, dated as of April 22, 2022 (the "Elmira Lease"), which lease was the result of the consummation sale leaseback transaction among Hardinge Technology Systems, Inc. ("HTS") and One Hardinge Drive LLC, an indirect subsidiary of Privet.

## II.     THE DEBTORS' PREPETITION CORPORATE AND CAPITAL STRUCTURE

16.     The Debtors' corporate enterprise consists of the Debtor and non-Debtor entities depicted on the corporate structure attached hereto as **Exhibit A**.

17.     As of the Petition Date, the Debtors have approximately $106,660,241.92 of funded principal debt obligations, consisting of obligations under the Prepetition Credit Agreement (as defined below).

18.     On September 27, 2022, Debtor Hardinge Inc. (the "Borrower") entered into that certain Credit Agreement (as amended, restated, supplemented, amended and restated or otherwise modified from time to time prior to the Petition Date, the "Prepetition Credit Agreement," and collectively with any other agreements and documents executed or delivered in connection therewith, including the "Loan Documents" as defined therein, each as may be amended, restated, supplemented, or otherwise modified from time to time, the "Prepetition Loan Documents"), among the Borrower, the other Debtors and other guarantors party thereto, the several financial institutions party thereto as "Lenders" (collectively, the "Prepetition Lenders") and BMO Harris Bank N.A., as administrative agent  (in such capacities, the "Prepetition Agent" and, collectively with the Prepetition Lenders, the "Prepetition Secured Parties").  Pursuant to the Prepetition Loan Documents, the Prepetition Lenders agreed to extend loans and other financial accommodations to the Borrower.  The Prepetition Lenders provided an initial term loan of $75 million and a revolver of $35 million.

19.     Each of the Borrower, Hardinge Holdings, LLC, Hardinge Grinding Group Inc., Hardinge Technology Systems, Inc., Hardinge Ventures LLC, Forkardt Inc., and Ohio Tool

Works, LLC (collectively, the "Prepetition U.S. Loan Parties") and the Prepetition Agent are party to the Security Agreement, dated September 27, 2022 (as amended, restated, supplemented, amended and restated or otherwise modified from time to time prior to the Petition Date, the "Prepetition Security Agreement"). Pursuant to the Prepetition Security Agreement, each of the Debtor Prepetition U.S. Loan Parties has granted and pledged to the Prepetition Agent for the benefit of each Prepetition Secured Party, a security interest in substantially all of the assets of each of the Debtor Prepetition U.S. Loan Parties to secure the obligations under the Prepetition Credit Agreement. All borrowings under the Prepetition Credit Agreement mature on September 27, 2027.

20. On July 22, 2024, the Prepetition Financial Institutional Lenders irrevocably sold and assigned to the Replacement Lender their rights and obligations under the Prepetition Credit Agreement. Following the sale, on July 23, 2024, the Borrower entered into a second amendment to the Prepetition Credit Agreement (the "Second Amendment"), which provides for a new term loan to the Borrower in the aggregate principal amount of $2,930,515 and that all borrowings under the Prepetition Credit Agreement mature on July 31, 2024.

21. As of the Petition Date, approximately $106,660,241.92 in aggregate principal amount and accrued but unpaid interest remains outstanding on the Prepetition Credit Agreement.

## III.   EVENTS LEADING TO THESE CHAPTER 11 CASES

22. These chapter 11 cases are being filed as a result of a number of issues and events that affected the Debtors' performance and available liquidity in recent years. Accordingly, the Debtors have determined that seeking relief pursuant to chapter 11 of the Bankruptcy Code and continuing in their efforts to implement a value-maximizing transaction in chapter 11 provides the best option for the Debtors and their stakeholders at this time.

### A.    Challenging Operating Environment and Industry-Specific Challenges

23.    A confluence of factors contributed to the Debtors' need to commence the Chapter 11 Cases.  These include: (a) the regulatory approvals for the sale of Hardinge China not being obtained; (b) the greater than anticipated challenges resulting from the Weisser acquisition; (c) the buildup of unsold finished goods inventory ahead of the facility consolidation from Kellenberger and (d) macroeconomic pressures, particularly in the Chinese markets.  Over time, these factors have tightened the Debtors' liquidity, complicated their vendor relationships and impacted manufacturing operations.  To help address these liquidity issues, between April 2023 and November 2023, Privet invested an additional approximately $36 million of equity into the Company.  In or around May 2024, the Debtors faced dwindling cash flows and the inability to access even incremental liquidity under the Prepetition Credit Agreement.  The combination of the above factors precipitated these chapter 11 cases.

