## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| Hardinge Inc., *et al.*,[1] | Case No. 24-11605 (JKS) |
| Debtors. | (Joint Administration Requested) |
| | **Hearing Date:  TBD** |
| | **Objection Deadline: August 16 at 4:00 p.m. (ET) (REQUESTED)** |

### DEBTORS' MOTION PURSUANT TO SECTIONS 105, 363 AND 365 OF THE BANKRUPTCY CODE FOR ENTRY OF AN ORDER (I) APPROVING THE BIDDING PROCEDURES, INCLUDING THE DEBTORS' ENTRY INTO THE STALKING HORSE APA, THE SALE TIMELINE, AND THE FORM AND MANNER OF NOTICE THEREOF; (II) APPROVING THE DEBTORS' (A) SALE OF ALL OR SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS FREE AND CLEAR OF ALL LIENS OTHER THAN ASSUMED LIABILITIES AND (B) ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES TO THE SUCCESSFUL BIDDER; AND (III) GRANTING RELATED RELIEF

Hardinge Inc. and its affiliated debtors and debtors in possession (each, a "Debtor" and collectively, the "Debtors") in the above-captioned chapter 11 cases, by and through their undersigned proposed counsel, hereby submit this motion (this "Motion")[2] for entry of orders granting the relief described below.  In support hereof, the Debtors represent as follows:

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number are:  Hardinge Ventures LLC (0586); Ohio Tool Works, LLC (7569); Kellenberger Swiss Grinding Machines, LLC (N/A); Hardinge Inc. (0200); Hardinge Technology Systems, Inc. (6427); Forkardt Inc. (4671); and Hardinge Grinding Group Inc. (6173).  The Debtors' service address is One Hardinge Drive, Elmira, NY 14902-1507.

[2]  Capitalized terms used but not defined herein have the meanings ascribed to them in the Bidding Procedures Order or the *Debtors Motion for Entry of Interim and Final Orders (I) Authorizing Debtors to Obtain Postpetition Financing Pursuant to Section 364 of the Bankruptcy Code, (II) Authorizing the Use of Cash Collateral Pursuant to Section 363 of the Bankruptcy Code, (III) Granting Adequate Protection to the Prepetition Secured Parties Pursuant to Sections 361, 362, 363 and 364 of the Bankruptcy Code, (IV) Granting Liens and Superpriority Claims, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* [Docket No. 16] (the "DIP Motion").]

## BACKGROUND

1.      As set forth in the *Declaration of Adrian Frankum, Chief Restructuring Officer of the Debtors, in Support of Debtors' Chapter 11 Petitions and First Day Motions* [Docket No. 18] and the *Declaration of Adam Dunayer in Support Debtors' Motion to Obtain Postpetition Debtor in Possession Financing and the Debtors' Bidding Procedures Motion* [Docket No. 17] (the "Dunayer Declaration") the Debtors filed these chapter 11 cases to effectuate a sale (the "Sale") of all or substantially all of their assets, including any and all rights, claims, and causes of action, and all of the issued and outstanding equity interests of certain non-debtor foreign entities (collectively, the "Assets") to maximize value for all stakeholders.  By this Motion, the Debtors seek the Court's approval of bidding procedures pursuant to which they will seek bids for the Sale of all or substantially all of the Assets.

2.      A thorough yet expedited bidding process and consummation of the Sale are vitally important to the Debtors' efforts to maximize value by selling the Assets.  The expedited timeline set forth in the Bidding Procedures, attached as Exhibit 1 (the "Bidding Procedures") to the Bidding Procedures Order (as defined below) is reasonable under the circumstances of these chapter 11 cases and is necessary to meet the milestone included in the Debtors' proposed debtor in possession financing facility for closing of the Sale.

3.      The Bidding Procedures and the related relief requested in this Motion are in the best interests of the Debtors' estates and their stakeholders.  Accordingly, the Debtors request that this Court grant this Motion.

## JURISDICTION AND VENUE

4.      The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction to consider this Motion under 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware dated

2

February 29, 2012.  Pursuant to Rule 9013-1(f) of the Local Rules of Bankruptcy Practice and

Procedure for the United States Bankruptcy Court for the District of Delaware (the "Local Rules"),

the Debtors confirm their consent to the entry of a final order by the Court in connection with this

Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot

enter final orders or judgments in connection herewith consistent with Article III of the United

States Constitution.

5.      This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue of these

chapter-11 cases and this Motion is proper in this district under 28 U.S.C. §§ 1408 and 1409.

6.      The statutory bases for the relief requested herein are sections 105, 363, and 365 of

title 11 of the United States Code, as amended (the "Bankruptcy Code"), Rules 2002, 6004 and

6006 of the Federal Rules of Bankruptcy Procedures (the "Bankruptcy Rules"), and Local

Rules 2002-1 and 6004-1.

**RELIEF REQUESTED**

7.      The Debtors seek entry of an order approving, among other things, the Bidding

Procedures, in substantially the form attached hereto as **Exhibit A** (the "Bidding Procedures

Order"), which:

> (a)      authorizes and approves the Bidding Procedures;
>
> (b)      authorizes the Debtors to enter into the Stalking Horse APA (as defined below), upon finalization or the form attached hereto as **Exhibit B**;
>
> (c)      approves the form and manner of notice of the proposed Sale of Assets, the Stalking Horse APA, the Bidding Procedures, the Auction (as defined below), and the Sale Hearing (as defined below), attached to the Bidding Procedures Order as Exhibit 2 (the "Sale Notice"), and the notice of Successful Bidder, attached to the Bidding Procedures Order as Exhibit 3;
>
> (d)      approves procedures for the assumption and assignment of the Purchased Contracts (as defined in the Bidding Procedures Order) in connection with any sale, and approves the form and manner of the notice thereof, attached as Exhibit 4 to the Bidding Procedures Order (as defined below);

3

(e)     schedules certain dates with respect thereto;

(f)     grants authority to sell certain de minimis assets in order to effectuate the Sale; and

(g)     grants related relief.

8.      The Debtors will seek entry of a sale order (the "Sale Order") at the Sale Hearing (as defined below), which the Debtors will file in advance of the Sale Hearing.  The proposed Sale Order will, among other things:

(a)     authorize and approve the Sale to the Stalking Horse Purchaser (as defined below) or otherwise Successful Bidder (as defined in the Bidding Procedures), on the terms substantially set forth in the Successful Bid (as defined in the Bidding Procedures);

(b)     authorize and approve the Sale of the Assets free and clear of any claim, pledge, option, charge, hypothecation, easement, security interest, right-of-way, encroachment, mortgage, statutory or deemed trust, and deed of trust or other encumbrance to the extent set forth in the asset purchase agreement with the Successful Bidder, attached to the Sale Order, which may be the Stalking Horse APA;

(c)     authorize and approve the assumption and assignment of the Purchased Contracts to the Successful Bidder; and

(d)     grants related relief.

9.      The Debtors will file declarations or other evidence in support of the Sale in advance of the sale hearing (the "Sale Hearing") to approve the Successful Bid and any Backup Bid (as defined below) (or if no Acceptable Bid (as defined below) other than that of the Stalking Horse Purchaser is received, then the Stalking Horse APA).

**THE PROPOSED SALE**

**II.     The Prepetition Marketing Process**

10.     In late-May 2024, the Debtors engaged Houlihan Lokey Capital Inc. ("Houlihan") to serve as their investment banker to begin exploring strategic alternatives to address upcoming

debt maturities and liquidity constraints. Upon its retention, Houlihan immediately began conducting due diligence with respect to the Assets and the Debtors' operations. Subsequent to its initial assessment of alternatives and timing of a marketing process, Houlihan began marketing preparations, including determining market interest in (a) a potential sale of the Debtors' business or (b) a new debt financing deal that would be coupled with a restructuring of existing debt claims.

11.     Beginning in early-June 2024, Houlihan began contacting potential bidders regarding the debt sale, providing a detailed teaser to ninety-four (94) potential strategic and financial sponsor parties and holding introductory calls with eighty-four (84) of those. Of those parties, fifty-six (56) potential bidders executed non-disclosure agreements, after which Houlihan held numerous follow-up diligence calls for such parties' benefit. Houlihan requested that potential bidders submit initial bids by June 19, 2024, and received five (5) such bids, none of which were actionable. However, the Company's management worked diligently to preserve liquidity, allowing Houlihan to extend the deadline to July 12, 2024. By July 12, 2024, parties were able to conduct additional diligence, and the Company received eight (8) proposals.

12.     One of these proposals was from Centre Lane Partners, LLC to, through one or more affiliates or newly formed affiliate entities,  purchase the secured debt, provide an incremental bridge facility immediately after closing the proposed debt sale closing, provide a debtor in possession financing facility in chapter 11, and to serve as the stalking horse bidder (the "Stalking Horse Purchaser") for substantially all of the Debtors' and their Non-debtor subsidiaries (collectively, the "Company") businesses, except WEISSER Gesellschaft mit beschränkter haftung and J.G. WEISSER SöHNE GmbH & Co. KG("Weisser") (the "Sale Transaction"). On July 22, 2024, Centre Lane Partners V, LP (the "Replacement Lender") purchased and took an assignment of the existing secured lenders' rights and obligations under the

Prepetition Credit Agreement (the "Secured Debt Purchase"). The following day, the Replacement Lender entered into the Second Amendment to the Prepetition Credit Agreement, pursuant to which the Replacement Lender provided a bridge loan of approximately $2.9 million but shortened the maturity date of the Prepetition Credit Agreement to July 31, 2024.

13.      During these discussions and through the Petition Date, Houlihan continued its efforts to solicit offers for the Debtors' Assets as well as its business segments, and to that end, the Debtors commenced these chapter 11 cases to conduct a market check as to whether the Stalking Horse APA constitutes the highest or otherwise best bid for the Debtors' business.

14.      As part of the proposed postpetition sale process, the Debtors, through Houlihan and their other professionals, will continue their marketing efforts with respect to the Debtors' Assets continuing to contact both financial and strategic investors regarding a potential sale, including all parties contacted prior to the commencement of the chapter 11 cases. Many of the interested parties remain under non-disclosure agreements with the Company and have access to a data room maintained by the Debtors, populated with over 470 documents. Any other interested parties will be given an opportunity to execute a non-disclosure agreement and be given access to the data room. Those parties that execute a non-disclosure agreement will be provided with substantial due diligence information concerning, and access to, the Debtors, including, without limitation, presentations by the Debtors and their advisors, and access to financial, operational, and other detailed information.

### III.      The Proposed Schedule.

15.      Pursuant to the Bidding Procedures, the Debtors will solicit the highest or otherwise best proposals according to the following proposed schedule, subject to Court approval and availability (the "Sale Timeline"):

6

| Date | Event or Deadline | |
|---|---|---|
| Entry of Bidding Procedures Order | August 26, 2024 | Date for the approval of the Bidding Procedures |
| Bid Deadline | September 9, 2024 at 4:00 p.m., prevailing Eastern Time | Deadline for when the Debtors must *actually receive* binding bids from parties. |
| Auction (if Necessary) | September 10, 2024 | Date for when an auction for the Assets (the "Auction") will be conducted, if necessary. The Auction will be conducted at the office of Ropes & Gray LLP, 1211 6th Avenue, New York New York 10036 or via remote video at the Debtors' election. |
| Sale Transaction Objection Deadline | September 11, 2024 at 4:00 p.m., prevailing Eastern Time | Deadline by which general objections to the sale must be filed with the Court and served so as to be actually received by the appropriate notice parties (the "Sale Transaction Objection Deadline"). |
| Sale Order Hearing | September 12, 2024 (subject to Court availability) | Date for the hearing to consider the approval of the Sale Order |
| Sale Order Approval | September 13, 2024 | Date for the approval of the Sale Order |
| Sale and, in the event of a sale of all or substantially all of the Debtors' Assets, Confirmation Hearing | September 17, 2024 (subject to Court availability) | Date for the Sale Hearing at which the Court will consider approving the sale of the Assets to one or more prospective purchasers, pursuant to a sale order or a chapter 11 plan. |

16.     The Debtors believe that this timeline balances a thorough marketing process to maximize value with the need to proceed expeditiously, as required under the Debtors' postpetition financing.   In addition to the Debtors' marketing efforts thus far, the Debtors will use the time prior to, and after, entry of the Bidding Procedures Order to actively market the Assets to expedite the solicitation of bids for the Debtors' Assets in advance of the deadline for interested parties to submit bids for the Debtors' Assets (the "Bid Deadline").     In light of the foregoing, the Debtors have determined that the proposed schedule is in the best interests of the Debtors' estates, will assist in establishing whether and to what extent a market exists for the Assets, and

provides interested parties with sufficient opportunity to participate in any sale transaction(s) and ultimately, will result in the highest or otherwise best bid for the underlying Assets under the circumstances.

## IV.    The Bidding Procedures

17.    To optimally and expeditiously solicit, receive, and evaluate bids in a fair and efficient manner, the Debtors request that the Court approve the propose Bidding Procedures.[3]    The proposed Bidding Procedures are designed to permit a fair, efficient, competitive, and value-maximizing auction process for the Debtors' assets, consistent with the Debtors' goal of implementing a cost-effective Sale.

18.    The Bidding Procedures will provide potential bidders with ample notice and time to conduct thorough due diligence to submit binding bids in advance of the Sale Hearing.  Indeed, the Debtors' investment banker, Houlihan, commenced a marketing and sale process two months ago to inform the Debtors and their secured lenders of a market view of the value of the Debtors' assets and business.    The Bidding Procedures are designed to encourage all prospective bidders to put their best bid forward, effectuate an expeditious sale process with minimal disruption, and create a path towards entry of the Sale Order that will secure the highest or otherwise best value for the business and the Debtors' stakeholders.  The proposed Bidding Procedures are in the best interests of all stakeholders and should be approved.

19.    The Debtors also request authority, as set forth in the Bidding Procedures Order, to enter into the Stalking Horse APA with the Stalking Horse Purchaser.  The Stalking Horse APA

---

[3]    This summary is qualified in its entirety by the Bidding Procedures attached as Exhibit 1 to the Bidding Procedures Order.    All capitalized terms that are used in this summary but not otherwise defined herein shall have the meanings given to such terms in the Bidding Procedures or the DIP Orders, as applicable.    To the extent there are any conflicts between this summary and the Bidding Procedures, the terms of the Bidding Procedures shall govern.

4870-8290-8372, v. 2

will provide the Debtors with the ability to maximize the value of the Assets by setting a floor for potential bidders and encouraging potential bidders to put forth their best bid.  As noted above, although an affiliate of the DIP Agent is the Stalking Horse Purchaser, the Debtors understand that the DIP Agent  and prepetition Agent are willing to release their liens if a higher or otherwise better bid is received.  Therefore, given the Debtors' need to maximize value for creditors and other stakeholders through a timely and efficient marketing process, the Debtors' entry into the Stalking Horse APA is a reasonable and sound exercise of the Debtors' business judgment and provides an actual benefit to the Debtors' estates.

