# EXHIBIT B

*Draft 7.29.2024*

**ASSET PURCHASE AGREEMENT**

**BY AND AMONG**

**HARDINGE INC.,**

**EACH OF THE SUBSIDIARIES OF**

**HARDINGE INC.**

**LISTED ON THE SIGNATURE PAGES HERETO**

**AND**

**[HONING US HOLDINGS, LLC]**

**July [30], 2024**

# TABLE OF CONTENTS[1]

**Page**

ARTICLE I DEFINITIONS AND INTERPRETATION ............................................................. 2
    Section 1.1   Definitions ............................................................................................ 2
    Section 1.2   Interpretation ...................................................................................... 19

ARTICLE II PURCHASE AND SALE OF ASSETS ............................................................ 19
    Section 2.1   Purchased Assets ............................................................................... 19
    Section 2.2   Retained Assets ................................................................................. 24

ARTICLE III ASSUMPTION OF LIABILITIES ................................................................. 25
    Section 3.1   Assumed Liabilities .......................................................................... 25
    Section 3.2   Retained Liabilities ........................................................................... 26

ARTICLE IV CONSIDERATION ........................................................................................ 28
    Section 4.1   Purchase Price ................................................................................... 28
    Section 4.2   Allocation of Purchase Price ............................................................ 29
    Section 4.3   Cure Costs ......................................................................................... 30
    Section 4.4   Withholding ...................................................................................... 30

ARTICLE V REPRESENTATIONS AND WARRANTIES OF SELLERS ............................. 31
    Section 5.1   Organization and Good Standing; Subsidiaries; Acquired Entities .......... 31
    Section 5.2   Power; Authority; Enforceability ..................................................... 32
    Section 5.3   Title to Assets ................................................................................... 32
    Section 5.4   Noncontravention; Governmental Filings ........................................ 33
    Section 5.5   Financial Statements ......................................................................... 33
    Section 5.6   Litigation .......................................................................................... 34
    Section 5.7   Permits ............................................................................................. 34
    Section 5.8   Intellectual Property Rights .............................................................. 34
    Section 5.9   Government ....................................................................................... 37
    Section 5.10  Compliance with Laws. .................................................................... 38
    Section 5.11  Employees ......................................................................................... 40
    Section 5.12  Employee Benefit Plans .................................................................... 42
    Section 5.13  Real Property .................................................................................... 44
    Section 5.14  Contracts ........................................................................................... 45
    Section 5.15  Environmental Matters ..................................................................... 47
    Section 5.16  Insurance ........................................................................................... 47
    Section 5.17  Brokers or Finders ............................................................................ 48
    Section 5.18  Taxes ................................................................................................ 48
    Section 5.19  Customers and Suppliers .................................................................. 51
    Section 5.20  Warranties/Product Liability ............................................................ 52
    Section 5.21  Confidentiality .................................................................................. 52
    Section 5.22  Accounts Receivable ........................................................................ 52

---

[1] **Note to Draft**:  To be updated prior to signing.

Section 5.23    No Implied or Other Representations or Warranties ............................... 52

ARTICLE VI REPRESENTATIONS AND WARRANTIES OF PURCHASER...................... 52
Section 6.1     Organization and Good Standing................................................ 53
Section 6.2     Power; Authority; Enforceability............................................... 53
Section 6.3     Consents.................................................................................. 53
Section 6.4     No Conflicts............................................................................ 54
Section 6.5     Litigation................................................................................. 54
Section 6.6     Brokers or Finders................................................................... 54
Section 6.9     No Implied or Other Representations or Warranties ............... 54

ARTICLE VII CONDITIONS TO CLOSING ................................................................. 55
Section 7.1     Conditions to Obligations of All Parties ................................. 55
Section 7.2     Conditions to Purchaser's Obligations.................................... 55
Section 7.3     Conditions to Sellers' Obligations........................................... 57

ARTICLE VIII COVENANTS........................................................................................ 58
Section 8.1     Conduct of the Business.......................................................... 58
Section 8.2     Access..................................................................................... 61
Section 8.3     Bankruptcy Court Matters....................................................... 61
Section 8.4     [Employee Matters.................................................................. 62
Section 8.5     Publicity.................................................................................. 65
Section 8.6     Assignment of Purchased Assets Subject to Consent Requirements........ 66
Section 8.7     Further Assurances.................................................................. 66
Section 8.8     Approvals................................................................................ 67
Section 8.9     Notice of Certain Matters........................................................ 68
Section 8.10    Bulk Transfer Laws................................................................. 69
Section 8.11    Insurance................................................................................. 69
Section 8.12    Confidentiality ....................................................................... 70
Section 8.13    Back-up Bidder....................................................................... 70
Section 8.14    Resignations........................................................................... 70
Section 8.15    Corporate Names.................................................................... 70

ARTICLE IX CLOSING AND TERMINATION ............................................................. 71
Section 9.1     Closing.................................................................................... 71
Section 9.2     Termination............................................................................. 71
Section 9.3     Effect of Termination.............................................................. 72

ARTICLE X TAX MATTERS........................................................................................ 73
Section 10.1    Tax Cooperation...................................................................... 73
Section 10.2    Transfer Taxes ........................................................................ 73
Section 10.3    Tax Prorations and Straddle Periods........................................ 73
Section 10.4    Provision of Tax Forms .......................................................... 74
Section 10.5    Certain Tax Elections.............................................................. 74
Section 10.6    Chinese Indirect Transfer Tax Filing....................................... 75

ARTICLE XI GENERAL PROVISIONS ............................................................ 76
    Section 11.1   Bankruptcy Court Approval................................................ 76
    Section 11.2   Notices ............................................................................. 76
    Section 11.3   Survival of Representations, Warranties, Covenants and
              Agreements...................................................................... 77
    Section 11.4   Binding Effect ................................................................. 77
    Section 11.5   Headings .......................................................................... 78
    Section 11.6   Exhibits and Schedules ................................................... 78
    Section 11.7   Counterparts .................................................................... 78
    Section 11.8   Governing Law/Jurisdiction............................................ 78
    Section 11.9   WAIVER OF JURY TRIAL............................................ 78
    Section 11.10  Waivers ........................................................................... 78
    Section 11.11  Modification.................................................................... 79
    Section 11.12  Successors/Assignment ................................................... 79
    Section 11.13  Entire Agreement ............................................................ 79
    Section 11.14  Severability ..................................................................... 79
    Section 11.15  No Third Party Beneficiaries .......................................... 79
    Section 11.16  Non-Recourse ................................................................. 79
    Section 11.17  Expenses ......................................................................... 80
    Section 11.18  Negotiated Agreement ..................................................... 80
    Section 11.19  Seller Representative ....................................................... 80

**EXHIBITS**

Exhibit A – Bill of Sale and Assignment and Assumption Agreement
Exhibit B – Cash Shortfall Budget
Exhibit C – IP Assignment Agreement

NAI-1540627251v4

4880-8016-9684, v. 2

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this "***Agreement***"), dated as of July [30], 2024 (the "***Execution Date***"), is by and among [Honing US Holdings, LLC], a Delaware limited liability company ("***Purchaser***"), Hardinge Inc., a New York corporation (the "***Company***"), and each of the Subsidiaries of the Company party hereto as set forth on the signature pages hereto (together with the Company, each a "***Seller***", and collectively, "***Sellers***").  The Company, in its capacity as the representative, agent and attorney-in-fact of Sellers, is also referred to herein as the "***Seller Representative***".

### RECITALS

WHEREAS, Sellers intend to become debtors-in-possession under Title 11 of the United States Code, 11 U.S.C. § 101 et seq. (including the rules promulgated thereunder, the "***Bankruptcy Code***"), by filing voluntary petitions for relief under Chapter 11 of the Bankruptcy Code (the "***Bankruptcy Cases***") (such filing date, the "***Petition Date***"), in the United States Bankruptcy Court for the District of Delaware (the "***Bankruptcy Court***");

WHEREAS, in connection with the Bankruptcy Cases, Purchaser desires to Credit Bid on a dollar-for-dollar basis the Credit Bid Amount pursuant to section 363 of the Bankruptcy Code;

WHEREAS, Sellers and Purchaser are entering into this Agreement subject to the final approval by the Bankruptcy Court;

WHEREAS, the Company Group is engaged in the business of designing, manufacturing, supporting, maintaining, licensing, selling and commercializing computer-numerically controlled cutting lathes, machining centers, grinding machines, honing machines, collets, chucks, index fixtures, abrasives, automation solutions and other industrial products and accessories (including all related activities of the Company Group pertaining thereto, the "***Business***");

WHEREAS, subject to the approval of the Bankruptcy Court, Sellers desire to sell, transfer, convey, assign and deliver to Purchaser, and Purchaser desires to purchase, acquire, and assume from Sellers pursuant to, *inter alia*, sections 105, 363 and 365 of the Bankruptcy Code, all of the Purchased Assets, together with the Assumed Liabilities, as contemplated by this Agreement and the Transaction Documents (together with the other transactions contemplated hereby and thereby, the "***Transactions***"); and

WHEREAS, Sellers, as debtors and debtors-in-possession, will continue in the possession of their assets and in the management of the Business pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

NOW THEREFORE, in consideration of the premises and mutual covenants and agreements hereinafter contained, the Parties hereby agree as follows:

# ARTICLE I
## DEFINITIONS AND INTERPRETATION

Section 1.1     Definitions. When used in this Agreement, the following terms in all of their tenses shall have the meanings assigned to them below or elsewhere in this Agreement as indicated below:

"*Accounts Receivable*" means all accounts, rights to payment and notes and other amounts receivable (whether current or non-current) arising from the conduct of the Business, including receivables from credit card processors.

"*Acquired Chinese Entities*" means any Subsidiaries of the Sellers set forth on Schedule 1.1(a), as it may be amended from time to time pursuant to the terms hereof, including any successor thereto as a result of an Entity Conversion, that are formed or organized in the PRC.

"*Acquired Entities*" means one or more Subsidiaries of Sellers set forth on Schedule 1.1(a), as it may be amended from time to time pursuant to the terms hereof, including any successor thereto as a result of an Entity Conversion.

"*Acquired Entity Employee*" means each Person who is, or could be considered to be, an employee of any Acquired Entity (subject to the amendment of Schedule 1.1(a) as contemplated by Section 2.1(b)).

"*Acquired Entity Plan*" means each Seller Plan that is sponsored or maintained by an Acquired Entity (subject to the amendment of Schedule 1.1(a) as contemplated by Section 2.1(b)).

"*Acquired Equity Interests*" has the meaning set forth in Section 2.1(a)(xxiv).

"*Affiliate*" of a Person means any other Person that directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Person. The term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by Contract or otherwise.

"*Agreement*" has the meaning set forth in the Preamble.

"*Allocation Statement*" has the meaning set forth in Section 4.2(a).

"*Alternative Transaction*" means a transaction or series of transactions involving a sale, transfer or other disposition of all or any material portion of the Purchased Assets to another purchaser or purchasers other than Purchaser.  Notwithstanding the foregoing, any Expense Reimbursement under this Agreement will be treated as an administrative expense under Sections 503(a) and 507(a) of the Bankruptcy Code and shall be immediately paid at the Closing from the proceeds of the Alternative Transaction.

"*Announcement 7*" means the Announcement on Several Issues concerning the Enterprise Income Tax on Indirect Transfer of Properties by Non-Resident Enterprises (in Chinese, "关于非

居民企业间接转让财产企业所得税若干问题的公告"), promulgated by the State Taxation Administration of the PRC on 3 February 2015 as Public Notice 2015 No. 7, as may be amended or supplemented from time to time and including any similar or replacement law, notice, circular or bulletin on the Tax treatment of offshore indirect transfer of any Chinese taxable property.

"*Anti-Corruption and Trade Control Laws*" means all applicable U.S. and non-U.S. Laws relating to (a) the prevention of corruption and bribery, including the U.S. Foreign Corrupt Practices Act of 1977, as amended ("*FCPA*"), (b) economic or trade sanctions, including economic or trade sanctions administered or enforced by the United States (including by the United States Department of Treasury, Office of Foreign Assets Control ("*OFAC*") or the U.S. Department of State), the United Nations or the governments of Canada, the United Kingdom, the European Union, or any European Union member state, (c) export controls, including the International Traffic in Arms Regulations (ITAR), 22 C.F.R. Parts 120 et seq. and the Export Administration Regulations (EAR), 15 C.F.R. Parts 730 et seq., (d) the customs and imports, including the customs regulations set forth in Title 19 of the Code of Federal Regulations, the Tariff Act of 1930, as amended, and the Laws, regulations and programs administered or enforced by U.S. Customs and Border Protection, the U.S. Department of Commerce, U.S. International Trade Commission, U.S. Immigration and Customs Enforcement, and their respective predecessor agencies, (e) the anti-boycott Laws administered by the U.S. Department of Commerce and the U.S. Department of Treasury's Internal Revenue Service, or any applicable requirements of similar Laws in any jurisdiction where Sellers or the Acquired Entities (subject to the amendment of Schedule 1.1(a) as contemplated by Section 2.1(b)) or any of their respective Subsidiaries or Affiliates transact business any other jurisdiction.

"*Anti-Money-Laundering Laws*" means any and all requirements of Law related to engaging in, financing, or facilitating terrorism or money laundering, including as applicable the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (the "*PATRIOT Act*"), the Financial Recordkeeping and Currency and Foreign Transactions Reporting Act (also known as the "Bank Secrecy Act", 31 U.S.C. §§5311 et seq.), and any applicable requirements of similar Laws of any jurisdiction where Sellers or the Acquired Entities or any of their respective Subsidiaries or Affiliates transact business or any other jurisdiction.

"*Antitrust Law*" means the Sherman Act, as amended, the Clayton Act, as amended, the HSR Act, the Federal Trade Commission Act, as amended, and all other foreign Laws that are designed or intended to prohibit, restrict or regulate actions having the purpose or effect of monopolization, restraint of trade or lessening of competition.

"*Approved Budget*" has the meaning set forth in the DIP Order, which initial Approved Budget is attached to the DIP Order as Exhibit 2.

"*Asset Allocation*" has the meaning set forth in Section 4.2(a).

"*Assumed Contracts*" has the meaning set forth in Section 2.1(a)(v).

"*Assumed Liabilities*" has the meaning set forth in Section 3.1(a).

NAI-1540627251v4

4880-8016-9684, v. 2

"***Assumed Seller Plan***" has the meaning set forth in <u>Section 2.1(a)(xx)</u>.

"***Auction***" has the meaning set forth in the Bidding Procedures.

["***Audited Financial Statements***" has the meaning set forth in <u>Section 5.5</u>.]

"***Avoidance Actions***" means any claim, right, or cause of action arising under chapter 5 of the Bankruptcy Code, including claims brought pursuant to sections 541, 542, 544, 545, 547, 548 and 549, 550 and 551 of the Bankruptcy Code and any analogous state-law claims.

"***Back-up Bidder***" means the bidder with the next highest or otherwise second-best bid for the Purchased Assets, as determined in accordance with the Bidding Procedures.

"***Balance Sheet Date***" has the meaning set forth in <u>Section 5.5</u>.

"***Bankruptcy Cases***" has the meaning set forth in the Recitals.

"***Bankruptcy Code***" has the meaning set forth in the Recitals.

"***Bankruptcy Court***" has the meaning set forth in the Recitals and includes such other courts exercising competent jurisdiction over the Bankruptcy Cases involving Sellers.

"***Bidding Procedures***" means the procedures for the solicitation and submission of bids and conducting an Auction with respect to the acquisition of the Purchased Assets approved by the Bankruptcy Court pursuant to the Bidding Procedures Order, which shall be in form and substance acceptable to Purchaser and the DIP Agent (as defined in the DIP Order).

"***Bidding Procedures Order***" means an order of the Bankruptcy Court approving, among other things, the Bidding Procedures and the payment of the Expense Reimbursement, including provisions for an Auction and scheduling a hearing to consider entry of the Sale Order, in form and substance acceptable to Purchaser and DIP Agent (as defined in the DIP Order).

"***Bill of Sale and Assignment and Assumption Agreement***" means a Bill of Sale and Assignment and Assumption Agreement executed by Purchaser and Sellers, in substantially the form of <u>Exhibit A</u>.

"***Business***" has the meaning set forth in the Recitals.

"***Business Day***" means a day other than a Saturday, Sunday or other day on which commercial banks in New York City are authorized or required by Law to close.

"***Business Employee***" means each Person who is, or could be considered to be, employed by a Seller.

"***Business Information***" means Personal Information, Trade Secrets and all other confidential or non-public information Processed, used or held for use by any Seller, including those disclosed by any third party to a Seller under which a Seller has an obligation of confidentiality or non-disclosure and any and all confidential or non-public files, documents and

materials (whether in electronic or tangible format) that constitute, comprise or relate to the investigation, evaluation, preparation, prosecution, maintenance, defense, enforcement, filing, issuance or registration of any of the Transferred Intellectual Property Rights or any abandoned application or expired provisional application in the same patent family as any of the Transferred Intellectual Property Rights or claiming priority from or having priority claims to any of the Patents in the Transferred Intellectual Property Rights or help to support or establish the dates of conception or reduction to practice of any inventions, including laboratory reports, invention disclosures and inventor notebooks, and those portions of the laboratory and inventor notebooks containing such information.

"***CARES Act***" has the meaning set forth in Section 7.2(d).

["***Cash Shortfall***" means, if Excluded Cash is insufficient to fund (or unavailable to fund pursuant to the Approved Budget, the DIP Order or otherwise), (a) any amounts required to fund final payroll and any other compensation required to be paid in connection with termination of any Business Employee or independent contractor pursuant to applicable Law, including accrued and unpaid PTO, severance, payroll tax contributions and FSA/HSA contributions, to the extent that failure to pay would result in personal liability of any employee, officer or director of any Group Company, (b) any amounts required to pay Taxes of any Group Company for the period beginning after the Petition Date, to the extent such Taxes constitute administrative and priority claims in the Bankruptcy Cases or failure to pay such Taxes would result in personal liability of any employee, officer or director of any Group Company, (c) the HL Fee, and (d) [●], each to the extent set forth in the Cash Shortfall Budget.]

"***Cash Shortfall Budget***" means the budget attached as Exhibit B.

"***Cash Shortfall Escrow Account***" means the account established pursuant to the Escrow Agreement into which the Cash Shortfall will be deposited on the Closing Date in accordance with Section 7.3(e).

"***Check-the-Box Election***" has the meaning set forth in Section 10.6(c).

"***Claim***" means a "claim" as defined in Section 101(5) of the Bankruptcy Code.

"***Closing***" has the meaning set forth in Section 9.1.

"***Closing Date***" has the meaning set forth in Section 9.1.

"***COBRA***" means the continuation coverage provisions of the Consolidated Omnibus Budget Reconciliation Act of 1985, as codified in Code Section 4980B and ERISA Sections 601 et seq., as amended from time to time, and the regulations and other guidance promulgated thereunder and any other similar provisions of state or local Law.

"***Code***" means the United States Internal Revenue Code of 1986, as amended.

"***Company Group***" means, collectively, Sellers, the Acquired Entities and the Excluded Entities (subject to the amendment of Schedule 1.1(a) as contemplated by Section 2.1(b)) and each of the foregoing is individually a "***Group Company***".

"***Contract***" means any commitment, understanding, instrument, lease, sub-lease, pledge, mortgage, indenture, license, agreement, purchase or sale order, contract, commitment, note, bond, franchise, guarantee, indemnity, instrument, promise or other arrangement evidencing or creating any legally binding obligation, whether written or oral (including all amendments, side-letters, supplements and modifications of any of the foregoing and all rights and interests arising thereunder or in connection therewith) that is binding upon a Person or its property, but shall expressly exclude purchase orders and invoices entered into in the Ordinary Course of Business.

"***Contracting Parties***" is defined in <u>Section 11.16</u>.

"***Controlled Group Liability***" means any and all liabilities (including any contingent liabilities) (a) under Title IV of ERISA; (b) under Section 302, 303, or 4068(a) of ERISA; (c) under Section 412, 430 or 4971 of the Code; (d) under Section 436 of the Code or Section 206(g) of ERISA; (e) as a result of the failure to comply with the continuation coverage requirements of ERISA Sections 601 *et seq.,* and Section 4980B of the Code or the group health requirements of Sections 701 *et seq.,* of ERISA and Sections 9801 *et seq.,* of the Code; (f) for violation of HIPAA or the Patient Protection and Affordable Care Act of 2010, as amended; or (g) as a result of a failure to comply with the requirements of Section 414(t) of the Code.

"***Credit Bid***" has the meaning set forth in <u>Section 4.1(a)</u>.

"***Credit Bid Amount***" has the meaning set forth in <u>Section 4.1(a)</u>.

"***Creditors' Committee***" means the official creditors' committee of unsecured creditors, if any, appointed in the Bankruptcy Cases.

"***Cure Costs***" means, with respect to the Assumed Contracts, all amounts required to be paid or otherwise satisfied pursuant to the Bankruptcy Code in order to cure Sellers' monetary defaults under such Assumed Contracts at the time of the assumption thereof by and assignment to Purchaser as provided hereunder.

"***Deeds***" has the meaning set forth in <u>Section 7.2(e)(vii)</u>.

"***DIP Facility***" means the debtor-in-possession financing facility provided to Sellers under that certain Secured Superpriority Debtor-in-Possession Credit Agreement, dated as of July [●], 2024, by and among Hardinge, as the borrower, the guarantors parties thereto, Centre Lane Solutions Partners, LP, as administrative agent, and the lenders party thereto (the "***DIP Credit Agreement***").

"***DIP Lenders***" means lenders party to the DIP Facility.

"***DIP Obligations***" means all Obligations (as defined in the DIP Credit Agreement).

"***DIP Order***" means, as applicable, the interim and Final Orders of the Bankruptcy Court approving and authorizing Sellers to enter into the DIP Facility.

"***Entity Conversions***" has the meaning set forth in <u>Section 10.6(c)</u>.

"*Environment*" means soil, surface waters, groundwater, drinking water, land, stream sediments, soil gas, natural resources, surface or subsurface strata, ambient air or indoor air, including any material or substance used in the physical structure of any building or improvement.

"*Environmental Laws*" means all applicable federal, state, local, municipal and foreign Laws concerning public or human health and safety (as it relates to exposure to Hazardous Substances), endangered or threatened species, pollution, or protection of the Environment, including all those relating to the presence, use, production, generation, handling, transportation, treatment, storage, disposal, processing, management, manufacture, importation, exportation, sale, distribution, labeling, recycling, discharge, Release, threatened Release, control, or cleanup of, or exposures to, any Hazardous Substances (including the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended (42 U.S.C. § 9601 et seq.), and any regulations promulgated thereunder, and analogous state Laws).

"*ERISA*" means the Employee Retirement Income Security Act of 1974, as amended, and the rules and regulations promulgated thereunder.

"*Escrow Agent*" means the escrow agent under the Escrow Agreement.

"*Escrow Agreement*" means an Escrow Agreement, to be entered into as of the Closing Date, by and among Seller Representative, Purchaser and the Escrow Agent, in respect of the (a) Cash Shortfall Escrow Account and (b) Wind-Down Escrow Account, in each case in a form to be mutually agreed between Purchaser and Seller Representative.

"*Excluded Cash*" means all cash on hand and cash drawn under the DIP Facility to the extent necessary to fund and satisfy amounts equal to the Carve-Out (less the Post-Trigger Carve-Out) (each as defined in the DIP Order), determined as of immediately prior to the Closing.

"*Excluded Employee Liabilities*" means, except as otherwise provided in Section 3.1(a), the following liabilities of Sellers or any of their respective Affiliates: (a) any liability arising at any time under or in connection with any Seller Plan (other than, for the avoidance of doubt, any Assumed Seller Plan or Acquired Entity Plan or with respect to Post-Closing COBRA Liability, Accrued PTO or IBNR Claim); (b) [any liability that constitutes a Pre-Closing WARN Act Liability]; (c) any Controlled Group Liability arising or related to a period prior to Closing; (d) any liability arising at any time in connection with the actual or prospective employment or engagement, the discharge by Sellers or any of their respective Affiliates of any current or former Business Employee or other service provider of Sellers or any of their respective Affiliates (other than any such liability with respect to Transferred Employees arising or occurring following the Closing); and (e) any employment, labor, compensation, pension, employee welfare and employee-benefits-related liabilities (other than, for the avoidance of doubt, liabilities of the Assumed Seller Plans and Acquired Entity Plans or Post-Closing COBRA Liability, Accrued PTO or IBNR Claim) relating to any current or former Business Employee or other service provider of Sellers or any of their respective Affiliates, or any spouse, dependent or beneficiary thereof, including all liabilities related to or arising out of claims made by any such Person (i) for any statutory or common law severance or other separation benefits, (ii) for any contractual or other severance or separation benefits and any other legally-mandated payment obligations (including any compensation payable during a mandatory termination notice period and any payments

pursuant to a judgment of a court, tribunal or other authority having jurisdiction over the Parties), (iii) with respect to any unfair labor practice, (iv) under any state unemployment compensation or workers' compensation Law, (v) under any federal or state employment Law or other Law relating to employment, discrimination, classification, immigration, or (vi) relating to any obligation to inform or consult with employees or other service providers, employee representatives, unions, works councils or other employee representative bodies in connection with the Transactions, in each case (1) associated with any current or former Business Employee or other service provider of Sellers or any of their respective Affiliates, or any spouse, dependent or beneficiary thereof, arising at any time, and (2) associated with any Transferred Employee, arising prior to the Closing or arising solely by virtue of the Closing having occurred.

"*Excluded Entity*" means WEISSER Gesellschaft mit beschränkter haftung ("*Weisser*"), J.G. WEISSER SöHNE GmbH & Co. KG ("*Weisser KG 1*") and any direct or indirect Subsidiary of a Seller that is not an Acquired Entity (and, for the avoidance of doubt, that is not itself a Seller).

"*Execution Date*" has the meaning set forth in the Recitals.

"*Expense Reimbursement*" means an amount equal to the reasonable, documented, out-of-pocket costs and expenses of Purchaser (including the reasonable, documented expenses of outside counsel, investment bankers and other outside advisors) related to negotiating this Agreement and investigating Sellers and the Purchased Assets, which amount, upon entry of the Bidding Procedures Order, will constitute an administrative expense of Sellers in the Bankruptcy Cases under Sections 503(a) and 507(a) of the Bankruptcy Code and shall be immediately paid at the Closing from the proceeds of the Alternative Transaction.

"*Final Order*" means a final order of the Bankruptcy Court, which shall be in full force and effect and not stayed, and as to which no appeal, petition for certiorari or other proceeding for reconsideration has been timely filed, or if timely filed, such appeal, petition for certiorari or motion to reconsider has been dismissed or denied with no further appeal and the time for filing such appeal has passed, and such order shall not be reversed, vacated, amended, supplemented, or otherwise modified, in each case, without the prior written consent of the Administrative Agent (as defined in the DIP Facility) or Purchaser, each as applicable.

"*Financial Statements*" has the meaning set forth in <u>Section 5.5</u>.

"*GAAP*" means generally accepted accounting principles in the United States, consistently applied.

"*Governmental Approvals*" means any approval, consent, Permit, license, waiver, or other authorization issued, granted, given or otherwise made available by or under any Governmental Authority or pursuant to any Law.

"*Governmental Authority*" means any federal, state, local or foreign government or political subdivision thereof, or any agency or instrumentality of such government or political subdivision, or any self-regulated organization or other non-governmental regulatory authority or quasi-governmental authority (to the extent that the rules, regulations or orders of such organization or authority have the force of Law), or any arbitrator, court or tribunal of competent

jurisdiction, including the United States Patent and Trademark Office and the Internet Corporation for Assigned Names and Numbers or equivalent authority anywhere in the world.

"*Government Contract*" means any prime contract, subcontract, teaming agreement or arrangement, joint venture, basic ordering agreement, blanket purchase agreement, letter agreement, purchase order, delivery order, task order, grant, cooperative agreement, change order or other commitment or funding vehicle that (a) exists between a Target Company and any Governmental Authority or (b) is entered into by a Target Company as a subcontractor at any tier in connection with a Contract between another Person and a Governmental Authority.

"*Hazardous Substances*" means any pollutant, contaminant, chemical, material, substance or waste defined, listed or classified as a "pollutant," "contaminant," "hazardous waste," "hazardous material" or "hazardous substance" under, or otherwise regulated under any Environmental Law, including petroleum, petroleum-containing and petroleum-derived substances, products, by products and wastes, asbestos and asbestos-containing materials, radon and radioactive materials, perfluoroalkyl and polyfluoroalkyl substances, urea, formaldehyde and lead based paint or lead-containing materials.

"*HL Fee*" means all amounts payable to Houlihan Lokey in respect of the Transactions and the Bankruptcy Cases.

"*HSR Act*" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, and the rules and regulations promulgated thereunder.

"*IFRS*" means International Financial Reporting Standards.

"*Improvements*" means all improvements located, placed, constructed or installed on or under any parcel of Owned Real Property or Leased Real Property (but only to the extent the related Real Property Leases constitute Assumed Contracts), including all utilities, fire protection, security, surveillance, telecommunications, computer, wiring, cable, heat, exhaust, ventilation, air conditioning, electrical, mechanical, plumbing and refrigeration and cooling systems, facilities, lines, installations and conduits.

"*Income Tax*" means any Tax imposed on or measured by reference to net or gross income or receipts (however denominated), including franchise and withholding Taxes imposed in lieu of Taxes denominated as "income taxes."

"*Income Tax Return*" means any Tax Return with respect to Income Taxes.

"*Indebtedness*" means, with respect to each Target Company (including with respect to the Business or the Purchased Assets), as of any given time of determination, both the current and long-term portions of any amount owed (whether or not contingent and including any and all principal, accrued and unpaid interest, prepayment premiums or penalties, related expenses, commitment and other fees, sale or liquidity participation amounts, reimbursements, indemnities and other amounts which would be payable thereon) with respect to, without duplication, (a) any indebtedness for borrowed money under any credit facilities, (b) any liabilities evidenced by bonds, debentures, notes or other similar instruments or debt securities, (c) any obligation evidenced by any letter of credit or bankers' acceptance, performance bonds, sureties or similar

- 9 -

obligations, to the extent drawn, (d) any liabilities of a Seller to a counterparty to settle interest rate and currency swap, cap and any other arrangements designed to provide protection against fluctuations in interest or currency rates, in each case, including any amounts payable to terminate such arrangements, (e) any obligations for the deferred purchase price or property, goods or services, (f) any obligations with respect to earnout, holdbacks or contingent payment obligations (in each case, valued at the maximum amount thereof), (g) all capital or finance leases, (h) any synthetic lease obligations or any obligations in respect of off-balance sheet agreements or transactions that are in the nature of, or in substitution of, financings, (i) any obligations for prepayment premiums, redemption costs, accrued interest, penalties, collection costs, fees and expenses in respect of any of the foregoing, and (j) any guarantees of obligations of the type described in clauses (a) through (i) above (including by way of agreement to purchase products or securities, to provide funds for payment, to maintain working capital or other balance sheet conditions, to provide security (or, pursuant to an existing right, to provide security at a later date) by a Lien on property or otherwise to assure a creditor against loss).

