**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>Hardinge Inc., *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 24-11605 (JKS)<br><br>(Jointly Administered) |

# FOURTH AMENDED COMBINED DISCLOSURE STATEMENT AND CHAPTER 11 PLAN OF LIQUIDATION OF HARDINGE INC. AND ITS AFFILIATED DEBTORS AND DEBTORS IN POSSESSION

Dated: December 18, 2024
Wilmington, Delaware

**CHIPMAN BROWN CICERO & COLE, LLP**

*<u>/s/ Mark L. Desgrosseilliers</u>*
Robert A. Weber (No. 4013)
Mark L. Desgrosseilliers (No. 4083)
Hercules Plaza
1313 N. Market Street, Suite 5400
Wilmington, DE 19801
(302) 295-0196
weber@chipmanbrown.com
desgross@chipmanbrown.com

-and-

**ROPES & GRAY LLP**
Gregg M. Galardi (No. 2991)
Lindsay C. Barca (*admitted* pro hac vice)
1211 Avenue of the Americas
New York, New York 10036
Telephone: (212) 596-9000
Facsimile: (212) 596-9090
gregg.galardi@ropesgray.com
lindsay.barca@ropesgray.com

*Counsel to the Debtors and Debtors in Possession*

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number are: Hardinge Ventures LLC (0586); Ohio Tool Works, LLC (7569); Kellenberger Swiss Grinding Machines, LLC (N/A); Hardinge Inc. (0200); Hardinge Technology Systems, Inc. (6427); Forkardt Inc. (4671); and Hardinge Grinding Group Inc. (6173). The Debtors' service address is One Hardinge Drive, Elmira, NY 14902-1507.

# TABLE OF CONTENTS


I. Introduction ........................................ 1

II. Important Dates ........................................ 2

III. Definitions and Construction of Terms ........................................ 2

A. Definitions ........................................ 2

B. Interpretation; Application of Definitions and Rules of Construction ........................................ 16

IV. Disclosures ........................................ 17

A. General Background ........................................ 17

1. Overview of Business Operations ........................................ 17

2. Debtors' Prepetition Capital Structure ........................................ 18

3. The Pension Plan and the PBGC's Claims ........................................ 18

4. Events Precipitating the Chapter 11 Filing ........................................ 19

5. The Restructuring Committee Appointment and Investigation ........................................ 20

B. The Chapter 11 Cases ........................................ 21

1. First Day Orders ........................................ 21

2. Retention of Professionals ........................................ 22

3. Appointment of the Committee ........................................ 22

4. The DIP Facility ........................................ 22

5. Marketing and Sale of the Debtors' Assets ........................................ 23

6. The Committee Resolution Term Sheet ........................................ 24

C. Summary of Assets ........................................ 29

D. Summary of Plan Treatment of Claims and Equity Interests ........................................ 29

1. Summary of Treatment of Unclassified Claims ........................................ 29

2. Summary of Treatment of Classified Claims and Equity Interests Under the Plan ........................................ 30

E. Potential Claims and Causes of Action ....................31

F. Certain Federal Income Tax Consequences ....................32

1. Tax Consequences to the Debtors ....................32

2. Tax Treatment of the GUC Trust and Tax Consequences for Holders of Claims ....................33

G. Certain Risk Factors to Be Considered ....................34

H. Feasibility ....................35

I. Best Interests Test and Alternatives to the Combined Disclosure Statement and Plan ....................36

J. Releases by the Debtors ....................37

V. Plan treatment ....................37

A. UNCLASSIFIED CLAIMS ....................38

1. DIP Facility Claims ....................38

2. Administrative Expense Claims ....................38

3. Professional Fee Claims ....................38

4. Priority Tax Claims ....................40

5. Statutory Fees ....................40

B. CLASSIFIED CLAIMS AND INTERESTS ....................40

1. Class 1 – Prepetition Secured Claims ....................40

2. Class 2 – Miscellaneous Secured Claims ....................41

3. Class 3 – Priority Claims ....................41

4. Class 4 – Deficiency Claims ....................42

5. Class 5 – PBGC Claims ....................42

6. Class 6 – General Unsecured Claims ....................42

7. Class 7 - Subordinated Claims ....................43

8. Class 8 – Equity Interests ....................43

C. Impaired Claims and Equity Interests ..... 43

D. Cramdown and No Unfair Discrimination ..... 43

VI. Confirmation Procedures ..... 44

A. Confirmation Procedures ..... 44

1. Combined Hearing ..... 44

2. Procedure for Objections ..... 44

3. Requirements for Confirmation ..... 44

B. Solicitation and Voting Procedures ..... 44

1. No Substantive Consolidation; Limited Administrative Consolidation ..... 44

2. Eligibility to Vote on the Plan ..... 45

3. Solicitation Package ..... 45

4. Voting Procedures and Voting Deadline ..... 45

5. Deemed Acceptance or Rejection ..... 47

6. Acceptance by Impaired Classes ..... 47

VII. Implementation and Execution of the Plan ..... 47

A. Effective Date ..... 47

B. Closing of the Chapter 11 Cases ..... 47

C. Records ..... 48

D. GUC Trustee ..... 48

1. Establishment of the GUC Trust ..... 48

2. Transfer of GUC Trust Assets to GUC Trust ..... 48

3. Purpose of the GUC Trust ..... 48

4. Preservation of Rights ..... 49

5. Continued Cooperation ..... 50

6. GUC Trustee ..... 50

7. GUC Trust Expenses....54

8. Privileges....54

9. Termination of GUC Trust....54

E. Provisions Governing Distributions Under the Plan....54

1. Distribution Record Date....54

2. Method of Payment....54

3. Surrender of Instruments....55

4. Delivery of Distributions....55

5. Objection to and Resolution of Claims....56

6. Preservation of Rights to Settle Claims....56

7. Miscellaneous Distribution Provisions....57

VIII. Executory Contracts and Unexpired Leases....57

A. Background....57

B. Executory Contracts and Unexpired Leases....57

C. Rejection Claims....57

IX. Conditions Precedent to Confirmation and the Effective Date....58

A. Conditions Precedent to Confirmation....58

B. Conditions Precedent to the Effective Date....58

C. Waiver of Conditions....59

D. Effect of Nonoccurrence of Conditions....59

X. Exculpation, Releases, and Injunctions....59

A. Injunction....59

B. Exculpation....60

C. Releases by the Debtors....60

D. Committee Release of Released Directors and Officers and the CLP Parties....62

E. Privet Settlement Releases ....................63

F. Releases by Holders of Claims and Equity Interests of Debtors. ....................64

XI. Retention of Jurisdiction ....................65

XII. Miscellaneous Provisions ....................66

A. Amendment or Modification of the Combined Disclosure Statement and Plan....66

B. Exhibits/Schedules ....................67

C. Plan Supplement ....................67

D. Filing of Additional Documents ....................67

E. Binding Effect of Plan ....................67

F. Governing Law ....................67

G. Time ....................67

H. Severability ....................67

I. Revocation ....................68

J. Dissolution of the Committee ....................68

K. Inconsistency ....................68

L. No Admissions ....................68

M. Reservation of Rights ....................68

XIII. Recommendation ....................69


**PLAN EXHIBITS**


Exhibit A: Liquidation Analysis

Exhibit B: Committee Resolution Term Sheet

**NOTICE**

THIS FOURTH AMENDED COMBINED DISCLOSURE STATEMENT AND PLAN SETS FORTH THE COMMITTEE PLAN SETTLEMENT AS FINALIZED AMONG THE DEBTORS, COMMITTEE, AND CERTAIN OTHER PARTIES. THE DEBTORS RESERVE ALL RIGHTS TO FURTHER AMEND OR MODIFY THE PLAN CONSISTENT WITH SUCH SETTLEMENT AND APPLICABLE LAW.

THERE HAS BEEN NO INDEPENDENT AUDIT OF THE FINANCIAL INFORMATION CONTAINED IN THIS COMBINED DISCLOSURE STATEMENT AND PLAN EXCEPT AS EXPRESSLY INDICATED HEREIN. THIS COMBINED DISCLOSURE STATEMENT AND PLAN WAS COMPILED FROM INFORMATION OBTAINED FROM NUMEROUS SOURCES BELIEVED TO BE ACCURATE TO THE BEST OF THE DEBTORS' KNOWLEDGE, INFORMATION AND BELIEF. NO GOVERNMENTAL AUTHORITY HAS PASSED ON, CONFIRMED, OR DETERMINED THE ACCURACY OR ADEQUACY OF THE INFORMATION CONTAINED HEREIN.

NOTHING STATED HEREIN SHALL BE DEEMED OR CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY, OR BE ADMISSIBLE IN ANY PROCEEDING INVOLVING THE DEBTORS OR ANY OTHER PARTY, OR BE DEEMED CONCLUSIVE EVIDENCE OF THE TAX OR OTHER LEGAL EFFECTS OF THE COMBINED DISCLOSURE STATEMENT AND PLAN ON THE DEBTORS OR HOLDERS OF CLAIMS OR EQUITY INTERESTS. CERTAIN STATEMENTS CONTAINED HEREIN, BY NATURE, ARE FORWARD-LOOKING AND CONTAIN ESTIMATES AND ASSUMPTIONS. THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL REFLECT ACTUAL OUTCOMES.

THE STATEMENTS CONTAINED HEREIN ARE MADE AS OF THE DATE HEREOF, UNLESS ANOTHER TIME IS SPECIFIED. THE DELIVERY OF THIS COMBINED DISCLOSURE STATEMENT AND PLAN SHALL NOT BE DEEMED OR CONSTRUED TO CREATE ANY IMPLICATION THAT THE INFORMATION CONTAINED HEREIN IS CORRECT AT ANY TIME AFTER THE DATE HEREOF.

HOLDERS OF CLAIMS AND EQUITY INTERESTS SHOULD NOT CONSTRUE THE CONTENTS OF THIS COMBINED DISCLOSURE STATEMENT AND PLAN AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL, OR TAX ADVICE. THEREFORE, EACH SUCH HOLDER SHOULD CONSULT WITH ITS OWN LEGAL, BUSINESS, FINANCIAL AND TAX ADVISORS AS TO ANY SUCH MATTERS CONCERNING THE COMBINED DISCLOSURE STATEMENT AND PLAN AND THE TRANSACTIONS CONTEMPLATED HEREBY.

# I. INTRODUCTION[1]

The Debtors propose this Combined Disclosure Statement and Plan pursuant to Bankruptcy Code sections 1125 and 1129, and Local Rule 3017-2. The Debtors are the "proponents" of the Combined Disclosure Statement and Plan within the meaning of Bankruptcy Code section 1129.

The Combined Disclosure Statement and Plan reflects settlements reached after substantial negotiations among the Debtors, the Committee, Centre Lane and other parties in interest.

**Copies of this Combined Disclosure Statement and Plan and all other documents related to these Chapter 11 Cases are available for review with charge on the bankruptcy case website at https://www.pacer.gov/, through Debtors' counsel by emailing desgross@chipmanbrown.com, or online for no charge at https://cases.ra.kroll.com/Hardinge.**

The Combined Disclosure Statement and Plan describes and proposes a liquidating chapter 11 plan. If the Plan is confirmed by the Bankruptcy Court, then upon the Effective Date: the GUC Trust Assets will be transferred to the GUC Trust and the GUC Trustee shall administer the GUC Trust and monetize and distribute the value of the GUC Assets to Holders of Allowed General Unsecured Claims and PBGC Claims as soon as practicable pursuant to the terms of the Plan and the GUC Trust Agreement. Because the cash made available for distribution pursuant to the Committee Resolution Term Sheet is not allocated to specific Debtor Estates, although the Combined Disclosure Statement and Plan are proposed jointly for administrative purposes, the Combined Disclosure Statement and Plan also seeks entry of a Bankruptcy Court order consolidating the Debtors' Estates into a single Estate for the limited purposes of voting on, the confirmation of , and distributions under the Plan. As a result, each Class of Claims and Equity Interests will be treated as against a single consolidated Estate without regard to the separate legal existence of the Debtors.

Each Holder of a Claim against the Debtors entitled to vote to accept or reject the Plan is encouraged to read the Combined Disclosure Statement and Plan in its entirety before voting.

Subject to the restrictions on modifications as set forth in section 1127 of the Bankruptcy Code, Bankruptcy Rule 3019, and in this Combined Disclosure Statement and Plan, the Debtors expressly reserve the right to alter, amend, or modify the Combined Disclosure Statement and Plan one or more times before its substantial consummation.

[1] All capitalized terms used but not defined in the Introduction shall have the meanings ascribed to them in Article II of the Combined Disclosure Statement and Plan.

## II. IMPORTANT DATES

| DESCRIPTION | DEADLINE |
|---|---|
| Voting Procedures Hearing Objection Deadline | October 23, 2024, at 4:00 p.m. (ET) |
| Voting Procedures and Interim Disclosure Statement Hearing | October 30, 2024, at 1:00 p.m. (ET) |
| Voting Record Date | October 30, 2024 |
| Solicitation Commencement Date | Within five (5) business days after entry of the Interim Approval and Procedures Order |
| Deadline for Creditors to File Rule 3018 Motions | December 4, 2024, at 4:00 p.m. (ET) |
| Deadline for Debtors to Respond to Rule 3018 Motions | December 11, 2024, at 4:00 p.m. (ET) |
| Deadline for Plan Supplement | December 2, 2024 at 4:00 p.m. (ET) |
| Voting Deadline for the Combined Disclosure Statement and Plan | December 9, 2024, at 4:00 p.m. (ET) |
| Combined Disclosure Statement and Plan Objection Deadline | December 9, 2024, at 4:00 p.m. (ET) |
| Deadline to File Confirmation Brief and Other Evidence Supporting the Combined Disclosure Statement and Plan | December 13, 2024, at 4:00 p.m. (ET) |
| Deadline for Reply to Objections to Combined Disclosure Statement and Plan | December 13, 2024 at 4:00 p.m. (E.T.) |
| Deadline to File Voting Tabulation Affidavit | December 13, 2024, at 4:00 p.m. (ET) |
| Combined Hearing | December 18, 2024, at 10:00 a.m. (ET) |

## III. DEFINITIONS AND CONSTRUCTION OF TERMS

### A. Definitions

"**Administrative Expense Claim**" means any Claim for the costs and expenses of administration of the Chapter 11 Cases pursuant to section 503(b), 507(a)(2), 507(b) or 1114(e)(2) of the Bankruptcy Code, including the actual and necessary costs and expenses incurred after the Petition Date and through the Effective Date of preserving the Estates and operating the businesses of the Debtors, other than Professional Fee Claims.

**"Administrative Expense Claim Request"** means a request, filed with the Bankruptcy Court, for allowance and payment of an Administrative Expense Claim against any Debtor in accordance with the Bar Date Order or any other order by the Bankruptcy Court requiring the fixing of Administrative Expense Claims.

**"Affiliate"** means an "affiliate" as defined in section 101(2) of the Bankruptcy Code.

"**Allowed**" means, with respect to any Claim, except as otherwise provided herein: (a) a Claim that has been scheduled by the Debtors in their Schedules as other than "disputed, contingent or unliquidated" (as such terms are defined in the Schedules) and as to which the Debtors, the GUC Trustee, or other parties-in-interest have not Filed an objection by the applicable Claims Objection Deadline; (b) a proof of Claim that has been Filed and as to which the Debtors, the GUC Trustee, or other parties-in-interest have not Filed an objection by the applicable Claims Objection Deadline; (c) a Proof of Claim that is neither Disputed nor has been disallowed by a Final Order; (d) a Claim that is allowed pursuant to the terms of this Plan; (e) a Claim that has been Allowed by a Final Order of the Bankruptcy Court; or (f) a Claim that is estimated pursuant to section 502(c) of the Bankruptcy Code, unless otherwise and explicitly provided by order of the Bankruptcy Court.

**"Amended Schedules Bar Date"** means the later of (a) the General Bar Date, and (b) 5:00 p.m. (prevailing Eastern Time) on the date that is thirty (30) days following the service of notice of the applicable amendment to the Schedules.

"**APAs**" means the OTW APA and the Stalking Horse APA, as approved by the Sale Orders, as may have been subsequently amended or modified consistent with their terms.

"**Assets**" means any and all right, title, and interest of the Debtors in and to property of whatever type or nature, real or personal, tangible or intangible, including, without limitation, any real estate, buildings, structures, improvements, privileges, rights, easements, leases, subleases, licenses, goods, materials, supplies, furniture, fixtures, equipment, works in progress, accounts, chattel paper, deposit accounts, reserves, deposits, contractual rights, intellectual property rights, Causes of Action, Claims, other causes of action, and any general intangibles, but specifically excludes the Purchased Assets.

"**Avoidance Actions**" means any and all Causes of Action and rights to recover or avoid transfers or to avoid any lien under chapter 5 of the Bankruptcy Code or applicable state law or otherwise belonging to the Debtors and which were not transferred to the Purchasers in connection with the Sale Transactions.

"**Ballot**" means the voting form distributed to each Holder of an Impaired Claim entitled to vote on the Plan, on which the Holder is to indicate acceptance or rejection of the Plan in accordance with the voting instructions and make any other elections or representations required pursuant to the Plan.

"**Bankruptcy Code**" means title 11 of the United States Code, 11 U.S.C. §§ 101-1532.

"**Bankruptcy Court**" means the United States Bankruptcy Court for the District of Delaware, having jurisdiction over the Chapter 11 Cases or, if such Court ceases to exercise

jurisdiction over the Chapter 11 Cases, such court or adjunct thereof that exercises jurisdiction over the Chapter 11 Cases in lieu of the United States Bankruptcy Court for the District of Delaware.

"**Bankruptcy Rules**" means the Federal Rules of Bankruptcy Procedure, as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, as amended from time to time.

"**Bar Date**" means, as applicable, the General Bar Date, the Governmental Bar Date, the Rejection Dar Date, the Amended Schedules Bar Date, the Initial Administrative Expense Bar Date, and the Supplemental Administrative Expense Claims Bar Date.

"**Bar Date Order**" means the *Order (I) Establishing (A) Bar Date and Related Procedures for Filing Proofs of Claim (Including for Administrative Expense Claims Arising Under Section 503(b)(9) of the Bankruptcy Code) and (B) Initial Bar Date and Related Procedures for Assertion of Post-Petition Administrative Expense Claims, (II) Approving the Form and Manner of Notice Thereof, and (III) Granting Related Relief* [Docket No. 413].

"**Bidding Procedures Motion**" means the *Debtors' Motion Pursuant to Sections 105, 363 and 365 of the Bankruptcy Code for Entry of an Order (I) Approving the Bidding Procedures, Including the Debtors' Entry Into the Stalking Horse APA, the Sale Timeline, and the Form and Manner of Notice Thereof; (II) Approving the Debtors' (A) Sale of All or Substantially All of the Debtors' Assets Free and Clear of All Liens Other Than Assumed Liabilities and (B) Assumption and Assignment of Certain Executory Contracts and Unexpired Leases to the Successful Bidder; and (III) Granting Related Relief* [Docket No. 35].

"**Bidding Procedures Order**" means the *Order (I)(A) Approving Certain Bidding Procedures and the Form and Manner of Notice Thereof, (B) Approving the Debtors' Entry into the Stalking Horse APA, (C) Approving the Form and Manner of Notice of the Sale Hearing; and (II) Granting Related Relief* [Docket No. 194].

"**Business Day**" means any day other than a Saturday, Sunday, or any other day on which commercial banks in New York, New York are required or authorized to close by law or executive order.

"**Cash**" means legal tender of the United States of America or equivalents thereof, including, without limitation, payment in such tender by check, wire transfer, or any other customary payment method.

"**Causes of Action**" means any Claim, cause of action, controversy, right of setoff, cross claim, counterclaim, or recoupment and any claim on contracts or for breaches of duties imposed by law or in equity, demand, right, action, lien, indemnity, guaranty, suit, obligation, liability, damage, judgment, account, defense, power, privilege, license, or franchise of any kind or character whatsoever, known, unknown, fixed or contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity, or pursuant to any other theory of law.

**"Centre Lane"** means Centre Lane Partners, LLC or any of its affiliated Entities.

"**Chapter 11 Cases**" means the chapter 11 cases initiated by the Debtors' filing on the Petition Date of voluntary petitions for relief in the Bankruptcy Court under chapter 11 of the Bankruptcy Code. The Chapter 11 Cases are jointly administered by the Bankruptcy Court under Case No. 24-11605 (JKS).

"**Claim**" shall have the meaning set forth in section 101(5) of the Bankruptcy Code.

**"Claims and Balloting Agent"** means Kroll Restructuring Administration LLC.

**"Claims Objection Deadline"** means the date by which the Debtors or the GUC Trust must file and serve objections to Claims, which date shall be the later of (i) 180 days after the Effective Date and (ii) such later date as may be fixed by the Bankruptcy Court after reasonable notice and opportunity to object.

"**Class**" means any group of substantially similar Claims or Equity Interests classified by the Combined Disclosure Statement and Plan pursuant to Bankruptcy Code sections 1122 and 1123(a)(1).

"**Clerk**" means the Clerk of the Bankruptcy Court.

"**Close of Sale**" means the date upon which the Debtors and the Purchasers closed the transactions that transferred the Purchased Assets to the Purchasers pursuant to the Sale Orders.

"**Closing Date**" means the date on which the Close of Sale occurred.

**"CLP Parties"** means, individually and collectively, in each case solely in their capacities as such, each and all of: (a) DIP Lenders; (b) DIP Agent; (c) Prepetition Lender; (d) Stalking Horse Purchaser and successors thereto; and (e) all directors, managers, officers, employees, agents, attorneys, consultants, advisors or other representatives of (a)-(d).

"**COD**" means cancellation of indebtedness.

"**Combined Disclosure Statement and Plan**" means this combined disclosure statement and chapter 11 plan of liquidation including, without limitation, all exhibits, supplements, appendices, and schedules hereto, either in their present form or as the same may be altered, amended, or modified from time to time.

"**Committee Resolution Term Sheet**" means that certain term sheet, entered into by and between the Committee and Purchasers on September 12, 2024, attached as Exhibit 2 to the Stalking Horse Sale Order and attached hereto as **Exhibit B**.

**"Committee's Retained Professionals"** means McDermott Will & Emery LLP and Province, LLC.

"**Company**" means, collectively, the Debtors and their non-debtor foreign subsidiaries as of the Petition Date.

"**Confirmation Date**" means the date on which the Confirmation Order is entered on the Bankruptcy Court's Docket.

"**Confirmation Hearing**" means the hearing held by the Bankruptcy Court to consider (a) approval of the Combined Disclosure Statement as providing adequate information pursuant to Bankruptcy Code section 1125, and (b) Confirmation of the Plan pursuant to Bankruptcy Code section 1129, as such hearing may be adjourned or continued from time to time.

"**Confirmation Order**" means the order of the Bankruptcy Court confirming the Plan pursuant to Bankruptcy Code section 1129.

"**Confirmation**" means confirmation of the Plan pursuant to Bankruptcy Code section 1129.

"**Creditor**" means any Entity that is the Holder of a Claim against the Debtors.

**"D&O Insurance Coverage"** means any insurance coverage under which any of the Debtors or their respective officers or directors is entitled to coverage for actions taken in their capacity as such, including but not limited to (a) Extended Reporting D&O policy (Chubb + Excess Carriers), (b) D&O Policy, Federal Insurance Company, (c) D&O - 1st Excess Policy, Bridgeway, (d) D&O - 2nd Excess Policy, AXIS Insurance Company, (e) D&O - 3rd Excess Policy, Allied World, (f) D&O - Side A Excess Policy, National Union Fire Insurance Company of Pittsburgh, Pa., (g) LEAD SIDE A D&O Policy, Everest National Insurance Company, and (h)Directors and Officers – Side A Excess Policy, QBE Insurance Corporation.

**"Debtors' Retained Professions"** means Ropes & Gray LLP, Chipman Brown Cicero & Cole, LLP, Houlihan Lokey Capital, Inc., Ankura Consulting Group, LLC, Bonadio & CO. LLP, Pillsbury Winthrop Shaw Pittman LLP, and Kroll Restructuring Administration LLC in its capacity as administrative advisor pursuant to the Final Order entered at docket number 159.

"**Debtors**" means the Debtors in the Chapter 11 Cases: Hardinge Ventures LLC; Ohio Tool Works, LLC; Kellenberger Swiss Grinding Machines, LLC; Hardinge; Hardinge Technology Systems, Inc.; Forkardt Inc.; and Hardinge Grinding Group Inc.

**"Deficiency Claims"** means unpaid unsecured Claims, if any, held by the Prepetition Lender arising under or related to the Prepetition Credit Agreement.

"**DIP Agent**" means Centre Lane Solutions Partners, LP, as administrative agent under the DIP Facility.

**"DIP Credit Agreement"** means that certain Superpriority Secured Debtor-in-Possession Credit Agreement dated as of July 31, 2024 (as the same may be amended, supplemented, restated or otherwise modified from time to time) among Hardinge, the Guarantors from time to time parties thereto, the Lenders from time to time party thereto, and Centre Lane Solutions Partners, LP, as Administrative Agent.

"**DIP Facility**" means the financing facility provided to the Debtors pursuant to the terms of the DIP Credit Agreement and the DIP Orders.

"**DIP Facility Claims**" means all Claims asserted against the Debtors by the DIP Lenders, including, without limitation, principal, accrued and unpaid interest, any reimbursement obligations (contingent or otherwise), all fees, expenses, and disbursements (including, without limitation, attorneys' fees, financial advisors' fees, and related expenses and disbursements incurred by, or on behalf of, the DIP Lenders), indemnification obligations, all other charges, amounts, and costs of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing or chargeable in respect thereof.

"**DIP Lenders**" means the lenders from time-to-time party to the DIP Credit Agreement.

**"DIP Orders"** means the Interim DIP Order and the Final DIP Order.

"**Disallowed**" means, when used in reference to a Claim, all or that portion, as applicable, of any Claim that has been disallowed under the Combined Disclosure Statement and Plan, the Bankruptcy Code, applicable law, or by Final Order.

**"Disclosure Statement"** means the combined disclosure statement portion of this Combined Disclosure Statement and Plan.

"**Disputed**" means any Claim or Equity Interest, or any portion thereof, that is (a) listed on the Schedules as unliquidated, disputed, and/or contingent for which no Proof of Claim in a liquidated and non-contingent amount has been Filed, (b) not listed on the Schedules as unliquidated, disputed, and/or contingent and as to which the Claims Objection Deadline to such claim has not passed, (c) the subject of an objection or request for estimation Filed by the Debtors or the GUC Trustee or any other party in interest in accordance with applicable law and which objection has not been withdrawn, resolved, or overruled by a Final Order, or (d) filed after any applicable Bar Date.

"**Distribution**" means any distribution to a Holder of an Allowed Claim pursuant to the terms of the Plan.

**"Distribution Record Date"** means the Date the Bankruptcy Court enters the Interim Approval and Procedures Order.

"**Docket**" means the docket in the Chapter 11 Cases maintained by the Clerk.

"**Effective Date**" means the date on which the conditions specified in Article IX.B of the Combined Disclosure Statement and Plan have been met or satisfied.

**"Elmira Entities"** means Elmira Landlord and Hardinge Property.

**"Elmira Landlord"** means One Hardinge Drive, LLC, the owner of the Elmira Leased Property, a direct subsidiary of Hardinge Property, and an indirect subsidiary of Privet Capital.

**"Elmira Leased Property"** means the real estate located at One Hardinge Drive, Elmira, New York 14903, which as of the Petition Date was leased by Elmira Landlord to Debtor Hardinge Technology Systems, Inc.

**"Elmira Owned Property"** means the real property owned by Hardinge Technology Systems, Inc. located in Elmira, New York.

"**Entity**" means an "entity" as defined in Bankruptcy Code section 101(15).

"**Equity Interests**" means all equity interests in the Debtors, including, but not limited to, all issued, unissued, authorized, or outstanding shares or membership interests together with any warrants, options, or contract rights to purchase or acquire such interests at any time.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended.

"**Estates**" means the estates of the Debtors created upon the commencement of the Chapter 11 Cases pursuant to Bankruptcy Code section 541.