### B.    Failed Sale Process for Hardinge China

24.    Beginning in the first quarter of 2023, as part of its efforts to streamline its operations and divest non-core business lines, the Company commenced a sale process for Hardinge China and the Company's Taiwan business.  In November 2023, the Company successfully completed a sale of its Taiwan business, generating proceeds of $8 million, which the Company used for working capital purposes.

25.    The Company engaged Houlihan Lokey Corporate Finance to conduct the sale process for Hardinge China, and Houlihan Lokey Corporate Finance marketed the Hardinge China business throughout the second, third and fourth quarters of 2023.  The sale process generated substantial interest among both financial and strategic buyers and, in January of 2024, the Company entered into a definitive agreement to sell Hardinge China. The closing for the Hardinge China sale was contemplated to occur in the first half of 2024 and the Company planned to use the

proceeds to pay off the amounts outstanding under the Prepetition Credit Agreement and use the remainder for working capital needs across the Company's remaining streamlined businesses. Unfortunately, prior to the closing of the Hardinge China sale, the Shenzhen Stock Exchange and its regulator, the Chinese Securities Regulatory Commission (the "CSRC"), unexpectedly intervened and, due to the specific nature of the proposed buyer for Hardinge China, required a Material Asset Restructuring review process, requiring extensive filings. While Hardinge China gathered the extensive documents required and did all it could to help support the regulatory process, the buyer expressed substantial uncertainty that the transaction would ultimately be approved by the CSRC.

26.    While the Company had negotiated the Hardinge China sale and worked to close that transaction, the Company's financial condition had become strained, but the proceeds from the Hardinge China sale were expected to quickly remedy this issue. When the Hardinge China sale stalled and the likelihood of closing became uncertain, the Company recognized that it could not continue to invest in that process given its current liquidity position. Accordingly, in early May, the parties terminated the purchase agreement for Hardinge China and refocused its efforts on solving its immediate liquidity needs. To that end, as stated above, in late May 2024, the Debtors engaged the Advisors to explore strategic alternatives, including financing and sale alternatives.

### C.    European Capital Requirements

27.    In October 2021, the Company acquired Weisser, a German tool company that was in the process of restructuring, by acquiring the entities Weisser GmbH and J.G. Weisser Söhne GmbH & Co. KG (collectively, "Weisser"). The Company financed the acquisition of Weisser with proceeds from its credit facility at that time, as well as $15 million in cash equity contributed by Privet as an incremental investment. Today, Weisser is an indirect subsidiary of Hardinge Inc.

When the Company acquired Weisser, Weisser was not profitable but was in the process of restructuring and the Company was optimistic that it could integrate Weisser into its existing business lines and capitalize on synergies to turn Weisser into a profitable operation. Unfortunately, the capital requirements for a turnaround of Weisser were significantly higher than anticipated and became a source of stress on the Company's financial condition shortly after the Company acquired Weisser.  By the second half of 2023, the amount of cash being provided to Weisser by the rest of the Company's business lines had created significant working capital issues for the Company as a whole, despite having received two additional equity investments during this period of time.  In that regard, Hardinge Inc. has provided certain credit support to Weisser in the form of a comfort letter in the amount of €13 million and also presently has an intercompany receivable from Weisser in the approximate amount of $70 million attributable to the initial acquisition of Weisser as well as incremental capital Hardinge Inc. provided to Weisser to support operations.  Accordingly, the Company, recently with the assistance of Houlihan, has been seeking a buyer for Weisser and, as of the commencement of the Chapter 11 Cases, the direct owner of Weisser, Hardinge GmbH, is negotiating a sale of its interest in Weisser.