20.    Pursuant to Local Rule 6004-1(c)(i),  the chart below sets forth the salient points of the proposed Bidding Procedures:

| Requirement | Description |
| --- | --- |
| **Stalking Horse Purchaser** | The Debtors are in the process of negotiating the Stalking Horse APA with the Stalking Horse Purchaser and will file the final form as soon as available.  As set forth more fully in the Stalking Horse APA, the Stalking Horse Purchaser is the Purchase Price to be paid by the Stalking Horse Purchaser is (i) a credit bid in the amount of $100,000,000 consisting of the Pre-petition Credit Bid Amount plus the full amount of the DIP Obligations as of the Closing Date, (ii) cash in an aggregate amount equal to the Cash Shortfall, (iii) cash in an aggregate amount equal to the Wind-Down Funds, (iv) the aggregate amount of Excluded Cash, and (v) the assumption by Purchaser of the Assumed Liabilities (including payment of the Cure Costs) (as defined in the Stalking Horse APA) (collectively (i), (ii), (iii), (iv), and (v) the "Purchase Price").  The Stalking Horse APA also includes various customary representations, warranties, and covenants by and from the Debtors and the Stalking Horse Purchaser, and certain conditions to closing and rights of termination related to the Sale and the chapter 11 cases generally.<br><br>The Stalking Horse Purchaser is deemed to be a Acceptable Bidder (as defined below) and the Stalking Horse APA is deemed to be a Acceptable Bid.  Subject to the DIP Orders, the Stalking Horse Purchaser is credit bidding pursuant to 11 U.S.C. § 363(k), and thus is not required to make a Deposit (as defined below) with the Debtors. |

9

| Requirement | Description |
|---|---|
| **Assets to be Sold** | The Debtors shall offer for sale the Assets, *provided* that the Debtors, in consultation with the Consultation Parties, determine that the aggregate consideration offered by any bid, or combination of bids, for the Assets, satisfies the requirements set forth in these Bidding Procedures. Potential Bidders may bid on all or any number or combination of the Assets. |
| **Participation Requirements: Acceptable Bidders** | Any person or entity that wishes to conduct diligence about the Debtors (an "Interested Party") may request access to the Debtors' confidential electronic data room concerning the Assets (the "Data Room"). To become an Interested Party, and thus be able to conduct due diligence, an Interested Party must execute a non-disclosure agreement, in form and substance satisfactory to the Debtors, with the Debtors and submit the following documents (collectively the "Preliminary Bid Documents").<br><br>Any Interested Party that wishes to participate in the bidding process for the Assets other than in the case of the Stalking Horse Purchaser (each, a "Potential Bidder") must first become an "Acceptable Bidder." To become an Acceptable Bidder, an Acceptable Bidder must submit to the Debtors and their advisors:<br><br>(a) documentation identifying the Potential Bidder, its principals, and the representatives thereof who are authorized to appear and act on their behalf for all purposes regarding the contemplated transaction;<br><br>(b) an executed confidentiality agreement on terms acceptable to the Debtors, to the extent not already executed, which confidentiality agreement shall, among other terms, contain customary provisions regarding: (i) the nondisclosure of confidential information, (ii) prohibitions on contacting third parties in connection with a transaction, (iii) covenant to not solicit employees of the Debtors, (iv) prohibitions on purchasing or otherwise acquiring the Debtors' debt and equity securities, and (v) the survival of certain provisions of the confidentiality agreement;<br><br>(c) evidence by the Potential Bidder of its sufficient financial capacity to close a proposed transaction, which may include financial statements of, or verified financial commitments obtained by, the Potential Bidder (or, if the Potential Bidder is an entity formed for the purpose of acquiring the Assets, the party that will bear liability for a breach), the adequacy of which will be assessed by the Debtors, with the assistance of the Debtors' advisors;<br><br>(d) a statement and other factual support that the Potential Bidder has a bona fide interest in consummating a sale transaction, to |

| Requirement | Description |
|---|---|
| | the reasonable satisfaction of the Debtors after consultation with the Consultation Parties (as defined below); |
| | (e) written disclosure of any connections or agreements with the Debtors, the Stalking Horse Purchaser, any other known Potential Bidder, or Qualified Bidder (as defined below), "insiders" of the Debtors (as that term is contemplated by section 101(31) of the Bankruptcy Code), or any manager or direct or indirect equity security holder of the Debtors; and |
| | (f) documentation identifying the Potential Bidder, its principals, and the representatives thereof who are authorized to appear and act on its behalf for all purposes regarding the contemplated transaction. |
| | Only Acceptable Bidders may submit Bids.  Notwithstanding anything to the contrary herein, and for the avoidance of doubt, for all purposes under the Bidding Procedures: (i) the Stalking Horse Purchaser shall be considered an Acceptable Bidder, and the Stalking Horse APA shall be considered an Acceptable Bid, for all purposes under the Bidding Procedures, without regard to any of the requirements or conditions set forth therein and without any other or further action by the Stalking Horse Purchaser; and (ii) in determining whether the Potential Bidders constitute Acceptable Bidders, the Debtors may consider a combination of bids for the Assets. |
| **Bankruptcy Court Jurisdiction** | Any Potential, Acceptable Bidders, and Acceptable Bidders shall: (i) be deemed to have waived any right to a jury trial in connection with, and consented and submitted to the exclusive jurisdiction of the Court over, any disputes relating to, actions or proceedings arising from or relating to the Bidding Procedures, the Sale, the Auction and the construction and enforcement of the contemplated transaction documents; (ii) bring any such action or proceeding in the Court; and (ii) be deemed to have consented to the Court entering a final judgment determining any such action or proceeding and that such final judgment in any such action or proceeding, including all appeals, shall be conclusive and may be enforced in other jurisdictions (including any foreign jurisdictions) by suit on the judgment or in any other manner provided by applicable law |
| **Due Diligence** | The Debtors will provide any Acceptable Bidder with reasonable access to the Data Room and any other additional information that the Debtors believe to be reasonable and appropriate under the circumstances.  All additional due diligence requests shall be directed to: (a) proposed investment banker for the Debtors, Houlihan, attn:   Adam l. Dunayer (adunayer@hl.com) and Jim Georgeadis (jgeorgeadis@hl.com),; or (b) proposed counsel for the Debtors, |

| Requirement | Description |
|---|---|
| | Gregg M. Galardi, Esq. (212-596-9139; gregg.galardi@ropesgray.com); and Lindsay Barca, Esq. (212-596-9092; lindsay.barca@ropesgray.com). |
| | The due diligence period shall extend through and including the Bid Deadline. The Debtors, in their business judgment, may, but shall not be obligated to, furnish any due diligence information after the Bid Deadline. |
| | The Debtors reserve the right, in their reasonable discretion, to withhold or limit access to any due diligence information that the Debtors determines is business-sensitive or otherwise not appropriate for disclosure to a Acceptable Bidder.   Notwithstanding any prepetition limitations, including, without limitation, any non-disclosure, confidentiality or similar provisions relating to any due diligence information, the Debtors and their estates shall be authorized to provide due diligence information to Acceptable Bidders *provided* that such Acceptable Bidders have delivered an executed confidentiality agreement in form and substance acceptable to the Debtors.  The Debtors and their estates are not responsible for, and shall have no liability with respect to, any information obtained by, or provided to, any Acceptable Bidders in connection with the Bidding Procedures and the Sale. |
| **Qualified Bids & Bid Requirements** | Each bid (a "Bid") submitted by an Acceptable Bidder must be submitted in writing and satisfy the following requirements (collectively, the "Bid Requirements,") unless otherwise modified by the Debtors (except for the requirement set forth in II(c) below), in their discretion: |
| | (a)  Marked Agreement.  A Bid must be in writing and include an executed asset purchase agreement (a "Competing APA"), together with all exhibits and schedules (the "Transaction Documents"), pursuant to which the Acceptable Bidder proposes to effectuate the contemplated transaction, which Competing APA must be similar in form and substance to the Stalking Horse APA and be marked to reflect the differences between the Stalking Horse APA and the Acceptable Bidder's Competing APA, including, without limitation, specification of the proposed purchase price, any assumed liabilities, and any changes to any exhibits or schedules to the Competing APA.  A Bid must identify with particularity each and every condition to closing and all executory contracts and unexpired leases to be assumed and assigned pursuant to the Transaction Documents. The Transaction Documents must include a commitment to close the Transaction by no later than the Closing Date provided in the Stalking Horse APA.   A Bid should propose a contemplated transaction involving all or substantially all of the Assets; *provided, however*, that the Debtors in their discretion may consider proposals for less than substantially all the Assets, *provided further* that the Debtors will evaluate all Bids, in their |

| Requirement | Description |
|---|---|
| | sole discretion, subject to prior consultation with the Consultation Parties, to determine whether such Bid or combination of Bids maximizes the value of the Debtors' estates as a whole in light of any factors regarding such bid which the Debtors, in their discretion, determine are appropriate to be considered in evaluating Bids. |
| | (b) <u>Purpose</u>. Each Acceptable Bidder must state that the Bid includes an offer by the Acceptable Bidder to purchase some or all of the Assets and state which Assets with reasonable specificity. Each Bid must clearly identify the following: (i) contracts to be assumed, including cure amounts to be paid, if any, and parties responsible for payment thereof; (ii) the liabilities, if any, to be assumed; (iii) leases of equipment or stores to be assumed, including cure amounts to be paid, if any, and parties responsible for payment thereof; and (iv) which employees or groups thereof will be offered employment. |
| | (c) The consideration proposed by a Bid may include cash or other consideration acceptable to the Debtors in an amount of no less than the sum of (i) the Purchase Price <u>plus</u> (ii) the Expense Reimbursement (as defined below) <u>plus</u> (iii) $250,000; *provided that* the Bid must include sufficient cash to pay (A) all DIP Obligations or Pre-petition Obligations that have been credit bid by the Stalking Horse Purchaser (the "<u>Credit Bid Amount</u>"), (B) the Expense Reimbursement, (C) the [Wind-Down Amount], and (D) any sale transaction fee payable to Houlihan pursuant to Houlihan's letter agreement with the Debtors dated as of May 24, 2024, on account of the Transaction. |
| | (d) <u>Forms of Consideration</u>. Each Bid must (a) indicate (x) whether it is an all-cash offer (including confirmation that the cash component of the Bid is based in U.S. Dollars) or consists of certain non-cash components, such as a credit bid or the assumption of liabilities; and (y) the liabilities to be assumed, if applicable; and (b) provide sufficient cash consideration specifically designated for the payment of the Credit Bid Amount and the Expense Reimbursement. The Debtors may request that any Bid include the allocation of the Purchase Price among the Assets to be acquired. In addition, any Bid shall identify separately any cash and non-cash components, which non-cash components shall be limited only to credit-bids in accordance with section 363(k) of the Bankruptcy Code and assumed liabilities. |

| Requirement | Description |
|---|---|
| | (e)    Deposit.  Each Bid must be accompanied by a cash deposit in the amount equal to 10% of the aggregate value of the cash and non-cash consideration (with the deposit amount for the non-cash consideration determined by the Debtors in their discretion) of the Bid to be held in an escrow account to be identified and established by the Debtors (the "Deposit"); provided that that the Debtors reserve the right to increase the amount of the Deposit in their discretion, including, without limitation, the right to request an additional Deposit in the event an Acceptable Bidder increases the amount of its Bid.  For the avoidance of doubt, the Stalking Horse Purchaser shall not be required to provide a Deposit. |
| | (f)    Irrevocable.  All Bids must be irrevocable until the Debtors' selection of the Successful Bid and Backup Bid (each as defined below); provided, however, that the Successful Bid shall be irrevocable until the closing of the Approved Transaction (as defined below) and the Backup Bid must be irrevocable in accordance with Section VI below, as applicable. |
| | (g)    Committed Financing.  To the extent that a Bid is not accompanied by evidence of the Acceptable Bidder's capacity to consummate the Transaction set forth in its Bid with cash on hand, each Bid must include committed financing documented to the Debtors' satisfaction that demonstrates that the Acceptable Bidder has received sufficient debt or equity funding commitments to satisfy the Acceptable Bidder's purchase price and other obligations under its Bid.  Such funding commitments or other financing must be unconditional and must not be subject to any internal approvals, syndication requirements, diligence, or credit committee approvals, and shall have covenants and conditions acceptable to the Debtors. |
| | (h)    Unconditional Offer / Contingencies.  A statement that the Bid is formal, binding, and unconditional and is not subject to any further due diligence or contingencies related to financing, internal approval, due diligence, or otherwise, and is irrevocable until the Debtors notify the Acceptable Bidder that such Bid is not a Successful Bid or a Backup Bid. |
| | (i)    Non-Reliance.  A Bid must include a written acknowledgement and representation of the Acceptable Bidder that it has had an opportunity to conduct any and all due diligence regarding the Assets and assumed liabilities prior to making its Bid, that it has relied solely upon its own independent review, investigation or |

14

| Requirement | Description |
|---|---|
| | inspection of any documents or the Assets in making its bid, and that it did not rely upon any written or oral statements, representations, warranties, or guaranties, express, implied, statutory or otherwise, regarding the Assets, the financial performance of the Assets or the physical condition of the Assets, the assumed liabilities, or the completeness of any information provided in connection therewith or the Auction. |
| (j) | Identity.  Each Bid must fully disclose the identity of each entity that will be bidding or otherwise participating in connection with such Bid (including each equity holder, sponsor, parent company or other financial backer of the Acceptable Bidder, including if such Acceptable Bidder is an entity formed for the purpose of consummating the proposed Transaction contemplated by such Bid), and the complete terms of any such participation.  Under no circumstances shall any undisclosed principals, equity holders, or financial backers be associated with any Bid.  Each Bid must also include contact information for the specific person(s), counsel and other advisors whom the Debtors' Advisors should contact regarding such Bid.  Nothing herein shall preclude multiple Acceptable Bidders from submitting a joint Bid, subject to the Debtors' prior written consent to such submission and the disclosure requirements set forth herein. |
| (k) | Adequate Assurance.  Each Bid must contain evidence acceptable to the Debtors in their discretion that the Acceptable Bidder has the ability to perform thereunder and otherwise complies with the requirements of adequate assurance of future performance under sections 365(b)(1) and 365(b)(3) of the Bankruptcy Code.  Such evidence may include audited and unaudited financial statements, tax returns, bank account statements, a description of the proposed business to be conducted at the premises or any other documentation that the Debtors further request. |
| (l) | Authorization.  Each Bid must contain evidence that the Acceptable Bidder has obtained authorization or approval from its board of directors (or a comparable governing body acceptable to the Debtors) with respect to the submission of its Bid and the closing of the Transaction contemplated in such Bid (including the submission, execution, and delivery of the Competing APA). |

4870-8290-8372, v. 2

| Requirement | Description |
|---|---|
|  | <u>No Fees Payable to Bidder.</u>  Except with respect to the Expense Reimbursement payable to the Stalking Horse Purchaser in accordance with the Stalking Horse APA, a Bid may not request or entitle the Bidder to any break-up fee, termination fee, expense reimbursement or similar type of payment.  Moreover, by submitting a Bid, a Bidder shall be deemed to waive the right to pursue any break-up fee, termination fee, expense reimbursement or similar type of payment, or substantial contribution claim under section 503 of the Bankruptcy Code related in any way to the submission of its Bid or the Bidding Procedures.<br><br>By submitting its Bid, each Acceptable Bidder is agreeing, and shall be deemed to have agreed, to abide by and honor the terms of the Bidding Procedures and to refrain from submitting a Bid or seeking to reopen any round of bidding or the Auction after conclusion of any round of bidding or the Auction.  **The submission of a Bid shall constitute a binding and irrevocable offer to acquire the Assets as reflected in such Bid.**<br><br>Notwithstanding anything herein to the contrary and for the avoidance of doubt, for all purposes under the Bidding Procedures, the Stalking Horse APA submitted by the Stalking Horse Purchaser is a Qualified Bid without regard to any of the requirements or conditions set forth therein and without any other or further action by the Stalking Horse Purchaser. |
| **Bid Deadline** | An Acceptable Bidder, other than the Stalking Horse Purchaser, that desires to make a bid shall deliver a written and electronic copy of its bid in both PDF and MS-WORD format to the Notice Parties (as defined below) and the Consultation Parties so as to be received on or before **<u>September 9, 2024 at 5:00 p.m. (E.T.)</u>** (the "<u>Bid Deadline</u>"); *provided* that the Debtors, in their sole discretion may extend the Bid Deadline without further order of the Court; *provided further* that such modification shall be subject to the Milestones (as defined in the DIP Order) and after consultation with the Consultation Parties. To the extent that the Bid Deadline is extended for all parties, the Debtors shall file a notice on the docket of the chapter 11 cases indicating the same.  **Any party that does not submit a bid by the Bid Deadline will not be allowed to (a) submit any offer after the Bid Deadline, or (b) participate in the Auction.** |
| **Designation of Acceptable Bidders** | A Bid will be considered a "<u>Qualified Bid</u>," and each Acceptable Bidder that submits a Qualified Bid will be considered a "<u>Qualified Bidder</u>," if the Debtors determine, in their discretion, subject to prior consultation with the Consultation Parties, that such Bid:<br><br>(a)    satisfies the Bid Requirements set forth above; and<br><br>(b)    is reasonably likely (based on availability of financing, antitrust, or other regulatory issues, experience, and other considerations) |

16

| Requirement | Description |
|---|---|
| | to be consummated, if selected as the Successful Bid, within a time frame acceptable to the Debtors. |

The Debtors will notify each Qualified Bidder whether such party is a Qualified Bidder and shall provide the Notice Parties (as defined below) with a copy of each Bid that has been submitted to the Debtors (whether or not such bid has been determined by the Debtors to be a Qualified Bid).