"*Indirect Transfer Report*" has the meaning set forth in Section 10.6(b).

"*Insurance Policies*" has the meaning set forth in Section 5.16.

"*Intellectual Property*" means any and all (a) trademarks and service marks, brands, certification marks, logos, trade dress, trade names, designs and other similar indicia of source or origin, including all applications, registrations and renewals of any of the foregoing, together with the goodwill connected with the use of and symbolized by the foregoing ("*Trademarks*"); (b) copyrights, including all applications, registrations and renewals of any of the foregoing, and works of authorship, whether or not copyrightable (collectively, "*Copyrights*"); (c) trade secrets, confidential know-how, discoveries, improvements, technology, business and technical information, databases, data compilations and collections, tools, methods, processes, techniques, specifications, and other confidential and proprietary information (collectively, *Trade Secrets*"); (d) patents, registered industrial designs, design patents, certificates of invention, and other indicia of invention ownership issued or granted by any Governmental Authority and patent applications for any of the foregoing, together with all continuations, divisionals, reexaminations and reissues thereof or other post-grant forms of any of the foregoing, equivalents or counterparts of any of the foregoing (collectively, "*Patents*"); (e) Software; (f) websites, internet domain name registrations and social media account or user names (including "handles"), all associated web addresses, URLs, websites and web pages, social media sites and pages, and all content and data thereon or relating thereto and registrations and applications for registration of any of the foregoing (collectively, "*Domain Names*"); and (g) all other intellectual and industrial property rights and assets, and all rights, interests and protections that are associated with any of the foregoing throughout the world.

"*Intellectual Property Rights*" means all rights in, to, arising out of, or associated with any Intellectual Property in any and all jurisdictions throughout the world.

"*Interim Financial Statements*" has the meaning set forth in Section 5.5.

"*Inventory*" means all inventory related to, required for or used in connection with the Business, wherever located, including all finished goods whether held at any location or facility of

any Target Company or any of or in transit to a Target Company or any of their respective Affiliates.

"***IP Assignment Agreement***" means the IP Assignment Agreements, executed by Purchaser and Sellers, in substantially the form of Exhibit C.

"***IRS***" has the meaning set forth in Section 3.2(i).

"***IT Assets***" means all computers (including, servers, firewalls, workstations, desktops, laptops and handheld devices), Software, websites, hardware, networks, firmware, middleware, routers, hubs, switches, data communications lines, data storage devices, information security and telecommunications capabilities, data centers, operating systems and all other information technology equipment and other similar or related items of information technology systems, hardware and infrastructure, in each of the foregoing, owned, licensed or used by or for Sellers or the Business.

"***Knowledge of Sellers***" or any other similar knowledge qualification in this Agreement means, as to a particular matter, the actual knowledge of the following individuals: Greg Knight, Matthew Weeks, Jeremy Michael, Hoil Kim and Kevin Marvel, in each case, solely with respect to the representations and warranties as set forth in ARTICLE V as applied on and as of the Closing, after taking into account his or her actual knowledge after (a) preparing the true and correct list of Available Contracts (as required by Section 2.1(b)), (b) preparing the Schedules and Seller Disclosure Schedule (as required by Section 8.17) and (c) otherwise being involved or assisting with the preparation of any filings or motions with the Bankruptcy Court in connection with the Bankruptcy Cases.

"***Law***" means any federal, state, provincial, territorial, local, municipal, foreign, international, or multinational statute, law, ordinance, regulation, rule, directive, decision, code, Order, constitution, treaty, common law, judgment, decree, other requirement or rule of law enacted, adopted, promulgated, issued, applied by or administered or enforced by or on behalf of, any Governmental Authority or other similar authority.

"***Leased Real Property***" means all real property leased or otherwise occupied (but not owned) by any Target Company and used in connection with the Business.

"***Legal Proceeding***" means any judicial, administrative or arbitral action, investigation, litigation, suit, proceeding (public or private), cause of action, examination, dispute, charge, hearing, audit, assessment, inquiry or claim by or before any Governmental Authority, and any appeal from any of the foregoing.

"***liability***" means any liability, damage, fine, fee, penalty, settlement, cost, expense, Tax, debt or obligation of any kind, character, or description, whether known or unknown, asserted or unasserted, matured or unmatured, liquidated or unliquidated, disputed or undisputed, accrued or unaccrued, due or to become due, fixed, absolute, contingent or otherwise, whenever or however arising and regardless of when asserted and by whom.

"***Licensed Seller Intellectual Property***" means all Intellectual Property and Intellectual Property Rights licensed to a Seller from any third party.

"***Lien***" means any lien (statutory or otherwise), mortgage, hypothecation, claim, deed of trust, right of use or possession, right of setoff, successor liability, servitude, encroachment, restriction or restrictive covenant, charge, covenant, condition, easement, adverse claim, demand, Encumbrance, limitation, security interest, preference, priority, right of first refusal, option, pledge, title defect, or restriction, of any kind or nature, whether secured or unsecured, choate or inchoate, filed or unfiled, scheduled or unscheduled, recorded or unrecorded, contingent or non-contingent, material or non-material, known or unknown.

"***Local Transfer Instruments***" means the agreements, certificates and instruments required by applicable Law to effect the transfer of all of the issued and outstanding equity interests of Hardinge Holdings GmbH or any other Acquired Entity (to the extent required), in the manner contemplated by this Agreement.

"***Malicious Code***" means any "back door," "drop dead device," "time bomb," "Trojan horse," "virus," "worm," "spyware" or "adware" (as such terms are commonly understood in the software industry) or any other code having, or capable of performing or facilitating, any of the following functions (whether intentionally designed as such, or resulting from a design flaw, unpatched vulnerability, or otherwise): (a) disrupting, disabling, harming or otherwise impeding in any manner the operation of, or providing unauthorized access to, a computer system or network or other device on which such code is stored or installed or with which such code interoperates, communicates, or transacts, or (b) compromising the privacy or data security of a user, system, or software, or accessing modifying, damaging or destroying any data, file, software, or system without the user's knowledge or consent.

"***Material Adverse Effect***" means any event, occurrence, fact, condition, development or change (each, a "***Change***") that, individually or in the aggregate with other such Changes, (a) prevents, materially delays, or materially impairs the ability of the Target Group to consummate the Transactions, or would reasonably be expected to do so, or (b) has, or would reasonably be expected to have, individually or in the aggregate, a material adverse effect on the business, assets, liabilities, condition (financial or otherwise) or operating results of the Business, the Purchased Assets or the Assumed Liabilities, taken as a whole, or except, in the case of this clause (b), to the extent resulting from or arising in connection with (i) the pendency or consummation of the Transactions or the public announcement thereof, including the identity, nature or ownership of Purchaser or its Affiliates (and any communications by Purchaser or its Affiliates, including regarding their respective plans or intentions with respect to the Sellers, the Acquired Entities or the Business) including any effects thereof on business relationships with suppliers and customers; (ii) changes or conditions affecting the Business' industries generally in the geographic regions in which the Business operates; (iii) the outbreak or escalation of hostilities involving the United States, the declaration by the United States of a national emergency or war or the occurrence of any other calamity or crisis, including an act of terrorism; (iv) changes in Law or in GAAP or interpretations thereof; (v) changes arising in connection with any earthquake, flood, hurricane, tornado or other "act of God;" (vi) any epidemic, pandemic, virus or disease outbreak, state of emergency, public health crisis or other public health event or other epidemic event; (vii) the commencement or pendency of the Bankruptcy Cases, operating in bankruptcy, any reasonably anticipated effects of the commencement or prosecution of the Bankruptcy Cases or the financial condition of the Sellers or any Acquired Entity (including any Legal Proceeding brought against a Seller or any Acquired Entity for breach of Contract in connection with the collection of payment

- **12** -

due thereunder (whether alone or with other claims) or any modification of credit, cash on delivery or similar terms of a Contract); (viii) any act or omission by any Seller or any of their respective Affiliates required to be taken pursuant to the terms of the DIP Order or any Order of the Bankruptcy Court or taken with the express written consent of Purchaser or actions or omissions of the Sellers or any Acquired Entity expressly required to be taken (or not taken) in accordance with this Agreement, or (ix) any failure, in and of itself, to achieve any budgets, projections, forecasts, estimates, plans, predictions, performance metrics or operating statistics or the inputs into such items, whether or not shared with Purchaser or its Affiliates or Representatives (it being understood and agreed that the foregoing will not preclude Purchaser from asserting that any facts or occurrences giving rise to or contributing to such failure that are not otherwise excluded from the definition of Material Adverse Effect may be taken into account in determining whether there has been or would reasonably be expected to be a Material Adverse Effect), except, in the case of the foregoing clauses (ii), (iii), (iv), (v) and (vi), to the extent such event, occurrence, fact, condition, development or change has a disproportionate effect on the business, assets, liabilities, condition (financial or otherwise) or operating results of the Business, the Purchased Assets or the Assumed Liabilities, taken as a whole, relative to other participants in the industries in which the Business operates.

"***Material Contracts***" has the meaning set forth in <u>Section 5.14(b)</u>.

"***Material Customer***" has the meaning set forth in <u>Section 5.19(a)</u>.

"***Material Supplier***" has the meaning set forth in <u>Section 5.19(b)</u>.

"***Multiemployer Plan***" means a "multiemployer plan" (as defined in Section 3(37) of ERISA).

"***Necessary Consent***" has the meaning set forth in <u>Section 8.6</u>.

"***Non-Party Affiliates***" has the meaning set forth in <u>Section 11.16</u>.

"***Omitted Contract***" has the meaning set forth in <u>Section 2.1(b)</u>.

"***Open Source***" means any software subject to any license meeting the Open Source definition (as promulgated by the Open Source Initiative) or the Free Software definition (as promulgated by the Free Software Foundation), or any substantially similar license.

"***Order***" shall mean any order, judgment, decision, ruling, injunction, award, decree or writ of any Governmental Authority.

"***Ordinary Course of Business***" means substantially the same manner in which the Business is conducted by the Group Companies immediately prior to the Petition Date, consistent with past practice; <u>provided</u> that "Ordinary Course of Business" shall take into account the business and operating practices of the Group Companies in light of their current financial condition, financial distress and the Bankruptcy Cases.

"***Organizational Documents***" means (a) the articles or certificate of incorporation, the bylaws and any shareholders agreement of a corporation, (b) the partnership agreement and any

statement of partnership of a general partnership, (c) the limited partnership agreement and the certificate of limited partnership of a limited partnership, (d) the operating or limited liability company agreement and certificate of formation or organization of any limited liability company, (e) any charter or similar document adopted or filed in connection with the creation, formation or organization of a Person and (f) any amendment to any of the foregoing.

"*Owned IP*" means the Transferred Intellectual Property Rights and all Intellectual Property and Intellectual Property Rights owned or purported to be owned by an Acquired Entity.

"*Owned Real Property*" has the meaning set forth in Section 5.13(a).

"*Party*" and "*Parties*" means (a) Purchaser and Sellers, collectively and individually, and (b) in the context of references to bilateral action, refers to Purchaser, on the one hand, and to the Seller Representative, on the other hand.

"*Pension Plan*" means the Hardinge, Inc. Pension Plan.

"*Periodic Taxes*" has the meaning set forth in Section 10.3.

"*Permit Consent*" has the meaning set forth in Section 8.7.

"*Permits*" means all approvals, authorizations, permits, provider numbers, certificates of need, certificates of exemption, licenses, franchises, approvals, authorizations, accreditations, registrations, certificates and consents issuable by Governmental Authorities, and all pending applications therefor and amendments, modifications and renewals thereof.

"*Permitted Liens*" means with respect to the Purchased Assets and the Acquired Entities (as applicable) (i) Liens for Taxes, assessments or other governmental charges not yet due and payable or the amount or validity of which is being contested in good faith by appropriate proceedings, in each case, for which appropriate reserves have been established in accordance with GAAP, or the nonpayment of which is permitted or required by the Bankruptcy Code, (ii) zoning, entitlement and other land use and environmental regulations by any Governmental Entity having jurisdiction over any real property which are not violated by the current use, occupancy or operation of any real property, (iii) non-exclusive licenses of Intellectual Property entered into in the Ordinary Course of Business, (iv) easements, rights of way, restrictive covenants, encroachments, and similar non-monetary encumbrances or non-monetary impediments against any of the Purchased Assets which do not, individually or in the aggregate, adversely affect the operation of the Purchased Assets and, in the case of the Owned Real Property and Leased Real Property, which do not, individually or in the aggregate, adversely affect the use or occupancy of such Owned Real Property or Leased Real Property as it relates to the operation of the Purchased Assets, (v) materialmans', mechanics', artisans', shippers', warehousemans' or other similar common law or statutory liens incurred in the Ordinary Course of Business for amounts not yet due and payable and which are not material, (vi) Liens securing the DIP Facility and any other Liens not prohibited by the DIP Facility, (vii) such other defects, exceptions, restrictions, imperfections in title, charges, easements, restrictions and encumbrances (other than in connection with the DIP Facility) which would not, individually or in the aggregate, reasonably be expected to detract from the value of the Owned Real Property or Leased Real Property and/or the use

thereof for its intended purpose in the Ordinary Course of Business and (viii) Liens that will be released or that are specifically permitted by the Sale Order.

"***Person***" means an individual, corporation, partnership, joint venture, limited liability company, Governmental Authority, unincorporated organization, trust, association or other entity.

"***Personal Information***" means personally identifiable information and any information defined as "personal data", "personally identifiable information", or "personal information" under or subject to any Privacy and Data Security Requirement, of any Person, including of Sellers' employees, other personnel, agents, officers, directors, contractors, patients, potential and prospective patients, suppliers, or other Persons, which information may include name, address, other contact information, persistent identifier, financial account information, biometric information, heath or medical information, insurance information, social security number, tax ID number, driver's license, mother's maiden name, date of birth, password, PIN number, employee ID number, payroll records, salary information or other human resources records and information, personal identification number or code, other account information or account activity information, other information or data that can be used for identity theft (including that which is not personally identifiable) or to identify or locate a particular natural person, computer, device or software, and any other sensitive information regarding such Persons.

"***Petition Date***" has the meaning set forth in the Recitals.

"***Post-Closing Tax Period***" means any taxable period beginning after the Closing Date and, for any Straddle period, the portion of any Straddle Period beginning on the day following the Closing Date.

"***Postpetition Payables***" means trade obligations and accrued operating expenses of Sellers, excluding the fees and expenses of Professional Persons (as defined in the DIP Order), as of the Closing Date incurred in the Ordinary Course of Business, to the extent such obligations relate to the Purchased Assets.

"***PRC***" means the People's Republic of China.

"***Pre-Closing Tax Period***" means any taxable period ending on or before the Closing Date and, for any Straddle Period, the portion of such Straddle Period ending on (and including) the Closing Date.

"***Pre-Closing WARN Act Liability***" means any liability arising under the WARN Act, in any case arising on or prior to the Closing Date.

"***Pre-petition Credit Agreement***" means the Credit Agreement, dated as of September 27, 2022, among the Company, as borrower, BMO Harris Bank N.A., as administrative agent, and the other lenders and guarantors parties thereto, as thereafter amended, restated, supplemented and otherwise modified from time to time.

"***Pre-petition Credit Bid Amount***" means an amount equal to (a) the Credit Bid Amount *less* (b) the DIP Obligations.

"***Pre-petition Obligations***" means all Obligations (as defined in the Pre-Petition Credit Agreement).

"***Pre-petition Secured Parties***" means the lenders party to the Pre-petition Credit Agreement.

"***Privacy and Data Security Requirements***" means (a) any applicable Laws and published self-regulatory guidelines (including of any applicable foreign jurisdiction and including PCI-DSS) regulating the Processing of Personal Information, (b) obligations under all Contracts to which any Seller is a party that relate to Personal Information, and (c) all of Sellers' internal and publicly posted policies and notices (including if posted on Sellers' products or services) regarding the Processing of Personal Information.

"***Process***" or "***Processing***" with regard to Personal Information or other data, information or source code, means the collection, receipt, use, storage, safeguarding, securing (technical, physical or administrative), maintenance, retention, transmission, access, processing, recording, distribution, transfer (including cross-border), sharing, import, export, protection (including security measures), deletion, disposal or disclosure, modification or other activity regarding or performed on Personal Information, data, information or source code (whether electronically or in any other form or medium).

"***Product***" means any product or service, including all versions thereof, that have been or are currently marketed, performed, licensed, sold, offered for sale, distributed, supported or maintained by or on behalf of the Target Companies, and all products and services currently under development by or on behalf of any Target Company.

"***Purchase Price***" has the meaning set forth in <u>Section 4.1</u>

"***Purchased Assets***" has the meaning set forth in <u>Section 2.1(a)</u>.

"***Purchaser***" has the meaning set forth in the Preamble.

"***Purchaser Documents***" has the meaning set forth in <u>Section 6.2</u>.

"***Real Property Leases***" has the meaning set forth in <u>Section 5.12(b)</u>.

"***Registered Owned IP***" has the meaning set forth in <u>Section 5.8(a)</u>.

"***Related Party***" means any member, employee, officer, director, equityholder or partner of any Group Company, or any immediate family member of any of the foregoing or any of their respective Affiliates.

"***Release***" means any releasing, spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, migrating, disposing, depositing or dumping of a Hazardous Substance on, into or through the Environment (including the abandonment or discarding of barrels, containers and other closed receptacles containing any Hazardous Substance).

"*Representative*" of any Person means such Person's directors, managers, officers, employees, agents, attorneys, consultants, advisors or other representatives.

"*Retained Assets*" has the meaning set forth in <u>Section 2.2(a)</u>.

"*Retained Contracts*" means all Contracts to which any Seller is a party and which are not Assumed Contracts.

"*Retained Liabilities*" has the meaning set forth in <u>Section 3.2</u>.

"*Retained Seller Plan*" has the meaning set forth in <u>Section 2.2(a)(xi)</u>.

"*Sale Hearing*" means the hearing conducted by the Bankruptcy Court to approve the Transactions or an Alternative Transaction.

"*Sale Motion*" means the motion, in form and substance acceptable to the DIP Agent (as defined in the DIP Order) and Purchaser, filed by Sellers pursuant to, inter alia, Sections 363 and 365 of the Bankruptcy Code to obtain entry of the (a) Bidding Procedures Order and (b) Sale Order.

"*Sale Order*" means a Final Order of the Bankruptcy Court, to be issued by the Bankruptcy Court pursuant to sections 363 and 365 of the Bankruptcy Code in a form and substance reasonably acceptable to Purchaser, (a) approving this Agreement and the Transactions, (b) approving the sale of the Purchased Assets to Purchaser free and clear of all Liens, Claims and interests pursuant to section 363(f) of the Bankruptcy Code, on the terms and subject to the conditions set forth in this Agreement, (c) approving the assumption and assignment to Purchaser of the Assumed Contracts, in each case, on the terms and subject to the conditions set forth in this Agreement, (d) approving mutual releases between and among Purchaser and Sellers, and (e) finding that (i) Purchaser purchased the Purchased Assets for reasonably equivalent value, (ii) the sale of the Purchased Assets was negotiated at arm's length, and (iii) conditioned on Purchaser's cooperation with Sellers in obtaining a good-faith finding, Purchaser is a good faith purchaser entitled to the protections of section 363(m) of the Bankruptcy Code.

"*Sanctioned Country*" has the meaning set forth in <u>Section 5.9(a)</u>.

"*Sanctioned Person*" means any Person that is the subject or target of sanctions or restrictions under any Anti-Corruption and Trade Control Law, including: (a) any Person listed on any applicable U.S. or non-U.S. sanctions- or export-related restricted party list, including OFAC's Specially Designated Nationals and Blocked Persons List and other similar lists maintained by the United Nations or the governments of Canada, the United Kingdom or the European Union or any other applicable Governmental Authority; (b) any Person located, organized, or resident in a Sanctioned Country; or (c) any Person that is, in the aggregate, fifty percent (50%) or greater owned, directly or indirectly, or otherwise controlled by, or acting on behalf of a Person or Persons described in <u>clauses (a)</u> and <u>(b)</u> above.

"*Schedules*" means the schedules to be delivered to Purchaser on behalf of Sellers pursuant to this Agreement, a copy of which shall be attached to the Agreement upon mutual agreement of

the Parties on the finalization thereof pursuant to Section 11.6 and incorporated in this Agreement by reference.

"*Section 338(g) Elections*" has the meaning set forth in Section 10.6.

"*Security Breach*" has the meaning set forth in Section 5.8(f).

"*Seller Disclosure Schedule*" has the meaning set forth in Article V.

"*Seller Documents*" has the meaning set forth in Section 5.2.

"*Seller Plan*" means each "employee benefit plan" (as defined in ERISA § 3(3), whether or not subject to ERISA) or other benefit, employment, individual independent contractor or consulting agreements (including those entered with an "alter ego" entity) or compensation plan, program, policy, practice, contract, agreement, or arrangement providing for retirement, medical, dental, vision, prescription drug, employee assistance, wellness, severance, vacation, termination pay, workers' compensation, compensation, disability, death, hospitalization, relocation, cafeteria, dependent care, commuter or transportation, adoption assistance, tuition reimbursement, relocation, retention, change of control, deferred compensation, short-term incentive, long-term incentive, performance awards, stock or stock-related awards, fringe benefits or other employee benefits of any kind (a) maintained, sponsored, or contributed or required to be contributed to by (i) the Acquired Entities (subject to the amendment of Schedule 1.1(a) as contemplated by Section 2.1(b)) or (ii) Sellers or (b) with respect to which (i) the Acquired Entities (subject to the amendment of Schedule 1.1(a) as contemplated by Section 2.1(b)) or (ii) Sellers have any liability, other than (A) any Multiemployer Plan and (B) any plans, programs, agreements or arrangements maintained or sponsored by a Governmental Authority.

"*Seller Representative*" has the meaning set forth in the Preamble.

"*Sellers*" has the meaning set forth in the Preamble.

"*Software*" means any and all computer programs, including operating system and applications software, firmware, computerized implementations of algorithms, program interfaces and other code, whether in source code or object code form (including all of the foregoing that is installed on computer hardware), including data files, databases, and related protocols, specifications, and all available documentation, including user manuals, relating to the foregoing.

"*Straddle Period*" means any taxable period beginning on or prior to and ending after the Closing Date.

"*Subsidiary*" means each Person in which a Person owns or controls, directly or indirectly, capital stock or other equity interests representing more than 50% of the outstanding voting stock or other equity interests.

"*Successful Bidder*" means the bidder with the highest or otherwise best bid for the Purchased Assets, as determined in accordance with the Bidding Procedures.

- 18 -

"***Target Group***" means, collectively, Sellers and the Acquired Entities (subject to the amendment of Schedule 1.1(a) as contemplated by Section 2.1(b) and excluding, for the avoidance of doubt, any Excluded Entity), and each of the foregoing is individually a "***Target Company***".

"***Tax***" means (a) any federal, state, local, or non-U.S. income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental, customs duties, capital stock, franchise, profits, branch profits, ad valorem, capital gains, goods and services, withholding, social security (or similar), unemployment, disability, real property, personal property, sales, use, transfer, registration, value added, alternative or add-on minimum, estimated, or other tax of any kind whatsoever, whether computed on a separate or consolidated, unitary or combined basis or in any other manner (including withholding on amounts paid to or by any Person), including any interest, penalty, or addition thereto, whether disputed or not, or (b) liability for the payment of any amounts of the type described in (a) as a result of contract, agreement, assumption, transferee or successor liability, operation of Law, Treasury Regulations Section 1.1502-6(a) (or any similar provision of Law or any predecessor or successor thereof) or otherwise (in each case other than a commercial contract entered into in the Ordinary Course of Business the primary purpose of which is unrelated to any amount described in clause (a)).

"***Tax Proceeding***" means any audit, assessment, examination, claim or other controversy or proceeding relating to Taxes or Tax Returns.

"***Tax Purchase Price***" has the meaning set forth in Section 4.2(a).

"***Tax Returns***" means any return, declaration, report, claim for refund, information return or other document (including any related or supporting estimates, elections, schedules, statements, or information) filed or required to be filed in connection with the determination, assessment or collection of any Tax or the administration of any Laws or administrative requirements relating to any Tax.

"***Taxing Authority***" means any Governmental Authority responsible for the administration, enforcement, review or imposition of any Tax (domestic or foreign).

"***Termination Date***" has the meaning set forth in Section 9.2(d)(i).

"***Trademarks***" has the meaning set forth in the definition of "Intellectual Property."

"***Transaction Documents***" means the Bidding Procedures Order, the Sale Order, the Bill of Sale and Assignment and Assumption Agreement, the IP Assignment Agreement, the Local Transfer Instruments, the Escrow Agreement and the other agreements, certificates and instruments executed and delivered in connection with this Agreement or any of the foregoing (or the Transactions).

"***Transactions***" has the meaning set forth in the Recitals.

"***Transfer Taxes***" has the meaning set forth in Section 10.2.

"***Transferred Employee***" has the meaning set forth in Section 8.4(a).

NAI-1540627251v4

4880-8016-9684, v. 2

"***Transferred Intellectual Property Rights***" means all Intellectual Property and Intellectual Property Rights owned by any Seller, other than Retained Assets.

"***Treasury Regulations***" means the United States Treasury regulations promulgated under the Code.

"***VAT***" means any value added tax, sales tax, business tax, gross receipts tax, consumption tax, goods and services tax or similar.

"***WARN Act***" means the Worker Adjustment and Retraining Notification Act, as amended, together with any state or local "mass layoff" or "plant closing" Laws or any Laws in jurisdictions other than the United States that, in any such case, address similar matters or have similar effects.

"***Wind Down Escrow Account***" means the account established pursuant to the Escrow Agreement into which the Wind-Down Funds will be deposited on the Closing Date in accordance with <u>Section 7.3(e)</u>.

"***Wind-Down Funds***" means $500,000.

Section 1.2    <u>Interpretation</u>. When a reference is made in this Agreement to a Section, Schedule or Exhibit, such reference shall be to a Section, Schedule or Exhibit of this Agreement unless otherwise indicated. Whenever the words "included," "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the phrase "without limitation." Unless otherwise indicated, all references to dollars refer to United States dollars. The word "or" when used in this Agreement is not meant to be exclusive unless expressly indicated otherwise. The use of a particular pronoun herein shall not be restrictive as to gender or number but shall be interpreted in all cases as the context may require. The word "will" will be construed to have the same meaning and effect as the word "shall". References to "written" or "in writing" include in electronic form (including by e-mail transmission or electronic communication by portable document format (.pdf)). All accounting terms used in this Agreement and not otherwise defined herein have the meanings assigned to them under GAAP. A reference to any Party shall include such Party's successors and permitted assigns. Any reference to any agreement or Contract will be a reference to such agreement or Contract, as amended, modified, supplemented, or waived. Unless otherwise specified, references to a statute means such statute as amended from time to time and includes any successor legislation thereto and any rules or regulations promulgated thereunder. References to "days" means calendar days unless Business Days are expressly specified. When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period will be excluded. If the last day of such period is a day other than a Business Day, the period in question will end on the next succeeding Business Day. Any document or item will be deemed "delivered," "provided" or "made available" by the Sellers, within the meaning of this Agreement if such document or item is made available for viewing at any time prior to the Closing in the virtual data room hosted by Intralinks. The Parties acknowledge that both Purchaser on the one hand, and Sellers on the other hand, have participated in the drafting and preparation of this Agreement and agree that any rule of construction to the effect that ambiguities are to be construed against the drafting party shall not be applied to the construction or interpretation of this Agreement.

Section 1.3    Seller Disclosure Schedule. The inclusion of any matter in any section of the Seller Disclosure Schedule will be deemed to be a disclosure in all other sections of the Seller Disclosure Schedule, without the need for repetition or cross reference, to the extent that the relevance of such disclosure to the other section(s) of the Seller Disclosure Schedule is reasonably apparent on its face without further investigation or reference to underlying documentation.  The inclusion of any matter in any section of the Seller Disclosure Schedule will not be deemed to constitute an admission, or otherwise imply, that any such matter is material or creates a measure for materiality for purposes of this Agreement.  The disclosure of any particular fact or item in any section of the Seller Disclosure Schedule will not be deemed an admission as to whether the fact or item is "material" or would constitute a "Material Adverse Effect."

## ARTICLE II
## PURCHASE AND SALE OF ASSETS

Section 2.1    Purchased Assets.