**"Excluded Causes of Action"** means the claims and causes of action not acquired by the Stalking Horse Purchaser pursuant to the Committee Resolution Term Sheet.

**"Exculpated Parties"** means, individually and collectively, in each case solely in their capacities as such, each and all of: (a) the Debtors and the Debtors' Retained Professionals; (b) the Committee, the members of the Committee in their capacity as members of the Committee, and the Committee's Retained Professionals; and (c) the officers and directors of the Debtors, each in their capacity as such, for any period from and after the Petition Date through the Effective Date.

"**Executory Contract**" means any executory contract or unexpired lease as of the Petition Date between the Debtors and any other Entity or Entities, specifically excluding contracts and agreements entered into pursuant to this Combined Disclosure Statement and Plan.

"**File, Filed, or Filing**" means file, filed, or filing with the Bankruptcy Court in the Chapter 11 Cases.

"**Final Decree**" means the order entered pursuant to Bankruptcy Code section 350, Bankruptcy Rule 3022, and Local Rule 5009-1 closing the Chapter 11 Cases.

"**Final DIP Order**" means the *Final Order (I) Authorizing the Debtors to Obtain Postpetition Financing Pursuant to Section 364 of the Bankruptcy Code, (II) Authorizing the Debtors to Use Cash Collateral Pursuant to Section 363 of the Bankruptcy Code, (III) Granting Adequate Protection to the Prepetition Secured Parties Pursuant to Sections 361, 362, 363 and 364 of the Bankruptcy Code, (IV) Granting Liens and Superpriority Claims, (V) Modifying the Automatic Stay, and (VI) Granting Related Relief* [Docket No. 336].

"**Final Order**" means an order, ruling or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter: (a) which has not been reversed, stayed, modified, amended, or vacated as to which the time to appeal, petition for certiorari or move for a new trial, stay, reargument, reconsideration or rehearing has expired and no appeal, petition for certiorari or motion for reargument, reconsideration or rehearing has been timely filed; or (b) as to which any appeal, petition for certiorari or motion for a new trial, stay, reargument, reconsideration or rehearing that has been or may timely be filed has been resolved by the highest court to which the order or judgment was appealed or from which certiorari,

reargument, reconsideration or rehearing was sought; provided, however, that, any motion for relief from an order, ruling or judgment shall not affect the finality or suspend the operation of such order, ruling or judgment.

"**First Day Declaration**" means the *Declaration of Adrian Frankum, Chief Restructuring Officer of the Debtors, in Support of Debtors' Chapter 11 Petitions and First Day Motions* [Docket No. 18].

"**First Day Motions**" means the Debtors' motions filed upon the commencement of the Chapter 11 Cases [Docket Nos. 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16 and 27].

**"General Bar Date"** means November 13, 2024 at 5:00 p.m. (prevailing Eastern Time), as established under the Bar Date Order

"**General Unsecured Claims**" means any unsecured Claim against the Debtors which is not a Priority Claim, Administrative Expense Claim, Professional Fee Claim, Priority Tax Claim, DIP Facility Claim, First Lien Claim, a Miscellaneous Secured Claim, a Deficiency Claim, PBGC Claim, or a Subordinated Claim and is not entitled to a priority under the Bankruptcy Code or any order of the Bankruptcy Court.

"**Governmental Bar Date**" means January 27, 2025 at 5:00 p.m. (*prevailing* Eastern Time), as established by the Bar Date Order.

"**Governmental Unit**" means a "governmental unit" as defined in Bankruptcy Code section 101(27).

**"GUC Estate Causes of Action"** means the Estate Causes of Action (other than any Causes of Action against the Released Directors and Officers, Privet, Levenson, and Rosenzweig), including the Retained Causes of Action transferred to the GUC Trust pursuant to the Plan and as described in Article IV.B.7. herein.

"**GUC Trust Agreement**" means the trust agreement that documents the powers, duties, and responsibilities of the GUC Trustee, and which agreement will be materially consistent with the Plan and otherwise reasonably acceptable to the Debtors and the Committee, in the final form agreed among the Debtors and the Committee prior to the Effective Date.

"**GUC Trust Assets**" means the Initial GUC Trust Funding Amount, the Elmira Owned Property and the GUC Estate Causes of Action and the proceeds thereof.

"**GUC Trust**" means a trust to be established on the Effective Date pursuant to the terms of the GUC Trust Agreement and the Plan.

"**GUC Trust Beneficiaries**" means the Holders of Allowed Claims in Class 5 and Class 6.

"**GUC Trust Oversight Committee"** means the oversight committee, which is tasked with overseeing the GUC Trustee in accordance with the Plan and GUC Trust Agreement, the members

of which shall be Paul Nold of Forefront Machining Technologies, Inc. and Nancy Yesue of Lincoln Park Boring, Co.

"**GUC Trustee**" means the Entity selected by the Committee, in consultation with the Debtors and the Prepetition Lender, to administer the GUC Trust under the GUC Trust Agreement and identified in the Plan Supplement.

**"Hardinge"** means Debtor Hardinge, Inc.

**"Hardinge Holdings"** means non-debtor Hardinge Holdings, LLC, the holder of the equity interests in Debtor Hardinge.

**"Hardinge Property"** means Hardinge Property Company, LLC the parent of Elmira Landlord.

"**Holder**" means the beneficial holder of any Claim or Interest.

**"Impaired"** means, with respect to any Class, a Class that is impaired within the meaning of Bankruptcy Code sections 1123(a)(4) and 1124.

"**Initial Administrative Expense Bar Date**" means the deadline to file an Administrative Claim Request for administrative claims asserted between July 29, 2024 and September 17, 2024, which deadline is November 13, 2024 at 5:00 p.m. (prevailing Eastern Time).

**"Initial GUC Trust Funding Amount"** means the amount of cash transferred from the Debtors to the GUC Trust on the Effective Date, which amount is presently unknown.

"**Intercompany Claims**" means any Claim held by one Debtor against another Debtor.

"**Interest**" means any "equity security" in a Debtor as defined in section 101(16) of the Bankruptcy Code, including, without limitation, all issued, unissued, authorized or outstanding ownership interests (including common and preferred) or other equity interests, together with any warrants, options, convertible securities, liquidating preferred securities or contractual rights to purchase or acquire any such equity interests at any time and all rights arising with respect thereto.

"**Interim Approval and Procedures Order**" means the order of the Bankruptcy Court conditionally approving the Combined Disclosure Statement and Plan for solicitation purposes only and authorizing the Debtors to solicit the Combined Disclosure Statement and Plan.

**"Interim DIP Order"** means that certain *Interim Order (I) Authorizing the Debtors to Obtain Postpetition Financing Pursuant to Section 364 of the Bankruptcy Code, (II) Authorizing the Debtors to Use Cash Collateral Pursuant to Section 363 of the Bankruptcy Code, (III) Granting Adequate Protection to the Prepetition Secured Parties Pursuant to Sections 361, 362, 363 and 364 of the Bankruptcy Code, (IV) Granting Liens and Superpriority Claims, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* [Docket No. 85].

"**Kellenberger**" means Debtor Kellenberger Swiss Grinding Machines, LLC.

"**Levenson**" means Ryan Levenson.

"**Local Rules**" means the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware.

**"Miscellaneous Secured Claims"** means any Secured Claim other than the DIP Facility Claims or Prepetition Secured Claims.

**"Notice of Permitted Borrowing"** means the *Notice of Permitted Borrowing Under Kellenberger and USACH Term Loan Commitments Pursuant to Interim DIP Order* [Docket No. 142].

"**OTW APA**" means that certain *Asset Purchase Agreement*, dated as of September 17, 2024, by and between OTW Purchaser and Debtor Ohio Tool Works, LLC, as attached to the OTW Sale Order.

"**OTW Purchaser**" means Ohio Tool Work, LLC, an Ohio limited liability company or its designee.

"**OTW Sale Order**" means the *Order (I) Approving the Sale of All or Substantially All of Debtor Ohio Tool Works, LLC's Assets Free and Clear of Liens, Claims, Interests, and Encumbrances, (II) Authorizing the Debtor Ohio Tool Works, LLC to Enter Into and Perform Its Obligations Under the Asset Purchase Agreement and Related Documents, (III) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases in Connection Therewith, and (IV) Granting Related Relief* [Docket No. 338].

**"PBGC"** means the Pension Benefit Guaranty Corporation.

**"Pension Plan"** means the pension plan of Hardinge, Inc. as may have been modified or amended and as described in Article IV.A.3. herein.

"**Person**" means a "person" as defined in Bankruptcy Code section 101(41).

"**Petition Date**" means July 29, 2024, the date on which the Debtors filed their voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

**"Plan"** means the chapter 11 plan of liquidation contemplated by and described in this Combined Disclosure Statement and Plan.

"**Plan Supplement**" means the appendix of schedules and exhibits to be Filed with the Bankruptcy Court.

**"Preference Claims"** means all claims and Causes of Action that may be asserted pursuant to section 547 of the Bankruptcy Code by the Debtors and the Debtors' Estates, including, without limitation, any successors in interest thereto and which were not transferred to the Purchasers in connection with the Sale Transactions. Privet, Levenson, and Rosenzweig shall not be subject to any Preference Claims. For the avoidance of doubt, no such claims were transferred to the Purchasers in connection with the Sale Transactions.

**“Prepetition Agent”** means BMO Harris Bank N.A., as administrative agent under the Prepetition Credit Agreement.

**“Prepetition Credit Agreement”** means that certain Loan and Security Agreement, dated as of September 27, 2022 (as the same has been amended, restated, supplemented or modified from time to time prior to the Petition Date) between and among the Prepetition Agent and the Prepetition Financial Institutional Lenders.

**“Prepetition Financial Institutional Lenders”** means those certain financial institution parties as lenders under the Prepetition Credit Agreement.

“**Prepetition Lender**” means Centre Lane Partners V, L.P. in its capacity as Replacement Lender.

**“Prepetition Secured Claims**” means the Claims held by the Prepetition Lender pursuant to the Prepetition Credit Agreement.

**“Prepetition Secured Parties”** means the Prepetition Lender and the Prepetition Agent.

**“Prepetition Security Agreement”** means that certain Security Agreement, dated September 27, 2022 (as amended, restated, supplemented, amended and restated or otherwise modified from time to time prior to the Petition Date), between and among the Prepetition U.S. Loan Parties and the Prepetition Agent.

**“Prepetition U.S. Loan Parties”** means Hardinge (as Borrower), Hardinge Holdings, LLC, Hardinge Grinding Group Inc., Hardinge Technology Systems, Inc., Hardinge Ventures LLC, Forkardt Inc., and Ohio Tool Works, LLC.

“**Priority Claims**” means any Claim entitled to priority pursuant to Bankruptcy Code section 507(a) other than Administrative Expense Claims, Professional Fee Claims, and Priority Tax Claims.

“**Priority Tax Claims**” means any Claims of a Governmental Unit against any Debtor entitled to priority pursuant to Bankruptcy Code section 507(a)(8) or specified section of Bankruptcy Code section 502(i).

“**Privet**” means Privet Capital, Privet Fund, Privet Fund Management and Privet Capital Affiliates, together with their non-Debtor current affiliates, including, but not limited to, Hardinge Holdings, Hardinge Property, and Elmira Landlord, as well as any of the foregoing entities respective officers, members, partners, directors, employees, agents, attorneys, advisors and other representatives.

**“Privet Capital”** means Privet Capital Management LLC, an indirect equity owner of Hardinge Holdings.

**“Privet Capital Affiliates”** means the entities known as Privet Capital Investments II, L.P., Privet Capital Investments III, L.P., and Privet Capital Investments IV, L.P., holders of equity interests in Hardinge Holdings.

**"Privet Fund"** means Privet Fund LP, an equity owner in Hardinge Holdings.

**"Privet Fund Management"** means Privet Fund Management, LLC, an indirect equity holder in Hardinge Holdings and a provider of management and consulting services to Debtor Hardinge pursuant to the Privet Management Services Agreement.

**"Privet Management Services Agreement"** means that certain Management Services Agreement, entered into as of May 25, 2018, between and among Privet Fund Management, Hardinge Holdings, and Hardinge, as amended and restated from time to time, including on June 1, 2020 and September 22, 2022.

"**Privet Settlement**" means the settlement between and among Privet, the Debtors, the PBGC, and the Committee, as further described in this Combined Disclosure Statement and Plan, pursuant to which (i) Privet, Rosenzweig, and Levenson will contribute a total of $3.25 million, (ii) PBGC will receive $250,000 of the foregoing from Privet to settle its direct control group claims against Privet and its representatives, and (iii) the Privet Settlement Releases set forth in Article 10.E shall be deemed granted between and among the Debtors, Committee and its members, the PBGC, Privet, Levenson and Rosenzweig.

"**Privet Settlement Releases**" shall mean the releases set forth in Article 10.E.

"**Pro Rata**" means the proportion that an Allowed Claim in a particular Class bears to the aggregate amount of Allowed Claims in the same Class.

"**Professional**" means any professional Person employed in the Chapter 11 Cases pursuant to Bankruptcy Code section 327, 328, 363, or 1103 pursuant to an order of the Bankruptcy Court who is to be compensated for services rendered pursuant to Bankruptcy Code sections 327, 328, 329, 330, 331, or 363.

**"Professional Fee Amount"** means the aggregate amount of Professional Fee Claims and other unpaid fees and expenses of Professionals that such Professionals estimate they have incurred or will incur in rendering services to the Debtors through the Effective Date.

"**Professional Fee Claims Bar Date**" means the date that is sixty (60) days after the Effective Date, which date shall be the deadline for all Professional Fee Claims to be Filed.

"**Professional Fee Claims**" means all Claims for compensation and reimbursement of expenses by Professionals to the extent Allowed by the Bankruptcy Court.

**"Professional Fee Escrow Account"** means the escrow account established by the Debtors pursuant to the Final DIP Order at Citizens Bank, which account was funded by the Debtors with Cash on or prior to the Effective Date on account of Professional Fee Claims incurred between the Petition Date and Closing Date.

**"Professional Fee Reserve"** means a reserve to be established on the Effective Date consisting of the sum of (i) the balance, if any, of the Professional Fee Escrow Account, plus (ii) such additional Cash as is necessary to pay the accrued and unpaid Professional Fee Amount.

"**Proof of Claim**" means a proof of Claim Filed against any Debtor.

"**Purchased Assets**" means the Assets that the Debtors have already sold, conveyed, assigned, transferred, and delivered to the Purchasers, and that Purchasers purchased from each Debtor, in each case, free and clear of all Liens in accordance with the terms of the Sale Orders and the APAs. Any inconsistencies that arise under this definition shall be interpreted in favor of the definition of Purchased Assets in the APAs, as modified by the Sale Orders.

"**Purchasers**" means the OTW Purchaser and Stalking Horse Purchaser.

"**Rejection Bar Date**" means the later of (a) the General Bar Date, and (b) 5:00 p.m. (prevailing Eastern Time) on the date that is thirty (30) days following the service of an order of the Bankruptcy Court rejecting a claimant's Executory Contract, which order may be the Confirmation Order.

"**Rejection Claims**" means any Claim arising from, or relating to, the rejection of an executory contract or unexpired lease pursuant to section 365(a) of the Bankruptcy Code by any of the Debtors, as limited, in the case of a rejected unexpired lease, by Bankruptcy Code section 502(b)(6).

"**Release by Debtors**" means the release given by the Debtors to the Released Parties as set forth in Article X.C.

**"Released Directors and Officers"** means David Perdue, David Withers, Timothy Fitzgerald, Timothy R. Pohl, Adrian Frankum and, to the extent of any remaining Debtor claims against any of the Transferred Directors and Officers, such Transferred Directors and Officers.

"**Released Parties**" means, individually and collectively, in each case solely in their capacities as such, each and all of: (a) the Debtors; (b) the Debtors' Retained Professionals; (c) the Released Directors and Officers; (d) the Committee and members of the Committee in their capacity as members of the Committee; and (e) the Committee's Retained Professionals.

"**Releasing Parties**" means, individually and collectively, (a) the Released Parties, and (b) each holder of a Claim that (i) votes to accept the Plan and opts into the releases contained in the Plan, (ii) votes to reject the Plan and opts into the releases contained in the Plan, provided, however, that the Entities identified in part (b) shall be Releasing Parties only to the extent the corresponding Entities in part (a) are legally entitled to bind such Entities in part (b) to the releases contained in the Plan under applicable non-bankruptcy law.

"**Replacement Lender**" means Centre Lane Partners V, L.P.

**"Retained Causes of Action"** means all Causes of Action, if any, that belong to the Debtors or their Estates as of the Effective Date under section 1123(b)(3) of the Bankruptcy Code, which are expressly preserved and retained by the GUC Trust under the Plan and are not released, waived, or transferred to another Person pursuant to the Plan, which shall include (but not be limited to) (i) all Causes of Action other than those being released by this Plan, (ii) all Avoidance Actions, (iii) all Preference Claims, and (iv) those Causes of Action or other claims identified in Exhibit C attached to this Combined Disclosure Statement and Plan. For the avoidance of doubt,

the Retained Causes of Action shall not include any claims and any Causes of Action against Privet, Levenson, and Rosenzweig and any Causes of Action sold by the Debtors prior to the Effective Date, including all Causes of Action sold pursuant to the OTW APA and the Stalking Horse APA.

"**Rosenzweig**" means Benjamin Rosenzweig.

"**Rule 3018 Motion**" means a motion for temporary allowance of a claim for the purpose of voting on the Plan.

"**Sale Transactions**" means the transfer of the Purchased Assets by the Debtors to the Purchasers pursuant to the OTW APA and the Stalking Horse APA, as approved by the Sale Orders.

**"Sale Orders"** means the OTW Sale Order and the Stalking Horse Sale Order.

**"Sale Proceeds"** means all Cash proceeds generated from the sales of the Assets of the Debtors under the OTW APA and the Stalking Horse APA.

"**Schedules**" means the schedules of assets and liabilities, the list of Holders of Equity Interests, and the statements of financial affairs Filed by the Debtors under Bankruptcy Code section 521 and Bankruptcy Rule 1007, and all amendments and modifications thereto.

**"Second Amendment"** means that certain amendment to the Prepetition Credit Agreement, executed on July 23, 2024, providing incremental liquidity to the Debtors.

"**Secured Claims**" means Claims which are: (a) secured by a valid and perfected lien in collateral which is enforceable pursuant to applicable law, the amount of which is equal to or less than the value of such collateral (i) as set forth in this Combined Disclosure Statement and Plan, (ii) as agreed to by the Holder of such Claim and the Debtors, or (iii) as determined by a Final Order in accordance with Bankruptcy Code section 506(a); or (b) subject to a valid right of setoff under Bankruptcy Code section 553.

"**Solicitation Package**" means the packages to be distributed to creditors for solicitation of votes on the Plan.

"**Stalking Horse Purchaser**" means, collectively, Workholding US Holdings, LLC, KB Machines US Holdings, LLC, and Super Precision US Holdings, LLC.

"**Stalking Horse APA**" means that certain *Asset Purchase Agreement*, dated as of August 23, 2024, by and among the Debtors and the Stalking Horse Purchaser, as amended, as attached to the Stalking Horse Sale Order.

"**Stalking Horse Sale Order**" means the *Order (I) Approving the Sale of All or Substantially All of the Debtors' Assets Free and Clear of Liens, Claims, Interests, and Encumbrances, (II) Authorizing the Debtors to Enter Into and Perform Their Obligations Under the Asset Purchase Agreement and Related Documents, (III) Approving the Assumption and*

*Assignment of Certain Executory Contracts and Unexpired Leases in Connection Therewith, and (IV) Granting Related Relief* [Docket No. 337].

"**Statutory Fees**" means all fees payable to the U.S. Trustee pursuant to 28 U.S.C. § 1930, and any interest thereupon.

"**Supplemental Administrative Expense Bar Date**" means the deadline to file an Administrative Claim Request for administrative claims asserted between September 18, 2024 and the Effective Date, which date shall be 5:00 p.m. (prevailing Eastern Time) on the date that is thirty (30) days following the Effective Date.

"**Tax Code**" means the Internal Revenue Code of 1986, as amended.

"**Transferred Directors and Officers**" means Greg Knight, Matt Weeks, Alex Casajuana, Jeremy Michael, Ryan Ervin, Viktor Gaspar, and Hoil Kim.

"**Treasury Regulations**" means the regulations, including temporary regulations or any successor regulations, promulgated under the Tax Code, as amended from time to time.

"**Trust Expense**" means all actual and necessary fees, costs, expenses and obligations incurred or owed by the GUC Trustee or his or her agents, employees, attorneys, advisors or other professions in administering the Plan and the GUC Trust (including, without limitation, reasonable compensation for services rendered, and reimbursement for actual and necessary expense incurred by the GUC Trustee and his or her agents, employees and professionals) arising after the Effective Date through and including the date upon which the Bankruptcy Court enters a Final Decree closing the Chapter 11 Cases, which expenses shall be payable from the GUC Trust Assets.

"**U.S. Trustee**" means the Office of the United States Trustee for the District of Delaware.

"**Voting Classes**" means Classes 1, 4, 5 and 6.

"**Voting Deadline**" means December [9], 2024, at 4:00 p.m. (ET).

"**Voting Record Date**" means the date established by the Bankruptcy Court pursuant to the Interim Approval and Procedures Order.

"**Weisser**" means Weisser Gesellschaft mit beschränkter haftung and J.G. Weisser Söhne GmbH & Co. KG.

**B. Interpretation; Application of Definitions and Rules of Construction**

The following rules of construction, interpretation, and application shall apply:

(1) Wherever from the context it appears appropriate, each term stated in either the singular or the plural shall include both the singular and the plural and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and neuter genders.

(2) Unless otherwise specified, each section, article, schedule, or exhibit reference in the Combined Disclosure Statement and Plan is to the respective section in, article of, schedule to, or exhibit to the Combined Disclosure Statement and Plan.

(3) The words "herein," "hereof," "hereto," "hereunder," and other words of similar import refer to the Combined Disclosure Statement and Plan as a whole and not to any particular section, subsection, or clause contained in the Combined Disclosure Statement and Plan.

(4) The rules of construction contained in Bankruptcy Code section 102 shall apply to the construction of the Combined Disclosure Statement and Plan.

(5) A term used herein that is not defined herein but that is used in the Bankruptcy Code shall have the meaning ascribed to that term in the Bankruptcy Code.

(6) The headings in the Combined Disclosure Statement and Plan are for convenience of reference only and shall not limit or otherwise affect the provisions of the Combined Disclosure Statement and Plan.

(7) Unless otherwise provided, any reference in the Combined Disclosure Statement and Plan to an existing document, exhibit, or schedule means such document, exhibit, or schedule as may be amended, restated, revised, supplemented, or otherwise modified.

(8) In computing any period of time prescribed or allowed by the Combined Disclosure Statement and Plan, the provisions of Bankruptcy Rule 9006(a) shall apply.

## IV. DISCLOSURES

### A. General Background

#### 1. Overview of Business Operations

The Debtors were a global leader in the design, manufacture and distribution of precise, advanced metal-cutting machine tool solutions. With locations spanning the globe, including the United States, England, France, Germany, Switzerland, China, and India, the Company was able to service customers worldwide. Through the twelve brands operated under the Company's umbrella, including Kellenberger®, Hardinge®, Buck Chuck®, Forkardt® and Ohio Tool Works®, the Company engineered and supplied computer controlled metalcutting turning machines, grinding machines, machining centers, collets, chucks, index fixtures, repair parts for machines, and other industrial products. The Company also provided post-sale support services and maintenance training, in-field maintenance, and in-field repair.

In May 1993, Hardinge completed an initial public offering and remained publicly traded on the NASDAQ exchange until 2018. Beginning in 2014, affiliates of Privet began acquiring shares of Hardinge, accumulating a significant stake such that by mid-2017, Privet was Hardinge's largest shareholders. Then, on May 25, 2018, the Company was acquired by Privet for a total transaction value of $245 million, which amounted to $18.50 per outstanding share.

## 2. Debtors' Prepetition Capital Structure

On September 27, 2022, Hardinge, as borrower (the "Borrower") entered into the Prepetition Credit Agreement, between and among the Borrower, the other Debtors and other guarantors party thereto, the Prepetition Financial Institutional Lenders and the Prepetition Agent. Pursuant to the Prepetition Credit Agreement, the Prepetition Financial Institutional Lenders agreed to extend loans and other financial accommodations to the Borrower. The Prepetition Financial Institutional Lenders provided an initial term loan of $75 million and a revolver of $35 million.

Each of the Prepetition U.S. Loan Parties and the Prepetition Agent were parties to the Prepetition Security Agreement. Pursuant to the Prepetition Security Agreement, each of the Debtor Prepetition U.S. Loan Parties granted and pledged to the Prepetition Agent for the benefit of each Prepetition Secured Party, a security interest in substantially all of the assets of each of the Debtor Prepetition U.S. Loan Parties to secure the obligations under the Prepetition Credit Agreement. All borrowings under the Prepetition Credit Agreement were to mature on September 27, 2027.

On July 22, 2024, the Replacement Lender purchased and took an assignment of the existing Prepetition Financial Institutional Lenders' rights and obligations under the Prepetition Credit Agreement. The following day, the Replacement Lender entered into the Second Amendment to the Prepetition Credit Agreement, pursuant to which the Replacement Lender provided a bridge loan of approximately $2.9 million and the maturity date of the Prepetition Credit Agreement was shortened to July 31, 2024.

As of the Petition Date, approximately $106,660,241.92 in aggregate principal amount and accrued but unpaid interest remained outstanding on the Prepetition Credit Agreement.

## 3. The Pension Plan and the PBGC's Claims

The Debtor Hardinge is the contributing sponsor of the Hardinge Inc. Pension Plan, a single-employer pension plan (the "Pension Plan"), *see* 29 U.S.C. §§ 1301(a)(13)-(14). The Pension Plan is a defined benefit plan covered by Title IV of ERISA. *See* 29 U.S.C. § 1321, and as such, is administered by the PBGC, a United States government agency, under Title IV of the Employee Retirement Income Security Act of 1974 ("ERISA"), *as amended*, 29 U.S.C. §§ 1301-1461.

In 2009, Hardinge froze the benefits provided under the Pension Plan but nonetheless continued to have ongoing funding obligations to the Pension Plan. In July 2024, shortly before commencing the Chapter 11 Cases, Hardinge failed to make a required contribution and none of the Debtors have or will be making any contributions to the Pension Plan going during the Chapter 11 Cases or under the proposed Plan. Based on the Annual Funding for the plan year January 1, 2023 through December 31, 2023, the Debtors believe the Pension Plan is presently underfunded by approximately $25.5-35.0 million on a termination basis.

Upon the termination of an underfunded single-employer pension plan covered by Title IV of ERISA, such as the Pension Plan, the PBGC may generally seek to become the trustee of the pension plan and, subject to certain statutory limitations, guarantees the payment of certain of a

plan's unfunded benefits with its insurance funds. *See* 29 U.S.C. §§ 1321-1322, 1342, 1361. On October 28, 2024, the Debtors received correspondence from the PBGC concerning the process by which the PBGC becomes trustee and administers a terminated plan. On November 13, 2024, the PBGC filed several proofs of claim, including a proof of claim asserting that the Pension Plan is underfunded by more than $21 million. *See* Proof of Claim No. 315 (asserting underfunding liability of $21,747,481.000). On November 14, 2024, the PBGC provided the Debtors with a Notice of Determination advising, in part, that the PBGC has determined to proceed with termination of the Pension Plan and become its statutory trustee effective as of September 17, 2024. On November 27, 2024, the Debtors filed a motion [Docket No. 531] seeking authorization to enter into an agreement with the PBGC for the consensual termination of the Pension Plan and the commencement of the PBGC's role as trustee, effective as of September 17, 2024. The motion remains pending as of the date of this Fourth Amended Combined Disclosure Statement and Plan.