28.     As mentioned above, in March 2020, Kellenberger embarked upon a facility consolidation initiative combining four antiquated manufacturing sites to one optimized location in Goldach, Switzerland, to be completed in July 2023.  Ahead of that facility consolidation, stock finished goods inventory of machinery was built to support shipments through the second half of 2023 as production in the new facility was ramped up.  The finished goods inventory was a substantial use of capital that, due to the macroeconomic issues noted above, remained unsold through the second half of 2023 and first quarter of 2024, thus contributing to the constrained liquidity position of the company.

**D.      Prepetition Restructuring Efforts**

29.      At the end of May 2024, the Debtors engaged Houlihan to serve as their investment banker to begin exploring strategic alternatives to address imminent liquidity concerns.  Upon its retention, Houlihan immediately began conducting due diligence with respect to the Debtors' assets and operations.  Subsequent to its initial assessment of alternatives and timing of a marketing process, the Company, together with the Advisors, determined the Company lacked the liquidity needed to conduct an out of court sale process.  The Company needed an immediate liquidity infusion.  The Company approached the Prepetition Financial Institution Lenders to request incremental liquidity to allow time to develop the best plan to maximize the value of the Company's assets for all the Company's stakeholders.  While the Prepetition Financial Institution Lenders initially stated they would potentially provide some bridge financing, they ultimately declined to provide incremental funding.  In order to preserve the Company's significant going-concern value and save the jobs of the Company's 1,700 employees, the Company, together with the Advisors, embarked on a process to find a buyer for the secured debt held by the Prepetition Financial Institution Lenders, in an effort to bring in new secured lenders who would be willing to support and fund the Company to preserve the value of the Company as a going concern.  Houlihan led the debt sale process and approached the process similarly to a sale of substantially all assets of the Company.  For a buyer to purchase the Company's secured debt, the buyer would need to be comfortable with the value of the collateral securing the debt, *i.e.*, the Company's assets. Houlihan encouraged interested parties to submit any bid those parties were comfortable with, be it to purchase the Prepetition Financial Institution Lenders' debt, to purchase substantially all of the Company's assets, to provide additional financing whether in court or out of court, or to purchase a subset of the Company's assets.

30.     Given the urgency of the Company's liquidity concerns, on June 4, 2024, Houlihan began contacting potential bidders for the sale of the Company, providing a "teaser" summary of the Company to 81 potential strategic and financial sponsor parties and holding introductory calls with 70 parties.  Of those parties, 47 potential bidders executed non-disclosure agreements, after which Houlihan held numerous follow-up diligence calls for these parties' benefit and these parties received access to a virtual data room, management presentations, and other more comprehensive diligence information.  Houlihan requested that the potential bidders submit initial bids by June 19, 2024.  The Company received five (5) proposals, none of which were acceptable to the Prepetition Financial Institution Lenders.  At the time the Company requested bids by June 19, 2024, the Company believed it would need incremental funding by June 23, 2024, or would otherwise need to file for bankruptcy.  However, due to the dedicated work of the Company's management team, the Company was able to extend the process to July 12, 2024, to allow additional time for parties to conduct diligence and submit bids, and I understand Houlihan continued its marketing efforts during this period, including contacting additional parties.  By July 12, 2024, the Company had received eight (8) proposals, including a proposal for the Replacement Lender to (a) purchase the secured debt held by the Prepetition Financial Institution Lenders, (b) provide incremental funding to the Company immediately after the closing of the debt purchase, (c) provide a debtor in possession financing facility in chapter 11, and (d) to serve as the stalking horse purchaser for the Debtors' assets.   On July 22, 2024, the sale of the Prepetition Financial Institution Lenders' secured debt to the Replacement Lender closed.  On July 23, 2024, the Replacement Lender funded a bridge loan in the amount of approximately $2.9 million pursuant to the Second Amendment.  As of the Petition Date, the Debtors are in the process of finalizing a stalking horse agreement with the Stalking Horse Bidder and have commenced these

chapter 11 cases to consummate a sale transaction with the Stalking Horse Bidder or a third-party bidder who submits a higher or otherwise better bid for the Debtors' business and assets. The Debtor's contemplated sale process, which is a continuation of a nearly two-month prepetition process, seeks to obtain Court approval and consummation of the sale transaction in compliance with the milestones included in the Debtors' DIP Facility (as defined herein). Based on discussions with Houlihan and my experience, I believe that in addition to the prepetition sale process conducted by Houlihan, this process will enable the Debtors to obtain a value maximizing sale transaction that is in the best interest of the Debtors and their stakeholders.