If any Bid is determined by the Debtors not to be a Qualified Bid, the Debtors will refund such Acceptable Bidder's Deposit on the date that is the later of (i) three (3) Business Days after the Bid Deadline and (ii) the date on which the Debtors make a final determination that such Bid is not a Qualified Bid or, in each case, as soon as is reasonably practicable thereafter. The Debtors reserve the right to work with any Acceptable Bidder in advance of the Auction to cure any deficiencies in a Bid that is not initially deemed a Qualified Bid and to determine at any time prior to the start of the Auction that such Bid, as modified, is a Qualified Bid.

Between the date that the Debtors notify an Acceptable Bidder that it is a Qualified Bidder and the Auction, the Debtors may discuss, negotiate, or seek clarification of any Qualified Bid from a Qualified Bidder. Without the prior written consent of the Debtors, a Qualified Bidder may not modify, amend, or withdraw its Qualified Bid, except for proposed amendments to increase the Acceptable Bidder's purchase price, or otherwise improve the terms of, the Qualified Bid, during the period that such Qualified Bid remains binding as specified in these Bidding Procedures; provided that any Qualified Bid may be improved at the Auction as set forth herein; provided, further, that the Stalking Horse Bid may be modified or amended pursuant to its terms. Any improved Qualified Bid must continue to comply in all respects with the requirements for Qualified Bids set forth in these Bidding Procedures.

Notwithstanding anything herein to the contrary, the Debtors reserve the right, (a) to work with potential bidders and Acceptable Bidders to aggregate two or more Bids into a single consolidated Bid prior to the Bid Deadline or (b) to work with Qualified Bidders to aggregate two or more Qualified Bids into a single Qualified Bid prior to the conclusion of the Auction. No bidders, Acceptable Bidders or Qualified Bidders may aggregate any Bids without the Debtors' prior consent, subject to prior consultation with the Consultation Parties.

Notwithstanding anything herein to the contrary and for the avoidance of doubt, for all purposes under the Bidding Procedures, the Stalking Horse Purchaser is a Qualified Bidder without regard to any of the requirements or conditions set forth therein and without any other or further action by the Stalking Horse Purchaser.

17

| Requirement | Description |
|---|---|
| **Right to Credit Bid** | Unless otherwise ordered by the Court, any Qualified Bidder who has a valid and perfected lien on any assets of the Debtors' estates (a "<u>Secured Creditor</u>") and the right, power, and authorization to credit bid claims secured by such liens, shall have the right to credit bid all or a portion of such Secured Creditor's secured claims within the meaning of, and subject to, section 363(k) of the Bankruptcy Code; provided that a Secured Creditor shall have the right to credit bid its secured claim only with respect to the collateral by which such Secured Creditor is secured.<br><br>As set forth in the DIP Order, the DIP Lenders or the Prepetition Lenders (each as defined in the DIP Order) are permitted to credit bid any of the outstanding DIP Obligations or Pre-petition Obligations, respectively, in accordance with section 363(k) of the Bankruptcy Code in any sale of the Assets, and may assign such right to credit bid in whole or in part to any of their affiliates (including, but not limited to, the Stalking Horse Purchaser). The Stalking Horse Purchaser (as an affiliate of the DIP Lenders and the Prepetition Lenders) shall have the unqualified right to credit bid on a dollar-for-dollar basis up to the full amount of the DIP Obligations and the Pre-petition Obligations pursuant to section 363(k) of the Bankruptcy Code; provided, that the Stalking Horse Purchaser's ability to credit bid shall be subject to the Committee's rights to challenge the validity of the liens underlying the Pre-petition Obligations. |
| **Auction** | If no Qualified Bid (other than the Stalking Horse Bid) is received by the Bid Deadline, the Stalking Horse Purchaser shall be deemed the Successful Bidder without the need or requirement to hold or open the Auction.<br><br>If the Debtors receive more than one Qualified Bid for the Assets (other than the Stalking Horse Bid), the Debtors will conduct the Auction to determine both the Successful Bidder and the Backup Bidder with respect to such Assets. The Auction shall take place on September 10, 2024, at the offices of Ropes & Gray, LLP, at 1211 6th Avenue, New York NY 10036, or such later date and time as selected by the Debtors (following consultation with the Consultation Parties); provided that such modification shall be subject to the Milestones.<br><br>No later than the day before the Auction, the Debtors will notify all Qualified Bidders of the highest or otherwise best Qualified Bid, or, if multiple bids are received in respect of non-overlapping Assets, the highest or best Qualified Bid(s) received in relation to each group of Assets, in each case as determined in the Debtors' business judgment (each such bid, a "<u>Baseline Bid</u>"), and provide copies of the documents supporting the Baseline Bid(s) to all Qualified Bidders and the Consultation Parties. The determination of which Qualified Bid(s) constitutes the Baseline Bid(s) and which Qualified Bid(s) constitutes the Successful Bid(s) shall take into account any factors the Debtors, in consultation of the Consultation Parties, reasonably deem relevant |

18

| Requirement | Description |
|---|---|
| | to the value of the Qualified Bid(s) to the Debtors' estates, which may include, among other things: (a) the type and amount of Assets sought to be purchased in the Bid; (b) the amount and nature of the total consideration; (c) the likelihood of the Bidder's ability to close a transaction and the timing thereof; (d) the net economic effect of any changes to the value to be received by the Debtors' estates from the transaction contemplated by the Bid; (e) the tax consequences of such Bid; (f) the assumption of obligations, including contracts and leases; (g) the cure amounts to be paid; and (h) the impact on employees, including the number of employees proposed to be transferred and employee-related obligations to be assumed (collectively, the "Bid Assessment Criteria"). |

The Auction shall be conducted pursuant to the following procedures:

The Debtors Shall Conduct the Auction

The Debtors and the Debtors' Advisors shall direct and preside over the Auction.

The Auction shall be conducted in an open cry format (and not by way of sealed bids). At the start of the Auction, the Debtors shall describe the terms of the Baseline Bid(s). All incremental Bids made thereafter shall be Overbids (as defined below) and shall be made and received on an open basis, and all material terms of each Overbid shall be fully disclosed to all other Qualified Bidders and the Consultation Parties. The Debtors shall maintain a written transcript of all Bids made and announced at the Auction, including the Baseline Bid(s), all Overbids, the Successful Bid(s), and any Backup Bid(s).

Only (i) Qualified Bidders (including, for the avoidance of doubt, the Stalking Horse Purchaser) and (ii) the Consultation Parties, and each of their respective legal and financial advisors, shall be entitled to attend the Auction, and the Qualified Bidders shall appear at the Auction in person (live or on videoconference) and may speak or bid themselves or through duly authorized representatives. Only Qualified Bidders (including, for the avoidance of doubt, the Stalking Horse Purchaser) shall be entitled to make any subsequent bids at the Auction; provided, however, that any creditor who wishes to physically attend the Auction (other than (i) the parties set forth in the Bidding Procedures (including the Qualified Bidders), and (ii) such other parties the Debtors deem appropriate), shall provide at least two (2) days' notice of such attendance prior to the Auction by sending an email to counsel to the Debtors.

Terms of Overbids

19

| Requirement | Description |
|---|---|
| | "Overbid" means any bid made at the Auction by a Qualified Bidder subsequent to the Debtors' announcement of the Baseline Bid.  Each Overbid must comply with the following conditions: |

(a) Minimum Overbid Increment.  Any Overbid to the initial Baseline Bid at the start of the Auction shall be in increments of no less than a value equal to $250,000 unless otherwise determined by the Debtors in an exercise of their business judgment; provided, however, that to the extent that the Baseline Bid constitutes the Stalking Horse Bid, the bidding for such Assets at the first round of bidding will start at an amount equal to the sum of:  (i) the value of the Baseline Bid, (ii) the amount of the Breakup Fee and Expense Reimbursement, and (iii) $250,000.

(b) Conclusion of Each Overbid Round.  Upon the solicitation of each round of Overbids, the Debtors may announce a deadline (as the Debtors may, in their business judgment, extend from time to time, the "Overbid Round Deadline") by which time any Overbids must be submitted to the Debtors.

(c) Overbid Alterations.  An Overbid may contain alterations, modifications, additions, or deletions of any terms of the Bid no less favorable to the Debtors' estates than any prior Qualified Bid or Overbid, as determined in the Debtors' business judgment, but shall otherwise comply with the terms of these Bidding Procedures.

(d) No Round-Skipping.  Round-skipping, as described herein, is explicitly prohibited.  To remain eligible to participate in the Auction, in each round of bidding, (i) each Qualified Bidder must submit a Bid in such round of bidding that is a higher or otherwise better offer than the immediately preceding Bid submitted by a Qualified Bidder in such round of bidding and (ii) to the extent a Qualified Bidder fails to bid in such round of bidding or to submit a Bid in such round of bidding that is a higher or otherwise better offer than the immediately preceding Bid submitted by a Qualified Bidder in such round of bidding, as determined by the Debtors in their reasonable business judgment, such Qualified Bidder shall be disqualified from continuing to participate in the Auction for the Assets including, without limitation, submitting further Bids.

(e) Announcing Highest Bid.  With respect to the Auction, the Debtors shall, subsequent to each Overbid Round Deadline, announce whether the Debtors in consultation with the Consultation Parties have identified (a) in the initial Overbid round, an Overbid as being higher or otherwise better than the Baseline Bid in respect of the Assets that are the subject

| Requirement | Description |
|---|---|
| | of the Auction or (b) in subsequent rounds, an Overbid as being higher or otherwise better than the Overbid previously designated by the Debtors as the prevailing highest or otherwise best Bid (the "<u>Prevailing Highest Bid</u>"). The Debtors shall describe to all Qualified Bidders the material terms of any new Overbid designated by the Debtors as the Prevailing Highest Bid as well as the value attributable by the Debtors to such Prevailing Highest Bid based on, among other things, the Bid Assessment Criteria.<br><br><u>Consideration of Overbids</u><br><br>For the purpose of evaluating the value of the consideration provided by any Bid subsequent to the Baseline Bid, the Debtors will at each round of bidding, give effect to the Breakup Fee and Expense Reimbursement payable to the Stalking Horse Purchaser under the Stalking Horse APA.<br><br>The Debtors reserve the right, in their business judgment, to adjourn the Auction one or more times, to, among other things, (i) facilitate discussions between the Debtors and Qualified Bidders, (ii) allow Qualified Bidders to consider how they wish to proceed, and (iii) provide Qualified Bidders the opportunity to provide the Debtors with such additional evidence as the Debtors, in their business judgment, may require that the Qualified Bidder has sufficient internal approvals and resources or has received sufficient non-contingent debt or equity funding commitments to consummate the proposed Transaction at the prevailing Overbid amount; provided that such adjournment shall be subject to the Milestones.<br><br><u>Closing the Auction</u><br><br>The Auction shall continue until there is only one Qualified Bid that the Debtors determine, in their discretion following consultation with the Consultation Parties, to be the highest or otherwise best Qualified Bid for the Assets. Such Qualified Bid shall be declared the "<u>Successful Bid</u>," and such Qualified Bidder, the "<u>Successful Bidder</u>," at which point the Auction will be closed. The Auction shall not close unless and until all Qualified Bidders have been given a reasonable opportunity to submit an Overbid at the Auction to the then Prevailing Highest Bid. Such acceptance by the Debtors of such Successful Bid is conditioned upon approval by the Court of such Successful Bid. As soon as reasonably practicable after closing the Auction, the Debtors shall finalize definitive documentation to implement the terms of the Successful Bid, and, as applicable, cause such definitive documentation to be filed with the Court.<br><br><u>No Collusion; Good Faith Bona Fide Offer</u> |

| Requirement | Description |
|---|---|
| | Each Qualified Bidder participating at the Auction will be required to confirm on the record at the Auction that (i) it has not engaged in any collusion, within the meaning of section 363(n) of the Bankruptcy Code with respect to any bids submitted or not submitted in connection with the Sale, and (ii) its Qualified Bid is a good faith bona fide offer and it intends to consummate the proposed Transaction if selected as the Successful Bidder. |
| **Sale Hearing** | The Sale Hearing, pursuant to which the Debtors and the Successful Bidder will consummate the Transaction (the "Approved Transaction"), will be held no later than September 12, 2024.<br><br>**The Sale Hearing may be continued to a later date by the Debtors by sending notice prior to, or making an announcement at, the Sale Hearing; provided that such later date is consistent with the Milestones, or the Debtors have obtained the necessary consents under the DIP Order. No further notice of any such continuance will be required to be provided to any party.** |
| **Backup Bidder** | Notwithstanding anything in these Bidding Procedures to the contrary, if the Auction is conducted, the Qualified Bidder with the next-highest or otherwise second-best Qualified Bid at the conclusion of the Auction for the Assets or any sub-group thereof, as determined by the Debtors in the exercise of their business judgment, shall be required to serve as a backup bidder (the "Backup Bidder") in accordance with the terms and conditions set forth herein. Each Qualified Bidder shall agree and be deemed to agree to be a Backup Bidder if so designated by the Debtors, subject to the terms of such Backup Bidder's Competing APA.<br><br>The identity of a Backup Bidder and the amount and material terms of the Qualified Bid of such Backup Bidder shall be announced by the Debtors, at the conclusion of the Auction at the same time the Debtors announce the identity of the Successful Bidder related thereto. Such Backup Bidder shall be required to keep its Qualified Bid (the "Backup Bid") (or if the Backup Bidder submits one or more Overbids at the Auction, its final Overbid) open and irrevocable until the earlier of (i) the closing of the Approved Transaction and (ii) 30 days from entry of the Sale Order; provided, that if the Stalking Horse Purchaser is selected as the Backup Bidder, such date shall not be later than the date set forth in Section 9.2(d)(i) of the Stalking Horse APA. Each Backup Bidder's Deposit shall be held in escrow until the earlier of (i) three (3) Business Days after the closing of the Approved Transaction and (ii) 30 days from entry of the Sale Order, subject to the terms of such Backup Bidder's Competing APA.<br><br>If a Successful Bidder fails to consummate the Approved Transaction contemplated by its Successful Bid, the Debtors may select the Backup Bidder (which may be the Stalking Horse Purchaser) with respect to the Assets or sub- |

22

| Requirement | Description |
|---|---|
|  | group of the Debtors' Assets or business as the Successful Bidder, and such Backup Bidder shall be deemed a Successful Bidder for all purposes. The Debtors will be authorized, but not required, to consummate all transactions contemplated by the Bid of such Backup Bidder without further order of the Court or notice to any party.