(a)    Subject to the terms and conditions of this Agreement and pursuant to Sections 363 and 365 of the Bankruptcy Code, effective as of the Closing, Sellers shall sell, convey, transfer, assign and deliver to Purchaser, free and clear of all Liens except Permitted Liens, and Purchaser shall purchase, all right, title and interest of Sellers in and to all assets, properties, claims and rights of every kind and nature, whether real, personal or mixed, tangible or intangible (including goodwill) wherever located and whether now existing or hereafter acquired (other than the Retained Assets) (collectively, the "***Purchased Assets***"), including the following:

(i)    All cash, bank deposits, certificates of deposit and cash equivalents (including all undeposited checks, marketable securities and short term investments) of Sellers, other than the Excluded Cash;

(ii)    All bank accounts of Sellers, and all safety deposit boxes, lock boxes and other cash management accounts (including cash amounts in any accounts against which outstanding bank drafts have been written, to the extent of the amount of such bank drafts), except for up to two bank accounts designated by the Seller Representative at least 10 Business Days prior to Closing, including one account to hold the Wind-Down Amount;

(iii)    All tangible personal property owned or leased by any Seller, wherever located, including all such machinery, equipment, tools, fixtures, parts, supplies, furniture, furnishings, motor vehicles, Inventory, computers, mobile phones, personal digital assistants, tangible personal property included in the IT Assets, hardware, peripherals, information technology infrastructure and telephone systems (including any of the foregoing property that is subject to a finance lease, but only to the extent that Purchaser assumes such finance lease as an Assumed Contract);

(iv)    The Transferred Intellectual Property Rights and all manuals, instructions, documents, protocols and other tangible embodiments relating thereto that are owned by any Seller, including those Intellectual Property and Intellectual Property Rights listed on Schedule 5.8(a), including (A) the right to file, prosecute and maintain the Transferred Intellectual Property Rights; (B) royalties, fees, income, payments, and other

- 21 -

proceeds now or hereafter due or payable to Sellers with respect to the Transferred Intellectual Property Rights; and (C) claims and causes of action with respect to the Transferred Intellectual Property Rights accruing prior to, on or after the Closing Date, including all rights to and claims for damages, restitution, and injunctive and other legal or equitable relief or remedy of any kind for past, present, or future infringement, misappropriation, dilution or other violation thereof, and rights to protection of interests therein under the Laws of all jurisdictions;

(v)     All of the Contracts and Real Property Leases that are listed on Schedule 2.1(a)(v) (with the Cure Costs associated with each), and all Leased Real Property associated with such Real Property Leases and all rights of any kind relating to any of the foregoing, including rights to payments thereunder and all of Sellers' interests in and to all Orders, Contracts, abstracts of title, leases, participation agreements, and all other agreements and instruments, easements, rights-of-way, licenses, authorizations, Permits and similar rights and interests relating thereto, subject to the rights of third parties (collectively, the "***Assumed Contracts***"), subject to the amendment of Schedule 2.1(a)(v) as contemplated by Section 2.1(b);

(vi)     Subject to Section 8.6, all Permits held by any Seller;

(vii)     All of each Seller's rights under warranties, indemnities and all similar rights against third parties, including rights of Sellers to the warranties and licenses received from manufacturers or sellers of the equipment of the Business, Improvements or any component thereof, rights under any bond or security instrument, condemnation proceeds and all audit rights and claims for reimbursement from third parties of Sellers or any of their Affiliates, in each case, to the extent related to or attributable to the Business, any Purchased Assets, or the Assumed Liabilities;

(viii)     All rights with respect to prepaid expenses, credits, advance payments (including prepayments to third party vendors), security, deposits (including utility deposits, security deposits, deposits held by parties to the Assumed Contracts and deposits held by vendors or trade creditors and other deposits held directly or indirectly by a third party as of the Closing Date), deferred assets, rights to refunds, credits, rights to recover overpayments or other receivables, charges, sums, and any cash collateral used to secure surety bonds, performance bonds or other transactional assurances to the extent related to the Business or any Purchased Assets, including any deposits made by Sellers to any third parties (excluding those related to Retained Assets);

(ix)     All Business Information and originals, and rights thereto, or where originals are not available or are retained by Sellers, copies of all books and records, files and papers including books of account, ledgers and general, financial and accounting records, supplier lists, production data, quality control records and procedures, complaints and inquiry files, research and development files, records and data (including all correspondence with any Governmental Authority), strategic plans, internal financial statements and marketing and promotional surveys, material and research, documentation relating to the Transferred Intellectual Property Rights and Business Information, and other similar documents and records, that relate to the Business or the Purchased Assets;

*provided, however*, that Sellers and their related persons (including their employees and Representatives) shall have, upon the written request of the Seller Representative following the Closing Date, reasonable access to, and use of, such records solely for purposes of claims reconciliation and other wind-down activities until Sellers' wind-down process is complete and Sellers are finally dissolved;

      (x)    Copies of all Tax Returns and supporting workpapers in the possession of Sellers relating to any Tax imposed on or with respect to the Purchased Assets, the Acquired Entities (subject to the amendment of Schedule 1.1(a) as contemplated by Section 2.1(b)) or the Business; *provided, however*, that Sellers and their Affiliates and Representatives) shall have, upon the written request of the Seller Representative following the Closing Date, reasonable access to, and use of, such Tax Returns and supporting workpapers for purposes of preparation of Tax Returns and defense of any Tax audit until any applicable audit or review period is expired;

      (xi)    All rights to any Legal Proceedings, credits, allowances, refunds, rebates, rights of recovery or rights of setoff or claim of any nature (other than in respect of Legal Proceedings or claims against Sellers or any of their Affiliates) available to or being pursued by Sellers arising out of or relating to the Business or any of the Purchased Assets or Assumed Liabilities (including, for the avoidance of doubt, the items set forth on Schedule 2.1(a)(xi)) and any claim of any nature by any Seller against any present or former officer, director, employee, partner, equity holder, controlling person member, Representative or agent of any Seller, whether arising by way of counterclaim or otherwise (but excluding counterclaims and defenses related to Retained Assets), in each case, that are not otherwise Purchased Assets as described in Section 2.1(a)(xxiii);

      (xii)    All Accounts Receivable (whether billed or unbilled), trade credits, notes receivable, take-or-pay amounts receivable and other receivables attributable to the Purchased Assets and any security, claim, remedy or other rights related to such Accounts Receivable and other receivables or to the collectability thereof;

      (xiii)    All Improvements;

      (xiv)    All rights to the telephone and facsimile numbers and email addresses used by Sellers;

      (xv)    All Insurance Policies and any claims thereunder to the extent such policies relate to the operation of the Business or to any Assumed Liabilities, except to the extent included as a Retained Asset on Schedule 2.2(a)(ii), including (a) the rights to make, administer and settle claims under any such Insurance Policies and to pursue and exhaust applicable coverage (including initiating, prosecuting and resolving litigation), and (b) the amount of, and all rights to any insurance proceeds received by Sellers under any such Insurance Policies after the Closing Date in respect of any loss, liability, destruction or condemnation of any Purchased Assets occurring prior to, on, or after the Closing or relating to any Assumed Liabilities;

NAI-1540627251v4

4880-8016-9684, v. 2

(xvi)    All enforceable rights under non-disclosure or confidentiality, non-compete or non-solicitation agreements with employees, independent contractors, consultants, Representatives, and agents of any Seller or with other third parties (including, any nondisclosure or confidentiality, non-compete or non-solicitation agreements entered into in connection with an Auction), in each case, which relate to the Business or any of the Purchased Assets or Assumed Liabilities;

(xvii)    All unexpired, transferable warranties, indemnities, or guaranties from any third party with respect to the Business or any Purchased Asset or Assumed Liability, including any item of real property, personal property or equipment;

(xviii)  Unless prohibited by applicable Law (in which case Sellers shall make and hold available all such records to and for Purchaser to the extent permitted by applicable Law), all employee and personnel records, including all current employment eligibility verification forms and related records, documents, and papers, of the Transferred Employees;

(xix)    Any refunds, rebates, overpayments, prepayments or credits of Taxes relating to the Purchased Assets or of any Acquired Entity (subject to the amendment of Schedule 1.1(a) as contemplated by Section 2.1(b));

(xx)     All rights in or under the Seller Plans listed on Schedule 2.1(a)(xx) that are maintained, or sponsored, by Sellers for the benefit of any Transferred Employee, on or prior to the Closing Date (each, an "***Assumed Seller Plan***") and all Acquired Entity Plans, including in each case, all pre-payments, deposits and refunds thereunder and any assets, trusts and service provider Contracts maintained or entered pursuant thereto or in connection therewith;

(xxi)    All goodwill and other intangible property and all privileges, relating to, arising from or associated with any of the assets described in the foregoing clauses, the Assumed Liabilities or the Business;

(xxii)   All rights with respect to proofs of claim filed by or on behalf of any of Sellers in any bankruptcy case other than the Bankruptcy Cases;

(xxiii)  All Avoidance Actions and any commercial tort claims of Sellers related to the Business, the Purchased Assets or the Assumed Contracts;

(xxiv)  All shares of capital stock or other equity or ownership interests held by any Seller in each Acquired Entity (the "***Acquired Equity Interests***"), subject to the amendment of Schedule 1.1(a) as contemplated by Section 2.1(b);

(xxv)   All claims of any Seller against any Excluded Entity or other Group Company; and

(xxvi)  All Owned Real Property.

(b)    Sellers shall provide Purchaser with a true and correct list of all Contracts, Real Property Leases and Seller Plans (the "***Available Contracts***"), including true and correct copies of each such Available Contract, promptly following the date hereof and in no event later 20 days following the date hereof, which time may be reasonably extended upon the agreement (email to suffice) of the Purchaser and the Seller Representative, which list may be updated to add or remove Contracts, Real Property Leases and Seller Plans entered into in the Ordinary Course of Business or otherwise not prohibited by this Agreement following the date hereof or that were inadvertently included or excluded from such list.  Purchaser shall designate in writing which Available Contracts that Purchaser wishes for the Sellers to assign and transfer to Purchaser at the Closing no later than two (2) Business Days prior to the Auction (the "***Designation Deadline***"), which Available Contracts will thereby be included on Schedule 2.1(a)(v) or Schedule 2.1(a)(xx), as applicable.  Notwithstanding anything in this Agreement to the contrary, by written notice to the Seller Representative, Purchaser may, in its sole and absolute discretion, amend or revise Schedule 2.1(a)(v) and Schedule 2.1(a)(xx) (i) two (2) Business Days prior to the Closing Date (or such earlier date on which the Bankruptcy Code or Bankruptcy Courts otherwise would require a determination to assume or reject any such Contract, Real Property Lease or Seller Plan), in order to add any Contract or Real Property Lease to such Schedule 2.1(a)(v) or Seller Plan to such Schedule 2.1(a)(xx) and it shall be automatically included as an Assumed Contract or Assumed Seller Plan, as applicable, for purposes of this Agreement, (ii) two (2) Business Days prior to the Closing Date (or such earlier date on which the Bankruptcy Code or Bankruptcy Courts otherwise would require a determination to assume or reject any such Contract, Real Property Lease or Seller Plan), in order to remove any Contract or Real Property Lease from such Schedule 2.1(a)(v) and it shall be automatically deemed a Retained Contract for purposes of this Agreement or Seller Plan from such Schedule 2.1(a)(xx) and it shall be automatically deemed a Retained Seller Plan for purposes of this Agreement, or (iii) at any time prior to 60 days following the Closing Date (or such shorter period of time as necessary to wind-down the Sellers) (the "***Extended Contract Period***") to remove any Contract from such Schedule 2.1(a)(v) in the event that after the Closing Date, (A) the Bankruptcy Court determines (or the parties otherwise agree) that the actual Cure Costs exceed the estimated Cure Costs listed on Schedule 2.1(a)(v), or (B) a timely filed objection to a Cure Cost or to Purchaser's assumption and assignment of a Contract is not resolved, and, in each case of the preceding clauses (A) or (B), Purchaser notifies the Seller Representative in writing to remove the contract from Schedule 2.1(a)(v) and such removed Contract shall be automatically deemed a Retained Contract for purposes of this Agreement.  Purchaser shall be responsible for any obligations or Liabilities of the Sellers arising following the Closing during any Extended Contract Period and any incremental costs or expenses (x) that arise out of the Sellers' extension and continuation of the Bankruptcy Cases that is directly attributable to the Extended Contract Period and (y) are incurred as a result of the Sellers' performance of their obligations under Section 2.1(b).  Furthermore, if it is discovered that a Contract should have been listed on Schedule 2.1(a)(v) but was omitted therefrom (an "***Omitted Contract***"), the Seller Representative shall, promptly following discovery thereof (but in no event later than three (3) Business Days after such discovery), (x) notify Purchaser in writing of such Omitted Contract and the corresponding estimated Cure Costs related thereto (if any) and (y) if requested by Purchaser in writing (email to suffice), either file a supplemental contract assumption notice as set forth in the Bidding Procedures Order or file a motion with the Bankruptcy Court on notice to the counterparties to such Omitted Contract seeking entry of an Order fixing the Cure Costs and approving the assumption and assignment of such Omitted Contract in accordance with this

- 25 -

Section 2.1 (*provided* that no Omitted Contract shall be assumed by and assigned to Purchaser unless such Omitted Contract shall be accepted at such time in writing (email to suffice) by Purchaser as an Assumed Contract). With respect to each Assumed Contract, Purchaser shall provide adequate assurance of the future performance of such Assumed Contract to the applicable counterparty to such Assumed Contract. Furthermore, notwithstanding anything in this Agreement to the contrary, by written notice to the Seller Representative, Purchaser may, in its sole and absolute discretion, amend or revise Schedule 1.1(a) at any time and from time to time prior to the date that is two (2) Business Days prior to the Auction, in order to add any direct or indirect Subsidiary of Sellers (other than a Seller) to such Schedule 1.1(a) (and such added Subsidiary shall be automatically included as an Acquired Entity for purposes of this Agreement), or remove any direct or indirect Subsidiary of Sellers (other than a Seller) from such Schedule 1.1(a) (and such removed Subsidiary shall be automatically deemed an Excluded Entity for purposes of this Agreement). The Parties acknowledge and agree that there will be no reduction in, or increase to, the Credit Bid Amount as a result of any addition or elimination of any Contract, Real Property Lease, Seller Plan or Acquired Entity (or otherwise as a result of any changes to the Schedules pursuant to this Section 2.1(b)); provided, however, that any such addition or elimination may increase or decrease (as applicable) the extent of the Assumed Liabilities, Retained Liabilities, Purchased Assets or Retained Assets.

It is acknowledged and agreed that, except where specifically provided, this Section 2.1 speaks only to the assets, properties, claims and rights of Sellers, and that no provision of this Section 2.1 shall be construed to limit the scope of the assets acquired by Purchaser indirectly through its acquisition of the Acquired Entities and the Acquired Equity Interests hereunder, it being understood that Purchaser shall indirectly acquire all such assets, properties, claims and rights.

      Section 2.2     Retained Assets.

      (a)     Notwithstanding anything to the contrary in this Agreement, the Purchased Assets shall not include any of the following assets, properties or rights (collectively, the "***Retained Assets***"):

      (i)     All rights of Sellers under this Agreement or the Transaction Documents or the Retained Contracts (including the Licensed Seller Intellectual Property licensed under the Retained Contracts and IT Assets licensed by a Seller under the Retained Contracts);

      (ii)     (A) All Insurance Policies of each Seller set forth on Schedule 2.2(a)(ii) (including any directors' and officers' (or similar) insurance policies, any insurance policies of Sellers that cover directors and officers, and any rights thereunder), and all credits, premium refunds, proceeds, causes of action or rights arising thereunder, and (B) the amount of, and all rights to any insurance proceeds under any Insurance Policies received by either Sellers or Purchaser after the Closing Date in respect of the loss, liability, destruction or condemnation of any Retained Assets occurring prior to, on, or after the Closing or relating to any Retained Liabilities;

      (iii)     The Organizational Documents, stock and minute books, qualifications to conduct business as a foreign corporation or limited liability company,

arrangements with registered agents relating to foreign qualifications, taxpayer and other identification numbers, seals, personnel records, stock records and original Tax Returns of Sellers and other similar books and records (other than (i) any such Tax Returns or other such books and records that relate primarily to the Purchased Assets or Assumed Liabilities and (ii) any such Tax Returns or other such books and records relating primarily to any Acquired Entities), financial records, books of account, bank and brokerage records and statements and any other books and records which Sellers are prohibited from disclosing or transferring to Purchaser under applicable Law or are required by applicable Law to retain;

(iv)    All shares of capital stock or other equity interests issued in or issued by a Seller;

(v)    All shares of capital stock or other equity interests held by a Seller in any Excluded Entity (which includes, for the avoidance of doubt, all right assets, properties or rights of any such Excluded Entity), subject to the amendment of Schedule 1.1(a) as contemplated by Section 2.1(b);

(vi)    All nontransferable Permits;

(vii)    All Intellectual Property Rights described on Schedule 2.2(a)(vii);

(viii)    All equipment and other assets and items that are (A) owned by third parties or (B) leased to any Seller or an Affiliate thereof, in each case, pursuant to a Contract that is not an Assumed Contract;

(ix)    All Seller Plans (including the Pension Plan) and any assets of any Seller Plan or any right, title or interest in any of the assets thereof or relating thereto (other than Assumed Seller Plans and Acquired Entity Plans, each, a "***Retained Seller Plan***");

(x)    Any confidential personnel or other records pertaining to any employee who is not a Transferred Employee and all employee and personnel records of the Transferred Employees that cannot be provided under applicable Law;

(xi)    The Excluded Cash;

(xii)    The Wind-Down Funds; *provided*, that any unused portion of the Wind-Down Funds that is not utilized by Sellers to pay wind-down expenses in accordance with the Escrow Agreement shall be returned to Purchaser in accordance with the Escrow Agreement;

(xiii)    The Cash Shortfall; *provided*, that any unused portion of the Cash Shortfall that is not utilized by Sellers in accordance with the Cash Shortfall Budget and the Escrow Agreement shall be returned to Purchaser in accordance with the Escrow Agreement; and

(xiv)    Those other assets, properties and rights specifically set forth on Schedule 2.2(a)(xiv).

(b)      It is acknowledged and agreed that, except where specifically provided, this Section 2.2 speaks only to the retained assets of Sellers, and that no provision of this Section 2.2 shall apply to or shall be construed to limit the scope of the assets, properties, claims and rights acquired by Purchaser indirectly through its acquisition of the Acquired Entities and the Acquired Equity Interests hereunder, it being understood that Purchaser shall indirectly acquire all such assets, properties, claims and rights.

**ARTICLE III**
**ASSUMPTION OF LIABILITIES**

Section 3.1      Assumed Liabilities.

(a)      Purchaser shall assume no obligation or other liability of any Seller, or of any predecessor or any Affiliate of any Seller or any Affiliate of any Group Company (other than the Acquired Entities), other than the obligations and other liabilities explicitly set forth in this Section 3.1(a).  Upon the terms and subject to the conditions of this Agreement, Purchaser agrees, effective as of the Closing Date, to assume, pay, perform and discharge when due (subject to any defenses or claimed offsets asserted in good faith against the obligee to whom such liabilities are owed), only the following liabilities of Sellers existing after the Closing (collectively, the "*Assumed Liabilities*"):

(i)      All of Sellers' liabilities, responsibilities and obligations under (i) the Assumed Contracts, solely to the extent arising or attributable to any period after the Closing (but not with respect to any breach, failure to perform, default or violation of any such Assumed Contracts as of or prior to the Closing or any obligation under such Assumed Contracts relating to actions, omissions or conditions existing or occurring as of or prior to the Closing other than the Cure Costs or other liabilities expressly assumed pursuant to this Section 3.1(a)), and all Cure Costs in respect thereof, and (ii) the Assumed Seller Plans and Acquired Entity Plans;

(ii)      All liabilities arising in any way out of the ownership or operation of the Purchased Assets, in each case solely to the extent first arising after, and relating to events, occurrences, acts or omissions occurring or existing solely after, the Closing;

(iii)      All liabilities relating to Transferred Employees accruing on or after the Closing Date, to the extent arising out of or relating to their employment by Purchaser;

(iv)      Those (i) outstanding Postpetition Payables and (ii) all administrative and priority claims in the Bankruptcy Cases that are reflected in the Cash Shortfall Budget, excluding the fees and expenses of Professional Persons (as defined in the DIP Order), to the extent unpaid as of the Closing Date (except to the extent included in Excluded Cash or the Wind-Down Funds);

(v)      100% of all Transfer Taxes assessed in connection with the sale of the Purchased Assets (including the Acquired Equity Interests);

(vi)    All Taxes associated with the Purchased Assets for a Post-Closing Tax Period (including any Tax liabilities that are the responsibility of Purchaser under ARTICLE X);

(vii)    Those liabilities specifically set forth on Schedule 3.1(a)(vii), subject to the amendment of Schedule 3.1(a)(vii) as contemplated by Section 3.1(b);

(viii)    Liabilities to indemnify, reimburse or advance amounts to the present or former officers or directors of any Target Company identified on Schedule 3.1(a)(viii), whether arising under Organizational Documents or the Contracts set forth on Schedule 3.1(a)(viii);

(ix)    [Liabilities related to any accrued or earned paid time off of any Business Employees who become Transferred Employees as of the Closing Date pursuant to any Seller Plan ("*Accrued PTO*");

(x)    Post-Closing COBRA Liability]; and

(xi)    All liabilities related to the claims incurred as of the Closing Date but not reported in respect of the Company Group's self-insured [medical and dental] plan[s] ("*IBNR Claims*").

(b)    Notwithstanding anything in this Agreement to the contrary, by written notice to the Seller Representative, Purchaser may, in its sole and absolute discretion, amend or revise Schedule 3.1(a)(vii) no later than two (2) Business Days prior to the Closing Date, in order to add any liabilities (other than with respect to Taxes) arising from the ownership or operation of the Business, the Purchased Assets or the Company Group prior to the Closing to such Schedule 3.1(a)(vii) and it shall be automatically included as an Assumed Liability for purposes of this Agreement.

It is acknowledged and agreed that this Section 3.1 speaks only to the liabilities of Sellers, and that no provision of this Section 3.1 shall be construed to limit the scope of the liabilities assumed by Purchaser through its acquisition of the Acquired Entities and the Acquired Equity Interests hereunder (including liabilities relating to Taxes and liabilities relating to any Acquired Entity Employee), it being understood that Purchaser shall assume all such liabilities.

Section 3.2    Retained Liabilities.    Notwithstanding anything to the contrary in this Agreement or the Transaction Documents, Purchaser shall not assume or be obligated for any liability, Claim, Encumbrance or obligations of any kind whatsoever, direct or indirect, known or unknown, absolute or contingent, or whatever nature, whether presently in existence or arising hereafter, not expressly assumed by Purchaser under Section 3.1(a) and shall under no circumstances be liable or responsible for any liabilities (other than the Assumed Liabilities) of any Seller, any Group Company (other than to the extent relating to the Acquired Entities), or any predecessor or Affiliate thereof, whether existing on the Closing Date or arising thereafter as a result of any act, omission or circumstance taking place prior to the Closing. Purchaser shall not be a successor in interest to any of Sellers for any purpose and is not answerable for any successor liability Claims.    Sellers shall retain all liabilities, responsibilities and obligations of Sellers not specifically included in the Assumed Liabilities (all such liabilities, responsibilities and obligations

- 29 -

not being assumed being herein referred to, collectively, as the "**_Retained Liabilities_**").  For the avoidance of doubt, even where this <u>Section 3.2</u> does not expressly cross-reference <u>Section 3.1</u>, this <u>Section 3.2</u> and each clause hereof is subject to and limited by <u>Section 3.1</u> (that is, where a liability is expressly assumed by Purchaser pursuant to <u>Section 3.1</u>, it is not retained pursuant to this <u>Section 3.2</u>).  Without limiting the foregoing, the Retained Liabilities shall include each of the following items:

(a)     Any liability which is not expressly listed as an Assumed Liability in <u>Section 3.1(a)</u>, including any Claims under section 503 and 507 of the Bankruptcy Code;

(b)     Any liabilities of any of Sellers not related to the operation of the Business or the Purchased Assets;

(c)     Except as otherwise provided in <u>Section 3.1(a)</u> or <u>ARTICLE X</u>, all Tax liabilities of Sellers and their respective Affiliates (other than Acquired Entities) for any period, any Taxes (other than Transfer Taxes governed by <u>Section 10.2</u>) resulting from the purchase of the Purchased Assets (including gain on sale or any cancellation of indebtedness income as defined in Section 108 of the Code) and all Taxes associated with the Purchased Assets for any Pre-Closing Tax Period (including Taxes allocated to Sellers pursuant to <u>Section 10.3(a)</u>);

(d)     Any liabilities relating to or arising out of the Retained Assets, including those in connection with the ownership and operation of the Excluded Entities and the conduct of the Business, or of any other businesses or operations, of the Excluded Entities, subject to the amendment of <u>Schedule 1.1(a)</u> as contemplated by <u>Section 2.1(b)</u>;

(e)     Any liabilities in respect of any Retained Contracts, and all liabilities relating to claims arising from or related to the termination of any Contract prior to the Petition Date or any liabilities arising out of the rejection of any such Contracts pursuant to section 365 of the Bankruptcy Code, including any administrative expense claims arising from the rejection of Contracts previously assumed;

(f)     Any liabilities to any Excluded Entity, or any current or former equityholder or Affiliate of any Group Company;

(g)     Any tort liabilities or any other liabilities relating to investigations, Claims or other Legal Proceedings (including any workers' compensation matters and all liabilities arising in connection therewith, and including all claims or Legal Proceedings against each Seller) which arise out of, relate to or otherwise are in respect of (i) the existence, use or operation of the Business or the Purchased Assets on or prior to the Closing Date, (ii) any violation of any applicable Law or Order by any of Sellers (or their respective Affiliates), or (iii) any manufacture, sale, distribution or marketing of any product (including any product containing asbestos or asbestos-containing materials) prior to the Closing by any of Sellers or their respective Affiliates or any of their respective predecessors in interest;

(h)     Any liabilities (other than with respect to Taxes) arising from the ownership or operation of the Business, the Purchased Assets or the Company Group prior to the Closing, including (i) in respect of any Indebtedness (including any Indebtedness or accounts payable arising under any intercompany loan arrangements or promissory notes), and (ii) all accounts

NAI-1540627251v4

4880-8016-9684, v. 2

payable (including vendor trade payables) that are not Assumed Liabilities pursuant to <u>Section 3.1(a)</u>;

(i)    Any (i) Excluded Employee Liability, (ii) liability (whether arising before, on or after the Closing Date) with respect to any employee or former employee of Sellers who is not a Transferred Employee, and any confidential personnel or other records pertaining to any such employee, (iii) liability arising prior to the Closing with respect to any Transferred Employee, and (iv) all liabilities (including to the Internal Revenue Service ("***IRS***") or United States Department of Labor) with respect to any Seller Plan or other employee benefit plans that are not Assumed Seller Plans or Acquired Entity Plans, including the Pension Plan;

(j)    Any costs, fees, commissions, expenses and other liabilities owing to any broker, investment banker, financial or restructuring advisor, outside counsel, auditing firm or consultant retained by or on behalf of any Seller (or any of its Affiliates), whether relating to or arising out of the Transactions or otherwise, except as otherwise permitted in the DIP Order;

(k)    Any liability of any Seller with respect to any Lien (except Permitted Liens) (including with respect to the Business or the Purchased Assets, to the extent arising out of or relating to the existence, use or operation of the Business or the Purchased Assets on or prior to the Closing);

(l)    Any liabilities to indemnify, reimburse or advance amounts, or any liabilities relating to claims for indemnification of any present or former officer, director, employee, partner, member, Representative or agent of any Group Company (or any of its Affiliates) (including with respect to any breach of fiduciary obligations by same), whether arising under Organizational Documents or Contract, in each case to the extent arising prior to the Closing Date, in each case other than as set forth in <u>Section 3.1(a)(viii)</u>;

(m)    [Any liability of any Seller arising from an obligation to escheat property, to the extent existing at the Closing]; and

(n)    Except as set forth on <u>Schedule 3.1(a)(vii)</u>, subject to the amendment of <u>Schedule 3.1(a)(vii)</u> as contemplated by <u>Section 3.1(b)</u>, any cash deposit from any customer with respect to the Business or any Purchased Asset retained by or on behalf of any Seller in respect of services not yet rendered or products not yet delivered.

## ARTICLE IV
## <u>CONSIDERATION</u>

Section 4.1    <u>Purchase Price</u>. The total consideration to be paid by Purchaser to Sellers for the Purchased Assets (collectively, the "***Purchase Price***") is:

(a)    a credit bid pursuant to Section 363(k) of the Bankruptcy Code (the "***Credit Bid***") in an amount equal to $100,000,000, consisting of (i) the Pre-petition Credit Bid Amount *plus* (ii) the full amount of the DIP Obligations as of the Closing Date (the amounts set forth in the preceding clauses (i) and (ii) collectively, the "***Credit Bid Amount***"); *provided*, *however*, that any portion of the Pre-petition Obligations that remain unsatisfied after the application of the Credit Bid Amount shall remain outstanding following the consummation of the Transactions;

NAI-1540627251v4

4880-8016-9684, v. 2

(b)       cash in an aggregate amount equal to the Cash Shortfall;

(c)       cash in an aggregate amount equal to the Wind-Down Funds;

(d)       the aggregate amount of Excluded Cash; and

(e)       the assumption by Purchaser of the Assumed Liabilities (including payment of the Cure Costs pursuant to Section 4.3).

Section 4.2    Allocation of Purchase Price.

(a)       The Purchase Price (including any Assumed Liabilities and any other items treated as taxable consideration for Tax purposes) will be allocated for Tax purposes (as so determined, the "***Tax Purchase Price***") to the Purchased Assets in accordance with Section 1060 of the Code and the Treasury Regulations promulgated thereunder (and any similar provisions of state, local or foreign Law). Within 90 days following the Closing Date, Purchaser shall prepare and deliver to the Seller Representative a schedule setting forth the allocation (the "***Asset Allocation***") of such Tax Purchase Price and any adjustments thereto.  If a Check-the-Box Election is made with respect to any Acquired Entity, an Acquired Entity undergoes an Entity Conversion or Purchaser intends to make a Section 338(g) Election in accordance with Section 10.6 with respect to any Acquired Entity (subject to the amendment of Schedule 1.1(a) as contemplated by Section 2.1(b)), the Asset Allocation shall include an allocation of the amounts allocated to such Acquired Entity (including any liabilities of such Acquired Entity and any other items treated as taxable consideration for Tax purposes) to the assets of such Acquired Entity.  The Seller Representative shall have the right to raise objections to any portion of the initial Asset Allocation within 20 days after its receipt thereof from Purchaser by delivering written notice to Purchaser setting forth in reasonable detail its objections to the initial Asset Allocation and the reasons therefor. In such event, Purchaser and the Seller Representative shall negotiate in good faith to resolve such dispute within 20 days, it being understood and agreed that if the Seller Representative shall fail to deliver such written notice of objection to Purchaser on or before the 20th day following the date of delivery of the initial Asset Allocation to the Seller Representative, the initial Asset Allocation shall be deemed final and binding on Purchaser and Sellers for all purposes of this Agreement and with respect to any Tax filings made in connection with the actions and transactions contemplated by this Agreement. If the Seller Representative has timely delivered a notice of objection to Purchaser as provided above, and if Purchaser and the Seller Representative are unable to resolve such dispute within 20 days, Purchaser and the Seller Representative shall jointly select and retain a nationally recognized accounting firm to resolve the disputed item, which firm will be instructed to determine its best estimate of the Asset Allocation based on its determination of the unresolved allocations and provide a written description of the basis for its determination within 45 Business Days after submission, such written determination to be final, binding and conclusive. During any selection process for the retention of such accounting firm, each Party will disclose any material relationship that it or its direct or indirect owners or their Affiliates have with any accounting firm it or any other Party proposes to retain. Upon resolution of the disputed items, the Asset Allocation shall be adjusted to reflect such resolution, which shall be deemed final and binding on Purchaser and Sellers (the initial Asset Allocation as finally determined pursuant to this Section 4.2, the "***Allocation Statement***"). The costs, fees and expenses of such accounting firm shall be borne equally by Purchaser and Sellers.