If the Pension Plan is terminated, as the Debtors expect, the Debtors believe that the assets of the Pension Plan will be insufficient to cover the liabilities of the Pension Plan. *See* 29 U.S.C. § 1362(b). Under ERISA, each member of the contributing sponsor's controlled group is jointly and severally liable to PBGC for insurance premiums, interest, and penalties (collectively "premiums") with respect to a pension plan. 29 U.S.C. § 1307(e)(2). ERISA also provides that the contributing sponsor of a pension plan and each member of its controlled group are jointly and severally liable to a pension plan for contributions necessary to satisfy the minimum funding standards under sections 412 and 430 of the Internal Revenue Code.

Thus, the Debtors expect that the PBGC will likely assert that any such insufficiency is at least the amount of the Pension Plan's unfunded benefit liabilities, and that each of the Debtors and each non-Debtor member of its controlled group, are jointly and severally liable to PBGC for at least $25.5-35.0 million, the estimated amount of unfunded benefit liabilities of the Pension Plan. *See* 29 U.S.C. § 1362(a), (b); *See* 29 U.S.C. § 1301(a)(18).

**4. Events Precipitating the Chapter 11 Filing**

In the years preceding the Petition Date, the Company had sought to proactively transform its business by divesting non-core business lines to allow the Company to gain capital from asset sales, reduce long-term costs, and focus on the Company's core business lines. Unfortunately, these plans were not successful.

As set forth in detail in the First Day Declaration, a confluence of factors contributed to the Debtors' need to commence the Chapter 11 Cases. These include: (a) the regulatory approvals for the sale of Hardinge China not being obtained; (b) the greater than anticipated challenges resulting from the Weisser acquisition; (c) the buildup of unsold finished goods inventory ahead of the facility consolidation from Kellenberger and (d) macroeconomic pressures, particularly in the Chinese markets. Over time, these factors tightened the Debtors' liquidity, complicated their vendor relationships and impacted manufacturing operations.

Recognizing the need for a long-term solution, in May 2024, the Debtors retained Ankura Consulting Group, LLC ("Ankura") as restructuring advisors and designated Adrian Frankum as Chief Restructuring Officer of the Debtors, Ropes & Gray LLP ("Ropes") as restructuring legal counsel, and Houlihan Lokey Capital, Inc. as investment banker ("Houlihan", and together with

Ankura and Ropes, the "Advisors") to explore strategic alternatives, including a sale of some or all of the Company's assets and businesses to a third-party buyer. Shortly after hiring the Advisors, the Hardinge board of directors (the "Hardinge Board") determined it was advisable to appoint an independent director to the Hardinge Board and, following such appointment, to form a restructuring committee of the Hardinge Board, responsible for all of the Debtors' restructuring matters (the "Restructuring Committee"). In addition, in the months leading up to these Chapter 11 Cases, the Debtors proactively engaged with their secured lenders with the goal of developing and ultimately implementing a strategic transaction or transactions that would provide incremental liquidity to fund the Debtors' operations and allow the Debtors the time needed to conduct a value-maximizing sale of their assets and business segments.

At the time the Debtors engaged the Advisors, the Company was in default under its Prepetition Credit Agreement and required a significant infusion of additional cash to stabilize the business and provide the runway necessary for the Company to explore value maximizing transactions. Accordingly, with the Advisors' assistance, the Company approached the Prepetition Financial Institution Lenders requesting that they provide additional capital, and the Company began its search for third-party financing. Unfortunately, however, the Prepetition Financial Institution Lenders declined to provide incremental funding or consent to new financing on a consensual "priming" basis. Accordingly, in an effort to preserve the substantial value associated with the Company operating as a going concern, avoid an imminent chapter 7 bankruptcy filing, and preserve jobs, at the direction of the Restructuring Committee, the Debtors simultaneously looked for alternative solutions, including, among other things, soliciting bids for the potential sale and assignment by the Prepetition Financial Institution Lenders of the existing obligations under the Prepetition Credit Agreement to a third party.

As a result of this process, on July 22, 2024, the Prepetition Financial Institution Lenders consummated a sale and assignment of their rights under the Prepetition Credit Agreement to the Replacement Lender. On July 23, 2024, the Prepetition U.S. Loan Parties and the Replacement Lender entered into the Fourth Amendment, pursuant to which the Company received a bridge loan of approximately $2.9 million. This necessary incremental liquidity allowed the Debtors to continue to fund certain operations, prepare for the orderly commencement of the Chapter 11 Cases, and negotiate the terms of a stalking horse asset purchase agreement with an affiliate of the Replacement Lender.

## 5. The Restructuring Committee Appointment and Investigation

In June 2024, Timothy Pohl was appointed to the board of directors of Hardinge at which time Mr. Pohl was also appointed as the Chairman of the newly formed Restructuring Committee. Mr. Pohl was also subsequently appointed as Chairman of the Hardinge board. At the time of its formation, the Restructuring Committee was given full delegation of authority with respect to the Debtors' pre and post bankruptcy restructuring efforts. Although other members of the Hardinge Board initially served as members of the Restructuring Committee, those other members subsequently resigned and as of July 27, 2024, Mr. Pohl was the sole member of the Restructuring Committee.

As the sole member of the Restructuring Committee, Mr. Pohl, with the assistance of Ropes, undertook an investigation to determine the value, if any, of estate claims and causes of

action the Stalking Horse Purchaser was originally seeking to acquire in the Stalking Horse APA. As set forth in the Committee Resolution Term Sheet, however, the Committee negotiated for the Excluded Causes of Action to remain with the Debtors' estates, and Mr. Pohl continued his investigation to determine whether and how the Excluded Causes of Action should be pursued. As of the date of the initial Combined Disclosure Statement and Plan, Mr. Pohl's investigation was significantly complete, and the Restructuring Committee's views regarding such claims were shared with the Committee. The initial Combined Disclosure Statement and Plan reflected a settlement between the Committee and the Debtors regarding the assignment and prosecution of certain of the Excluded Causes of Action resulting in the Debtors transferring the GUC Estate Causes of Action to the GUC Trust and a release by the Debtors and Committee of certain of the Excluded Causes of Action. See infra Article IV.B.6. Committee Plan Settlement. At this time, the Debtors are the sole parties with legal standing to pursue Excluded Causes of Action. As further described below, the Debtors have negotiated a settlement of certain Excluded Causes of Action and seek approval of such settlement through the Plan

The Committee conducted an independent investigation into potential claims against, among others, Privet and the Debtors' officers and directors. The Committee's investigation remains ongoing. On October 14, 2024, the Committee made a formal demand upon the Debtors to investigate potential claims identified through the Committee's investigation as of that date. The Debtors have, in turn, submitted such demand to their insurers. On October 29, 2024, the Committee made a further formal demand that the Debtors immediately commence action seeking monetary relief in excess of $100 million against Company's former and current officers, directors, managers, and high-level employees, as well as a claim against Privet Fund Management. The Debtors in turn, submitted such demand to their insurers. While the Debtors' Restructuring Committee believes there are colorable claims, the Restructuring Committee believes damages, if any, are far less than those asserted by the Committee.

Following extensive negotiations between and among the Debtors, the Committee, the PBGC and Privet, a settlement was reached. The terms of the settlement are set forth in Article IV.B.7 Committee Plan Settlement below.

## B. The Chapter 11 Cases

### 1. First Day Orders

On the Petition Date, the Debtors Filed the First Day Motions to transition into operations during the Chapter 11 Cases, stabilize operations, and preserve relationships with vendors, clients, and employees.

The First Day Motions requested relief from the Bankruptcy Court to, among other things: (a) jointly administer the Chapter 11 Cases; (b) maintain the Debtors' cash management system; (c) pay insurance, taxes and other amounts in the ordinary course; (d) provide adequate assurance to utility companies; (e) obtain postpetition financing; and (e) pay certain customers, critical vendors and lien claimants. In support of the First Day Motions, the Debtors relied upon the First Day Declaration.

The Bankruptcy Court held a hearing on the First Day Motions on July 30, 2024, and granted the relief sought in the First Day Motions on an interim basis. A final hearing on the First Day Motions (with the exception of the DIP Motion) was scheduled for August 22, 2024. In the absence of objections, the Bankruptcy Court entered final orders on all First Day Motions other than the DIP Motion, cash management and customer seal motions, which motions were continued on an interim basis. The Bankruptcy Court entered final orders on the First Day Motions on or about August 20, 2024, and September 17, 2024.

**2. Retention of Professionals**

The Debtors, through various applications which were subsequently approved by the Bankruptcy Court, sought to employ certain professionals including: Ropes as bankruptcy counsel [Docket No. 92]; Chipman Brown Cicero & Cole, LLP as co-counsel [Docket No. 93]; Houlihan as financial advisor and investment banker [Docket No. 94], Kroll Restructuring Administration LLC as administrative advisor [Docket No. 95]; and Ankura as restructuring advisors and designating Adrian Frankum as Chief Restructuring Officer [Docket No. 96]. The Bankruptcy Court later approved these retentions [Docket Nos. 159, 190, 205, 206, and 210]. On November 27, 2024, the Debtors filed an application to retain a real estate broker, Pyramid Brokerage Company of Binghamton, Inc. to market the Elmira Owned Property [Docket No. 527], which application remains pending as of the date hereof.

**3. Appointment of the Committee**

On August 8, 2024, the U.S. Trustee appointed the Committee [Docket No. 117]. The Committee originally consisted of the following parties: (1) Pension Benefit Guaranty Corporation; (2) Forefront Machining Technologies, Inc.; (3) Lincoln Park Boring Co.; (4) NexGen Data Solutions, LLC; and (5) Main Street Apps.

The Committee, through various applications that were subsequently approved by the Bankruptcy Court, sought to employ certain professionals including: McDermott Will & Emery LLP as counsel [Docket Nos. 212, 214]; and Province, LLC as financial advisor [Docket Nos. 215, 216]. The Bankruptcy Court later approved these retentions [Docket Nos. 284 and 294].

**4. The DIP Facility**

Upon the bankruptcy filing, the Debtors required immediate access to incremental liquidity in the form of postpetition financing to preserve the value of the Debtors' Estates, undertake the successful sale process, and maximize recoveries for all stakeholders. Accordingly, the Debtors sought authorization to enter into the DIP Facility in an aggregate principal amount of up to $27,350,000, with up to $24,200,000 of such amount available upon interim approval (the "<u>Interim DIP Amount</u>"), with $14,000,000 to be available immediately upon interim approval and the additional $10,200,000 upon the DIP Agent's approval of a revised approved DIP budget setting forth the use of proceeds with respect to the Company's USACH and Kellenberger businesses. The Bankruptcy Court entered an interim order on July 31, 2024 [Docket No. 85]. On August 13, 2024, the Debtors filed the Notice of Permitted Borrowing providing notice that the DIP Agent had approved a revised DIP budget approving the use of proceeds for the USACH and Kellenberger businesses, making the full Interim DIP Amount available to the Debtors. On

September 17, 2024, the Bankruptcy Court entered the Final DIP Order approving the DIP Facility on a final basis [Docket No. 336] as part of the resolution of issues raised by the Committee to the DIP Facility and the Stalking Horse Purchase Agreement proposed by Centre Lane, which resolution between the Committee and Centre Lane is set forth in the Committee Resolution Term Sheet (discussed below). The Final DIP Order authorized the Debtors to incur DIP Facility obligations, subject to the terms of the Final DIP Order, in an aggregate principal amount not to exceed $27,350,000.

**5. Marketing and Sale of the Debtors' Assets**

In late-May 2024, the Debtors engaged Houlihan to serve as their investment banker to begin exploring strategic alternatives to address upcoming debt maturities and liquidity constraints. Upon its retention, Houlihan immediately began conducting due diligence with respect to the Assets and the Debtors' operations. Subsequent to its initial assessment of alternatives and timing of a marketing process, Houlihan began marketing preparations, including determining market interest in (a) a potential sale of the Debtors' business or (b) a new debt financing deal that would be coupled with a restructuring of existing debt claims.

Beginning in early-June 2024, Houlihan began contacting potential bidders regarding the debt sale, providing a detailed teaser to ninety-four (94) potential strategic and financial sponsor parties and holding introductory calls with eighty-four (84) of those. Of those parties, fifty-six (56) potential bidders executed non-disclosure agreements, after which Houlihan held numerous follow-up diligence calls for such parties' benefit. Houlihan requested that potential bidders submit initial bids by June 19, 2024, and received five (5) such bids, none of which were actionable. However, the Company's management worked diligently to preserve liquidity, allowing Houlihan to extend the deadline to July 12, 2024. By July 12, 2024, potential bidders were able to conduct additional diligence, and the Company received eight (8) proposals.

One of these proposals was from Centre Lane to, through one or more affiliates or newly formed affiliate entities, purchase the secured debt, provide an incremental bridge facility immediately after closing the proposed debt sale, provide a debtor in possession financing facility in chapter 11, and to serve as the stalking horse bidder for substantially all of the Debtors' and their non-debtor subsidiaries businesses, except Weisser.

On July 29, 2024, the Debtors filed the Bidding Procedures Motion seeking approval of, among other things, (a) bidding procedures governing the potential auction and sale of the Debtors' assets and (b) the Debtors' entry into the Stalking Horse APA. On August 21, 2024, the Bankruptcy Court entered the Bidding Procedures Order approving, *inter alia*, (i) procedures setting forth the process by which the Debtors were authorized to conduct a marketing and auction process for the sale or sales of substantially all of the Debtors' assets through one or more sale transactions, (ii) the Debtors' entry into the Stalking Horse APA, and (iii) the scheduling the sale hearing. Other than the Stalking Horse APA, no other Qualified Bids for substantially all of the Debtors' assets were received prior to the Bid Deadline. Accordingly, pursuant to the Bidding Procedures Order and Bidding Procedures, by notice dated September 10, 2024, Docket. No. 275, the Stalking Horse APA was designated as the Successful Bid, and the Auction was cancelled.

Prior to the hearing to approve the Stalking Horse APA, however, the Committee raised informal objections to the Stalking Horse APA and Stalking Horse Sale Order as well as to the proposed Final DIP Order. In addition, the Debtors received a bid from Ohio Tool Work, LLC with respect to the Debtors' assets related to the Debtors' Ohio Tool Works business (the "OTW Assets"), which were also covered by the Stalking Horse APA. Working with the Committee, the Stalking Horse Purchaser and Ohio Tool Work, LLC, the Committee's objections were resolved through the Committee Resolution Term Sheet and revised forms of proposed orders approving the Sale Transactions and approving the DIP Facility on a final basis. On September 17, 2024, the Bankruptcy Court entered the Stalking Horse Sale Order and the OTW Sale Order [Docket Nos. 337 and 338], which Sales Transactions closed on September 17 and 18, 2024, respectively [Docket Nos. 343 and 349].

### 6. The Committee Resolution Term Sheet

As noted above, the Committee and Stalking Horse Purchaser, the Prepetition Lender, and the DIP Lender resolved the Committee's informal objections with respect to the proposed Stalking Horse Sale Order and the proposed Final DIP Order and, on September 12, 2024, the Stalking Horse Purchaser, the Prepetition Lender, the DIP Lender, and the Committee entered into the Committee Resolution Term Sheet. A copy of the Committee Resolution Term Sheet is attached hereto as **Exhibit B** and was attached as Exhibit 2 to the Stalking Horse Sale Order. The Committee Resolution Term Sheet includes, among other things, the following terms and provisions:[2]

> (a) *Funding*. The Stalking Horse Purchaser and the DIP Lenders will fund $3,000,000 in the aggregate, inclusive of amounts budgeted for the Committee's professional in the budget filed with the Interim DIP Order (the "CLP Funding Amount"), which is intended to cover (i) $1,350,000 of allowed, unpaid professional fees and expenses of the Committee incurred in the period prior to and following the closing of the sale to the Stalking Horse Purchaser (the "Committee Professionals' Reserve"), and (ii) $1,650,000 of wind down expenses (the "Wind-Down Amount"), including the Initial GUC Trust Funding Amount of $500,000 to be segregated by the Debtors and, subject to further order of the Court, is to be utilized for the funding of the GUC Trust (as defined below) for the benefit of general unsecured creditors (the "Initial GUC Trust Funding Amount").
>
> (b) *Payment of Administrative and Priority Claims*. The Stalking Horse Purchaser shall pay or assume the administrative and priority claims set forth in the Stalking Horse APA, including, for

[2] The summary of key terms of the Committee Resolution Term Sheet is included for informational purposes only, and is subject to the Committee Resolution Term Sheet, which should be reviewed for completeness. A copy of the Committee Resolution Term Sheet is attached hereto as **Exhibit B**. In the event of any inconsistency between the foregoing summary of key terms and Exhibit B, the latter shall control. The summary of key terms from the Committee Resolution Term Sheet and the attachment of the Committee Resolution Term Sheet hereto are for reference purposes only and do not modify the terms of this Plan or the Committee Plan Settlement.

example, (i) postpetition payables (§3.1(a)(iv)); (ii) section 503(b)(9) liability (§3.1(a)(xviii)); (iii) payroll, PTO, and WARN Act Liability (Ex. C; §3.1(a)(iv), (ix), (xiii)); (iv) Houlihan Lokey fee (Ex. C); (v) certain taxes (§3.1(a)(xvi), (xvii)); and (vi) U.S. Trustee fees (Ex. C).

(c) *Causes of Action*. The Stalking Horse Purchaser will acquire all cause of actions and the proceeds thereof other than the following (the "Excluded Causes of Action"), which will remain with the Debtors' estates, and which shall include:

(i) Avoidance Actions, commercial torts, and similar causes of action against Hardinge Holdings, LLC and Privet Fund Management, LLC and its affiliates (excluding, for the avoidance of doubt, the Debtors and the Debtors' non-debtor direct and indirect subsidiaries) (collectively, "Privet"), other than causes of action against Privet or its affiliates (1) in their capacity as landlord under the Elmira Lease and (2) in connection with the Promissory Note between Hardinge Property Company LLC and Hardinge Technology Systems, Inc.; and

(ii) Causes of action against current and former officers and directors of the Debtors that are not Transferred Employees (as defined in the Committee Resolution Term Sheet) or independent contractors going forward with the Stalking Horse Purchaser or otherwise carved-out by the Committee and the Stalking Horse Purchaser (collectively, the "Carved-Out Parties"). A list of the Carved-Out Parties (the "Carved-Out Parties List") is attached to the Committee Resolution Term Sheet as Exhibit B. The Stalking Horse Purchaser may add or remove persons from the Carved-Out Parties List with the consent of the Committee. For the sake of clarity, and notwithstanding anything to the contrary in the Committee Resolution Term Sheet, the Purchaser may add or remove persons from the Carved-Out Parties List, with the consent of the Committee, after the Closing of the Transactions.

The Stalking Horse Purchaser will not assume or be deemed to assume any liabilities related to the Excluded Causes of Action.

(d) *D&O Insurance*. The Debtors' directors' and officers' liability insurance policies in existence on the Petition Date (the "D&O Policies") that are not Purchased Assets shall remain with the estate.

(e) *Chapter 11 Plan*. The Committee and the Stalking Horse Purchaser shall support confirmation of a chapter 11 plan of liquidation, which shall be filed pursuant to Local Rule 3017-2, provided that such plan incorporates the terms set forth in the Committee Resolution Term Sheet, and which plan shall include the following:

(i) The establishment of a liquidating trust for purposes of winding down the Debtors' estates and the prosecution of Excluded Causes of Action for the benefit of general unsecured creditors (the "GUC Trust"), which may initially be funded by the Initial GUC Trust Funding Amount, and the corpus of which shall include 100% of the proceeds of the Excluded Causes of Action (the "GUC Trust Assets").

(ii) The GUC Trust shall be directed by a trustee selected by the Committee, in consultation with the Debtors and the Stalking Horse Purchaser.

(iii) Centre Lane agrees to forgo distributions under the plan on account of any deficiency claims that Centre Lane may hold but does not waive any deficiency claims themselves.

(iv) Will contain customary releases as to Centre Lane. No releases shall be given to Privet, Hardinge Holdings, LLC, or current or former officers and directors of the Debtors who are not Transferred Employees or independent contractors going forward ("Non-Released Parties").

(v) Will provide that the Bankruptcy Court shall retain jurisdiction for usual and customary matters.

(vi) Will provide for other standard and customary provisions for a plan of this kind on terms satisfactory to the Committee.

(vii) The plan shall incorporate the terms of the Committee Resolution Term Sheet in full and the Committee shall have consent rights with respect to any and all provisions of the plan that incorporate the terms of the Committee Resolution Term Sheet or impact recoveries to general unsecured creditors.

(viii) support the establishment of the GUC Trust, which may initially be funded by the GUC Trust Assets.

(ix) the GUC Trust shall be directed by a trustee selected by the Committee, in consultation with the Debtors and Centre Lane.

The recitation above of the terms of the Committee Resolution Term Sheet is informational only. The Debtors are not parties to or bound by the Committee Resolution Term Sheet and reserve all rights concerning, among other things, the provisions of the Committee Resolution Term Sheet regarding the establishment and funding of the GUC Trust, the appointment of the GUC Trustee and the prosecution of Causes of Action not acquired by the Stalking Horse Purchaser (i.e., the Excluded Causes of Action). The Debtors anticipate that cash available to contribute to the Initial GUC Trust Funding Amount will be at least $3 million as a result of the settlements described below.

## 7. Settlements

Bankruptcy Code section 1123(b)(3) permits a plan to "provide for the settlement or adjustment of any claim or interest belonging to the debtor or the estate." The Plan provides for several settlements which are described in greater detail below. Confirmation of the Plan shall constitute Bankruptcy Court approval of all such Plan settlements.

### a. The Committee Plan Settlement

**THE DEBTORS AND COMMITTEE HAVE FINALIZED THE COMMITTEE PLAN SETTLEMENT (AS SET FORTH IN THIS PLAN AND DESCRIBED BELOW). THE DEBTORS RESERVE ALL RIGHTS TO AMEND OR MODIFY THE PLAN IN ACCORDANCE WITH SUCH SETTLEMENT AND APPLICABLE LAW.**

After the Sale Transaction closing, the Debtors and the Committee commenced negotiations regarding a cost-effective resolution of the Chapter 11 Cases pursuant to a consensual plan of liquidation that would provide unsecured creditors the opportunity for some recovery. As a result of those negotiations, the Debtors and the Committee resolved their differences regarding numerous matters, which resolutions are embodied in this Fourth Amended Combined Disclosure Statement and Plan and reflected in the provisions, among others, implementing the Committee Resolution Term Sheet, including by establishing the GUC Trust, providing funding to the GUC Trust, and permitting the Committee to select the GUC Trustee. The Debtors' settlement with the Committee also contemplates the assignment of Excluded Causes of Action that are not settled under the Plan to the GUC Trust (i.e., the GUC Estate Causes of Action), which GUC Estate Causes of Action the Restructuring Committee has determined are arguably colorable and, thus, appropriate to assign to the GUC Trust so that the GUC Trustee, in his or her sole discretion, may determine whether or not to pursue such GUC Estate Causes of Action (such resolution among the Debtors and the Committee, the "Committee Plan Settlement"). The Committee supports the Plan.

### b. The Privet – Related Settlement

The Debtors have reached a settlement of potential estate claims and Causes of Action against Privet and former Debtor directors affiliated with Privet. The settlement also includes the resolution of the PBGC's potential controlled-group liability claims against Privet and potential

objections to confirmation of the Plan, including objections based upon the Plan's use of a single trust to effectuate distributions. In full and final satisfaction of, and in exchange for the release of claims and Causes of Action, as set forth in Article X, from the Debtors, the Committee and its members (both individually and as members of the Committee) and the PBGC (which asserts potential independent claims against Privet), Privet, Rosenzweig, and Levenson will contribute Cash in the amount of $3.25 million, which Cash will be distributable under the Plan as follows: (i) $3 million shall be available to distribute *pro rata* to Holders of Allowed Claims in Classes 5 and 6; and (ii) $250,000 shall be available to distribute to the PBGC as the sole Holder of Allowed Claims in Class 5. The settlement thus provides that the PBGC, as a general unsecured creditor of the Debtors, will share *pro rata* in the $3 million fund available to unsecured creditors in Class 5 and 6, and will also receive $250,000 in exchange for its settlement of direct claims against Privet and former Debtor directors affiliated with Privet. The PBGC has agreed to vote in favor of the Plan as part of the settlement and the Committee supports Plan confirmation. The PBGC is a "Released Party" under the Plan for purposes of this settlement. Privet may receive payment of a certain amount directly from the Debtors' D&O Insurance Coverage towards the payments made on behalf of Privet, Levenson, and Rosenzweig of the Cash contribution of the Privet-Related Settlement (the "D&O Payment"). The D&O Payment, to the extent it is received by Privet, shall reduce, dollar for dollar, the applicable policy limits of liability under the Debtors' D&O Insurance Coverage; *provided*, *however*, nothing in the above sentence is intended as an agreement that the D&O Payment constitutes grounds on which the Debtors' D&O Insurance Coverage may deny coverage or limit coverage for other matters beyond the amount of the D&O Payment.

## 8. Monthly Reporting, Schedules, and Meeting of Creditors

The Debtors have filed all monthly operating reports [Docket Nos. 366 – 379, 474-480] and timely filed their Schedules on September 6, 2024 [Docket Nos. 243 – 270] and amended Schedules on September 27, 2024 [Docket Nos. 381-88]. The section 341 meeting of creditors was held on August 28, 2024, continued on September 10, 2024, and concluded on October 7, 2024.

## 9. Claims Reconciliation Process and Bar Date

On September 25, 2024, the Debtors filed the Bar Date Motion. On October 10, 2024, the Bankruptcy Court entered the Bar Date Order, which, among other things, established November 13, 2024 at 5:00 p.m. (prevailing Eastern Time) as the General Bar Date and Initial Administrative Claims Bar Date, and January 27, 2025 at 5:00 p.m. (prevailing Eastern Time) as the Governmental Bar Date.

Thus, pursuant to the Bar Date Order,

(f) all creditors holding or wishing to assert unsecured, secured, priority, or nonpriority claims (as defined in Bankruptcy Code section 101(5)) against the Debtors or the Debtors' Estates, accruing prior to the Petition Date, including claims arising under Bankruptcy Code section 503(b)(9), will be required to file a separate, completed, and executed Proof of Claim Form on account of each such Claim, together with accompanying documentation by the General Bar Date;

Case 24-11605-JKS Doc 589 Filed 12/20/24 Page 36 of 97

(g) all creditors asserting administrative expense priority claims accruing between the Petition Date and September 17, 2024 must file a request for payment on account of such claims on or before the Initial Administrative Claims Bar Date; and

(h) Governmental Units, as defined by section 101(27) of the Bankruptcy Code, must submit Proofs of Claim by the Governmental Bar Date.

The Debtors believe that after the reconciliation and Claims objection process is complete, the Debtors' total General Unsecured Claims liability should not be materially more than reported in its Schedules. However, the Debtors' claims review is ongoing, and its assessments are subject to change.

## C. Summary of Assets

Following closing of the Sale Transactions, the Debtors have no remaining tangible Assets other than the Elmira Owned Property, which was previously a CERCLA site. The Debtors' other remaining Assets consist primarily of limited cash, which is being used to fund the wind-down and administration of the Chapter 11 Cases and the Excluded Causes of Action, certain of which (the GUC Estate Causes of Action) are being transferred to the GUC Trust. Accordingly, if the Plan is confirmed, the GUC Trust shall initially be funded by the Initial GUC Trust Amount. The Elmira Owned Property will also be transferred to the GUC Trust for subsequent disposition. The GUC Trust Assets will be the source of Distributions to Holders of Allowed Claims in Class 5 and Class 6.

Environmental remediation work at the Elmira Owned Property was completed prior to the Petition Date. At present, no ongoing remediation work is occurring or required. The Debtors currently provide periodic reporting to regulatory authorities. The estimated annual carrying costs for the Elmira Owned Property are modest (less than $10,000 per year). The Debtors are soliciting brokers potentially interested in selling the Elmira Owned Property. If the Debtors determine that the Elmira Owned Property has potential value, it will either be sold prior to the Effective Date or assigned to the GUC Trust; otherwise, the Debtors may seek to abandon the Elmira Owned Property prior to the Effective Date, if permitted under applicable law. Subject to Bankruptcy Court approval, which remains pending, the Debtors have engaged a broker to market the Elmira Owned Property.