31.     In sum, the filing of the Chapter 11 Cases was precipitated by, among other things, the Company's severe liquidity concerns and the mounting pressure from vendors for payments and their refusal to deliver products without assurances of payment. The threats of product interruption placed the Debtors' business and their relationships with key customers and, thus, its going concern value, at significant risk. Accordingly, to obtain the significant new capital necessary to ensure that the Company is able to obtain the goods and supplies required to complete and deliver products to key customers and stabilize the business, and to preserve going concern value, the Debtors commenced the Chapter 11 Cases to obtain the immediate cash infusion provided under the DIP Facility and to consummate a sale transaction to maximize the value of the Debtors' assets.

## IV.     FIRST DAY MOTIONS AND RELATED RELIEF REQUESTED

### A.     The DIP Facility and Related Relief Requested

32.     Pursuant to the DIP Motion,[2] the Debtors seek authority to obtain senior secured postpetition financing on a superpriority basis consisting of a superpriority senior secured multiple

---

[2]     "DIP Motion" means *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Financing Pursuant to Section 364 of the Bankruptcy Code, (II) Authorizing the Debtors to*

draw term loan facility (the "DIP Facility") in an aggregate principal amount not to exceed $27,350,000, use cash collateral ("Cash Collateral"), and obtain related relief. If the DIP Facility is approved, $24,200,000 of the DIP Facility would be available (subject to the DIP Lenders agreeing on funding for the USACH/Kellenberger Term Loan Commitments, as defined in the DIP Motion) upon entry of the Interim Order (as defined in the DIP Motion) and the remainder would be available upon entry of the Final Order (as defined in the DIP Motion).

      *1.*     *The Debtors Have an Immediate and Continuing Need for DIP Financing and Access to Cash Collateral*

33.     The Debtors commenced the Chapter 11 Cases with limited cash on hand and are in need of both access to Cash Collateral and an immediate infusion of liquidity to ensure sufficient working capital to operate their businesses, pay their employees and vendors, service their customers, administer their estates during the Chapter 11 Cases, and fund the sale process. As detailed above, the Debtors have had pressing liquidity issues for nearly two months, and have only narrowly avoided filing for chapter 7 bankruptcy due to these liquidity concerns.

34.     Without prompt access to postpetition financing and Cash Collateral, the Debtors would be unable to: (a) ensure payments to employees, third-party vendors, utilities, taxing authorities, and insurance companies, among others, who provide the essential services needed to operate, maintain, and insure the Debtors' assets; (b) ensure the timely payment of administrative expenses to be incurred; (c) provide a positive message to the market that the Chapter 11 Cases are sufficiently funded and that the sale process will be adequate, which is critical to ensure confidence in the Debtors from, among others, their customers, employees, and vendors; and

---

*Use Cash Collateral Pursuant to Section 363 of the Bankruptcy Code, (III) Granting Adequate Protection to the Prepetition Secured Parties Pursuant to Sections 361, 362, 363 and 364 of the Bankruptcy Code, (IV) Granting Liens and Superpriority Claims, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief.*

(d) make any necessary payments to preserve the value of the Debtors' brands in the United States and other foreign countries in which the Debtors do business.  Immediate access to the DIP Facility and continued access to the Cash Collateral is, therefore, crucial to the Debtors' efforts to preserve value for their stakeholders during these chapter 11 cases and to avoid immediate and irreparable harm to the value of the Debtors' estates.  Absent this funding, the Debtors would not be able to continue to operate their businesses at the levels that are necessary to preserve their goodwill, employee morale, vendor confidence in the Debtors' businesses, and customer loyalty and reputation in the marketplace.  I further believe that the Debtors' entry into the DIP Credit Agreement (as defined in the DIP Motion) is an exercise of the Debtors' sound business judgment, and that the benefits of accessing the DIP Facility and further use of Cash Collateral outweigh the modest burdens and expenses imposed by the financing arrangements.