Notwithstanding any of the foregoing, in the event that the Successful Bidder (other than the Stalking Horse Purchaser) fails to consummate the Transaction on or before September 17, 2024 (or such date as may be extended by the Debtors with the consent of the DIP Agent (as defined in the DIP Order) and in consultation with the Consultation Parties), the Backup Bid will be deemed to be the Successful Bid, the Backup Bidder will be deemed to be the Successful Bidder, and the Debtors shall be authorized to consummate the Transaction with the Backup Bidder subject to the terms of the Backup Bid without the need for further order of the Court and without the need for further notice to any interested parties. |
| **Return of Deposits** | The Deposit of the Successful Bidder shall be applied to the purchase price of the Approved Transaction at closing. The Deposits for each Qualified Bidder shall be held in one or more escrow accounts on terms acceptable to the Debtors in their sole discretion and shall be returned (other than with respect to each Successful Bidder and each Backup Bidder) on the date that is three (3) business days after the Auction, or as soon as is reasonably practicable thereafter. Upon the return of the Deposits, the applicable Qualified Bidders shall receive any and all interest that will have accrued thereon.

If the Successful Bidder (or, if the Sale is to be closed with the Backup Bidder, then the Backup Bidder) other than the Stalking Horse Purchaser fails to consummate the Sale because of a breach or failure to perform on the part of such bidder, then, subject to the terms of the Competing APA, the Debtors and their estates shall be entitled to retain the Deposit of the Successful Bidder (or, if the Sale is to be closed with the Backup Bidder, then the Backup Bidder).

To the extent the Debtors do not consummate the proposed transaction with the Backup Bidder due to the closing of the transaction with the Successful Bidder, the Backup Bidder's deposit shall be refunded within three (3) business days of the closing of the Approved Transaction. |
| **Notice and Consultation Parties** | Information that is provided to the "Notice Parties" under these Bidding Procedures must be provided to the following parties: (a) proposed co-counsel to the Debtors, (i) Ropes & Gray LLP, 1211 Avenue of the Americas, New York, NY 10036, Attn: Gregg M. Galardi (gregg.galardi@ropesgray.com) and Lindsay Barca (lindsay.barca@ropesgray.com) and (ii) Chipman Brown Cicero & Cole LLP, 1313 N. Market Street, Suite 5400, Wilmington, DE 19801 (Attn: Robert A. Weber and Mark L. Desgrosseilliers; email: weber@chipmanbrown.com and desgross@chipmanbrown.com); (b) counsel |

| Requirement | Description |
|---|---|
| | to the DIP Secured Parties, the Prepetition Lenders, and the Stalking Horse Purchaser, (i) Jones Day, 250 Vesey Street, New York, NY 10281, Attn: Thomas M. Wearsch (twearsch@jonesday.com) and Genna L. Ghaul (gghaul@jonesday.com) and (ii) Richards, Layton & Finger, P.A., 920 N. King Street, Wilmington, DE 19801, Attn: Mark D. Collins (collins@rlf.com) and Zachary I. Shapiro (shapiro@rlf.com); and (c) the Office of the United States Trustee for the District of Delaware, 844 King Street, Suite 2207, Lockbox 35, Wilmington, Delaware 19801 Attn: (Attn: Linda Casey, email: linda.casey@usdoj.com).<br><br>The term "Consultation Parties" as used in these Bidding Procedures shall mean (a) any official committee of unsecured creditors appointed in the chapter 11 cases (the "Creditors' Committee") and, (b) in the event that the Stalking Horse Purchaser terminates its credit bid, the DIP Agent. |
| **Reservation of Rights** | The Debtors reserve their rights, subject to prior consultation with the Consultation Parties and subject to the DIP Order and the DIP Credit Agreement (as defined therein), to modify these Bidding Procedures in their business judgment in any manner that will best promote the goals of these Bidding Procedures or impose at or prior to the Auction, additional customary terms and conditions on a Transaction, including, without limitation: (a) extending the deadlines set forth in these Bidding Procedures; (b) adjourning the Auction at the Auction; (c) adding procedural rules that are reasonably necessary or advisable under the circumstances for conducting the Auction; (d) canceling the Auction; and (e) rejecting any or all Bids or Qualified Bids (other than the Stalking Horse Bid). Notwithstanding the foregoing, the Debtors shall not be permitted to modify these Bidding Procedures in any way that (i) permits the submission of Bids after the close of bidding or the close of the Auction, (ii) permits Qualified Bids that propose consideration that does not include cash sufficient and specifically designated to pay (a) the Expense Reimbursement and (b) the Credit Bid Amount. |

21.　　Importantly, the Bidding Procedures recognize and comply with the Debtors' fiduciary obligations to maximize sale value, and, as such, do not impair the Debtors' ability to consider all qualified bid proposals and, as noted, preserve the Debtors' right to modify the Bidding Procedures as necessary or appropriate to maximize value for the Debtors' estates.

24

## IV.    The Stalking Horse APA

22.    Certain material terms of the Stalking Horse APA, and certain provisions of the Stalking Horse APA that are required to be highlighted pursuant to Local Rule 6004-1(b)(iv), are described below:[4]

| Key Terms of the Stalking Horse APA[5] | |
|---|---|
| **Stalking Horse Purchaser** | [Honing US Holdings, LLC] |
| **Purchase Price (APA § 4.1; L.R. 6004-1(b)(iv)(N))** | The total consideration to be paid by Purchaser to Sellers for the Purchased Assets (collectively, the "Purchase Price") is: |
| | (a)    a credit bid pursuant to Section 363(k) of the Bankruptcy Code (the "Credit Bid") in an amount equal to $100,000,000, consisting of (i) the Pre-petition Credit Bid Amount plus (ii) the full amount of the DIP Obligations as of the Closing Date (the amounts set forth in the preceding clauses (i) and (ii) collectively, the "Credit Bid Amount"); provided, however, that any portion of the Pre-petition Obligations that remain unsatisfied after the application of the Credit Bid Amount shall remain outstanding following the consummation of the Transactions; |
| | (b)    cash in an aggregate amount equal to the Cash Shortfall; |
| | (c)    cash in an aggregate amount equal to the Wind-Down Funds; |
| | (d)    the aggregate amount of Excluded Cash; and |
| | (e)    the assumption by Purchaser of the Assumed Liabilities (including payment of the Cure Costs pursuant to Section 4.3). |

---

[4]    Any summary of the Stalking Horse APA contained herein is qualified in its entirety by the actual terms and conditions of the Stalking Horse APA.  To the extent that there is any conflict between any summary contained herein and the actual terms and conditions of the Stalking Horse APA, the actual terms and conditions of the Stalking Horse APA shall control.

[5]    Capitalized terms used in this table and not otherwise defined herein shall have the meaning ascribed to such terms in the Stalking Horse APA.

| **Key Terms of the Stalking Horse APA[5]** | |
|---|---|
| **Purchased Assets (APA § 2.1)** | Subject to the terms and conditions of the Agreement and pursuant to Sections 363 and 365 of the Bankruptcy Code, effective as of the Closing, Sellers shall sell, convey, transfer, assign and deliver to Purchaser, free and clear of all Liens except Permitted Liens, and Purchaser shall purchase, all right, title and interest of Sellers in and to all assets, properties, claims and rights of every kind and nature, whether real, personal or mixed, tangible or intangible (including goodwill) wherever located and whether now existing or hereafter acquired (other than the Retained Assets) (collectively, the "Purchased Assets"), including the following: |
| | (a)    All cash, bank deposits, certificates of deposit and cash equivalents (including all undeposited checks, marketable securities and short term investments) of Sellers, other than the Excluded Cash; |
| | (b)    All bank accounts of Sellers, and all safety deposit boxes, lock boxes and other cash management accounts (including cash amounts in any accounts against which outstanding bank drafts have been written, to the extent of the amount of such bank drafts), except for up to two bank accounts designated by the Seller Representative at least ten (10) Business Days prior to Closing, including one account to hold the Wind-Down Amount; |
| | (c)    All tangible personal property owned or leased by any Seller, wherever located, including all such machinery, equipment, tools, fixtures, parts, supplies, furniture, furnishings, motor vehicles, Inventory, computers, mobile phones, personal digital assistants, tangible personal property included in the IT Assets, hardware, peripherals, information technology infrastructure and telephone systems (including any of the foregoing property that is subject to a finance lease, but only to the extent that Purchaser assumes such finance lease as an Assumed Contract); |
| | (d)    The Transferred Intellectual Property Rights and all manuals, instructions, documents, protocols and other tangible embodiments relating thereto that are owned by any Seller, including those Intellectual Property and Intellectual Property Rights listed on Schedule 5.8(a), including (A) the right to file, |

| | | |
|---|---|---|
| **Key Terms of the Stalking Horse APA**[5] | | |
| | | prosecute and maintain the Transferred Intellectual Property Rights; (B) royalties, fees, income, payments, and other proceeds now or hereafter due or payable to Sellers with respect to the Transferred Intellectual Property Rights; and (C) claims and causes of action with respect to the Transferred Intellectual Property Rights accruing prior to, on or after the Closing Date, including all rights to and claims for damages, restitution, and injunctive and other legal or equitable relief or remedy of any kind for past, present, or future infringement, misappropriation, dilution or other violation thereof, and rights to protection of interests therein under the Laws of all jurisdictions; |
| | (e) | All of the Contracts and Real Property Leases that are listed on Schedule 2.1(a)(v) (with the Cure Costs associated with each), and all Leased Real Property associated with such Real Property Leases and all rights of any kind relating to any of the foregoing, including rights to payments thereunder and all of Sellers' interests in and to all Orders, Contracts, abstracts of title, leases, participation agreements, and all other agreements and instruments, easements, rights-of-way, licenses, authorizations, Permits and similar rights and interests relating thereto, subject to the rights of third parties (collectively, the "<u>Assumed Contracts</u>"), subject to the amendment of Schedule 2.1(a)(v) as contemplated by Section 2.1(b); |
| | (f) | Subject to Section 8.6, all Permits held by any Seller; |
| | (g) | All of each Seller's rights under warranties, indemnities and all similar rights against third parties, including rights of Sellers to the warranties and licenses received from manufacturers or sellers of the equipment of the Business, Improvements or any component thereof, rights under any bond or security instrument, condemnation proceeds and all audit rights and claims for reimbursement from third parties of Sellers or any of their Affiliates, in each case, to the extent related to or attributable to |

| Key Terms of the Stalking Horse APA[5] | | |
|---|---|---|
| | | the Business, any Purchased Assets, or the Assumed Liabilities; |
| | (h) | All rights with respect to prepaid expenses, credits, advance payments (including prepayments to third party vendors), security, deposits (including utility deposits, security deposits, deposits held by parties to the Assumed Contracts and deposits held by vendors or trade creditors and other deposits held directly or indirectly by a third party as of the Closing Date), deferred assets, rights to refunds, credits, rights to recover overpayments or other receivables, charges, sums, and any cash collateral used to secure surety bonds, performance bonds or other transactional assurances to the extent related to the Business or any Purchased Assets, including any deposits made by Sellers to any third parties (excluding those related to Retained Assets); |
| | (i) | All Business Information and originals, and rights thereto, or where originals are not available or are retained by Sellers, copies of all books and records, files and papers including books of account, ledgers and general, financial and accounting records, supplier lists, production data, quality control records and procedures, complaints and inquiry files, research and development files, records and data (including all correspondence with any Governmental Authority), strategic plans, internal financial statements and marketing and promotional surveys, material and research, documentation relating to the Transferred Intellectual Property Rights and Business Information, and other similar documents and records, that relate to the Business or the Purchased Assets; provided, however, that Sellers and their related persons (including their employees and Representatives) shall have, upon the written request of the Seller Representative following the Closing Date, reasonable access to, and use of, such records solely for purposes of claims reconciliation and other wind-down activities until Sellers' wind-down process is complete and Sellers are finally dissolved; |
| | (j) | Copies of all Tax Returns and supporting workpapers in the possession of Sellers relating to |

28

| Key Terms of the Stalking Horse APA[5] |
|---|

|  |  | any Tax imposed on or with respect to the Purchased Assets, the Acquired Entities (subject to the amendment of Schedule 1.1(a) as contemplated by Section 2.1(b)) or the Business; *provided, however*, that Sellers and their Affiliates and Representatives shall have, upon the written request of the Seller Representative following the Closing Date, reasonable access to, and use of, such Tax Returns and supporting workpapers for purposes of preparation of Tax Returns and defense of any Tax audit until any applicable audit or review period is expired; |
|  | (k) | All rights to any Legal Proceedings, credits, allowances, refunds, rebates, rights of recovery or rights of setoff or claim of any nature (other than in respect of Legal Proceedings or claims against Sellers or any of their Affiliates) available to or being pursued by Sellers arising out of or relating to the Business or any of the Purchased Assets or Assumed Liabilities (including, for the avoidance of doubt, the items set forth on Schedule 2.1(a)(xi)) and any claim of any nature by any Seller against any present or former officer, director, employee, partner, equity holder, controlling person member, Representative or agent of any Seller, whether arising by way of counterclaim or otherwise (but excluding counterclaims and defenses related to Retained Assets), in each case, that are not otherwise Purchased Assets as described in Section 2.1(a)(xxiii); |
|  | (l) | All Accounts Receivable (whether billed or unbilled), trade credits, notes receivable, take-or-pay amounts receivable and other receivables attributable to the Purchased Assets and any security, claim, remedy or other rights related to such Accounts Receivable and other receivables or to the collectability thereof; |
|  | (m) | All Improvements; |
|  | (n) | All rights to the telephone and facsimile numbers and email addresses used by Sellers; |
|  | (o) | All Insurance Policies and any claims thereunder to the extent such policies relate to the operation of the Business or to any Assumed Liabilities, except to |

| Key Terms of the Stalking Horse APA[5] | | |
|---|---|---|
| | | the extent included as a Retained Asset on Schedule 2.2(a)(ii), including (a) the rights to make, administer and settle claims under any such Insurance Policies and to pursue and exhaust applicable coverage (including initiating, prosecuting and resolving litigation), and (b) the amount of, and all rights to any insurance proceeds received by Sellers under any such Insurance Policies after the Closing Date in respect of any loss, liability, destruction or condemnation of any Purchased Assets occurring prior to, on, or after the Closing or relating to any Assumed Liabilities; |
| | (p) | All enforceable rights under non-disclosure or confidentiality, non-compete or non-solicitation agreements with employees, independent contractors, consultants, Representatives, and agents of any Seller or with other third parties (including, any nondisclosure or confidentiality, non-compete or non-solicitation agreements entered into in connection with an Auction), in each case, which relate to the Business or any of the Purchased Assets or Assumed Liabilities; |
| | (q) | All unexpired, transferable warranties, indemnities, or guaranties from any third party with respect to the Business or any Purchased Asset or Assumed Liability, including any item of real property, personal property or equipment; |
| | (r) | Unless prohibited by applicable Law (in which case Sellers shall make and hold available all such records to and for Purchaser to the extent permitted by applicable Law), all employee and personnel records, including all current employment eligibility verification forms and related records, documents, and papers, of the Transferred Employees; |
| | (s) | Any refunds, rebates, overpayments, prepayments or credits of Taxes relating to the Purchased Assets or of any Acquired Entity (subject to the amendment of Schedule 1.1(a) as contemplated by Section 2.1(b)); |
| | (t) | All rights in or under the Seller Plans listed on Schedule 2.1(a)(xx) that are maintained, or sponsored, by Sellers for the benefit of any |

| Key Terms of the Stalking Horse APA[5] | | |
|---|---|---|
| | | Transferred Employee, on or prior to the Closing Date (each, an "Assumed Seller Plan") and all Acquired Entity Plans, including in each case, all pre-payments, deposits and refunds thereunder and any assets, trusts and service provider Contracts maintained or entered pursuant thereto or in connection therewith; |
| | (u) | All goodwill and other intangible property and all privileges, relating to, arising from or associated with any of the assets described in the foregoing clauses, the Assumed Liabilities or the Business; |
| | (v) | All rights with respect to proofs of claim filed by or on behalf of any of Sellers in any bankruptcy case other than the Bankruptcy Cases; |
| | (w) | All Avoidance Actions and any commercial tort claims of Sellers related to the Business, the Purchased Assets or the Assumed Contracts; |
| | (x) | All shares of capital stock or other equity or ownership interests held by any Seller in each Acquired Entity (the "Acquired Equity Interests"), subject to the amendment of Schedule 1.1(a) as contemplated by Section 2.1(b); |
| | (y) | All claims of any Seller against any Excluded Entity or other Group Company; and |
| | | All Owned Real Property. |
| Retained Assets (APA § 2.2) | | Notwithstanding anything to the contrary in this Agreement, the Purchased Assets shall not include any of the following assets, properties or rights (collectively, the "Retained Assets"): |
| | (a) | All rights of Sellers under this Agreement or the Transaction Documents or the Retained Contracts (including the Licensed Seller Intellectual Property licensed under the Retained Contracts and IT Assets licensed by a Seller under the Retained Contracts); |
| | (b) | (A) All Insurance Policies of each Seller set forth on Schedule 2.2(a)(ii) (including any directors' and officers' (or similar) insurance policies, any insurance policies of Sellers that cover directors and officers, and any rights thereunder), and all credits, premium refunds, proceeds, causes of action or rights arising thereunder, and (B) the amount of, |