(b)    Purchaser and Sellers shall prepare and file all Tax Returns in a manner consistent with the Allocation Statement. The parties shall cooperate in the preparation of the Allocation Statement and any related Tax Return (including IRS Form 8594 and other applicable forms) and each Party shall provide the other Party with such information as may be reasonably requested by such other Party that is necessary for purposes of the preparation of its respective Tax Returns consistent with the Allocation Statement that is in the possession of such Party. None of the parties shall take any position inconsistent with the Allocation Statement and each of the parties shall act in accordance therewith in the preparation, filing and audit of any Tax Return (including filing IRS Form 8594 and other applicable forms), unless otherwise required by a final "determination" (as defined in Section 1313(a) of the Code).

(c)    Purchaser shall prepare, in accordance with applicable Law, an allocation of the Tax Purchase Price allocable to any Purchased Assets that are subject to a Transfer Tax and deliver such allocation to the Seller Representative as soon as reasonably practicable after the date hereof but in all events at least four (4) Business Days prior to the Closing, which preliminary allocation shall be used for purposes of calculating any Transfer Taxes due and payable prior to the determination of the Allocation Statement.

Section 4.3    Cure Costs. Purchaser shall as promptly as reasonably practicable or thereafter upon assumption of each Assumed Contract, pay all Cure Costs associated therewith (if any).

Section 4.4    Withholding. Notwithstanding anything herein to the contrary, Purchaser and its agents and Affiliates are entitled to deduct and withhold from amounts otherwise payable in connection with this Agreement and the Transactions as it is required to deduct and withhold under the Code or any other applicable Law. To the extent amounts are so withheld and paid over to the applicable Taxing Authority, such withheld amounts will be treated for all purposes as having been paid to the Person in respect of whom such deduction and withholding was made, and such amounts shall be promptly paid over to the appropriate Taxing Authority; *provided* that, if Purchaser becomes aware that any such withholding may be required (except with respect to any amounts that constitute compensation or wages), it shall use commercially reasonable efforts to (a) promptly notify and consult with the Seller Representative regarding any applicable withholding Taxes and (b) cooperate with the Seller Representative in good faith to reduce the amount required to be deducted and withheld in accordance with applicable Law. Purchaser or any other applicable withholding agent shall provide evidence that the amount deducted and withheld has been remitted to the appropriate taxing authority.

## ARTICLE V
## REPRESENTATIONS AND WARRANTIES OF SELLERS

Subject to the applicable section of the disclosure schedule (subject to Section 1.3) delivered by Sellers (the "***Seller Disclosure Schedule***") to Purchaser, each Seller hereby represents and warrants to Purchaser as of the date hereof and as of the Closing, as follows:

Section 5.1    Organization and Good Standing; Subsidiaries; Acquired Entities.

(a)     Each Target Company is duly licensed or qualified to transact business and is in good standing in each jurisdiction in which the ownership of Purchased Assets (or, in the case of an Acquired Entity, such Acquired Entity's assets) or the operation of the Business as currently conducted makes such licensing or qualification necessary, except to the extent that the failure to be so licensed, qualified or in good standing (i) would not adversely affect the ability of a Seller (and, to the extent applicable, any Acquired Entity) to carry out its obligations under this Agreement or the Transaction Documents and to consummate the Transactions, and (ii) would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect. Schedule 5.1(a) sets forth the respective jurisdictions of organization of each Target Company.

(b)     Except as set forth on Schedule 5.1(b), no Target Company has any Subsidiaries or otherwise, directly or indirectly, owns any equity interests of any Person or has any direct or indirect equity interests in any business, or is a member of or participant in any partnership, joint venture or similar Person. Schedule 5.1(b) accurately sets forth a true, correct and complete list of (i) each Acquired Entity, (ii) the issued and outstanding shares of capital stock and other equity securities of such Acquired Entity, and (iii) the holder(s) of such shares of capital stock and other equity securities of such Acquired Entity. All of the issued and outstanding equity interests of the Acquired Entities have been duly authorized, are validly issued, fully paid and nonassessable, and are owned of record and beneficially by the applicable Seller (or another Acquired Entity) set forth on Schedule 5.1(b). None of the authorized and outstanding equity interests of any Acquired Entity was issued in violation of any preemptive or similar rights and all issuances, sales and repurchases by each Acquired Entity of their respective equity interests has been effected in compliance with all applicable Law.

(c)     Except as set forth on Schedule 5.1(c), there are no outstanding equity securities, options, warrants, rights, contracts, pledges, calls, puts, rights to subscribe, rights of first refusal, repurchase rights, exchange rights, conversion rights, preemptive rights, or other agreements or commitments to which any Acquired Entity is a party or which is binding upon any Acquired Entity providing for the issuance, disposition or acquisition of any of its equity, capital or profits or any rights or interests exercisable therefor. There are no outstanding or authorized stock options, equity appreciation, phantom shares, profit participation or similar rights with respect to the Acquired Entities.

(d)     Except as set forth on Schedule 5.1(d), none of the Acquired Entities have outstanding bonds, debentures, notes or other similar obligations, the holders of which have the right to vote (or which are convertible into or exercisable for shares or equity securities having the right to vote) with the equityholders of any of the Acquired Entities on any matter. There are no voting trusts or other agreements or understandings to which any Acquired Entity is a party with respect to the voting of any equity interests of such Acquired Entity.

Section 5.2   Power; Authority; Enforceability.   (a) Each Target Company has full corporate, limited liability company, or equivalent power in its jurisdiction of organization to own, lease and operate the Purchased Assets (or, in the case of an Acquired Entity, such Acquired Entity's assets) and carry on the Business as and where such assets are now owned or leased and as the Business is presently being conducted; and (b) each Seller has full power and authority to execute, deliver and perform this Agreement, the Transaction Documents and all other agreements and documents to be executed and delivered by such Seller in connection herewith (the "*Seller*

***Documents***"), subject to and after giving effect to the approval of the Bankruptcy Court (including satisfying any conditions imposed by the Bankruptcy Court) and compliance with all requirements of the Bankruptcy Code. All requisite actions to approve, execute, deliver and perform this Agreement and the Seller Documents have been taken by Sellers. This Agreement and each of the Seller Documents have been duly executed and delivered by each Seller, and constitute binding obligations of such Seller signatory thereto, enforceable against such Seller in accordance with their respective terms, except as enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium, and other Laws affecting creditors' rights generally and by principles of equity.

Section 5.3    Title to Assets; Inventory.

(a)    Subject to the entry of the Sale Order and the obligation to pay any Cure Costs in connection therewith, Sellers have, or will have as of immediately prior to the Closing, good and valid title to, or, in the case of leased or subleased Purchased Assets (including the Leased Real Property), valid and subsisting leasehold interests in, all of the Purchased Assets, free and clear of all Liens (other than Assumed Liabilities and Liens permitted under the Sale Order). Upon consummation of the Transactions at the Closing and subject to the entry of the Sale Order, Sellers will convey such title to or rights to use, all of the Purchased Assets, free and clear of all Liens (other than Assumed Liabilities and Liens permitted under the Sale Order) to Purchaser. Except for the Retained Assets, the Purchased Assets constitute all of the assets, rights, interests, claims and properties used in (to the extent Sellers hold rights, title and interest in such assets or properties) or held for use in the conduct of the Business, or otherwise necessary for Purchaser to conduct and operate the Business immediately after the Closing in all material respects as presently conducted by the Company Group. Except as set forth on Schedule 5.3(a), no part of the Business is currently operated through any Person other than the Company Group and directors, officers, employees, agents or independent contractors of the Company Group.

(b)    Except as set forth on Schedule 5.3(b), to the Knowledge of Sellers: (i) the buildings, equipment and other tangible personal property comprising the Purchased Assets (including those subject to leasehold interests pursuant to Assumed Contracts) are, in all material respects, in good operating condition and repair, free of defects, maintained as required under any applicable Real Property Lease, and are generally in a state of good maintenance (ordinary wear and tear excepted in each case), and (ii) all Inventory included in the Purchased Assets or held by the Acquired Entities (A) is merchantable and fit for the purpose for which it was procured and manufactured; (B) is of comparable quality and quantity with past practice; and (C) is properly reflected on the books and records of the Target Companies. Except as set forth on Schedule 5.3(b), as of the date of this Agreement and as of the Closing Date, all Inventory included in the Purchased Assets and Inventory of the Acquired Entities conforms in all material respects with all applicable specifications and warranties, is not obsolete, is useable or saleable in the Ordinary Course of Business at values not less than the book value amounts thereof except to the extent adequately reserved on the balance sheet included in the financial statements of the Target Companies, and such amounts reflected on the financial statements of the Target Companies have been appropriately recorded in accordance with GAAP. Other than Inventory in transit from suppliers to the Target Companies or from the Target Companies to customers, the Inventory included in the Purchased Assets and Inventory of the Acquired Entities is located only at, or in-transit to or between, the locations identified on Schedule 5.3(b).

NAI-1540627251v4

4880-8016-9684, v. 2

Section 5.4    <u>Noncontravention; Governmental Filings</u>.  Subject to the entry of the Sale Order the execution, delivery and performance by Sellers of this Agreement and the Transaction Documents and the consummation of the Transactions do not and will not (a) violate any Target Company's Organizational Documents or (b) assuming compliance with the matters referred to in the last sentence of this <u>Section 5.4</u>, violate any applicable Law or Order.  Except for compliance with and any required filings, notices, or notifications under Antitrust Laws and as set forth on <u>Schedule 5.4</u>, as applicable, the execution, delivery and performance by Sellers of this Agreement, the Transaction Documents and the consummation of the Transactions by the Target Group do not and will not require any action by or in respect of, notification to or filing with, any Governmental Authority other than consents, approvals or authorizations of, or declarations or filings with, the Bankruptcy Court.

Section 5.5    [<u>Financial Statements</u>.

(a)    <u>Schedule 5.5</u> sets forth (i) the audited, consolidated balance sheets as of December 31, 2022 and December 31, 2023 and the related audited, consolidated statements of income, comprehensive income, changes in stockholders' equity and cash flows for the years then ended (the "***Audited Financial Statements***") and (ii) the consolidated interim unaudited balance sheet as of June 30, 2024, and the related unaudited, consolidated statements of income, comprehensive income and cash flows for such six-month period (the "***Interim Financial Statements***" and the date of such Interim Financial Statements, the "***Balance Sheet Date***"), in each case of the Company Group (clauses (i) and (ii), collectively, the "***Financial Statements***").]  The Financial Statements have been prepared based on the books and records of the Company Group, have been prepared in conformity with GAAP or IFRS (as applicable) consistently applied (except for the absence of footnotes and customary year-end adjustments), and present fairly the consolidated financial position, statements of income, comprehensive income, changes in stockholders' equity and cash flows of the Company Group as of their respective dates and for the respective periods covered thereby.  No Acquired Entity is subject to any material liability which is not shown or which is in excess of amounts shown or reserved for in the balance sheet of the applicable Acquired Entity as of the Balance Sheet Date, other than liabilities of the same nature as those set forth in the balance sheet of the applicable Acquired Entity as of the Balance Sheet Date and reasonably incurred in the Ordinary Course of Business after the Balance Sheet Date.

(b)    The books of account and other financial records of the Business have been kept accurately in the Ordinary Course of Business and in compliance with all applicable Laws in all material respects, and the Target Companies make and keep books, records and accounts that, in reasonable detail, accurately reflect, in all material respects, their transactions and dispositions of assets.

(c)    The Target Companies maintain a system of internal controls over financial reporting that is designed to provide reasonable assurances regarding the reliability of financial reporting, including that (i) transactions are executed in accordance with management's general or specific authorizations and recorded as necessary to permit preparation of the Financial Statements in accordance with GAAP or IFRS (as applicable) and to maintain accountability for the Business' and the Target Group's assets and (ii) access to the Business' and the Target Group's assets is permitted only in accordance with management's general or specific authorization.

NAI-1540627251v4

4880-8016-9684, v. 2

Section 5.6    <u>Litigation</u>.    Except as disclosed on <u>Schedule 5.6</u>, there are no Legal Proceedings pending against or, to the Knowledge of Sellers, threatened against any Target Company, or any manager, director, officer or key employee of any Target Company involving, relating to or affecting, the Purchased Assets, Assumed Liabilities or the Business which (a) if determined adversely to any such Target Company, would be, individually or in the aggregate, material with respect to the Purchased Assets, Assumed Liabilities, the Business or the Target Group or (b) questions the validity of this Agreement as of the date hereof, any Transaction Document or the Transactions, or in any manner challenges or seeks to prevent, enjoin, alter or materially delay the Transactions.  As of the date hereof, no party to any Legal Proceeding pending against any Seller has taken action to, or, to the Knowledge of Sellers, threatened to take action to involve any Acquired Entity in any such Legal Proceeding.

Section 5.7    <u>Permits</u>.    To the Knowledge of Sellers,  except for the Retained Assets, the Target Group holds all the material Permits that are required under Law for the conduct of the Business, is, and for the past five years has been, in material compliance with them, and does not share any legal interest in any such Permits with [any Excluded Entity].  Except for the Retained Assets, the Target Group holds all Permits which are necessary for (y) the ownership of the Target Companies and their respective properties and assets and (z) the operation of any aspect of their respective businesses including without limitation the Permits that are necessary to the Business.  All such Permits are duly and lawfully secured and are in full force and effect except as set forth on <u>Schedule 5.7</u>.  There is no Legal Proceeding pending or threatened in writing, to revoke, suspend, withdraw, expire, modify or terminate any Permit of the Target Group.  Except as set forth on <u>Schedule 5.7</u>, each Target Company has fulfilled and performed its obligations under or in relation to each Permit of the Target Group, there is no breach or default under and in relation to any such Permit, in each case, except as would not reasonably be expected to be material to the Target Group.  To the Knowledge of Sellers, no event has occurred that, with or without notice or lapse of time or both, would be expected to result in the revocation, suspension, lapse, expiration, modification, termination or limitation of any Permit, except as would not reasonably be expected to the Target Group.

Section 5.8    <u>Intellectual Property Rights</u>.

(a)    <u>Schedule 5.8(a)</u> sets forth a complete and accurate list of all Owned IP that is registered as a Patent or pending Patent application, Trademark or Trademark application, Copyright or Copyright application, or domain name, with any Governmental Authority or authorized registrar or for which an application for registration of a Patent, Trademark, Copyright, or Domain Name with any Governmental Authority or authorized registrar has been filed as of the date hereof, in each instance enumerating, if applicable, (i) the applicable application number, registration number or serial number; (ii) title; (iii) date of application and issuance (if applicable); (iv) jurisdiction in which each such item has been issued or registered or in which any application for such issuance or registration has been filed, if applicable, and (v) owner (collectively, the "***Registered Owned IP***").  All Registered Owned IP is subsisting, valid and in full force and effect.  There is no pending or, to Knowledge of Sellers, threatened in writing, interferences, re-examinations, oppositions, cancellation proceedings, or the non-U.S. equivalent thereof involving any Registered Owned IP.

NAI-1540627251v4

4880-8016-9684, v. 2

(b)      A Target Company is the sole and exclusive legal owner with respect to the Owned IP, in all cases, free and clear of all Liens (except Permitted Liens and Contracts identified on Schedule 5.8(d)).  All Owned IP, together with the Intellectual Property and Intellectual Property Rights licensed to a Target Company pursuant to an Inbound License, and Intellectual Property and Intellectual Property Rights included in the Retained Assets (if any), constitute all of the Intellectual Property and Intellectual Property Rights owned, used or held for use by any Target Company in connection with the Business or otherwise necessary to operate the Business as presently conducted by Sellers. Except as set forth on Schedule 5.8(b), the Owned IP has been created, developed or reduced to practice by either (i) a former or present employee of a Target Company acting within the scope of their employment who have validly and irrevocably assigned all of their Intellectual Property and Intellectual Property Rights therein, to a Target Company, or such Intellectual Property and Intellectual Property Rights therein have otherwise vested in a Target Company by operation of law, or (ii) other Persons who have validly and irrevocably assigned all of their Intellectual Property and Intellectual Property Rights therein, to a Seller or one of their respective Subsidiaries.  Sellers are in material compliance with all such agreements and to the Knowledge of Sellers, none of such employees or other Persons have materially breached or defaulted (or are currently in material breach or default) under such agreements, and no claims are pending alleging any such breach or default, except for any breach or default arising out of or relating to the Bankruptcy Cases or the Company Group's financial condition.

(c)      Except as disclosed on Schedule 5.8(c), the conduct of the Business as currently conducted does not infringe, misappropriate or violate, and has not, in the last two (2) years, infringed, misappropriated or violated any Intellectual Property or Intellectual Property Rights of any other Person.  In the last two (2) years, there has been no, and there is no, pending or, to the Knowledge of Sellers, threatened, Legal Proceeding alleging that a Target Company is infringing, misappropriating or violating (or has infringed, misappropriated or violated) any Intellectual Property or Intellectual Property Rights of any Person or challenging the validity, enforceability or ownership by any Target Company of any Owned IP.  To the Knowledge of Sellers, in the last two (2) years, no other Person has infringed, misappropriated or violated, or is infringing, misappropriating or violating, any Owned IP in any material respect.  No Target Company has received any written notice from any Person in the last two (2) years claiming that the operation of the Business infringes, misappropriates or violates (or has infringed, misappropriated or violated) the Intellectual Property or Intellectual Property Rights of any Person.

(d)      Schedule 5.8(d) sets forth a true, correct and complete list of any Contract to which any Target Company is a party (A) pursuant to which any Target Company is granted a right (including a license, covenant not to sue or immunity) with respect to any third party Intellectual Property or Intellectual Property Right that is material to the Business ("*Inbound License*"), other than (x) non-exclusive licenses for commercially available or off-the shelf Software or (y) Software that is subject to click-through or shrink wrap agreements entered into by any Target Company in the Ordinary Course of Business, (B) pursuant to which any Target Company grants or has granted a third party a right (including a license, covenant not to sue or immunity) with respect to any Owned IP that is material to the Business or any material source code or material Trade Secrets included in the Owned IP, (C) relating to the settlement of any claims related to any Intellectual Property or Intellectual Property Rights, or (D) pursuant to which any Target Company is prohibited or restricted in any manner that is material to the Business from using any Owned IP.

- 38 -

(e)    The Target Group has taken commercially reasonable steps to protect the secrecy and confidentiality of all Trade Secrets and source code included in the Owned IP, and material Business Information, including employing appropriate physical and electronic safeguards and security measures.  No Target Company has disclosed any material Trade Secrets or material source code, or material Business Information, to any third party without having such third party execute a written Contract regarding the non-disclosure and non-use thereof.

(f)    To the Knowledge of Sellers, in the past two (2) years, no Person has (A) gained unauthorized access to, acquired, or engaged in unauthorized Processing of  any Personal Information or other material data, information or source code held by or on behalf of a Target Company or included in the Owned IP, or (B) gained unauthorized access to any IT Assets that process any Personal Information or other data, information or source code held by or on behalf of a Target Company or included in the Owned IP (a "***Security Breach***") and the Target Companies have no reason to reasonably suspect a Security Breach has occurred. Each Target Company has used commercially reasonable efforts to implement industry standard security measures, controls, technologies, processes, and practices reasonably designed to (x) detect, identify and remediate Security Breaches, (y) comply with Privacy and Data Security Requirements, and (z) defend and recover against any disruptions of its IT Assets. The Processing of any Personal Information by or on behalf of Sellers, including the acquisition of consents from and provision of notice to individuals and data subjects regarding Personal Information, as applicable, has not violated, and does not violate, any applicable Privacy and Data Security Requirements in a manner reasonably likely to cause a Material Adverse Effect.  In the past three years, no Seller has received written notice of any claim of any alleged violation of any Privacy and Data Security Requirement.

(g)    Except as set forth on Schedule 5.8(g), (i) no government funding and no facilities of a university, college, other educational institution or research center were used in the development of any Owned IP where, as a result of such funding or the use of such facilities, such entity has any right, title or interest in such Owned IP, and (ii) to the Knowledge of Sellers, no former or current employee, consultant or independent contractor of any Seller who contributed to the creation or development of any Owned IP has performed services for the government or a university, college, other educational institution or research center during a period of time during which such employee, consultant or independent contractor was also performing services for the Business.

(h)    The Target Group is in material compliance with all applicable Open Source licenses. To the Knowledge of Sellers, no Software included in the Owned IP contains any Malicious Code.  The IT Assets are sufficient for the conduct of the Business as currently conducted, including functionality.  The IT Assets operate and perform in all material respects sufficient to permit the operation of the Business as currently conducted.    Sellers have used commercially reasonable security measures designed to protect the IT Assets and Software included in the Products from any Malicious Code or continued substandard performance that would be expected to cause any disruption or interruption in or to the use of any such IT Assets in the Business or Software included in the Products or to the Business.

Section 5.9    Government Contracts.

(a)     With respect to any Government Contract, in the past five (5) years, there has been no: (i) civil fraud, criminal or bribery investigation by any Governmental Authority against any Target Company; (ii) internal investigation in connection with any alleged fraud, bribery, contractual noncompliance or any other issue in connection with such Government Contract; (iii) suspension or debarment action against any Target Company; (iv) written request by a Governmental Authority for a contract price adjustment based on a claimed disallowance by the Defense Contract Audit Agency (or other applicable Governmental Authority) or written claim of defective pricing against any Target Company; or (v) dispute between any Target Company and a Governmental Authority that has resulted in a government contracting officer's final decision against a Target Company in fines, penalties, legal fees, accounting fees or expenses or, which, regardless of any monetary cost, could reasonably be expected to impede a Target Company from doing business with any Governmental Authority.

(b)     The Target Group is in material compliance with all statutory, regulatory and contractual requirements applicable to each Government Contract, and no performance evaluation of any Target Company in the last five (5) years with respect to any Government Contract has cited a material default or other material failure to perform thereunder.

(c)     As of the date hereof and in the past five (5) years: (i) all written representations, certifications and disclosures made by each Target Company were current, accurate and complete in all material respects when made and such representations and certifications were updated so that they remained current, accurate, and complete, if updating was required; and (ii) neither any Governmental Authority nor any prime contractor, subcontractor or other Person has notified a Target Company, in writing, the Target Company has, or is alleged to have, breached or violated any Law, representation, certification, disclosure, clause, provision or requirement pertaining to any Government Contract.

(d)     As of the date hereof and in the past five (5) years, there has been no termination for default, cure notice or show cause notice issued to a Target Company in connection with any Government Contract.

(e)     No Target Company, nor any current manager, director, or officer of a Target Company is, or has ever been, debarred, suspended or otherwise rendered generally ineligible for award of Contracts with any Governmental Authority.

(f)     To the Knowledge of Sellers, none of the Government Contracts is or was set aside or reserved based in whole or in part on a Target Company's size status or other set aside or preference category or was awarded to any Target Company as a non-traditional defense contractor or small business for purposes of its other transaction agreements. Any representation or certification made by a Target Company that it is a small business for the purpose of any Government Contract or Government Bid was accurate when made incorporating all factors including affiliation that are required under applicable Laws.

(g)     At all times during the past five (5) years, (i) the data, privacy, information security, and cyber incident reporting practices of each Target Company are, and have been, in compliance with applicable Laws, including Defense Federal Acquisition Regulation Supplement (DFARS) 252.204-7012 and NIST SP 800-171; (ii) each Target Company has met all cyber

incident reporting requirements under DFARS 252.204-7012; and (iii) each Target Company has cooperated with and complied with all Governmental Authority cyber incident damage assessment activities.]

Section 5.10    <u>Compliance with Laws</u>.

(a)    Each Target Company is, and for the past three (3) years has been, in compliance and has not been in violation of any Law applicable to the Purchased Assets, the Assumed Liabilities or the conduct of the Business, except for violations or instances of non-compliance, which do not or would not reasonably be expected to be material to the Business, the Purchased Assets or the Assumed Liabilities, taken as a whole. None of the Business, the Purchased Assets, the Assumed Liabilities nor any Target Company is subject to any Order (other than, for the avoidance of doubt, any Orders entered by the Bankruptcy Court).

(b)    No Group Company, nor, any Representatives acting on behalf of any Group Company, nor the Business, is currently, or has been in the past five (5) years (i) a Sanctioned Person; (ii) organized, resident or located in any country or region that is subject or target of  comprehensive sanctions under applicable Anti-Corruption and Trade Control Laws (including Cuba, Iran, North Korea, Syria and the Crimea, so-called Luhansk People's Republic, and so-called Donetsk People's Republic regions of Ukraine) (a "***Sanctioned Country***"); (iii) engaged in any dealings or transactions with any Sanctioned Person or in any Sanctioned Country, in violation of Anti-Corruption and Trade Control Laws; (iv) engaged in any export, re-export, transfer or provision of any goods, technology, or service without, or exceeding the scope of, any required or applicable licenses or authorizations under all applicable Laws, except as would not reasonably be expected to be material to the Business, the Purchased Assets or the Assumed Liabilities, taken as a whole; or (v) otherwise in violation, in any material respect, of applicable Anti-Corruption and Trade Control Laws.

(c)    In the past five (5) years, no Group Company has (A) received from any Governmental Authority or any other Person any notice, inquiry, or internal or external allegation, (B) made any voluntary or involuntary disclosure to a Governmental Authority or (C) conducted any internal investigation or audit, in each case, concerning any actual or potential violation or wrongdoing related to Anti-Corruption and Trade Control Laws.

(d)    In the past five (5) years, to the Knowledge of Sellers, none of the products or materials imported by, for or on behalf of a Target Company for which final liquidation has not yet occurred is subject to or otherwise covered by an antidumping duty order or countervailing duty order that remains in effect or is subject to or otherwise covered by any pending antidumping or countervailing duty investigation by any Governmental Authority, except as would not, individually or in the aggregate, reasonably be expected to be material to the Business, taken as a whole.  In the past five (5) years none of the products or materials imported by, for or on behalf of any Target Company are subject to, or meet the criteria to be subject to, any Withhold Release Order administered by U.S. Customs and Border Protection or any equivalent Order outside the United States, except as would not, individually or in the aggregate, reasonably be expected to be material to the Business, taken as a whole.

(e)     No Target Company is importing, nor in the past five (5) years, has imported, products or materials mined, produced, or manufactured wholly or in part with the use of forced labor or mined, produced, or manufactured wholly or in part in the Xinjiang Uyghur Autonomous Region or by an entity on the Uyghur Forced Labor Prevention Act Entity List.

(f)     In the past five (5) years no Group Company, nor, to the Knowledge of Sellers, any Representative acting on any such Person's behalf or on behalf of the Business, has made, directly or indirectly, any payment or promise to pay, or gift or promise to give or authorized such a promise or gift, of any money or anything of value, directly or indirectly, to (i) any foreign official (as such term is defined in the FCPA) for the purpose of influencing any official act or decision of such official or inducing him or her to use his or her influence to affect any act or decision of a foreign government, or any agency or subdivision thereof; or (ii) any foreign political party or official thereof or candidate for foreign political office for the purpose of influencing any official act or decision of such party, official or candidate or inducing such party, official or candidate to use his, her or its influence to affect any act or decision of a foreign government or agency or subdivision thereof, in the case of both clauses (i) and (ii) above in order to assist a Group Company or the Business to obtain or retain business for or direct business to a Group Company or the Business and under circumstances that would subject any Group Company to material liability under any Anti-Corruption and Trade Control Laws. The internal accounting controls of each Group Company are adequate in all material respects to detect any of the foregoing.

(g)     The operations of each Group Company are, and for the past five (5) years have been, conducted at all times in all material respects with all applicable financial recordkeeping and reporting requirements and Anti-Money-Laundering Laws, and no Legal Proceeding by or before any Governmental Authority involving any Group Company with respect to Anti-Money-Laundering Laws is pending or, to the Knowledge of Sellers, threatened in writing. The internal accounting controls of each Group Company are adequate in all material respects to detect any of the foregoing.

Section 5.11     Employees.

(a)     [Schedule 5.11(a) sets forth a complete and correct list of employees of the Target Group as of the date hereof, including each such individual's (a) name (or anonymized by employee number where required by applicable law) (b) total annual compensation or rate of pay, as applicable (as of the date hereof), including any discretionary or non-discretionary bonuses, (b) employment location (city and state), (c) title or employment position, (d) date of hire or, if applicable, date of rehire, (e) applicable paymaster/payroll entity, and (f) the amount of accrued but unused vacation or paid time off as of the date hereof, with each such individual identified as (i) salaried or hourly, (ii) exempt or nonexempt for overtime purposes, (iii) union or nonunion, (iv) full-time or part-time, (v) temporary, regular or leased/staffing agency, (vi) active or inactive (with the reason for such inactive status specified, e.g., leave of absence, FMLA, disability, layoff, etc. and anticipated return date), (vii) visa or work permit status, and (viii) if the employee is subject to an employment contract.]   Other than those employees identified as being subject to an employment contract, or otherwise entitled by Law to prior notice or payments or benefits upon a termination of employment, all Business Employees and Acquired Entity Employees are employed

"at will" and may be dismissed immediately without notice or cause and without further liability to any Target Company other than for services previously rendered.

(b)     Schedule 5.11(b) contains a true, correct and complete list of all individual independent contractors of the Target Group as of the date hereof, together with (i) annual or hourly compensation rate; (ii) location (state); (iii) contract start and termination dates, if known; and (iv) a description of services provided.