## D. Summary of Plan Treatment of Claims and Equity Interests

### 1. Summary of Treatment of Unclassified Claims

The following chart summarizes the treatment provided to Claims that are not classified under the Plan:

| Unclassified Claims | Estimated Claims[3] | Treatment | Estimated Recovery to Holders of Allowed Claims |
|---|---|---|---|
| DIP Facility Claims | $0 | Deemed satisfied in full | 100% |
| Administrative Expense Claims | $0-$500,000 | Paid in full as set forth in Article V.B. below | 100% |
| Professional Fee Claims | $1.0-$2.0 million | Paid in full as set forth in Article V.C. below | 100% |
| Priority Tax Claims | $0-$250,000 | Paid in full as set forth in Article V.D. below | 100% |
| Statutory Fees | $10,000 - $20,000 | Paid in full as set forth in Article V.E. below | 100% |

### 2. Summary of Treatment of Classified Claims and Equity Interests Under the Plan

The following chart summarizes the classification and treatment of the Classes:

| Class | Estimated Claims[4] | Treatment | Entitled to Vote | Estimated Recovery to Holders of Allowed Claims[5] |
|---|---|---|---|---|
| Class 1 – Prepetition Secured Claims | $0 | Impaired | Yes | n/a[6] |

[3] The Debtors have not completed their analysis of Claims in the Chapter 11 Cases, and objections to such Claims have not been Filed and/or fully litigated and may continue following the Effective Date. Therefore, there can be no assurances of the exact amount of the Allowed Claims at this time. Rather, the actual amount of the Allowed Claims may be greater or lower than estimated.

[4] These amounts represent filed or scheduled Claims. The Debtors have not completed their analysis of Claims in the Chapter 11 Cases, and objections to such Claims have not been Filed and/or fully litigated and may continue following the Effective Date. Therefore, there can be no assurances of the exact amount of the Allowed Claims at this time. Rather, the actual amount of the Allowed Claims may be greater or lower than estimated.

[5] The estimated percentage recovery is based upon, among other things, an estimate of potential Allowed Claims in the Chapter 11 Cases and the settlements set forth in the Plan. As set forth above, the actual amount of the Allowed Claims may be greater or lower than estimated. Thus, the actual recoveries may be higher or lower than projected depending upon, among other things, the amounts and priorities of Claims that are actually allowed by the Bankruptcy Court.

[6] The Debtors have included Class 1 out of an abundance of caution only, and do not believe that any Class 1 Claims remain after the closing of the Sale Transactions. Pursuant to the Committee Resolution Term Sheet, the Prepetition Lender has agreed to forego distributions under the Plan on account of any deficiency claims that the Prepetition Lender may hold without waiver of any such deficiency claims.

Case 24-11605-JKS Doc 580 Filed 12/20/24 Page 38 of 97

| Class | Estimated Claims[4] | Treatment | Entitled to Vote | Estimated Recovery to Holders of Allowed Claims[5] |
|---|---|---|---|---|
| Class 2 – Miscellaneous Secured Claims | $0 | Unimpaired | No | 100% |
| Class 3 – Priority Claims | $0 | Unimpaired | No | 100% |
| Class 4 – Deficiency Claims | $32.9 million | Impaired | Yes | 0% |
| Class 5 – PBGC Claims | $25.5-$35.0 million | Impaired | Yes | 3.6%-6.2%[7] |
| Class 6 – General Unsecured Claims | $25.7-$29.2 million | Impaired | Yes | 3.6% - 6.2% |
| Class 7 – Subordinated Claims | Unknown | Impaired | No | 0% |
| Class 8 – Equity Interests | n/a | Impaired | No | 0% |

## E. Potential Claims and Causes of Action

The Bankruptcy Code preserves the Debtors' rights to prosecute claims and causes of action that exist outside of bankruptcy and empowers the Debtors to prosecute certain claims that arise under the Bankruptcy Code, including claims to avoid and recover certain preferential transfers and fraudulent conveyances. Subject to Section B.7 above, pursuant to the Committee Plan Settlement, the Plan provides that the Debtors' rights with respect to the GUC Estate Causes of Action will be transferred to the GUC Trust and the GUC Trustee will have the authority to investigate, prosecute, collect, or settle the GUC Estate Causes of Action as the GUC Trustee deems appropriate for the benefit of the GUC Trust Beneficiaries. The retention and preservation of known and unknown GUC Estate Causes of Action and their prosecution and liquidation by the GUC Trustee, are an integral part of the Combined Disclosure Statement and Plan and the Committee Plan Settlement.

As described in further detail in Article VII.D herein, from and after the Effective Date, the GUC Trustee, on behalf of the GUC Trust and subject to the terms of the Plan and the GUC Trust Agreement, shall have the exclusive right, authority, and discretion to institute, prosecute, abandon, settle, or compromise any and all GUC Estate Causes of Action without the consent or approval of any third party and without any further order of the Bankruptcy Court.

---

[7] The estimated percentage recoveries for Class 5 and 6 do not reflect potential recoveries on account of GUC Estate Causes of Action. In addition, the estimated percentage recovery for Class 5 does not reflect the additional $250,000.00 distributable to the PBGC pursuant to the Plan settlement of Privet-related claims described above.

## F. Certain Federal Income Tax Consequences

The following discussion is a summary of certain U.S. federal income tax consequences of the Combined Disclosure Statement and Plan to the Debtors and to Holders of General Unsecured Claims and PBGC Claims. This discussion is based on the Tax Code, Treasury Regulations promulgated and proposed thereunder, judicial decisions and published administrative rules, and pronouncements of the IRS, all as in effect on the date hereof.

Due to the complexity of certain aspects of the Combined Disclosure Statement and Plan, the lack of applicable legal precedent, the possibility of changes in the law, the differences in the nature of the Claims, and each Holder's status and method of accounting and the potential for disputes as to legal and factual matters with the IRS, the tax consequences described herein are uncertain. No legal opinions have been requested from counsel with respect to any of the tax aspects of the Combined Disclosure Statement and Plan and no rulings have been or will be requested from the IRS with respect to any of the issues discussed below. Further, legislative, judicial, or administrative changes may occur, perhaps with retroactive effect, which could affect the accuracy of the statements and conclusions set forth below as well as the tax consequences to the Debtors and the Holders of Claims.

This discussion does not purport to address all aspects of U.S. federal income taxation that may be relevant to the Debtors or the Holders of Claims in light of their personal circumstances, nor does the discussion deal with tax issues with respect to taxpayers subject to special treatment under the U.S. federal income tax laws (including, for example, insurance companies, financial institutions, real estate investment trusts, tax-exempt organizations, small business investment companies, regulated investment companies, foreign taxpayers, persons whose functional currency is not the U.S. dollar, persons subject to the alternative minimum tax, and persons holding Claims as part of a "straddle," "hedge," "constructive sale," or "conversion transaction" with other investments). This discussion does not address the tax consequences to Holders of Claims who did not acquire such Claims at the issue price on original issue. No aspect of foreign, state, local, or estate and gift taxation is addressed.

**EACH HOLDER OF A CLAIM OR EQUITY INTEREST IS URGED TO CONSULT WITH SUCH HOLDER'S TAX ADVISORS CONCERNING THE U.S. FEDERAL, STATE, LOCAL, FOREIGN, AND OTHER TAX CONSEQUENCES OF THE PLAN.**

### 1. Tax Consequences to the Debtors

#### a. Cancellation of Debt

Pursuant to the Tax Code and subject to certain exceptions, a taxpayer generally must recognize income from COD income to the extent that such taxpayer's indebtedness is discharged for an amount less than the indebtedness' adjusted issue price determined in the manner described below. Generally, the amount of COD income, subject to certain statutory and judicial exceptions, is the excess of (a) the adjusted issue price of the discharged indebtedness less (b) the sum of the fair market value (determined at the date of the exchange) of the consideration, if any, given in exchange for such discharged indebtedness.

The recognition of COD income may be treated differently in the context of a confirmed chapter 11 plan. For example, under the Bankruptcy Exception, instead of recognizing COD income, the taxpayer is required, pursuant to section 108(b) to reduce certain of that taxpayer's tax attributes to the extent of the amount of COD income. The tax attributes of the taxpayer generally are reduced in the following order: net operating losses, general business and minimum tax credit carry forwards, capital loss carry forwards, the basis of the taxpayer's assets and, finally, foreign tax credit carry forwards. If the amount of COD income exceeds the amount of tax attributes available to be reduced, the excess still is excluded from income. Pursuant to section 108(b)(4)(A), the reduction of tax attributes does not occur until the end of the taxable year after such tax attributes have been applied to determine the tax in the year of discharge or, in the case of asset basis reduction, the first day of the taxable year following the taxable year in which the COD income is realized. Section l08(e)(2) provides a further exception to the recognition of COD income upon the discharge of debt, providing that a taxpayer will not recognize COD income to the extent that the taxpayer's satisfaction of the debt would have given rise to a deduction for United States federal income tax purposes.

**b. Transfer of Assets to the GUC Trust**

Notwithstanding any prohibition on assignability under applicable non-bankruptcy law, on the Effective Date, and thereafter if additional GUC Trust Assets become available, the Debtors shall be deemed, subject to the GUC Trust Agreement, to have automatically transferred to the GUC Trust. all of their right, title and interest in and to all of the GUC Trust Assets, in accordance with section 1141 of the Bankruptcy Code. All such GUC Trust Assets shall automatically vest in the GUC Trust free and clear of all Claims, Liens, and other interests. Thereupon, the Debtors shall retain no interest in or with respect to the GUC Trust Assets. The Debtors will thereafter be dissolved in accordance with the Plan and GUC Trust Agreement.

Accordingly, as of the end of the Effective Date, all of the Debtors should be treated as having completely liquidated for U.S. federal income tax purposes. For U.S. federal income tax purposes, the transfer of the liquidating trust assets to the liquidating trust generally is treated as equivalent to a sale of the assets at the then fair market value. *See* "Tax Treatment of the GUC Trust and Tax Consequences for Holders of Claims" below. The Debtors may recognize taxable income in connection with the transfer of the GUC Trust Assets to the GUC Trust and their liquidation. If the Debtors have sufficient available net operating losses and/or other tax attributes, they will avoid any meaningful U.S. federal, state, local or foreign income tax liability.

**2. Tax Treatment of the GUC Trust and Tax Consequences for Holders of Claims**

The GUC Trust is intended to qualify as a "liquidating trust" for U.S. federal income tax purposes, treated as a "grantor" trust, meaning it is a pass-through entity. Under the Plan and Revenue Procedure 94-45, all parties shall treat the transfer of assets to the GUC Trust as a transfer directly to the GUC Trust Beneficiaries, who then transfer the assets to the GUC Trust in exchange for interests. The GUC Trust Beneficiaries are treated as the grantors and owners of their share of the trust assets for tax purposes. There can be no assurance that the IRS would not take a contrary position to the classification of the GUC Trust as a grantor trust. If the IRS were to challenge successfully such classification, the U.S. federal income tax consequences to the GUC Trusts and the Holders of Claims could vary from those discussed herein.

A transfer of assets to the GUC Trust is treated as a transfer to the GUC Trust Beneficiaries under section 61 of the Tax Code. Generally, a Holder of a Claim should in most, but not all circumstances, recognize gain or loss equal to the difference between the "amount realized" by such Holder in exchange for its Claim and such Holder's adjusted tax basis in the Claim. The "amount realized" is equal to the sum of the cash and the fair market value of any other consideration received under a plan of reorganization in respect of a Holder's Claim. The tax basis of a Holder in a Claim will generally be equal to the Holder's cost. To the extent applicable, the character of any recognized gain or loss (e.g., ordinary income, or short-term or long-term capital gain, or loss) will depend upon the status of the Holder, the nature of the Claim in the Holder's hands, the purpose and circumstances of its acquisition, the Holder's holding period of the Claim, and the extent to which the Holder previously claimed a deduction for the worthlessness of all or a portion of the Claim. Generally, if the Claim is a capital asset in the Holder's hands, any gain or loss realized generally will be characterized as capital gain or loss, and will constitute long-term capital gain or loss if the Holder has held such Claim for more than one (1) year.

A Holder who received Cash (or potentially other consideration) in satisfaction of its Claims may recognize ordinary income or loss to the extent that any portion of such consideration is characterized as accrued interest. A Holder who did not previously include in income accrued but unpaid interest attributable to its Claim, and who receives a distribution on account of its Claim pursuant to the Combined Disclosure Statement and Plan, will be treated as having received interest income to the extent that any consideration received is characterized for United States federal income tax purposes as interest, regardless of whether such Holder realizes an overall gain or loss as a result of surrendering its Claim. A Holder who previously included in its income accrued but unpaid interest attributable to its Claim should recognize an ordinary loss to the extent that such accrued but unpaid interest is not satisfied, regardless of whether such Holder realizes an overall gain or loss as a result of the distribution it may receive under the Combined Disclosure Statement and Plan on account of its Claim.

## G. Certain Risk Factors to Be Considered

Effect of Failure to Confirm the Plan. If the Plan is not confirmed by the requisite majorities in number and amount as required by Bankruptcy Code section 1126, or if any of the other Confirmation requirements imposed by the Bankruptcy Code are not met, the Chapter 11 Cases may not have sufficient funding to proceed, which may result in conversion to a case under chapter 7 of the Bankruptcy Code or dismissal.

"Cramdown." Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if all impaired classes have not accepted it; provided, that the plan has been accepted by at least one impaired class. Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class's rejection or deemed rejection of the plan, the plan will be confirmed, at the plan proponent's request, in a procedure commonly known as a "cramdown" so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or equity interests that is impaired under, and has not accepted, the plan. If any Impaired Class rejects the Plan, the Debtors reserve the right to seek to confirm the Plan utilizing the "cramdown" provision of section 1129(b) of the Bankruptcy Code. To the extent that any Impaired Class rejects the Plan or is deemed to have rejected the Plan, the Debtors may request Confirmation of the Plan, as it may be modified from time to time, under section 1129(b) of the

Bankruptcy Code. To the extent the Debtors are unable to confirm the Plan utilizing the "cramdown" provision of section 1129(b) of the Bankruptcy Code, the Chapter 11 Cases may not have sufficient funding to proceed, which may result in conversion to a case under chapter 7 of the Bankruptcy Code or dismissal.

Claims Estimation. While the Debtors have undertaken their best efforts to accurately estimate the amount of Claims in each Class, the actual amount of Allowed Claims may differ materially from the Debtors' estimates.

GUC Estate Causes of Action. Pursuant to the Combined Disclosure Statement and Plan, the GUC Trust Assets, including the GUC Estate Causes of Action, will be transferred to the GUC Trust upon the establishment of the GUC Trust upon the Effective Date. The GUC Estate Causes of Action include Causes of Action that are not released, waived, or transferred pursuant to the Plan, the Sale Transactions, or otherwise. There is no assurance that the GUC Trust will be successful in prosecuting any GUC Estate Causes of Action or that such prosecution will generate sufficient proceeds from the GUC Estate Causes of Action for Distribution. To the extent Distributions are possible from the GUC Estate Causes of Action, the timing of any such Distribution is uncertain.

Delays. Any delay in Confirmation of the Plan or delay to the Effective Date could result in additional or increased Administrative Expense Claims. This may result in there being insufficient funds to meet the requirements to confirm the Plan or for the Plan to go effective or result in less or no recovery for Holders of Unsecured Claims. The Debtors are seeking preliminary approval of the Combined Disclosure Statement for solicitation of votes on the Plan. In the event that such preliminary approval is delayed or not obtained at all, the Debtors may withdraw the Plan or it may not be confirmed. Any of the foregoing could alternatively result in a possible dismissal of the Debtors' Chapter 11 Cases or conversion to a chapter 7 liquidation.

Plan Settlements. In the event that the Plan settlements are not approved by the Bankruptcy Court, the Debtors may proceed to seek to confirm the Plan, or to withdraw or modify the Plan.

Sufficient Cash for GUC Trust Distributions. There is no assurance that the GUC Trust Assets will be sufficient to fund the liquidation of the GUC Trust Assets as envisioned under the Combined Disclosure Statement and Plan. Accordingly, there is no assurance as to whether the GUC Trust will make any Distributions, the amount, if any, or the timing of such Distributions.

Elmira Owned Property. There is no assurance that: (i) a buyer can be located for the Elmira Owned Property; (ii) any meaningful value can be realized from its sale; (iii) additional remediation requirements, costs or obligations will not be imposed in the future such that the Elmira Owned Property becomes burdensome or unmarketable; or (iv) such additional potential costs and expenses will not result in increased Administrative Expense Claims that exceed beyond available estate resources or preclude the Debtors' ability to confirm the Plan or the occurrence of the Effective Date.

## H. Feasibility

The Bankruptcy Code requires that for a plan to be confirmed, the Bankruptcy Court must find that confirmation of such plan is not likely to be followed by the liquidation or need for further reorganization of the debtor unless contemplated by the plan.

Here, the Plan provides for the liquidation and distribution of all of the Debtors' remaining assets. The Plan provides for the GUC Trust to be funded initially by the Initial GUC Trust Funding Amount, which the GUC Trustee may use to make distributions to creditors or to pursue the GUC Estate Causes of Action. Accordingly, the Debtors believe that all Plan obligations will be satisfied without the need for further reorganization of the Debtors.

## I. Best Interests Test and Alternatives to the Combined Disclosure Statement and Plan

The Bankruptcy Code requires that the Bankruptcy Court determine that a plan accepted by the requisite number of creditors in an impaired class provides each such member of each impaired class of claims and interests a recovery that has value, on the effective date, at least equal to the value of the recovery that each such creditor would receive if the debtor was liquidated under chapter 7 of the Bankruptcy Code.

The Bankruptcy Code further requires that the Bankruptcy Court determine that a plan is in the best interests of each holder of a claim or interest in any such impaired class which has not voted to accept the plan. Thus, if an impaired class does not vote unanimously to confirm the plan, the best interests test requires that the Bankruptcy Court find that the plan provides to each member of such impaired class a recovery on account of the class member's Allowed Claim or interest that has a value, on the effective date, at least equal to the value of the recovery that each such class member would receive if the debtor was liquidated under chapter 7 of the Bankruptcy Code.

Here, the Debtors believe the Plan satisfies the best interests test as the Liquidation Analysis, attached hereto as Exhibit A, demonstrates that the recoveries expected to be available to Holders of Allowed Claims and Equity Interests under the Plan will be at least the same or greater than the recoveries expected in a liquidation under chapter 7 of the Bankruptcy Code.

In a typical chapter 7 case, a trustee is elected or appointed to liquidate a debtor's assets for distribution to creditors in accordance with the priorities set forth in the Bankruptcy Code. Generally, secured creditors are paid first from the proceeds of sales of the properties securing their liens. If any assets are remaining in the bankruptcy estate after satisfaction of secured creditors' claims from their collateral, administrative expenses (including those incurred by a chapter 7 trustee) are next to receive payment. Unsecured creditors are paid from any remaining proceeds, according to their respective priorities. Unsecured creditors with the same priority share in proportion to the amount of their allowed claims in relationship to the total amount of allowed claims held by all unsecured creditors with the same priority. Finally, equity interest holders receive the balance that remains, if any, after all creditors are paid.

Substantially all of the Debtors' Assets have already been sold and transferred to the Purchasers under the Sale Orders. While a liquidation under chapter 7 of the Bankruptcy Code would have the same goal, the Plan provides the best source of recovery for several reasons. First, liquidation under chapter 7 of the Bankruptcy Code would not provide for a timely distribution.

Second, Distributions would likely be smaller because of the fees and expenses incurred by a chapter 7 trustee in a liquidation under chapter 7 of the Bankruptcy Code.

At this time, there are no alternative plans available to the Debtors. Following the Closing of the Sale Transactions, the Debtors have few assets remaining. Therefore, the Debtors believe that the Plan provides the greatest possible value for creditors under the circumstances and has the greatest chance of being confirmed and consummated.

### J. Releases by the Debtors

Article X of this Combined Disclosure Statement and Plan contains certain releases, exculpations, and injunction language. Parties are urged to read these provisions carefully to understand how Confirmation and consummation of the Plan will affect any claim, interest, right, or action with regard to the Debtors and certain third parties.

Pursuant to the Plan, the Debtors are releasing certain potential claims and Causes of Action that were subject to the Committee Resolution Term Sheet as part of the settlement with the Committee embodied in this Combined Disclosure Statement and Plan. Specifically, the Released Directors and Officers that were not identified as Transferred Employees or Independent Contractors in the Committee Resolution Term Sheet are being released from any liability to the Debtors or their Estates and any claims against such parties shall not be GUC Estate Causes of Action in exchange for the agreement of each such individual to waive rights to indemnification or advancement from the Debtors' Estates and certain rights under any D&O Insurance Coverage solely with respect to claims released pursuant to the Plan. The Released Directors and Officers expressly reserve their rights to indemnification and advancement and to seek coverage and utilize any remaining proceeds of any D&O Insurance Coverage or any other insurance policy for future claims or litigation.

**IF THE TRANSACTIONS DESCRIBED IN THE COMBINED DISCLOSURE STATEMENT AND PLAN ARE CONSUMMATED ALL HOLDERS OF CLAIMS AGAINST THE DEBTORS SHALL BE BOUND TO THE TERMS OF THE COMBINED DISCLOSURE STATEMENT AND PLAN, INCLUDING THE RELEASE, EXCULPATION AND INJUNCTION PROVISIONS THEREOF, TO THE FULLEST EXTENT AUTHORIZED OR PROVIDED UNDER THE APPLICABLE PROVISIONS OF THE BANKRUPTCY CODE AND ALL OTHER APPLICABLE LAW.**

Under the voting procedures described in Article VI and Article VII of this Combined Disclosure Statement and Plan, the Debtors believe that these releases, exculpations, and injunction language are considered consensual under applicable bankruptcy law.

## V. PLAN TREATMENT

## A. UNCLASSIFIED CLAIMS

### 1. DIP Facility Claims

DIP Facility Claims are deemed Allowed Claims. Pursuant to the Stalking Horse APA and the Stalking Horse Sale Order, the DIP Facility Claims were satisfied in full and released upon the closing of the transactions contemplated under the Stalking Horse APA.

### 2. Administrative Expense Claims

Requests for payment of Administrative Expense Claims must be Filed no later than the applicable Administrative Expense Bar Date. Holders of Administrative Expense Claims that do not File requests for the allowance and payment thereof on or before the applicable Administrative Expense Bar Date shall forever be barred from asserting such Administrative Expense Claims against the GUC Trust.

Except to the extent that a Holder of an Allowed Administrative Expense Claim agrees to a less favorable treatment or has been paid by any applicable Debtor prior to the Effective Date, the Debtors or GUC Trustee, as applicable, shall remit to each Holder of an Allowed Administrative Expense Claim the full unpaid amount of such Allowed Administrative Expense Claim in Cash (a) on the Effective Date or as soon thereafter as is reasonably practicable or, if not then due, when such Allowed Administrative Expense Claim is due or as soon thereafter as is reasonably practicable; (b) if an Administrative Expense Claim is Allowed after the Effective Date, on the date such Administrative Expense Claim is Allowed or as soon thereafter as is reasonably practicable or, if not then due, when such Allowed Administrative Expense Claim is due; (c) at such time and upon such terms as set forth in an order of the Bankruptcy Court; or (d) at such time and upon such terms as agreed upon by a Holder of an Allowed Administrative Expense Claim and the GUC Trustee.

### 3. Professional Fee Claims

(a) Final Fee Application and Payment of Professional Fee Claims

All Professionals or other Persons requesting compensation or reimbursement of Professional Fee Claims for services rendered between the Petition Date and the Effective Date (including compensation requested by any Professional or other Entity for making a substantial contribution in the Chapter 11 Cases) shall File an application for final allowance of compensation and reimbursement of expenses no later than the Professional Fee Claims Bar Date.

The final hearing to determine the allowance of Professional Fee Claims shall be held as soon as practicable after the Professional Fee Claims Bar Date. Debtors' counsel shall File a notice of such hearing, which shall be served upon counsel for the Committee, all Professionals, the U.S. Trustee, and all parties on the Debtors' Bankruptcy Rule 2002 service list.

The GUC Trustee shall pay Professional Fee Claims when such Professional Fee Claims are Allowed or awarded by entry of an order of the Bankruptcy Court.

(b) Professional Fee Escrow Account; Professional Fee Reserve

Pursuant to Paragraph 17(b) of the Final DIP Order, the Debtors established the Professional Fee Escrow Account and have funded the same with Cash on account of accruing Professional Fee Claims. Professional Fee Claims for the period from the Petition Date through the Closing Date shall be paid from the Professional Fee Account upon approval. The Professional Fee Escrow Account shall be maintained in trust solely for the Professionals. Such funds shall not be considered property of the Debtors' Estates or the GUC Trust.

Prior to or on the Effective Date or as soon thereafter as practicable, the Debtors shall create the Professional Fee Reserve. The Professional Fee Reserve shall be utilized to pay Professional Fee Claims incurred from the Closing Date through the Effective Date, and shall be funded for each Professional with (i) such Professional's remaining allocable portion of the Professional Fee Escrow Account, less such Professional's unused retainer, if any; and (ii) Cash on hand, in an aggregate amount equal to 110% of the Professional Fee Estimate. Professional Fee Claims for the period from the Closing Date through the Effective Date shall be paid from the Professional Fee Reserve upon approval. The Professional Fee Reserve shall be maintained in trust solely for the Professionals. Such funds shall not be considered property of the Estates of the Debtors or the GUC Trust. Upon the final payment of all Allowed Professional Claims, any excess Cash remaining in the Professional Fee Reserve shall be utilized to pay the fees and expenses incurred by Professionals after the Effective Date.

(c) Professional Fee Amount Estimates

Professional Fee Claims incurred from the Closing Date to the Effective Date shall, to the extent not billed or paid from the Professional Fee Escrow on or before Effective Date, be estimated and delivered to the Debtors by each Professional no later than two (2) business days prior to the Effective Date (the "Professional Fee Estimates"); provided, however, that such Professional Fee Estimates shall not be considered an admission, cap or limitation with respect to the fees and expenses of such Professional and such Professionals are not bound to any extent by the Professional Fee Estimates. If a Professional does not provide an estimate, the Debtors may estimate the unpaid and unbilled fees and expenses of such Professional; provided, however, that such estimate shall not be binding or considered an admission with respect to the fees and expenses of such Professional. Professional Fee Estimates shall be net of any unused retainer held as of the Effective Date.

(d) Post-Effective Date Fees and Expenses

Except as otherwise specifically provided in the Plan, from and after the Effective Date, the Debtors and the GUC Trust shall, in the ordinary course of business and without any further notice to or action, order or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional or other fees and expenses related to implementation of the Plan incurred by the Debtors, the GUC Trust or any professional following the Effective Date. On the Effective Date, any requirement that professionals comply with sections 327 through 331, 363 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Debtors or the GUC Trust may employ and pay any professional for services rendered or expenses incurred after the Effective Date in the ordinary course of business without any further notice to or action, order or approval of the Bankruptcy Court.

### 4. Priority Tax Claims

Except to the extent the Debtors, with the consent of the GUC Trustee, and the Holder of an Allowed Priority Tax Claim agree to a different and less favorable treatment, each holder of an Allowed Priority Tax Claim shall be paid Cash, in an amount equal to such Allowed Priority Tax Claim, on the later of: (a) the Effective Date and (b) the first Business Day after the date that is thirty (30) days after the date on which such Priority Tax Claim becomes an Allowed Priority Tax Claim, or as soon thereafter as is reasonably practicable.

Any Claims asserted by a Governmental Unit on account of any penalties and assessments shall not be Priority Tax Claims and shall be subordinated to General Unsecured Claims. On the Effective Date, any Liens securing any Allowed Priority Tax Claim shall be deemed released, terminated, and extinguished, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule, or the vote, consent, authorization, or approval of any Entity.

The Debtors estimate that the aggregate amount of Allowed Priority Tax Claims does not exceed $250,000.00.