35.     Ankura undertook a detailed analysis of the Debtors' operations and funding needs, and, from this review and analysis, it became clear that the Debtors would require an infusion of capital to operate during these chapter 11 cases as they conduct their marketing for the sale process. In furtherance of their cash needs, the Debtors and Ankura prepared the Approved Budget (as defined in the DIP Motion) outlining the funding that would be critical in the initial seven (7) weeks post-filing, with such budget to be updated pursuant to the terms of the DIP Credit Agreement and the Interim Order. Based on information available as of the Petition Date, it is my belief that the Approved Budget, as will be updated, is an accurate reflection of their initial funding requirements based on the contemplated case timeline and sale process and will allow the Debtors to meet their obligations in the Chapter 11 Cases.

2.      *The DIP Facility Was Negotiated in Good Faith and at Arm's Length*

36.     The Debtors' management and Advisors were actively involved throughout the negotiations with the DIP Lenders (as defined in the DIP Motion) for debtor in possession

financing, which were conducted at arm's length and in good faith. Following such negotiations, the Debtors reached an agreement with the DIP Lenders with respect to the terms of the DIP Facility. The Debtors and their advisors worked to negotiate the most favorable terms of the DIP Facility available to the Debtors given the Debtors' lack of alternative third-party financing. Ultimately, the DIP Lenders were unwilling to lend on terms other than those specifically set forth in the DIP Documents.

37.    Without immediate access to the DIP Facility and the use of Cash Collateral, I believe the Debtors would suffer immediate and irreparable harm and would not be able to successfully consummate a value-maximizing transaction and administer these chapter 11 cases. I believe that the DIP Facility should be approved, and the Debtors be authorized to pay the Applicable Rate (as defined in the DIP Motion) and the DIP Fees (as defined in the DIP Motion) under the DIP Facility given the Debtors' financial circumstances and the lack of any other viable financing alternatives. I also believe that the use of Cash Collateral alone would be insufficient to meet the Debtors' postpetition liquidity needs. Based on my discussions with the Debtors' management team and their advisors and my review of the terms of the DIP Facility, I believe that the DIP Facility is the best financing option presently available to the Debtors and that the terms of the DIP Facility are reasonable under the circumstances. Accordingly, I believe that the Court's entry of the Interim Order is necessary to preserve the going concern value of the Debtors' operating businesses, pursue the sale of substantially all of the Debtors' assets, and ultimately effectuate a value-maximizing transaction in the best interest of their estates and stakeholders.

**B.    Other First Day Motions and Related Relief Requested**

38.    In connection with the filing of these chapter 11 petitions, in addition to the DIP Motion, the Debtors filed the below-listed First Day Motions requesting relief that the Debtors believe is necessary to enable them to administer their estates with minimal disruption and loss of

value during these chapter 11 cases.  The facts set forth in each of the First Day Motions are incorporated herein in their entirety.[3]

(i)  **Administrative Motions:**

(1)  <u>Joint Administration Motion</u>.  *Debtors' Motion for Entry of an Order (I) Directing Joint Administration of Related Chapter 11 Cases and (II) Granting Related Relief;*

(2)  <u>Kroll Application</u>.  *Debtors' Application for Appointment of Kroll Restructuring Administration LLC as Claims and Noticing Agent;*

(3)  <u>Global Automatic Stay Motion</u>. *Debtors' Motion for Entry of Order (I) Restating and Enforcing Protections Of 11 U.S.C. §§ 362, 365, 525, and 541(C), (II) Approving Notice Related to Non-Debtor Affiliates, and (III) Granting Related Relief; and*

(4)  <u>Creditor Matrix Motion</u>.  *Debtors' Motion for Entry of Order (I) Authorizing Debtors to File a Consolidated (A) Creditor Matrix and (B) Top 30 Creditors List, (II) Authorizing Redaction of Certain Personal Identification Information, and (III) Granting Related Relief.*

(ii)  **Operational Motions:**

(5)  <u>Cash Management Motion</u>.  *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Debtors to (A) Continue to Operate Their Cash Management System, (B) Honor Certain Prepetition Obligations Related Thereto, (C) Maintain Existing Business Forms, and (D) Continue Certain Intercompany Transactions and (II) Granting Related Relief;*

(6)  <u>Insurance Motion</u>. *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Debtors To (A) Maintain Existing Insurance Policies and Pay All Insurance Obligations Arising Thereunder, and (B) Renew, Supplement, Modify, or Purchase Insurance Coverage; and (II) Granting Related Relief;*

(7)  <u>Taxes Motion</u>.  *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Debtors to Pay Certain Prepetition Taxes and Fees and (II) Granting Related Relief;*

(8)  <u>Utilities Motion</u>.  *Debtors' Motion for Entry of Interim and Final Orders (I)(A) Approving the Debtors' Proposed Adequate*

---

[3]  Capitalized terms used in this section but not otherwise defined herein shall have the meanings ascribed to them in the respective First Day Motions.