31

| Key Terms of the Stalking Horse APA[5] | |
|---|---|
| | and all rights to any insurance proceeds under any Insurance Policies received by either Sellers or Purchaser after the Closing Date in respect of the loss, liability, destruction or condemnation of any Retained Assets occurring prior to, on, or after the Closing or relating to any Retained Liabilities; |
| (c) | The Organizational Documents, stock and minute books, qualifications to conduct business as a foreign corporation or limited liability company, arrangements with registered agents relating to foreign qualifications, taxpayer and other identification numbers, seals, personnel records, stock records and original Tax Returns of Sellers and other similar books and records (other than (i) any such Tax Returns or other such books and records that relate primarily to the Purchased Assets or Assumed Liabilities and (ii) any such Tax Returns or other such books and records relating primarily to any Acquired Entities), financial records, books of account, bank and brokerage records and statements and any other books and records which Sellers are prohibited from disclosing or transferring to Purchaser under applicable Law or are required by applicable Law to retain; |
| (d) | All shares of capital stock or other equity interests issued in or issued by a Seller; |
| (e) | All shares of capital stock or other equity interests held by a Seller in any Excluded Entity (which includes, for the avoidance of doubt, all right assets, properties or rights of any such Excluded Entity), subject to the amendment of Schedule 1.1(a) as contemplated by Section 2.1(b); |
| (f) | All nontransferable Permits; |
| (g) | All Intellectual Property Rights described on Schedule 2.2(a)(vii); |
| (h) | All equipment and other assets and items that are (A) owned by third parties or (B) leased to any Seller or an Affiliate thereof, in each case, pursuant to a Contract that is not an Assumed Contract; |
| (i) | All Seller Plans (including the Pension Plan) and any assets of any Seller Plan or any right, title or |

| **Key Terms of the Stalking Horse APA[5]** | |
|---|---|
| | interest in any of the assets thereof or relating thereto (other than Assumed Seller Plans and Acquired Entity Plans, each, a "Retained Seller Plan");
(j)    Any confidential personnel or other records pertaining to any employee who is not a Transferred Employee and all employee and personnel records of the Transferred Employees that cannot be provided under applicable Law;
(k)    The Excluded Cash;
(l)    The Wind-Down Funds; provided, that any unused portion of the Wind-Down Funds that is not utilized by Sellers to pay wind-down expenses in accordance with the Escrow Agreement shall be returned to Purchaser in accordance with the Escrow Agreement;
(m)    The Cash Shortfall; provided, that any unused portion of the Cash Shortfall that is not utilized by Sellers in accordance with the Cash Shortfall Budget and the Escrow Agreement shall be returned to Purchaser in accordance with the Escrow Agreement; and
(n)    Those other assets, properties and rights specifically set forth on Schedule 2.2(a)(xiv).
It is acknowledged and agreed that, except where specifically provided, this Section 2.2 speaks only to the retained assets of Sellers, and that no provision of this Section 2.2 shall apply to or shall be construed to limit the scope of the assets, properties, claims and rights acquired by Purchaser indirectly through its acquisition of the Acquired Entities and the Acquired Equity Interests hereunder, it being understood that Purchaser shall indirectly acquire all such assets, properties, claims and rights. |
| **Assumed Liabilities (APA § 3.1)** | Purchaser shall assume no obligation or other liability of any Seller, or of any predecessor or any Affiliate of any Seller or any Affiliate of any Group Company (other than the Acquired Entities), other than the obligations and other liabilities explicitly set forth in this Section 3.1(a). Upon the terms and subject to the conditions of this Agreement, Purchaser agrees, effective as of the Closing Date, to assume, pay, perform and discharge when due (subject to |

| **Key Terms of the Stalking Horse APA[5]** |
|---|

|  | any defenses or claimed offsets asserted in good faith against the obligee to whom such liabilities are owed), only the following liabilities of Sellers existing after the Closing (collectively, the "<u>Assumed Liabilities</u>") |
|---|---|
|  | (a)      All of Sellers' liabilities, responsibilities and obligations under (i) the Assumed Contracts, solely to the extent arising or attributable to any period after the Closing (but not with respect to any breach, failure to perform, default or violation of any such Assumed Contracts as of or prior to the Closing or any obligation under such Assumed Contracts relating to actions, omissions or conditions existing or occurring as of or prior to the Closing other than the Cure Costs or other liabilities expressly assumed pursuant to this Section 3.1(a)), and all Cure Costs in respect thereof, and (ii) the Assumed Seller Plans and Acquired Entity Plans; |
|  | (b)      All liabilities arising in any way out of the ownership or operation of the Purchased Assets, in each case solely to the extent first arising after, and relating to events, occurrences, acts or omissions occurring or existing solely after, the Closing; |
|  | (c)      All liabilities relating to Transferred Employees accruing on or after the Closing Date, to the extent arising out of or relating to their employment by Purchaser; |
|  | (d)      Those (i) outstanding Postpetition Payables and (ii) all administrative and priority claims in the Bankruptcy Cases that are reflected in the Cash Shortfall Budget, excluding the fees and expenses of Professional Persons (as defined in the DIP Order), to the extent unpaid as of the Closing Date (except to the extent included in Excluded Cash or the Wind-Down Funds); |
|  | (e)      100% of all Transfer Taxes assessed in connection with the sale of the Purchased Assets (including the Acquired Equity Interests); |
|  | (f)      All Taxes associated with the Purchased Assets for a Post-Closing Tax Period (including any Tax |

| Key Terms of the Stalking Horse APA[5] |
| --- |

|  | liabilities that are the responsibility of Purchaser under ARTICLE X); |
|  | (g) Those liabilities specifically set forth on Schedule 3.1(a)(vii), subject to the amendment of Schedule 3.1(a)(vii) as contemplated by Section 3.1(b); |
|  | (h) Liabilities to indemnify, reimburse or advance amounts to the present or former officers or directors of any Target Company identified on Schedule 3.1(a)(viii), whether arising under Organizational Documents or the Contracts set forth on Schedule 3.1(a)(viii); |
|  | (i) Liabilities related to any accrued or earned paid time off of any Business Employees who become Transferred Employees as of the Closing Date pursuant to any Seller Plan ("Accrued PTO"); |
|  | (j) Post-Closing COBRA Liability; and |
|  | (k) All liabilities related to the claims incurred as of the Closing Date but not reported in respect of the Company Group's self-insured [medical and dental] plan[s] ("IBNR Claims"). |
|  | Notwithstanding anything in this Agreement to the contrary, by written notice to the Seller Representative, Purchaser may, in its sole and absolute discretion, amend or revise Schedule 3.1(a)(vii) no later than two (2) Business Days prior to the Closing Date, in order to add any liabilities (other than with respect to Taxes) arising from the ownership or operation of the Business, the Purchased Assets or the Company Group prior to the Closing to such Schedule 3.1(a)(vii) and it shall be automatically included as an Assumed Liability for purposes of this Agreement. |
|  | It is acknowledged and agreed that this Section 3.1 speaks only to the liabilities of Sellers, and that no provision of this Section 3.1 shall be construed to limit the scope of the liabilities assumed by Purchaser through its acquisition of the Acquired Entities and the Acquired Equity Interests hereunder (including liabilities relating to Taxes and liabilities relating to any Acquired Entity Employee), it |

| Key Terms of the Stalking Horse APA[5] | |
|---|---|
| | being understood that Purchaser shall assume all such liabilities. |
| **Retained Liabilities (APA § 3.2)** | Notwithstanding anything to the contrary in this Agreement or the Transaction Documents, Purchaser shall not assume or be obligated for any liability, Claim, Encumbrance or obligations of any kind whatsoever, direct or indirect, known or unknown, absolute or contingent, or whatever nature, whether presently in existence or arising hereafter, not expressly assumed by Purchaser under <u>Section 3.1(a)</u> and shall under no circumstances be liable or responsible for any liabilities (other than the Assumed Liabilities) of any Seller, any Group Company (other than to the extent relating to the Acquired Entities), or any predecessor or Affiliate thereof, whether existing on the Closing Date or arising thereafter as a result of any act, omission or circumstance taking place prior to the Closing.  Purchaser shall not be a successor in interest to any of Sellers for any purpose and is not answerable for any successor liability Claims.  Sellers shall retain all liabilities, responsibilities and obligations of Sellers not specifically included in the Assumed Liabilities (all such liabilities, responsibilities and obligations not being assumed being herein referred to, collectively, as the "<u>Retained Liabilities</u>").   For the avoidance of doubt, even where this <u>Section 3.2</u> does not expressly cross-reference <u>Section 3.1</u>, this <u>Section 3.2</u> and each clause hereof is subject to and limited by <u>Section 3.1</u> (that is, where a liability is expressly assumed by Purchaser pursuant to <u>Section 3.1</u>, it is not retained pursuant to this <u>Section 3.2</u>).  Without limiting the foregoing, the Retained Liabilities shall include each of the following items: |
| | (a)     Any liability which is not expressly listed as an Assumed Liability in Section 3.1(a), including any Claims under section 503 and 507 of the Bankruptcy Code; |
| | (b)     Any liabilities of any of Sellers not related to the operation of the Business or the Purchased Assets; |
| | (c)     Except as otherwise provided in Section 3.1(a) or ARTICLE X, all Tax liabilities of Sellers and their respective Affiliates (other than Acquired Entities) for any period, any Taxes (other than Transfer Taxes governed by Section 10.2) resulting from the purchase of the Purchased Assets (including |

| Key Terms of the Stalking Horse APA[5] |
|---|

|  |  |  |
|---|---|---|
|  |  | gain on sale or any cancellation of indebtedness income as defined in Section 108 of the Code) and all Taxes associated with the Purchased Assets for any Pre-Closing Tax Period (including Taxes allocated to Sellers pursuant to Section 10.3(a)); |
|  | (d) | Any liabilities relating to or arising out of the Retained Assets, including those in connection with the ownership and operation of the Excluded Entities and the conduct of the Business, or of any other businesses or operations, of the Excluded Entities, subject to the amendment of Schedule 1.1(a) as contemplated by Section 2.1(b); |
|  | (e) | Any liabilities in respect of any Retained Contracts, and all liabilities relating to claims arising from or related to the termination of any Contract prior to the Petition Date or any liabilities arising out of the rejection of any such Contracts pursuant to section 365 of the Bankruptcy Code, including any administrative expense claims arising from the rejection of Contracts previously assumed; |
|  | (f) | Any liabilities to any Excluded Entity, or any current or former equityholder or Affiliate of any Group Company; |
|  | (g) | Any tort liabilities or any other liabilities relating to investigations, Claims or other Legal Proceedings (including any workers' compensation matters and all liabilities arising in connection therewith, and including all claims or Legal Proceedings against each Seller) which arise out of, relate to or otherwise are in respect of (i) the existence, use or operation of the Business or the Purchased Assets on or prior to the Closing Date, (ii) any violation of any applicable Law or Order by any of Sellers (or their respective Affiliates), or (iii) any manufacture, sale, distribution or marketing of any product (including any product containing asbestos or asbestos-containing materials) prior to the Closing by any of Sellers or |

4870-8290-8372, v. 2

| Key Terms of the Stalking Horse APA[5] | | |
|---|---|---|
| | | their respective Affiliates or any of their respective predecessors in interest; |
| | (h) | Any liabilities (other than with respect to Taxes) arising from the ownership or operation of the Business, the Purchased Assets or the Company Group prior to the Closing, including (i) in respect of any Indebtedness (including any Indebtedness or accounts payable arising under any intercompany loan arrangements or promissory notes), and (ii) all accounts payable (including vendor trade payables) that are not Assumed Liabilities pursuant to Section 3.1(a); |
| | (i) | Any (i) Excluded Employee Liability, (ii) liability (whether arising before, on or after the Closing Date) with respect to any employee or former employee of Sellers who is not a Transferred Employee, and any confidential personnel or other records pertaining to any such employee, (iii) liability arising prior to the Closing with respect to any Transferred Employee, and (iv) all liabilities (including to the Internal Revenue Service ("IRS") or United States Department of Labor) with respect to any Seller Plan or other employee benefit plans that are not Assumed Seller Plans or Acquired Entity Plans, including the Pension Plan; |
| | (j) | Any costs, fees, commissions, expenses and other liabilities owing to any broker, investment banker, financial or restructuring advisor, outside counsel, auditing firm or consultant retained by or on behalf of any Seller (or any of its Affiliates), whether relating to or arising out of the Transactions or otherwise, except as otherwise permitted in the DIP Order; |
| | (k) | Any liability of any Seller with respect to any Lien (except Permitted Liens) (including with respect to the Business or the Purchased Assets, to the extent arising out of or relating to the existence, use or operation of the Business or the Purchased Assets on or prior to the Closing); |

| Key Terms of the Stalking Horse APA[5] | |
|---|---|
| | (l)    Any liabilities to indemnify, reimburse or advance amounts, or any liabilities relating to claims for indemnification of any present or former officer, director, employee, partner, member, Representative or agent of any Group Company (or any of its Affiliates) (including with respect to any breach of fiduciary obligations by same), whether arising under Organizational Documents or Contract, in each case to the extent arising prior to the Closing Date, in each case other than as set forth in Section 3.1(a)(viii);<br><br>(m)   [Any liability of any Seller arising from an obligation to escheat property, to the extent existing at the Closing]; and<br><br>(n)    Except as set forth on Schedule 3.1(a)(vii), subject to the amendment of Schedule 3.1(a)(vii) as contemplated by Section 3.1(b), any cash deposit from any customer with respect to the Business or any Purchased Asset retained by or on behalf of any Seller in respect of services not yet rendered or products not yet delivered. |
| **Conditions to Closing (APA § 7)** | The obligation of each Party to consummate the Transactions on the Closing Date is subject to the fulfillment on or prior to the Closing Date of the following conditions, any one or more of which may be waived by each Party:<br><br>(a)    The Bankruptcy Court shall have entered the Bidding Procedures Order.<br><br>(b)    The Bankruptcy Court shall have entered the Sale Order, and such order shall have become a Final Order in full force and effect and shall not have been stayed or vacated.<br><br>(c)    There shall be no Law or Order of any nature which is in effect and has the effect of making the transactions contemplated by this Agreement illegal or otherwise restraining, preventing or prohibiting the consummation of such transactions (a "Restraint").<br><br>(d)    [All required consents and approvals under the Antitrust Laws shall have been obtained.] |