(c)     Except as disclosed on Schedule 5.11(c),

(i)     no Target Company is, or has been in the past three (3) years, a party to or bound by any union collective bargaining agreements, or other labor contracts governed by Section 301 of the Labor Management Relations Act, 29 U.S.C. § 185 (or non-U.S. equivalent thereof) covering any Business Employee or Acquired Entity Employee, there are no unions or similar labor organizations representing or, to the Knowledge of Sellers, purporting to represent or attempting to represent, any Acquired Entity Employee for purposes of collective bargaining, to the Knowledge of Sellers, no such organization or individual is attempting, or has attempted, to form a union or similar labor organization including representation or certification proceedings or petitions seeking a representation proceeding or a demand for recognition, and the Target Company has not been involved in negotiations with any labor organization regarding the terms for any Collective Bargaining Agreement, effects bargaining agreement, neutrality agreement, voluntary recognition agreement, or other similar labor agreement, nor does any Target Company have any legal duty to engage in collective bargaining with any labor organization;

(ii)     no Target Company is experiencing or has experienced in the past three (3) years, any material labor disputes, strikes, slowdowns or work stoppages in connection with their business and operations and there is not currently, and has not been in the past three (3) years, any labor strike, dispute, concerted slow down or concerted stoppage actually pending or, threatened against any Target Company;

(iii)     no Target Company has in the past three (3) years been found to or alleged to have engaged in any unfair labor practices within the meaning of the National Labor Relations Act with respect to its employees or other individuals who provide services that support the business and operations;

(iv)     the consent or rendering of formal advice by, or the conclusion of any legally required consultation process with, any labor or trade union, works council or other employee representative body is not required for the Sellers to enter into this Agreement or to consummate any of the transactions contemplated hereby;

(v)     with respect to the Target Group, (A) there has been no plant closing, mass layoff, work relocation or redundancy of employees that required notice or consultation under any applicable plant closing Laws (including without limitation the WARN Act) or any similar state, local or foreign law or regulation) in the past three (3) years, and no Target Company has given notice of any collective redundancies to any

relevant Governmental Authority or (B) there has been no incurred liability or obligation under the WARN Act that remains unpaid or unsatisfied;

(vi)    in the past three (3) years, (A) there are no pending employment discrimination, employee health and safety, unfair labor practice, wage and hour, unemployment compensation, worker's compensation, immigration, union grievance or other employment-related claims, audits, citations, proceedings or investigations or allegations against any Target Company; and (B) no Target Company (x) is subject to any judgment, consent decree, or settlement agreement related to any such claims, audits, citations, proceedings or investigations or (y) is liable for the payment of any claims, damages, fines, penalties, or other amounts to any current or former employees or independent contractors, however designated, for failure to comply with any law;

(vii)    in the past three (3) years, no Target Company has been found to be a joint employer of any non-employee workers hired as independent contractors or temporary workers, and no allegations of joint-employer status with respect to these non-employees have been made against any Target Company;

(viii)    in the past (3) three years, the Target Group has complied in all material respects with all applicable legal requirements relating to employment and employment practices, including all legal requirements respecting terms and conditions of employment, wages, hours, classification of employees, including for minimum wage, overtime, and independent contractor purposes, discrimination in employment, immigration, occupational health and safety, disability rights or benefits, equal opportunity, plant closures and layoffs, affirmative action, workers' compensation, labor relations, collective bargaining, and record-keeping obligations and are not liable for any arrears of wages or any Taxes or penalties for failure to comply with any of the foregoing.

(ix)    no employee of a Target Company or independent contractor is in violation of any term of any Contract including, but not limited to, employment agreement, consulting agreement, non-disclosure agreement, non-competition agreement, non-solicitation agreement or other form of restrictive covenant agreement;

(x)    in the past three (3) years, no allegations of sexual or other unlawful harassment or discrimination have been made against any Target Company, officer or director of a Target Company, or any employee of any Target Company, nor do facts or circumstances exist that would make it reasonably likely that a Target Company or any employee of a Target Company would become subject to such allegations. Except as disclosed on Schedule 5.11(b), no Person whose name or likeness is used in the Business is currently subject to allegations of sexual or other unlawful harassment or discrimination, nor do facts or circumstances exist that would make it reasonably likely that such Person will become subject to such allegations. In the past six (6) years, no Target Company has entered into any settlement agreement related to allegations of sexual or other unlawful harassment or discrimination; and

(xi)    in the past three (3) years, each Target Company has correctly classified each of its respective service providers as "partners", "employees" or

- 44 -

"independent contractors" and as "exempt" or "non-exempt" for all purposes and has properly reported all compensation paid to such service providers for all purposes.

Section 5.12    Employee Benefit Plans.

(a)    Schedule 5.12(a) contains a complete and accurate list of all material Seller Plans. Schedule 5.12(a) separately designates each Seller Plan that is an Acquired Entity Plan. Sellers have provided to, or made available to, Purchaser true, correct and complete copies of the following with respect to each Seller Plan: (i) each plan document, and in the case of an unwritten plan, a written description of the material terms thereof, (ii) all current trust documents, investment management contracts, custodial agreements and insurance Contracts relating thereto, (iii) the current summary plan description and each summary of material modifications thereto, (iv) the most recently filed annual report (Form 5500 and all schedules thereto) or such similar report, statement or information return required to be filed with or delivered to any Governmental Authority, if any, (v) the most recent IRS, or other Governmental Authority, determination or opinion letter, (vi) the most recent summary annual report, actuarial report, financial statement and trustee report, (vii) the most recent nondiscrimination tests required to be performed under the Code and (viii) any material correspondence with a Governmental Authority regarding any Seller Plan. There are no pending or, to the Knowledge of Sellers, threatened claims, litigation or other proceedings with respect to any Seller Plan, other than ordinary and usual claims for benefits by participants and beneficiaries.

(b)    Each Seller Plan (and any related trust or other funding vehicle) (i) has been established, maintained, funded, operated and administered in compliance in all material respects with its terms and all applicable requirements of ERISA, the Code, and other applicable Laws, (ii) all payments, premiums and contributions required to be made or paid under the terms of such Seller Plan have been timely made or provided for by Seller, and (iii) there has been no written notice issued by any Governmental Authority questioning or challenging such compliance, and there are no audits, examinations, investigations or other Legal Proceedings (other than non-material routine claims for benefits) pending, or, to the Knowledge of Sellers, threatened, involving any such Seller Plan or the assets of any such Seller Plan. No Seller Plan is subject to any audit, investigation, or examination by any Governmental Authority and no such actions are pending or, to the Knowledge of Sellers, threatened with respect to any Seller Plan.

(c)    Each Seller Plan which is intended to be qualified within the meaning of Code Section 401(a) is so qualified and has received, or timely requested, a favorable determination letter (or, if applicable, advisory or opinion letter) from the IRS upon which it may rely, or is comprised of a master or prototype plan that has received a favorable opinion letter from the IRS, and its trust is exempt from federal taxation under Code Section 501(a), and to the Knowledge of Sellers, no event has occurred and no facts or conditions exist that could reasonably be expected to adversely affect the qualified status of any such Seller Plan or result in the imposition of any material liability, penalty or Tax under ERISA, the Code or other applicable Law. Each Seller Plan maintained outside the United States which is intended to receive any favorable tax treatment has met the requirements to receive such favorable tax treatment.

(d)    No "prohibited transaction," within the meaning of Section 4975 of the Code or Sections 406 and 407 of ERISA, or breach of fiduciary duty has occurred with respect to

any Seller Plan. None of the Sellers nor any Acquired Entity has any liability (whether or not assessed) under Sections 4980D, 4980H, 6721 or 6722 of the Code.

(e)     Except as set forth on Schedule 5.12(e), no Group Company maintains, sponsors, contributes to or is required to contribute to, or has ever maintained, sponsored, contributed to, been required to contribute to or has any liabilities with respect to: (i) any Multiemployer Plan, (ii) any pension plan subject to Title IV of ERISA, Part 3 of Title I of ERISA or Section 412 of the Code, (iii) any "multiple employer plan" as defined in Section 413(c) of the Code, (iv) any "multiple employer welfare arrangement" as defined in Section 3(40) of ERISA, (v) a voluntary employee benefit association under Section 501(c)(9) of the Code, or (vi) any plan which provides, or under which any Group Company thereof has any liability to provide, retiree or post-employment life insurance, medical, severance or other employee welfare benefits to any participant, except as required by Section 601 et seq. of ERISA or Section 4980B of the Code or any similar applicable Law and at the sole expense of the applicable participant. No Group Company has any Controlled Group Liability.

(f)     Each Seller Plan subject to Section 409A of the Code (if any) has been operated and maintained in compliance with Section 409A of the Code. No Group Company has any obligations to indemnify, "gross-up" or reimburse any individual in respect of any Taxes or related interest or penalties incurred by such individual, including under Sections 409A or 4999 of the Code or otherwise.

(g)     No Group Company sponsors, maintains, or contributes to, or otherwise has any liability with respect to, any Seller Plan that may not be terminated by such Group Company in its sole discretion at any time without material liability.

(h)     Neither the execution nor the delivery of this Agreement or any other document related to the Transaction nor the consummation of the Transactions, either alone or in combination with another event (including the termination of employment on or following the date hereof), will (i) entitle any Business Employee or Acquired Entity Employee to any payment; (ii) increase the amount of compensation or benefits due to any Business Employee or Acquired Entity Employee; (iii) accelerate the vesting, funding or time of payment of any compensation, equity award or other benefits; (iv) result in any obligation or other liability to or obligation or commitment by Purchaser or any of its Affiliates (including, subsequent to the Closing, the Acquired Entities) to any Business Employee or Acquired Entity Employee; or (v) result in any "parachute payment" within the meaning of Code Section 280G that, separately or in the aggregate, could be nondeductible to the payor under Code Section 280G or would result in an excise Tax on any recipient under or Code Section 4999.

(i)     [None of the Assumed Seller Plans, or any insurance Contract relating thereto, require or permit a material retroactive increase in premiums or payments or include a loss-sharing arrangement.]

Section 5.13   Real Property.

(a)     Schedule 5.13(a)(i) sets forth a true, correct and complete list of all of the real property owned in fee by the Target Group, that is used, or held for use, by the Business (other

than any Retained Asset) (such real property listed or required to be listed on Schedule 5.13(a)(i), the "***Owned Real Property***"), specifying the street address and the current owner of each parcel of Owned Real Property.  Each Target Company, as applicable, has good and valid fee simple title to all Owned Real Property, free and clear of all Liens, except for Permitted Liens and Liens listed on Schedule 5.13(a)(ii).  No Target Company currently leases any parcel or any portion of any parcel of any Owned Real Property to any other Person, and no Person holds any option to purchase or right of first offer or refusal in respect of any parcel or any portion of any parcel of any Owned Real Property.  Except as would not be reasonably be expected to result in a material liability to the Target Group, taken as a whole, (i) there is no pending or, to the Knowledge of Sellers, threatened condemnation or other Legal Proceeding of any type relating to the Owned Real Property or other matters affecting adversely the use, occupancy or value of the Owned Real Property, except as disclosed on Schedule 5.13(a)(i); (ii) the Owned Real Property does not, to the Knowledge of Sellers, serve any adjoining property for any purpose inconsistent with the use of such Owned Real Property; and (iii) to the Knowledge of Sellers, neither the current use of the Owned Real Property nor the operation of the Business violates any instrument of record or agreement affecting the Owned Real Property or any applicable legal requirements.

(b)    Schedule 5.13(b) sets forth a true, correct and complete list of each lease, sublease, license or occupancy agreement, including all amendments, modifications or supplements thereof, pursuant to which a Target Company occupies any Leased Real Property (collectively, the "***Real Property Leases***").  Sellers have delivered (or otherwise made available) to Purchaser a true, correct and complete copy of each Real Property Lease, in each case, as amended or otherwise modified and in effect subject to proper authorization and execution of applicable bankruptcy, receivership, insolvency, reorganization, moratorium, fraudulent conveyance, equitable subordination or similar Laws of general application and other Laws affecting creditors' rights generally.  None of the Target Companies has subleased or otherwise granted to any Person the right to use or occupy the Leased Real Property or any portion thereof.  Except as would not be reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, (i) there is no pending or, to the Knowledge of Sellers, threatened condemnation or other Legal Proceeding of any type relating to the Leased Real Property or other matters affecting adversely the use, occupancy or value of the Leased Real Property, except as disclosed on Schedule 5.13(b)(i); (ii) the Leased Real Property does not, to the Knowledge of Sellers, serve any adjoining property for any purpose inconsistent with the use of such Leased Real Property; and (iii) to the Knowledge of Sellers, neither the current use of the Leased Real Property nor the operation of the Business violates any instrument of record or agreement affecting the Leased Real Property or any applicable legal requirements.

Section 5.14    Contracts.

(a)    Schedule 5.14(a) sets forth a true, correct and complete list of all Contracts effective as of the date hereof to which any Target Company is a party or by which any of the Purchased Assets are bound or to which the Assumed Liabilities relate and that fall within the following categories:

(i)    any partnership agreement, joint venture agreement, strategic alliance, stockholders' agreement or limited liability company agreement or any other

similar Contract involving a sharing of profits and losses, in each case, of any Acquired Entity;

       (ii)    any Contract relating to the acquisition or disposition of any material business (whether by merger, sale of stock, sale of assets or otherwise) pursuant to which a Seller or Purchaser would have continuing obligations applicable to the Acquired Entities following the date of this Agreement;

       (iii)    any Contract where any Acquired Entity is or would be required to become, obligor or guarantor relating to indebtedness;

       (iv)    any Contract containing covenants expressly limiting, individually or in the aggregate, the freedom of the Acquired Entities to compete with any Person in a product or line of business or operate in any jurisdiction;

       (v)    any Contract that contains (A) exclusivity requirements, "most-favored nation" or similar provisions binding on any Acquired Entity, or (B) minimum commitment terms in favor of the counterparty with respect to an Acquired Entity;

       (vi)    any Government Contract applicable to the Business or the Purchased Assets;

       (vii)    any Contract granting to any Person an option or a first refusal or similar preferential right to purchase or acquire any Purchased Asset or any assets or properties of any Acquired Entity;

       (viii)    any Contract involving capital expenditures of more than $100,000, individually or in the aggregate, over any 12-month period by or on behalf of any Acquired Entity;

       (ix)    any Contract which involves the sale, issuance, purchase or repurchase of any Acquired Equity Interest;

       (x)    any Contract with a Material Customer or Material Supplier

       (xi)    any Contracts for the settlement of any Action (A) for which there are ongoing obligations or liabilities to any Acquired Entity, or (B) which, in the last three years, resulted in liabilities to any Acquired Entity in excess of $100,000; or

       (xii)    any Contract reflecting leases of personal property by or to any Acquired Entity which individually have a value in excess of $100,000 per year.

       (b)    Except as otherwise set forth on <u>Schedule 5.14(a)</u>, <u>Schedule 5.14(b)</u> sets forth a true, correct and complete list of all material Contracts to which any Seller is a party or by which of the Purchased Assets are bound or to which the Assumed Liabilities relate (collectively, with the Contracts set forth in <u>Schedule 2.1(a)(v)</u>, <u>Schedule 5.8(d)</u>, <u>Schedule 5.13(b)</u> and <u>Schedule 5.14(a)</u>, the "***Material Contracts***").  Prior to the date by which Sellers are required to deliver the final version of the Seller Disclosure Schedule pursuant to <u>Section 8.17</u>, Sellers agree to make

available to Purchaser a true, correct and complete copy of each Material Contract; provided, that, a copy of any Material Contract added to Schedule 5.14(a) or Schedule 5.14(b) (in accordance with Section 11.6) following the date by which Sellers are required to deliver the final version of the Seller Disclosure Schedule shall be made available to Purchaser prior to the Closing Date.

(c)     Other than the obligation to pay Cure Costs (if any), or as a result of the financial conditions of the Company Group, the Bankruptcy Cases or the application of the automatic stay under the Bankruptcy Code, and except as set forth on Schedule 5.14(c), with respect to each such Contract, to the Knowledge of Sellers, no Target Company that is party thereto, as applicable, or any third party is in default or breach with respect to any obligation to be performed under any such Material Contract, except for any breach or default that would not reasonably be expected to be material to the Business, the Purchased Assets or the Assumed Liabilities, taken as a whole.  Each such Contract is valid, binding and in full force and effect, enforceable against all applicable Group Companies and, to the Knowledge of Sellers, enforceable against the other party or parties thereto, in each case, in accordance with the terms thereof (except (A) as enforcement may be limited by applicable bankruptcy, receivership, insolvency, reorganization, moratorium, fraudulent conveyance, equitable subordination or similar Laws of general application and other Laws affecting creditors' rights generally and (B) insofar as the availability of equitable remedies may be limited by applicable Law).

(d)     Except as set forth on Schedule 5.14(c), to the Knowledge of Sellers, no Related Party (other than solely as between the Acquired Entities or Sellers) (i) is a party to any Contract or transaction involving the Target Companies or the Business other than (A) loans and other extensions of credit to directors and officers of the Company Group (or the Business) for travel or business expenses or other employment-related purposes in the Ordinary Course of Business, none of which are material, individually or in the aggregate, and (B) employment arrangements disclosed on Schedule 5.14(b), or (ii) except for direct and indirect ownership of the equity interests of the Company Group, owns, directly or indirectly, any material interest in, or is an officer, director, employee or consultant of, any Person which is, or is engaged in business as a material supplier, lessor, lessee or any other Person with a material commercial relationship with the Business.

Section 5.15   Environmental Matters. To the Knowledge of Sellers and except as set forth on Schedule 5.15, (i) the Target Group is and has been for the past two (2) years in compliance in all material respects with all applicable Environmental Laws, (ii) no Target Company has any liability that is not fully resolved in respect of violations of Environmental Laws or any presence or Release of or exposure to a Hazardous Substance, (iii) the Target Group has obtained and is and has been for the past two (2) years in material compliance with all Permits required under all applicable Environmental Laws necessary to own the Acquired Assets and operate the Business, (iv) no Target Company has received a written notice, order, complaint or penalty from a Governmental Authority or any other Person alleging any actual or potential violation by or liability under any Environmental Law or with respect to any Hazardous Substance and there are no judicial, administrative or other actions, suits or Legal Proceedings pending or, to the Knowledge of Sellers, threatened, which allege a violation by or liability of any member of the Target Group under any Environmental Law, (v) no Target Company has assumed, undertaken, provided an indemnity with respect to, or otherwise become responsible for any material liability of any other Person relating to or arising from any Environmental Law and (vi) Sellers and the

- 49 -

Target Group agree to use commercially reasonable efforts made available to Purchaser copies of all material documents, records and information in their respective possession or control concerning noncompliance with or potential liability under Environmental Laws in any way associated with the Assets, the Business or the Target Group.

Section 5.16    Insurance.  Schedule 5.16 sets forth a true and complete list of the insurance policies (collectively, the "***Insurance Policies***") maintained by each Group Company that cover (or relate to) the Target Group, the Business, the Purchased Assets or the Assumed Liabilities. Each of the Insurance Policies are in full force and effect and all premiums due thereon as of the date hereof have been paid.  To the Knowledge of Sellers and except as set forth on Schedule 5.16, there are no claims, by or with respect to any Person pending under any of the Insurance Policies or disputes with insurers with respect thereto.  Sellers will make available to Purchaser true, complete and accurate copies of all Insurance Policies.  No Group Company has received any written notice of cancellation or non-renewal of, or material reduction of coverage with respect to, any such Insurance Policy.

Section 5.17    Brokers or Finders.  Except as set forth on Schedule 5.17, Sellers have not entered into any agreement or arrangement to pay any commission, brokerage, finder's fee or other similar compensation arrangement or incurred any liability for any investment banking fees, financial advisory fees, brokerage fees, finders' fees or other similar fees in connection with this Agreement or the Transactions.

Section 5.18    Taxes.  Except as set forth on Schedule 5.18,

(a)    Each Target Company and every Group Company has timely filed or caused to be filed (taking into account any extension of time within which to file) all income and other material Tax Returns in respect of the Business, the Purchased Assets and the Acquired Entities required to be filed with the appropriate Taxing Authority.  All such Tax Returns are true, complete and correct and were prepared in compliance with all applicable Laws.  All Taxes relating to the Business, the Purchased Assets and the Acquired Entities that are due and payable, whether or not shown to be payable on such Tax Returns, have been or will be timely paid before or at the Closing.

(b)    No Target Company has agreed to any waiver or extension of any statute of limitations in respect of income or other material Taxes with respect to the Business, the Purchased Assets or the Acquired Entities (other than those claimed in connection with an extension of time to file a Tax Return).  There are no pending (or, to the Knowledge of Sellers, threatened in writing) audits, investigations, disputes, notices of deficiency, claims or other Legal Proceedings for or relating to any liability for Taxes relating to the Business, the Purchased Assets or the Acquired Entities.

(c)    None of the Target Companies is a party to any "closing agreement" as described in Section 7121 of the Code (or any similar provision of state, local or foreign Law) or any other agreement with any Taxing Authority with respect to Taxes relating to the Business, the Purchased Assets or the Acquired Entities. None of the Target Companies nor any other Group Company has outstanding requests for a private letter ruling, technical advice memoranda or similar rulings with any Taxing Authority, and no such rulings are in effect, with respect to Taxes relating to the Business, the Purchased Assets or the Acquired Entities.

(d)     None of the Target Companies is in default under, nor does there exist any condition which, with the giving of notice or passage of time, would constitute a default by such Target Company under any agreement with any Taxing Authority that provides for or results in a reduction, rebate or exemption from a material amount of Taxes or any other form of Tax incentive applicable to the Business, the Purchased Assets or the Acquired Entities.

(e)     Each Target Company has withheld and paid all Taxes required to have been withheld and paid in connection with amounts paid or owing to any employee, independent contractor, creditor, stockholder, or other third party under applicable Law (in each case, to the extent related to the Business, the Purchased Assets or the Acquired Entities) thereto have been properly and timely distributed.

(f)     None of the Target Companies is a party to any Tax allocation, Tax indemnification or Tax sharing agreement other than such agreement (i) as to which only the Acquired Entities, or only the Excluded Entities, are party or (ii) that is a commercial contract entered in the Ordinary Course of Business the primary purpose of which is unrelated to Tax. None of the Target Companies (i) has been a member of an affiliated group filing a consolidated federal income Tax Return (other than any group the common parent of which was the Company), and (ii) has any liability for the Taxes of any Person under Treasury Regulations Section 1.1502-6 (or any similar provision of state, local, or non-U.S. law), as a transferee or successor or by Contract (other than a commercial contract entered into in the Ordinary Course of Business the primary purpose of which is unrelated to Tax).

(g)     None of the Target Companies nor any Group Company has participated in any "listed" transaction within the meaning of Treasury Regulations Section 1.6011-4(b) or any transaction under a corresponding or similar provision of state, local or foreign Law.

(h)     There are no Liens for Taxes on the Purchased Assets or the assets of the Acquired Entities other than Permitted Liens.

(i)     No claim has, to the Knowledge of Seller, been made in writing by any Taxing Authority in a jurisdiction where a Target Company does not file Tax Returns that such Target Company is or may be subject to taxation by that jurisdiction with respect to the Business, the Purchased Assets or the Acquired Entities. No Target Company has (or has had) any (i) place of management, (ii) branch, (iii) office (or any other place of business), (iv) operations or employees, (v) agent with binding authority or (vi) any other activities, in each case that could give rise to a permanent establishment or taxable presence in any country other than the country where such Target Company was organized.

(j)     No power of attorney with respect to Taxes relating to the Business, the Purchased Assets or the Acquired Entities has been executed or filed with any Taxing Authority by or on behalf of any Target Company that will remain in effect after the Closing Date.

(k)     Each Target Company has, with respect to the Business, the Purchased Assets or the Acquired Entities, properly (i) collected and remitted sales and similar Taxes with respect to sales made to its customers, and (ii) for all sales that are exempt from sales and similar Taxes that were made without charging or remitting sales or similar Taxes, received and retained

any appropriate Tax exemption certificates and other documentation qualifying such sale as exempt.

(l)     None of the "section 197 intangibles" (as defined in Section 197 of the Code) owned by the Target Companies immediately prior to the Closing are excluded from being "amortizable section 197 intangibles" (as defined in Section 197 of the Code) as a result of Section 197(f)(9) of the Code.

(m)     Neither the Acquired Entities nor Purchaser (nor any of their respective Affiliates) will be required to include any item of income in, or exclude any item of deduction from, taxable income for any taxable period (or portion thereof) ending after the Closing Date as a result of (i) a change made prior to the Closing in any method of accounting of an Acquired Entity during a taxable period ending on or prior to the Closing Date; (ii) an installment sale or open transaction disposition made by an Acquired Entity prior to the Closing; (iii) any prepaid amount received or deferred revenue accrued by an Acquired Entity prior to the Closing; (iv) a "closing agreement" as described in Section 7121 of the Code (or any similar provision of state, local or foreign Law) executed by an Acquired Entity prior to the Closing; or (v) any intercompany transactions or any excess loss account of an Acquired Entity described in Treasury Regulations Section 1.1502-19 (or any similar provision of state, local or foreign Law) existing prior to the Closing.

(n)     No Target Company has made an election under Section 965(h) of the Code.

(o)     None of the Target Companies has in the last two (2) years distributed stock of another Person, or has had its stock distributed by another Person, in a transaction that was purported or intended to be governed in whole or in part by Section 355 or Section 361 of the Code.

(p)     None of the Acquired Entities is a "controlled foreign corporation" within the meaning of Section 957 of the Code that holds any "United States property" within the meaning of Section 956 of the Code.

(q)     The most recent balance sheet reflects all liabilities for unpaid Taxes of the Target Companies for periods (or portions of periods) through the Balance Sheet Date. Since the Balance Sheet Date, none of the Target Companies has incurred any liability for Taxes outside the Ordinary Course of Business.

(r)     <u>VAT Matters</u>.

(i)     Each Group Company is registered for the purposes of VAT in its jurisdiction of incorporation only (if applicable) and is not registered or required to be registered for the purposes of VAT in any other jurisdiction.

(ii)     Each Group Company has made, given, obtained, and kept up to date, proper records, invoices and documents appropriate or required for the purposes of VAT and has preserved such records, invoices, and documents in such form and for such period as required for the purposes of VAT.

(iii)    Each Group Company is compliant in all material respects with applicable VAT legislation and in particular has filed all Tax Returns and made all payments of VAT on a timely basis.

(iv)    Except where credit or repayment of VAT incurred on items or services is mandatorily blocked under relevant legislation, each Target Company is not restricted to any extent from obtaining a credit or repayment from any input tax incurred by it.

(v)    Each Group Company is not and has not been treated as a member of a group for the purposes of any relevant enactment in relation to VAT, and has not applied for such treatment.

(vi)    All VAT, import duty and other taxes or charges of a similar nature payable by an Acquired Entity upon the supply, acquisition, use or importation of goods or services, and all excise or customs duties payable in respect of any assets (including trading stock) imported or owned by an Acquired Entity, have been paid in full.

Section 5.19    <u>Customers and Suppliers</u>.

(a)    <u>Schedule 5.19(a)</u> contains a true, correct and complete list of the 15 largest customers, including distributors, of the Business, taken as a whole, for the 12-month period ended December 31, 2023 (as determined on the basis of the total dollar amount of sales in respect of goods and services sold, in each case, a "***Material Customer***"), showing the total dollar amount of gross sales to each such Material Customer during such period.

(b)    <u>Schedule 5.19(b)</u> contains a true, correct and complete list of the 15 largest suppliers of the Business, taken as a whole, for the 12-month period ended December 31, 2023 (as determined on the basis of the total dollar amount of purchases made by the Target Companies, in each case, a "***Material Supplier***"), showing the total dollar amount of purchases by the Business from each such Material Supplier during such period.

(c)    Except as set forth on <u>Schedule 5.19(c)</u>, (i) there has not been an actual termination, cancellation, non-renewal or material reduction in volume with respect to the Business between the Business, on the one hand, and any Material Customer or Material Supplier (as measured by 2024 gross sales or 2024 total purchases), on the other hand, and (ii) no Material Customer or Material Supplier has given any member of the Target Group written notice that such Material Customer or Material Supplier, as applicable, intends to, or to the Knowledge of Seller, has otherwise threatened to, terminate its business with any Target Company or reduce or become unable for any reason to maintain the volume of business transacted with the Business in any material respect (as measured by 2024 gross sales or 2024 total purchases) (other than reductions in volume as contemplated by any Material Contract with such Material Customer or Material Supplier).

Section 5.20    <u>Warranties/Product Liability</u>.  Except as specifically reflected, reserved against or otherwise disclosed in the Financial Statements or incurred since the Balance Sheet Date and except as would not be reasonably be expected to be material to the Business, the Purchased Assets or the Assumed Liabilities, taken as a whole, (a) there is no Action by or before any

Governmental Authority relating to any Product, including the packaging and advertising related thereto, designed, formulated, manufactured, processed, sold or placed in the stream of commerce by the Business or any services provided by the Business, or claim or lawsuit involving a Product which is pending or, to the Knowledge of Sellers, threatened, by any Person, and (b) there has neither been, nor is there under consideration by the Business, any Product recall or post-sale warning of a material nature conducted by or on behalf of the Business concerning any Product. In the past three years, all Products materially complied and currently comply with applicable Governmental Approvals and Laws, and there have not been and there are no material defects or deficiencies in such Products.Confidentiality.  For the past three years, the Target Group has taken all steps reasonably necessary to preserve the confidential nature of all material confidential information (including any trade secrets and other proprietary information) with respect to the Business. Accounts Receivable. Since the Balance Sheet Date, the Target Group has not adversely modified payment terms for Accounts Receivable in such a manner as would reasonably be expected to result in an Accounts Receivable portfolio that, in amount or character, is materially and adversely different than that maintained by the Target Group in the Ordinary Course of Business.  To the Knowledge of Sellers, the Accounts Receivable of the Target Group in connection with the Business is, in the aggregate, collectible in full, net of any reserve therefor, in the Ordinary Course of Business.

Section 5.23   No Implied or Other Representations or Warranties.  IT IS THE INTENT OF EACH PARTY HERETO THAT SELLERS AND THEIR RESPECTIVE AFFILIATES ARE NOT MAKING ANY REPRESENTATION OR WARRANTY WHATSOEVER, EXPRESS OR IMPLIED, BEYOND THOSE EXPRESSLY GIVEN IN THIS ARTICLE V (AS QUALIFIED BY THE SELLER DISCLOSURE SCHEDULE), INCLUDING ANY IMPLIED WARRANTY OR REPRESENTATION AS TO CONDITION, MERCHANTABILITY, SUITABILITY OR FITNESS FOR A PARTICULAR PURPOSE AS TO ANY OF THE PURCHASED ASSETS. EXCEPT AS OTHERWISE EXPRESSLY SET FORTH IN THIS ARTICLE V, UPON THE CLOSING, PURCHASER IS ACQUIRING THE PURCHASED ASSETS ON AND "AS-IS, WHERE-IS" BASIS, AND PURCHASER ACKNOWLEDGES THAT IT IS RELYING SOLELY ON PURCHASER'S INVESTIGATION OF THE PURCHASED ASSETS.

## ARTICLE VI
## REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser hereby represents and warrants to Sellers, as of the date hereof and as of the Closing, as follows:

Section 6.1    Organization and Good Standing. Purchaser is a limited liability company, duly organized, validly existing and in good standing under the Laws of the State of Delaware.