### 5. Statutory Fees

All U.S. Trustee Statutory Fees due and payable prior to the Effective Date shall be paid by the Debtors on the Effective Date. After the Effective Date, the GUC Trustee shall be liable to pay any and all U.S. Trustee Statutory Fees when due and payable. The Debtors shall file all monthly operating reports due prior to the Effective Date when they become due, using UST Form 11-MOR. After the Effective Date, the GUC Trustee shall file with the Bankruptcy Court separate UST Form 11-PCR reports when they become due. The GUC Trust shall remain obligated to pay U.S. Trustee Statutory Fees on account of each Debtor's Chapter 11 Case until the earliest of that particular Debtor's Chapter 11 Case being closed, dismissed, or converted to a case under chapter 7 of the Bankruptcy Code. The U.S. Trustee shall not be required to file any Proof of Claim for an Administrative Claim in the Chapter 11 Cases and shall not be treated as providing any release under the Plan.

## B. CLASSIFIED CLAIMS AND INTERESTS

The below categories of Claims and Equity Interests classify such Claims and Equity Interests for all purposes, including voting, Confirmation, and Distribution pursuant hereto and pursuant to Bankruptcy Code sections 1122 and 1123.

### 1. Class 1 – Prepetition Secured Claims

*Classification*: Class 1 consists of any Prepetition Secured Claims against the Debtors.

*Treatment*: Except to the extent that a Holder of an Allowed Prepetition Secured Claim agrees to less favorable treatment of its Allowed Claim, each such Holder shall receive the following treatment in accordance with the Committee Resolution Term Sheet:

> Pursuant to the Committee Resolution Term Sheet, the Prepetition Lender has agreed to forgo distributions under the Combined Disclosure Statement and Plan on account of any deficiency claims the Prepetition Lender may hold, without waiver of any such deficiency claims.

*Impairment and Voting*: Class 1 is Impaired and entitled to vote to accept or reject the Plan.

**2. Class 2 – Miscellaneous Secured Claims**

*Classification*: Class 2 consists of all Miscellaneous Secured Claims against the Debtors.

*Treatment*: Except to the extent that a Holder of an Allowed Miscellaneous Secured Claim has agreed to a less favorable treatment of such Claim, and only to the extent that any such Allowed Miscellaneous Secured Claim has not been paid in full prior to the Effective Date, each such Holder, at the option of the Debtors (in consultation with the Committee) or the GUC Trustee, as applicable, shall (i) be paid in full in Cash; (ii) receive the collateral securing its Allowed Miscellaneous Secured Claim, plus postpetition interest to the extent required under Bankruptcy Code section 506(b); or (iii) receive other treatment rendering such Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code, in each case on the later of the Effective Date and the date such Miscellaneous Secured Claim becomes an Allowed Miscellaneous Secured Claim, or as soon thereafter as is reasonably practicable. In the event the Debtors or the GUC Trustee, as applicable, treat a Miscellaneous Secured Claim under clause (i), the Liens securing such Allowed Miscellaneous Secured Claim shall be deemed released, terminated, and extinguished, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order or rule or the vote, consent, authorization, or approval of any Entity. The Debtors and the GUC Trustee specifically reserve the right to challenge the validity, nature, and perfection of, and to avoid pursuant to the provisions of the Bankruptcy Code and other applicable law, any purported liens relating to the Miscellaneous Secured Claims.

The Debtors estimate that the aggregate amount of Allowed Miscellaneous Secured Claims will be approximately $0, as certain Claims included in this Class are assumed under the APAs as approved by the Sale Orders, or as provided for in the Committee Resolution.

*Impairment and Voting*: Class 2 is Unimpaired and is conclusively presumed to have accepted the Plan under Bankruptcy Code section 1129(f).

**3. Class 3 – Priority Claims**

*Classification*: Class 3 consists of all Priority Claims against the Debtors.

*Treatment*: Except to the extent that a Holder of an Allowed Priority Claim has agreed to a less favorable treatment of such Claim, and only to the extent that any such Allowed Priority Claim has not been paid in full prior to the Effective Date, each such Holder shall receive Cash in an amount equal to such Allowed Priority Claim, on or as soon as reasonably practicable after the later of (i) the Effective Date; (ii) the date the Priority Claim becomes an Allowed Claim; or (iii)

the date for payment provided by any agreement or arrangement between the Debtors or GUC Trustee, as the case may be, and the Holder of the Allowed Priority Claim.

The Debtors estimate that the aggregate amount of Allowed Priority Claims does not exceed approximately $0, as certain Claims included in this Class are assumed under the APAs as approved by the Sale Orders, or as provided for in the Committee Resolution.

*Impairment and Voting*: Class 3 is Unimpaired and is conclusively presumed to have accepted the Plan under Bankruptcy Code section 1129(f).

**4. Class 4 – Deficiency Claims**

*Classification:* Class 4 consists of all Deficiency Claims held by the Prepetition Lender.

*Treatment*: Allowed Deficiency Claims shall be extinguished and released for purposes of Distributions under the Plan, in accordance with the Committee Resolution Term Sheet.

Impairment and Voting: Class 4 is Impaired and entitled to vote to accept or reject the Plan.

**5. Class 5 – PBGC Claims**

*Classification*: Class 5 consists of all PBGC Claims.

*Treatment:* Except to the extent that a Holder of an Allowed PBGC Claim has agreed to a less favorable treatment of such Claim, and only to the extent that any such Allowed PBGC Claim has not been paid by any applicable Debtor prior to the Effective Date, each Holder of an Allowed PBGC Claim shall receive such Holder's Pro Rata share of the GUC Trust Assets.

The Debtors estimate that the aggregate amount of Allowed PBGC Claims will be approximately $25.5- $35.0 million.

Impairment and Voting: Class 5 is Impaired and entitled to vote to accept or reject the Plan.

**6. Class 6 – General Unsecured Claims**

*Classification*: Class 6 consists of all General Unsecured Claims against the Debtors.

*Treatment*: Except to the extent that a Holder of an Allowed General Unsecured Claim has agreed to a less favorable treatment of such Claim, and only to the extent that any such Allowed General Unsecured Claim has not been paid by any applicable Debtor prior to the Effective Date, each Holder of an Allowed General Unsecured Claim shall receive such Holder's Pro Rata share of the GUC Trust Assets.

The Debtors estimate that the aggregate amount of Allowed General Unsecured Claims, taking into account the assumption of liabilities under the APAs and Sale Orders, the Debtors' Schedules, and Claims asserted against the Estates, will be approximately $25.7-$29.2 million.

Pursuant to the Committee Resolution Term Sheet, the Prepetition Lender has agreed to forgo distributions under the Plan on account of any Deficiency Claims the Prepetition Lender may hold without waiver of any such Deficiency Claims. For the avoidance of doubt, the amount of the Deficiency Claims are not included in the approximately $25.7-$29.2 million estimated for General Unsecured Claims.

*Impairment and Voting*: Class 6 is Impaired and entitled to vote to accept or reject the Plan.

**7. Class 7 - Subordinated Claims**

*Classification:* Class 7 consists of all Claims against the Debtors that are subordinated to Claims in Classes 5 and 6 pursuant to Bankruptcy Code section 510.

*Treatment:* On the Effective Date, the Holders of Class 7 Claims against the Debtors shall be entitled to receive no recovery under the Plan.

*Impairment and Voting:* Class 7 is Impaired under the Plan. Holders of Claims in Class 7 are deemed not to have accepted the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject Plan, and the votes of such Holders will not be solicited with respect to such Claims.

**8. Class 8 – Equity Interests**

*Classification*: Class 8 consists of all Equity Interests in the Debtors.

*Treatment*: On the Effective Date, all Equity Interests in the Debtors shall be cancelled, released, and extinguished.

*Impairment and Voting*: Class 8 is Impaired under the Plan. Holders of Equity Interests in Class 8 are deemed not to have accepted the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject Plan, and the votes of such Holders will not be solicited with respect to such Equity Interests.

## C. Impaired Claims and Equity Interests

Under the Combined Disclosure Statement and Plan, Holders of Claims in Classes 1, 4, 5, 6, 7 and 8 are Impaired Classes of Claims or Equity Interests pursuant to section 1124 of the Bankruptcy Code because the Combined Disclosure Statement and Plan alters the legal, equitable, or contractual rights of the Holders of such Claims or Equity Interests treated in such Class.

## D. Cramdown and No Unfair Discrimination

The Debtors will seek Confirmation pursuant to Bankruptcy Code section 1129(b). This provision allows the Bankruptcy Court to confirm a plan accepted by at least one impaired class so long as it does not unfairly discriminate and is fair and equitable with respect to each class of

Case 24-11605-JKS Doc 598 Filed 12/20/24 Page 51 of 97

claims and interests that is impaired and has not accepted the plan. Colloquially, this mechanism is known as a "cramdown."

The Debtors believe the treatment of Claims and Equity Interests described in this Combined Disclosure Statement and Plan is fair and equitable and does not discriminate unfairly. The proposed treatment of Claims and Equity Interests provides that each Holder of such Claim or Equity Interest will be treated identically within its respective class and that, except when agreed to by such Holder, no Holder of any Claim or Interest junior will receive or retain any property on account of such junior Claim or Equity Interest.

## VI. CONFIRMATION PROCEDURES

### A. Confirmation Procedures

#### 1. Combined Hearing

The Confirmation Hearing before the Bankruptcy Court has been scheduled for **December 18, 2024, at 10:00 a.m. (ET)** at the United States Bankruptcy Court, 824 North Market Street, 3rd Floor, Courtroom #6, Wilmington, DE 19801 to consider (a) final approval of the Disclosure Statement as providing adequate information pursuant to Bankruptcy Code section 1125, and (b) Confirmation of the Plan pursuant to Bankruptcy Code section 1129. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice, except for an announcement of the adjourned date made at the Confirmation Hearing.

#### 2. Procedure for Objections

Any objection to approval or Confirmation of the Plan or approval of the Disclosure Statement on a final basis must be made in writing and specify in detail the name and address of the objector, all grounds for the objection and the amount of the Claim held by the objector. Any such objection must be Filed by **December 9, 2024, at 4:00 p.m. (ET)** with the Bankruptcy Court and served on the Debtors' counsel, the Committee's counsel, the U.S. Trustee, and all parties who have Filed a request for notice in these Chapter 11 Cases. Unless an objection is timely Filed and served, it may not be considered by the Bankruptcy Court.

#### 3. Requirements for Confirmation

The Bankruptcy Court will confirm the Plan only if the requirements of Bankruptcy Code section 1129 are met. As set forth in this Combined Disclosure Statement and Plan, the Debtors believe that the Plan: (a) meets the cramdown requirements; (b) meets the feasibility requirements; (c) is in the best interests of creditors; (d) has been proposed in good faith; and (e) meets all other technical requirements imposed by the Bankruptcy Code.

Additionally, pursuant to section 1126 of the Bankruptcy Code, under the Plan, only Holders of Claims in Impaired Classes are entitled to vote.

### B. Solicitation and Voting Procedures

#### 1. No Substantive Consolidation; Limited Administrative Consolidation

Case 24-11605-JKS Doc 589 Filed 12/20/24 Page 52 of 97

Given the sale process in these cases, the Sale Proceeds from the Sale Transactions cannot be traced or allocated to specific Debtor Estates. The Combined Disclosure Statement and Plan shall serve as a motion by the Debtors seeking entry of a Bankruptcy Court order consolidating the Debtors' Estates into a single Estate for certain limited purposes, including voting, Confirmation and Distributions. As a result of the limited administrative consolidation of the Estates, each Class of Claims and Equity Interests will be treated as against a single consolidated Estate without regard to the separate legal existence of each of the Debtors. The Plan will not result in the merger or otherwise affect the separate legal existence of each Debtor, other than with respect to voting and distribution rights under the Plan.

**2. Eligibility to Vote on the Plan**

Except as otherwise ordered by the Bankruptcy Court, Holders of Claims in Classes 1, 4, 5 and 6 may vote on the Plan pursuant to Bankruptcy Code section 1126. To vote on the Plan, a Holder must hold an Allowed Claim in Classes 1, 4, 5 and 6 or have a Claim that has been temporarily Allowed for voting purposes only under Bankruptcy Rule 3018(a).

**ACCORDINGLY, A BALLOT FOR ACCEPTANCE OR REJECTION OF THE PLAN IS BEING PROVIDED ONLY TO HOLDERS OF CLAIMS IN CLASSES 1, 4, 5 AND 6**.

**3. Solicitation Package**

Accompanying the Combined Disclosure Statement and Plan for the purposes of soliciting votes on the Plan are Solicitation Packages, which contain copies of: (a) the notice of the Confirmation Hearing; (b) the Interim Approval and Procedures Order, excluding the exhibits annexed thereto; (c) a Ballot; (d) [the Committee Solicitation Letter]; and (e) such other documents the Bankruptcy Court may direct or approve or that the Debtors deem appropriate following consultation with the Committee.

Holders of Claims in non-voting classes will receive packages consisting of: (a) the notice of the Confirmation Hearing; and (b) a notice of such Holder's non-voting status.

**4. Voting Procedures and Voting Deadline**

The Voting Record Date for determining which Holders of Claims or Equity Interests in Classes 1, 4, 5, and 6 may vote on the Plan is the date of entry of the Interim Approval and Procedures Order.

The Voting Deadline by which the Debtors must *RECEIVE* original ballots by mail, overnight delivery, hand delivery, email, or other electronic means authorized by the Bankruptcy Court is **December 9, 2024, at 4:00 p.m. (ET)**. As part of the Privet-PBGC settlement described above, the PBGC has agreed to vote in favor of the Plan and the Debtors have agreed to extend the Voting Deadline solely for the PBGC until 12:00 noon (ET) on December 12, 2024.[8]

[8] The Voting Deadline for Holders of Claims in Class 4 – Deficiency Claims, was also extended until12:00 noon (ET) on December 12, 2024.

If you are entitled to vote to accept or reject the Plan, a Ballot is enclosed. Please carefully review the Ballot instructions and complete the Ballot by: (a) indicating your acceptance or rejection of the Plan; and (b) signing and returning the Ballot to the Debtors.

If you are a member of the Voting Classes and did not receive a Ballot, received a damaged Ballot, or lost your Ballot, contact Kroll Restructuring Administration LLC, the Debtors' Claims and Balloting Agent, at https://cases.ra.kroll.com/Hardinge/ or Debtors' counsel at:

| | |
|---|---|
| **CHIPMAN BROWN CICERO & COLE, LLP**<br>Re: Hardinge Inc., *et al.*<br>Robert A. Weber<br>Mark L. Desgrosseilliers<br>Hercules Plaza<br>1313 N. Market Street, Suite 5400<br>Wilmington, DE 19801<br>Telephone: (302) 295-0191<br>weber@chipmanbrown.com<br>desgross@chipmanbrown.com | **ROPES & GRAY LLP**<br>Re: Hardinge Inc., *et al.*<br>Gregg M. Galardi<br>Lindsay C. Barca<br>1211 Avenue of the Americas<br>New York, New York 10036<br>Telephone: (212) 596-9000<br>Facsimile: (212) 596-9090<br>gregg.galardi@ropesgray.com<br>lindsay.barca@ropesgray.com |

The following Ballots will not be counted or considered:

(1) any Ballot received after the Voting Deadline, unless the Bankruptcy Court grants an extension to the Voting Deadline with respect to such Ballot;

(2) any Ballot that is illegible or contains insufficient information;

(3) any Ballot cast by a Person or Entity that does not hold a Claim in the Voting Classes;

(4) any Ballot cast for a Claim designated as unliquidated, contingent, or disputed or as zero (0) or unknown in amount in the Schedules and for which no Rule 3018 Motion has been Filed by the Rule 3018 Motion deadline;

(5) any Ballot timely received that is cast in a manner that indicates neither acceptance nor rejection of the Plan or that indicates both acceptance and rejection of the Plan;

(6) simultaneously filed duplicative Ballots voted inconsistently;

(7) Ballots partially rejecting and partially accepting the Plan;

(8) any Ballot received other than the official form sent by Debtors' Claims and Balloting Agent;

(9) any unsigned Ballot; or

(10) any Ballot that is submitted via email or facsimile.

### 5. Deemed Acceptance or Rejection

Holders of Claims in Classes 2 and 3 are Unimpaired, and thus under Bankruptcy Code section 1126(f), Holders of such Claims are conclusively presumed to have accepted the Plan and, therefore, are not entitled to vote and will not be solicited to vote.

Holders of Claims in Classes 1, 4, 5, and 6 are Impaired and entitled to vote to accept or reject the Plan.

Holders of Class 7 Subordinated Claims and Class 8 Equity Interests are not entitled to receive any distribution under the Plan. Pursuant to section 1126(g) of the Bankruptcy Code, Class 7 Subordinated Claims and Class 8 Equity Interests are deemed to have rejected the Plan, and, therefore, are not entitled to vote and shall not be solicited.

### 6. Acceptance by Impaired Classes

The Plan would be accepted by an Impaired Class of Claims, if holders of at least two thirds in amount and more than one-half in number of the Allowed Claims of such class have accepted the Plan, excluding the votes of insiders. To be confirmed, at least one (1) Impaired Class must accept the Plan. The Debtors urge that you vote to accept the Plan, and encourage you to complete, date, sign, and promptly mail the ballot attached to the notice. Please be sure to complete the ballot properly and legibly identify the exact amount of your claim and the name of the creditor.

## VII. IMPLEMENTATION AND EXECUTION OF THE PLAN

### A. Effective Date

The Effective Date shall not occur until the conditions for the Effective Date set forth in Article IX.B herein are satisfied or otherwise waived in accordance with the terms of the Plan. On or as soon as practicable after the Effective Date, the Debtors shall File a notice of the occurrence of the Effective Date.

### B. Closing of the Chapter 11 Cases

On and after the Effective Date, the GUC Trustee shall be permitted to close all of the Chapter 11 Cases of the Debtors in accordance with Bankruptcy Rule 3022 except for the Chapter 11 Case of a Debtor entity identified in the Plan Supplement as having its Chapter 11 Case remain open following the Effective Date, and, subject to the filing of a motion requesting appropriate authority, all contested matters relating to any of the Debtors, including objections to Claims or Equity Interests and any adversary proceedings, may be administered and heard in the Chapter 11 Case of the Debtor entity identified in the Plan Supplement as having its Chapter 11 Case remain open following the Effective Date, irrespective of whether such Claims or Equity Interests were Filed or such adversary proceeding was commenced against a Debtor whose Chapter 11 Case was closed.

After the Effective Date, the Debtors will be dissolved in accordance with applicable state law by the GUC Trustee.

## C. Records

On the Effective Date, the GUC Trustee shall provide for the retention and storage of the Debtors' books, records, and files (that were not otherwise transferred to the Purchasers pursuant to the APAs) that shall have been delivered by the Debtors to the GUC Trustee. After receipt of such documents, the GUC Trustee shall be authorized to destroy any documents he or she deems necessary or appropriate in his or her reasonable judgment and in accordance with applicable law; *provided*, *however*, that the GUC Trustee shall not destroy any documents, including but not limited to tax documents, that the GUC Trust is required to retain under applicable law.

## D. GUC Trustee

### 1. Establishment of the GUC Trust

On the Effective Date, the GUC Trust will be established pursuant to the Plan and GUC Trust Agreement, the latter of which will be filed with the Bankruptcy Court in the Plan Supplement, and all GUC Trust Assets shall be deemed transferred to the GUC Trust without any further action of any of the Debtors, or any employees, officers, directors, members, partners, shareholders, agents, advisors, or representatives of the Debtors. The GUC Trustee may elect for the GUC Trust to be treated as a partnership or a corporation or other Entity for tax purposes only, if the GUC Trustee may determine, in his or her reasonable discretion, that such election would be in the best interests of the GUC Trust Beneficiaries.

The Debtors shall have the power and authority to enter into the GUC Trust Agreement on the Effective Date. Prior to the Confirmation Date, the Committee, in consultation with the Debtors and the Prepetition Lender, shall designate a Person to serve as the GUC Trustee, and such designation shall be disclosed in the Plan Supplement.

### 2. Transfer of GUC Trust Assets to GUC Trust

Pursuant to section 1141 of the Bankruptcy Code, all transfers and contributions made pursuant to this Article VII shall be made free and clear of all Claims, liens, encumbrances, charges, and other interests including, for the avoidance of doubt, those held by the Prepetition Secured Parties and the DIP Lenders. Upon completion of the transfer of the GUC Trust Assets to the GUC Trust, the Debtors will have no further interest in, or with respect to, the GUC Trust Assets, or the GUC Trust. For all federal income tax purposes, all parties (including, without limitation, the Debtors, the GUC Trustee, and the GUC Trust Beneficiaries) will treat the transfer of the GUC Trust Assets to the GUC Trust in accordance with the terms of the Plan, as a transfer to the GUC Trust Beneficiaries, followed by a transfer by such GUC Trust Beneficiaries to the GUC Trust, and the GUC Trust Beneficiaries will be treated as the grantors and owners thereof. Pursuant to Bankruptcy Code section 1146, the making or delivery of an instrument of transfer under or pursuant to the Plan shall not be taxed under any law imposing a stamp tax or similar tax.

### 3. Purpose of the GUC Trust

The GUC Trust shall be established for the purpose of liquidating the GUC Trust Assets, prosecuting the GUC Estate Causes of Action transferred to the GUC Trust to maximize recoveries for the benefit of the GUC Trust Beneficiaries, and making Distributions in accordance with the

Plan to the GUC Trust Beneficiaries, with no objective to continue or engage in the conduct of a trade or business in accordance with Treas. Reg. § 301.7701-4(d). The GUC Trust is intended to qualify as a "grantor trust" for federal income tax purposes and, to the extent permitted by applicable law, for state and local income tax purposes, with the GUC Trust Beneficiaries treated as grantors and owners of the trust.

**4. Preservation of Rights**

Under the Combined Disclosure Statement and Plan, but subject in all respects to the Sale Orders, the APAs and the terms of the Confirmed Plan, the GUC Trustee retains any and all rights of, and on behalf of, the Debtors, the Estates, and the GUC Trust to commence and pursue any and all GUC Estate Causes of Action, including, without limitation, setoff, offset, and recoupment rights, regardless of whether or not such rights are specifically enumerated in the Combined Disclosure Statement and Plan, Plan Supplement, or elsewhere, and all such rights shall not be deemed modified, waived, or released in any manner, nor shall Confirmation of the Plan or entry of the Confirmation Order act as *res judicata* or limit any of such rights of the GUC Trustee to commence and pursue any and all GUC Estate Causes of Action, including, without limitation, setoff, offset, and recoupment rights, to the extent the GUC Trustee deems appropriate. Any and all GUC Estate Causes of Action, including, without limitation, setoff, offset, and recoupment rights, may, but need not, be pursued by the Debtors prior to the Effective Date and by the GUC Trustee after the Effective Date, to the extent warranted.

Unless a GUC Estate Cause of Action against a Person or other Entity is expressly waived, relinquished, released, compromised, or settled through the Plan, or any Final Order, including the Sale Orders, the Debtors expressly reserve any and all GUC Estate Causes of Action, including, without limitation, setoff, offset, and recoupment rights, for later enforcement and prosecution by the GUC Trustee (including, without limitation, any GUC Estate Causes of Action set forth in the Plan Supplement, or not specifically identified herein or otherwise, or which the Debtors may presently be unaware of, or which may arise or exist by reason of additional facts or circumstances unknown to the Debtors at this time, or facts or circumstances which may change or be different from those which the Debtors now believe to exist) and, therefore, no preclusion doctrine, including, without limitation, the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable or otherwise), or laches shall apply to any and all GUC Estate Causes of Action, including, without limitation, setoff, offset, and recoupment rights, upon or after entry of the Confirmation Order and consummation of the Plan. In addition, the GUC Trust expressly reserves the right to pursue or adopt any and all Causes of Action that are not GUC Estate Causes of Action, including, without limitation, setoff, offset, and recoupment rights, alleged in any lawsuit in which the Debtors are a defendant or an interested party, against any Entity, including, without limitation, the plaintiffs or co-defendants in such lawsuits, subject to the provisions of the Plan, the Confirmation Order or any Final Order.

The Debtors and the GUC Trustee do not intend, and it should not be assumed (nor shall it be deemed) that because any existing or potential GUC Estate Causes of Action, including, without limitation, setoff, offset, and recoupment rights, have not yet been pursued by the Debtors or are not set forth herein or otherwise, that any and all GUC Estate Causes of Action, including, without limitation, setoff, offset, and recoupment rights, has been waived or expunged.

Except as otherwise provided in the Combined Disclosure Statement and Plan, all GUC Estate Causes of Action against any Person or Entity shall, on the Effective Date, automatically vest in the GUC Trust free and clear of liens, claims, encumbrances and interests and no GUC Estate Causes of Action shall be deemed released or discharged by the Plan unless expressly stated therein. The GUC Trustee, on behalf of the GUC Trust, shall have the exclusive right, authority, and discretion to institute, prosecute, abandon, settle, or compromise any and all such GUC Estate Causes of Action without the consent or approval of any third party and without any further order of the Bankruptcy Court, except as otherwise provided herein or in the GUC Trust Agreement. From and after the Effective Date, the GUC Trustee, in accordance with Section 1123(b)(3) of the Bankruptcy Code, and on behalf of the GUC Trust, shall serve as a representative of the Debtors' Estates and shall retain and possess the sole and exclusive right to commence, pursue, settle, compromise or abandon, as appropriate, any and all GUC Estate Causes of Action, whether arising before or after the Petition Date, in any court or other tribunal. The Debtors and, after the Effective Date, the GUC Trustee, on behalf of the GUC Trust, reserve all rights to pursue any and all GUC Estate Causes of Action.

**5. Continued Cooperation**

On and after the Effective Date, the GUC Trustee and Purchasers shall provide reasonable and timely cooperation to effectuate the provisions of the Plan as the GUC Trustee or the Debtor might reasonably request, including, but not limited to, executing such documents as necessary to carry out the terms of the Plan and administer the GUC Trust.

**6. GUC Trustee**

Appointment of GUC Trustee. The GUC Trustee will be a disinterested Person selected by the Committee and whose identity shall be disclosed in the Plan Supplement. The GUC Trustee shall carry out the duties as set forth in this section and in the GUC Trust Agreement. Pursuant to section 1123(b)(3) of the Bankruptcy Code, the GUC Trustee shall be deemed the appointed representative to, and may pursue, litigate, and compromise and settle any such rights, claims, and GUC Estate Causes of Action in accordance with the best interests of and for the benefit of the GUC Trust Beneficiaries. In the event that the GUC Trustee resigns, is removed, terminated, or otherwise unable to serve as the GUC Trustee, then a successor shall be appointed as set forth in the GUC Trust Agreement. Any successor GUC Trustee appointed shall be bound by and comply with the terms of the Combined Disclosure Statement and Plan, the Confirmation Order, and the GUC Trust Agreement.