*Assurance of Payment for Future Utility Services, (B) Approving the Debtors' Proposed Procedures for Resolving Additional Assurance Requests, and (C) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Services; and (II) Granting Related Relief;*

(9)   <u>Wages Motion</u>. *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Debtors To (A) Pay Prepetition Wages, Employee Benefits Obligations and Other Compensation, and (B) Continue Employee Benefits Programs and Pay Related Administrative Obligations and (II) Granting Related Relief*; and

(10)   <u>NOL Motion</u>. *Debtors' Motion for Entry of Interim and Final Orders Establishing Notice and Objection Procedures for Transfers of Equity Securities and Claims of Worthless Stock Deductions.*

**(iii)   Payment of Claims Motions:**

(11)   <u>Customer Programs Motion</u>. *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Debtors To (A) Honor Certain Prepetition Obligations to Customers and (B) Otherwise Continue Certain Customer Programs in The Ordinary Course of Business and (II) Granting Related Relief*;

(12)   <u>Critical Vendors Motion</u>. *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Debtors to Pay Certain Prepetition Claims of Critical Vendors, (II) Authorizing Banks to Honor and Process Check and Electronic Transfer Requests, and (III) Granting Related Relief*; and

(13)   <u>Lien Claimants Motion</u>. *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Debtors to Pay Certain Prepetition Claims of Lien Claimants and Related Obligations, (II) Authorizing Banks to Honor and Process Check and Electronic Transfer Requests Related Thereto, and (III) Granting Related Relief.*

39.    The First Day Motions request authority to, among other things, honor workforce-related compensation and benefits obligations, pay claims of certain taxing authorities, continue to honor certain customer programs, and continue the Debtors' cash management system and other operations in the ordinary course of business to ensure minimal disruption of the Debtors' business operations during these chapter 11 cases.  For the avoidance of doubt, the

Debtors request authority, but not direction, to pay amounts or satisfy obligations with respect to the relief requested in the First Day Motions.

40.     The Debtors have tailored their requests for immediate relief to those circumstances where the failure to receive such relief would cause immediate and irreparable harm to the Debtors and their estates.  I believe an orderly transition into chapter 11 is critical to the viability of the Debtors' operations and that any delay in granting the relief described below could hinder the Debtors' operations and cause irreparable harm.  Other requests for relief will be deferred for consideration at a later hearing.

41.     I have reviewed each of the First Day Motions and am familiar with the content and substance contained therein.  The facts set forth in each First Day Motion are true and correct to the best of my knowledge and belief with appropriate reliance on other corporate officers and advisors and I can attest to such facts.  I believe the relief requested in each of the First Day Motions listed above (a) is necessary to allow the Debtors to operate with minimal disruption and productivity losses during these chapter 11 cases, (b) is critical to ensure the maximization of value of the Debtors' estates, (c) is essential to achieving a successful reorganization, and (d) serves the best interests of the Debtors' stakeholders.

## CONCLUSION

42.     The Debtors' ultimate goal in the Chapter 11 Cases is to achieve a value-maximizing result for the Debtors' stakeholders through the sale of the Debtors' assets.  To minimize any loss of value, the Debtors' immediate objective is to maintain a business-as-usual atmosphere during the course of the Chapter 11 Cases, with as little interruption or disruption to the Debtors' operations as possible.  I believe that if the Court grants the relief requested by the First Day Motions, the prospect for achieving these objectives will be substantially enhanced.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated: July 29, 2024

*/s/ Adrian Frankum*
Adrian Frankum
Chief Restructuring Officer

## EXHIBIT A

**Corporate Structure Chart**



Hardinge Corporate Structure Chart