| Key Terms of the Stalking Horse APA[5] |
|---|

|  | (e)      This Agreement and each other Transaction Document shall remain in full force and effect.<br><br>The obligation of Purchaser to consummate the Transactions on the Closing Date is subject to the fulfillment on or prior to the Closing Date of the following conditions, any one or more of which may be waived (to the extent waivable) by Purchaser:<br><br>(a)      Each of the representations and warranties of Sellers (i) contained in Article V (other than Section 5.1, Section 5.2, the penultimate sentence of Section 5.3(a), Section 5.4(a) and Section 5.17) shall be true and correct as of the date hereof and as of the Closing Date as if made on and as of the date hereof and the Closing Date (or to the extent such representations and warranties speak to an earlier date or period, such representations and warranties shall be true and correct in all respects as of such earlier date or with respect to such earlier period), except for those breaches, if any, of such representations and warranties that would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, and (ii) contained in Section 5.1, Section 5.2, the penultimate sentence of Section 5.3(a), Section 5.4(a) and Section 5.17 shall be true and correct in all respects as of the date hereof and as of the Closing Date as if made on and as of the date hereof and the Closing Date (or to the extent such representations and warranties speak to an earlier date or period, such representations and warranties shall be true and correct in all respects as of such earlier date or with respect to such earlier period), but disregarding all qualifications or limitations as to "materiality" or "material adverse effect" and words of similar import set forth therein for the purposes of this clause (a)(ii) and, solely with respect to the second sentence of Section 5.1(b), except for failures to be true or correct that are, individually or in the aggregate, de minimis in nature.<br><br>(b)      Sellers shall have performed and complied in all material respects with all of the covenants and agreements required by this Agreement to be |

| Key Terms of the Stalking Horse APA[5] |
|---|

|  |  |  |
|---|---|---|
|  |  | performed or complied with by Sellers on or prior to the Closing Date. |
|  | (c) | There shall not have been any Material Adverse Effect. |
|  | (d) | [The Sellers shall have either consummated a sale transaction of all of the issued and outstanding equity interests of the Excluded Entities or otherwise caused the business and operations of the Excluded Entities to be wound down prior to the Closing Date, including (with the mutual agreement of Sellers and Purchaser) through insolvency proceedings in such applicable jurisdiction.] |
|  | (e) | Each Seller shall have delivered, or caused to be delivered, to Purchaser the following documents, duly executed by such Seller (where appropriate) and in form and substance reasonably satisfactory to Purchaser. |
|  | i. | A duly executed counterpart of each Bill of Sale and Assignment and Assumption Agreement; |
|  | ii. | A duly executed counterpart of the IP Assignment Agreement; |
|  | iii. | A duly executed counterpart of each Local Transfer Instrument, reasonably requested by Purchaser; |
|  | iv. | A certificate, dated as of the Closing Date and signed by an authorized officer of the Seller Representative, certifying that the conditions contained in Sections 7.2(a), Section 7.2(b) and Section 7.2(c) have been satisfied; |
|  | v. | A copy of the Sale Order; |
|  | vi. | A duly executed counterpart of the Escrow Agreement; |
|  | vii. | Ownership and possession of each Owned Real Property, evidenced by duly executed special warranty deeds (collectively, the "Deeds") for each Owned Real Property conveying fee simple title in such Owned Real Property to Purchaser, subject only to Permitted Liens; |

| **Key Terms of the Stalking Horse APA**[5] | | |
|---|---|---|
| | viii. | [Customary affidavits of title, transfer tax forms and other similar documents reasonably necessary to permit a nationally recognized title insurance company of Purchaser's choosing to record the Deeds and to issue standard ALTA 2006 Form Title Insurance Policies with extended coverage in favor of Purchaser (or its designee) insuring that Purchaser (or its designee) owns fee simple title to the Owned Real Property at Closing free and clear of Liens (other than Permitted Liens) in an amount reasonably acceptable to Purchaser;] [and] |
| | ix. | [Evidence satisfactory to Purchaser that the Pension Plan has been terminated prior to the Closing Date or that such termination has been initiated and acknowledged in writing from the Pension Benefit Guaranty Corporation that neither Purchaser nor any of its Affiliates will be responsible for any liabilities related to the Pension Plan.] |
| | (f) | No Event of Default (as defined in the DIP Facility or the DIP Order, respectively) under the DIP Facility or the DIP Order shall have occurred thereunder which has not been waived. |
| | (g) | The Challenge Deadline (as defined in the DIP Order) shall have expired with no Challenges (as defined in the DIP Order) having been asserted in a pleading seeking standing to pursue a Challenge or otherwise against the Pre-petition Secured Parties by any party in interest in the Bankruptcy Cases. |
| | | The obligation of each Seller to consummate the Transactions on the Closing Date is subject to the fulfillment on or prior to the Closing Date of the following conditions, any one or more of which may be waived (to the extent waivable) by the Seller Representative: |
| | (a) | Each of the representations and warranties of Purchaser contained in this Agreement or the Transaction Documents shall be true and correct in all material respects as of the date hereof and as of the Closing Date as if made on and as of the date hereof and the Closing Date (or to the extent such representations and warranties speak to an earlier |

| Key Terms of the Stalking Horse APA[5] | | |
|---|---|---|
| | | date or period, such representations and warranties shall be true and correct in all material respects as of such earlier date or as to such earlier period), but disregarding all qualifications or limitations as to "materiality" or "material adverse effect" and words of similar import set forth therein. |
| | (b) | Purchaser shall have performed and complied in all material respects with all of the covenants and agreements required by this Agreement to be performed or complied with by Purchaser on or prior to the Closing Date. |
| | (c) | Purchaser shall deliver a payoff letter, release letter or other similar document acknowledging the conversion of the Credit Bid Amount as consideration for the transfer of the Purchased Assets. |
| | (d) | Purchaser shall have delivered, or caused to be delivered, a writing acknowledging the conversion of the Credit Bid Amount and the satisfaction of the DIP Obligations and the Pre-petition Credit Bid Amount. |
| | (e) | Purchaser shall have delivered, or cause to be delivered, to the Escrow Agent, (i) the Cash Shortfall, to be deposited and held in the Cash Shortfall Escrow Account by the Escrow Agent in accordance with the Escrow Agreement; provided, that any unused portion of the Cash Shortfall that is not utilized by Sellers in accordance with the Cash Shortfall Budget shall be returned to Purchaser in accordance with the Escrow Agreement, and (ii) the Wind-Down Funds, to be deposited and held in the Wind-Down Escrow Account by the Escrow Agent in accordance with the Escrow Agreement; provided, that any unused portion of the Wind-Down Funds which is not utilized by Sellers to pay wind-down expenses in accordance with the Escrow Agreement shall be returned to Purchaser in accordance with the Escrow Agreement. |
| | (f) | Purchaser shall have delivered to, or caused to be delivered, to the Seller Representative the following documents, duly executed by Purchaser (where appropriate): |

| Key Terms of the Stalking Horse APA[5] | |
|---|---|
| | i.   A duly executed counterpart of each Bill of Sale and Assignment and Assumption Agreement;<br><br>ii.  A duly executed counterpart of the IP Assignment Agreement;<br><br>iii. A certificate, dated as of the Closing Date and signed by an authorized officer of Purchaser, certifying that the conditions contained in Section 7.3(a) and Section 7.3(b) have been satisfied; and<br><br>iv.  A duly executed counterpart of the Escrow Agreement. |
| **Closing and Other Deadlines (APA § 9.1)** | The closing (the "Closing") of the Transactions shall be held on or before the third Business Day after the date on which the conditions set forth in ARTICLE VII are satisfied or, if legally permissible, waived (other than those conditions that by their nature are to be first satisfied (or validly waived) at the Closing, but subject to such satisfaction or waiver), remotely via the electronic exchange of documents and signature pages, or at such other time or date or place as Purchaser and the Seller Representative may agree (email to suffice).  The date on which the Closing occurs is referred to as the "Closing Date". |
| **Stalking Horse Purchaser Expense Reimbursement** | "Expense Reimbursement" means an amount equal to the reasonable, documented, out-of-pocket costs and expenses of Purchaser (including the reasonable, documented expenses of outside counsel, investment bankers and other outside advisors) related to negotiating this Agreement and investigating Sellers and the Purchased Assets, which amount, upon entry of the Bidding Procedures Order, will constitute an administrative expense of Sellers in the Bankruptcy Cases under Sections 503(a) and 507(a) of the Bankruptcy Code and shall be immediately paid at the Closing from the proceeds of the Alternative Transaction. |
| **Credit Bid (APA § 4.1; Local Rule 6004- 1(b)(iv)(N))** | [Purchase Price includes a credit bid in an amount equal to $100,000,000, consisting of (i) the Pre-petition Credit Bid Amount *plus* (ii) the full amount of the DIP Obligations as of the Closing Date (the amounts set forth in the preceding clauses (i) and (ii) collectively, the "Credit Bid Amount"); *provided*, *however*, that any portion of the Pre-petition Obligations that remain unsatisfied after the application of |

| Key Terms of the Stalking Horse APA[5] | |
| --- | --- |
| | the Credit Bid Amount shall remain outstanding following the consummation of the Transactions.] |
| **Relief from Bankruptcy Rule 6004(h) (L.R. 6004-1(b)(iv)(O))** | This Motion seeks, and the proposed Final Bidding Procedures Order approves, relief from the fourteen-day stay imposed by Bankruptcy Rule 6004(h). |
| **Sale Free and Clear of Unexpired Leases (L.R. 6004-1(b)(iv)(M))** | The Debtors' contracts and leases shall, to the extent designated by the Buyer, be assumed and assigned in accordance with Section 2.5 of the Agreement. |

## V.     Disposition of Excluded Entities or *De Minimis* Asset

23.     Per <u>Section 7.2(d)</u> of the Stalking Horse APA, the Debtors must have either (i) completed a sale of Excluded Entities or (ii) otherwise caused the business and operations of the Excluded Entities to be wound down.  The Excluded Entities include Weisser, which is a non-Debtor affiliate of the Company.  Debtor Hardinge Inc. holds a receivable from Weisser in the amount of $70 million, attributable to the initial acquisition of Weisser as well as incremental capital Hardinge Inc. provided to Weisser to support operations (the "<u>Weisser Receivable</u>").  Unfortunately, due to Weisser's own financial distress, Weisser does not have the ability to satisfy any—let alone the entire amount—of the Weisser Receivable.  As such, the Weisser Receivable has no monetary value to the Debtors' estate.  However, the sale of the Excluded Entities would provide value to the Debtors' estates by allowing the Debtors to consummate the transactions contemplated by the Stalking Horse APA.  While the Weisser receivable has no value to the Debtors, it presents a roadblock to the third-party buyer purchasing the equity of Excluded Entities, as any equity purchaser of the Excluded Entities would be taking on the liability for the Weisser Receivable.  Therefore, in order to enable the Debtors to satisfy the applicable condition precedent in the Stalking Horse APA, the Debtors seek authorization pursuant to the Bidding Procedures Order, to sell the Weisser Receivable for *di minimis* consideration or, in the Debtors' discretion, waive the Weisser Receivable.

## VI.    Notice Procedures for the Sale, Bidding Procedures, Auction, and Sale Hearing

24.    The Debtors also request approval of the Sale Notice, substantially in the form attached to the Bidding Procedures Order as <u>Exhibit 2</u>.

25.    Within three (3) business days of the entry of the Bidding Procedures Order or as soon as reasonably practicable thereafter, the Debtors will cause the Sale Notice, substantially in the form attached as <u>Exhibit 2</u> to the Bidding Procedures Order, to be served on the following parties or their respective counsel, if known: (a) the U.S. Trustee; (b) counterparties to the executory contracts and unexpired leases of nonresidential property (the "<u>Contract Counterparties</u>"), if known; (c) all parties who are known or reasonably believed, after reasonable inquiry, to have asserted any lien, encumbrance, claim, or interest in the Assets; (d) the Internal Revenue Service; (e) all applicable state and local taxing authorities; (f) all the Debtors' other creditors; (g) each governmental agency that is an interested party with respect to the proposed Sale Transaction; and (h) all parties that have requested or that are required to receive notice pursuant to Bankruptcy Rule 2002.

26.    Within seven (7) business days of the entry of the Bidding Procedures Order or as soon as reasonably practicable thereafter, the Debtors will also provide notice of the Sale Hearing through publication of the Sale Notice on their restructuring website, https://cases.ra.kroll.com/Hardinge/ (the "<u>Case Website</u>") and will also publish the Sale Notice, with any modifications necessary for ease of publication (the "<u>Publication Notice</u>") once in the national edition of *USA Today* or another nationally circulated newspaper, with any modifications necessary for ease of publication.

27.    The Debtors respectfully submit that the Sale Notice and Publication Notice are reasonably calculated to provide all interested parties with timely and proper notice of the proposed Sale Transaction, including: (a) the date, time, and place of the Auction; (b) the Bidding

Procedures; (c) the deadline for filing objections to the Sale Transaction and entry of the Sale Order, and the date, time, and place of the Sale Hearing; (d) a description of the Sale Transaction as being free and clear of liens, claims, interests, and other encumbrances, with all such liens, claims, interests, and other encumbrances attaching with the same validity and priority to the Sale Transaction proceeds; and (f) notice of the proposed assumption and assignment of the Contracts to the Successful Bidder arising from the Auction, if any.

28.    The Debtors further submit that notice of this Motion and the related hearing to consider entry of the Bidding Procedures Order, coupled with service of the Sale Notice and the Assumption Notice substantially in the form attached as Exhibit 3 to the Bidding Procedures Order (where applicable), as provided for herein, constitutes good and adequate notice of the Sale Transaction and the proceedings with respect thereto in compliance with, and satisfaction of, the applicable requirements of Bankruptcy Rule 2002. The Debtors propose that no other or further notice of the Sale Transaction shall be required.  Accordingly, the Debtors request that this Court approve the form and manner of the Sale Notice.

**VII.    Assumption and Assignment Notice**

29.    As soon as practicable, the Debtors intend to file a motion to fix monetary amounts that the Debtors would be obligated to pay in connection with the assumption or the assumption and assignment of executory contracts and unexpired leases and to elicit any objection to the assumption and assignment of such executory contracts and unexpired leases other than objections based on adequate assurance of future performance by a purchaser (such motion, the "Cure Amounts Motion").

30.    The Debtors are in the process of reviewing their prepetition executory contracts and unexpired leases and designating which of those executory contracts and leases a purchaser of all of the Assets may wish to have assumed and assigned to it.  At the Sale Hearing, to facilitate

and effect the sale of Assets, the Debtors will also seek authorization to assume certain of the executory contracts and leases (collectively, the "Purchased Contracts") and to assign the Purchased Contracts to the Successful Bidder.

31.     By this Motion, the Debtors request approval of the assumption and assignment notice (the "Assumption Notice"), substantially in the form attached to the Bidding Procedures Order as Exhibit 3, to be sent to counterparties to Purchased Contracts to provide notice of the potential assumption and assignment of their Purchased Contracts by the Successful Bidder. Supplements to the Assumption Notice shall be served on parties no later than two days following the Stalking Horse Purchaser's or other potential bidder's designation of any additional executory contracts or unexpired leases as Purchased Contracts. Any objections by the counterparties to adequate assurance of future performance by the Stalking Horse Purchaser with respect to Initial Purchased Contracts are due on September 11 2024 (the "Sale Transaction Objection Deadline"), and any objections with respect to subsequently added Purchased Contracts are due seven (7) days from service of the applicable supplement to the Assumption Notice.

32.     As soon as reasonably practicable after the completion of the Auction, the Debtors shall file with the Court a notice identifying the Successful Bidder (a "Notice of Successful Bidder"), which shall set forth, among other things, (i) the Successful Bidder and Back-Up Bidder (if any) and the amount of each of the Winning Bid and the Back-Up Bid (if any), (ii) the Purchased Contracts the Successful Bidder intends to assume, and (iii) the proposed assignee(s) of such Purchased Contracts.