Section 6.2    Power; Authority; Enforceability. Purchaser has all requisite limited liability company power and authority to execute and deliver this Agreement and each other agreement, document, instrument or certificate contemplated by this Agreement or to be executed by it in connection with the consummation of the transactions contemplated hereby and thereby (the "**Purchaser Documents**"), and to consummate the transactions contemplated hereby and thereby. The execution, delivery and performance by Purchaser of this Agreement and each Purchaser Document have been duly and validly authorized by all necessary limited liability

NAI-1540627251v4

4880-8016-9684, v. 2

company action on behalf of Purchaser necessary for it to validly execute and deliver, this Agreement and each Purchaser Document. This Agreement has been, and each Purchaser Document will be at or prior the Closing, duly and validly executed and delivered by Purchaser, and (assuming the due authorization, execution and delivery by the other parties hereto and thereto) this Agreement constitutes, and each Purchaser Document when so executed and delivered will constitute, the legal, valid and binding obligations of Purchaser, enforceable against Purchaser in accordance with their respective terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium and similar Laws affecting creditors' rights and remedies generally, and subject, as to enforceability, to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in a Legal Proceeding at law or in equity).

Section 6.3    Consents.

(a)    Purchaser is not required to obtain any consent, approval, authorization, waiver, Order or Permit of or from, or to make any declaration or filing with, or to give any notification to, any Person (including any Governmental Authority) in connection with the execution and delivery of this Agreement or Purchaser Documents by Purchaser, the compliance by Purchaser with any of the provisions hereof or thereof, the consummation of the transactions contemplated hereby or thereby or the taking by Purchaser of any other action contemplated hereby or thereby, except for (i) an Order from the Bankruptcy Court approving this Agreement and Transactions, (ii) approvals under applicable Laws, if any, and (iii) such other consents, waivers, approvals, Orders, Permits, authorizations, declarations, filings and notifications (A) that have already been obtained or made or (B) of which the failure to have obtained or made would not reasonably be expected to prevent or materially delay the ability of Purchaser to consummate the Transactions.

(b)    The execution and delivery by Purchaser of this Agreement or any of Purchaser Documents, the consummation of the Transactions by Purchaser, or compliance by Purchaser with any of the provisions hereof or thereof will not conflict with, or result in any violation of or a default (with or without notice or lapse of time, or both) under, or give rise to a right of termination or cancellation under any provision of, any Contract or Permit to which Purchaser is a party or by which any of the properties or assets of Purchaser are bound, other than any such conflicts, violations, defaults, terminations or cancellations that would not reasonably be expected to prevent or materially delay Purchaser's ability to consummate the Transactions.

Section 6.4    No Conflicts. No action taken by or on behalf of Purchaser in connection herewith, including the execution, delivery and performance of this Agreement, and each other agreement and document delivered by it in connection herewith, and consummation of the Transactions, (a) conflicts with or violates (i) any Law; (ii) Purchaser's Organizational Documents; or (iii) any Order to which Purchaser is subject; or (b) constitutes an event which, after notice or lapse of time or both, would result in any of the foregoing, except as would not, individually or in the aggregate, reasonably be expected to prevent or materially delay Purchaser's ability to consummate the Transactions.

Section 6.5    Litigation. There are no Legal Proceedings pending or, to the knowledge of Purchaser, threatened in writing against Purchaser, or to which Purchaser is otherwise a party

before any Governmental Authority, which, if adversely determined, would reasonably be expected to prevent or materially delay Purchaser's ability to consummate the Transactions. Purchaser is not subject to any Order of any Governmental Authority except to the extent the same would not reasonably be expected to prevent or materially delay Purchaser's ability to consummate the Transactions.

Section 6.6    <u>Brokers or Finders</u>. Purchaser has not entered into any agreement or arrangement to pay any commission, brokerage, finder's fee or other similar compensation arrangement or incurred any liability for any investment banking fees, financial advisory fees, brokerage fees, finders' fees or other similar fees in connection with this Agreement or the Transactions.

Section 6.7    <u>Financing; Qualification</u>. Purchaser has or will have as of the Closing Date adequate cash on hand, or immediately available to it, to enable it to fulfill its obligations under this Agreement.   Purchaser acknowledges and agrees that Purchaser's obligations under this agreement are not contingent on obtaining adequate financing.  Purchaser is and, as of the Closing, Purchaser shall be, capable of satisfying the conditions contained in sections 365(b)(1)(C) and 365(f)(2)(B) of the Bankruptcy Code with respect to the Assumed Contracts and the related Assumed Liabilities.   There exist no facts or circumstances that would cause, or be reasonably expected to cause, Purchaser or its Affiliates not to qualify as "good faith" purchasers under Section 363(m) of the Bankruptcy Code.  Purchaser has the authority to credit bid pursuant to section 363 of the Bankruptcy Code in order to pay the Credit Bid Amount portion of the Purchase Price.

Section 6.8    <u>Purchaser's Investigation</u>. Purchaser represents that it is a sophisticated entity that was advised by knowledgeable counsel and financial advisors and hereby acknowledges that it has conducted an investigation of the Purchased Assets.  Subject to the express terms and provisions of this Agreement, Purchaser acknowledges that it is accepting the Purchased Assets in their present condition and with their present operating capabilities.  Purchaser acknowledges that Sellers (and their Affiliates and Representatives) make no warranty, express or implied or written or oral, as to the condition of the Purchased Assets or as to the accuracy or completeness of any information regarding any Seller, any Acquired Entity, the Business, any Purchased Asset, any Retained Asset, any Assumed Liability, any Retained Liability or the Transactions, except as expressly set forth in <u>Article V</u> of this Agreement (as qualified by the Seller Disclosure Schedule).

Section 6.9    <u>No Implied or Other Representations or Warranties</u>. EXCEPT AS OTHERWISE EXPRESSLY SET FORTH IN THIS <u>ARTICLE VI</u>, IT IS THE INTENT OF EACH PARTY HERETO THAT PURCHASER IS NOT MAKING ANY REPRESENTATION OR WARRANTY WHATSOEVER, EXPRESS OR IMPLIED, BEYOND THOSE EXPRESSLY GIVEN IN THIS <u>ARTICLE VI</u>.

**ARTICLE VII**
**<u>CONDITIONS TO CLOSING</u>**

Section 7.1    <u>Conditions to Obligations of All Parties</u>.  The obligation of each Party to consummate the Transactions on the Closing Date is subject to the fulfillment on or prior to the Closing Date of the following conditions, any one or more of which may be waived by each Party:

NAI-1540627251v4

4880-8016-9684, v. 2

(a)    The Bankruptcy Court shall have entered the Bidding Procedures Order.

(b)    The Bankruptcy Court shall have entered the Sale Order, and such order shall have become a Final Order in full force and effect and shall not have been stayed or vacated.

(c)    There shall be no Law or Order of any nature which is in effect and has the effect of making the transactions contemplated by this Agreement illegal or otherwise restraining, preventing or prohibiting the consummation of such transactions (a "***Restraint***").

(d)    [All required consents and approvals under the Antitrust Laws shall have been obtained.]

(e)    This Agreement and each other Transaction Document shall remain in full force and effect.

Section 7.2    <u>Conditions to Purchaser's Obligations</u>. The obligation of Purchaser to consummate the Transactions on the Closing Date is subject to the fulfillment on or prior to the Closing Date of the following conditions, any one or more of which may be waived (to the extent waivable) by Purchaser:

(a)    Each of the representations and warranties of Sellers (i) contained in <u>Article V</u> (other than <u>Section 5.1</u>, <u>Section 5.2</u>, the penultimate sentence of <u>Section 5.3(a)</u>, <u>Section 5.4(a)</u> and <u>Section 5.17</u>) shall be true and correct as of the date hereof and as of the Closing Date as if made on and as of the date hereof and the Closing Date (or to the extent such representations and warranties speak to an earlier date or period, such representations and warranties shall be true and correct in all respects as of such earlier date or with respect to such earlier period), except for those breaches, if any, of such representations and warranties that would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, and (ii) contained in <u>Section 5.1</u>, <u>Section 5.2</u>, the penultimate sentence of <u>Section 5.3(a)</u>, <u>Section 5.4(a)</u> and <u>Section 5.17</u> shall be true and correct in all respects as of the date hereof and as of the Closing Date as if made on and as of the date hereof and the Closing Date (or to the extent such representations and warranties speak to an earlier date or period, such representations and warranties shall be true and correct in all respects as of such earlier date or with respect to such earlier period), but disregarding all qualifications or limitations as to "materiality" or "material adverse effect" and words of similar import set forth therein for the purposes of this clause (a)(ii) and, solely with respect to the second sentence of <u>Section 5.1(b)</u>, except for failures to be true or correct that are, individually or in the aggregate, *de minimis* in nature.

(b)    Sellers shall have performed and complied in all material respects with all of the covenants and agreements required by this Agreement to be performed or complied with by Sellers on or prior to the Closing Date.

(c)    There shall not have been any Material Adverse Effect.

(d)    [The Sellers shall have either consummated a sale transaction of all of the issued and outstanding equity interests of the Excluded Entities or otherwise caused the business and operations of the Excluded Entities to be wound down prior to the Closing Date, including

(with the mutual agreement of Sellers and Purchaser) through insolvency proceedings in such applicable jurisdiction.]

(e)    Each Seller shall have delivered, or caused to be delivered, to Purchaser the following documents, duly executed by such Seller (where appropriate) and in form and substance reasonably satisfactory to Purchaser:

(i)    A duly executed counterpart of each Bill of Sale and Assignment and Assumption Agreement;

(ii)    A duly executed counterpart of the IP Assignment Agreement;

(iii)    A duly executed counterpart of each Local Transfer Instrument, reasonably requested by Purchaser;

(iv)    A certificate, dated as of the Closing Date and signed by an authorized officer of the Seller Representative, certifying that the conditions contained in Sections 7.2(a), Section 7.2(b) and Section 7.2(c) have been satisfied;

(v)    A copy of the Sale Order;

(vi)    A duly executed counterpart of the Escrow Agreement; and

(vii)    Ownership and possession of each Owned Real Property, evidenced by duly executed special warranty deeds (collectively, the "***Deeds***") for each Owned Real Property conveying fee simple title in such Owned Real Property to Purchaser, subject only to Permitted Liens.

(f)    No Event of Default (as defined in the DIP Facility or the DIP Order, respectively) under the DIP Facility or the DIP Order shall have occurred thereunder which has not been waived.

(g)    The Challenge Deadline (as defined in the DIP Order) shall have expired with no Challenges (as defined in the DIP Order) having been asserted in a pleading seeking standing to pursue a Challenge or otherwise against the Pre-petition Secured Parties by any party in interest in the Bankruptcy Cases.

Section 7.3    Conditions to Sellers' Obligations. The obligation of each Seller to consummate the Transactions on the Closing Date is subject to the fulfillment on or prior to the Closing Date of the following conditions, any one or more of which may be waived (to the extent waivable) by the Seller Representative:

(a)    Each of the representations and warranties of Purchaser contained in this Agreement or the Transaction Documents shall be true and correct in all material respects as of the date hereof and as of the Closing Date as if made on and as of the date hereof and the Closing Date (or to the extent such representations and warranties speak to an earlier date or period, such representations and warranties shall be true and correct in all material respects as of such earlier

date or as to such earlier period), but disregarding all qualifications or limitations as to "materiality" or "material adverse effect" and words of similar import set forth therein.

(b)     Purchaser shall have performed and complied in all material respects with all of the covenants and agreements required by this Agreement to be performed or complied with by Purchaser on or prior to the Closing Date.

(c)     Purchaser shall deliver a payoff letter, release letter or other similar document acknowledging the conversion of the Credit Bid Amount as consideration for the transfer of the Purchased Assets.

(d)     Purchaser shall have delivered, or caused to be delivered, a writing acknowledging the conversion of the Credit Bid Amount and the satisfaction of the DIP Obligations and the Pre-petition Credit Bid Amount.

(e)     Purchaser shall have delivered, or cause to be delivered, to the Escrow Agent, (i) the Cash Shortfall, to be deposited and held in the Cash Shortfall Escrow Account by the Escrow Agent in accordance with the Escrow Agreement; *provided*, that any unused portion of the Cash Shortfall that is not utilized by Sellers in accordance with the Cash Shortfall Budget shall be returned to Purchaser in accordance with the Escrow Agreement, and (ii) the Wind-Down Funds, to be deposited and held in the Wind-Down Escrow Account by the Escrow Agent in accordance with the Escrow Agreement; *provided*, that any unused portion of the Wind-Down Funds which is not utilized by Sellers to pay wind-down expenses in accordance with the Escrow Agreement shall be returned to Purchaser in accordance with the Escrow Agreement.

(f)     Purchaser shall have delivered to, or caused to be delivered, to the Seller Representative the following documents, duly executed by Purchaser (where appropriate):

(i)     A duly executed counterpart of each Bill of Sale and Assignment and Assumption Agreement;

(ii)     A duly executed counterpart of the IP Assignment Agreement;

(iii)     A certificate, dated as of the Closing Date and signed by an authorized officer of Purchaser, certifying that the conditions contained in Section 7.3(a) and Section 7.3(b) have been satisfied; and

(iv)     A duly executed counterpart of the Escrow Agreement.

## ARTICLE VIII
## COVENANTS

Section 8.1     Conduct of the Business.

(a)     From the date hereof until the earlier of the termination of this Agreement pursuant to Section 9.2 and the Closing Date, except (i) as required to comply with any applicable Laws (including by Order or directive of the Bankruptcy Court or fiduciary duty of boards of managers (or similar governing bodies) of the Target Group) or any requirements or limitations

resulting from the Bankruptcy Cases, or (ii) as contemplated by this Agreement (including as restricted pursuant to Section 8.1(b)) or with the prior written consent (email to suffice) of Purchaser which such consent shall not be unreasonably withheld, conditioned or delayed, Sellers agree to: (A) use commercially reasonable efforts to conduct the Business (including the operation thereof) in the Ordinary Course of Business; (B) use commercially reasonable efforts to preserve the goodwill and present business relationships (contractual or otherwise) with all customers, suppliers, resellers, employees, licensors, distributors and others having business relationships with the Business; (C) use commercially reasonable efforts to keep available the services of the Business' current officers, directors, employees and consultants; (D) use commercially reasonable efforts to preserve and maintain (consistent with past practice) in all material respects the Business' present properties and its tangible and intangible assets (including all of the Purchased Assets); (E) comply in all material respects with all applicable Laws and use commercially reasonable efforts to company in all material respects with all Material Contracts; (F) with respect to the Business, the Purchased Assets or the Acquired Entities (subject to the amendment of Schedule 1.1(a) as contemplated by Section 2.1(b)), subject to funds available pursuant to the Approved Budget, pay all Taxes as such Taxes become due and payable; (G) maintain all existing Permits, except where the failure to do so would not be reasonably be expected to be material to the Business, the Purchased Assets or the Assumed Liabilities; and (H) maintain in all material respects their books, accounts and records in the Ordinary Course of Business.

(b)     From the date hereof until the earlier of the termination of this Agreement pursuant to Section 9.2 and the Closing Date, except (i) as required by applicable Laws (including by order or directive of the Bankruptcy Court or fiduciary duties of the boards of directors (or similar governing bodies) of the Target Companies or any requirements or limitations resulting from the Bankruptcy Cases) or (ii) as contemplated by this Agreement or with the prior written consent of Purchaser, Sellers will not:

(i)     acquire a material amount of assets from (or the equity interests of) any other Person, or sell, lease, license, transfer, encumber or otherwise dispose of any Purchased Assets (other than sales of Inventory in the Ordinary Course of Business);

(ii)     solely with respect to the Acquired Entities, (i) issue, grant, deliver or sell, or authorize the issuance, delivery or sale of, any equity interests or rights (which term, for purposes of this Agreement, will be deemed to include "phantom" stock or other commitments that provide any right to receive value or benefits similar to such equity interest, securities or other rights and any awards that may be granted) in any Acquired Entity, (ii) amend any term of any equity interest or such securities or rights of any Acquired Subsidiary or (iii) enter into any Contract, understanding or arrangement with respect to the sale, voting, pledge, encumbrance, disposition, acquisition, transfer, registration or repurchase of their equity interests or such securities or other rights;

(iii)     modify, amend, supplement or terminate any Material Contract;

(iv)     enter into any new Contract for the sale of goods or services relating to the USACH, Hardinge Super Precision or Ohio Tool Works businesses that provides for payments to the Business involving aggregate consideration in excess of $200,000 per annum;

- 60 -

(v)     fail to maintain and keep in full force and effect all existing insurance policies for the benefit of the Business or the Purchased Assets (including the Insurance Policies), other than such insurance policies that expire by their terms (in which event Sellers shall use commercially reasonable efforts to renew or replace such insurance policies) or changes to such insurance policies made in the Ordinary Course of Business, or fail to report known claims to any insurance carrier in a timely manner;

(vi)     except to the extent required by the terms of the applicable Seller Plan as in effect on the date hereof (excluding any discretionary actions permitted under any Seller Plan), (i) increase the salary, bonus, incentive pay, profit sharing, retirement, insurance, severance or other benefits or compensation arrangements of any officer, employee, individual independent contractor or other individual service provider (including "alter ego" entity independent contractors or service providers); (ii) adopt, enter into, amend or terminate any Seller Plan (including any employee benefit plan or arrangement which would be a Seller Plan if entered into as of the date hereof); (iii) exercise any discretion to accelerate the vesting or payment of any compensation or benefit under any Seller Plan; (iv) grant any loan to any officer, employee, individual independent contractor or other individual service provider (including "alter ego" entity independent contractors or service providers); (v) grant any severance, change of control, retention, termination or similar compensation or benefits to any officer, employee, individual independent contractor or other individual service provider (including "alter ego" entity independent contractors or service providers); (vi) pay to any employee or other individual service provider (including "alter ego" entity independent contractors or service providers) any benefit or amount not required under any Seller Plan as in effect on the date of this Agreement; (vii) hire any officer, employee, or individual independent contractor (including "alter ego" independent contractors or service providers) receiving annualized total compensation of $[150,000] or more, (viii) transfer the employment of any employee from a status in which such employee would have been a Business Employee or Acquired Entity Employee to a status in which such employee will not be a Business Employee or Acquired Entity Employee, as applicable; or (ix) transfer the employment of any employee from a status in which such employee would not have been a Business Employee or Acquired Entity Employee to a status in which such employee will be a Business Employee or Acquired Entity Employee, as applicable;

(vii)     unless required by Law, (A) enter into any collective bargaining agreement, neutrality agreement, voluntary recognition agreement, letter of agreement, memorandum of understanding or other similar labor agreement with any labor organization; or (B) recognize or certify any labor organization or employee representative as the collective bargaining representative of any Business Employees or Acquired Entity Employees;

(viii)     enter into any settlement agreement with any current or former director, officer or employee;

(ix)     make, revoke or change any material Tax election, file any amended Tax Return, change a taxable year or revoke or change any material Tax accounting method, enter into any closing agreement within the meaning of Section 7121 of the Code,

- 61 -

request any Tax ruling with or from a Governmental Authority, surrender any right to claim a material Tax refund, offset or other reduction in Tax liability, consent to any extension or waiver of limitations period applicable to any material Tax claim or assessment, or settle any Tax Proceeding, or permit any of their respective Affiliates to take any of the foregoing actions;

(x)    change any financial accounting policies or procedures or any methods of reporting income, deductions or other material items for financial accounting purposes, except as required by GAAP or applicable Law;

(xi)    adopt any amendments to the Organizational Documents of any Seller;

(xii)    form any new subsidiary of any Seller;

(xiii)    waive, release, assign, settle or compromise any material pending or threatened Legal Proceeding;

(xiv)    demolish or remove any Improvement on the Owned Real Property or Leased Real Property or erect Improvements on the Owned Real Property or Leased Real Property or any portion thereof;

(xv)    make or enter into any new commitment for loans or capital expenditures (except as permitted pursuant to the DIP Facility);

(xvi)    accelerate the delivery or sale of Products or offer discounts on the sale of Products or premium on purchase of raw materials, except in the Ordinary Course of Business;

(xvii)    (A) transfer, abandon, allow to expire or lapse or permit to fall into the public domain (including pursuant to an Open Source license) any Owned IP, or (B) sell, share or disclose any Trade Secrets included in the Owned IP without appropriate confidentiality or non-disclosure arrangements, (C) enter into any Contract regarding the license, sublicense, agreement or permission to use any Owned IP, other than non-exclusive license agreements in the Ordinary Course of Business and, in each case of (A), (B) or (C), agree to do any of the foregoing; or

(xviii)    agree or commit in writing to do any of the foregoing.

Section 8.2    Access; Acknowledgments.

(a)    From the date hereof until the earlier of the termination of this Agreement in accordance with its terms or the Closing, and as reasonably required following the Closing Date (*provided*, that the foregoing shall not restrict or limit wind-down of Sellers following the Closing Date), Sellers shall provide Purchaser and its Representatives reasonable access, during normal business hours upon reasonable advance notice of not less than forty-eight (48) hours before the requested date of access, to the Company Group's personnel and facilities, and to all books and records, Contracts, and such other information and Persons relating to the Business and the

Company Group as Purchaser may reasonably request in such a manner as not to unreasonably interfere with the conduct of the Business. Notwithstanding anything to the contrary in this Agreement, Sellers shall not be required to disclose any information to Purchaser if such disclosure would (x) jeopardize any attorney-client or other legal privilege or (y) contravene any applicable Law or fiduciary duty; *provided*, *however*, Sellers shall use their commercially reasonable efforts to provide a summary of such privileged information to the extent it would not violate any such privilege, applicable Law or fiduciary duty. The information provided pursuant to <u>Section 8.2</u> will be used solely for the purpose of consummating the Transactions (including in respect of transitional matters), and will be governed by all the terms and conditions of Section 11.25 of the Pre-petition Credit Agreement.

(b)    None of Sellers of their Affiliates makes any representation or warranty as to the accuracy of any information, if any, provided pursuant to this <u>Section 8.2</u>, and Purchaser may not rely on the accuracy of any such information, in each case, other than as expressly set forth in <u>Article IV</u> (as qualified by the Seller Disclosure Schedule). Purchaser, on its own behalf and on behalf of its Affiliates, acknowledges and agrees that it and its Affiliates have received from Sellers (and their Affiliates and Representatives) certain projections, forward-looking statements, forecasts, and prospective or third-party information relating to Sellers, the Acquired Entities, the Business, the Purchased Assets and the Assumed Liabilities (whether in written, electronic, or oral form) (collectively, "***Projections***"). Purchaser, on behalf of itself and its Affiliates, acknowledges that (i) such Projections are being provided solely for the convenience of Purchaser and its Affiliates to facilitate their own independent investigation; (ii) there are uncertainties inherent in attempting to make such Projections; (iii) Purchaser and its Affiliates are familiar with such uncertainties and are taking responsibility for making their own evaluation of the adequacy and accuracy of all such Projections (including the reasonableness of the assumptions underlying such Projections); and (iv) none of the Sellers nor any other Person makes any representations or warranties with respect to such Projections. Purchaser, on its own behalf and on behalf of its Affiliates, hereby disclaims reliance on any such Projections.

Section 8.3    <u>Bankruptcy Court Matters</u>.

(a)    <u>Bankruptcy Court Filings</u>.

(i)    <u>Sale Order, Bidding Procedures Order and Bankruptcy Court Milestones</u>. Sellers shall (A) seek entry of the Sale Order, the Bidding Procedures Order, and any other necessary orders by the Bankruptcy Court to consummate the Transactions as soon as reasonably practicable following the execution of this Agreement and (B) comply with all Milestones (as defined in the DIP Orders) set forth in the DIP Orders. Purchaser and Sellers understand and agree that the Transactions are subject to approval by the Bankruptcy Court. Purchaser agrees that it will promptly take such actions as are reasonably requested by the Seller Representative to assist in obtaining entry of the Sale Order and Bidding Procedures Order. In the event the entry of the Sale Order or the Bidding Procedures Order shall be appealed or otherwise challenged, Sellers shall use best efforts to defend such appeal or other challenge.

(ii)    Sellers shall file such motions or pleadings as may be appropriate or necessary to: (A) assume and assign the Assumed Contracts, and (B) determine the amount

of the Cure Costs; *provided* that nothing herein shall preclude Sellers, subject to Purchaser's prior written consent, from filing such motions to reject any Contracts or Real Property Leases that are not listed on Schedule 2.1(a)(v) as of the Designation Deadline or that have been designated for rejection by Purchaser.

(iii)    Sellers shall (A) cooperate with Purchaser concerning the Bidding Procedures Order, the Sale Order and any other orders of the Bankruptcy Court relating to the transactions contemplated by this Agreement, and (B) use commercially reasonable efforts to provide Purchaser with copies of all applications, pleadings, notices, proposed orders and other documents relating to this Agreement or the Transactions, at least three (3) Business Days in advance of the proposed filing date so as to permit Purchaser sufficient time to review and comment on such drafts and, with respect to all provisions that impact Purchaser or relate to the Transactions, such pleadings and proposed orders shall be in form and substance acceptable to Purchaser and consistent with this Agreement. The Seller Representative shall give Purchaser reasonable advance notice of any hearings regarding the motions required to obtain the issuance of the Bidding Procedures Order and the Sale Order.

(b)    Within [one] day following the Petition Date, Sellers shall file with the Bankruptcy Court the Sale Motion together with a substantially final form of this Agreement. Sellers shall promptly serve true and correct copies of all applicable pleadings and notices in accordance with the Bidding Procedures Order, the Bankruptcy Code and any other applicable order of the Bankruptcy Court.

Section 8.4    Employee Matters.

(a)    Seller Employees.  By no later than the date that is five Business Days prior to the Closing Date, Purchaser shall deliver a list of all Business Employees to whom Purchaser intends, in its sole and absolute discretion, to make a written offer of at-will employment no later than two (2) Business Days prior to the Closing, that is effective as of and contingent upon the Closing and that provides for employment with Purchaser or an Affiliate or designee thereof commencing as of the Closing.  Each Business Employee who receives an offer of employment from Purchaser and then performs services for Purchaser following the Closing will become a "Transferred Employee" as of the Closing Date.  Subject to applicable Law, any Business Employee who has received an offer of employment pursuant to this Section 8.4 shall be deemed to have accepted such offer if they continue to perform services following the Closing, unless such Business Employee expressly rejects such offer of employment.  [Purchaser agrees to include in the documentation pertaining to the offer of employment or engagement to any Business Employee to whom it extends an offer of employment (i) a waiver and release, in favor of Sellers, Purchaser, and all of their respective Affiliates, by such Business Employee, of any right to severance, separation pay, payment of paid time off by Sellers, or other payments or benefits, on account of their separation of employment or engagement with Sellers and acceptance of employment or engagement with Purchaser, in each case to the extent capable of being waived or released pursuant to applicable Law, and [(ii) confirmation that Accrued PTO will be credited or accrued, in each case to the extent allowable under applicable Law, with Purchaser or its Affiliates as of the date of termination from Sellers.]  Sellers will use commercially reasonable efforts to cooperate with any reasonable requests by Purchaser in order to facilitate the offers of employment and delivery of

such offers.  Purchaser shall have no obligations, liabilities, or responsibilities with respect to any Business Employees who do not become Transferred Employees, and Purchaser shall not be required to maintain any minimum benefit or compensation levels or prevent any change in the employee benefits provided to any Transferred Employees, except as required by Law.

(b)    [Acquired Entity Employees.  Without limiting the generality of Section 8.8, prior to the Closing, the Parties shall, and shall cause the applicable Acquired Entities (subject to the amendment of Schedule 1.1(a) as contemplated by Section 2.1(b)) to, take all actions reasonably necessary under applicable Law with respect to the effects of the consummation of the Transactions on the Acquired Entity Employees.  The Parties will reasonably cooperate with respect to any such actions, *provided* that, without the prior written consent of Purchaser, Sellers shall not, and shall not permit any Acquired Entity (subject to the amendment of Schedule 1.1(a) as contemplated by Section 2.1(b) and to the actions permitted by Section 8.1(b)(vi) hereof) to, enter into any contract, commitment, arrangement or understanding related to the Acquired Entity Employees that is or may become binding on any Person.]

(c)    Certain Employee Liabilities.  Except as otherwise set forth in Section 3.1(a) of the Agreement, Purchaser shall have no liability whatsoever for, and Sellers shall retain and hold Purchaser harmless and indemnify Purchaser with respect to, any and all liabilities (including statutory or contractual severance benefits) with respect to, (i) any compensation or other obligations owing or purported to be owing to any current or former Business Employee or other service provider by any Target Company, including any severance (including statutory or contractual severance benefits), separation pay, change of control payments or benefits, retention payments, unless otherwise set forth in Section 8.4(f), payment of accrued but unused vacation, leave, illness, or other time off or any other payments or benefits arising in connection with the termination of such employee's employment by or such service provider's services to any Company Group member or any of their respective Affiliates whether, occurring or arising prior to, on or after the Closing (except with respect any such liability relating to any Transferred Employees arising after the Closing), or [(ii) any cause of action under the WARN Act by any past or present Business Employee or other employee or service provider (whether or not a Transferred Employee, but excluding any Acquired Entity Employee) in connection with such employee's employment with or such service provider's services to any Target Company or any of their respective Affiliates (or any other "employment loss" or similar action identified in the WARN Act).] As soon as reasonably practicable following Purchaser's request, and in any event no later than the Closing Date, the Seller Representative shall provide Purchaser with a written schedule of each "employment loss" (as defined in the WARN Act) occurring prior to Closing experienced by any Business Employee or Acquired Entity Employee during the ninety (90) day period prior to the Closing Date (including the location of employment of such employee, and the reason for the employment loss) and such other information as Purchaser may reasonably request to determine whether any actions taken by Sellers prior to, upon or after the Closing Date, or any actions taken by Purchaser upon or after the Closing Date, is reasonably likely to require the delivery of notice or payment in lieu of notice (under the WARN Act, or otherwise) to any individuals. Except as provided below, (x) Sellers shall be responsible for any liabilities under the WARN Act with respect to any current or former Business Employee, any current or former Acquired Entity Employee, or other current or former employee or service provider, resulting from any actions, failures to act or facts or circumstances arising prior to or on the Closing Date, and (y) Purchaser shall be responsible for any liabilities under the WARN Act with respect to

- 65 -

Transferred Employees and Acquired Entity Employees resulting from any actions, failures to act or facts or circumstances arising either (i) in the case of Transferred Employees, after such individuals are hired by Purchaser, or (ii) in the case of Acquired Entity Employees, after both the consummation of the Closing and the conclusion of any employment-related processes under local Law related the Transactions.  Notwithstanding the foregoing, or anything else in this Agreement, if Purchaser fails to make offers of employment to, or makes offers of employment that constitute an employment loss to, any number of Business Employees that, if terminated by Sellers upon the Closing, would trigger any obligations or liabilities under the WARN Act, then Purchaser shall be solely liable for any such obligations of liabilities.