Responsibilities, Powers, and Authority of GUC Trustee. As of the Effective Date, the GUC Trustee shall take possession and charge of the GUC Trust Assets and, subject to the provisions herein and the GUC Trust Agreement, shall have full right, power and discretion to manage the affairs of the GUC Trust, subject to the oversight of the GUC Trust Oversight Committee, as further set forth in the GUC Trust Agreement. Except as otherwise provided herein or in the GUC Trust Agreement, the GUC Trustee shall have the right and power to enter into any covenants or agreements binding the GUC Trust and in furtherance of the purpose of this Combined Disclosure Statement and Plan and the GUC Trust Agreement and to execute, acknowledge and deliver any and all instruments that are necessary or deemed by the GUC Trustee to be consistent with and advisable in connection with the performance of the GUC Trustee's

Case 24-11605-JKS Doc 509-1 Filed 12/20/24 Page 58 of 97

duties. On and after the Effective Date, the GUC Trustee shall have the power and responsibility to do all acts contemplated by the Combined Disclosure Statement and Plan to be done by the GUC Trustee and all other acts that may be necessary or appropriate in connection with the disposition of the GUC Trust Assets and the distribution of the proceeds thereof, as contemplated herein, including, without limitation:

(a) To exercise all power and authority that may be or could have been exercised and take all actions that may be or could have been taken by the Debtors with like effect as if authorized, exercised and taken by unanimous action of the Debtors' partners, members, officers, directors and equity holders; including, without limitation, amendment of the certificates of incorporation and by-laws of the Debtors, merger of any Debtor into another Debtor, the dissolution of any Debtor and the assertion or waiver of the Transferred Privileges (defined below);

(b) To open and maintain bank and other deposit accounts, escrows and other accounts, calculate and implement Distributions to Holders of Allowed Claims as provided for or contemplated by the Combined Disclosure Statement and Plan and take other actions consistent with the Combined Disclosure Statement and Plan and the implementation thereof, including the establishment, re-evaluation, adjustment and maintenance of appropriate reserves in accordance with the Combined Disclosure Statement and Plan and the GUC Trust Agreement, in the name of the Debtors or the GUC Trustee, even in the event of the dissolution of the Debtors;

(c) To make a good faith valuation of the GUC Trust Assets, as soon as possible after the Effective Date;

(d) To collect and liquidate all GUC Trust Assets, including the sale of any GUC Trust Assets;

(e) To object to any Claims (Disputed or otherwise) including, without limitation, the power to subordinate and recharacterize Claims by objection, motion, or adversary proceeding, and to defend, compromise and/or settle any Claims prior to or following objection without the necessity of approval of the Bankruptcy Court, and/or to seek Bankruptcy Court approval for any Claims settlement, to the extent thought appropriate by the GUC Trustee or to the extent such approval is required by prior order of the Bankruptcy Court;

(f) To make decisions without further Bankruptcy Court approval regarding the retention or engagement of professionals, employees and consultants by the GUC Trust and to pay, from the GUC Trust Assets, the charges incurred by the GUC Trust on or after the Effective Date for services of professionals, disbursements, expenses or related support services relating to the winding up of the Debtors and implementation of the Combined Disclosure Statement and Plan, without application to the Bankruptcy Court;

(g) To cause, on behalf of the GUC Trust, the Debtors, and their Estates all necessary tax returns and all other appropriate or necessary documents related to municipal, State, Federal or other tax law to be prepared or filed timely;

(h) To invest Cash in accordance with section 345 of the Bankruptcy Code or as otherwise permitted by a Final Order of the Bankruptcy Court and as deemed appropriate by the GUC Trustee in accordance with the GUC Trust Agreement;

(i) To enter into any agreement or execute any document required by or consistent with the Combined Disclosure Statement and Plan and perform all of the obligations of the GUC Trustee thereunder;

(j) Upon Bankruptcy Court approval, to abandon in any commercially reasonable manner, including abandonment or donation to a charitable organization any assets that the GUC Trustee concludes are of no benefit to the GUC Trust Beneficiaries or too impractical to distribute;

(k) To investigate (including pursuant to Bankruptcy Rule 2004), prosecute and/or settle any GUC Estate Causes of Action, participate in or initiate any proceeding before the Bankruptcy Court or any other court of appropriate jurisdiction, participate as a party or otherwise in any administrative, arbitrative or other non-judicial proceeding, litigate or settle such GUC Estate Causes of Action on behalf of the GUC Trust and pursue to settlement or judgment such actions;

(l) To enter into, without Bankruptcy Court approval, an agreement to settle any GUC Trust Estate Cause of Action for which the GUC Trustee has not initiated a proceeding before the Bankruptcy Court;

(m) To use GUC Trust Assets to purchase or create and carry all appropriate insurance policies, bonds, or other means of assurance and protection of the GUC Trust Assets and pay all insurance premiums and other costs the GUC Trustee deems necessary or advisable to insure the acts and omissions of the GUC Trustee, and if appropriate, the oversight committee;

(n) To maintain appropriate books and records (including financial books and records) to govern the liquidation and distribution of the GUC Trust Assets;

(o) To pay fees incurred pursuant to 28 U.S.C. § 1930(a)(6) and to file with the Bankruptcy Court and serve on the U.S. Trustee quarterly post-confirmation financial reports for each of the Debtors until such time as a Final Decree is entered closing the Chapter 11 Cases or the Chapter 11 Cases are converted or dismissed;

(p) To dissolve the GUC Trust if the GUC Trustee determines that the expenses of administering the GUC Trust so as to make a final Distribution are likely to exceed the value of the remaining GUC Trust Assets.

(q) To provide the GUC Trust Beneficiaries, within thirty (30) days after the end of the first full month following the Effective Date, and within twenty (20) days after the end of each quarter thereafter, or such other period as subsequently agreed to between the oversight committee and the GUC Trustee, a report setting forth: (i) the receipt and disposition by the GUC Trustee of property during such period, including the amounts, recipients, and dates of any Distribution; (ii) any Disputed Claims resolved by the GUC Trustee; (iii) all known material non-Cash assets of the GUC Trust remaining to be disposed of; (iv) the status of all GUC Estate Causes of Action; (v) an itemization of all expenses the GUC Trustee anticipates will become due and payable within the subsequent quarter; and (vi) the GUC Trustee's forecast of Cash receipts and expenses for the subsequent quarter. The GUC Trustee shall also provide information about the activities of the GUC Trust on an informal basis as such recipients may reasonably request from time to time;

(r) Incur any reasonable and necessary expenses in liquidating and converting the GUC Trust Assets to Cash.

(s) To seek one or more Final Decrees closing the Chapter 11 Cases;

(t) To be the representative of the Estates and successor of the Debtors for all purposes; and

(u) To do all other acts or things consistent with the provisions of the Combined Disclosure Statement and Plan that the GUC Trustee deems reasonably necessary or desirable with respect to implementing the Combined Disclosure Statement and Plan.

Except as expressly set forth in the Combined Disclosure Statement and Plan and in the GUC Trust Agreement, the GUC Trustee, on behalf of the GUC Trust, shall have absolute discretion to pursue or not to pursue any GUC Estate Causes of Action as it determines is in the best interests of the GUC Trust Beneficiaries and consistent with the purposes of the GUC Trust.

Subject to the other terms and provisions of the Combined Disclosure Statement and Plan, the GUC Trustee shall be granted standing, authority, power, and right to assert, prosecute, and/or settle the GUC Estate Causes of Action and/or make a claim under any primary director and officer liability, employment practices liability, or fiduciary liability insurance policies based upon its powers as a Court-appointed representative of the Estates with the same or similar abilities possessed by insolvency trustees, receivers, examiners, conservators, liquidators, rehabilitators, or similar officials.

Enforcement of GUC Estate Causes of Action. Pursuant to section 1123(b) of the Bankruptcy Code, the GUC Trustee, on behalf of and for the benefit of the GUC Trust Beneficiaries, shall be vested with and shall retain and may prosecute GUC Estate Causes of Action transferred to the GUC Trust that were held by, through, or on behalf of, the Debtors and/or the Estates against any other Entity, arising before the Effective Date that have not been fully resolved or disposed of prior to the Effective Date, whether or not such GUC Estate Causes of Action are specifically identified in the Combined Disclosure Statement and Plan and whether or not litigation with respect to same has been commenced prior to the Effective Date. The recoveries from any GUC Estate Causes of Action transferred to the GUC Trust will be deposited into the GUC Trust and distributed in accordance with the GUC Trust Agreement and the Combined Disclosure Statement and Plan.

Compensation of GUC Trustee. The GUC Trustee shall be compensated from the GUC Trust Assets as set forth in the GUC Trust Agreement. The GUC Trustee shall fully comply with the terms, conditions, and rights set forth in the Plan, the Confirmation Order and the GUC Trust Agreement. The GUC Trustee shall not be required to file a fee application to receive compensation.

Indemnification of GUC Trustee. The GUC Trust shall indemnify the GUC Trustee and his or her professionals against any losses, liabilities, expenses (including attorneys' fees and disbursements), damages, taxes, suits, or claims that the GUC Trustee or his or her professionals may incur or sustain by reason of being or having been a GUC Trustee or professionals of the GUC Trustee for performing any functions incidental to such service; *provided*, *however*, the

foregoing shall not require indemnification of the GUC Trustee or his or her professionals from liability for bad faith, willful misconduct, reckless disregard of duty, criminal conduct, gross negligence, fraud, or self-dealing or malpractice.

**7. GUC Trust Expenses**

The GUC Trustee may, in the ordinary course of business and without the necessity for any application to, or approval of, the Bankruptcy Court, pay any accrued but unpaid expenses of the GUC Trust. All such expenses shall be charged against and paid from the GUC Trust Assets.

**8. Privileges**

The transfer, assignment, or vesting (if any) of the Debtors' privileges (each a "Privilege"), including, but not limited to, corporate privileges, confidential information, work product protections, attorney-client privileges, and other immunities or protections, will be governed by the final version of the GUC Trust Agreement.

**9. Termination of GUC Trust**

The GUC Trust shall be dissolved upon the earlier of the distribution of all of its assets to the GUC Trust Beneficiaries and the third anniversary of the creation of the GUC Trust, *provided* that the GUC Trustee shall, in its sole discretion, be authorized to extend the dissolution date to the fifth anniversary of the creation of the GUC Trust with prior Bankruptcy Court approval. If warranted by the facts and circumstances involved in resolving any GUC Estate Causes of Action, upon application to, and if approved by, the Bankruptcy Court upon a finding that such further extension is necessary for purposes of resolving such GUC Estate Causes of Action and distributing the proceeds to GUC Trust Beneficiaries, the term of the GUC Trust may be further extended by the GUC Trustee for a specified, finite term.

**E. Provisions Governing Distributions Under the Plan**

**1. Distribution Record Date**

As of the close of business on the Distribution Record Date, the various transfer registers for each of the Classes of Claims or Equity Interests as maintained by the Debtors or the GUC Trustee, or their respective agents, shall be deemed closed, and there shall be no further changes in the record Holders of any of the Claims or Equity Interests. The Debtors or the GUC Trustee shall have no obligation to recognize any ownership transfer of the Claims or Equity Interests occurring on or after the Distribution Record Date. The Debtors, the GUC Trustee, or any party responsible for making Distributions shall be entitled to recognize and deal for all purposes under the Combined Disclosure Statement and Plan only with those record holders stated on the transfer ledgers as of the close of business on the Distribution Record Date, to the extent applicable.

**2. Method of Payment**

Except as otherwise provided herein, any Distributions and deliveries to be made hereunder with respect to Claims that are Allowed as of the Effective Date shall be made on the Effective Date or as soon thereafter as is reasonably practicable. Except as otherwise provided herein, any

Case 24-11605-JKS Doc 590 Filed 12/20/24 Page 66 of 97

Distributions and deliveries to be made hereunder with respect to Claims that are Allowed after the Effective Date shall be made as soon as is reasonably practicable after the date on which such Claim becomes Allowed. Distributions made after the Effective Date to Holders of Allowed Claims shall be deemed to have been made on the Effective Date and, except as otherwise provided in the Combined Disclosure Statement and Plan, no interest shall accrue or be payable with respect to such Claims or any distribution related thereto. In the event that any payment or act under the Combined Disclosure Statement and Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on, or as soon as reasonably practicable after, the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

All Distributions hereunder shall be made by the GUC Trustee, or its named successor or assign, as "Disbursing Agent," on or after the Effective Date or as otherwise provided herein. For the avoidance of doubt, the GUC Trust shall act as Disbursing Agent with respect to all Distributions, and (ii) the GUC Trustee, or such other Entity designated by the GUC Trustee, shall act as Disbursing Agent with respect to General Unsecured Claims and PBGC Claims. A Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court, and, in the event that a Disbursing Agent is so ordered, all costs and expenses of procuring any such bond or surety shall be borne by the Disbursing Agent.

Unless otherwise expressly agreed in writing, all cash payments to be made pursuant to the Combined Disclosure Statement and Plan shall be made by check drawn on a domestic bank or an electronic wire.

**3. Surrender of Instruments**

Pursuant to Bankruptcy Code section 1143, as a condition precedent to receiving any Distribution under the Plan, each Holder of a certificated instrument or note must surrender such instrument or note held by it to the Disbursing Agent or its designee. Any Holder of such instrument or note that fails to (i) surrender the instrument or note or (ii) execute and deliver an affidavit of loss and/or indemnity reasonably satisfactory to the Disbursing Agent and furnish a bond in form, substance, and amount reasonably satisfactory to the Disbursing Agent before the third anniversary of the Effective Date shall be deemed to have forfeited all rights and Claims and may not participate in any Distribution hereunder.

**4. Delivery of Distributions**

Except as otherwise provided herein, Distributions to Holders of Allowed Claims shall be made: (a) at the addresses set forth on the respective Proofs of Claim Filed by such Holders; (b) at the addresses set forth in any written notice of address changes delivered to the GUC Trustee after the date of any related Proof of Claim; or (c) at the address reflected in the Schedules if no Proof of Claim is filed and the GUC Trustee has not received a written notice of a change of address.

If any Distribution to a Holder of an Allowed Claim is returned as undeliverable, the GUC Trustee shall use reasonable efforts to determine such Holder's then-current address, at which time a Distribution shall be made to such Holder without interest. If the GUC Trustee cannot determine,

or is not notified of, a Holder's then-current address within ninety (90) days after the original Distribution date for such Holder, such Distribution shall be deemed unclaimed property under Bankruptcy Code section 347(b). After such date, all unclaimed property or interest in property shall revert to the GUC Trust to be distributed in accordance with the terms of the GUC Trust Agreement and the Combined Disclosure Statement and Plan.

**5. Objection to and Resolution of Claims**

Except as expressly provided herein, or in any order entered in the Chapter 11 Cases prior to the Effective Date, including the Confirmation Order, no Claim or Equity Interest shall be deemed Allowed unless and until such Claim or Equity Interest is deemed Allowed under the Combined Disclosure Statement and Plan or the Bankruptcy Code or the Bankruptcy Court has entered a Final Order, including the Confirmation Order, in the Chapter 11 Cases allowing such Claim or Interest. On or after the Effective Date, the GUC Trust shall be vested with any and all rights and defenses each Debtor had with respect to any Claim or Equity Interest immediately prior to the Effective Date.

On and after the Effective Date, the GUC Trustee, with respect to all Claims and Equity Interests, shall be entitled to file objections to all Claims and Equity Interests that are otherwise not deemed Allowed Claims or Equity Interests, including Claims listed on the Debtors' Schedules, under the Combined Disclosure Statement and Plan, or otherwise. Any objections to Claims shall be served and filed on or before the Claims Objection Deadline.

**6. Preservation of Rights to Settle Claims**

Except as otherwise expressly provided herein, nothing contained in the Combined Disclosure Statement and Plan, the Plan Supplement, or in the Confirmation Order shall be deemed to be a waiver or the relinquishment of any rights or GUC Causes of Action that the Debtors may have or which the GUC Trustee may choose to assert on behalf of the Estates or the GUC Trust, as applicable, under any provision of the Bankruptcy Code or any applicable nonbankruptcy law or rule, common law, equitable principle, or other source of right or obligation, including, without limitation, (i) any and all claims against any Person or Entity, to the extent such Person or Entity asserts a crossclaim, counterclaim, and/or claim for setoff that seeks affirmative relief against the Debtors, their officers, directors, or representatives, and (ii) the turnover of all property of the Estates. This Section shall not apply to any claims sold, released, waived, relinquished, exculpated, compromised, or settled under the Combined Disclosure Statement and Plan or pursuant to a Final Order, expressly including the Sale Orders. Except as expressly provided in the Combined Disclosure Statement and Plan, nothing contained in the Combined Disclosure Statement and Plan, the Plan Supplement, or the Confirmation Order shall be deemed to be a waiver or relinquishment of any claim, cause of action, right of setoff, or other legal or equitable defense. No Entity may rely on the absence of a specific reference in the Combined Disclosure Statement and Plan, the Plan Supplement, or the Confirmation Order to any cause of action against it as any indication that the Debtors or the GUC Trustee, as applicable, will not pursue any and all available causes of action against them. The Debtors and the GUC Trustee expressly reserve all rights to prosecute any and all causes of action against any Person or Entity, except as otherwise expressly provided in the Plan.

## 7. Miscellaneous Distribution Provisions

Disputed Claims. At such time as a Disputed Claim becomes an Allowed Claim, the Disbursing Agent shall distribute to the Holder of such Claim, such Holder's Pro Rata share of the property distributable with respect to the Class in which such Claim belongs as soon as practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim becomes a Final Order. To the extent that all or a portion of a Disputed Claim is Disallowed, the Holder of such Claim shall not receive any Distribution on account of the portion of such Claim that is Disallowed, and any property withheld pending the resolution of such Claim shall be reallocated pro rata to the Holders of Allowed Claims in the same Class.

Setoff. The Debtors or GUC Trustee, as applicable, retain the right to reduce any Claim by way of setoff in accordance with the Debtors' books and records and in accordance with the Bankruptcy Code.

Minimum Distributions. Notwithstanding anything herein to the contrary, the GUC Trustee shall not be required to make Distributions or payments of less than $100.00.

# VIII. EXECUTORY CONTRACTS AND UNEXPIRED LEASES

## A. Background

The Bidding Procedures Order and the Sale Orders contemplate the treatment of Executory Contracts and Unexpired Leases. Nothing in this Combined Disclosure Statement and Plan shall be deemed to supersede the Bidding Procedures Order and Sale Orders.

## B. Executory Contracts and Unexpired Leases

All Executory Contracts and Unexpired Leases of the Debtors that have not been assumed, assigned, or rejected, prior to the Effective Date shall be deemed rejected on the Effective Date.

## C. Rejection Claims

In the event that the rejection of an executory contract or unexpired lease by any of the Debtors pursuant to the Combined Disclosure Statement and Plan results in a Rejection Claim in favor of a counterparty to such executory contract or unexpired lease, such Rejection Claim, if not heretofore evidenced by a properly filed Proof of Claim, shall be forever barred and shall not be enforceable against the Debtors or the GUC Trust, or their respective properties or interests in property as agents, successors, or assigns, unless a Proof of Claim is filed with the Bankruptcy Court and served upon counsel for the Debtors and the GUC Trustee on or before the date that is 30 days after the Effective Date. All Allowed Rejection Claims shall be treated as General Unsecured Claims pursuant to the terms of the Combined Disclosure Statement and Plan.

To the extent that any and all of the Debtors' insurance policies that were not transferred to Purchasers pursuant to the APAs, including any primary director and officer liability, employment practices liability, or fiduciary liability insurance policies, are considered executory contracts, then notwithstanding anything contained in the Combined Disclosure Statement and Plan to the contrary, such insurance policies, shall be deemed assumed and assigned to the GUC

Trust. Unless otherwise determined by the Bankruptcy Court, pursuant to a Final Order, no payments are required to cure any defaults of the Debtors existing as of the Confirmation Date with respect to each such policy. For the avoidance of any doubt, all rights under any insurance policy that is not an executory contract and was not transferred to Purchasers pursuant to the APAs and the Sale Orders, and all rights under any other insurance policies that were not transferred to Purchasers pursuant to the APAs and the Sale Orders and under which the Debtors may be beneficiaries, shall be preserved and shall vest with the GUC Trust and shall remain in full force and effect after the Effective Date for the term thereof; and nothing herein shall alter or adversely affect the rights of any non-Debtor beneficiaries of or covered Persons or Entities under such insurance policies. Further, for the avoidance of any doubt, the GUC Trustee may bring or assert GUC Estate Causes of Action under any primary director and officer liability, employment practices liability, or fiduciary liability insurance policies, as insolvency trustees, receivers, examiners, conservators, liquidators, rehabilitators, or similar officials, as those terms are used in the policies.

## IX. CONDITIONS PRECEDENT TO CONFIRMATION AND THE EFFECTIVE DATE

### A. Conditions Precedent to Confirmation

The following is the list of conditions precedent to Confirmation:

(1) the Plan Supplement is Filed;

(2) the Confirmation Order shall be in form and substance reasonably acceptable to the Debtors and the Committee;

(3) the form of GUC Trust Agreement shall be agreed upon by the Debtors and the Committee, and the proposed GUC Trustee identified and disclosed; and

(4) the Combined Disclosure Statement and Plan shall not have been materially amended, altered, or modified from the Combined Disclosure Statement and Plan as Filed on October 30, 2024, unless such material amendment, alteration, or modification has been made in accordance with Article XIII herein.

### B. Conditions Precedent to the Effective Date

The following is the list of conditions precedent to the Effective Date:

(1) The Bankruptcy Court shall have entered the Confirmation Order and the Confirmation Order shall be a Final Order;

(2) the GUC Trust Agreement shall be executed and the GUC Trustee shall have been appointed and accepted such appointment;

(3) The Professional Fee Escrow Account shall have been established and funded with the Professional Fee Amount; and

Case 24-11605-JKS Doc 580 Filed 12/20/24 Page 66 of 97

(4) the Combined Disclosure Statement and Plan shall not have been materially amended, altered, or modified from the Combined Disclosure Statement and Plan as confirmed by the Confirmation Order, unless such material amendment, alteration, or modification has been made in accordance with Article XII herein.

## C. Waiver of Conditions

The conditions precedent to Confirmation and conditions precedent to the Effective Date, other than those in paragraphs X.B. (1) and (2) above, may be waived in whole or in part, in writing, by both of the Debtors and the Committee, without further order of the Bankruptcy Court.

## D. Effect of Nonoccurrence of Conditions

If the conditions precedent to the Effective Date are not satisfied or waived, the Debtors may, upon motion and notice to parties in interest, seek to vacate the Confirmation Order.

If the Confirmation Order is vacated: (i) the Plan is null and void in all respects; and (ii) nothing contained in the Combined Disclosure Statement and Plan shall (a) constitute a waiver or release of any Claims by or against the Debtors, or (b) prejudice, in any manner, the rights of the Debtors or any other party in interest.

# X. EXCULPATION, RELEASES, AND INJUNCTIONS

## A. Injunction

**All injunctions or stays provided for in the Chapter 11 Cases under Bankruptcy Code sections 105 or 362, or otherwise, and in existence on the Confirmation Date shall remain in full force and effect until the later of (a) the Effective Date, or (b) the date indicated in the order providing for such injunction or stay. Notwithstanding the foregoing, nothing herein shall be otherwise deemed to modify, limit, amend, or supersede any injunctions or stays granted in the Sale Orders.**

**Except as otherwise provided in the Plan or to the extent necessary to enforce the terms and conditions of the Plan, the Confirmation Order, or a separate order of the Bankruptcy Court, all entities who have held, hold, or may hold Claims against or Equity Interests in the Debtors shall be permanently enjoined from taking any of the following actions against any property that is to be distributed under the terms of the Plan on account of any such Claims or Equity Interests: (a) commencing or continuing, in any manner or in any place, any action or other proceeding; (b) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or order; (c) creating, perfecting, or enforcing any lien or encumbrance; (d) asserting a setoff not asserted pre-confirmation, right or subrogation of any kind against any debt, liability, or obligation due to the Debtors; and (e) commencing or continuing, in any manner or in any place, any action that does not comply with or is inconsistent with the provisions of the Plan; *provided, however*, that such entities shall not be precluded from exercising their rights pursuant to and consistent with the terms of the Plan or the Confirmation Order; *provided, further*, that the foregoing provisions of this provision shall not apply to any acts, omissions, claims, causes of action, or other obligations expressly set forth in and preserved by this Plan or any defenses thereto. Notwithstanding**

**the foregoing, nothing herein shall be otherwise deemed to modify, limit, amend, or supersede any injunctions or stays granted in the Sale Orders. Notwithstanding any other provision of the Plan to the contrary, pursuant to 1141(d)(3), the Debtors shall not receive a discharge. For the avoidance of doubt nothing in this Plan, the Confirmation Order, or the Chapter 11 Cases shall in any way be construed to discharge, release, limit, or relieve any party for any ERISA fiduciary breach related to the Hardinge Inc. Pension Plan. PBGC and the Hardinge Inc. Pension Plan shall not be enjoined or precluded from enforcing such liability or responsibility by any of the provisions of this Plan.**

**B. Exculpation**

**Except as otherwise specifically provided in the Plan, none of the Exculpated Parties shall have or incur any liability to any holder of a Claim or Equity Interest (including GUC Estate Causes of Action) for any act or omission occurring on or after the Petition Date and on or before the Effective Date in connection with, related to, or arising out of the Chapter 11 Cases, the Committee Resolution Term Sheet, the Combined Disclosure Statement and Plan, the pursuit of Confirmation, the consummation of the Plan, the administration of the Plan, the property to be liquidated and/or distributed under the Plan or any postpetition and pre-Effective Date act taken or omitted to be taken in connection with or in contemplation of the liquidation of the Debtors, except for their fraud, willful misconduct or gross negligence as determined by a Final Order of a court of competent jurisdiction, and in all respects shall be entitled to rely reasonably upon the advice of counsel with respect to their duties and responsibilities under the Plan.**

**The foregoing paragraph shall apply to attorneys to the greatest extent permissible under applicable bar rules and case law.**

**C. Releases by the Debtors**

**PURSUANT TO BANKRUPTCY CODE SECTION 1123(B), AND NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THE COMBINED DISCLOSURE STATEMENT AND PLAN OR THE CONFIRMATION ORDER, ON AND AFTER THE EFFECTIVE DATE, FOR GOOD AND VALUABLE CONSIDERATION, THE ADEQUACY OF WHICH IS HEREBY CONFIRMED, THE RELEASED PARTIES (IN EACH CASE OTHER THAN THE DEBTORS), WHICH FOR CLARITY MEANS INDIVIDUALLY AND COLLECTIVELY, IN EACH CASE SOLELY IN THEIR CAPACITIES AS SUCH, EACH AND ALL OF: (A) THE DEBTORS; (B) THE DEBTORS' RETAINED PROFESSIONALS; (C) THE RELEASED DIRECTORS AND OFFICERS; (D) THE COMMITTEE AND MEMBERS OF THE COMMITTEE IN THEIR CAPACITY AS MEMBERS OF THE COMMITTEE; AND (E) THE COMMITTEE'S RETAINED PROFESSIONALS, SHALL BE DEEMED RELEASED BY THE DEBTORS AND THEIR ESTATES, FROM ANY AND ALL CLAIMS, OBLIGATIONS, DEBTS, RIGHTS, SUITS, DAMAGES, CAUSES OF ACTION, REMEDIES, AND LIABILITIES WHATSOEVER, INCLUDING DERIVATIVE CLAIMS ASSERTED OR ASSERTABLE ON BEHALF OF THE DEBTORS OR THE ESTATES, AS APPLICABLE, WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, EXISTING OR HEREINAFTER ARISING, IN LAW, EQUITY, OR OTHERWISE (EXCEPT FOR ANY CLAIMS BASED**

**UPON WILLFUL MISCONDUCT OR GROSS NEGLIGENCE AS DETERMINED BY A FINAL ORDER OF A COURT OF COMPETENT JURISDICTION) THAT THE DEBTORS, THEIR ESTATES, OR THE GUC TRUSTEE, AS APPLICABLE, WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT IN ITS OWN RIGHT, OR ON BEHALF OF THE HOLDER OF ANY CLAIM OR EQUITY INTEREST OR OTHER ENTITY, BASED ON OR RELATING TO, OR IN ANY MANNER ARISING FROM, IN WHOLE OR IN PART, THE DEBTORS, THE CHAPTER 11 CASES, THE PURCHASE, SALE, TRANSFER, OR RESCISSION OF THE PURCHASE, SALE, OR TRANSFER OF ANY DEBT, SECURITY, ASSET, RIGHT, OR INTEREST OF THE DEBTORS, THE SUBJECT MATTER OF, OR THE TRANSACTIONS OR EVENTS GIVING RISE TO, ANY CLAIM OR EQUITY INTEREST THAT IS TREATED IN THE PLAN, THE BUSINESS OR CONTRACTUAL ARRANGEMENTS BETWEEN THE DEBTORS AND ANY RELEASED SETTLEMENT PARTY OR RELEASED PARTY, THE RESTRUCTURING OF CLAIMS AND EQUITY INTERESTS PRIOR TO OR IN THE CHAPTER 11 CASES, THE NEGOTIATION, FORMULATION, OR PREPARATION OF THE COMMITTEE RESOLUTION TERM SHEET, THE COMBINED DISCLOSURE STATEMENT AND PLAN AND ANY OTHER AGREEMENTS OR DOCUMENTS EFFECTUATING THE COMBINED DISCLOSURE STATEMENT AND PLAN, OR RELATED AGREEMENTS, INSTRUMENTS, OR OTHER DOCUMENTS, AND ANY OTHER ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCE TAKING PLACE ON OR BEFORE THE EFFECTIVE DATE RELATING TO THE DEBTORS OR THE ESTATES. NOTHING IN THIS PLAN, THE CONFIRMATION ORDER, OR THE CHAPTER 11 CASES SHALL IN ANY WAY BE CONSTRUED TO DISCHARGE, RELEASE, LIMIT, OR RELIEVE ANY PARTY FOR ANY ERISA FIDUCIARY BREACH RELATED TO THE HARDINGE INC. PENSION PLAN. PBGC AND THE HARDINGE INC. PENSION PLAN SHALL NOT BE ENJOINED OR PRECLUDED FROM ENFORCING SUCH LIABILITY OR RESPONSIBILITY BY ANY OF THE PROVISIONS OF THIS PLAN. NOTWITHSTANDING ANYTHING TO THE CONTRARY HEREIN, THE DEBTORS ARE NOT RELEASING ANY CLAIMS OWNED BY A THIRD PARTY AGAINST THE RELEASED SETTLEMENT PARTIES OR THE RELEASED PARTIES.**