33.     The inclusion of a contract, lease, or other agreement on either the Assumption Amounts Motion, the list of Purchased Contracts attached to the Stalking Horse APA and any Assumption Notice shall not (a) constitute or be deemed a determination or admission by the

Debtors and their estates or any other party in interest that such contract, lease, or other agreement is, in fact, an executory contract or unexpired lease within the meaning of the Bankruptcy Code, and any and all rights with respect thereto shall be reserved; or (b) obligate the Debtors to assume any Purchased Contract listed thereon or the Successful Bidder(s) to take assignment of such Purchased Contract.  Only those Purchased Contracts that are included on a schedule of assumed and acquired contracts attached to the final asset purchase agreement with the Successful Bidder (including amendments or modifications to such schedules in accordance with such asset purchase agreement) will be assumed and assigned to the Successful Bidder, subject to the terms of the applicable sale order and asset purchase agreement.

34.     If, following the Closing Date, and only to the extent permitted under the asset purchase agreement that is the Winning Bid, the Stalking Horse Purchaser or other Successful Bidder designates a contract or lease not initially included as a Purchased Contract as a Purchased Contract, and not previously rejected by the Debtors, the Debtors will promptly file and serve, at the Stalking Horse Purchaser or other Successful Bidder's expense (except with respect to any Omitted Contracts under the Stalking Horse APA, which shall be at the Debtors' expense), a supplemental notice of potential assumption and assignment by electronic transmission, hand delivery, or overnight mail on the counterparty to the Purchased Contract (each, a "Supplemental Purchased Contract Counterparty") to each impacted Purchased Contract, and its attorney, if known, at the last known address available to the Debtors (a "Supplemental Assumption Notice").

35.     Any Supplemental Purchased Contract Counterparty may file an objection (a "Supplemental Purchased Contract Objection") to, as applicable, the proposed assumption and assignment of such Purchased Contract, the proposed Cure Amounts (if any) (as defined below), or adequate assurance of future performance by the Stalking Horse Purchaser or other Successful

Bidder.  All Supplemental Purchased Contract Objections must: (a) to the extent the monetary amount the Debtors believes they will be required to pay under section 365(b)(1)(A) and (B) of the Bankruptcy Code (the "Cure Amount") has not been resolved by the Assumption Amounts Motion, state, with specificity, the legal and factual basis for the objection and, if applicable, what Cure Amounts are required; (b) include appropriate documentation in support of the objection; and (c) be filed and served so as to be actually received by the Objection Notice Parties no later than seven (7) days from the date of service of such Supplemental Assumption Notice, which date will be set forth in the Supplemental Assumption Notice.

## BASIS FOR RELIEF

**I.    THE COURT SHOULD APPROVE THE BIDDING PROCEDURES AND ENTRY INTO THE STALKING HORSE APA**

36.    The key objective in any sale of property of a debtor's estate is to maximize the value received by the estate.  *See In re Mushroom Transp. Co.*, 382 F.3d 325, 339 (3d Cir. 2004) (finding that debtor "had a fiduciary duty to protect and maximize the estate's assets"); *Official Comm. of Unsecured Creditors of Cybergenics, Corp v. Chinery*, 330 F.3d 548, 573 (3d Cir. 2003) (same).  Procedures used to enhance competitive bidding support this objective and, therefore, are appropriate in the context of bankruptcy sales.  *See In re O'Brien Envtl. Energy, Inc.*, 181 F.3d 527, 537 (3d Cir. 1999); *see also Integrated Res. Inc.,* 147 B.R. at 659 (stating that bidding procedures "encourage bidding and . . . maximize the value of the debtor's assets").

37.    The Debtors and their professional advisors, including Houlihan, have designed the Bidding Procedures, including the Sale Timeline, to promote a competitive and fair bidding process and, thus, to maximize value for the Debtors estates and creditors.  The proposed Sale Timeline contemplates an efficient sale process, and the Debtors want to ensure that all interested

parties, and any potential bidders, understand the timeline to participate in the sale process and submit Acceptable Bids.

38.     The Debtors submit that the Sale Timeline is appropriate.  The Debtors and their advisors have negotiated a timeline that balances the need to provide adequate notice to parties in interest, including to sufficiently market the Assets in the context of a postpetition sale process, with the need to quickly and efficiently consummate one or more sale transactions while the Assets have realizable going-concern value.  The sale timeline is a product of good-faith, arm's-length negotiations and reflects the best option for maximizing the value of the Assets under the circumstances of these chapter 11 cases.  As detailed above, the Debtors' business has been thoroughly marketed to a wide range of potential strategic and financial buyers.  A substantial amount of information regarding the Debtors' businesses has been made available to these prospective purchasers during the prepetition phase of the sale process.  As such, the Debtors believe that prospective bidders already know the Assets well and will have sufficient time and information to conduct the necessary due diligence to submit binding bids in accordance with the Sale Timeline.  Moreover, Bankruptcy Rule 2002(a)(2) requires twenty-one (21) days' notice of the Sale and given the Debtors spent approximately two months conducting an extensive pre-bankruptcy marketing process, the Sale Timeline is more than adequate.

39.     Access to the DIP Facility (as defined in the DIP Orders) is critical to the Debtors' ability to operate their businesses through the completion of the sale process and during the pendency of these chapter 11 cases.  Failure to adhere to a quick and efficient Sale Timeline, could jeopardize the Debtors' available borrowing under the DIP Facility and, in turn, compromise the Debtors' chapter 11 strategy of transitioning the Debtors' Assets to new owners efficiently and expeditiously.  Given the anticipated cost of administering these chapter 11 cases, the Debtors

cannot afford any delay in monetizing their Assets.  The proposed Sale Timeline allows the
Debtors to maximize value while minimizing administrative expenses.

40.    The Bidding Procedures will allow the Debtors to conduct the Auction in an
orderly, fair, and open fashion, which will encourage participation by financially capable bidders,
thereby increasing the likelihood that the Debtors will receive the highest or best possible
consideration for the Assets.  The Debtors' entry into the Stalking Horse APA further increases
the likelihood of the Debtors receiving the highest or best consideration for the Assets by setting
the floor for the Sale.  Furthermore, the Bidding Procedures and the Stalking Horse APA provide
an appropriate framework for the Debtors and their fiduciaries and professional advisors to review,
analyze and compare any bids received to determine which bids are in the best interests of the
Debtors' estates and their creditors.  Houlihan, the Debtors' investment banker in connection with
the sale process, believes that the Bidding Procedures and Stalking Horse APA are appropriately
crafted to, and will maximize, the value of the Assets.  Approval of the Bidding Procedures and
the Debtors' entry into the Stalking Horse APA sets a floor for the Debtors at the Auction and
increases the likelihood that the Debtors receive the highest or best consideration for the Assets.

41.    The Debtors submit that the Bidding Procedures and entry into the Stalking Horse
APA are necessary and provide for a fair and transparent sale process that will result in the
Debtors' obtaining the highest or otherwise best value for the Assets.  Therefore, the Debtors
request the Court to approve the Bidding Procedures and entry into the Stalking Horse APA
through the Bidding Procedures Order.

## II.    THE BID PROTECTIONS HAVE A SOUND BUSINESS PURPOSE AND SHOULD BE APPROVE

42.    The use of a stalking horse in a public auction process for sales is a customary
practice in chapter 11 cases, as the use of a stalking horse bid is, in many circumstances, the best

way to maximize value in an auction process by "establish[ing] a framework for competitive bidding and facilitat[ing] a realization of that value." *Interforum Holding LLC*, No. 11-CV-219, 2011 WL 2671254 at *1 n. 1 (E.D. Wis. July 7, 2011). As a result, Stalking Horse Purchasers virtually always require break-up fees and, in many cases, other forms of bidding protections as an inducement for "setting the floor at auction, exposing [their] bid[s] to competing bidders, and providing other bidders with access to the due diligence necessary to enter into an asset purchase agreement." *Id*. (citation omitted). Thus, the use of bidding protections has become an established practice in chapter 11 cases.

43. Indeed, forms of bid protections are a normal and, in many cases, necessary component of significant sales conducted in chapter 11. Specifically, bid protections "may be legitimately necessary to convince a 'white knight' to enter the bidding by providing some form of compensation for the risks it is undertaking." *In re 995 Fifth Ave. Assocs., L.P.*, 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) (citation and quotations omitted); *see also Integrated Res.*, 147 B.R. at 660–61 (noting bid protections can prompt bidders to commence negotiations and "ensure that a bidder does not retract its bid").

44. As a result, courts routinely approve such bid protections in connection with proposed bankruptcy sales where a proposed fee or reimbursement provides a benefit to the estate. *See In re Energy Future Holdings Corp.*, 904 F.3d 298 (3d Cir. 2018) (holding that "[T]he allowability of break-up fees. . . depends upon the requesting party's ability to show that the fees [a]re actually necessary to preserve the value of the estate.") (citing *In re O'Brien Envtl. Energy, Inc.*, 181 F.3d 527, 535 (3d Cir. 1999)) (alterations in original); *In re Reliant Energy Channelview LP*, 594 F.3d 200, 206 (3d Cir. 2010) (same). The allowance of the Expense Reimbursement is in the best interests of the Debtors' estates and their creditors, as the Stalking Horse APA will

establish a floor for further bidding that may increase the consideration given in exchange for the Assets that are the subject of such Stalking Horse APA, which will inure to the benefit of the Debtors' estates.

45.     In the Third Circuit, bid protections, such as the Expense Reimbursement proposed here, are subject to the general standard used for administrative expenses under section 503 of the Bankruptcy Code. *Energy Future*, 904 F.3d at 313 ("[T]ermination fees are subject to the same general standard used for all administrative expenses under 11 U.S.C. § 503."); *Women First Healthcare, Inc.*, 332 B.R. 115, at 121–23 (Bankr. D. Del. 2005) (holding that the general standard used for all administrative expenses applies to bid protections). Thus, the "allowability of break-up fees, like that of other administrative expenses, depends upon the requesting party's ability to show that the fees were actually necessary to preserve the value of the estate." *Reliant Energy*, 594 F.3d at 206 (internal quotations omitted) (quoting *O'Brien*, 181 F.3d at 535).

46.     Here, the Expense Reimbursement is a critical component of the Debtors' ability to obtain the commitment of the Stalking Horse Purchaser. The Expense Reimbursement offered to the Stalking Horse Purchaser was negotiated in good faith and at arm's length and with significant give-and-take. As a result, by including the Expense Reimbursement, the Debtors ensure that their estates can realize the benefit of a transaction with the Stalking Horse Purchaser without sacrificing the potential for interested parties to submit overbids at the Auction.

47.     The Expense Reimbursement provided to the Stalking Horse Purchaser (a) is an actual and necessary cost and expense of preserving the Debtors' estates within the meaning of sections 503(b) and 507(a)(2) of the Bankruptcy Code, (b) is commensurate to the real and material benefits conferred upon the Debtors' estates by the Stalking Horse Purchaser, and (c) is fair, reasonable, and appropriate, including in light of the size and nature of the proposed Sale

Transaction, the commitments that have been made, and the efforts that have been and will be expended by the Stalking Horse Purchaser.  *See* Dunayer Declaration, para. 32.

48.     If the Court does not approve Expense Reimbursement, the Debtors risk the Stalking Horse Purchaser withdrawing the Stalking Horse APA, to the detriment of the Debtors' estates.  In short, the proposed Expense Reimbursement constitutes a "fair and reasonable percentage of the proposed purchase price" and are "reasonably related to the risk, effort, and expenses of the prospective purchaser." *Integrated Res.*, 147 B.R. at 662.

49.     The Expense Reimbursement is a sound exercise of the Debtors' business judgment and are in the best interests of the Debtors, their estates, and all stakeholders.  Accordingly, the Court should approve Expense Reimbursement.

## III.    THE PREPETITION AGENT AND DIP AGENT SHOULD BE AUTHORIZED TO CREDIT BID ON THE ASSETS UNDER SECTION 363(K) OF THE BANKRUPTCY CODE

50.     Section 363(k) of the Bankruptcy Code provides that, unless the court for cause orders otherwise, the holder of a claim secured by property that is the subject of a sale "may bid at such sale, and, if the holder of such claim purchases such property, such holder may offset such claim against the purchase price of such property." 11 U.S.C. § 363(k).  Even if a secured creditor is undersecured as determined in accordance with section 506(a) of the Bankruptcy Code, section 363(k) allows such secured creditor to bid the full face value of its claim and does not limit the credit bid to the claim's economic value.  *See Cohen v. KB Mezzanine Fund II, LP (In re Submicron Sys. Corp.)*, 432 F.3d 448, 459-60 (3d Cir. 2006).

51.     As a result, the Debtors propose that the Prepetition Agent and the DIP Agent, in their capacities as such under the DIP Orders, which hold claims that are secured by valid, binding, enforceable, non-avoidable and perfected liens on and security interests in substantially all of the Assets as provided for in the DIP Orders, be entitled to credit bid all or a portion of the amounts

then outstanding under the Replacement Lender's claims, Prepetition Lender's claims, and the DIP

Lenders' claims, or any part thereof, under section 363(k) of the Bankruptcy Code and as provided

for in the DIP Orders and the Bidding Procedures.

## IV.    SUFFICIENT BUSINESS JUSTIFICATION EXISTS FOR CONSUMMATION OF THE SALE UNDER SECTIONS 105(A) AND 363(B) OF THE BANKRUPTCY CODE

52.    Pursuant to section 105(a) of the Bankruptcy Code, a "[c]ourt may issue any order,

process or judgment that is necessary or appropriate to carry out the provisions of this title."  11

U.S.C. § 105(a).  Section 363(b) of the Bankruptcy Code provides that a debtor, "after notice and

a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the

estate." 11 U.S.C. § 363(b).  Although section 363(b) does not specify a standard for determining

when it is appropriate for a court to authorize the use, sale or lease of property of the estate, courts

have required that such use, sale or lease be based upon the sound business judgment of the debtor.

*See, e.g.*, *Myers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996) (internal citation

omitted); *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.),* 722 F.2d 1063, 1070-

71 (2d Cir. 1983); *In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143, 147-48 (3d Cir. 1986)

(implicitly adopting the "sound business judgment" test of *In re Lionel Corp.*); *In re Delaware &*

*Hudson Ry. Co.*, 124 B.R. 169, 175-76 (D. Del. 1991) (holding that the Third Circuit adopted the

"sound business judgment" test in *Abbotts Dairies*); *Dai-Ichi Kangyo Bank, Ltd. v. Montgomery*

*Ward Holding Corp. (In re Montgomery Ward Holding Corp.*), 242 B.R. 147, 153 (D. Del. 1999)

(same).

53.    The demonstration of a valid business justification by the debtor leads to a strong

presumption "that in making [the] business decision the directors of a corporation acted on an

informed basis, in good faith and in the honest belief that the action taken was in the best interests

of the company."  *Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re*

*Integrated Res., Inc.)*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)).

54. The Debtors submit that their decision to consummate the Sale represents a reasonable exercise of the Debtors' business judgment, and accordingly the Sale should be approved under sections 105(a) and 363(b) of the Bankruptcy Code. The Debtors will continue to conduct an extensive and fulsome process to market the Assets. The open and fair auction and sale process contemplated by the Bidding Procedures will ensure that the Debtors' estates receive the highest or best value available for the Assets by allowing the market to dictate the value of the Assets and will provide a greater recovery than would be provided by any other available alternative. Furthermore, compliance with the Bidding Procedures will ensure the fairness and reasonableness of the consideration to be paid by the Stalking Horse Purchaser or, in the event the Stalking Horse Purchaser is not the Successful Bidder, then the Successful Bidder, and establish that the Debtors and such bidder have proceeded in good faith.