(d)    Post-Closing COBRA Liability.  Purchaser or one of its Affiliates shall be responsible for satisfying the continuation coverage requirements of COBRA for all individuals who are M&A qualified beneficiaries (as such term is defined in Treasury Regulation Section 54.4980B-9, Q&A-4(a)) with respect to the transactions contemplated by this Agreement ("*Post-Closing COBRA Liability*"); provided that Sellers shall make available to Purchaser all applicable personnel records and personnel files and such other information as Purchaser may reasonably request in order to satisfy its obligations under this Section 8.4(d), to the extent compliant with applicable Laws.

(e)    [Withholding.  Sellers and Purchaser hereby agree to follow the "alternate procedure" for U.S. federal employment tax reporting as provided in Section 5 of Rev. Proc. 2004-53, 2004-34 I.R.B. 320 for each applicable U.S. Transferred Employee and to cooperate with each other in furtherance thereof, including Sellers timely providing to Purchaser all relevant information, including a Form W-4 for each U.S. Transferred Employee.  Purchaser (and not Seller) shall furnish a Form W-2 to each U.S. Transferred Employee, disclosing all wages and other compensation paid for such calendar year, and taxes withheld therefrom.]

(f)    [Reserved.]

(g)    Assignment of Plans.  The Parties shall reasonably cooperate in good faith to assign to Purchaser all Assumed Seller Plans, including all related pre-payments, deposits, contributions, premium payments, and refunds thereunder and any assets, insurance Contracts, service provider Contracts and trusts maintained or entered pursuant thereto or in connection therewith, in each case effective as of the Closing.  If Purchaser's assumption of one or more Assumed Seller Plans is not practicable, the Parties shall reasonably cooperate in good faith to permit the transfer of the applicable assets of the applicable Seller Plan(s) related to the Transferred Employees to the corresponding Purchaser employee benefit plan(s) in accordance with the intent of this Agreement.  The Parties shall reasonably cooperate in good faith to enter into such amendments to this Agreement as are necessary to effectuate the actions contemplated pursuant to this Section 8.4(g).

(h)    Cooperation.  Following the date of this Agreement, Sellers and Purchaser shall reasonably cooperate in good faith in all matters reasonably necessary to effect the transactions contemplated by this Section 8.4, including (i) exchanging information and data relating to workers' compensation, employee benefits and employee benefit plan coverages and any information that is reasonably necessary to effect their respective Tax withholding, accounting and reporting obligations under applicable Law, (ii) in obtaining any Governmental Approvals

required hereunder, (iii) in responding to reasonable questions posed by employees, labor unions, employee representatives or any other persons or entities, (iv) providing offers of employment to the Business Employees, and (v) transferring to Purchaser, no later than the Closing Date, all employee records, including all current employment eligibility verification form and related records, documents and papers, of the Transferred Employees to the extent permitted under applicable Law.

(i)    <u>Communications</u>.  The Parties shall reasonably cooperate in good faith with respect to any communications to Business Employees and Acquired Entity Employees regarding the Transactions.  Sellers will provide Purchaser with a reasonable opportunity to review and comment on any communications regarding the Transactions and future employment intended for the Business Employees or Acquired Entity Employees that it sends to Business Employees or Acquired Entity Employees prior to the Closing Date.

(j)    <u>No-Third Party Beneficiaries</u>.  The Parties acknowledge and agree that all provisions contained in this <u>Section 8.4</u> are included for the sole benefit of the parties to this Agreement, and that nothing in this Agreement, whether express or implied, shall create any third party beneficiary or other rights (i) in any other Person, including any employee or service provider or former employee or service provider of Sellers (including the Business Employees and Acquired Entity Employees), any participant in any employee benefit plan maintained by any of the Parties, or any dependent or beneficiary thereof, or (ii) to continued employment with any of the Parties or any of their respective Affiliates.  Nothing in this Agreement shall affect the right of the Parties or any of their respective Affiliates to terminate the employment of its employees.  Nothing contained in this <u>Section 8.4</u> is intended to be or shall be considered to be an amendment or adoption of any Seller Plan or any other plan, program, Contract, arrangement or policy of the Parties or any of their respective Affiliates.  In addition, nothing contained in this <u>Section 8.4 </u>shall interfere with the Parties' or any of their respective Affiliates' right to amend, modify or terminate any Seller Plan or any other plan, program, Contract, arrangement or policy of the Parties or any of their respective Affiliates in accordance with its provisions or to employ or terminate the employment of any employee any Group Company (including the Business Employees and Acquired Entity Employees).

Section 8.5    <u>Publicity</u>.  From the date hereof until the earlier of the termination of this Agreement in accordance with its terms or the Closing, no Party shall make any public announcements in respect of this Agreement or the Transactions or otherwise communicate with any news media without the prior written consent of Purchaser (with respect to any Seller) and the Seller Representative (with respect to Purchaser), which consent shall not be unreasonably withheld or delayed; <u>provided</u>, that the foregoing shall not include or apply to any announcements, filings or other communications required in connection with the Bankruptcy Cases or otherwise pursuant to Law.  Nothing herein shall prevent any Party or any Affiliate thereof which is a private equity or other investment fund from making customary disclosures on a confidential basis to its existing or prospective investors, managers, members, directors, officers, financing sources, direct and indirect partners and agents in connection with fundraising, marketing informational or reporting activities.  The Parties and any of their respective Affiliates or successors may also issue press releases or make web postings or other public announcements that include only such information that was previously included in any press release or announcement made in accordance with the first sentence of this <u>Section 8.5</u>.

NAI-1540627251v4

4880-8016-9684, v. 2

Section 8.6    Assignment of Purchased Assets Subject to Consent Requirements. Notwithstanding any other provision of this Agreement to the contrary, this Agreement will not constitute an agreement to assign or transfer and will not implement the assignment or transfer of any Purchased Asset if (a) an attempted assignment or transfer thereof, without the approval, authorization or consent of, or granting or issuance of any license or Permit by, any third party thereto (each such action, a "***Necessary Consent***"), would constitute a breach thereof or of any applicable Law or Order or in any way adversely affect the rights of Purchaser thereunder, (b) such Necessary Consent has not been obtained and (c) the Bankruptcy Court has not entered an Order providing that such Necessary Consent is not required.  In such event, subject to the terms and conditions hereof, the Closing will proceed with respect to the remaining Purchased Assets, and there will be no reduction in the Purchase Price as a result thereof (and neither Party will be in breach of this Agreement as a result thereof), and, for a period of six months after the Closing Date (or such shorter period of time as necessary to wind-down Sellers), (i) Sellers and Purchaser will use their respective commercially reasonable efforts to obtain the Necessary Consents with respect to any such Purchased Asset or any claim or right or any benefit arising thereunder for the assignment or transfer thereof to Purchaser as Purchaser may reasonably request; *provided* that Sellers will not be obligated to pay any consideration or grant any accommodation therefor to any third party from whom consent or approval is requested or to initiate any Legal Proceedings to obtain any such consent or approval, and (ii) Sellers and Purchaser will cooperate in a mutually agreeable arrangement, to the extent feasible and without the need for any Necessary Consent, under which Purchaser would obtain the benefits and assume the obligations under such Purchased Assets in accordance with this Agreement, including subcontracting, sub-licensing or sub-leasing to Purchaser, or under which the Sellers would enforce their rights thereunder for the benefit of Purchaser with Purchaser assuming each applicable Sellers' obligations thereunder.

Section 8.7    Further Assurances; Wrong Pockets.

(a)    Subject to the terms and conditions of this Agreement, the Bankruptcy Code and any Orders of the Bankruptcy Court, each Seller agrees that it will use commercially reasonable efforts to take, or cause to be taken, all reasonable actions and to do, or cause to be done, and cooperate with each other with respect to all things necessary or desirable under applicable Laws to consummate the Transactions.  Each Seller agrees to execute and deliver, or cause to be executed and delivered, to Purchaser such other instruments of conveyance and transfer, and to take all such further acts as may be reasonably required to further transfer and assign to Purchaser all of the Purchased Assets, and to vest in Purchaser good and marketable title to each of the Purchased Assets.

(b)    Subject to the terms and conditions of this Agreement, the Bankruptcy Code and any Orders of the Bankruptcy Court, Purchaser agrees that it will use commercially reasonable efforts to take, or cause to be taken, all reasonable actions and to do, or cause to be done, and cooperate with each other with respect to all things necessary or desirable under applicable Laws to consummate the Transactions.  Each Seller agrees to execute and deliver, or cause to be executed and delivered, to Purchaser such other instruments of conveyance and transfer, and to take all such further acts as may be reasonably required to cause Purchaser to assume the Assumed Liabilities in accordance with this Agreement and as may otherwise be appropriate to carry out the transactions contemplated by this Agreement.

NAI-1540627251v4

4880-8016-9684, v. 2

(c)     Following the Closing, if the Parties determine that any assets, rights, or properties that properly constitute Purchased Assets were not transferred to Purchaser at the Closing, Sellers shall promptly convey, transfer and deliver (or cause to be conveyed, transferred and delivered) such assets, rights or properties to Purchaser without the payment of any further consideration therefor.  Following the Closing, if the Parties determine that any assets, rights, or properties that properly constitute Retained Assets were not retained by Sellers at the Closing, Purchaser shall promptly convey, transfer, and deliver (or cause to be conveyed, transferred, and delivered) such assets, rights or properties to Sellers without the payment of any further consideration therefor.  Following the Closing, should any funds or property be paid or delivered to Purchaser comprising Retained Assets, Purchaser shall promptly pay and deliver the same to Sellers.  Following the Closing, should any funds or property be paid or delivered to Sellers comprising Purchased Assets, Sellers shall promptly pay and deliver the same to Purchaser.

(d)     Following the Closing, if the Parties determine that any liabilities that properly constitute Assumed Liabilities were not transferred to Purchaser at the Closing, Sellers shall promptly convey, transfer, and deliver (or cause to be conveyed, transferred, and delivered) such liabilities to Purchaser without the payment of any further consideration therefor.  Following the Closing, if the Parties determine that any liabilities that properly constitute Retained Liabilities were not retained by Sellers at the Closing, Purchaser shall promptly convey, transfer, and deliver (or cause to be conveyed, transferred, and delivered) such Liabilities to Sellers without the payment of any further consideration therefor.

(e)     The obligations of the Sellers pursuant to this <u>Section 8.7</u> and pursuant <u>Section 8.8</u> below shall be subject to any Orders entered, or approvals or authorizations granted or required, by or under the Bankruptcy Court or the Bankruptcy Code (including in connection with the Bankruptcy Cases), the DIP Facility, and each of Sellers' obligations as a debtor-in-possession to comply with any Order of the Bankruptcy Court (including the Bidding Procedures Order and the Sale Order) and Sellers' duty to seek and obtain the highest or otherwise best price for the Purchased Assets as required by the Bankruptcy Code.

Section 8.8     <u>Approvals</u>.  From the date hereof until the earlier of the termination of this Agreement in accordance with its terms or the Closing:

(a)     [Sellers and Purchaser shall cooperate with one another in good faith (i) in determining whether any action by or in respect of, or filing with, any Governmental Authority is required, or any actions, consents, approvals or waivers are required to be obtained from parties to any Transferred Intellectual Property Rights included in the Purchased Assets, in connection with the Transaction and (ii) in taking such actions or making any such filings, furnishing information required in connection therewith and seeking timely to obtain any such actions, consents, approvals or waivers. Each Party shall, as promptly as reasonably practicable, (A) make, or cause or to be made, all filings and submissions required under any Law applicable to such Party or any of its Affiliates for the consummation of the transactions contemplated by this Agreement; and (B) use commercially reasonable efforts to obtain, or cause to be obtained, all consents, authorizations, Orders and approvals from all Governmental Authorities that may be or become necessary for its execution and delivery of this Agreement and the performance of its obligations pursuant to this Agreement.

NAI-1540627251v4

4880-8016-9684, v. 2

(b)     Further, and without limiting the foregoing, the Target Group, Purchaser and Purchaser's Affiliates shall cooperate and use reasonable best efforts to submit, as soon as practicable, all filings, notifications, notices or other submissions required under the Antitrust Laws and to cooperate in all respects with each other regarding any investigation or other inquiry by any Governmental Authority (other than the Bankruptcy Court) in connection with the Transaction, which shall include (i) furnishing to the other Parties such necessary information and reasonable assistance as the other parties may request in connection with the foregoing, (ii) informing the other Parties of any communication with any Governmental Authority (other than the Bankruptcy Court) regarding any of the Transactions, and (iii) providing counsel for the other Parties with copies of all filings made by such Party, all correspondence between such party (and its Affiliates or advisors) with any Governmental Authority (other than the Bankruptcy Court) and any other information supplied by such party and such Party's Affiliates or advisors to a Governmental Authority (other than the Bankruptcy Court) or received from such a Governmental Authority (other than the Bankruptcy Court) in connection with the Transactions; *provided*, *however*, that materials may be redacted as necessary to comply with contractual arrangements and with applicable Law.  Each Party hereto shall, subject to applicable Law and to the extent practicable, permit counsel for the other Parties to review in advance, and consider in good faith the views of the other parties in connection with, any proposed communication to any Governmental Authority (other than the Bankruptcy Court) in connection with the Transactions. To the extent practicable, the Parties agree not to participate, or to permit their Affiliates or advisors to participate, in any substantive meeting or discussion, either in person or by telephone, with any Governmental Authority in connection with the Transactions unless it consults with the other Parties in advance and, to the extent not prohibited by such Governmental Authority, gives the other Parties the opportunity to attend and participate.

(c)     Further, and without limiting the generality of the rest of the foregoing clauses (a) and (b) of this Section 8.8, each of Sellers, each Target Company, Purchaser, and Purchaser's Affiliates shall use reasonable best efforts to avoid or eliminate each and every impediment under any Antitrust Law that may be asserted by any Governmental Authority or private party with respect to this Agreement so as to make effective as promptly as practicable the Transaction and to avoid any suit or proceeding, which would otherwise have the effect of preventing or delaying the Closing (and, for the avoidance of doubt, so as to avoid an in-depth or second phase review by the relevant Governmental Authority).  Notwithstanding anything to the contrary contained in this Agreement, however, neither Purchaser nor any of its Affiliates shall be required to take or agree to take any action, including entering into any consent decree, hold, Order or other arrangements, that would (i) require or result in the sale, divestiture or other direct or other disposition of any assets or businesses of Purchaser or any of its Affiliates or (ii) limit Purchaser's or any of its Affiliates' freedom of action with respect to, or its or their ability to retain, consolidate or control, the Purchased Assets, the Acquired Entities or any assets or businesses of Purchaser or any of its Affiliates.  Purchaser shall bear any filing fees or other fees or expenses in connection compliance with the obligations set forth in this Section 8.8 and Sellers shall not be in breach of this Agreement if Purchaser fails to fund amounts required for Sellers to comply with this Section 8.8.

Section 8.9     Notice of Certain Matters.  From the date hereof until the earlier of the termination of this Agreement in accordance with its terms or the Closing, Sellers and Purchaser will give prompt written notice to the other Parties (in the case of Purchaser, to the Seller

Representative) of (a) the existence of any fact or circumstance, or the occurrence of any event, of which any Seller has Knowledge or Purchaser has actual knowledge that would reasonably be likely to cause a condition to a Party's obligations to consummate the Transactions set forth in <u>ARTICLE VII</u> not to be satisfied as of any date, or (b) the receipt of any notice or other communication from any Governmental Authority in connection with the Transactions (other than any notice or communications with the Bankruptcy Court that are otherwise made available on the Bankruptcy Court's docket); *provided*, *however*, that the delivery of any such notice pursuant to this <u>Section 8.9</u> shall not be deemed to amend or supplement this Agreement and the failure to deliver any such notice shall not constitute a waiver of any right or condition to the consummation of the Transactions by any Party.

Section 8.10    <u>Bulk Transfer Laws</u>.  The Parties hereby waive (a) compliance with the provisions of any so-called bulk sales or bulk transfer law of any jurisdiction in connection with the sale of any or all of the Purchased Assets to Purchaser hereunder and (b) all claims related to the non-compliance therewith.  Pursuant to Section 363(f) of the Bankruptcy Code, the transfer of the Purchased Assets shall be free and clear of any and all Liens and claims on the Purchased Assets (other than Permitted Liens), including any Liens or claims arising out of any bulk transfer Laws, and the Parties shall take such steps as may be necessary or appropriate to so provide in the Sale Order.

Section 8.11    <u>Insurance</u>.  From the date hereof until the earlier of the termination of this Agreement in accordance with its terms or the Closing, and as reasonably required following the Closing Date (*provided*, that the foregoing shall not restrict or limit wind-down of the Sellers following the Closing Date):

(a)    To the extent that any of Purchaser's rights to insurance under the Insurance Policies (including those listed as a Retained Asset on <u>Schedule 2.2(a)(ii))</u>, or to proceeds therefrom, relating to the damage, destruction, taking or other impairment of any of the Purchased Assets or to liabilities arising from Assumed Liabilities, including insurance for pre-Closing occurrences, direct property loss and business interruption or other time element losses, are not transferable or assignable, then as promptly as practicable following receipt of a written request from Purchaser to the Seller Representative, Sellers shall use their commercially reasonable efforts to pursue recovery on all such claims; in its own name or as attorney-in-fact for Purchaser, and pursue and exhaust applicable coverage, make, administer and settle claims (including initiating, prosecuting and resolving litigation), subject, following the Closing, to direction and control by Purchaser with respect to Insurance Policies that are included as a Purchased Asset; *provided*, *however*, that Purchaser shall, within thirty (30) calendar days after receipt of written request therefor from the Seller Representative, reimburse Sellers and any of their Affiliates for any reasonable and documented out-of-pocket cost or expense incurred in the performance of Sellers' obligations under this <u>Section 8.11</u>.  Purchaser and Sellers shall cooperate in the making and recovery of any such claims for insurance proceeds.  Upon the receipt by Sellers of any such insurance proceeds or condemnation proceeds relating thereto, Sellers shall as promptly as practicable pay Purchaser such proceeds (but only to the extent those proceeds represent payment or reimbursement by an insurer for any damage, destruction, other impairment or other time element losses or liability arising from, any Assumed Liabilities actually suffered or incurred by Purchaser, or the costs of repair borne by Purchaser, in each case in excess of any losses, damages, costs and expenses or other amounts borne by Sellers or any of its Affiliates in connection with

such claims).  Additionally, Purchaser shall pay the amount of any deductibles, self-insured retentions, co-insurance or similar expenses (other than increases in premiums) that would otherwise be borne by Sellers or any of its Affiliates as a result of any such claims.

(b)    To the extent any Insurance Policy (including those policies listed on Schedule 2.2(a)(ii)), provides "occurrence based" liability insurance, Sellers shall request that, prior to the Closing, Purchaser be added as an additional insured, on a primary and noncontributory basis for claims or loss arising from or relating to the Purchased Assets and Assumed Liabilities, under such Insurance Policy for the current policy year and the preceding six policy years. Additionally, to the extent any Insurance Policy (including those policies listed on Schedule 2.2(a)(ii)), provides "claims made" liability insurance coverage, Sellers shall request that such Insurance Policy continues to provide similar coverage, in all material respects, for pre-Closing wrongful acts, errors or omissions arising from or relating to the Purchased Assets and Assumed Liabilities from the current policy year and the preceding six policy years for as many years following the Closing as Sellers' insurance carriers are willing to agree.  Purchaser shall, within five days after receipt of written request therefor from the Seller Representative, reimburse Sellers and any of their Affiliates for any reasonable and documented out-of-pocket cost or expense incurred in the performance of Sellers' obligations under this Section 8.11.

Section 8.12    Confidentiality.  From and after the Closing Date:

(a)    The Group Companies and their respective representatives shall treat as confidential and shall safeguard any and all non-public information included in the Purchased Assets or assets, properties, rights and claims or liabilities of any Acquired Entity, in each case by using the same degree of care, but no less than a reasonable standard of care, to prevent the unauthorized use, dissemination or disclosure of such information as the Group Companies used with respect thereto prior to the execution of this Agreement.

(b)    Purchaser acknowledges that the confidentiality obligations set forth herein shall not extend to information, knowledge and data that is publicly available or becomes publicly available (x) through no act or omission of the Group Companies and their respective representatives, (y) pursuant to the Bankruptcy Cases, or (z) as required by this Agreement.  In addition, Purchaser acknowledges and agrees that the foregoing shall not restrict any disclosure of any such non-public information (i) as required by Law, (ii) in connection with any effort to enforce any rights or defend any claim under this Agreement or related to the Transactions or any Retained Asset or Retained Liability, (iii) in response to a routine audit or investigation conducted by a regulatory entity or Governmental Authority in the ordinary course that does not primarily relate to the Business, the Acquired Entities, the Purchased Assets or the Transactions; (iv) in connection with the Bankruptcy Cases if so required under the Bankruptcy Code or Bankruptcy Court local rules or requested by the Bankruptcy Court; or (v) that is or may be necessary to wind down any of Sellers' estates or in connection with the enforcement of the rights of, or the defense of any Legal Proceeding against or involving, any Seller or its Affiliates.  In addition, notwithstanding the foregoing, each of the Parties and their respective Representatives may disclose to any and all Persons, without limitation of any kind, the tax treatment and tax structure of the Transactions and all materials of any kind (including opinions or other tax analyses) that are provided to it relating to such tax treatment and tax structure, all as contemplated by Treasury Regulation Section 1.6011-4(b)(3)(iii).

NAI-1540627251v4

4880-8016-9684, v. 2

(c)    In the event of a breach of the obligations hereunder, Purchaser, in addition to all other available remedies, will be entitled to injunctive relief to enforce the provisions of this Section 8.12 in any court of competent jurisdiction.

Section 8.13    Indemnification Obligations.  For a period of six years after the Closing Date, Purchaser shall not amend, modify or repeal (in a manner adverse to the beneficiary thereof) the indemnification, reimbursement or advancement provisions under the Organizational Documents of the Acquired Entities relating to the exculpation, reimbursement or indemnification of any officers or directors of the Acquired Entities with regard to pre-Closing acts, errors, omissions or matters by reason of their status with the Acquired Entities, unless required by applicable Law.

Section 8.14    Back-up Bidder. If an Auction is conducted, and Sellers do not choose Purchaser as the Successful Bidder, but instead choose Purchaser as the Back-up Bidder in accordance with the Bidding Procedures, Purchaser will serve as the Back-up Bidder. If Purchaser is chosen as the Back-up Bidder, Purchaser will be required to keep its bid to consummate the transactions contemplated by this Agreement on the terms and conditions set forth in this Agreement (as the same may be improved upon by Purchaser prior to or at the Auction) open and irrevocable until the closing of the sale of the Purchased Assets to the Successful Bidder, subject to the Termination Date.  If the Alternative Transaction with the Successful Bidder is terminated prior to the termination of this Agreement, Purchaser will be deemed to be the Successful Bidder and will forthwith consummate the transactions contemplated by this Agreement on the terms and conditions set forth in this Agreement (as the same may be improved upon by Purchaser prior to or at the Auction).

Section 8.15    Resignations.  Prior to the Closing, Sellers shall use their respective commercially reasonable efforts to obtain the resignation, effective as of the Closing, of each director, officer and manager of the Acquired Entities reasonably requested by Purchaser at least five Business Days prior to the Closing.

Section 8.16    Corporate Names.  On or prior to the date that is thirty (30) days after the Closing Date, Sellers shall use their respective commercially reasonable efforts to change their respective legal and corporate names to such other names that do not include any of the Trademarks included in the Transferred Intellectual Property Rights (or any portion thereof) and seek an Order of the Bankruptcy Court to make corresponding changes to the case caption for the Bankruptcy Cases, pursuant to the terms of the Sale Order or such further Order of the Bankruptcy Court.

Section 8.17    Schedules; Seller Disclosure Schedule.  Sellers shall provide final versions of the Schedules and the Seller Disclosure Schedule no later than two Business Days prior to the date on which the hearing on the Bidding Procedures Order is scheduled to occur; *provided*, *however*, the Parties acknowledge that Schedule 1.1(a), Schedule 2.1(a)(v), Schedule 2.1(a)(xx) and certain Schedules to the Seller Disclosure Schedule identified in Section 11.6 may be updated after such date but no later than the applicable dates set forth herein, in each case subject to the express terms of this Agreement.

Section 8.18    Wind-Down.

NAI-1540627251v4

4880-8016-9684, v. 2

(a)     From and after the Closing Date until the later of the conclusion of the Bankruptcy Cases and the wind-down and final distribution of all assets of Sellers, Purchaser shall give Sellers and the Seller Representative reasonable access during normal business hours upon reasonable advance notice of not less than forty-eight (48) hours before the requested date of access to the books and records pertaining to the Purchased Assets and Assumed Liabilities and certain key employees, at Sellers' sole cost and expense, for the purposes of (i) the preparation or amendment of Tax Returns, (ii) the determination of any matter relating to the rights or obligations of the Sellers under this Agreement, or (iii) as is necessary to administer, or satisfy their obligations in connection with, the Bankruptcy Cases and the wind-down of the Sellers and their assets, in each case of clauses (i)-(iii), in such a manner as not to unreasonably interfere with the conduct of the Business.  Notwithstanding anything to the contrary in this Agreement, Purchaser and its controlled Affiliates (including the Acquired Entities) shall not be required to disclose any information to Sellers and the Seller Representative if such disclosure would (x) jeopardize any attorney-client or other legal privilege or (y) contravene any applicable Law or fiduciary duty; provided, however, Purchaser shall use its commercially reasonable efforts to provide a summary of such privileged information to the extent it would not violate any such privilege, applicable Law or fiduciary duty.  Purchaser shall, and shall cause each of its controlled Affiliates (including the Acquired Entities) and its Representatives to, cooperate with the Sellers as may reasonably be requested by the Seller Representative for such purposes.

(b)     Unless otherwise consented to in writing by the Seller Representative, Purchaser will not, for a period of three years following the Closing Date, destroy, alter, or otherwise dispose of any of the books and records without first offering to surrender to the Seller Representative such books and records or any portion thereof that Purchaser may intend to destroy, alter, or dispose of.  From and after the Closing, Purchaser will, and will cause its employees to, provide Sellers and the Seller Representative with reasonable assistance, support, and cooperation with Sellers' wind-down and related activities (*e.g.*, helping to locate documents or information related to preparation of Tax Returns or prosecution or processing of insurance/benefit claims).  Without limiting the generality of the foregoing, Purchaser acknowledges and agrees that Sellers may reasonably require (x) ongoing services from one or more former Business Employees (and may request, upon the written consent of Purchaser (not to be unreasonably withheld, conditioned or delayed) that such Business Employees enter into consulting services or similar arrangements) and (y) reasonable access to or use of certain transferred IT Assets solely to the extent required to facilitate Sellers' wind-down and related activities, subject in each case to the parameters regarding access in Section 8.18(a).

(c)     Sellers shall be permitted to keep copies of any Contracts, documents, records, and other information to the extent reasonably necessary or required by the Bankruptcy Courts or in connection with the Bankruptcy Cases or to facilitate any subsequent wind-down proceedings of Sellers.

Section 8.19   Title Insurance.  From the date hereof until the earlier of the termination of this Agreement in accordance with its terms or the Closing, Sellers shall use their respective commercially reasonable efforts to obtain customary affidavits of title, transfer tax forms and other similar documents reasonably necessary to permit a nationally recognized title insurance company of Purchaser's choosing to record the Deeds and to issue standard ALTA 2006 Form Title Insurance Policies with extended coverage in favor of Purchaser (or its designee) insuring that

Purchaser (or its designee) owns fee simple title to the Owned Real Property at Closing, free and clear of Liens (other than Permitted Liens) and in an amount reasonably acceptable to Purchaser. So long as the Sellers use their respective commercially reasonable efforts to comply with this <u>Section 8.19</u>, the failure to obtain such title insurance policy in favor of Purchaser on or prior to the Closing Date shall not result in the failure of the condition set forth in <u>Section 7.2(b)</u> to be satisfied.

**ARTICLE IX**
**<u>CLOSING AND TERMINATION</u>**

Section 9.1    <u>Closing</u>.  The closing (the "***Closing***") of the Transactions shall be held on or before the third Business Day after the date on which the conditions set forth in <u>ARTICLE VII</u> are satisfied or, if legally permissible, waived (other than those conditions that by their nature are to be first satisfied (or validly waived) at the Closing, but subject to such satisfaction or waiver), remotely via the electronic exchange of documents and signature pages, or at such other time or date or place as Purchaser and the Seller Representative may agree (email to suffice).  The date on which the Closing occurs is referred to as the "***Closing Date***".

Section 9.2    <u>Termination</u>. This Agreement and the Transactions may not be terminated prior to the Closing except as follows:

(a)    Upon the mutual written consent of the Seller Representative and Purchaser.