**ENTRY OF THE CONFIRMATION ORDER SHALL CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL, PURSUANT TO BANKRUPTCY RULE 9019, OF THE RELEASE OF THE RELEASED PARTIES BY THE DEBTORS AND THE ESTATES, WHICH INCLUDES BY REFERENCE EACH OF THE RELATED PROVISIONS AND DEFINITIONS CONTAINED HEREIN, AND FURTHER, SHALL CONSTITUTE THE BANKRUPTCY COURT'S FINDING THAT THE RELEASE BY THE DEBTORS AND THE ESTATES IS: (A) IN EXCHANGE FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED BY THE RELEASED PARTIES; (B) A GOOD FAITH SETTLEMENT AND COMPROMISE OF THE CLAIMS RELEASED BY THE DEBTORS; (C) IN THE BEST INTERESTS OF THE DEBTORS, THE ESTATES, AND ALL HOLDERS OF CLAIMS AND EQUITY INTERESTS; (D) FAIR, EQUITABLE, AND REASONABLE; (E) GIVEN AND MADE AFTER DUE NOTICE AND OPPORTUNITY FOR HEARING; AND (F) A BAR TO THE DEBTORS, THEIR ESTATES, OR THE GUC TRUST ASSERTING ANY CLAIM OR CAUSE OF ACTION RELEASED PURSUANT TO THE RELEASE BY DEBTORS AND THE ESTATES.**

**D. Committee Release of Released Directors and Officers and the CLP Parties**

**PURSUANT TO BANKRUPTCY CODE SECTION 1123(B), AND NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THE COMBINED DISCLOSURE STATEMENT AND PLAN OR THE CONFIRMATION ORDER, ON AND AFTER THE EFFECTIVE DATE, FOR GOOD AND VALUABLE CONSIDERATION, THE ADEQUACY OF WHICH IS HEREBY CONFIRMED, THE RELEASED DIRECTORS AND OFFICERS AND THE CLP PARTIES SHALL BE DEEMED RELEASED BY THE COMMITTEE AND ITS MEMBERS FROM ANY AND ALL CLAIMS, OBLIGATIONS, DEBTS, RIGHTS, SUITS, DAMAGES, CAUSES OF ACTION, REMEDIES, AND LIABILITIES WHATSOEVER, INCLUDING DERIVATIVE CLAIMS ASSERTED OR ASSERTABLE ON BEHALF OF THE DEBTORS OR THE ESTATES, AS APPLICABLE, WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, EXISTING OR HEREINAFTER ARISING, IN LAW, EQUITY, OR OTHERWISE (EXCEPT FOR ANY CLAIMS BASED UPON WILLFUL MISCONDUCT OR GROSS NEGLIGENCE AS DETERMINED BY A FINAL ORDER OF A COURT OF COMPETENT JURISDICTION) THAT THE COMMITTEE OR ANY OF ITS MEMBERS WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT IN ITS OWN RIGHT, OR ON BEHALF OF THE HOLDER OF ANY CLAIM OR EQUITY INTEREST OR OTHER ENTITY, BASED ON OR RELATING TO, OR IN ANY MANNER ARISING FROM, IN WHOLE OR IN PART, THE DEBTORS, THE CHAPTER 11 CASES, THE PURCHASE, SALE, TRANSFER, OR RESCISSION OF THE PURCHASE, SALE, OR TRANSFER OF ANY DEBT, SECURITY, ASSET, RIGHT, OR INTEREST OF THE DEBTORS, THE SUBJECT MATTER OF, OR THE TRANSACTIONS OR EVENTS GIVING RISE TO, ANY CLAIM OR EQUITY INTEREST THAT IS TREATED IN THE PLAN, THE BUSINESS OR CONTRACTUAL ARRANGEMENTS BETWEEN THE DEBTORS AND ANY RELEASED SETTLEMENT PARTY OR RELEASED PARTY, THE RESTRUCTURING OF CLAIMS AND EQUITY INTERESTS PRIOR TO OR IN THE CHAPTER 11 CASES, THE NEGOTIATION, FORMULATION, OR PREPARATION OF THE COMMITTEE RESOLUTION TERM SHEET, THE COMBINED DISCLOSURE STATEMENT AND PLAN AND ANY OTHER AGREEMENTS OR DOCUMENTS EFFECTUATING THE COMBINED DISCLOSURE STATEMENT AND PLAN, OR RELATED AGREEMENTS, INSTRUMENTS, OR OTHER DOCUMENTS, AND ANY OTHER ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCE TAKING PLACE ON OR BEFORE THE EFFECTIVE DATE RELATING TO THE DEBTORS OR THE ESTATES.**

**ENTRY OF THE CONFIRMATION ORDER SHALL CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL, PURSUANT TO BANKRUPTCY RULE 9019, OF THE FOREGOING RELEASE OF THE RELEASED DIRECTORS AND OFFICERS AND THE CLP PARTIES BY THE COMMITTEE AND ITS MEMBERS, WHICH INCLUDES BY REFERENCE EACH OF THE RELATED PROVISIONS AND DEFINITIONS CONTAINED HEREIN, AND FURTHER, SHALL CONSTITUTE THE BANKRUPTCY COURT'S FINDING THAT SUCH RELEASE IS: (A) IN EXCHANGE FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED BY THE RELEASED PARTIES; (B) A GOOD FAITH SETTLEMENT AND COMPROMISE OF THE CLAIMS RELEASED; (C) IN THE BEST INTERESTS OF THE DEBTORS, THE**

**ESTATES, AND ALL HOLDERS OF CLAIMS AND EQUITY INTERESTS; (D) FAIR, EQUITABLE, AND REASONABLE; (E) GIVEN AND MADE AFTER DUE NOTICE AND OPPORTUNITY FOR HEARING; AND (F) A BAR TO THE ASSERTION OF ANY CLAIM OR CAUSE OF ACTION SO RELEASED.**

**E. Privet Settlement Releases**

**IN THE EVENT THE PRIVET SETTLEMENT OCCURS, PURSUANT TO BANKRUPTCY CODE SECTION 1123(B), AND NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THE COMBINED DISCLOSURE STATEMENT AND PLAN OR THE CONFIRMATION ORDER, ON AND AFTER THE EFFECTIVE DATE, FOR GOOD AND VALUABLE CONSIDERATION, THE ADEQUACY OF WHICH IS HEREBY CONFIRMED, AND IN FULL AND FINAL SATISFACTION OF CLAIMS AND CAUSES OF ACTION, (1) THE DEBTORS, ESTATES, THE PBGC, THE COMMITTEE AND ITS MEMBERS, SHALL BE DEEMED TO RELEASE PRIVET, LEVENSON AND ROSENZWEIG, AND (2) PRIVET, LEVENSON AND ROSENZWEIG SHALL BE DEEMED TO RELEASE THE DEBTORS, THE PBGC, AND THE COMMITTEE AND ITS MEMBERS, FROM ANY AND ALL CLAIMS, OBLIGATIONS, DEBTS, RIGHTS, SUITS, DAMAGES, CAUSES OF ACTION, REMEDIES, AND LIABILITIES WHATSOEVER, INCLUDING DERIVATIVE CLAIMS ASSERTED OR ASSERTABLE ON BEHALF OF THE DEBTORS, THE ESTATES, THE PBGC, OR THE COMMITTEE AND ITS MEMBERS, AS APPLICABLE, WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, EXISTING OR HEREINAFTER ARISING, IN LAW, EQUITY, OR OTHERWISE THAT THE DEBTORS, ESTATES, COMMITTEE OR ANY OF ITS MEMBERS AND THE PBGC WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT IN ITS OWN RIGHT, OR ON BEHALF OF THE HOLDER OF ANY CLAIM OR EQUITY INTEREST OR OTHER ENTITY, BASED ON OR RELATING TO, OR IN ANY MANNER ARISING FROM, IN WHOLE OR IN PART, THE DEBTORS, THE CHAPTER 11 CASES, THE PURCHASE, SALE, TRANSFER, OR RESCISSION OF THE PURCHASE, SALE, OR TRANSFER OF ANY DEBT, SECURITY, ASSET, RIGHT, OR INTEREST OF THE DEBTORS, THE SUBJECT MATTER OF, OR THE TRANSACTIONS OR EVENTS GIVING RISE TO, ANY CLAIM OR EQUITY INTEREST THAT IS TREATED IN THE PLAN, THE BUSINESS OR CONTRACTUAL ARRANGEMENTS BETWEEN THE DEBTORS AND ANY RELEASED SETTLEMENT PARTY OR RELEASED PARTY, THE RESTRUCTURING OF CLAIMS AND EQUITY INTERESTS PRIOR TO OR IN THE CHAPTER 11 CASES, THE NEGOTIATION, FORMULATION, OR PREPARATION OF THE COMMITTEE RESOLUTION TERM SHEET, THE COMBINED DISCLOSURE STATEMENT AND PLAN AND ANY OTHER AGREEMENTS OR DOCUMENTS EFFECTUATING THE COMBINED DISCLOSURE STATEMENT AND PLAN, OR RELATED AGREEMENTS, INSTRUMENTS, OR OTHER DOCUMENTS, AND ANY OTHER ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCE TAKING PLACE ON OR BEFORE THE EFFECTIVE DATE RELATING TO THE DEBTORS OR THE ESTATES.**

**IN ADDITION, AND FOR THE AVOIDANCE OF DOUBT, THE PBGC'S RELEASE OF PRIVET SHALL INCLUDE ANY CLAIM THAT THE PBGC MAY HAVE BROUGHT AGAINST PRIVET WITH RESPECT TO THE HARDINGE, INC. PENSION**

**PLAN; PROVIDED, HOWEVER, THAT NOTHING IN THIS PLAN, THE CONFIRMATION ORDER, OR THE CHAPTER 11 CASES SHALL IN ANY WAY BE CONSTRUED TO DISCHARGE, RELEASE, LIMIT, OR RELIEVE ANY PARTY FOR AN ERISA FIDUCIARY BREACH RELATED TO THE HARDINGE INC. PENSION PLAN. PBGC AND THE HARDINGE INC. PENSION PLAN SHALL NOT BE ENJOINED OR PRECLUDED FROM ENFORCING SUCH LIABILITY OR RESPONSIBILITY BY ANY OF THE PROVISIONS OF THIS PLAN. PRIVET AND RELATED PARTIES RETAIN ALL DEFENSES TO SUCH A CLAIM.**

**ENTRY OF THE CONFIRMATION ORDER SHALL CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL, PURSUANT TO BANKRUPTCY RULE 9019, OF THE FOREGOING PRIVET SETTLEMENT RELEASES, WHICH INCLUDES BY REFERENCE EACH OF THE RELATED PROVISIONS AND DEFINITIONS CONTAINED HEREIN, AND FURTHER, SHALL CONSTITUTE THE BANKRUPTCY COURT'S FINDING THAT SUCH RELEASES ARE: (A) IN EXCHANGE FOR THE GOOD AND VALUABLE CONSIDERATION; (B) A GOOD FAITH SETTLEMENT AND COMPROMISE OF THE CLAIMS RELEASED; (C) IN THE BEST INTERESTS OF THE DEBTORS, THE ESTATES, AND ALL HOLDERS OF CLAIMS AND EQUITY INTERESTS; (D) FAIR, EQUITABLE, AND REASONABLE; (E) GIVEN AND MADE AFTER DUE NOTICE AND OPPORTUNITY FOR HEARING; AND (F) A BAR TO THE ASSERTION OF ANY CLAIM OR CAUSE OF ACTION SO RELEASED.**

**F. Releases by Holders of Claims and Equity Interests of Debtors.**

**EXCEPT AS OTHERWISE PROVIDED IN THIS COMBINED DISCLOSURE STATEMENT AND PLAN, ON THE EFFECTIVE DATE AND AS OF THE EFFECTIVE DATE, FOR GOOD AND VALUABLE CONSIDERATION, THE ADEQUACY OF WHICH IS HEREBY CONFIRMED, THE RELEASING PARTIES SHALL BE DEEMED TO FOREVER RELEASE, WAIVE, AND DISCHARGE EACH OF THE RELEASED PARTIES, FROM ANY AND ALL CLAIMS, OBLIGATIONS, SUITS, JUDGMENTS, DAMAGES, DEMANDS, DEBTS, RIGHTS, CAUSES OF ACTION, AND LIABILITIES WHATSOEVER IN CONNECTION WITH OR IN ANY WAY RELATING TO THE DEBTORS, THE CONDUCT OF THE DEBTORS' BUSINESSES, THE CHAPTER 11 CASES, THE COMMITTEE RESOLUTION TERM SHEET, THE COMBINED DISCLOSURE STATEMENT AND PLAN (OTHER THAN THE RIGHTS OF THE DEBTORS, OR A CREDITOR HOLDING AN ALLOWED CLAIM TO ENFORCE THE OBLIGATIONS UNDER THE CONFIRMATION ORDER AND COMBINED DISCLOSURE STATEMENT PLAN AND THE CONTRACTS, INSTRUMENTS, RELEASES, AND OTHER AGREEMENTS OR DOCUMENTS DELIVERED THEREUNDER), WHETHER LIQUIDATED OR UNLIQUIDATED, FIXED OR CONTINGENT, MATURED OR UNMATURED, KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, THEN EXISTING OR THEREAFTER ARISING, IN LAW, EQUITY, OR OTHERWISE, WHETHER FOR TORT, CONTRACT, VIOLATION OF FEDERAL OR STATE SECURITIES LAW OR OTHERWISE, THAT ARE BASED IN WHOLE OR PART ON ANY ACT, OMISSION, TRANSACTION, EVENT, OR OTHER OCCURRENCE TAKING PLACE ON OR PRIOR TO THE EFFECTIVE DATE; PROVIDED, HOWEVER, THAT NOTHING IN THIS ARTICLE X SHALL OPERATE**

**AS A RELEASE, WAIVER OR DISCHARGE OF ANY CAUSES OF ACTION OR LIABILITIES ARISING OUT OF GROSS NEGLIGENCE, WILLFUL MISCONDUCT, FRAUD OR CRIMINAL ACTS OF ANY SUCH RELEASED PARTY, OR RELEASED SETTLEMENT PARTY, AS APPLICABLE. FOR THE AVOIDANCE OF DOUBT, NOTHING IN THIS PLAN, THE CONFIRMATION ORDER, OR THE CHAPTER 11 CASES SHALL IN ANY WAY BE CONSTRUED TO DISCHARGE, RELEASE, LIMIT, OR RELIEVE ANY PARTY FOR AN ERISA FIDUCIARY BREACH RELATED TO THE HARDINGE INC. PENSION PLAN. PBGC AND THE HARDINGE INC. PENSION PLAN SHALL NOT BE ENJOINED OR PRECLUDED FROM ENFORCING SUCH LIABILITY OR RESPONSIBILITY BY ANY OF THE PROVISIONS OF THIS PLAN.**

## XI. RETENTION OF JURISDICTION

Following the Confirmation Date and the Effective Date, the Bankruptcy Court shall retain jurisdiction for the following purposes:

(1) to hear and determine any objections to Claims and to address any issues relating to Disputed Claims;

(2) to enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified, or vacated;

(3) to issue such orders in aid of execution and consummation of the Plan, to the extent authorized by Bankruptcy Code section 1142;

(4) to consider any amendments to or modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any order of the Bankruptcy Court, including, without limitation, the Confirmation Order;

(5) to hear and determine all requests for compensation and reimbursement of expenses to the extent allowed by the Bankruptcy Court under Bankruptcy Code sections 330 or 503;

(6) to hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan;

(7) to hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Sale Orders;

(8) to hear and determine matters concerning state, local, and federal taxes in accordance with Bankruptcy Code sections 346, 505, and 1146;

(9) to hear any other matter not inconsistent with the Bankruptcy Code;

(10) to enter the Final Decree;

(11) to ensure that Distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of the Plan;

(12) to decide or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters and grant or deny any applications involving the Debtors that may be pending on the Effective Date;

(13) to hear and determine any and all motions, adversary proceedings, applications, and contested or litigated matters arising out of, under, or related to, the Chapter 11 Cases, including the GUC Estate Causes of Action;

(14) to issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Person or Entity with the occurrence of the Effective Date or enforcement of the Plan and Confirmation Order, except as otherwise provided herein;

(15) to determine any other matters that may arise in connection with or related to the Plan, the Confirmation Order, or any contract, instrument, release, indenture, or other agreement or document created or implemented in connection with the Plan;

(16) to determine any other matters that may arise in connection with or related to the Sale Orders or any contract, instrument, release, indenture, or other agreement or document created or implemented in connection with the Sale Orders;

(17) to enforce, interpret, and determine any disputes arising in connection with any stipulations, orders, judgments, injunctions, exculpations, and rulings entered in connection with the Chapter 11 Cases (whether or not the Chapter 11 Cases have been closed);

(18) to resolve disputes concerning any reserves with respect to Disputed Claims or the administration thereof; and

(19) to resolve any disputes concerning whether a Person or Entity had sufficient notice of the Chapter 11 Cases, the Bar Date, or the Confirmation Hearing, or for any other purpose.

# XII. MISCELLANEOUS PROVISIONS

## A. Amendment or Modification of the Combined Disclosure Statement and Plan

Alterations, amendments, or modifications of the Combined Disclosure Statement and Plan may be proposed in writing by the Debtors, but only with the prior written consent of the Committee, at any time before the Confirmation Date; provided that the Combined Disclosure Statement and Plan, as altered, amended, or modified, satisfies the conditions of Bankruptcy Code sections 1122 and 1123 and the Debtors shall have complied with Bankruptcy Code sections 1125 and 1127. The Debtors, but only with the prior written consent of the Committee, may modify the Combined Disclosure Statement and Plan at any time after Confirmation and before substantial consummation, provided that this Combined Disclosure Statement and Plan, as modified, meets

Case 24-11605-JKS Doc 589 Filed 12/20/24 Page 74 of 97

the requirements of Bankruptcy Code sections 1122, 1123 and 1127 and the circumstances warrant such modifications. A Holder of a Claim that has accepted the Combined Disclosure Statement and Plan shall be deemed to have accepted such Combined Disclosure Statement and Plan as modified if the proposed alteration, amendment, or modification does not materially and adversely change the treatment of the Claim of such Holder.

**B. Exhibits/Schedules**

All exhibits and schedules to this Combined Disclosure Statement and Plan are incorporated into and are part of the Combined Disclosure Statement and Plan as if set forth in full herein.

**C. Plan Supplement**

The Debtors filed the Plan Supplement on December 2, 2024 [Docket No. 537]. The Plan Supplement contains, among other things: (a) the GUC Trust Agreement; and (b) identification of the GUC Trustee, among other information.

**D. Filing of Additional Documents**

On or before substantial consummation of the Plan, the GUC Trustee shall File with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

**E. Binding Effect of Plan**

The Plan shall be binding upon and inure to the benefit of the Debtors, the Holders of Claims, the Holders of Equity Interests, and their respective successors and assigns. Notwithstanding anything to the contrary herein, nothing in the Plan modifies, alters, or amends the respective rights and obligations of the Debtors or Purchasers under the Sale Orders, the APAs, or any other document governing the Sale Transactions.

**F. Governing Law**

Except as required by the Bankruptcy Code, the Bankruptcy Rules, or the Local Rules, the rights and obligations arising under the Plan shall be governed by and construed and enforced in accordance with the laws of the State of Delaware.

**G. Time**

To the extent that any time for the occurrence or happening of an event as set forth in this Combined Disclosure Statement and Plan falls on a day that is not a Business Day, the time for the next occurrence or happening of said event shall be extended to the next Business Day.

**H. Severability**

Should any provision of the Plan be deemed unenforceable after the Effective Date, such determination shall in no way limit or affect the enforceability and operative effect of any and all other provisions of the Plan.

**I. Revocation**

The Debtors reserve the right to revoke and withdraw the Combined Disclosure Statement and Plan prior to the entry of the Confirmation Order. If the Debtors revoke or withdraw the Combined Disclosure Statement and Plan, the Combined Disclosure Statement and Plan shall be deemed null and void, and nothing contained herein shall be deemed to constitute a waiver or release of any claims by or against the Debtors, any other Person or Entity, or to prejudice in any manner the rights of such parties in any further proceedings involving the Debtors.

**J. Dissolution of the Committee**

On the Effective Date, the Committee shall dissolve and the members thereof and the professional retained by the Committee shall be released and discharged from all continuing duties, responsibilities, and obligations in connection with the Chapter 11 Cases or the Plan and its implementation; provided, however, that after the Effective Date, the Committee shall continue to exist and have standing and a right to be heard for the following limited purposes: (a) applications, and any relief related thereto, for payment of Professional Fee Claims and requests for allowance of Administrative Expense Claims for substantial contribution pursuant to section 503(b)(3)(D) of the Bankruptcy Code, and (b) any appeals of the Confirmation Order or other appeal to which the Committee is a party.

**K. Inconsistency**

To the extent that the Disclosure Statement or any Plan Supplement document conflicts with or is inconsistent with the Plan, the terms of the Plan shall control. To the extent that the Plan conflicts with the Confirmation Order, the Confirmation Order shall control. For the avoidance of doubt, nothing in the Plan shall be deemed to supersede, amend, or modify the provisions of the Sale Orders, Bidding Procedures Order, and APAs.

**L. No Admissions**

Notwithstanding anything herein to the contrary, nothing contained in the Combined Disclosure Statement and Plan shall be deemed an admission by any Entity with respect to any matter set forth herein.

**M. Reservation of Rights**

Except as expressly set forth herein, the Combined Disclosure Statement and Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order. None of the filing of the Combined Disclosure Statement and Plan, any statement or provision contained herein, or the taking of any action by the Debtors with respect to the Combined Disclosure Statement and Plan shall be or shall be deemed to be an admission or waiver of any rights of the Debtors, Holders of Claims, or Holders of Equity Interests before the Effective Date.

## XIII. RECOMMENDATION

In the opinion of the Debtors, the Combined Disclosure Statement and Plan is superior and preferable to any alternative described in this Combined Disclosure Statement and Plan. Accordingly, the Debtors recommend that Holders of Claims entitled to vote on the Plan vote to accept the Plan and support Confirmation.

Dated: December 18, 2024
Wilmington, Delaware

*/s/ Adrian Frankum*
Adrian Frankum
Chief Restructuring Officer of the Debtors and Debtors in Possession

# EXHIBIT A

**Hardinge Inc., et al**
**Liquidation Analysis**

| *($ in thousands)* | Value | Recovery (%) Lower | Recovery (%) Higher | Recovery ($) Lower | Recovery ($) Higher |
|---|---|---|---|---|---|
| **Illustrative Liquidation Proceeds** | | | | | |
| Cash and Cash Equivalents | $ 53 | 75.0% | 125.0% | $ 40 | $ 66 |
| Restricted Cash and Equivalents | 131 | 0.0% | 0.0% | - | - |
| Elmira Owned Property | 1,000 | 0.0% | 100.0% | - | 1,000 |
| Illustrative Causes of Action | 7,500 | 0.0% | 100.0% | - | 7,500 |
| **Subtotal Proceeds from Assets and Litigation** | **$ 8,683** | **0.5%** | **98.6%** | **$ 40** | **$ 8,566** |
| *Less:* Chapter 7 Professional Fees | | | | $ (38) | $ (2,970) |
| *Less: Chapter 7* Trustee Fees | | | | (1) | (257) |
| **Net Proceeds from Asset Sales** | | | | **$ -** | **$ 5,339** |
| | | | | | |
| **Illustrative Claims Waterfall (Higher Claims)** | | | | | |
| **Secured Claims** | $0 | | | $0 | $0 |
| **Administrative Expense Claims** | $0 | | | $0 | $0 |
| **Net Proceeds Available for Distribution to Unsecured Creditors** | | | | **$ -** | **$ 5,339** |
| **General Unsecured Claims** | | | | | |
| PBGC | 35,000 | 0.0% | 5.5% | - | 1,923 |
| Secured Lender Deficiency Claims | 32,945 | 0.0% | 5.5% | - | 1,810 |
| Non-Debtor Intercompany Claims | 11,424 | 0.0% | 5.5% | - | 628 |
| Other General Unsecured Claims | 17,810 | 0.0% | 5.5% | - | 978 |
| **Total General Unsecured Claims (Higher Claims)** | **$ 97,179** | **0.0%** | **5.5%** | **$ -** | **$ 5,339** |
| | | | | | |
| **Illustrative Claims Waterfall (Lower Claims)** | | | | | |
| **Secured Claims** | $0 | | | $0 | $0 |
| **Administrative Expense Claims** | $0 | | | $0 | $0 |
| **Net Proceeds Available for Distribution to Unsecured Creditors** | | | | **$ -** | **$ 5,339** |
| **General Unsecured Claims** | | | | | |
| PBGC | 25,497 | 0.0% | 6.3% | - | 1,618 |
| Secured Lender Deficiency Claims | 32,945 | 0.0% | 6.3% | - | 2,091 |
| Non-Debtor Intercompany Claims | 11,424 | 0.0% | 6.3% | - | 725 |
| Other General Unsecured Claims | 14,248 | 0.0% | 6.3% | - | 904 |
| **Total General Unsecured Claims (Lower Claims)** | **$ 84,113** | **0.0%** | **6.3%** | **$ -** | **$ 5,339** |

Note: Asset values are estimates as of 12/31/24. As a result, recovery percentages reflect a range of possible returns

**LIQUIDATION ANALYSIS FOR HARDINGE, INC., et al.**

**I. Introduction**

The Debtors with the assistance of their restructuring, legal, and financial advisors, have prepared this hypothetical liquidation analysis (the "Liquidation Analysis") in connection with the Debtors' Combined Disclosure Statement and Plan filed in these Chapter 11 Cases.[1]

Under the "best interests" of creditors test set forth in section 1129(a)(7) of the Bankruptcy Code, the Bankruptcy Court may not confirm a chapter 11 plan unless the plan provides each Holder of an Allowed Impaired Claim against or and Allowed Interest in the Debtors either (i) has accepted the Plan or (ii) will receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the amount that such Person would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code. To demonstrate that the proposed Plan satisfies the "best interests" of creditors test under section 1129(a)(7) of the Bankruptcy Code, the Debtors, with the assistance of their advisors, have prepared the following Liquidation Analysis, which is based upon certain assumptions discussed in the Combined Disclosure Statement and Plan and in the accompanying notes to the Liquidation Analysis.

**Statement of Limitations**

The determination of the costs of, and proceeds from, the hypothetical liquidation of the Debtors' assets in a chapter 7 case is an uncertain process involving the extensive use of significant estimates and assumptions that, although considered reasonable by the Debtors based upon their business judgment and input from their advisors, are inherently subject to significant business, economic, and legal uncertainties and contingencies beyond the control of the Debtors, their management and their advisors. Inevitably, some assumptions in the Liquidation Analysis might not materialize in a chapter 7 liquidation, and unanticipated events and circumstances could materially affect the ultimate results in an actual chapter 7 liquidation. The Liquidation Analysis was prepared for the sole purpose of generating a reasonable, good faith estimate of the proceeds that would be generated if the Debtors' assets were liquidated in accordance with chapter 7 of the Bankruptcy Code. The Liquidation Analysis is not intended and should not be used for any other purpose. The underlying financial information in the Liquidation Analysis was not compiled or examined by independent accountants in accordance with standards promulgated by the American Institute of Certified Public Accountants.