55. Additionally, the Debtors believe that the notice procedures described above are reasonable and adequate under the circumstances. Bankruptcy Rules 2002(a) and (c) require the Debtors to notify creditors of the Sale, the terms and conditions of the Sale, the time and place of the Auction, and the deadline for filing any objections. The Debtors believe that the proposed notice procedures fully comply with Bankruptcy Rule 2002, and are reasonably calculated to provide timely and adequate notice of the Stalking Horse APA, the Bidding Procedures, the Auction, the Sale Hearing, and the Sale to the Debtors' creditors and all other parties in interest that are entitled to notice, as well as those parties that have expressed a *bona fide* interest in acquiring the Assets.

56.     The Sale, conducted in accordance with the Bidding Procedures, will generate significant value for the Debtors' estates and represents the best path forward for maximizing recoveries in connection with these chapter 11 cases.  The Debtors submit that ample business justification exists for the consummation of the Sale and, therefore, request that this Court approve such Sale.

## V.     THE SALE OF THE ASSETS FREE AND CLEAR OF ALL ENCUMBRANCES OTHER THAN THE ASSUMED LIABILITIES IS AUTHORIZED UNDER SECTION 363(F) OF THE BANKRUPTCY CODE

57.     Section 363(f) of the Bankruptcy Code authorizes a debtor to sell assets free and clear of liens, claims, interests and encumbrances if:

> (1) applicable nonbankruptcy law permits sale of such property free and clear of such interest; (2) such entity consents; (3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property; (4) such interest is in bona fide dispute; or (5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).  This provision is supplemented by section 105(a) of the Bankruptcy Code, which provides that "[t]he court may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a).

58.     Because section 363(f) of the Bankruptcy Code is drafted in the disjunctive, satisfaction of any one of its five requirements will suffice to permit the Sale of the Assets "free and clear" of liens and interests.  *See Citicorp Homeowners Servs., Inc. v. Elliot (In re Elliot)*, 94 B.R. 343, 345 (E.D. Pa. 1988) (noting that because section 363(f) is written in the disjunctive, a court may approve a sale free and clear if any one subsection is met); *see also Mich. Emp't Sec. Comm'n v. Wolverine Radio Co. (In re Wolverine Radio Co.)*, 930 F.2d 1132, 1147 n.24 (6th Cir. 1991) (same); *In re Bygaph, Inc.*, 56 B.R. 596, 606 n.8 (Bankr. S.D.N.Y. 1986) (same).

Furthermore, a debtor possesses broad authority to sell assets free and clear of liens. *See In re Trans World Airlines, Inc.*, 322 F.3d 283, 289 (3d Cir. 2003).

59.     The Debtors submit that, in the interest of attracting the best offers, it is appropriate to sell the Assets on a final "as is" basis, free and clear of any and all Liens other than Assumed Liabilities (both as defined in the Stalking Horse APA) (and except as otherwise expressly set forth in the Sale Order), in accordance with section 363(f) of the Bankruptcy Code because one or more of the tests of section 363(f) are satisfied with respect to such Sale. In particular, the Debtors believe that section 363(f)(2) of the Bankruptcy Code will be met because the Prepetition Agent and DIP Agent consented to the Sale as the Stalking Horse Purchaser pursuant to the Stalking Horse APA, subject to higher or better terms as set forth in an Competing APA.

60.     Moreover, with respect to any other party asserting a lien, claim, encumbrance or the like against the Assets, the Debtors anticipate that they will be able to satisfy one or more of the conditions set forth in section 363(f) of the Bankruptcy Code. In particular, known lienholders will receive notice and will be given sufficient opportunity to object to the relief requested. Such lienholders that do not object to the Sale should be deemed to have consented. *See FutureSource LLC v. Reuters Ltd.*, 312 F.3d 281, 285-86 (7th Cir. 2002) ("[L]ack of objection (provided of course there is notice) counts as consent. It could not be otherwise; transaction costs would be prohibitive if everyone who might have an interest in the bankrupt's assets had to execute a formal consent before they could be sold.") (internal citations omitted); *Hargrave v. Twp. of Pemberton (In re Tabone, Inc.)*, 175 B.R. 855, 858 (Bankr. D.N.J. 1994) (holding that creditor's failure to object to sale free and clear of liens, claims and encumbrances satisfies section 363(f)(2)); *In re Elliot*, 94 B.R. at 345 (same). Consistent with the foregoing, the Bidding Procedures Order

provides that the absence of a timely objection to the Sale of the Assets in accordance therewith shall be "consent" to such Sale within the meaning of section 363(f)(2) of the Bankruptcy Code.

61.     Furthermore, the Debtors propose that any Lien asserted against the Assets be transferred to, and attach to, the proceeds of the Sale, and application of the proceeds generated by the Sale will be subject to any applicable provisions of the DIP Orders and the DIP Credit Agreement.

## VI.     THE SUCCESSFUL BIDDER SHOULD BE ENTITLED TO THE PROTECTIONS OF SECTION 363(M) OF THE BANKRUPTCY CODE

62.     Section 363(m) of the Bankruptcy Code provides, in part, that the reversal or modification on appeal of an authorization of a sale pursuant to section 363(b) or section 363(c) of the Bankruptcy Code does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal. *See* 11 U.S.C. § 363(m).  In approving the Sale free and clear of Liens other than Assumed Liabilities, the Debtors request that the Court find and hold that all purchasers of Assets purchased in accordance with the Bidding Procedures, including, without limitation, the Stalking Horse Purchaser, are entitled to the protections afforded by section 363(m) of the Bankruptcy Code.  Such relief is appropriate in that selection of the Successful Bidder will be the result of a competitive bidding process and arm's-length, good-faith negotiations, and parties in interest will have the opportunity to review and object to a proposed transaction.  *See In re Tempo Technology Corp.*, 202 B.R. 363, 370 (D. Del. 1996) (affirming the bankruptcy court's approval of a sale under section 363(b) of the Bankruptcy Code where, *inter alia*, adequate notice to creditors and other interested parties was given and the negotiations between buyer and seller took place at arm's-length with no evidence of fraud, collusion, or interested dealing).

VII.    **THE ASSUMPTION AND ASSIGNMENT OF THE PURCHASED CONTRACTS IN CONNECTION WITH THE SALE SATISFIES SECTION 365 OF THE BANKRUPTCY CODE**

63.     Section 365(a) of the Bankruptcy Code provides, in pertinent part, that a debtor in possession, "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a).

64.     In reviewing whether to approve the Debtors' assumption of a contract or an unexpired lease, the Court applies the "business judgment" standard.  *See In re AbitibiBowater Inc.*, 418 B.R. 815, 831 (Bankr. D. Del. 2009) (finding that a debtor's decision to assume or reject an executory contract will stand so long as "a reasonable business person would make a similar decision under similar circumstances."); *In re HQ Global Holdings, Inc.*, 290 B.R. 507, 511 (Bankr. D. Del. 2003) (stating a debtor's decision to reject an executory contract is governed by the business judgment standard and can only be overturned if the decision was the product of bad faith, whim, or caprice.  As described above, "[t]he business judgment rule 'is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interest of the company.'" *Integrated Res., Inc.*, 147 B.R. at 656 (quoting *Smith v. Van Gorkom*, 488 A.2d at 872).  Indeed, "the sole issue is whether the rejection benefits the estate."  *In re HQ Global*, 290 B.R. at 511.

65.     The business judgment rule is crucial in chapter 11 cases and shields a debtor's management from judicial second-guessing.  *See, e.g., id.*; *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006) ("The propriety of a decision to reject an executory contract is governed by the business judgment standard"); *In re Network Access Sols., Corp.*, 330 B.R. 67, 75 (Bankr. D. Del. 2005) ("The standard for approving the assumption of an executory contract is the business judgment rule.").  Generally, courts defer to a debtor in possession's business judgment to assume or reject an executory contract or lease.  *See Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp.*,

872 F.2d 36, 39–40 (3d Cir. 1989) (describing deference to a debtor's business judgment as "breathing space afforded [to] the debtor to consider whether to reject or assume executory contracts under the [Bankruptcy] Code.") (internal quotations omitted); *see also In re Trans World Airlines, Inc.*, 261 B.R. 103, 123 (Bankr. D. Del. 2001) ("Section 365(a) grants a debtor in possession the fundamental authority to assume or reject an executory contract as a vital part of the bankruptcy process…[The debtor in possession] has decided, based on its business judgment and as joined by the Committee, that rejection is in the best interest of the estate and its decision is entitled to the appropriate deference by this Court.").

66.     Here, the Debtors have exercised their sound business judgment in determining that assumption and assignment of the Purchased Contracts is in the best interests of the Debtors and their estates, and accordingly the Court should approve the proposed assumption under section 365(a) of the Bankruptcy Code. *See, e.g., In re Philadelphia Newspapers, LLC*, 424 B.R. 178, 182-83 (Bankr. E.D. Pa. 2010) (stating that if a debtor's business judgment has been reasonably exercised, a court should approve the assumption or rejection of an executory contract or unexpired lease); *Westbury Real Estate Ventures, Inc. v. Bradlees, Inc. (In re Bradlees Stores, Inc.)*, 194 B.R. 555, 558 n.1 (Bankr. S.D.N.Y. 1996); *Summit Land Co. v. Allen (In re Summit Land Co.)*, 13 B.R. 310, 315 (Bankr. D. Utah 1981) (holding that, absent extraordinary circumstances, court approval of a debtor's decision to assume or reject an executory contract "should be granted as a matter of course").

67.     As set forth above, the Sale will provide significant benefits to the Debtors' estates. To that end, the assumption, assignment and sale of the Purchased Contracts is necessary for the Debtors to obtain the benefits of the Stalking Horse APA or an Competing APA, as applicable.  In addition, under section 365(k) of the Bankruptcy Code, the assignment by a debtor to an entity of

a contract or lease "relieves the trustee and the estate from any liability for any breach of such contract or lease occurring after such assignment." 11 U.S.C. § 365(k). Thus, following an assignment to the Successful Bidder of any Purchased Contract, the Debtors will be relieved from any liability for any subsequent breach associated therewith.

68.     Furthermore, section 365(b)(1) of the Bankruptcy Code requires that any outstanding defaults under the Purchased Contracts must be cured or that adequate assurance be provided that such defaults will be promptly cured. 11 U.S.C. § 365(b)(1). As detailed in the Stalking Horse APA and the Bidding Procedures Order, the Debtors propose fixing the Cure Amounts (as defined in the Stalking Horse APA) through the Stalking Horse APA and allowing the counterparties the opportunity to object to the proposed Cure Amount, as well as the Debtors' assumption and assignment of the Purchased Contracts.

69.     Section 365(f)(2) of the Bankruptcy Code provides that a debtor may assign an executory contract or unexpired lease of nonresidential real property if "adequate assurance of future performance by the assignee of such contract or lease is provided." 11 U.S.C. § 365(f)(2). The words "adequate assurance of future performance" must be given a "practical, pragmatic construction" in light of the facts and circumstances of the proposed assumption. *See In re Fleming Cos., Inc.*, 499 F.3d 300, 307 (3d Cir. 2007) (internal citation omitted); *Carlisle Homes, Inc. v. Azzari (In re Carlisle Homes, Inc.)*, 103 B.R. 524, 538 (Bankr. D.N.J. 1988) (same); *see also In re Natco Indus., Inc.*, 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (finding that adequate assurance of future performance does not mean absolute assurance that debtor will thrive and profit); *In re Bon Ton Rest. & Pastry Shop, Inc.*, 53 B.R. 789, 803 (Bankr. N.D. Ill. 1985) ("Although no single solution will satisfy every case, the required assurance will fall considerably short of an absolute guarantee of performance.").

70.    Specifically, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. *See In re Bygaph, Inc.*, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (holding that adequate assurance of future performance is given where the assignee of lease has financial resources and expressed a willingness to devote sufficient funding to the business to ensure its success, and that in the leasing context, the chief determinant of adequate assurance is whether rent will be paid).

71.    Here, the Successful Bidder will have provided adequate assurance of future performance with respect to any Purchased Contract.  For its bid to be deemed a Acceptable Bid, each Acceptable Bidder will be required to provide evidence supporting its ability to comply with the requirements of adequate assurance of future performance under section 365(f)(2)(B) and, if applicable, section 365(b)(3) of the Bankruptcy Code (the "Adequate Assurance Information"), including:  (a) the bidder's financial wherewithal and willingness to perform under any contracts that are assumed and assigned to such potential bidder; and (b) a contact person for the proposed assignee that the counterparty may directly contact in connection with the adequate assurance of future performance.  To the extent that the Acceptable Bidder (other than the Stalking Horse Purchaser) is a newly formed acquisition entity or the like, the financial and other information supporting the Acceptable Bidder's financial wherewithal shall include financial and other information supporting the financial wherewithal of the Acceptable Bidder's parent company or sponsor.  Furthermore, given that the Debtors will submit evidence that all requirements for the assumption and assignment of such contracts at the Sale Hearing, the Court and other interested parties will have the opportunity to evaluate the ability of each Successful Bidder to provide adequate assurance of future performance.

72.     Therefore, the Debtors request the Court to approve the proposed assumption and assignment of the Purchased Contracts.

### WAIVER OF STAY UNDER BANKRUPTCY RULE 6004(h) AND 6006(d)

73.     Pursuant to Bankruptcy Rule 6004(h), "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h).  Furthermore, Bankruptcy Rule 6006(d) provides that an "order authorizing the trustee to assign an executory contract or unexpired lease under § 365(f) is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6006(d).  As set forth throughout this Motion, any delay in the Debtors' ability to consummate the Sale on the timeline contemplated by the Bidding Procedures would be detrimental to the Debtors, their creditors and estates.

74.     For this reason and those set forth above, the Debtors submit that ample cause exists to justify a waiver of the 14-day stay imposed by Bankruptcy Rule 6004(h) and 6006(d), to the extent applicable.

### NOTICE

75.     The Debtors will provide notice of this Motion to:  (a) United States Trustee for the District of Delaware, 844 N. King Street, Room 2207, Wilmington, Delaware 19801 (Linda J. Casey or by email at linda.casey@usdoj.gov); (b) the United States Attorney's Office for the District of Delaware; (c) the state attorneys general for all states in which the Debtors conduct business; (d) the Internal Revenue Service; (e) the United States Securities and Exchange Commission; (f) the holders of the thirty (30) largest unsecured claims against the Debtors on a consolidated basis; (g) counsel to the DIP Agent and DIP Lenders; (h) counsel to Privet; (i) counsel to the Prepetition Agent; (j) banks and financial institutions where the Debtors maintain accounts; (k) the Authorities; and (l) any party that has requested notice pursuant to Bankruptcy Rule 2002.

The Debtors respectfully submit that, in light of the nature of the relief requested, no further notice is necessary.

*[Remainder of Page Intentionally Left Blank]*

## CONCLUSION

WHEREFORE, the Debtors request entry of the Bidding Procedures Order and the Sale Order to be filed in advance of the Sale Hearing, granting the relief requested herein and such other and further relief as is just and proper.

Dated: July 29, 2024
      Wilmington, Delaware

**CHIPMAN BROWN CICERO & COLE, LLP**

*/s/ Robert A. Weber*
Robert A. Weber (No. (No. 4013)
Mark L. Desgrosseilliers (No. 4083)
Hercules Plaza
1313 North Market Street, Suite 5400
Wilmington, Delaware 19801
Telephone: (302) 295-0192
E-mail: desgross@chipmanbrown.com

-and-

**ROPES & GRAY LLP**
Gregg M. Galardi (No. 2991)
Lindsay C. Barca (admitted *pro hac vice*)
1211 Avenue of the Americas
New York, New York 10036
Telephone: (212) 596-9000
Facsimile: (212) 596-9090
E-mail: gregg.galardi@ropesgray.com
        lindsay.barca@ropesgray.com

*Proposed Counsel to the Debtors and Debtors in Possession*