(b)    By the Seller Representative, if:

(i)    no Seller is then in breach of any provision of this Agreement that would give rise to the failure of a condition set forth in <u>Section 7.1</u> or <u>Section 7.3</u>, and (i) there has been a breach, inaccuracy in or failure to perform any representation, warranty, covenant or agreement made by Purchaser pursuant to this Agreement that would, either individually or in the aggregate, if occurring or continuing on the Closing Date, give rise to the failure of any of the conditions specified in <u>Section 7.1</u> or <u>Section 7.3</u> and (ii) such breach, inaccuracy or failure to perform is not curable or has not been cured within 10 Business Days' written notice thereof to Purchaser; or

(ii)    (A) all of the conditions set forth in <u>Section 7.1</u> and <u>Section 7.2</u> are satisfied or waived by Purchaser as of the date Closing should otherwise occur pursuant to <u>Section 9.1</u> (other than those conditions that, by their nature, can only be satisfied as of the Closing Date, but which would be satisfied as of the Closing Date); (B) Sellers have notified Purchaser in writing that (x) they are ready, willing and able to consummate the Transactions, and (y) all conditions set forth in <u>Section 7.3</u> have been satisfied (other than those conditions that, by their nature, can only be satisfied as of the Closing Date, but which would be satisfied as of the Closing Date) or that they are willing to waive any unsatisfied conditions set forth in <u>Section 7.3</u>; (C) Sellers have given Purchaser written notice at least two (2) Business Days prior to such termination stating Sellers' intention to terminate this Agreement pursuant to this <u>Section 9.2(b)(ii)</u>; and (D) Purchaser fails to consummate the Closing, including if Purchaser does not provide, or cause to be provided, Sellers with sufficient funds to consummate the Transactions, within two (2) Business Days (as

- 75 -

contemplated by clause (C) hereof) of the time which the Closing should have occurred pursuant to Section 9.1;

    (c)    By Purchaser if:

        (i)    Purchaser is not then in breach of any provision of this Agreement that would give rise to the failure of a condition set forth in Section 7.1 or Section 7.2 and (A) there has been a breach, inaccuracy in or failure to perform any representation, warranty, covenant or agreement made by Sellers pursuant to this Agreement that would, either individually or in the aggregate, if occurring or continuing on the Closing Date, give rise to the failure of any of the conditions specified in Section 7.1 or Section 7.2 and (B) such breach, inaccuracy or failure to perform is not curable or has not been cured within 10 Business Days' written notice thereof to the Seller Representative;

        (ii)    As a result of an Order of the Bankruptcy Court, (A) the Bankruptcy Cases are converted to chapter 7 and a chapter 7 trustee is appointed with respect to Sellers; (B) the Bidding Procedures are materially modified or amended in a manner not acceptable to Purchaser; (C) the Bankruptcy Cases are dismissed; or (D) a responsible officer or examiner with enlarged powers appointed (other than a fee examiner) relating to the operation of the Business pursuant to Section 1104 of the Bankruptcy Code and the order of appointment is not vacated or reversed within 14 days after the entry thereof;

        (iii)    Any Seller (A) withdraws, or seeks to withdraw, the Sale Motion, or (B) announces or files a plan or other transaction, or seek to file a plan or other transaction, contemplating reorganization or sale of all or any part of any Seller under the Bankruptcy Code that does not comply with the terms and conditions of this Agreement or which relates to an Alternative Transaction;

        (iv)    An Event of Default (as defined in the DIP Facility and DIP Order, respectively) under the DIP Facility or the DIP Order shall have occurred thereunder (i) that gives the secured parties thereunder a right to terminate the DIP Order and DIP Facility, (ii) as a result of which, the secured parties thereunder shall have accelerated the repayment obligations of Sellers which such acceleration has not been rescinded after three (3) Business Days' notice thereof, and (iii) which has not been waived; or

        (v)    If for any reason Purchaser is unable, pursuant to Bankruptcy Code section 363(k), to Credit Bid in payment of all or any portion of the Credit Bid Amount.

    (d)    By either the Seller Representative or Purchaser if:

        (i)    The Closing shall not have been consummated on or before the date that is [75] calendar days from the Petition Date (or such later date as mutually agreed by the Seller Representative and Purchaser) (the "***Termination Date***"); *provided* that by written notice to the Seller Representative, Purchaser may, in its sole discretion, extend the Termination Date; *provided*, *further*, that neither Party shall have the right to terminate this Agreement pursuant to this Section 9.2(d)(i) if the Closing shall not have occurred on or prior to the Termination Date due to such party's failure to perform any covenants or breach of any representation or warranty of such party set forth in this Agreement.

**- 76 -**

(ii)     A final non-appealable Restraint of any nature shall have come into effect, including any such Restraint that (A) enjoins the consummation of the Transactions contemplated by this Agreement and (B) remains in effect for five Business Days after notice of such Restraint has been received by the Seller Representative and Purchaser.

(e)     Automatically, if any Seller closes or consummates an Alternative Transaction or the Bankruptcy Court enters an Order approving such Alternative Transaction.

The Party desiring to terminate this Agreement pursuant to this Section 9.2 (other than pursuant to Section 9.2(a) or Section 9.2(e)) shall give notice of such termination to the other Party in accordance with Section 11.2.

Section 9.3     Effect of Termination

(a)     Upon the termination of this Agreement in accordance with Section 9.2, and except as set forth in this Section 9.3, all rights and obligations of the Parties hereunder shall terminate without any liability on the part of either Party, other than (i) obligations or liabilities for any intentional and willful breaches of this Agreement by such Party occurring prior to such termination, and (ii) the obligations of the Parties under Section 8.13, this Section 9.3 and Article XI (including the related definitions) shall remain in full force and effect.

(b)     Notwithstanding the foregoing, if this Agreement is validly terminated under Section 9.2(e), Sellers shall pay to Purchaser the Expense Reimbursement upon the closing of the applicable Alternative Transaction through the flow of funds with respect thereto.  The Parties acknowledge and agree that Purchaser's entitlement to the Expense Reimbursement (to the extent applicable) will constitute liquidated damages (and not a penalty) and, if payable, then notwithstanding anything to the contrary contained herein, will be the sole and exclusive remedy of Purchaser and any other Person against Sellers in connection with this Agreement and the transactions contemplated hereby and neither Sellers nor their Affiliates will have any further liability relating to or arising out of this Agreement or the transactions contemplated hereby.

# ARTICLE X
# TAX MATTERS

Section 10.1     Tax Cooperation.  Purchaser and Sellers agree to furnish or cause to be furnished to each other, upon request, as promptly as reasonably practicable, such information and assistance relating to the Business, the Purchased Assets and the Acquired Entities subject to the amendment of Schedule 1.1(a) as contemplated by Section 2.1(b)) (including access to books and records) as is reasonably necessary for the preparation and filing of all Tax Returns (including any claim for a Tax refund), the making of any election relating to Taxes, the preparation for any audit by any Taxing Authority, and the prosecution or defense of any Claim, suit or other Legal Proceeding relating to any Tax. Sellers and Purchaser shall cooperate with each other in good faith in the conduct of any audit or other proceeding relating to Taxes involving the Purchased Assets, the Business and the Acquired Entities subject to the amendment of Schedule 1.1(a) as contemplated by Section 2.1(b)).

Section 10.2     Transfer Taxes.  To the extent not exempt under section 1146(c) of the Bankruptcy Code in connection with the Bankruptcy Cases, any VAT, use, stamp, transfer, indirect

transfer, documentary, registration, and other similar Taxes imposed by any Taxing Authority with respect to the transfer of the Purchased Assets to Purchaser (excluding, for the avoidance of doubt, any Income Taxes, but including any PRC Tax) ("***Transfer Taxes***") shall be borne by Purchaser. Each Tax Return with respect to such Transfer Taxes will be prepared and filed by the Party that customarily has primary responsibility for filing such Tax Return pursuant to applicable Law, in accordance with the allocation prepared pursuant to <u>Section 4.2(c)</u>.  The Parties will each timely sign and deliver (or cause to be timely signed and delivered) such certificates or forms as may be necessary or appropriate (and will each otherwise cooperate) to establish any available exemption (or otherwise reduce) with respect to any such Taxes or fees.  The Parties shall cooperate in good faith to minimize, to the fullest extent possible under applicable Law, the amount of any such Transfer Taxes.

Section 10.3    <u>Tax Prorations and Straddle Periods</u>.

(a)    As to any Purchased Assets acquired by Purchaser, Sellers and Purchaser shall apportion the liability for real and personal property Taxes and ad valorem Taxes ("***Periodic Taxes***") for all Straddle Periods. The Periodic Taxes described in this <u>Section 10.3(a)</u> shall be apportioned between Sellers and Purchaser as of the Closing Date, with Purchaser liable for that portion of the Periodic Taxes equal to the Periodic Tax for the Straddle Period multiplied by a fraction, the numerator of which is the number of days remaining in the Straddle Period after the Closing Date, and the denominator of which is the total number of days covered by such Straddle Period. Sellers shall be liable for that portion of the Periodic Taxes for the Straddle Period for which Purchaser is not liable under the preceding sentence. Purchaser and Sellers shall pay or be reimbursed for real and personal property Taxes (including instances in which such property Taxes have been paid before the Closing Date) on this prorated basis. The Party responsible for paying a Tax described in this <u>Section 10.3(a)</u> shall be responsible for administering the payment of (and any reimbursement for) such Tax. Upon payment of any such Periodic Taxes, the paying Party shall present a statement to the non-paying Party setting forth the amount of reimbursement to which the paying Party is entitled under <u>Section 10.3(a)</u>, together with such supporting evidence as is reasonably necessary to calculate the amount to be reimbursed. The non-paying Party shall make such reimbursement promptly, but in no event later than five (5) Business Days after the presentation of such statement. For purposes of this <u>Section 10.3(a)</u>, the Straddle Period for ad valorem Taxes and real and personal property Taxes shall be the fiscal period for which such Taxes were assessed by the relevant Tax Authority. For the avoidance of doubt, any Tax refund of Sellers that is attributable to the Periodic Taxes shall be promptly paid to Purchaser.

(b)    As to any Acquired Entity (subject to the amendment of <u>Schedule 1.1(a)</u> as contemplated by <u>Section 2.1(b)</u>), Sellers and Purchaser shall apportion the liability for Income Taxes for all Straddle Periods on the basis of a "closing of the books," as if such taxable period ended as of the end of the day on the Closing Date; *provided*, that in the case of any Income Taxes attributable to the ownership of any interest in any partnership, other "flow-through" entity or "controlled foreign corporation" (within the meaning of Section 957(a) of the Code or any comparable state, local or foreign Law), such computation shall be made as if the taxable period of such partnership, other "flow-through" entity or controlled foreign corporation ended as of the end of the day on the Closing Date (whether or not such Taxes arise in a Straddle Period of the applicable owner, it being understood, however, that any allocations of "global intangible low-taxed income" pursuant to Section 951A of the Code or "Subpart F" income allocated pursuant to

Section 951(a) of the Code shall be made in accordance with applicable Law); *provided*, *further*, that exemptions, allowances or deductions that are calculated on an annual basis (including depreciation and amortization deductions) shall be allocated between the period ending on the Closing Date and the period beginning after the Closing Date in proportion to the number of calendar days in each period.

Section 10.4   <u>Provision of Tax Forms</u>.  Each Seller shall provide an IRS Form W-9 duly executed by such Seller, before the Closing Date and such other documentation reasonably requested by Purchaser to reduce or eliminate any withholding Taxes that could be imposed on any of the transactions contemplated by this Agreement.

Section 10.5   <u>Certain Tax Elections</u>.

(a)   To the extent permitted by applicable Law, Purchaser shall be permitted to make (or cause to be made), in Purchaser's sole discretion, elections under Section 338(g) of the Code, or any similar provision of state, local or foreign Law (collectively, the "***Section 338(g) Elections***"), with respect to the acquisition by Purchaser of any or all of the Acquired Entities (subject to the amendment of <u>Schedule 1.1(a)</u> as contemplated by <u>Section 2.1(b)</u>). If Purchaser intends to make any such election with respect to an Acquired Entity, the allocation procedures of <u>Section 4.2</u> shall apply to the assets of such Acquired Entity, subject to the amendment of <u>Schedule 1.1(a)</u> as contemplated by <u>Section 2.1(b)</u>.

(b)   At the request of Purchaser, in Purchaser's sole discretion, Sellers shall make (and shall cause their relevant Affiliates to make) an election pursuant to Treasury Regulations Section 1.245A-5(e)(3)(i) (and any corresponding elections under applicable state or local Law) with respect to any Acquired Entity (subject to the amendment of <u>Schedule 1.1(a)</u> as contemplated by <u>Section 2.1(b)</u>) for which such an election is available.

(c)   Purchaser may, in its sole discretion, make (and may cause its relevant Affiliates to make), and Sellers shall, at the request of Purchaser, make or cooperate with Purchaser in making an election to be effective on or prior to the Closing Date pursuant to Treasury Regulations Section 301.7701-3 (and any corresponding elections under applicable state or local Law) with respect to any Acquired Entity (subject to the amendment of <u>Schedule 1.1(a)</u> as contemplated by <u>Section 2.1(b)</u>) (each, a "***Check-the-Box Election***").   In the event that an Acquired Entity is ineligible to make a Check-the-Box Election, then Sellers shall, at the request of Purchaser, convert or cooperate with Purchaser in converting any Acquired Entity into an legal entity that either by default or by Check-the-Box Election has the U.S. entity classification status requested by Purchaser in Purchaser's sole discretion (each an "***Entity Conversion***").

Section 10.6   <u>Chinese Indirect Transfer Tax Filing</u>.

(a)   Any PRC Income Taxes on capital gains attributable to the indirect transfer of the equity interests in the Acquired Chinese Entities will be for the account of the Purchaser. Notwithstanding anything to contrary provided in this Agreement, the Parties irrevocably agree that the Purchaser shall be solely responsible for any related PRC Tax filing and reporting, as further detailed herein.

NAI-1540627251v4

4880-8016-9684, v. 2

(b)    Purchaser shall make all filings or disclosures with the competent PRC taxing authority as required in connection with the indirect transfer of 100% equity interests in the Acquired Chinese Entities, including any filings or notices required to be made to the PRC taxing authority in accordance with the Announcement 7 (the "***Indirect Transfer Report***"), promptly after the signing of this Agreement (and in any event within 30 days).  If Purchaser or any Acquired Entity directly receives from any PRC taxing authority any determination, order, ruling, assessment or notice in connection with Announcement 7, Purchaser shall promptly notify Seller Representative of the same, provide Seller Representative with such determination, order, ruling, assessment or notice within five days of receipt, and consult in good faith with Seller Representative and obtain Seller Representative's consent (such consent not to be unreasonably withheld or delayed) before submitting any response to the relevant PRC taxing authority that may be required.

(c)    Sellers and Purchaser acknowledge and agree that Purchaser shall have the sole right and discretion to communicate and negotiate with the PRC taxing authority, to dispute or appeal the requests or decisions of the PRC taxing authority, and to reach any settlement on any relevant issues with the PRC taxing authority in connection with the assessment of the PRC Taxes as a result of the indirect transfer.

(d)    Purchaser shall file PRC Income Tax Returns and pay to the PRC taxing authority any PRC Income Taxes on capital gains finally assessed thereby.  If and to the extent a final and irrevocable tax assessment is imposed on Sellers by the PRC taxing authority in respect of the Announcement 7, Sellers will after such assessment has become final and irrevocable, provide a copy of such assessment to Purchaser.

(e)    Purchaser will prepare all the required documents and bear the reasonable expenses and cost with respect to the preparation and filing of the Indirect Transfer Report and PRC Income Tax Returns.  Purchaser shall, or shall procure that its relevant Affiliates shall, provide any information requested by Sellers and necessary for the preparation of such documents and take any action reasonably required for the filing of the Indirect Transfer Report and PRC Income Tax Returns without undue delay.  Sellers shall within five Business Days after Sellers having received the same, provide to Purchaser: a copy of the acceptable evidence of the Indirect Transfer Report under the Announcement 7; a copy of the relevant PRC Income Tax Return; and a copy of the payment receipt of PRC Income Taxes.

## ARTICLE XI
## GENERAL PROVISIONS

Section 11.1    <u>Bankruptcy Court Approval</u>. This Agreement and the Transactions contemplated hereby are contingent upon the Bankruptcy Court's entry of the Bidding Procedures Order and of the Sale Order.

Section 11.2    <u>Notices</u>. All notices, demands and other communications to be given or delivered under or by reason of the provisions of this Agreement shall be in writing and shall be deemed to have been given (a) when personally delivered, (b) when transmitted via electronic mail to the e-mail address set out below (so long as no undeliverable message is promptly received by sender), (c) the day following the day (except if not a Business Day then the next Business Day)

on which the same has been delivered prepaid to a reputable national overnight air courier service (with confirmation) to the respective Parties at the applicable address set forth below, unless another address has been previously specified in writing, or (d) the third Business Day following the day on which the same is sent by certified or registered mail, postage prepaid, to the respective Parties at the applicable address set forth below, unless another address has been previously specified in writing:

If to Purchaser, to:

[Honing US Holdings, LLC]
c/o Centre Lane Partners, LLC
60 E 42nd Street, Suite 2220
New York, New York 10022
Attention: Quinn Morgan; Tatiana Mishin
E-mail: qmorgan@centrelanepartners.com; tmishin@centrelanepartners.com

With a copy (which shall not constitute notice or service of process) to:

Jones Day
250 Vesey Street
New York, NY 10281
Attention: Jason Grove; Thomas Wearsch; Genna Ghaul; William Sinchuk
E-mail: jrgrove@jonesday.com; twearsch@jonesday.com; gghaul@jonesday.com; wsinchuk@jonesday.com

If to Sellers or Seller Representative, to:

Hardinge Holdings, LLC
[●]
[●]
Attention: [●]
E-mail: [●]

With a copy (which shall not constitute notice or service of process) to:

Ropes & Gray LLP
1211 Avenue of the Americas
New York, NY 10036
Attention: Gregg Galardi; Ellen Wheeler
E-mail: gregg.galardi@ropesgray.com; ellen.wheeler@ropesgray.com

Section 11.3    Survival of Representations, Warranties, Covenants and Agreements.  All representations and warranties made by Sellers and Purchaser in this Agreement or in any document delivered pursuant hereto, including any Transaction Documents, shall terminate on the Closing Date upon the purchase of the Purchased Assets by Purchaser, and none of Sellers, Purchaser nor their respective Affiliates shall have any liability after the Closing Date for any

breach of any representation or warranty. All covenants and agreements of the Parties in this Agreement as to which performance or compliance is expressly contemplated only prior to or upon the Closing shall lapse at, and be of no further force and effect following, the Closing. All covenants and agreements of the Parties in this Agreement as to which performance or compliance is contemplated to occur or continue from and after the Closing shall survive until fully performed or complied with or until such covenant or agreement expires by its terms.

Section 11.4    Binding Effect. Except as may be otherwise provided herein, this Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns, including any trustee, responsible Person, estate administrator, representative or similar Person appointed for or in connection with the Bankruptcy Cases or in any subsequent case under the Bankruptcy Code in which any Seller is a debtor. Except as otherwise provided in this Agreement, nothing in this Agreement is intended or shall be construed to confer on any Person other than the Parties any rights or benefits hereunder.

Section 11.5    Headings. The headings in this Agreement are intended solely for convenience of reference and shall be given no effect in the construction or interpretation of this Agreement.

Section 11.6    Exhibits and Schedules.  The Exhibits, Schedules and Seller Disclosure Schedule referred to in this Agreement shall be deemed to be an integral part of this Agreement. Sellers and Purchaser acknowledge that certain of the representations and warranties of Sellers affirmatively require that Sellers list certain factual information on the Seller Disclosure Schedule. [Without limiting Section 8.17 or any other provisions set forth herein regarding updating specific Schedules, Sellers shall be permitted to update Schedules 5.6, 5.7, 5.11, 5.14(a), 5.14(b) and 5.18 on or prior to the Closing Date with the consent of Purchaser (to be given or withheld in Purchaser's sole discretion).]

Section 11.7    Counterparts.  This Agreement may be executed in multiple counterparts, each of which shall be deemed an original, and all of which together shall constitute one and the same document. Any signature delivered by a Party via facsimile or delivered electronically in PDF format shall be deemed to be an original signature hereto.

Section 11.8    Governing Law/Jurisdiction.  Except to the extent inconsistent with the Bankruptcy Code (in which case the Bankruptcy Code shall govern), this Agreement and all claims or causes of action (whether in contract, tort or statute) that may be based upon, arise out of or relate to this Agreement or the Transaction Documents or the negotiation, execution or performance of this Agreement or the Transaction Documents (including any claim or cause of action based upon, arising out of or related to any representation or warranty made in or in connection with this Agreement as an inducement to enter this Agreement) shall be governed by and construed under Delaware law, without regard to conflict of laws principles. Any action or proceeding seeking to enforce any provision of, or based on any right arising out of, this Agreement or the Transaction Documents shall be brought against any of the Parties exclusively in the Bankruptcy Court, or, if the Bankruptcy Court does not have or declines to exercise jurisdiction, in the Chancery Court of the State of Delaware or, if but only if such court declines jurisdiction, the Superior Court of the State of Delaware or the United States District Court for the District of Delaware, and each of the Parties consent to the jurisdiction of such courts (and of the appropriate

appellate courts) in any such action or proceeding and waive any objection to venue in those courts. Process in any action or proceeding referred to in the preceding sentence may be served on any Party anywhere it the world.

Section 11.9   WAIVER OF JURY TRIAL. EACH OF THE PARTIES HEREBY WAIVES TRIAL BY JURY IN ANY ACTION TO WHICH THEY ARE PARTIES INVOLVING, DIRECTLY OR INDIRECTLY, ANY MATTER IN ANY WAY ARISING OUT OF, RELATED TO OR CONNECTED WITH THIS AGREEMENT AND THE TRANSACTIONS CONTEMPLATED HEREBY AND THEREBY.

Section 11.10  Specific Performance.  Each Party acknowledges and agrees that the other Party would be damaged irreparably in the event that a Party does not perform its obligations under this Agreement in accordance with its specific terms or otherwise breaches this Agreement, so that, in addition to any other remedy that Purchaser or the Sellers may have under law or equity, each Party shall be entitled to seek injunctive relief to prevent any breaches of the provisions of this Agreement by the other Parties and to seek to enforce specifically this Agreement and the terms and provisions hereof, in each case, without any requirement for the posting of any bond or other undertaking and without the necessity of proving the inadequacy of money damages as a remedy.  Purchaser and the Sellers agree that they will not oppose the granting of an injunction, specific performance and other equitable relief on the basis that the Purchaser or Sellers, as applicable, have an adequate remedy at Law or that any award of specific performance is not an appropriate remedy for any reason at Law or in equity.

Section 11.11  Waivers.  Compliance with the provision of this Agreement may be waived only by a written instrument specifically referring to this Agreement and signed by the Party waiving compliance.  No course of dealing, nor any failure or delay in exercising any right, shall be construed as a waiver, and no single or partial exercise of a right shall preclude any other or further exercise of that or any other right.

Section 11.12  Modification.  No supplement, modification or amendment of this Agreement shall be binding unless made in a written instrument which is signed by all of the Parties and which specifically refers to this Agreement.

Section 11.13  Successors/Assignment.  The provisions of this Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and assigns.  Purchaser may assign any and all of its rights, title and interest in this Agreement to one or more designees, Affiliates or assignees at its sole election.  No assignment by any Seller or the Seller Representative of this Agreement or any right or obligation hereunder may be made without the prior written consent of Purchaser, and any assignment attempted without such consent will be void *ab initio*; *provided*, that Sellers may transfer or assign such rights and obligations under this Agreement to a liquidation trust or similar vehicle under a confirmed chapter 11 plan of liquidation in the Bankruptcy Cases.  For the avoidance of doubt, Purchaser may assign its rights under this Agreement to its lenders as collateral security for its obligations under any of its secured debt financing arrangements (but in no event will any such lender be required or deemed to assume any obligation of Purchaser hereunder and such assignment shall not relieve Purchaser of any of its obligations hereunder).

NAI-1540627251v4

4880-8016-9684, v. 2

Section 11.14  <u>Entire Agreement</u>.  This Agreement, including the Schedules and Exhibits hereto, and the other agreements and documents referred to in this Agreement or delivered hereunder are the exclusive statement of the agreement among the Parties concerning the subject matter hereof.  All negotiations among the Parties are merged into this Agreement, and there are no representations, warranties, covenants, understandings or agreements, oral or otherwise, in relation thereto among the Parties other than those incorporated herein and to be delivered hereunder.

Section 11.15  <u>Severability</u>. If any provision of this Agreement is held to be illegal, invalid or unenforceable under present or future Laws effective during the term hereof, then to the maximum extent permitted by Law, the legality, validity, and enforceability of the remaining provisions of this Agreement shall not be affected thereby.

Section 11.16  <u>No Third Party Beneficiaries</u>. No provision of this Agreement is intended to confer upon any Person other than the Parties any rights or remedies hereunder; *provided*, that each of the Non-Party Affiliates is and shall be an intended third party beneficiary with respect to <u>Section 11.16</u> and shall have the right to enforce such provisions to the same extent as if it was a party.

Section 11.17  <u>Non-Recourse</u>. All claims or causes of action (whether in contract or in tort, at law or in equity, or granted by statute) that may be based upon, in respect of, arise under, out or by reason of, be connected with, or related in any manner to this Agreement or the Transaction Documents may be made only against (and are expressly limited to) the Persons that are expressly identified as parties hereto or thereto (each a "***Contracting Party***"). In no event shall any Contracting Party have any shared or vicarious liability for the actions or omissions of any other Person. Except as otherwise set forth in this Agreement, no Person who is not a Contracting Party, including any director, officer, employee, incorporator, member, partner, manager, stockholder, Affiliate, agent, attorney or representative of, and any financial advisor or lender to, any of the foregoing ("***Non-Party Affiliates***"), shall have any liability (whether in contract or in tort, in law or in equity, or granted by statute or based upon any theory that seeks to impose liability of an entity party against its owners or affiliates) for any claims, causes of action, obligations or liabilities arising under, out of, in connection with or related in any manner to this Agreement or the Transaction Documents or based on, in respect of, or by reason of this Agreement or the Transaction Documents or their negotiation, execution, performance or breach; and, to the maximum extent permitted by Law, each Contracting Party waives and releases all such liabilities, claims and obligations against any such Non-Party Affiliates.

Section 11.18  <u>Expenses</u>. Notwithstanding the payment of the Expense Reimbursement in accordance with <u>Section 9.3(b)</u> and the HL Fees (which shall be included as a component of the Cash Shortfall), each of Sellers, on the one hand, and Purchaser, on the other hand, will bear its own respective expenses incurred in connection with the negotiation and execution of this Agreement, the other Transaction Documents and the transactions contemplated hereby and thereby.

Section 11.19  <u>Negotiated Agreement</u>. Each of Sellers and Purchaser acknowledges that it has been advised and represented by counsel in the negotiation, execution and delivery of this Agreement and accordingly agrees that, if an ambiguity exists with respect to any provision of this

**- 84 -**

Agreement, such provision shall not be construed against any party because such party or its Representatives drafted such provision.

Section 11.20  Seller Representative.  By the adoption of this Agreement, and by receiving the benefits thereof, including any consideration payable hereunder, each Seller shall be deemed to have appointed, authorized and empowered, and hereby appoint, authorize and empower, as of the date hereof, the Company to act as the Seller Representative, for the benefit of each Seller, as the exclusive agent and attorney-in-fact to act on behalf of each Seller for all purposes in connection with, and to facilitate the consummation of, the Transactions, to take any and all actions and make any and all decisions required or permitted to be taken or made by Sellers under this Agreement, the other Transaction Documents and any other agreements ancillary hereto or thereto, including (i) the exercise of the right to give and receive notices and communications, (ii) to agree to, negotiate, enter into settlements and compromises of and comply with arbitration awards and court orders with respect to claims made under this Agreement, (iii) to grant any consent, waiver or approval on behalf of Sellers under this Agreement, and (iv) take all actions necessary or appropriate in the good faith judgment of the Seller Representative in connection with this Agreement, the other Transaction Documents, and the agreements ancillary hereto or thereto. The powers, immunities and rights granted to the Seller Representative hereunder are coupled with an interest and shall be irrevocable and survive the consummation of the transactions contemplated by this Agreement.  From and after the date hereof, a decision, act, consent or instruction of the Seller Representative shall be final, binding and conclusive upon each Seller and their successors as if expressly confirmed and ratified in writing, may be relied upon by Purchaser, and all defenses which may be available to any Seller to contest, negate or disaffirm the action of the Seller Representative taken in good faith under this Agreement or the other Transaction Documents are hereby waived. Purchaser may conclusively and absolutely rely, without inquiry, upon the actions of the Seller Representative as the actions of each Seller in all matters referred to in this Agreement.

Section 11.21  Fiduciary Obligation.  Notwithstanding anything to the contrary in this Agreement or any document related to the Transactions, nothing in this Agreement or any such document will require any Seller or any of such Seller's respective directors, managers, officers or members, in each case, in their capacity as such, to take any action, or to refrain from taking any action, that the board of directors or managers (or other governing body) of such Seller has determined, in good faith after consultation with legal counsel and independent financial advisors, would be a violation of such Person's fiduciary obligations or applicable Law.  For the avoidance of doubt, Sellers retain the right to pursue any transaction or restructuring strategy that, in Sellers' business judgment, will maximize the value of their estates.  For the avoidance of doubt, the Sellers' ability to conduct the sale process (including the Auction) and to consider or advance alternative proposals in a manner consistent with the foregoing and the Bidding Procedures Order shall not be impaired in any respect by this Agreement.

**[SIGNATURE PAGES FOLLOW]**

NAI-1540627251v4

4880-8016-9684, v. 2

IN WITNESS WHEREOF, each of the Parties has caused this Agreement to be duly executed and delivered in its name and on its behalf, all as of the day and year first written above:

**PURCHASER:**

**[HONING US HOLDINGS, LLC]**

By: _____
Name:
Title:

**[SIGNATURE PAGES CONTINUE]**

IN WITNESS WHEREOF, each of the Parties has caused this Agreement to be duly executed and delivered in its name and on its behalf, all as of the day and year first written above:

**SELLERS:**

**HARDINGE HOLDINGS, LLC**

By: _____
Name:
Title:

**HARDINGE INC.**

By: _____
Name:
Title:

**OHIO TOOL WORKS, LLC**

By: _____
Name:
Title:

**HARDINGE TECHNOLOGY SYSTEMS INC.**

By: _____
Name:
Title:

**HARDINGE GRINDING GROUP INC.**

By: _____
Name:
Title:

**FORKARDT INC.**

By: _____
Name:
Title:

**[SIGNATURE PAGES CONTINUE]**

IN WITNESS WHEREOF, each of the Parties has caused this Agreement to be duly executed and delivered in its name and on its behalf, all as of the day and year first written above:

**HARDINGE VENTURES LLC**


By: _____
Name:
Title:


**KELLENBERGER SWISS GRINDING MACHINES LLC**


By: _____
Name:
Title:

**SCHEDULE 1.1(a)**

**Acquired Entities**

1.      Hardinge Holdings GmbH
2.      L. Kellenberger & Co. AG
3.      Jones & Shipman Hardinge Limited
4.      Hardinge Asia Limited
5.      Hardinge Machine (Shanghai) Co. Ltd.
6.      Forkardt Precision Machinery (Shanghai) Co. Ltd.
7.      Hardinge Holdings B.V.
8.      Hardinge Taiwan Precision Machinery Limited
9.      Hardinge Machine Tools B.V.
10.     Jones Shipman SARL
11.     Hardinge Machine Tools B.V. Taiwan Branch
12.     Hardinge Machine Tools India LLP
13.     Hardinge Precision Machinery (JiaXing) Co. Ltd.
14.     Hardinge GmbH
15.     Forkardt Deutschland GmbH
16.     Forkardt France S.A.S.

## **EXHIBIT A**

## **Form of Bill of Sale and Assignment and Assumption Agreement**

**EXHIBIT B**

**Cash Shortfall Budget**

**EXHIBIT C**

**Form of IP Assignment Agreement**