NEITHER THE DEBTORS NOR THEIR ADVISORS MAKE ANY REPRESENTATION OR WARRANTY THAT THE ACTUAL RESULTS WOULD OR WOULD NOT APPROXIMATE THE ESTIMATES AND ASSUMPTIONS REPRESENTED IN THE LIQUIDATION ANALYSIS. ACTUAL RESULTS COULD VARY MATERIALLY.

[1] Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Combined Disclosure Statement and Plan, as applicable.

THE LIQUIDATION ANALYSIS IS A HYPOTHETICAL EXERCISE THAT HAS BEEN PREPARED FOR THE SOLE PURPOSE OF PRESENTING A REASONABLE, GOOD FAITH ESTIMATE OF THE PROCEEDS THAT WOULD BE REALIZED IF THE DEBTORS WERE LIQUIDATED IN ACCORDANCE WITH CHAPTER 7 OF THE BANKRUPTCY CODE AS OF DECEMBER 31, 2024. THE LIQUIDATION ANALYSIS IS NOT INTENDED AND SHOULD NOT BE USED FOR ANY OTHER PURPOSE. THE LIQUIDATION ANALYSIS DOES NOT PURPORT TO BE A VALUATION OF THE DEBTORS' ASSETS AS A GOING CONCERN, AND THERE MAY BE A SIGNIFICANT DIFFERENCE BETWEEN THE LIQUIDATION ANALYSIS AND THE VALUES THAT WOULD BE REALIZED OR CLAIMS GENERATED IN AN ACTUAL LIQUIDATION.

NOTHING CONTAINED IN THE LIQUIDATION ANALYSIS IS INTENDED TO BE, OR CONSTITUTES, A CONCESSION, ADMISSION, OR ALLOWANCE OF ANY CLAIM AGAINST THE DEBTORS. THE ACTUAL AMOUNT OR PRIORITY OF ALLOWED CLAIMS IN THE CHAPTER 11 CASES COULD MATERIALLY DIFFER FROM THE ESTIMATED AMOUNTS SET FORTH AND USED IN THE LIQUIDATION ANALYSIS. THE DEBTORS RESERVE ALL RIGHTS TO SUPPLEMENT, MODIFY, OR AMEND THE ANALYSIS SET FORTH HEREIN.

**Basis of Presentation**

The Liquidation Analysis is based on estimated asset and liability values as of December 31, 2024 (except as otherwise indicated). As noted above, the actual assets available to the Debtors' Estates and claims arising in the event of an actual liquidation might differ materially from the assets assumed to be available and the liabilities related thereto pursuant to the Liquidation Analysis.

The Debtors have neither fully evaluated all claims filed against the Debtors nor have any claims been finally allowed by the Bankruptcy Court. Accordingly, the amount of the final Allowed Claims against the Debtors' Estates may differ from the claim amounts used in the Liquidation Analysis.

In preparing the Liquidation Analysis, the Debtors estimated Allowed Claims based upon a review of books and records and a review of claims asserted against the Debtors to account for estimated liabilities. In addition, the Liquidation Analysis includes estimates for Claims not currently asserted in the chapter 11 cases, but which could be asserted and allowed in a chapter 7 liquidation, including chapter 7 administrative expense claims, wind-down costs, trustee fees, and tax liabilities. To date, the Bankruptcy Court has not estimated or otherwise fixed the total amount of Allowed Claims incorporated into this Liquidation Analysis. Therefore, the Debtors' estimate of Allowed Claims set forth in the Liquidation Analysis should not be relied on for any other purpose, including determining the value of any distribution to be made on account of Allowed Claims under the Plan.

**Conversion Date and Appointment of Chapter 7 Trustee**

The Liquidation Analysis has been prepared assuming that the Debtors' Chapter 11 Cases are converted to chapter 7 cases on or about December 31, 2024 (the "Chapter 7 Conversion Date"). Except as otherwise noted herein, the Liquidation Analysis is based upon the forecasted unaudited balance sheets of the Debtors as of December 31, 2024. It is assumed that, on the Chapter 7 Conversion Date, the Bankruptcy Court would appoint a chapter 7 trustee (the "Chapter 7 Trustee")

Case 24-11605-JKS Doc 589 Filed 12/20/24 Page 81 of 97

who would oversee the liquidation of the Debtors' Estates, during which time all of the Debtors' remaining assets would be monetized, and all of the Debtors' cash proceeds, net of any liquidation-related costs and other administrative expenses and priority claims, would be distributed to satisfy Allowed Claims and Interests in accordance with the priority scheme set forth in the Bankruptcy Code. Recoveries included in the Liquidation Analysis are shown nominal value and have not been discounted to reflect the present value of future recoveries.

There can be no assurance that the liquidation would be completed in a limited time frame, nor is there any assurance that the recoveries assigned to the assets would in fact be realized. Under section 704 of the Bankruptcy Code, the Chapter 7 Trustee must, among other duties, collect and convert the property of the Estate as expeditiously (generally at distressed prices) as is compatible with the best interests of parties in interest.

**Consolidation of Asset Proceeds for Distribution Purposes**

As a result of the sale of substantially all of the Debtors' assets in the Sale Transactions, the assets that would be available to the Chapter 7 Trustee are (i) any cash remaining from the $1.65 million funds provided to the Debtors by the Stalking Horse Purchaser as of the Chapter 7 Conversion Date, (ii) the potential sale proceeds, if any, from a sale of the Elmira Owned Property, and (iii) the potential proceeds from the prosecution of settlement of the Causes of Actions existing as of the Chapter 7 Conversion Date. The Liquidation Analysis assumes that any remaining cash was provided to all of the Debtors to wind down their operations and that the proceeds, if any, from the other assets will be available to all Holders of Allowed Claims who will receive a single pro rata distribution from the aggregate proceeds (i.e. a "pot plan") regardless of whether or not the Holder has Allowed Claims against more than one Debtor, even if multiple Debtors are jointly and severally liable for such an Allowed Claim. Therefore, the Liquidation Analysis also assumes no Distributions are made on account of Intercompany Claims owed by one Debtor against another Debtor and any Intercompany Claim owed by a Debtor to a non-Debtor subsidiary is treated as an unsecured claim.

## II. Additional Notes and Assumptions

The Liquidation Analysis should be read in conjunction with the following notes and assumptions:

1. *Significant dependence on unaudited financial statements and cashflow projections*. The Liquidation Analysis contains numerous estimates. Proceeds available for distribution are based upon the unaudited forecast financial statements and cash flow projections of the Debtors as of the Chapter 7 Conversion Date, unless otherwise noted.

2. *Chapter 7 liquidation costs and length of liquidation process*. The Debtors have assumed that liquidation would occur over approximately 4 months to a year, but given that the primary assets that would need to be liquidated are the Debtors' Causes of Action and the Elmira Owned Property, there can be no assurances that 4 months to a year will be an adequate period of time for the Chapter 7 Trustee to monetize the remaining assets, as well

as to arrange distributions and otherwise administer and close the Estates. In an actual chapter 7 liquidation, the wind-down process and time-period could vary significantly, thereby impacting recoveries. Accordingly, there can be no assurance that the values reflected in the Liquidation Analysis would be realized if the Debtors were, in fact, to undergo such a liquidation.

Pursuant to section 726 of the Bankruptcy Code, the allowed administrative expenses incurred by the Chapter 7 Trustee, including expenses associated with selling or otherwise monetizing the Debtors' assets, and legal and financial fees relating to professionals retained by the Trustee, would be entitled to payment in full prior to any distributions to Holders of Administrative Expense Claims and other Priority Claims. The estimates used in the Liquidation Analysis for the Trustee are pursuant to the fee guidelines in section 326(a) of the Bankruptcy Code. The estimate used in the Liquidation Analysis for these expenses includes an assumed 3% fee payable to the Chapter 7 Trustee based upon distributed proceeds.

3. *Distribution of net proceeds. Chapter 11 Administrative Expense Claim amounts and Priority Claim amounts,* professional fees, Chapter 7 Trustee fees, and such claims that may arise in a liquidation scenario are required to be paid in full from the liquidation proceeds before the balance of any proceeds will be made available to pay General Unsecured Claims. Under the absolute priority rule, no junior creditor would receive any distribution until all senior creditors are paid in full, and no equity holder would receive any distribution until all creditors are paid in full. The assumed distributions to creditors as reflected in the Liquidation Analysis are estimated in accordance with the absolute priority rule.

4. *Certain exclusions and assumptions.* This Liquidation Analysis does not include estimates for the tax consequences, both federal and state, that may be triggered upon the liquidation and sale of assets in the manner described above. Such tax consequences could be material.

**<u>Asset Recoveries:</u>**

1. **Cash & Cash Equivalents**

   Cash balance recoveries are based on projected cash as of the Chapter 7 Conversion Date per the Debtors' cash flow forecast, to which a range of +/-25% was applied to account for estimated potential differences in expenditures.

2. **Restricted Cash & Equivalents**

   Restricted cash consists of a cash collateralized letter of credit supporting an old, self insured workers compensation plan. Under the Stalking Horse APA with the Stalking Horse Purchaser, any funds remaining after the settlement of workers' compensation claims belong to the Stalking Horse Purchaser. As a result, recoveries are assumed to be zero.

3. **Elmira Owned Property**

   Elmira Owned Property is comprised of the approximately 58 acres of land owned by the Debtors' Estates in Elmira, New York. This property is an environmentally contaminated site that underwent remediation. While the Debtors are soliciting interest in the property, at this time its value is speculative as a result of the historical contamination and the Liquidation Analysis assumes a potential value between $0 to $1 million.

4. **Potential Causes of Actions**

   The Debtors' have investigated but not completed their evaluation of Causes of Action, as has the Committee. At this time, the value of any such Causes of Action is very speculative, and for purposes of the Liquidation Analysis, the Debtors have estimated potential recoveries between $0 - $7.5 million.

**<u>Chapter 7 Costs:</u>**

Chapter 7 costs relate to those that would be required to administer and monetize remaining assets of the Estate and include the following:

5. **Professional Fees**

   Professional fees include estimated costs for a financial advisor, an attorney and a claims agent retained by the Chapter 7 Trustee in connection with the wind-down of the Estates. Professional fees are estimated at approximately $0.1 to $3.0 million for the liquidation period. The high range assumes incremental, contingent-based professional fees that would be required to successfully pursue Causes of Action.

**6. Chapter 7 Trustee Fees**

Chapter 7 Trustee fees include fees paid to the Chapter 7 Trustee based on distributions made to creditors. The Chapter 7 Trustee fees are estimated at 3% of the proceeds distributed to creditors as a result of the monetization of the Debtors' assets and Causes of Action.

**Claims**:

**7. Secured Claims**

The Liquidation Analysis assumes that there are no remaining Secured Claims as they were discharged with the Stalking Horse Purchaser's successful credit bid for substantially all of the Debtors' assets.

8. **Administrative Expense Claims**

The Liquidation Analysis assumes that there are no Administrative Expense Claims against the Debtors' Estates, as all Administrative Expense Claims were either (i) assumed by the Stalking Horse Purchaser or (ii) expected to be paid prior the Chapter 7 Conversion Date.

**9. Unsecured Claims**

Unsecured claims consist of:

- **PBGC Claims**: The PBGC Claim is based on a 2023 actuarial report which valued the underfunded pension liability at approximately $25.5 million. The Liquidation Analysis assumes that the PBGC has a single claim of $25.5 million to $35 million.

- **Secured Lender Deficiency Claims**: The Deficiency Claim represents the portion of the Prepetition Lenders' Secured Claim that was in excess of the amount included in the Stalking Horse Purchaser's credit bid. Under the current construct of the Plan, pursuant to an agreement between the Stalking Horse Purchaser and the Committee, there will be no recovery for the Deficiency Claims; however, in a chapter 7 liquidation, this agreement would no longer be valid and the Deficiency Claim would be an Allowed unsecured claim entitled to receive a distribution.

- **Non-Debtor Intercompany Claims:** In March 2024, the Debtors provided credit support to Weisser in the form of a letter, through which the Debtors committed to provide financial support to Weisser in the amount of $14.2 million (€13 million) through March 20, 2025. As of the Chapter 7 Conversion Date, the outstanding obligation remaining under this commitment is approximately $10.5 million. Additionally, there is a non-Debtor intercompany claim of approximately $0.9 million owed by the Debtors to Weisser. The Liquidation Analysis assumes these obligations are treated as unsecured claims.

- **Other General Unsecured Claims**: As of the Chapter 7 Conversion Date, the Debtors estimate that Allowed General Unsecured Claims will be between $14.2 and $17.8 million.

Case 24-11605-JKS Doc 580 Filed 12/20/24 Page 86 of 97

## III. Conclusions

**THE DEBTORS HAVE DETERMINED THAT CONFIRMATION OF THE PLAN WILL PROVIDE CREDITORS WITH A RECOVERY THAT IS NOT LESS THAN WHAT THEY WOULD OTHERWISE RECEIVE IN CONNECTION WITH A LIQUIDATION OF THE DEBTORS UNDER CHAPTER 7 OF THE BANKRUPTCY CODE, AND AS SUCH BELIEVE THAT THE PLAN SATISFIES THE REQUIREMENT OF 1129(A)(7) OF THE BANKRUPTCY CODE.**

# EXHIBIT B

**Hardinge Inc.,** ***et al.***
**Case No. 24-11605 (JKS) (Bankr. D. Del.)**

**Committee Resolution Term Sheet**
**September 12, 2024**

This term sheet (the "Term Sheet") sets forth proposed terms for a consensual resolution of the rights and claims of the estates, as acquired by the Purchaser (as defined below) pursuant to the sale transaction and which otherwise serve as CLP's collateral, between CLP and the Committee (each as defined below) (together, the "Parties"). This Term Sheet resolves the Committee's objection to entry of an order approving the sale of substantially all of the Debtors' assets to CLP or its designee (the "Sale Order") and entry of a final order approving the DIP Motion at Docket No. 16 (the "Final DIP Order"). This Settlement Term Sheet shall be binding upon the Parties immediately upon entry of the earlier of the Sale Order or the Final DIP Order.

**Parties**

| | |
|---|---|
| **CLP/Purchaser** | Centre Lane Partners, Centre Lane Solutions Partners, LP, Centre Lane Partners V, LP, Workholding US Holdings, LLC, KB Machine US Holdings, LLC, Super Precision US Holdings, LLC, OTW US Holdings, LLC (together with Workholding US Holdings, LLC, KB Machine US Holdings, LLC, and Super Precision US Holdings, LLC, the "Purchaser"), and any other affiliated entities involved with the Transactions (as defined in the APA).[1] |
| **Committee** | The Official Committee of Unsecured Creditors as appointed by the United States Trustee [Docket. No. 117]. |

**Proposed Terms**

| | |
|---|---|
| **Purchaser Contributions and Commitments** | • Funding of $3,000,000, inclusive of amounts budgeted for the Committee's professional in the budget filed with the Interim DIP Order (the "CLP Funding Amount"), which is intended to cover (i) $1,350,000 of allowed, unpaid professional fees and expenses of the Committee incurred in the period prior to and following the closing of the sale of substantially all of the Debtors' assets to CLP or its designee (the "Sale"), and (ii) $1,650,000 of wind down expenses (the "Wind-Down Amount"), including $500,000 to be segregated by the Debtors, and, subject to further order of the Court, is to be utilized for |

[1] The term "APA" refers to the final form of Asset Purchase Agreement, as amended pursuant to the terms of this Term Sheet and filed as an exhibit to the Sale Order. Capitalized terms used in this Term Sheet but not otherwise defined have the meaning given to them in the APA.

| | |
|---|---|
| | the initial funding of the GUC Trust (as defined below) for the benefit of general unsecured creditors (the "Initial GUC Trust Funding Amount").<br>• Consistent with the foregoing, (a) CLP shall amend the Asset Purchase Agreement (the "APA") to increase the Wind Down Fund from $500,000 to $1,650,000, which shall be funding at the closing of the Sale; (b) the Approved Budget (as defined in the Interim DIP Order) shall be revised (the "Revised Approved Budget")[2] to increase the line item for the fees and expenses of the Committee's professionals from $320,000 to $1,350,000; and (c) upon the Court's entry of the Final DIP Order and the Sale Order, each of which shall be consistent with the terms of this Term Sheet), the Debtors (with DIP funding from CLP if needed) shall increase the amount of fees allocated to the Committee's professionals in the Professional Fee Escrow (as defined in the DIP Order) by $1,030,000.<br>• Commit to work in good faith with certain specified vendors (the "Specified Vendors") on the terms for a go-forward business relationship between with the Purchaser and the Specified Vendors. The Specified Vendors shall be determined by the Purchaser in consultation with the Committee.<br>• Purchaser to pay all Cure Costs for Assumed Contracts post-closing (without any cap).<br>• Payment of or assumption of administrative and priority claims as set forth in the APA, including, for example:<br>o Postpetition payables[3] (§ 3.1(a)(iv))<br>o Section 503(b)(9) liability (§ 3.1(a)(xviii))<br>o Payroll, PTO, and WARN Act Liability (Ex. C; § 3.1(a)(iv), (ix), (xi), (xiii))<br>o Houlihan Lokey fee (Ex. C)<br>o Certain taxes (§ 3.1(a)(xvi), (xvii))<br>o U.S. Trustee fees (Ex. C)<br>• The current Cash Shortfall Budget, Exhibit C to the APA, includes $5.6 million for certain of the above amounts, subject to modification in accordance with the APA. As part of the |

2 The Revised Proposed Budget is attached hereto as **Exhibit A**.

3 "***Postpetition Payables***" means trade obligations and accrued operating expenses of Sellers incurred in the Ordinary Couse of Business, including any obligations in respect of freight, supplier invoice claims received following the Petition Date, obligations in respect of any post-petition sales, obligations with respect to any changes to pre-petition sales orders made by Sellers with the prior written consent (email to suffice) of Purchaser, obligations in respect of any Contracts entered into following the Petition Date with the prior written consent (email to suffice) of Purchaser, obligations relating to any pull forward payments or deposits made with respect to any postpetition sales, and intercompany obligations owing by a Seller to an Acquired Entity (excluding the Weisser Entities), in each case, excluding the fees and expenses of Professional Persons (as defined in the DIP Order), as of the Closing Date, to the extent such obligations were incurred after the Petition Date and relate to the Business or the Purchased Assets.

| | |
|---|---|
| | Cash Shortfall, Purchaser will pay such liabilities in accordance with the Cash Shortfall Budget, as such may be modified in accordance with the APA or the Sale Order. |
| **Approved Budget; Professional Fees; Closing** | • The Revised Approved Budget shall provide for funding sufficient to operate the Debtors' business through the closing of the Sale, which amounts shall be funded through borrowings under the DIP Facility or through additional amounts provided by CLP (the "Bridge Funding"); *provided, however*, that such Bridge Funding shall not include amounts for additional Professional Fees and Expenses or other non-operating expenses commencing the week starting September 14, 2024, which Professional Fees and Expenses shall be paid in accordance with the Revised Approved Budget and first, from the Professional Fee Escrow, and then, from the Wind-Down Amount.<br>• The Closing will occur as soon as practical after the later of the following (the "Timing Conditions"): (i) entry of the Sale Order and (ii) CLP's receipt of necessary regulatory clearances.<br>• In no event may any portion of the Professional Fee Escrow, or the CLP Funding Amount be used to fund pre-closing operational expenses of the Debtors. |
| **Causes of Action** | • Purchaser to acquire all cause of actions and the proceeds thereof other than the following (the "Excluded Causes of Action"), which will remain with the Debtors' estates, and which shall include:<br>o Avoidance Actions, commercial torts, and similar causes of action against Hardinge Holdings, LLC and Privet Fund Management (collectively, "Privet") and its affiliates, other than causes of action against Privet or its affiliates (i) in their capacity as landlord under the Elmira Lease and (ii) in connection with the Promissory Note between Hardinge Property Company LLC and Hardinge Technology Systems, Inc.<br>o Causes of action against current and former officers and directors of the Debtors that are not Transferred Employees or independent contractors going forward with the Purchaser or otherwise carved-out by the Parties (collectively, the "Carved-Out Parties"). A list of the Carved-Out Parties (the "Carved-Out Parties List") is attached hereto as **Exhibit B**. The Purchaser may add or remove persons from the Carved-Out Parties List with the consent of the Committee.<br>o Purchaser will not assume or be deemed to assume any liabilities related to the Excluded Causes of Action. |

| | |
|---|---|
| | • Purchaser shall provide a list of all Transferred Employees and independent contractors that are going forward with the purchaser prior to Closing. |
| **D&O Insurance** | • The Debtors' directors' and officers' liability insurance policies in existence on the Petition Date (the "D&O Policies") that are not Purchased Assets shall remain with the estate. |
| **Plan of Liquidation** | • The Parties shall support confirmation of a chapter 11 plan of liquidation (the "Plan"), which shall be filed pursuant to Local Rule 3017-2, provided that the Plan incorporates the terms set forth in this Term Sheet, and which Plan shall include the following:<br>o Shall provide for the establishment of a liquidating trust for purposes of winding down the Debtors' estates and the prosecution of Excluded Causes of Action for the benefit of general unsecured creditors (the "GUC Trust"), which may initially be funded by the Initial GUC Trust Funding Amount, and the corpus of which shall include 100% of the proceeds of the Excluded Causes of Action (the "GUC Trust Assets").<br>o The GUC Trust shall be directed by a trustee selected by the Committee, in consultation with the Debtors and CLP.<br>o CLP agrees to forgo distributions under the Plan on account of any deficiency claims CLP may hold but does not waive any deficiency claims themselves.<br>o Will contain customary releases as to CLP. No releases shall be given to Privet, Hardinge Holdings, LLC, or current or former officers and directors of the Debtors who are not Transferred Employees or independent contractors going forward ("Non-Released Parties").<br>o Will provide that the Bankruptcy Court shall retain jurisdiction for usual and customary matters.<br>o Will provide for other standard and customary provisions for a plan of this kind on terms satisfactory to the Committee.<br>o The Plan shall incorporate the terms of this Term Sheet in full and the Committee shall have consent rights with respect to any and all provisions of the Plan that incorporate the terms of this Term Sheet or impact recoveries to general unsecured creditors. |
| **Conditions Precedent** | • Purchaser must be the Successful Bidder (as defined in the Bid Procedures Order).<br>• The Term Sheet shall be attached to the Sale Order and shall be a part of each of the Sale Order and the Final DIP Order.<br>• The Lenders and the Committee shall file the Term Sheet with the Court in advance of the hearing on September 13, 2024. |

| | |
|---|---|
| | • The Final DIP Order shall provide for a shortening of the Challenge Period to allow the Closing to occur after the later of the Timing Conditions. |
| **Commitments and Requirements** | • A revised APA, Sale Order, and Final DIP Order, each in a form acceptable to CLP and reasonably acceptable to the Committee and the Debtors.<br>• The Committee agrees to support approval and entry of (a) the DIP Motion, including the termination of the Challenge Period (as defined in the DIP Order) upon entry of the Sale Order, and (b) the Sale Order; *provided*, that the Debtors attach this Term Sheet to each of the DIP Order and the Sale Order as an exhibit, and *provided further*, that each of the DIP Order and Sale Order reference the terms of the Term Sheet therein, subject to approval as part of the Plan.<br>• The Committee agrees to support the Plan; *provided* that the Plan incorporates the terms of this Term Sheet.<br>• CLP shall vote in favor of the Plan; *provided,* that the Plan incorporates the terms of this Term Sheet; *provided, further*, that CLP shall vote against any chapter 11 plan that does not incorporate the terms of this Term Sheet unless otherwise released from this commitment by the Committee. |
| **Effect of Non-Consummation** | • In the event the Plan is not consummated, to the fullest extent possible under applicable law, the Parties agree that the economic terms of this Term Sheet shall survive, and the Committee and general unsecured creditors shall be entitled the benefits of, and retain all rights with respect to, the economic terms set forth herein. |
| **Materiality** | • Each term set forth in this Term Sheet is material in nature, and the failure of any individual provision shall be fatal. |
| **No Solicitation** | • Notwithstanding anything to the contrary herein, this Term Sheet is not, and shall not be deemed to be, (a) solicitation of consents to a chapter 11 plan, or (b) an offer for the issuance, purchase, sale, exchange, hypothecation, or other transfer of securities or a solicitation of an offer to purchase or otherwise acquire securities for purposes of the Securities Act or the Securities Exchange Act of 1934, as amended. The acceptance of the Plan will not be solicited until the Debtors have solicited votes following the filing of a disclosure statement, as approved on a conditional basis by the Court. |

# <u>Exhibit A</u>

## Revised Approved Budget

## <u>Exhibit B</u>

## Carved-Out Parties List

**<u>Directors & Officers – Full-time Employees</u>**

Greg Knight
Matt Weeks
Alex Casajuana
Jeremy Michael
Ryan Ervin
Viktor Gaspar

**<u>Directors & Officers - Contractors</u>**

Hoil Kim

**<u>Other Directors & Officers</u>**

None

# EXHIBIT C

# EXHIBIT C

## GUC ESTATE CAUSES OF ACTION

Unless any Cause of Action[1] against an Entity is expressly waived, relinquished, exculpated, released, compromised, or settled in the Combined Disclosure Statement and Plan or a Final Order, in accordance with section 1123(b) of the Bankruptcy Code, the Debtors shall convey to the GUC Trustee all rights to commence, prosecute or settle, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, which shall vest in the GUC Trustee pursuant to the terms of the Combined Disclosure Statement and Plan. The GUC Trustee may enforce all rights to commence, prosecute, or settle, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, and the GUC Trustee's rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date. The GUC Trustee may, in its reasonable business judgment, pursue such Causes of Action and may retain and compensate professionals in the analysis or pursuit of such Causes of Action to the extent the GUC Trustee deems appropriate, including on a contingency fee basis. No Entity may rely on the absence of a specific reference in the Combined Disclosure Statement and Plan or the Plan Supplement to any Cause of Action against them as any indication that the Debtors or the GUC Trustee will not pursue any and all available Causes of Action against them. The Debtors and the Trustee expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Combined Disclosure Statement and Plan or Confirmation Order. Unless any Cause of Action against an Entity is expressly waived, relinquished, exculpated, released, compromised, or settled in the Combined Disclosure Statement and Plan or a Final Order, the GUC Trustee expressly reserves all Causes of Action for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation. The GUC Trustee reserves and shall retain the foregoing Causes of Action notwithstanding the rejection of any Executory Contract or unexpired lease during the Chapter 11 Cases or pursuant to the Combined Disclosure Statement and Plan. The GUC Trustee shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action, or to decline to do any of the foregoing, or to take any action contemplated by the Combined Disclosure Statement and Plan, without the consent or approval of any third party or any further notice to, or action, order, or approval of, the Bankruptcy Court.

For the avoidance of doubt, the Retained Causes of Action shall not include any Causes of Action sold by the Debtors prior to the Effective Date, including all Causes of Action sold pursuant to the OTW APA and the Stalking Horse APA.

The Retained Causes of Action specifically include, but are not limited to, any claims of the Estates related to the specific litigation listed in the Debtors' Statement of Financial Affairs (as supplemented and amended) and Schedules (as supplemented and amended), including the

[1] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Combined Disclosure Statement and Plan.

following Retained Causes of Action and claims, all of which are retained by the Combined Disclosure Statement and Plan and the Confirmation Order:

1. All Preference Claims.

2. Avoidance Actions, commercial torts, and similar causes of action that are not released under the Plan.

3. Causes of action against current and former officers and directors of the Debtors that are not (a) Transferred Directors and Officers, (b) Released Directors and Officers, (c) Levenson, or (d) Rosenzweig.

4. All claims or Causes of Action which are or may be covered by insurance, including D&O Insurance Coverage other than such Causes of Action that are released by the Combined Disclosure Statement and Plan.